CASE NO. 25-11929

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

---

### ALEXANDER CARTWRIGHT, TOSHA DUPRAS,
### MICHAEL JOHNSON, AND NANCY MYERS,
**Defendants/Appellants,**

v.

### CHARLES NEGY,
**Plaintiff/Appellee.**

---

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### District Court Case No. 6:23-CV-00666-CEM-DCI

---

### APPELLANTS' INITIAL BRIEF

---

### GRAYROBINSON, P.A.

KRISTIE HATCHER-BOLIN, ESQ.
Florida Bar No.: 521388
One Lake Morton Drive
Lakeland, Florida 33801
(863) 284-2251 telephone
(863) 683-7462 facsimile

RICHARD L. BARRY, ESQ.
Florida Bar No. 360650
KATHERINE KATZ, ESQ.
Florida Bar No. 1022526
JULIE ZOLTY, ESQ.
Florida Bar No. 1036454
301 East Pine Street, Suite 1400
Orlando, Florida 32801
(407) 843-8880 telephone
(407) 244-5690 facsimile

*Attorneys for Appellants, Alexander Cartwright, Tosha Dupras, Michael Johnson, Nancy Myers*

i

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to 11th Cir. R. 26.1-1(a), Appellants certify the following is a complete list of the district court judges, attorneys, persons, associations of persons, firms, partnerships, corporations (including subsidiaries, conglomerates, affiliates, parent corporations, and any publicly held corporation owning 10% or more of the party's stock), and other identifiable legal entities related to a party that have an interest in this case.

1. Allen Harris Law—Attorneys for Plaintiff/Appellee;

2. Barry, Richard L.—Attorney for Defendants/Appellants;

3. Butler, S. Kent—Defendant;

4. Cartwright, Alexander—Defendant/Appellant;

5. Dupras, Tosha—Defendant/Appellant;

6. Engel, Joshua A.—Attorney for Plaintiff/Appellee;

7. Engel & Martin, LLC—Attorneys for Plaintiff/Appellee;

8. Goldstein Law Partners, LLC—Attorneys for Plaintiff/Appellee;

9. GrayRobinson, P.A.—Attorneys for Defendants/Appellants;

10. Harris, Samantha—Attorney for Plaintiff/Appellee;

11. Hatcher-Bolin, Kristie—Attorney for Defendants/Appellants;

12.    Irick, Daniel C. – United States Magistrate Judge, Middle District of Florida, Orlando Division;

13.    Johnson, Michael—Defendant/Appellant;

14.    Katz, Katherine W.—Attorney for Defendants/Appellants;

15.    Lauten, Jr., Frederick James—Mediator;

16.    Mendoza, Carlos E.—United States District Judge, Middle District of Florida, Orlando Division;

17.    Myers, Nancy—Defendant/Appellant;

18.    Negy, Charles—Plaintiff/Appellee;

19.    Osborne, David R.—Attorney for Plaintiff/Appellee;

20.    Spradley, Susan T.—Former Attorney for Defendants/Appellants;

21.    The University of Central Florida Board of Trustees—Defendant;

22.    Zimmerman, Jason—Former Attorney for Defendants/Appellants;

23.    Zolty, Julie M.—Attorney for Defendants/Appellants;

## STATEMENT REGARDING ORAL ARGUMENT

Appellants believe oral argument will aid the Court in addressing the issues raised in this Appeal, and therefore respectfully request the opportunity to appear before this Court.

# <u>TABLE OF CONTENTS</u>

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT ................................................................. ii

STATEMENT REGARDING ORAL ARGUMENT ........................................... iv

TABLE OF CONTENTS............................................................................v

TABLE OF CITATIONS ..................................................................... vii

STATEMENT OF JURISDICTION........................................................1

STATEMENT OF THE ISSUES..............................................................2

STATEMENT OF THE CASE.................................................................3

I.      The Course of Proceedings and Disposition in the District Court .................3

II.     Statement of The Facts .........................................................11

III.    Standard of Review............................................................17

SUMMARY OF THE ARGUMENT ....................................................17

ARGUMENT .......................................................................20

The District Court Erred in Denying Appellants' Motions for Summary Judgment Based on Qualified Immunity...................................................20

I.      The Qualified Immunity Standard.............................................20

II.     The District Court erred by defining clearly established law in a high level of generality as to all Appellants ........................................22

      A.     "Clearly Established Law".............................................22

      B.     The District Court failed to consider the law in the specific context of the case before it, as opposed to a broad general proposition.............24

III.    The District Court erred in denying Myers qualified immunity because recommending a range of discipline did not render her a decisionmaker subject to individual liability ..........................................................................33

        A.    The Cat's Paw Theory..........................................................................33

        B.    The District Court misapplied the Cat's Paw theory to impose liability on a recommender of a range of discipline ..........................................35

IV.    As to all Appellants, the District Court erred by assuming this was not a mixed motive case and by failing to determine whether the presence of unlawful motivations is a bar to qualified immunity .....................................45

V.    The District Court erred by not individually analyzing Dupras, Cartwright, Johnson, and Myers' claims of qualified immunity ......................................50

CONCLUSION ........................................................................................................54

CERTIFICATE OF COMPLIANCE ........................................................................55

CERTIFICATE OF SERVICE ................................................................................56

# <u>TABLE OF CITATIONS</u>

## <u>UNITED STATES SUPREME COURT</u>

*Anderson v. Creighton*,
483 U.S. 635 (1987)..................................................................23

*Ashcroft v. al-Kidd*,
563 U.S. 731 (2011)............................................................. 22-23

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)............................................................42, 50

*Davis as Next Friend of LaShonda D. v. Monroe Cnty. Bd. of Educ.*,
526 U.S. 629 (1999)..................................................................29

*Harlow v. Fitzgerald*,
457 U.S. 800 (1982)..................................................................20

*Hartman v. Moore*,
547 U.S. 250 (2006)..................................................................24

*Hope v. Pelzer*,
536 U.S. 730 (2002)..................................................................22

*Mitchell v. Forsyth*,
472 U.S. 511 (1985).....................................................................1

*Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*,
429 U.S. 274 (1977)...................................................30-31, 41, 45-46

*Mullenix v. Luna*,
577 U.S. 7 (2015)......................................................................22

*Pickering v. Board of Ed.*,
391 U.S. 563 (1968)..............................................................25, 30

*Plumhoff v. Rickard*,
572 U.S. 765 (2014)..................................................................21

*Reichle v. Howards*,
132 S. Ct. 2088 (2012) ......................................................................22

*Staub v. Proctor Hosp.*,
562 U.S. 411 (2011) ..........................................................................33

*Tolan v. Cotton*,
572 U.S. 650 (2014) ..........................................................................21

*White v. Pauly*,
580 U.S. 73 (2017) .................................................................. 20,  23-24

## <u>UNITED STATES CIRCUIT COURT OF APPEALS</u>

*Alcocer v. Mills*,
906 F.3d 944 (11th Cir. 2018) ....................................................50, 54

*Alexandre v. Ortiz*,
789 F. App'x 169 (11th Cir. 2019) .......................................................51

*Anderson v. Burke Cnty.*,
239 F.3d 1216 (11th Cir. 2001) ...........................................................24

*Bates v. Harvey*,
518 F.3d 1233 (11th Cir. 2008) ...........................................................20

*Berry v. Crestwood Healthcare LP*,
84 F.4th 1300 (11th Cir. 2023) ...........................................................41

*Bishop v. Aronov*,
926 F.2d 1066 (11th Cir. 1991) .............................................................8

*Crawford v. Carroll*,
529 F.3d 961 (11th Cir. 2008) ......................................................34, 35

*D.H. by Dawson v. Clayton Cnty. Sch. Dist.*,
830 F.3d 1306 (11th Cir. 2016) .....................................................22, 48

*Foy v. Holston*,
94 F.3d 1528 (11th Cir. 1996) ................................20-21, 32, 43, 45-48

*Gaines v. Wardynski*,
871 F.3d 1203 (11th Cir. 2017) ..........................................................24, 37

*Gilmore v. Georgia Dep't of Corr.*,
144 F.4th 1246 (11th Cir. 2025) ................................................................21

*Gilroy v. Baldwin*,
843 F. App'x 194 (11th Cir. 2021) ...................................................... 36-39

*Hall v. Flournoy*,
975 F.3d 1269 (11th Cir. 2020) ...........................................................1, 22

*Hoyt v. Cooks*,
672 F.3d 972 (11th Cir. 2021) ..................................................................17

*Huggins v. Sch. Dist. of Manatee Cnty.*,
No. 22-13325, 2025 WL 2374371 (11th Cir. Aug. 15, 2025) ..........................42, 50

*Jackson v. Humphrey*,
776 F.3d 1232 (11th Cir. 2015) ........................................................46, 48

*Kamensky v. Dean*,
148 F. App'x. 878 (11th Cir. 2005) .........................................................39

*King v. Pridmore*,
961 F.3d 1135 (11th Cir. 2020) ...............................................................23

*Labriola v. Miami-Dade Cnty.*,
142 F.4th 1305 (11th Cir. 2025) ..............................................................25

*Leslie v. Hancock Cnty. Bd. of Educ.*,
720 F.3d 1338 (11th Cir. 2013) ...............................................................31

*Llampallas v. Mini-Cirs., Lab, Inc.*,
163 F.3d 1236 (11th Cir. 1998) ..................................................... 34-35, 38

*Maggio v. Sipple,*
211 F.3d 1346 (11th Cir. 2000) ...............................................................24

*Marshall v. City of Cape Coral,*
 797 F.2d 1555 (11th Cir. 1986) ............................................................30

*Mathews v. Wetherbee,*
839 F. App'x 395 (11th Cir. 2020) ........................................................50

*Merricks v. Adkisson,*
785 F.3d 553 (11th Cir. 2015) ..............................................................24

*Moss v. City of Pembroke Pines,*
782 F.3d 613 (11th Cir. 2015) ..............................................................41

*Nelson v. Tompkins*,
89 F.4th 1289 (11th Cir. 2024) .............................................................43

*Owen v. I.C. Sys., Inc.*,
629 F.3d 1263 (11th Cir. 2011) ............................................................17

*Quinn v. Monroe County*,
330 F.3d 1320 (11th Cir. 2003) ............................................................33

*Sherrod v. Johnson,*
667 F.3d 1359 (11th Cir. 2012) ...........................................25, 46, 48, 52

*Stanley v. City of Dalton,*
219 F.3d 1280 (11th Cir. 2000) ............................................................43

*Stimpson v. City of Tuscaloosa,*
186 F.3d 1328 (11th Cir. 1999) ............................................................38

*Tillis on behalf of Wuenschel v. Brown,*
12 F.4th 1291 (11th Cir. 2021) .............................................................17

*Travers v. Jones,*
32 F.3d 1294 (11th Cir. 2003) ..............................................................24

*Wall-DeSousa v. Fla. Dep't of Highway Safety & Motor Vehicles,*
691 F. App'x 584 (11th Cir. 2017)........................................................23

*Williams v. Aguirre*,
965 F.3d 1147 (11th Cir. 2020) ...............................................................17

*Zatler v. Wainwright*,
802 F.2d 397 (11th Cir. 1986) ................................................................53

*Ziyadat v. Diamondrock Hosp. Co*.,
3 F.4th 1291 (11th Cir. 2021) ................................................................35

## UNITED STATES DISTRICT COURTS

*Maddox v. Girtz*,
No. 3:21-CV-124 (CAR), 2023 WL 2727540 (M.D. Ga. Mar. 30, 2023) .............40

*Montoya v. Morgan*,
2018 WL 4701795 (N.D. Fla. 2018).......................................... 36-37, 40

*Wall-DeSousa v. Johnson*,
Case No. 6:14-cv-1959-Orl-41DAB, 2016 WL 9444142 (M.D. Fla. Jan. 19, 2016)..
................................................................................................................23

*Wilcox v. Andalusia City Sch. Bd. of Educ.*,
660 F. Supp. 3d 1167 (M.D. Ala. 2023) ................................................43

## STATUTES AND REGULATIONS

28 C.F.R. § 42.104 ...............................................................................29
34 C.F.R. § 106.44.34 ..........................................................................29
28 U.S.C. § 1291 ....................................................................................1
28 U.S.C. § 1331 ....................................................................................1
42 U.S.C. § 1983 .............................................. 1-3, 5, 36-37, 40, 42, 50
§768.28, Fla. Stat. .................................................................................4

## STATEMENT OF JURISDICTION

The appeal before this Court is from a May 12, 2025 Order of the United States District Court, Middle District of Florida, Orlando Division, denying Appellants' summary judgment motions, which asserted that they are entitled to qualified immunity as to Appellee's claim arising under 42 U.S.C. § 1983 for retaliation in violation of his free speech rights under the First Amendment. (Doc. 100).[1] The District Court exercised jurisdiction over Appellee's claims under 28 U.S.C. § 1331 for claims arising under 42 U.S.C. § 1983.

This Court has jurisdiction to review the order, which is "an appealable interlocutory decision," because it denied Appellants summary judgment on the grounds of qualified immunity. *Mitchell v. Forsyth*, 472 U.S. 511, 527 (1985). A denial "of a claim of qualified immunity, to the extent that it turns on an issue of law, is an appealable 'final decision' within the meaning of 28 U.S.C. § 1291 notwithstanding the absence of a final judgment." *Id.* at 530; *see also Hall v. Flournoy*, 975 F.3d 1269, 1275, 1277 (11th Cir. 2020).

---

[1] Record citations are to the District Court's docket entry and page numbers indicated in the ECF Document stamp, not the transcript page.

## <u>STATEMENT OF THE ISSUES</u>

I.    Whether, as to all Appellants, the District Court erred in denying summary judgment on the First Amendment retaliation claim based on qualified immunity by applying a highly generalized statement of law.

II.    Whether the District Court erred in denying Nancy Myers summary judgment on the First Amendment retaliation claim based on qualified immunity because recommending a range of discipline does not render her a decisionmaker liable under 42 U.S.C. § 1983, and it is not the law in this Circuit that the Cat's Paw theory can be applied to impose liability on a recommender of discipline who lacks authority to effectuate disciplinary action.

III.    Whether, as to all Appellants, the District Court erred in assuming this is not a mixed motive case and failing to analyze whether the presence of unlawful motivations is a bar to immunity.

IV.    Whether the District Court erred by not individually analyzing whether Alexander Cartwright, Tosha Dupras, Michael Johnson, and Nancy Myers are entitled to qualified immunity based on their individual conduct.

## STATEMENT OF THE CASE

### I.    The Course of Proceedings and Disposition in the District Court

Appellee, Charles Negy, filed his original Complaint on April 12, 2023 in the District Court asserting multiple claims against the Board of Trustees ("BOT") of the University of Central Florida ("UCF") and S. Kent Butler, Alexander Cartwright, Tosha Dupras, Michael Johnson, and Nancy Myers (collectively, the "Individual Defendants"). The Individual Defendants are all current and former UCF administrators sued in their individual and official capacities. (Doc. 1). Negy's claims are based on the termination of his employment from UCF. *Id.*

Negy sued the BOT and the Individual Defendants under 42 U.S.C. § 1983 for retaliation based on the exercise of his free speech rights under the First Amendment (Count I). *Id.* at 25-29. He also sued the BOT and Myers under 42 U.S.C. § 1983 for violation of his First Amendment rights (Count II), and the BOT for negligence under Florida law (Count III). *Id.* at 29-34. Negy further asserted claims for intentional infliction of emotional distress under Florida law against the BOT, Myers, and Dupras (Count IV), and abuse of process under Florida law (Count V) against the BOT, Cartwright, Johnson, Dupras, and Myers. *Id.* at 34-40.

All Defendants moved to dismiss the Complaint (Doc. 19), which Negy met with an Amended Complaint. (Doc. 26). The Amended Complaint's allegations were largely the same as those in the Complaint, but Negy sued the Individual

Defendants only in their individual capacities and remedied the shotgun pleading issues in the original Complaint. *Compare* Doc. 1, *with* Doc. 26. The BOT again moved to dismiss, arguing it had sovereign immunity under the Eleventh Amendment and Section 768.28, *Florida Statutes*. (Doc. 32). Defendants also argued Negy could not state a claim for relief for the Florida law claims (Counts IV and V) and that the Individual Defendants had qualified immunity. *Id*. The District Court granted in part and denied in part the Motion to Dismiss. (Doc. 38). The District Court dismissed the BOT from the lawsuit and dismissed the state law tort claims (Counts III-V) but denied the Individual Defendants' Motion as to Counts I and II, which sought dismissal based on qualified immunity. *Id.* Following the order on the Motion, Negy's only remaining claims were for First Amendment retaliation against all Individual Defendants (Count I), and for violation of free speech rights against Myers (Count II).

The parties engaged in discovery and took the depositions of all five Individual Defendants (Butler, the former Interim Chief Diversity, Equity, and Inclusion Officer; Cartwright, the President; Dupras, the former Interim Dean of the College of Sciences; Johnson, the former Provost; and Myers, the former Director of the Office of Institutional Equity ("OIE")), along with Negy, and two other UCF administrators: Rhonda Bishop, the Vice President of Compliance, Ethics, and Risk, and Florian Jentsch, Chair of the Psychology Department. The

Individual Defendants then moved for summary judgment on Negy's two remaining claims. (Docs. 59, 60, 61). Butler and Myers each filed their own summary judgment motions given their distinct scopes of involvement—or lack thereof—with Negy's employment and termination. Cartwright, Dupras, and Johnson collectively filed one summary judgment motion, as the decisionmakers to Negy's termination. *Id.*

Butler argued he had no involvement in the investigation or termination of Negy, and that Negy's only allegations about Butler centered on Butler's own First Amendment-protected speech. (Doc. 59). Because Butler was not a decisionmaker in an adverse employment action against Negy, there was no basis for individual liability under Section 1983. *Id.*

Myers argued her involvement was limited to conducting an independent, internal investigation of students' claims of Negy's discriminatory and harassing classroom conduct. (Doc. 61). In the report memorializing OIE's investigation (the "OIE Report"), Myers generally recommended discipline "up to and including termination" based on numerous findings that Negy's discriminatory and harassing classroom conduct violated UCF policies. *Id.* at 6. Myers had no authority to terminate Negy and was not a decisionmaker in his termination. *Id.* at 8-13. Myers also argued she could not be individually liable under Section 1983 because she was not a decisionmaker in an adverse employment action. *Id.*

Myers argued she was entitled to qualified immunity because merely conducting an investigation, which was required under various federal civil rights statutes and UCF's Policies, did not violate Negy's constitutional rights, nor was there any clearly established law that would have provided Myers notice that her investigation violated Negy's constitutional rights. *Id.* at 13-24. As to Count II, Myers similarly argued she was entitled to qualified immunity because she was not on notice that her conduct in investigating Negy's classroom statements violated his constitutional rights, let alone clearly established law. *Id.* at 21. What was clearly established and undisputed, however, was that Myers had a competing federal statutory duty to investigate student complaints of discrimination and harassment and that Eleventh Circuit precedent supported the proposition that a university may investigate claims and even limit a professor's speech that may expose it to civil claims by students. *Id.* at 21-22.

Cartwright, Johnson, and Dupras argued in their joint motion that Negy could not establish retaliation, as a matter of law, because he could not show his protected speech was the substantial motivating factor behind his termination. (Doc. 60 at 7-13). Rather, the decisionmakers terminated Negy based on the OIE Report's findings that detailed a pattern of discrimination and harassment by Negy against students in his classroom, that was protected neither by Negy's free speech or academic freedom rights under the First Amendment. *Id*. The decisionmakers

asserted they were entitled to qualified immunity because there was no clearly established law placing them on notice that terminating Negy for his classroom conduct violated his First Amendment rights. *Id.* at 13-24.

In his Response, Negy argued Myers was a decisionmaker under the Cat's Paw theory of liability and that the entire investigation was pretextual based on Myers' alleged bias. (Doc. 88). Negy maintained his protected speech, not the hundreds of student complaints about his classroom conduct, was the motivating factor in his termination. *Id.* at 37-47. He asserted his First Amendment rights were clearly established, despite not citing a single case with closely related facts. *Id.* at 53-62.

In their omnibus Reply, the Individual Defendants noted Negy was not immune from discipline for discriminatory and harassing classroom conduct simply because he previously engaged in protected speech. (Doc. 93). Further, Negy did not overcome the legitimate, non-retaliatory reason for his termination supporting qualified immunity: the undisputed evidence in the OIE Report documenting classroom misconduct by Negy. *Id.*

The District Court entered its order, granting in part, and denying in part, Defendants' Motions for Summary Judgment. (Doc. 100). Because Butler was not a decisionmaker, the District Court granted him summary judgment. *Id.* at 6-7. The District Court also granted Myers summary judgment on Count II (free speech)

based on qualified immunity. *Id.* at 18-21. The District Court agreed that under the Eleventh Circuit precedent, *Bishop v. Aronov,* 926 F.2d 1066 (11th Cir. 1991), a university can reasonably restrict a professor's speech during class time, outweighing academic freedom and freedom of speech. *Id.* The District Court concluded Myers did not violate clearly established law because "a reasonable university official would not be on notice that her finding that a professor's in-class statements . . . amounted to harassment under university policy was a constitutional violation of a professor's academic freedom." *Id.* at 20-21.

However, the District Court denied summary judgment for Cartwright, Dupras, Johnson, and Myers on Negy's retaliation claim in Count I. *Id.* at 18. As for Myers, the District Court found that, as a recommender of discipline, Myers could be liable for Negy's termination under the Cat's Paw theory. *Id.* at 7-9. The District Court noted that while "it was Rhonda Bishop, Myers' supervisor, who made the recommendation Plaintiff be fired, she did so based on Myers' findings in the [OIE] Report." *Id.* at 8. The District Court found Negy introduced sufficient evidence to create an issue of fact "as to whether Myers' investigation and recommendation was biased," based solely on Negy's criticisms of the way Myers conducted the investigation: that Myers allegedly "cherry-picked" evidence used "to arrive at the biased outcome so many desired;" provided Negy "only the nature of the allegations not the details of each complaint;" that there was "evidence of

animus in Myers's finding he had a motive to lie to protect his reputation and tenured status," while not finding the same motive as to "the creators of the Google Form who actively sought that he be fired" (notwithstanding the District Court's finding that Negy was "certainly dishonest"); that only half the witness forms OIE collected were "reviewed and signed;" that Myers did not memorialize independent credibility assessments; and OIE's finding that Negy "failed to report a sexual assault allegation, despite UCF administration's apparent prior knowledge about the incident." *Id.* at 8-9.

The District Court found, as to all Appellants, that there was an issue of fact as to whether Negy's protected speech was a substantial motivating factor in the decision to terminate him. *Id.* at 14. As to Myers, specifically, the District Court found "there is an issue of fact as to whether Myers skewed the investigation against Plaintiff," and as to Cartwright, Dupras, and Johnson, it found there were factual issues concerning the use and timing of their "statements condemning Plaintiffs' tweets that included information about where to file reports against professors." *Id.* at 13, 14.

The District Court second-guessed OIE's investigation and substantiated findings of Negy's misconduct, many of which Negy did not contest and merely tried to explain. (Doc. 70 at 287-88, 291-92, 297-99, 301-04, 305-06, 448-50, 451-55). It similarly ignored the legitimate non-retaliatory reason for termination

proffered by Cartwright, Dupras, and Johnson—i.e., Negy's "in-classroom behavior"—which "Plaintiff admitted was the content of the investigation." The District Court also found the timing of Negy's discipline, which it criticized as a "slow and deliberate process," created an issue of fact. *Id.* at 14.

Next, the District Court analyzed whether Negy's constitutional right was clearly established. *Id.* at 16-18. In doing so, the District Court found that while there was no reported case directly on point, it was well-settled that the First Amendment prohibits government officials from subjecting an individual to retaliatory actions for engaging in protected speech. *Id.* at 17. The District Court found "this is not a situation where an officer made a split-second decision in the heat of the moment or where an unsophisticated party is acting," that Appellants "had ample time to make reasoned, thoughtful decisions regarding how *they* wished to proceed with the investigation," and "had the benefit of making those decisions with counsel," notwithstanding the absence of record support that any Appellant other than Myers was involved in the investigation, or that they vetted their decisions through counsel. *Id.* at 17 (emphasis added).

The District Court further found Negy "created an issue of fact as to whether *Defendants' investigation* was rigged from the start," that a jury could find "*Defendants' motives* were entirely unlawful," and concluded, without explanation, that this was not a mixed motive case. *Id.* at 17-18 (emphasis added). The District

Court determined "this could be one of those 'rarest of cases [where] reasonable government officials truly know that the termination . . . of a public employee violated 'clearly established' federal rights.'" *Id.* at 18. Therefore, the District Court denied summary judgment as to Cartwright, Dupras, Johnson, and Myers as to Count I, thereby denying them qualified immunity. *Id.* This appeal timely followed. (Doc. 110).

## II.    <u>Statement of the Facts</u>

Negy's claims are based on posts he made on Twitter shortly after the death of George Floyd in May 2020. (Doc. 26 ¶ 22). Between May 29, 2020 and June 3, 2020, Negy posted on his personal Twitter account his view that African Americans are not systematically oppressed in the United States. *Id.* Many UCF students, faculty, staff, and members of the public took offense at these tweets, and UCF Administrators, including Cartwright, Dupras, and Johnson, were barraged with hundreds of complaints about Negy's tweets and classroom conduct, many demanding his termination. (Doc. 26 at ¶ 23; Doc. 72 at 36:14-17, 135:5-136:1).

Myers was the Director of UCF's OIE. (Doc. 70 at 22:10-23:6). As the OIE Director, Myers oversaw UCF's compliance with various federal civil rights laws that apply to institutions of higher education, including but not limited to, Title IX of the Education Amendments of 1972, Title VI and Title VII of the Civil Rights Act of 1964, and Section 503 and 504 of the Rehabilitation Act of 1973. *Id.* at

24:13-25:20. To ensure compliance with these federal laws, OIE reviews and objectively investigates complaints of unlawful discrimination and harassment to determine if an employee's conduct violates UCF's non-discrimination policies. When an investigation reveals discriminatory or harassing conduct, OIE makes a recommendation to mitigate the effects of the conduct. *Id.*

Rhonda Bishop, UCF's Vice President for Compliance & Risk and Myers' supervisor, called Myers early on the morning of June 4, 2020, to inform her UCF had received complaints about Negy's tweets and his classroom conduct. *Id.* at 40:16-43:9, 267, 467-68. The complaints were forwarded to Myers, who printed them and "created two piles," separating complaints about Negy's tweets from those about his classroom conduct to assess which were "within [OIE's] jurisdiction." *Id.* As later explained in the OIE Report, Myers determined Negy's tweets were protected by the First Amendment and "could not be the basis for a finding of misconduct or disciplinary action." (Doc. 70 at 267-68, 439-40). OIE opened an inquiry into Negy's classroom conduct and began interviewing witnesses. *Id.* at 43:7-14.

Also on June 4, 2020, Cartwright, Johnson, and Butler issued a statement titled "Addressing Intolerance in our Community." (Doc. 68 at 257-58). The statement characterized Negy's tweets as "counter to [UCF's] core values of diversity and inclusion," but stated UCF "upholds…academic freedom" and

"[e]veryone has the right to their personal beliefs." (Doc. 68 at 72:24-73:25, 257-58). The same day, Dupras emailed all College of Sciences students, faculty, and alumni, stating Negy's tweets were not representative of UCF's values, and that UCF leadership was aware of the tweets and working to "address" the situation. (Doc. 66 at 25:11-26:3, 193-94). And, later that day, UCF hosted a virtual "Town Hall," via Zoom, which Cartwright and Johnson attended. (Doc. 64 at 83:18-84:11; Doc. 68 at 51:7-15). While the Town Hall was planned to address the pandemic, Cartwright and Johnson fielded student questions about Negy's classroom conduct and explained that he was entitled to due process. (Doc. 64 at 84:21-86:18).

Throughout June and July 2020, UCF continued to receive hundreds of complaints about Negy's classroom conduct, including over 100 complaints to UCF's Integrity Line. (Doc. 70 at 49:17-22; 52:5-9; 82:23-83:5). OIE's inquiry was conducted to review allegations of discrimination and harassment under federal civil rights statutes. *Id.* at 188:4-7. The inquiry transitioned to a formal investigation on July 17, 2020, when OIE sent Negy a Notice of Investigation. *Id.* at 1487-90. The Notice described the UCF policies Negy was accused of violating; the nature of the allegations against him; that multiple students made these allegations; and the investigative procedures, interview information, and resources available to Negy. *Id.* Negy was provided limited background information before his interviews, consistent with OIE practices. *Id.* at 177:5-178:24.

13

On August 7, 2020 and August 14, 2020, Myers interviewed Negy via Zoom, with his counsel present, reviewing all allegations about his classroom conduct and other conduct violating UCF policies. *Id.* at 179:16-19, 180:6-13, 180:24-181:7, 815:10-17). During the next few months, six OIE investigators, two OIE administrative assistants, and Myers interviewed hundreds of witnesses, conducted "climate checks" on students in Negy's classes, and reviewed IntegrityLine Reports, documents from witnesses, Negy's course recordings and materials, and student evaluations. *Id.* at 28:10-20, 49:1-22, 50:2-51:12, 52:5-21, 92:21-93:23, 467-91, 499-509. Negy was not placed on leave during the investigation, nor was his class schedule or salary affected during the investigation. (Doc. 72 at 85:3-25).

On January 4, 2021, Myers met with Bishop, Johnson, Dupras, and UCF's Associate Provost for Contract Compliance & Administrator Support, Charles Reilly, to discuss the draft OIE Report. (Doc. 70:35:3-14; Doc. 62 at 99:9-101:12, 102:10-20). In the OIE Report, Myers found "sufficient evidence to support finding that [Negy] created a hostile learning environment for students" based on comments he made in his classes, and "deterr[ed] students from filing complaints related to his classroom conduct" in violation of various UCF Policies and Code of Conduct. (Doc. 70 at 268-270, 464-465). "Based on the totality of the record and findings," Myers recommended that administration "consider effective disciplinary

14

action, up to and including termination." *Id.* at 270. The OIE Report substantiated numerous claims that Negy made discriminatory or harassing statements in the classroom, including, but not limited to:

- *"At [the] university, we happen to have [a] system called the tenure system, so that once you have tenure, like I have at the university, unless I rape you—which I won't, I promise—the university can't fire me. They just can't fire me";*
- *Telling students he visits nudist beaches in Florida and that he identifies as a nudist, stating "you can't imagine how liberating it is", that he goes "every chance I get" and commenting to a student during the conversation "I didn't mean to get you so excited";*
- *Joking that women are "kind of like a Ford pickup truck, built to take a pounding";*
- *"I love it when I see mostly guys at the gym working out and looking at themselves in the mirror as they are working out. I am tempted to tell them to masturbate in the bathroom with the mirrors";*
- *Asking a student, "Have you even had an erection before? I'm sorry, be that way";*
- *Telling students there is no evidence of a God, all religions are mythologies, believing in religion is as delusional as believing in things for which there is no evidence, religion is a cultural delusion, and "believing in religion is like believing in a flying elephant";*
- *"The crackpots who run the cult called Islam will kill you";*
- *Telling a student that his God was just "a figment of your imagination"; and*
- *Comparing religion to child abuse and using an exam question that asked: According to any reasonable and rational person, telling children* that someone *is watching them 24/7 and knows every "move they make" and every thought they have, represents essentially: A. a good moral upbringing, B. child abuse, C. parental love, or D. parental protection. Students needed to select option "B. child abuse" to receive credit for answering this question correctly.*

- *Calling Islam "a toxic cult;"*
- *Calling Muhammed a "scam artist," a "sociopath," and a "crackpot," and Jesus a "schizophrenic";*
- *Stating that "the whole modern world has been created by Whites" and that "if you compare what Whites have contributed to the world compared to all the non-Whites, it's embarrassing, it's embarrassing the discrepancy."*

(Doc. 70 at 287-88, 292-92, 295, 298-301, 365-66, 369-70, 373-80, 386-91, 424-27).

Based on the totality of the findings in the OIE Report, Bishop recommended Negy's termination. (Doc. 70 at 35:12-14; Doc. 62 at 102:10-103:3). Dupras and Johnson, the decisionmakers in the meeting, agreed with the recommendation after they read and assessed the OIE Report. (Doc. 70 at 35:12-36:3) (Myers testifying she was not involved in further discussion of discipline as her role in sharing her findings was completed); Doc. 62 at 102:10-103:6; Doc. 66 at 92:1-10, 100:4-20, 101:8-102:11, 110:5-7; Doc. 68 at 140:2-21, 163:6-164:13). Johnson subsequently informed Cartwright of the termination decision; Cartwright did not object to the decision. (Doc. 64 at 37:25-40:1).

On January 13, 2021, Myers signed and published the OIE Report. (Doc. 70 at 266). The same day, Dupras issued Negy a Notice of Intent to Terminate his employment. (Doc. 66 at 234-37). On January 29, 2021, Dupras provided Negy his Notice of Termination. (Doc. 77 at 14-15). In May 2022, an arbitrator reinstated Negy "with all compensation and benefits fully restored . . . as of the termination

date," based on a finding that UCF should have granted him six-months' notice of termination under the Collective Bargaining Agreement. (Doc. 26 at ¶¶ 96-97).

### III.    Standard of Review

This Court reviews a district court's order on summary judgment and the denial of qualified immunity *de novo*, reviewing all evidence in the light most favorable to the non-moving party. *Owen v. I.C. Sys., Inc.*, 629 F.3d 1263, 1270 (11th Cir. 2011); *Tillis on behalf of Wuenschel v. Brown*, 12 F.4th 1291, 1296 (11th Cir. 2021) (citing *Hoyt v. Cooks*, 672 F.3d 972, 977 (11th Cir. 2012)); *Williams v. Aguirre*, 965 F.3d 1147, 1156 (11th Cir. 2020).

## SUMMARY OF THE ARGUMENT

This Court should reverse the District Court's order denying Cartwright, Dupras, Johnson, and Myers summary judgment as to Count I of the Amended Complaint based on qualified immunity. To deny Appellants qualified immunity, the District Court had to find that no reasonable university official would have taken the actions Appellants took—meaning that no reasonable university official would have investigated claims of discrimination in the classroom (Myers), or terminated Negy based on investigative findings that Negy engaged in such discriminatory conduct (Cartwright, Dupras, Johnson), simply because Negy engaged in protected speech around the same time the complaints were made. None of the Appellants' conduct violated clearly established law.

As to all Appellants, the District Court erred in defining clearly established law at a high level of generality, finding it was clearly established that Appellants could not retaliate against a public employee for his public comments. With respect to Myers, it was not clearly established that she had to forgo investigating claims of discrimination and harassment against Negy just because he also engaged in protected speech around the same time those complaints were made. This is especially true considering the absence of authority placing Myers on notice that her actions violated Negy's clearly established rights. Nor was it clearly established that the Appellant decisionmakers (Cartwright, Dupras, and Johnson) could not terminate Negy based on the substantiated findings in the OIE Report that Negy engaged in discriminatory classroom conduct separate from his protected speech on Twitter.

The District Court also erred in denying Myers qualified immunity because it is not clearly established that a recommender of a range of possible discipline, as opposed to an actual decisionmaker with authority to effectuate termination, can be individually liable under Section 1983, or under a Cat's Paw theory of liability. The District Court wrongly applied the Cat's Paw theory in this case to impose liability on Myers, who *at best* was a recommender, as opposed to an actual decisionmaker.

The District Court further erred in assuming this was not a mixed motive case. It did correctly state that "if this was a mixed motives case, Defendants would be entitled to qualified immunity" but incorrectly assumed this was not a mixed motive case. (Doc. 100 at 18). Negy admitted that UCF, through Myers, had a duty to investigate claims of discrimination and harassment under federal law and did not present any evidence to refute the substantiated findings of discrimination and harassment in the OIE Report. The District Court stated, "a jury could find Defendants' motives were entirely unlawful," but failed to determine whether the presence of unlawful motivations is a bar to immunity. Existing law does not clearly prohibit officials from acting on substantiated misconduct complaints, even if partly motivated by bias. Myers' actions in investigating, and the other Appellants' actions in disciplining Negy, were objectively reasonable and did not violate clearly established law, entitling them to qualified immunity.

Finally, the District Court failed to individually analyze each Appellants' entitlement to qualified immunity, instead lumping Appellants' and UCF's (the nonparty employer) actions together and imputing the conduct of one onto others to deny qualified immunity to all. Doing so when the record is clear as to each individual defendant's actions constitutes reversible error. For these reasons, Appellants respectfully request that this Court reverse the order denying them summary judgment based on qualified immunity, and remand with instructions to

enter final summary judgment for Cartwright, Dupras, Johnson, and Myers as to Count I of the Amended Complaint.

## ARGUMENT

## THE DISTRICT COURT ERRED IN DENYING APPELLANTS' MOTIONS FOR SUMMARY JUDGEMENT BASED ON QUALIFIED IMMUNITY

### I.    The Qualified Immunity Standard

Qualified immunity protects government officials performing discretionary functions from civil trials and liability if their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 817–19 (1982). "In other words, immunity protects all but the plainly incompetent or those who knowingly violate the law." *White v. Pauly*, 580 U.S. 73, 79 (2017). Qualified immunity is a shield for a public servant against social costs, such as the "expenses of litigation, the diversion of official energy from pressing public issues, and the deterrence of able citizens from the acceptance of public office." *Foy v. Holston*, 94 F.3d 1528, 1532 (11th Cir. 1996). "Qualified immunity is too important a right of public servants and too important a public policy to be nullified so easily." *Id.* at 1533.

A defendant's entitlement to qualified immunity is generally a question of law for the court. *Bates v. Harvey*, 518 F.3d 1233, 1239 (11th Cir. 2008). Resolving a claim of qualified immunity requires a two-prong inquiry: (1) whether the facts, viewed in the light most favorable to the plaintiff, show the official's

20

conduct violated a federal right; and (2) whether that right was "clearly established" at the time of the violation. *Tolan v. Cotton*, 572 U.S. 650, 655-56 (2014). A plaintiff cannot easily discharge his burden to show that the federal rights allegedly violated were clearly established. *Foy*, 94 F.3d at 1532.

"[A] defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Plumhoff v. Rickard*, 572 U.S. 765, 778–79 (2014) (citations omitted) "In other words, 'existing precedent must have placed the statutory or constitutional question' confronted by the official 'beyond debate.'" *Id.* at 779.

For purposes of qualified immunity, a right is "clearly established" if "(1) case law with indistinguishable facts clearly establish[es] the constitutional right; (2) a broad statement of principle within the Constitution, statute, or case law that clearly establishes a constitutional right; or (3) [the defendant's] conduct [is] so egregious that a constitutional right was clearly violated, even in the total absence of case law." *Gilmore v. Georgia Dep't of Corr.*, 144 F.4th 1246, 1258 (11th Cir. 2025)(en banc). "Under the second method, the salient question is whether 'every objectively reasonable government official facing the circumstances would know that the official's conduct did violate federal law when the official acted.'" *D.H. by*

*Dawson v. Clayton Cnty. Sch. Dist.*, 830 F.3d 1306, 1318 (11th Cir. 2016) (citations omitted).

Whether an alleged violation contravened clearly established law "of which a reasonable person would have known" is "purely a question of law as it requires analysis of an issue wholly distinct from the merits of the case: even if the events transpired in the way the plaintiff asserts, did the alleged misconduct amount to a violation of clearly established law?" *Hall v. Flournoy*, 975 F.3d 1269, 1275, 1277 (11th Cir. 2020).

## II.    The District Court erred by defining clearly established law at a high level of generality as to all Appellants.

### A.    "Clearly Established Law"

The District Court erred in "defin[ing] clearly established law at a high level of generality." *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011). To determine whether the law was clearly established, the court must decide "whether the state of the law" at the time of an incident provided "fair warning" to the defendants "that their alleged [conduct] was unconstitutional." *Hope v. Pelzer*, 536 U.S. 730, 739, 741 (2002). "A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (quoting *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012)).

In qualified immunity cases, the Supreme Court has "repeatedly told courts . . . not to define clearly established law at a high level of generality. The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established." *Ashcroft*, 563 U.S. at 742; *White*, 580 U.S. at 79; *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).  To be clearly established, "pre-existing law must dictate, that is truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what the defendant is doing violates federal law in the circumstances." *King v. Pridmore*, 961 F.3d 1135, 1145 (11th Cir. 2020).

The general proposition that investigating or terminating a public employee for his public comments is of little help in determining whether the government official's conduct violated clearly established law. Yet, that is what the District Court did here. (Doc. 100 at 16-18).  Without "particulariz[ing] the constitutional right at issue," the plaintiff cannot "show how reasonable officials in Defendants' circumstances would have understood their conduct to violate Plaintiffs' First Amendment rights." *Wall-DeSousa v. Johnson*, Case No. 6:14-cv-1959-Orl-41DAB, 2016 WL 9444142, at *3 (M.D. Fla. Jan. 19, 2016), *aff'd sub nom. Wall-DeSousa v. Fla. Dep't of Highway Safety & Motor Vehicles*, 691 F. App'x 584 (11th Cir. 2017) ("It follows that the right 'alleged to have [been] violated must

have been 'clearly established' in a more particularized, and hence more relevant, sense.'"). The district court "must consider the law 'in light of the specific context of the case, not as a broad general proposition.'" *Id.* (citing *Merricks v. Adkisson*, 785 F.3d 553, 559 (11th Cir. 2015)).

While "[t]he law is clearly established that an employer may not demote or discharge a public employee for engaging in protected speech," *Travers v. Jones,* 323 F.3d 1294, 1295 (11th Cir. 2003), these "general statements of the law are not inherently capable of giving fair and clear warning." *White,* 580 U.S. at 79. Courts have recognized that First Amendment rights are rarely clearly established. *Anderson v. Burke Cnty.,* 239 F.3d 1216, 1222 (11th Cir. 2001). "It is particularly difficult to overcome the qualified immunity defense in the First Amendment context," *Gaines v. Wardynski*, 871 F.3d 1203, 1210 (11th Cir. 2017), because a defendant "will only rarely be on notice that his actions are unlawful." *Maggio v. Sipple,* 211 F.3d 1346, 1354 (11th Cir. 2000).

**B.    The District Court failed to consider the law in the specific context of the case before it, as opposed to a broad general proposition.**

The District Court cited *Hartman v. Moore,* 547 U.S. 250, 256 (2006), for the highly generalized principle that "the law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions . . . for speaking out," (Doc. 100 at 17), and made no attempt to

particularize the constitutional right at issue. Indeed, even the District Court's highly generalized statement is not necessarily clearly established, as a public employee may be terminated for their speech addressing a matter of public concern under *Pickering v. Board of Ed.,* 391 U.S. 563 (1968) if the circumstances so warrant. *Labriola v. Miami-Dade Cnty.*, 142 F.4th 1305, 1311 (11th Cir. 2025) (affirming summary judgment in favor of county on employee's claim that he was terminated for a blog post where county's interests in effective and efficient fulfillment of its responsibilities outweighed employee's free speech interests).

Here, Appellants all testified that Negy was investigated and subsequently terminated based on complaints of classroom misconduct separate from his speech on Twitter. Accordingly, "[a] proper analysis of [the defendants'] entitlement to qualified immunity is not whether they knew that terminating" or investigating the plaintiff "in retaliation for protected speech was lawful, but rather whether terminating him based upon all the information available to them at the time, to include any knowledge of his protected speech, was objectively reasonable." *Sherrod v. Johnson*, 667 F.3d 1359, 1364 (11th Cir. 2012) (per curiam).

In *Sherrod*, a public high school history teacher claimed that following his public criticism of the school board and district employees, he was subjected to transfers, suspensions, and subsequent termination in retaliation for exercising his First Amendment rights. *Id.* at 1361. But because "the facts in the record showed

25

lawful justifications" for termination—unsatisfactory performance reviews, complaints from parents about excessive work and deviations from the curriculum—this Court determined the individual defendants were entitled to qualified immunity. *Id.* at 1364 ("Plaintiff failed to present any precedent, and the Court is aware of none, to suggest that a reasonable principal and superintendent armed with the knowledge they possessed, to include the unsatisfactory performance reviews," would know that taking adverse employment actions against the plaintiff would violate his constitutional rights).

Analyzing all the information available to Appellants when the decisions to investigate and to terminate Negy were made, those decisions were objectively reasonable. As to Myers, she investigated complaints about Negy regarding his classroom conduct, setting aside complaints about his Twitter posts and finding in the OIE Report that this speech was protected.  Myers' seven-month investigation included interviews of hundreds of witnesses, and substantiated countless allegations that Negy made discriminatory and harassing statements in the classroom—many of which Negy admitted—that were not only in violation of federal civil rights laws and UCF Policies but were also not protected by academic freedom or the First Amendment. Based on all the information available to Myers, Negy failed to establish that a reasonable investigator in her position, armed with

all the knowledge she possessed, would know that she could not investigate reported complaints or recommend discipline for Negy's in-class conduct.

Additionally, Myers' investigation resulted in an OIE Report detailing findings of in-class comments that violated UCF policies. The OIE Report substantiated allegations that Negy made the following, among others, in the classroom:

- *"At [the] university, we happen to have [a] system called the tenure system, so that once you have tenure, like I have at the university, unless I rape you—which I won't, I promise—the university can't fire me. They just can't fire me";*
- *Telling students he visits nudist beaches in Florida and that he identifies as a nudist, stating "you can't imagine how liberating it is", that he goes "every chance I get" and commenting to a student during the conversation "I didn't mean to get you so excited";*
- *Joking that women are "kind of like a Ford pickup truck, built to take a pounding;*
- *"I love it when I see mostly guys at the gym working out and looking at themselves in the mirror as they are working out. I am tempted to tell them to masturbate in the bathroom with the mirrors";*
- *Asking a student, "Have you even had an erection before? I'm sorry, be that way";*
- *Telling students there is no evidence of a God, all religions are mythologies, believing in religion is as delusional as believing in things for which there is no evidence, religion is a cultural delusion, and "believing in religion is like believing in a flying elephant";*
- *"The crackpots who run the cult called Islam will kill you";*
- *Telling a student that his God was just "a figment of your imagination";*
- *Comparing religion to child abuse and using an exam question that asked: According to any reasonable and rational person, telling children that someone is watching them 24/7 and knows every "move they make"*

*and every thought they have, represents essentially: A. a good moral upbringing, B. child abuse, C. parental love, or D. parental protection. Students needed to select option "B. child abuse" to receive credit for answering this question correctly.*

- *Calling Islam "a toxic cult";*
- *Calling Muhammed a "scam artist," a "sociopath," and a "crackpot," and Jesus a "schizophrenic";*
- *Stating that "the whole modern world has been created by Whites" and that "if you compare what Whites have contributed to the world compared to all the non-Whites, it's embarrassing, it's embarrassing the discrepancy";*

(Doc. 70 at 287-88, 292-92, 295, 298-301,  365-66, 369-70, 373-80, 386-91, 424-27). These allegations detailed in Myers' 244-page OIE Report were presented to Dupras, then the Interim Dean of the College of Sciences, and Johnson, then the Interim Provost, for their own review and consideration. Negy admitted that OIE—not Cartwright, Dupras, or Johnson—determined whether to open an investigation. (Doc. 72 at 134:5-18). This is consistent with Appellants' testimony that OIE is responsible for determining whether to investigate complaints. (Doc. 64 at 87:13-88:4; Doc. 68 at 87:14-88:3, 114:22-115:4; Doc. 66 at 150:10-15). Based on the substantiated findings in the OIE Report, Bishop (not Myers) recommended Negy be terminated. Dupras and Johnson agreed with the recommendation and decided to terminate, and Johnson advised Cartwright of the decision to terminate based on the OIE Report's findings; Cartwright also agreed. (Doc. 70 at 35:12-15; Doc. 62 at 102:10-103:6; Doc. 64 at 37:25-40:1).

To deny qualified immunity, the District Court would have had to find that no reasonable university official would have followed their obligations under Title VI and Title IX, and University Policies, to investigate the hundreds of complaints about Negy's classroom conduct and terminate him based on substantiated findings he routinely engaged in discriminatory and harassing conduct in the classroom, simply because Negy engaged in protected speech around the same time UCF received these complaints. It is a highly generalized statement of the law that Negy cannot be disciplined for his protected speech. There are no cases stating that a plaintiff who engages in protected speech is immune from the consequences of misconduct *separate* from his protected speech.

Nor was it clearly established that addressing allegations of Negy's discriminatory classroom conduct violated his First Amendment rights since all Appellants, as university officials, have a countervailing obligation under federal law to address such allegations. *Davis as Next Friend of LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 643 (1999) (holding "recipient intentionally violates Title IX, and is subject to a private damages action, where the recipient is deliberately indifferent to known acts of teacher-student discrimination"); 34 C.F.R. § 106.44.34 (recipient of federal funds "with knowledge of conduct that reasonably may constitute sex discrimination in its education program or activity must respond promptly and effectively"); 28 C.F.R. § 42.104 (implementing

regulations for Title VI prohibiting discrimination based on race).

All Appellants, as university officials, were obligated under Title VI, Title IX, and UCF policies to address allegations of discrimination and harassment based on students' race, ethnicity, national origin, sex, gender, disability, and religion in the hundreds of complaints OIE received in June and July 2020. (Doc. 70 at 267). Negy admitted as much, acknowledging UCF, through OIE or Myers, has a duty to investigate claims of discrimination and harassment under federal law. (Doc. 72 at 65:4-14).

Negy cannot point to a single case that clearly established Myers could not investigate him for complaints of classroom conduct, or that the other Appellants could not discipline him for such classroom conduct merely because he had also engaged in protected speech. To the contrary, *Pickering*, *Mt. Healthy,* and their progeny allow government employers to discipline employees who engage in protected First Amendment speech if the speech is not a substantial motivating factor in the decision, or if the defendant would have made the same disciplinary decision absent the plaintiff's speech. "While the exercise of individual liberties must not be chilled, such rights are not a shield to protect one from one's own malfeasance. As stated in *Mount Healthy*:

> [An employee] ought not to be able, by engaging in such conduct, to prevent his employer from assessing his performance record and reaching a decision not to rehire on the basis of that record, simply

> because the protected conduct makes the employer more certain of the
> correctness of its decision."

*Marshall v. City of Cape Coral,* 797 F.2d 1555, 1561 (11th Cir. 1986)(quoting *Mt.*

*Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 286 (1977)).

Based on this case law, the District Court could not find "'that every

objectively reasonable government official facing the circumstances'" Appellants

faced here "'would know that [investigating claims of discrimination in the

classroom and terminating Negy based on such claims] did violate federal law

when the official acted.'" *Leslie v. Hancock Cnty. Bd. of Educ.*, 720 F.3d 1338,

1345, 1349 (11th Cir. 2013) (citations omitted). As such, it is not clearly

established that Myers could not investigate the complaints, nor is it clearly

established that Cartwright, Dupras, and Johnson could not decide to terminate

Negy based on the numerous substantiated allegations of misconduct in the OIE

Report, which expressly excluded consideration of his protected speech.

Negy did not show that Myers was on fair notice that investigating

allegations of his discriminatory and harassing classroom conduct, or that

Cartwright, Dupras, and Johnson were on fair notice that responding to students'

concerns by informing them where they could complain about classroom

discrimination or terminating Negy based on substantiated complaints of

discriminatory and harassing classroom conduct violated his First Amendment

rights, simply because he also engaged in protected speech. It was not clearly

established that Appellants' actions in addressing allegations of discriminatory classroom conduct violated his First Amendment rights when Appellants, as state university officials, are under competing obligations to comply with federal laws aimed at addressing discrimination and harassment against students.

This case does not present one of the rare exceptions to qualified immunity. And Appellants are unable to find any Supreme Court, Eleventh Circuit, or Florida Supreme Court cases holding that state university officials must forego *investigating* complaints of discrimination or harassment or *disciplining* a faculty member based on substantiated findings of classroom misconduct merely because that faculty member also engaged in protected speech. The record demonstrates that OIE initiated the investigation based on lawful motivations to comply with federal law. *See Foy,* 94 F.3d at 1535, 1536 n. 10 ("Never has the Supreme Court or this circuit or Alabama's appellate courts held that a social worker cannot act to protect children—when faced with circumstances that would warrant a pure-hearted reasonable person to act—if the particular social worker's motivations are, in fact, mixed, some lawful and some not. We cannot say the preexisting law was so clearly established, at the pertinent moment, that a social worker (who had unlawful motivations) would have known—even when faced with circumstances that would have justified a reasonable (and pure-hearted) social worker to act—that

he, because some of his motivations were not right, had to turn away and not to act on behalf of the children if he wished to avoid violating federal law.").

Negy did not demonstrate that Appellants violated clearly established law, and the District Court erred in defining clearly established law in such highly generalized terms. As such, Appellants are entitled to qualified immunity.

### III. The District Court erred in denying Myers qualified immunity because recommending a range of discipline did not render her a decisionmaker subject to individual liability.

#### A. The Cat's Paw Theory

Independent of municipal liability, an individual official may be subject to individual liability under Section 1983 if he is an "official decisionmaker," which means an official who has "the authority not merely to *recommend* [the plaintiff's] termination but to immediately effectuate" it. *Quinn v. Monroe County*, 330 F.3d 1320, 1327-1328 (11th Cir. 2003) (emphasis added). The District Court did not find that Myers was a decisionmaker; nonetheless, it determined she could be liable for Negy's termination under the Cat's Paw theory. (Doc. 100 at 7-8).

The Cat's Paw theory of liability originates from "The Monkey and the Cat" fable about a monkey who persuades a cat to pull chestnuts from the embers of a fire, only to take the reward for himself and leave the cat nursing a burnt paw. *Staub v. Proctor Hosp.*, 562 U.S. 411, 416 n. 1 (2011) ("The term 'cat's paw' derives from a fable conceived by Aesop, put into verse by La Fontaine in 1679,

and injected into United States employment discrimination law by Judge Posner in 1990."). The fable is the source of the English idiom "cat's paw"—essentially, one who does another's dirty work. Based on this fable, the theory of employer liability involves a scenario where an employee or supervisor, motivated by unlawful intent, influences an otherwise unbiased decisionmaker to take an adverse employment action against another employee. *Crawford v. Carroll*, 529 F.3d 961, 979 n. 21 (11th Cir. 2008) ("Under a 'cat's paw' theory, a non-decisionmaking employee's discriminatory animus may be imputed to a neutral decisionmaker when the decisionmaker has not independently investigated allegations of misconduct."); *see also Llampallas v. Mini-Cirs., Lab, Inc.*, 163 F.3d 1236, 1249 (11th Cir. 1998) (explaining Cat's Paw in a Title VII employer liability case). In the end, the employer is held liable, not the biased employee. *Crawford*, 529 F.3d at 979.

It is undisputed that Myers did not expressly recommend Negy's termination. (Doc. 70 at 268-70, 464-65). Rather, she recommended a range of possible discipline, up to and including termination. *Id.* It is undisputed that Myers' supervisor, Rhonda Bishop, recommended termination to the decisionmakers. (Doc. 100 at 8; Doc. 70 at 35:12-14; Doc. 62 at 102:21-24). And it is undisputed that Myers had no ability to effectuate Negy's termination. (Doc. 72 at 42:24-43:7, 105:6-10; Doc. 75 at 6). So, the question is whether Myers can be held liable

merely for recommending, through the OIE Report, that Negy be disciplined. She cannot.

### B.     The District Court misapplied the Cat's Paw theory to impose liability on a recommender of a range of discipline.

It is not the law in this Circuit that a recommender of a range of possible disciplinary action—as opposed to an official decisionmaker who relies upon a biased termination recommendation—may be subject to individual liability under Section 1983. Yet, the District Court concluded that "[b]ecause the decisionmakers here based their decision to terminate Plaintiff on the Investigative Report, Plaintiff may pursue a cat's paw theory of liability against Myers." (Doc. 100 at 9). In this Circuit, Cat's Paw is not used to hold a biased recommender who lacks authority to effectuate termination liable. Rather, under the Cat's Paw theory, liability is imposed on the employer, or in Section 1983 cases, the official who has the authority to effectuate disciplinary action, based on the evidence of bias of a subordinate's recommendation of termination. *Crawford*, 529 F.3d at 979; *Llampallas*, 163 F.3d at 1249.

In other words, the theory permits the retaliatory motive of a nondecision-making employee to be imputed to the employer or official decisionmaker, such that the employer or official decisionmaker—not the nondecision-making employee—may be held liable. *See Ziyadat v. Diamondrock Hosp. Co*., 3 F.4th 1291, 1298 (11th Cir. 2021).  Here, Myers, through the OIE Report, recommended

Negy be disciplined for his classroom conduct, but did not specifically recommend termination. Her recommendations were based on substantiated findings of misconduct. And it is undisputed that Myers had no power to terminate Negy.

When Negy was terminated, there was not a published opinion from this Circuit that imposed individual liability against the recommender, as opposed to the official decisionmaker. *Montoya v. Morgan*, 2018 WL 4701795, *17 (N.D. Fla. 2018) ("It is not clearly established in [the Eleventh] Circuit that a 'recommender' under the cat's paw theory can be individually liable under § 1983 for reporting performance deficiencies in a manner intended to result in a subordinate's termination."). Nor have Appellants found any Eleventh Circuit case imposing individual liability on a recommender who lacks authority to effectuate disciplinary action.

To impose liability on Myers, the District Court improperly relied on *Gilroy v. Baldwin*, 843 F. App'x 194, 196 (11th Cir. 2021). (Doc. 100 at 7). In *Gilroy*, which was decided *after* Negy's termination, this Court analyzed Section 1983 claims against both the city and its former police chief, Baldwin. *Id.* Addressing the individual liability claim against Baldwin, this Court noted there was no evidence to refute that "Baldwin merely recommended that Gilroy be terminated," and that the city manager, not the former police chief, decided to terminate Gilroy and effectuated the termination. *Id.* at 197. Based on this, the Court held "the

36

district court did not err in concluding, for purposes of summary judgment, that Baldwin, the former police chief, was not the decisionmaker who could effectuate Gilroy's termination." *Id.*

In analyzing the Cat's Paw theory, this Court did not decide that it applied to impose liability on the recommender. Rather, the Court only analyzed the issue, after "*assuming* arguendo that it applies in the § 1983 context," found it inapplicable to Baldwin, and concluded the plaintiff could not show either the city manager or the board was Baldwin's cat's paw. *Id.* (emphasis added).

The District Court misapplied *Gilroy* in two ways. First, *Gilroy* was decided on January 29, 2021, <u>after</u> the termination decision in this case, and therefore, *Gilroy* did not apply here. *Gaines*, 871 F.3d at 1208; *see also Montoya*, 2018 WL 4701795 at \*17 (explaining it is "not clearly established in the Eleventh Circuit" that a "recommender" can be held liable under the cat's paw theory in a Section 1983 case).

Second, this Court in *Gilroy* did not hold the Cat's Paw theory actually applies in Section 1983 cases to impose individual liability, nor did it hold that the theory imposes individual liability on a recommender who lacks authority to effectuate disciplinary action and therefore is not a decisionmaker. Rather, the *Gilroy* Court merely assumed it applied and found the theory inapplicable in the

case before it as Gilroy could not show the decisionmakers (the city manager and board) were the cat's paws of the police chief recommender. 843 F. App'x at 197.

A closer reading of *Stimpson*, cited in *Gilroy*, and cases preceding *Gilroy,* show the District Court misapplied the Cat's Paw theory to impose individual liability on Myers, as a recommender of disciplinary action, when the Cat's Paw theory is a means to impose liability on an employer based on the recommender's unlawful bias. *See Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1332 (11th Cir. 1999)(Title VII); *Llampallas*, 163 F.3d at 1245 (Title VII). In *Stimpson,* a police officer alleged the city terminated her based on her sex. 186 F.3d at 1328. However, under Alabama law, the city had no power to discharge a police officer; only the statutorily-created civil service board could do so. *See id.* at 1331. The plaintiff failed to introduce evidence reasonably indicating the "alleged discriminatory animus" of the city recommender influenced the board decisionmaker to terminate her. The plaintiff likewise failed to show the board "acted as a 'cat's paw' or rubber stamp for the City's recommendation." *Id.* at 1332. Thus, the plaintiff could not show a causal connection between the city's alleged discriminatory animus and the board's termination decision. *Id.*

Like *Stimpson*, there is no evidence that Dupras, Johnson, and Cartwright were mere conduits for Myers' alleged retaliatory motive. In fact, Negy alleges

throughout his Complaint and summary judgment response that Cartwright, Dupras, and Johnson were biased against him based on their own protected speech.

Regardless, *Stimpson*, a Title VII municipal liability case, did not establish that a recommender can be liable under Section 1983. In fact, *Kamensky v. Dean*, 148 F. App'x 878, 880 (11th Cir. 2005), which the District Court cited in its Order (Doc. 100 at 11-12), held the opposite. In *Kamensky*, the plaintiff claimed her employer, the county, and her supervisor, terminated her in retaliation for exercising her First Amendment rights. *Id.* at 879. This Court found her former supervisor could only recommend termination, not effectuate it, and therefore, "was not the 'official decisionmaker,' and thus cannot be held individually liable." *Id.* at 880. This Court declined to create a "rubber stamp" exception that would allow for the recommender to be held individually liable under Section 1983. *Id.* As in *Kamensky*, the evidence here indisputably shows Myers had no power to terminate Negy, and only had the power to recommend possible discipline. So, Myers was not the "official decisionmaker," and cannot be held individually liable. *See id.* at 879-80.

While this Court in *Gilroy* assumed Cat's Paw *may* apply to individual liability under Section 1983, it did not actually determine it applied. 843 F. App'x at 197. And, in *Kamensky*, the Court expressly declined to use Cat's Paw to create a "rubber stamp" exception to the decisionmaker inquiry in individual liability

cases under Section 1983. 148 F. App'x at 880 ("We have not extended this line of cases to individual liability and refrain from doing so here."). Consequently, "the Eleventh Circuit has not conclusively held that the cat's paw theory applies in the context of § 1983," and had not done so at the time of Negy's termination. *Maddox v. Girtz*, No. 3:21-CV-124 (CAR), 2023 WL 2727540, at *8 (M.D. Ga. Mar. 30, 2023). Because neither the Eleventh Circuit nor the Supreme Court has recognized individual liability for a Cat's Paw 'recommender' under Section 1983, the District Court erred in finding Myers could be liable as a recommender. *See id; see also Montoya*, 2018 WL 4701795 at *17.  Myers is entitled to qualified immunity.

Moreover, the District Court's Order fails to cite any record evidence of Myers' alleged bias against Negy *based on his speech*. Negy argued Myers' conduct of the investigation itself is circumstantial evidence of her retaliatory motive. The District Court found Negy created an issue of fact "as to whether Myers' investigation and recommendation were biased" but did so without record evidence that Myers was biased against Negy's speech. Rather, the Court implied bias based solely on Negy's criticisms of the way Myers conducted the investigation, including her alleged use of "cherry-picked" evidence and her reliance on some witness forms that were not "reviewed and signed," among others. *See* supra at 8-9; (Doc. 100 at 8-9). None of these alleged faults in the investigation, however, show bias premised on Negy's speech, especially

considering Myers' concurrent legal obligation to investigate claims of discrimination and harassment—an obligation Negy himself recognized university officials must honor. Nor is there *any* evidence that Myers was directed to investigate Negy because of his tweets.

As part of his prima facie case, a plaintiff claiming retaliation based on the exercise of his First Amendment rights must show his protected conduct "was a substantial motivating factor in his termination." *Moss v. City of Pembroke Pines*, 782 F.3d 613, 618 (11th Cir. 2015); *Mt. Healthy*, 429 U.S. at 287 (noting plaintiff bears the burden to show his protected conduct "was a 'substantial factor' or to put it in other words, that it was a 'motivating factor' in the Board's decision not to rehire him."). While "an employee may prove retaliation with any circumstantial evidence that creates a reasonable inference of retaliatory intent," it must raise "a reasonable inference of unlawful conduct." *Berry v. Crestwood Healthcare LP*, 84 F.4th 1300, 1310–11 (11th Cir. 2023).

Importantly, in *Berry*, the Court rejected the plaintiff's assertion that "suspicious timing" was circumstantial evidence of retaliatory motive, finding "the intervening discovery" of misconduct—complaints the plaintiff "bullied several coworkers and . . . caused several employees to quit"—"fatally undermine[d] the probative value of temporal proximity between [her] protected activity and her termination." *Id.* at 1309-12. Similarly, Negy's complaints that he was not treated

41

the same as others who had been investigated, or that the timing of the investigation is suspicious do not hold water given the intervening complaints of classroom misconduct. He can point to no other investigation of a faculty member involving the breadth and scope of complaints asserted against him. *Id.* (noting plaintiff could not show other employees who were not terminated were "similarly situated in all material respects.").

Myers was not the decisionmaker, she did not specifically recommend termination, and there is no record evidence of any statements or conduct by Myers based on Negy's speech, let alone that his speech was a substantial motivating factor in OIE's decision to investigate or to recommend a range of potential discipline. There were no comments by Myers about Negy's tweets aside from those in the OIE Report, which found the posts were protected. Neither Negy nor the District Court cited any record evidence showing Myers harbored any animus based on his protected speech. Nor could Negy or the District Court rely upon statements made by others to impute an unlawful intent on Myers. *Huggins v. Sch. Dist. of Manatee Cnty.*, No. 22-13325, 2025 WL 2374371, at *9 (11th Cir. Aug. 15, 2025) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009) ("Because vicarious liability is inapplicable to Bivens and § 1983 suits . . . the plaintiff . . . must plead that each Government-official defendant, through his own individual actions, has violated the Constitution.")).

Instead, the Court arrived at a conclusion of bias based on nothing more than Negy's bald allegations of what he viewed as irregularities in the conduct of the investigation.  Even assuming, arguendo, the investigation was imperfect (which Appellants deny), that does not defeat qualified immunity.  In *Foy*, the court found that qualified immunity was not defeated even if "the investigation and custody determination procedures were not 'textbook perfect.'" *Foy*, 94 F. 3d. at 1536; *see also Wilcox v. Andalusia City Sch. Bd. of Educ.*, 660 F. Supp. 3d 1167, 1192 (M.D. Ala. 2023) (observing, in a claim that the defendant violated Title IX based on a flawed, inadequate investigation, "it is at best uncertain that Watson's conduct with respect to the investigation and discipline of Clark violated clearly established law, particularly given the undisputed facts that Watson conducted some investigation into Clark's alleged misconduct.").

This is not a factual issue, but a failure to properly apply the governing law to the facts of the case. Nevertheless, because the question before the Court is the legal question of whether Myers' conduct violated clearly established law, this Court "may decide both questions because 'the factual issue of what conduct the defendant engaged in . . . is a necessary part of the core qualified immunity analysis of whether the defendant's conduct violated clearly established law.'" *Nelson v. Tompkins*, 89 F.4th 1289, 1296 (11th Cir. 2024) (citing *Stanley v. City of Dalton*, 219 F.3d 1280, 1286-87 (11th Cir. 2000)). Because there was no record

evidence Myers harbored any discriminatory animus premised on Negy's speech, he could not show her action in investigating complaints about his classroom conduct violated his clearly established First Amendment rights.

Additionally, the District Court's denial of qualified immunity to Myers on Count I based on its finding that Negy created an issue of fact as to whether her investigation was biased is internally inconsistent with its conclusion as to Count II, where it granted Myers qualified immunity. In Count II, the District Court concluded Myers was entitled to qualified immunity based on her investigation's findings regarding Negy's same classroom comments. The District Court reasoned in Count II that "a reasonable university official would not be on notice" that she violated Negy's First Amendment rights by finding his in-class statements demonstrated harassment under the University's Policies. (Doc. 100 at 20-21). There was only one investigation that included all the findings regarding Negy's classroom conduct. Since the District Court determined it was not clearly established that Myers' findings regarding Negy's in-class statements violated his First Amendment rights in Count II, it likewise could not be clearly established that the very same investigation and findings violated his First Amendment rights in Count I.

**IV.** **As to all Appellants, the District Court erred by assuming this was not a mixed motive case and by failing to determine whether the presence of unlawful motivations is a bar to qualified immunity.**

Appellants argued Negy was terminated for discriminatory classroom conduct substantiated by an OIE investigation, while Negy claimed retaliation for his protected speech. The District Court presumed this was not a mixed motives case, stating a jury could conclude Appellants' motivations were "entirely unlawful," notwithstanding its conclusion that "the decisionmakers here based their decision to terminate Plaintiff on the Investigative Report." (Doc. 100 at 9, 18). It is inconsistent to find the decisionmakers relied on "the Investigation Report" and, at the same time, not find this was "a mixed motives case."

In making its finding, the District Court failed to determine whether the presence of unlawful motivations was a bar to qualified immunity. The District Court stopped short of determining whether it was clearly established that no university official could lawfully investigate or terminate Negy based on complaints of discriminatory conduct in the classroom, even if they were motivated in part by his speech, contrary to the direction in *Foy v. Holston,* 94 F. 3d 1528, 1533-34 (11th Cir. 1996). The District Court cited *Foy,* but erred by not applying the *Foy* framework, which assumed mixed motives and then determined whether such motives bar qualified immunity. Under *Foy* and related cases, they do not.

45

The Supreme Court has established state officials can act lawfully even when motivated by a dislike or hostility to certain protected behavior. *See Mt. Healthy,* 429 U.S. at 274. For example, state officials act lawfully, despite having discriminatory intent, where the record shows they would have acted the same even if they lacked discriminatory intent. *Id.* at 286–87. It "must not be understood to rule out qualified immunity wherever discriminatory intent appears in the summary judgment record even if discriminatory intent is an element of the underlying constitutional tort." *Foy,* 94 F.3d at 1533; *see also Sherrod,* 667 F.3d at 1364; *Jackson v. Humphrey*, 776 F.3d 1232, 1241-42 (11th Cir. 2015).

Appellants are entitled to qualified immunity under this analysis. In *Foy,* this Court overturned the district court's denial of summary judgment on qualified immunity grounds for Alabama officials accused of religious discrimination under Section 1983. *Foy,* 94 F.3d at 1530. While the defendants in *Foy* maintained "the record supports no finding of discriminatory intent," this Court accepted that the plaintiffs "presented a triable issue of fact on whether Defendants were motivated by a hostility toward the [plaintiffs'] religion," resolved these disputes in the plaintiffs' favor, assumed the defendants' actions were motivated in some part by prejudice against the plaintiffs' religion, and then considered whether such motivations were "a bar to immunity." *Id.* at 1533-34. In doing so, the Court asked,

"[c]ould a reasonable officer have believed that what the defendant did might be lawful in the circumstances and in the light of the clearly established law?" *Id.*

Qualified immunity requires an objective inquiry, and cannot be ruled out even if the plaintiff points to some evidence of retaliatory intent. *Id.* at 1533. *Foy* determined qualified immunity was appropriate because neither the plaintiffs nor the Court could point to any cases "which would have clearly established as a matter of law that child custody workers cannot act lawfully under these circumstances—even when we accept that the circumstances do include substantial prejudice by the officials against Plaintiffs on account of Plaintiffs' religious beliefs." *Id.* at 1536 ("[A] reasonable child custody worker could have considered Defendants' conduct arguably proper even if Defendants were motivated in substantial part by unlawful motives[;] Defendants' conduct was objectively reasonable for the purposes of qualified immunity.").

Notwithstanding its citation of *Foy* and acknowledgment that having a mix of motives results in qualified immunity (Doc. 100 at 18), the District Court failed to determine whether the presence of unlawful motivations was a bar to qualified immunity. Rather, the District Court's analysis stopped short of determining whether it was clearly established that no university official could lawfully investigate or terminate Negy based on complaints of discriminatory conduct in the classroom, even if they were motivated in part by his speech. This was contrary to

47

the direction in *Foy*. *Cf. id.* at 1536 ("So, unless it was already clearly established when Defendants acted that no child custody worker could lawfully act—that is, do what Defendants did—to protect children in the circumstances of this case if the worker also acted, in part, out of hostility toward the parent's religion, Defendants are entitled to immunity.").

The pertinent question is whether the existence of a biased motive is a bar to immunity. Under *Foy, Sherrod,* and *Jackson,* the answer is no. As stated, to deny Appellants qualified immunity under this line of cases, this Court would have to find that no reasonable university official would have followed their obligations under Title VI and Title IX to advise students how to complain about discrimination, investigate the hundreds of complaints about Negy's classroom conduct, or terminate him based on the OIE Report substantiating many instances of discriminatory and harassing classroom conduct, simply because Negy also had engaged in protected activity. In light of the clearly established law requiring a university official to investigate allegations of discrimination and harassment in the classroom and act on substantiated findings, it cannot be said that "every objectively reasonable government official facing the circumstances" Appellants faced would know that their conduct "violated federal law when the official acted." *D.H. by Dawson*, 830 F.3d at1318.

48

Existing law—including *Foy*, *Sherrod*, and *Jackson*—does not clearly prohibit officials from acting on substantiated misconduct complaints, even if partly motivated by bias. Appellants' actions were objectively reasonable and did not violate clearly established law, entitling them to qualified immunity.

The District Court's denial of qualified immunity on Count I is likewise internally inconsistent with its conclusion as to Count II. In Count II, the District Court concluded Myers was entitled to qualified immunity based on her investigation's findings regarding Negy's classroom comments. The District Court reasoned in Count II that "a reasonable university official would not be on notice" that she violated Negy's First Amendment rights by finding his in-class statements demonstrated harassment under the University's policy. (Doc. 100 at 20-21). But as to Count I, the District Court found the decisionmakers were not entitled to rely on that very same investigation of Negy's in-class statements because Negy "created an issue of fact as to whether Defendants'[2] investigation was rigged from the start." *Id.* at 17. If it were not clearly established that the OIE investigation violated Negy's First Amendment rights in Count II, it cannot be clearly established that the decisionmakers were precluded from relying on that same OIE investigation in Count I.

---

[2] It was not the "Defendants'" investigation, but OIE's investigation, conducted by Myers. (Doc. 72: 36:1-6, 134:5-18).

**V.    The District Court erred by not individually analyzing Dupras, Cartwright, Johnson, and Myers' claims of qualified immunity.**

Negy's claim of First Amendment retaliation is not a claim against UCF, his employer. Rather, it is a claim against four individual university administrators, each with different roles in either investigating or terminating Negy based on complaints of classroom misconduct. Because each Appellant was in a unique position, with different facts pertaining to their individual knowledge and involvement in the investigation or the termination decision, each is entitled to an individual qualified immunity analysis. *Alcocer v. Mills*, 906 F.3d 944, 951 (11th Cir. 2018). When a district court fails to engage in the individual analysis, it is grounds to reverse a denial of summary judgment. *Mathews v. Wetherbee*, 839 F. App'x 395, 396 (11th Cir. 2020).

Courts must be careful to evaluate a given defendant's qualified immunity claim, considering only the actions and omissions in which that particular defendant engaged. *Alcocer*, 906 F.3d at 944; *see also Huggins*, 2025 WL 2374371 at *9 ("Huggins must allege a factual connection between his speech and each individual official's conduct for both his speech-restriction and First Amendment retaliation claims."); *Iqbal*, 556 U.S. at 663 (noting "vicarious liability is inapplicable to Bivens and § 1983 suits"). That did not occur here.

Throughout the District Court's qualified immunity analysis, it often conflated the actions of the individual Appellants and failed to separately analyze

their conduct, notwithstanding a clear record of each Appellant's actions. *C.f.*
*Alexandre v. Ortiz*, 789 F. App'x 169, 176 (11th Cir. 2019) (finding individual
qualified immunity analysis was not possible for two defendants because it was
impossible to separate their actions from the larger group based on the record
evidence). The District Court did not consider what the individual Appellants knew
at the time they acted, and instead imputed non-parties' statements and actions
against the individual Appellants to find they collectively violated Negy's
constitutional rights.

First, in its pretext analysis, the District Court's Order notes that, "after
public outrage, Dupras, Cartwright, and Johnson all issued statements condemning
Plaintiffs' tweets"; however, the District Court only analyzed Cartwright's and
Dupras' statements, not Johnson's. Still, the District Court imputed purported bias
from Dupras' and Cartwright's statements about Negy to Johnson to find
Johnson's actions were pretextual. (Doc. 100 at 13). The District Court also
imputed an unidentified professor's knowledge to Appellants collectively to deny
qualified immunity. (Doc. 100 at 15) ("Plaintiff had a reputation of using
incendiary language, as another UCF professor noted."). The District Court also
analyzed the allegation that Negy failed to report a sexual assault and generally
concluded that "[i]t also appears that *UCF Administration* knew about this
allegation and Plaintiff's role in it," without citing any record evidence that any of

the individual Appellants had such prior knowledge. *Id.* (emphasis added). But qualified immunity does not turn on what "another UCF professor noted" or what it "appears that UCF Administration knew."

Rather, the District Court should have analyzed what Dupras, Cartwright, Johnson, and Myers each independently knew at the time to determine whether they were entitled to qualified immunity. *Sherrod*, 667 F.3d at 1364 ("A proper analysis of [the defendants'] entitlement to qualified immunity is not whether they knew that terminating" the plaintiff "in retaliation for protected speech was lawful, but rather whether terminating him based upon all the information available to them at the time, to include any knowledge of his protected speech, was objectively reasonable.").

The District Court also wrongly, and without record citation, imputed the supposed longstanding knowledge of Negy's on-campus misconduct to all Appellants: "as Defendants tell it, Plaintiff had long been a menace upon UCF's campus." (Doc. 100 at 15). There was no record evidence that any individual Appellant had prior knowledge of the extensive complaints about Negy before the Summer of 2020. (Doc. 93 at 2-3). In fact, the only individual Appellant with any historical relationship with Negy is Johnson (a former Dean of the College of Sciences), who testified he was dismayed after realizing the complaints were so

longstanding and that students had not known the proper channels to complain about faculty. (Doc. 68 at 80:18-81:24, 168:10-169:2).

The District Court's order also found that "Defendants had ample time to make reasoned, thoughtful decisions regarding how they wished to proceed with the investigation." (Doc. 100 at 17). However, the record evidence is clear that the only Appellant involved in the investigation was Myers. It is undisputed Dupras, Cartwright, and Johnson had no involvement in determining whether to initiate an investigation or how to conduct it. (Doc. 72 at 35:18-36:6, 134:5-18). Yet, the Court's Order implies that all Appellants directed the investigation.

Similarly, the District Court imputed Dupras, Cartwright, and Johnson's allegedly biased statements to Myers. In its Order, it found "there is evidence showing *they* were motivated by their distaste for Plaintiff and his views along with public pressure." (Doc. 100 at 18). Myers' undisputed testimony was that she was neither offended by nor had a "distaste" for Negy due to his tweets. (Doc. 70 at 40:2-15). There is also no record evidence that Myers made any statements about Negy's tweets.

Ultimately, the District Court failed to analyze the conduct of each individual Appellant to perform an individualized qualified immunity analysis for each. Because Section 1983 requires proof of an affirmative causal connection between the official's acts or omissions and the alleged constitutional deprivation,

*Zatler v. Wainwright*, 802 F.2d 397, 401 (11th Cir. 1986) (per curiam), each Appellant was entitled to an independent qualified-immunity analysis as it relates to his or her actions and omissions. *Alcocer*, 906 F.3d at 944. The District Court erred by failing to conduct an individualized analysis and by imputing other parties' and non-parties' actions onto all individual Appellants to deny qualified immunity. This Court should reverse the District Court's Order and grant Appellants summary judgment based on qualified immunity.

## CONCLUSION

For the foregoing reasons, Appellants, Alexander Cartwright, Tosha Dupras, Michael Johnson, and Nancy Myers, respectfully request that this Court reverse the Order on Appeal to the extent it denied them summary judgment as to Count I, and remand for entry of judgment in their favor as to Count I of Appellee, Charles Negy's, Amended Complaint based on qualified immunity.

## CERTIFICATE OF COMPLIANCE

The undersigned attorneys certify that Appellants' Initial Brief complies with the page limitation and type-volume limitation of Fed. R. App. P. 32(a)(7). This Initial Brief contains 12,524 words, excluding the parts exempted by Fed. R. App. P. 32(f) and 11th Cir. R. 32-4. The undersigned attorneys also certify that Appellants' Initial Brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5), (a)(6) as it was prepared with Times New Roman 14-point font.

*/s/ Richard L. Barry*
**RICHARD L. BARRY, ESQ.**
Florida Bar No. 360650
Richard.Barry@gray-robinson.com
Lead Trial Counsel
**KATHERINE W. KATZ, ESQ.**
Florida Bar No. 1022526
Katherine.Katz@gray-robinson.com
**JULIE M. ZOLTY**
Florida Bar No.: 1036454
Julie.Zolty@gray-robinson.com
**GRAY ROBINSON, P.A.**
Post Office Box 3068
Orlando, Florida  32802-3068
Telephone:  (407) 843-8880
Facsimile:   (407) 244-5690

*/s/ Kristie Hatcher-Bolin*
**KRISTIE HATCHER-BOLIN**
Florida Bar No. 521388
Kristie.Hatcher-bolin@gray-robinson.com
**GRAY ROBINSON, P.A.**
Post Office Box 3
Lakeland, Florida 33802-0003
Telephone: (863) 284-2251
Facsimile: (863) 683-7462
*Counsel for Defendants/Appellants*

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that a true and correct copy of the foregoing was electronically filed on September 3, 2025 using the ECF system which will automatically transmit a copy to:

*Counsel for Plaintiff/Appellee*
*Charles Negy*
c/o David R. Osborne, Esq.
Goldstein Law Partners, LLC
200 School Alley, Suite 5
Green Lane, PA 18054
dosborne@goldsteinlp.com

*Co-counsel for Charles Negy*
c/o Joshua Engel, Esq.
Engel & Martin, LLC
4660 Duke Drive, Ste. 101
Mason, OH 45040
engel@engelandmartin.com

*Co-counsel for Charles Negy*
Samantha Harris, Esq.
Allen Harris PLLC
P.O. Box 673
Narberth, PA 19072
sharris@allenharrislaw.com

/s/ Richard L. Barry
**RICHARD L. BARRY, ESQ.**
Florida Bar No. 360650
Richard.Barry@gray-robinson.com
Lead Trial Counsel
**KATHERINE W. KATZ, ESQ.**
Florida Bar No. 1022526
Katherine.Katz@gray-robinson.com
**JULIE M. ZOLTY**
Florida Bar No.: 1036454
Julie.Zolty@gray-robinson.com
**GRAY ROBINSON, P.A.**
Post Office Box 3068
Orlando, Florida  32802-3068
Telephone:  (407) 843-8880
Facsimile:  (407) 244-5690

/s/ Kristie Hatcher-Bolin
**KRISTIE HATCHER-BOLIN**
Florida Bar No. 521388
Kristie.Hatcher-bolin@gray-robinson.com
**GRAY ROBINSON, P.A.**
Post Office Box 3
Lakeland, Florida 33802-0003
Telephone: (863) 284-2251
Facsimile: (863) 683-7462
*Counsel for Defendants/Appellants*