CASE NO. 25-11929

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

---

**ALEXANDER CARTWRIGHT, TOSHA DUPRAS, MICHAEL JOHNSON, AND NANCY MYERS,**
**Defendants/Appellants,**

v.

**CHARLES NEGY,**
**Plaintiff/Appellee.**

---

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## District Court Case No. 6:23-CV-00666-CEM-DCI

---

### APPELLANTS' APPENDIX TO INITIAL BRIEF – VOLUME 1

---

### GRAYROBINSON, P.A.

KRISTIE HATCHER-BOLIN, ESQ.
Florida Bar No.: 521388
One Lake Morton Drive
Lakeland, Florida 33801
(863) 284-2251 telephone
(863) 683-7462 facsimile

RICHARD L. BARRY, ESQ.
Florida Bar No. 360650
KATHERINE KATZ, ESQ.
Florida Bar No. 1022526
JULIE ZOLTY, ESQ.
Florida Bar No. 1036454
301 East Pine Street, Suite 1400
Orlando, Florida 32801
(407) 843-8880 telephone
(407) 244-5690 facsimile

*Attorneys for Appellants, Alexander Cartwright, Tosha Dupras, Michael Johnson, and Nancy Myers*

## INDEX TO APPENDIX

**Volume 1**                                                    **Docket/Tab #**

District Court Civil Docket ........................................................................A

Doc. 1 - Complaint and Demand for Jury Trial ........................................................1

Doc. 19 - Defendants' Dispositive Motion to Dismiss, or Alternatively, Motion for More Definite Statement and Motion to Strike Punitive Damages ........................19

Doc. 26 - First Amended Complaint, Demand for a Jury Trial, Request for Declaratory Relief, and Request for Injunctive Relief ...........................................26

Doc. 32 - Defendants' Dispositive Motion to Dismiss, or Alternatively, Motion for More Definite Statement and Motion to Strike Punitive Damages ........................32

Doc. 38 - Order ........................................................................................38

Doc. 43 - Defendant Alexander Cartwright's Answer and Affirmative Defenses to Plaintiff's First Amended Complaint, Demand for Jury Trial, Request for Declaratory Relief, and Request for Injunctive Relief ...........................................43

Doc. 44 - Defendant Tosha Dupras' Answer and Affirmative Defenses to Plaintiff's First Amended Complaint, Demand for Jury Trial, Request for Declaratory Relief, and Request for Injunctive Relief ...........................................44

**Volume 2**

Doc. 45 - Defendant Michael Johnson's Answer and Affirmative Defenses to Plaintiff's First Amended Complaint, Demand for Jury Trial, Request for Declaratory Relief, and Request for Injunctive Relief ...........................................45

Doc. 46 - Defendant Nancy Myers's Answer and Affirmative Defenses to Plaintiff's First Amended Complaint, Demand for Jury Trial, Request for Declaratory Relief, and Request for Injunctive Relief ...........................................46

Doc. 59 - Defendant S. Kent Butler's Motion for Summary Judgment .................59

Doc. 60 - Defendants Alexander Cartwright, Tosha Dupras, and Michael Johnson's Joint Motion for Summary Judgment ......................................................................60

Doc. 61 - Defendant Nancy Myers' Motion for Summary Judgment .....................61

**Volume 3**

Doc. 62 - Notice of Filing deposition transcript of Rhonda Bishop taken 11.20.24 (pgs. 1-220) ..............................................................................................................62

**Volume 4**

Doc. 62 - Notice of Filing deposition transcript of Rhonda Bishop taken 11.20.24 (pgs. 221-420) cont'd. ..............................................................................................62

**Volume 5**

Doc. 64 - Notice of Filing deposition transcript of Alexander Cartwright taken 11.04.24 – volume 1 ................................................................................................64

**Volume 6**

Doc. 65 - Notice of Filing deposition transcript of Alexander Cartwright taken 11.05.24 – volume 2 (pgs. 1-230) ...........................................................................65

**Volume 7**

Doc. 65 - Notice of Filing deposition transcript of Alexander Cartwright taken 11.05.24 – volume 2 (pgs. 231-460) cont'd. ............................................................65

**Volume 8**

Doc. 65 - Notice of Filing deposition transcript of Alexander Cartwright taken 11.05.24 – volume 2 (pgs. 461-690) cont'd. ............................................................65

**Volume 9**

Doc. 65 - Notice of Filing deposition transcript of Alexander Cartwright taken 11.05.24 – volume 2 (pgs. 691-890) cont'd. ............................................................65

**Volume 10**

Doc. 65 - Notice of Filing deposition transcript of Alexander Cartwright taken 11.05.24 – volume 2 (pgs. 891-1044) cont'd..........................................................65

**Volume 11**

Doc. 66 - Notice of Filing deposition transcript of Tosha Dupras taken 09.17.24 (pgs. 1-200) ......................................................................................................66

**Volume 12**

Doc. 66 - Notice of Filing deposition transcript of Tosha Dupras taken 09.17.24 (pgs. 201-400) cont'd..........................................................................................66

**Volume 13**

Doc. 66 - Notice of Filing deposition transcript of Tosha Dupras taken 09.17.24 (pgs. 401-543) cont'd..........................................................................................66

**Volume 14**

Doc. 68 - Notice of Filing deposition transcript of Michael Johnson taken 10.31.24 (pgs. 1-200) ............................................................................................68

**Volume 15**

Doc. 68 - Notice of Filing deposition transcript of Michael Johnson taken 10.31.24 (pgs.  201-400) cont'd ............................................................................68

**Volume 16**

Doc. 68 - Notice of Filing deposition transcript of Michael Johnson taken 10.31.24 (pgs. 401-562) cont'd ............................................................................68

**Volume 17**

Doc. 70 - Notice of Filing deposition transcript of Nancy Myers taken 09.27.24 (pgs. 1-235) ......................................................................................................70

**Volume 18**

Doc. 70 - Notice of Filing deposition transcript of Nancy Myers taken 09.27.24 (pgs. 236-470) cont'd ...........................................................................................70

**Volume 19**

Doc. 70 - Notice of Filing deposition transcript of Nancy Myers taken 09.27.24 (pgs. 471-705) cont'd ...........................................................................................70

**Volume 20**

Doc. 70 - Notice of Filing deposition transcript of Nancy Myers taken 09.27.24 (pgs. 706-940) cont'd ...........................................................................................70

**Volume 21**

Doc. 70 - Notice of Filing deposition transcript of Nancy Myers taken 09.27.24 (pgs. 941-1175) cont'd .........................................................................................70

**Volume 22**

Doc. 70 - Notice of Filing deposition transcript of Nancy Myers taken 09.27.24 (pgs. 1176-1410) cont'd .......................................................................................70

**Volume 23**

Doc. 70 - Notice of Filing deposition transcript of Nancy Myers taken 09.27.24 (pgs. 1411-1593) cont'd .......................................................................................70

**Volume 24**

Doc. 70 - Notice of Filing deposition transcript of Nancy Myers taken 09.27.24 (pgs. 1594-1654) cont'd .......................................................................................70

**Volume 25**

Doc. 71 - Notice of Filing Notice of Service of Answers and Objections to Plaintiff's First Set Interrogatories to Defendant, Alexander Cartwright (pgs. 1-230)............71

**Volume 26**

Doc. 71 - Notice of Filing Notice of Service of Answers and Objections to Plaintiff's First Set Interrogatories to Defendant, Alexander Cartwright (pgs. 231-460) cont'd .................................................................................................................71

**Volume 27**

Doc. 71 - Notice of Filing Notice of Service of Answers and Objections to Plaintiff's First Set Interrogatories to Defendant, Alexander Cartwright (pgs. 461-630) cont'd .................................................................................................................71

**Volume 28**

Doc. 72 - Notice of Filing deposition transcript of Charles Negy taken 10.28.24 (pgs. 1-235) .................................................................................................................72

**Volume 29**

Doc. 72 - Notice of Filing deposition transcript of Charles Negy (pgs. 236-470) cont'd.................................................................................................................72

**Volume 30**

Doc. 72 - Notice of Filing deposition transcript of Charles Negy (pgs. 471-582) cont'd.................................................................................................................72

**Volume 31**

Doc. 73 - Notice of Filing Notice of Service of Answers and Objections to Plaintiff's First Set of Interrogatories to Defendant, Tosha Dupras .......................................73

Doc. 74 - Notice of Filing Notice of Service of Answers and Objections to Plaintiff's First Set of Interrogatories to Defendant, Michael Johnson (pgs. 1-130) ...............74

## Volume 32

Doc. 74 - Notice of Filing Notice of Service of Answers and Objections to Plaintiff's First Set of Interrogatories to Defendant, Michael Johnson (pgs. 131-360) cont'd .... ........................................................................................................................74

## Volume 33

Doc. 74 - Notice of Filing Notice of Service of Answers and Objections to Plaintiff's First Set of Interrogatories to Defendant, Michael Johnson (pgs. 361-380) cont'd .... ........................................................................................................................74

Doc. 75 - Notice of Filing Notice of Service of Answers and Objections to Plaintiff's First Set of Interrogatories to Defendant, Nancy Myers..........................................75

Doc. 77 - Notice of filing Defendant Michael Johnson's Responses to Plaintiff's First Request for Production to Defendant ...........................................................77

Doc. 88 - Plaintiff's Response to Defendants' Motions for Summary Judgment ...88

## Volume 34

Doc. 93 - Defendants' Reply to Plaintiff's Response to Motions for Summary Judgment ........................................................................................................93

Doc. 100 - Order on Motion for Summary Judgment .........................................100

Doc. 110 - Defendants Alexander Cartwright, Tosha Dupras, Michael Johnson, and Nancy Myers' Notice of Appeal .........................................................................110

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Pursuant to 11th Cir. R. 26.1-1(a), Appellants certify the following is a complete list of the district court judges, attorneys, persons, associations of persons, firms, partnerships, corporations (including subsidiaries, conglomerates, affiliates, parent corporations, and any publicly held corporation owning 10% or more of the

party's stock), and other identifiable legal entities related to a party that have an interest in this case.

1. Allen Harris Law—Attorneys for Plaintiff/Appellee;

2. Barry, Richard L.—Attorney for Defendants/Appellants;

3. Butler, S. Kent—Defendant;

4. Cartwright, Alexander—Defendant/Appellant;

5. Dupras, Tosha—Defendant/Appellant;

6. Engel, Joshua A.—Attorney for Plaintiff/Appellee;

7. Engel & Martin, LLC—Attorneys for Plaintiff/Appellee;

8. Goldstein Law Partners, LLC—Attorneys for Plaintiff/Appellee;

9. GrayRobinson, P.A.—Attorneys for Defendants/Appellants;

10. Harris, Samantha—Attorney for Plaintiff/Appellee;

11. Hatcher-Bolin, Kristie—Attorney for Defendants/Appellants;

12. Irick, Daniel C. – United States Magistrate Judge, Middle District of Florida, Orlando Division;

13. Johnson, Michael—Defendant/Appellant;

14. Katz, Katherine W.—Attorney for Defendants/Appellants;

15. Lauten, Jr., Frederick James—Mediator;

16. Mendoza, Carlos E.—United States District Judge, Middle District of Florida, Orlando Division;

17.    Myers, Nancy—Defendant/Appellant;

18.    Negy, Charles—Plaintiff/Appellee;

19.    Osborne, David R.—Attorney for Plaintiff/Appellee;

20.    Spradley, Susan T.—Former Attorney for Defendants/Appellants;

21.    The University of Central Florida Board of Trustees—Defendant;

22.    Zimmerman, Jason—Former Attorney for Defendants/Appellants;

23.    Zolty, Julie M.—Attorney for Defendants/Appellants.

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that a true and correct copy of the foregoing was electronically filed on September 10, 2025 using the ECF system which will automatically transmit a copy to:

*Counsel for Plaintiff/Appellee Charles Negy*
c/o David R. Osborne, Esq.
Goldstein Law Partners, LLC
200 School Alley, Suite 5
Green Lane, PA 18054
dosborne@goldsteinlp.com

*Co-counsel for Charles Negy*
c/o Joshua Engel, Esq.
Engel & Martin, LLC
4660 Duke Drive, Ste. 101
Mason, OH 45040
engel@engelandmartin.com

*Co-counsel for Charles Negy*
Samantha Harris, Esq.
Allen Harris PLLC
P.O. Box 673
Narberth, PA 19072
sharris@allenharrislaw.com

*/s/ Richard L. Barry*

**RICHARD L. BARRY, ESQ.**
Florida Bar No. 360650
Richard.Barry@gray-robinson.com
Lead Trial Counsel
**KATHERINE W. KATZ, ESQ.**
Florida Bar No. 1022526
Katherine.Katz@gray-robinson.com
**JULIE M. ZOLTY**
Florida Bar No.: 1036454
Julie.Zolty@gray-robinson.com
**GRAY ROBINSON, P.A.**
Post Office Box 3068
Orlando, Florida  32802-3068
Telephone:  (407) 843-8880
Facsimile:   (407) 244-5690

*/s/ Kristie Hatcher-Bolin*

**KRISTIE HATCHER-BOLIN**
Florida Bar No. 521388
Kristie.Hatcher-bolin@gray-robinson.com
**GRAY ROBINSON, P.A.**
Post Office Box 3
Lakeland, Florida 33802-0003
Telephone: (863) 284-2251
Facsimile: (863) 683-7462
*Counsel for Defendants/Appellants*

/57110/93#64630159

USCA11 Case: 25-11839    Document: 23-1    Date Filed: 09/10/2025    Page: 11 of 217

**6:23-cv-00666-CEM-DCI** Regn v. Board of Trustees of the University of Central Florida et al
Carlos E. Mendoza, presiding
Daniel C. Irick, referral
**Date filed:** 04/12/2023
**Date terminated:** 06/10/2025
**Date of last filing:** 06/12/2025

# History

| Doc. No. | Dates | Description |
|---|---|---|
| 1 | *Filed & Entered:* 04/12/2023 | Complaint |
| | *Filed & Entered:* 04/13/2023 | Disbursement Voucher / Refund |
| 2 | *Filed & Entered:* 04/13/2023 | Case Assigned/Reassigned |
| 3 | *Filed & Entered:* 04/13/2023 | Notice of a Related Action |
| 4 | *Filed & Entered:* 04/13/2023 | Disclosure Statement - LR 3.03 and FRCP 7.1 |
| 5 | *Filed & Entered:* 04/14/2023 | Order |
| 6 | *Filed & Entered:* 04/14/2023 | Notice to Counsel of Local Rule |
| 7 | *Filed & Entered:* 04/14/2023 | Order Reassigning Case to Another Judge w/in Division |
| 8 | *Filed & Entered:* 04/14/2023 *Terminated:* 04/17/2023 | Motion to Appear |
| 9 | *Filed & Entered:* 04/17/2023 | Case Assigned/Reassigned |
| 10 | *Filed & Entered:* 04/17/2023 | Order on Motion to Appear Pro Hac Vice |
| 11 | *Filed & Entered:* 04/17/2023 | Order |
| 12 | *Filed & Entered:* 04/17/2023 | Order |
| 13 | *Filed & Entered:* 04/17/2023 | Order |
| 14 | *Filed & Entered:* 04/20/2023 | Notice of a Related Action |
| 15 | *Filed & Entered:* 04/20/2023 | Disclosure Statement - LR 3.03 and FRCP 7.1 |
| 16 | *Filed & Entered:* 04/28/2023 | Disclosure Statement - LR 3.03 and FRCP 7.1 |

| | | |
|---|---|---|
| 17 | *Filed & Entered:*    05/01/2023 | Order |
| 18 | *Filed & Entered:*    05/01/2023 | Case Assigned/Reassigned |
| 19 | *Filed & Entered:*    06/09/2023 <br> *Terminated:*    07/04/2023 | Motion to Dismiss |
| 20 | *Filed & Entered:*    06/09/2023 | Disclosure Statement - LR 3.03 and FRCP 7.1 |
| 21 | *Filed & Entered:*    06/09/2023 | Notice of a Related Action |
| 22 | *Filed & Entered:*    06/12/2023 | Notice of appearance |
| 23 | *Filed & Entered:*    06/12/2023 | Notice of appearance |
| 24 | *Filed & Entered:*    06/12/2023 | Notice of appearance |
| 25 | *Filed & Entered:*    06/12/2023 | Notice of appearance |
| 26 | *Filed & Entered:*    06/29/2023 | Amended Complaint |
| 27 | *Filed & Entered:*    06/29/2023 | Certificate of service |
| 28 | *Filed & Entered:*    07/04/2023 | Order on Motion to Dismiss |
| 29 | *Filed & Entered:*    07/10/2023 <br> *Terminated:*    07/13/2023 | Motion for Extension of Time to File Response/Reply |
| 30 | *Filed & Entered:*    07/13/2023 | Order on Motion for Extension of Time to File Response / Reply |
| 31 | *Filed & Entered:*    07/20/2023 | Case Management Report |
| 32 | *Filed & Entered:*    07/21/2023 <br> *Terminated:*    04/29/2024 | Motion to Dismiss |
| 33 | *Filed & Entered:*    08/07/2023 | Case Management Scheduling Order |
| 34 | *Filed & Entered:*    08/11/2023 | Response in Opposition to Motion |
| 35 | *Filed & Entered:*    08/11/2023 | Certificate of service |
| 36 | *Filed & Entered:*    04/17/2024 | Notice of appearance |
| 37 | *Filed & Entered:*    04/19/2024 <br> *Terminated:*    04/29/2024 | Motion to Stay |

| 38 | *Filed & Entered:* 04/29/2024 | Order on Motion to Dismiss |
| 39 | *Filed & Entered:* 04/29/2024 | Order on Motion to Stay |
| 40 | *Filed & Entered:* 05/08/2024 <br> *Terminated:* 05/13/2024 | Motion for Extension of Time to File Answer / Respond to Complaint |
| 41 | *Filed & Entered:* 05/13/2024 | Order on Motion for Extension of Time to Answer |
| 42 | *Filed & Entered:* 05/23/2024 | Answer to amended complaint |
| 43 | *Filed & Entered:* 05/23/2024 | Answer to amended complaint |
| 44 | *Filed & Entered:* 05/23/2024 | Answer to amended complaint |
| 45 | *Filed & Entered:* 05/23/2024 | Answer to amended complaint |
| 46 | *Filed & Entered:* 05/23/2024 | Answer to amended complaint |
| 47 | *Filed & Entered:* 06/24/2024 <br> *Terminated:* 07/07/2024 | Motion for Extension of Time to Complete Discovery |
| 48 | *Filed & Entered:* 07/07/2024 | Order on Motion for Extension of Time to Complete Discovery |
| 49 | *Filed & Entered:* 08/08/2024 <br> *Terminated:* 08/08/2024 | Motion to Withdraw as Attorney |
| 50 | *Filed & Entered:* 08/08/2024 | Order on Motion to Withdraw as Attorney |
| 51 | *Filed & Entered:* 12/04/2024 <br> *Terminated:* 12/05/2024 | Motion for Miscellaneous Relief |
| 52 | *Filed & Entered:* 12/05/2024 | Order on Motion for Miscellaneous Relief |
| 53 | *Filed & Entered:* 12/05/2024 | Notice of mediation conference/hearing |
| 54 | *Filed & Entered:* 12/12/2024 <br> *Terminated:* 12/17/2024 | Motion for Extension of Time to File |
| 55 | *Filed & Entered:* 12/17/2024 | Order on Motion for Extension of Time to File |
| 56 | *Filed & Entered:* 01/13/2025 | Notice of Lead Counsel Designation |
| 57 | *Filed & Entered:* 01/15/2025 | Mediation report |
| 58 | *Filed & Entered:* 01/20/2025 | Motion to Withdraw as Attorney |

| | | | |
|---|---|---|---|
| [59](#) | *Filed & Entered:* | 01/21/2025 | Motion for Summary Judgment |
| | *Terminated:* | 05/12/2025 | |
| [60](#) | *Filed & Entered:* | 01/21/2025 | Motion for Summary Judgment |
| | *Terminated:* | 05/12/2025 | |
| [61](#) | *Filed & Entered:* | 01/21/2025 | Motion for Summary Judgment |
| | *Terminated:* | 05/12/2025 | |
| [62](#) | *Filed & Entered:* | 01/21/2025 | Deposition |
| [63](#) | *Filed & Entered:* | 01/21/2025 | Deposition |
| [64](#) | *Filed & Entered:* | 01/21/2025 | Deposition |
| [65](#) | *Filed & Entered:* | 01/21/2025 | Deposition |
| [66](#) | *Filed & Entered:* | 01/21/2025 | Deposition |
| [67](#) | *Filed & Entered:* | 01/21/2025 | Deposition |
| [68](#) | *Filed & Entered:* | 01/21/2025 | Deposition |
| [69](#) | *Filed & Entered:* | 01/21/2025 | Notice (Other) |
| [70](#) | *Filed & Entered:* | 01/21/2025 | Deposition |
| [71](#) | *Filed & Entered:* | 01/21/2025 | Notice (Other) |
| [72](#) | *Filed & Entered:* | 01/21/2025 | Deposition |
| [73](#) | *Filed & Entered:* | 01/21/2025 | Notice (Other) |
| [74](#) | *Filed & Entered:* | 01/21/2025 | Notice (Other) |
| [75](#) | *Filed & Entered:* | 01/21/2025 | Notice (Other) |
| [76](#) | *Filed & Entered:* | 01/21/2025 | Notice (Other) |
| [77](#) | *Filed & Entered:* | 01/21/2025 | Notice (Other) |
| [78](#) | *Filed & Entered:* | 01/21/2025 | Notice (Other) |
| [80](#) | *Filed:* | 01/22/2025 | *Remark |
| | *Entered:* | 01/23/2025 | |

| 79 | *Filed & Entered:* 01/23/2025 | Order on Motion to Withdraw as Attorney |
|----|---|---|
| 81 | *Filed & Entered:* 01/28/2025 <br> *Terminated:* 01/29/2025 | Motion for Extension of Time to File Response/Reply |
| 82 | *Filed & Entered:* 01/29/2025 | Order on Motion for Extension of Time to File Response / Reply |
| 83 | *Filed & Entered:* 02/12/2025 <br> *Terminated:* 02/13/2025 | Motion to File Excess Pages |
| 84 | *Filed & Entered:* 02/13/2025 | Order on Motion to File Excess Pages |
| 85 | *Filed & Entered:* 02/24/2025 <br> *Terminated:* 02/25/2025 | Motion to Appear |
| 86 | *Filed & Entered:* 02/25/2025 | Order on Motion to Appear Pro Hac Vice |
| 87 | *Filed & Entered:* 03/04/2025 | Notice (Other) |
| 88 | *Filed & Entered:* 03/04/2025 | Response in Opposition to Motion |
| 89 | *Filed & Entered:* 03/06/2025 <br> *Terminated:* 03/06/2025 | Motion for Leave to File Document |
| 90 | *Filed & Entered:* 03/06/2025 | Order on Motion for Leave to File Document |
| 91 | *Filed & Entered:* 03/13/2025 <br> *Terminated:* 03/13/2025 | Motion for Extension of Time to File Response/Reply |
| 92 | *Filed & Entered:* 03/13/2025 | Order on Motion for Extension of Time to File Response / Reply |
| 93 | *Filed & Entered:* 03/21/2025 | Reply to Response to Motion |
| 94 | *Filed & Entered:* 03/25/2025 | Notice of appearance |
| 95 | *Filed & Entered:* 04/08/2025 <br> *Terminated:* 05/12/2025 | Motion to Stay |
| 96 | *Filed & Entered:* 04/25/2025 <br> *Terminated:* 04/25/2025 | Motion to Appear |
| 97 | *Filed & Entered:* 04/25/2025 | Order on Motion to Appear Telephonically / Video |
| 98 | *Filed & Entered:* 05/05/2025 <br> *Terminated:* 06/10/2025 | Motion In Limine |

| 99 | *Filed & Entered:* 05/05/2025 | Pretrial statement |
|---|---|---|
| [100](#) | *Filed & Entered:* 05/12/2025 | Order on Motion for Summary Judgment |
| [101](#) | *Filed & Entered:* 05/13/2025 | Judgment |
| [102](#) | *Filed & Entered:* 05/13/2025 | Judgment |
| [103](#) | *Filed & Entered:* 05/13/2025<br>*Terminated:* 05/14/2025 | Motion to Appear |
| 104 | *Filed & Entered:* 05/14/2025 | Order on Motion to Appear Telephonically / Video |
| [105](#) | *Filed & Entered:* 05/15/2025 | Status Conference |
| 106 | *Filed & Entered:* 05/15/2025 | Notice of Hearing |
| [107](#) | *Filed & Entered:* 05/19/2025 | Response in Opposition to Motion |
| [108](#) | *Filed & Entered:* 05/27/2025 | Bill of costs - proposed |
| 109 | *Filed & Entered:* 05/30/2025 | Notice of Hearing - Reschedule |
| [110](#) | *Filed & Entered:* 06/06/2025 | Notice of Appeal |
| [111](#) | *Filed & Entered:* 06/09/2025 | Transmission of Notice of Appeal, Order/Judgment and Docket Sheet to USCA |
| [112](#) | *Filed & Entered:* 06/10/2025 | Transcript Information Form |
| 113 | *Filed & Entered:* 06/10/2025 | Order |
|  | *Filed & Entered:* 06/11/2025 | USCA Appeal Fees |
| 114 | *Filed & Entered:* 06/11/2025 | Notice of Hearing - Cancel |
| [115](#) | *Filed & Entered:* 06/12/2025 | Bill of costs |

| **PACER Service Center** | | |
|---|---|---|
| **Transaction Receipt** | | |
| 09/02/2025 13:40:26 | | |
| **PACER Login:** | khatcherbolin0521388 | **Client Code:** |  |
| **Description:** | History/Documents | **Search Criteria:** | 6:23-cv-00666-CEM-DCI |

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

CHARLES NEGY,

      Plaintiff,

  v.

                                   No. 23-666

BOARD OF TRUSTEES OF THE
UNIVERSITY OF CENTRAL FLORIDA;
S. KENT BUTLER; individually and in
his official capacity; ALEXANDER
CARTWRIGHT, individually and in
his official capacity; TOSHA DUPRAS,
individually and in her official capacity;
MICHAEL JOHNSON, individually and in
his official capacity; and NANCY MYERS,
individually and in her official capacity,

      Defendants.

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Charles Negy, by and through his undersigned attorneys, files this complaint for violations of the First and Fourteenth Amendments pursuant to 42 U.S.C. § 1983, as well as for negligence, abuse of process, and intentional infliction of severe emotional distress. In support of this complaint, Charles Negy respectfully alleges as follows:

## NATURE OF THE ACTION

1.    In the name of a crusade "to be actively anti-racist," as Defendant Alexander Cartwright announced on June 2, 2020, the University of Central

Florida (UCF) harassed and retaliated against Professor Charles Negy because he dared to publicly express viewpoints out of step with the prevailing campus orthodoxy on anti-racism.

2.      After Charles Negy posted several tweets to his personal Twitter account expressing his view that, contrary to the ascendant orthodoxy on campus, Blacks are not systematically oppressed in the United States, he became the target of a Twitter mob that demanded he be fired. Protests erupted at UCF and even at Negy's home, leading him to require police protection.

3.      Forbidden by the First Amendment to explicitly fire him for his tweets, UCF administrators publicly solicited people to come forward with complaints of discrimination and harassment against Professor Negy and then launched a malicious, pretextual investigation into every aspect of his 22-year career at the university.

4.      UCF's investigation culminated in a 9-hour interrogation of Professor Negy, during which a senior UCF administrator barraged Negy with hundreds of allegations that she had previously refused to give him notice of, despite his repeated requests. The interrogation — which included wide-ranging allegations, many of which bordered on the absurd — made clear that UCF was not merely investigating Negy for alleged harassment and discrimination, but rather was looking for any information it could use to

2

get rid of a faculty member who had become politically inconvenient to the university administration.

5.     Following an investigation which dragged on, without good cause, for 7 months, UCF summarily terminated Negy in January 2021. Maliciously invoking an inapplicable exception to the collective bargaining agreement ("CBA") requiring that tenured faculty receive six months' notice of termination, UCF terminated Negy effective immediately. As a result of this sudden loss of income, Negy — who is the sole caretaker of his mentally and physically disabled brother — was forced to sell his home and move in with a relative.

6.     Negy pursued a grievance through his faculty union for violating the CBA, and in May 2022, an arbitrator ordered UCF to reinstate Negy with back pay and benefits, finding he was terminated without just cause. However, the award cannot compensate Negy for the massive loss he incurred on the sale of his home; for the out-of-pocket medical expenses he faced after UCF's destruction of his life led him to be diagnosed with anxiety and depression; or for the severe emotional distress he suffered for nearly two years at the hands of UCF administrators who, because they disliked his political views, treated him as less than human.

## THE PARTIES

7.     Plaintiff Charles Negy is, and was at all times relevant to this Complaint, an Associate Professor of Psychology at the University of Central Florida, where he has taught since 1998.

8.     Defendant Board of Trustees of the University of Central Florida ("the Trustees") is the 13-member governing body of UCF, a governmental entity, and is responsible for the administration of UCF, including but not limited to UCF's compliance with laws, rules, regulations, and requirements. At all times relevant to this complaint, the Trustees acted under color of state law and are sued in their official capacities.

9.     At all times relevant to the Complaint, Defendant S. Kent Butler was UCF's Interim Chief Equity, Inclusion and Diversity Officer. Immediately following Negy's expression of dissenting views on Twitter, Defendant Butler, along with Defendants Cartwright and Johnson, publicly announced an inquiry into Negy's classroom conduct and solicited UCF community members to come forward with complaints of bias and discrimination against Negy. Defendant Butler acted under color of state law and is sued in both his individual and official capacities.

10.     Defendant Alexander Cartwright is the President of UCF. Immediately following Negy's expression of dissenting views on Twitter, Defendant Cartwright, along with Defendants Butler and Johnson, publicly

4

announced an inquiry into Negy's classroom conduct and solicited UCF community members to come forward with complaints of bias and discrimination against Negy. Defendant Cartwright acted under color of state law and is sued in both his individual and official capacities.

11.     Defendant Tosha Dupras was, at all times relevant to this Complaint, the Interim Dean of UCF's College of Sciences. Defendant Dupras issued Negy's notice of termination and invoked an inapposite provision of UCF's CBA to deny Negy the customary six months' notice of termination afforded to tenured faculty, causing him severe damage. Defendant Dupras acted under color of state law and is sued in both her individual and official capacities.

12.     Defendant Michael Johnson is UCF's Provost and Executive Vice President for Academic Affairs. Immediately following Negy's expression of dissenting views on Twitter, Defendant Johnson, along with Defendants Butler and Cartwright, publicly announced an inquiry into Negy's classroom conduct and solicited UCF community members to come forward with complaints of bias and discrimination against Negy. Defendant Johnson acted under color of state law and is sued in both his individual and official capacities.

13.     Defendant Nancy Myers is the Director of UCF's Office of Institutional Equity ("OIE"). Defendant Myers served as the investigator in

5

the disciplinary proceedings against Negy, proceedings which were conducted without affording Plaintiff due process of law. Defendant Myers acted under color of state law and is sued in both her individual and official capacities.

## JURISDICTION AND VENUE

14.    This case arises under the Constitution and laws of the United States, specifically 42 U.S.C. § 1983. Accordingly, this Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

15.    Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over all other claims so related to the claim in this action with such original jurisdiction that they form part of the same case or controversy under Article III of the U.S. Constitution.

16.    Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391. The defendants are residents of the State in which this district is located and a substantial part of the events or omissions giving rise to the claim occurred in this district.

## FACTS

### *Negy Engages in Political Expression on Twitter*

17.    At all times relevant to this Complaint, Professor Negy maintained a Twitter account for his personal use, using the handle

@CharlesNegy. Negy's Twitter profile does not mention his affiliation with UCF and states "Opinions are my own."

18.    Negy is a minority, being both gay and Hispanic, and in fact was identified by UCF in 1998 as a "Diversity Enhancement Hire."

19.    However, Negy holds opinions that do not align with the way the way minority individuals are expected to think by those in power at America's colleges and universities, including UCF. In particular, Negy disagrees with the critical race theory that is ascendant on today's campuses.

20.    In light of national outrage over the fatal use of force by police against unarmed Black men and women, particularly the May 2020 murder of George Floyd, colleges and universities have come under tremendous pressure to take action to fight "systemic racism" on campus.

21.    UCF has not been immune to this pressure. On June 2, 2020, for example, Defendant Alexander Cartwright, UCF's president, issued a statement making "a commitment from our university to not merely celebrate our diversity, but to be actively anti-racist." Defendant Cartwright's message emphasized that education and reflection on these issues was insufficient, and that they "must be paired with action and a commitment to stand against racism in all its forms."

22.    In response to the national conversation around race happening at that time, Negy posted several tweets to his personal Twitter account

between May 29 and June 3, 2020, expressing his view that Blacks are not systemically oppressed in the United States.

### *UCF is Inundated by Demands to Fire Negy*

23.     Negy's tweets garnered an angry response on social media. Almost immediately, the hashtag #UCFfirehim began trending on Twitter.

24.     UCF quickly came under media scrutiny because of Negy's tweets. *See, e.g.*, Jason Dill, "A UCF Professor Tweeted About 'Black Privilege.' Then #UCFFireHim Started Trending," Miami Herald (June 4, 2020),

https://www.miamiherald.com/news/state/florida/article243261961.html.

25.     The pressure on UCF mounted immediately. On June 4, 2020, UCF's Assistant Vice President for Board Relations, Karen Monteleone, wrote UCF's Board of Trustees to say the following: "A UCF professor's personal Twitter posts have gone viral and have received significant media attention. Overnight, there have been thousands of posts on social media and hundreds of individuals have emailed university offices, including more than 175 submissions to the Board of Trustees account."

26.     One of these social media posts came from a Florida politician, Rep. Anna Eskamani, who has more than 80,000 followers on Twitter. On June 5, 2020, Rep. Eskamani tweeted a request for "help," asking members of

the UCF community to report "any abusive or discriminatory behavior at UCF by Dr. Negy," and noting that complaints could be "anonymous."

27.    On June 11, 2020, UCF's Student Senate passed a resolution calling on the university to fire Negy for his tweets. The resolution stated that "Negy's comments and views are, in fact, being supported and not condemned in the strongest terms if his employment is continued at this university."

28.    Also on June 11, 2020, the Psychology Department sent out an official departmental message stating that the opinions Negy expressed on Twitter were "insensitive, hurtful, offensive, and wrong," and urging students to come forward, even anonymously, with allegations of "classroom bias," since that — unlike Negy's constitutionally protected tweets — would be punishable.

29.    On June 14, 2020, protesters gathered on the UCF campus to demand Negy's firing, chanting "UCF, fire him!"

30.    An online petition demanding that UCF fire Negy received more than 34,000 signatures. *See* "UCF: Fire Psychology Professor Charles Negy," Change.org, https://www.change.org/p/university-of-central-florida-ucf-fire-psychology-professor-charles-negy.

***UCF's Administration Rushes to Placate Those Angered by Negy's Tweets***

9

31.     The UCF administration acted immediately to mollify those demanding that Negy be fired for his protected speech.

32.     On June 4, 2020, for example, Defendant Butler released a video statement on UCF's official Twitter account effectively admitting that UCF hoped to have Negy fired. Butler stated, "We're trying to do the right thing. Sometimes that takes change and takes time … **The #UCFFirehim I understand all of that but the fact of the matter is it's not going to happen overnight.**" (Emphasis added.)

33.     On June 4, 2020, Defendant Cartwright attended a virtual town hall with students angry over Negy's tweets. Cartwright told them "I promise you this is a matter that has our full attention, and we have launched an inquiry to quickly — but fully — evaluate this situation."

34.     On June 4, 2020, Defendant Dupras sent an email message to all College of Sciences students, faculty, and staff about Negy's Twitter comments, stating that "UCF leadership is aware of these tweets and are actively working to address this situation. I cannot speak to next steps until they are finalized, but I'm reaching out to let you know that the administration is moving forward."

35.     Also on June 4, 2020, Defendants Butler, Cartwright, and Johnson posted a statement to the UCF website entitled "Addressing Intolerance in our Community." The headline underneath the title stated:

"**Members of UCF's leadership urge current and former students to report discriminatory behavior they may have experienced from faculty and staff**." (Emphasis added).

36.    Defendants' post was intended to specifically target Negy. It stated that "we are disgusted by the racist posts one of our faculty members has shared on his personal Twitter account" and thanked students for speaking out about their outrage. Defendants' post then stated: "If any student, current or former, believes they may have experienced abusive or discriminatory behavior by any faculty or staff member, we want to know about it. UCF takes every report seriously. Concerns can be reported to UCF's IntegrityLine, which also takes anonymous complaints, at www.ucfintegrityline.com or 855-877-6049."

37.    On June 5, 2020, Negy was advised by UCF police that protesters were organizing to come to his home, and that he should be on guard for his safety. Negy wrote to Defendant Cartwright to say that "the way you have vilified me publicly has contributed to this situation," and to ask Defendant Cartwright to send out a message cautioning students against violence and against protesting at people's private homes. Defendant Cartwright did not send any such message.

38.    Instead, on June 5, 2020, Defendants Cartwright, Butler, and Johnson hosted a "Virtual Conversation about Race and Unity." During that

"conversation," Defendant Cartwright called Negy's tweets "abhorrent" and stated that "Although everyone has a right to their personal beliefs, we cannot allow that to cross over into our classrooms or into our workplace if it hurts people."

39.   The first question from a student during the June 5 "conversation" was "what avenues" UCF had open to fire Negy if his tweets were protected by the First Amendment.

40.   Defendant Johnson answered that if a faculty member is "offensive" in the classroom, "we have the capacity to act."

41.   Later in the conversation, an incoming student asked "what is going to be done" about Negy. Defendant Butler answered that "the wheels are in motion in terms of what needs to happen in regards to that… believe that by the time you get on the campus as a freshman, it will have been dealt with."

42.   On June 9, 2020, the staff of the Multicultural Student Center issued a letter addressed to all "UCF Knights" in response to the Twitter controversy stating that "Negy's discrimination against people of color is not to be tolerated or taken lightly." The letter concluded by encouraging students to "report to the Just Knights Response Team," a team created to assist those "who have been impacted by hate or bias-related incidents."

43.     On June 13, 2020, egged on by UCF's repeated expressions of outrage, UCF students protested in front of Negy's home. After two hours of protesting at the entrance to Negy's neighborhood, they drove up and down his street for 40 minutes, blowing their horns non-stop, with a megaphone, shouting to all of his neighbors "Negy is a racist" and "UCF must Fire Racist Negy." Negy had six Orange County sheriff's officers at his home that day, four of them parked in front of his house to prevent the UCF protesters from coming onto his property.

44.     On June 14, Defendant Cartwright attended a protest held by students demanding Negy's firing.

45.     At the June 14 protest, one of the students in attendance said to Defendant Cartwright that Negy "should have been fired before he got tenure." Defendant Cartwright agreed with the student, responding **"[S]o, one thing is that.** One is also looking at the Office of Diversity, Equity, and Inclusion, I mean that office, honestly… is understaffed."[1] (Emphasis added.)

***UCF Subjects Negy to an Intrusive and Protracted Investigation***

46.     Negy has taught at UCF since 1998 and has received consistently superior performance reviews. In the four years leading up to his

---

[1] https://twitter.com/UCFKnightNews/status/1272310037617291264

termination, he received an evaluation rating of "Outstanding" for his instruction and advising.

47.    Following the administration's public solicitation of complaints on June 4, 2020, however, UCF received a litany of allegations, many anonymous, about Negy's classroom teaching.

48.    Without informing Negy that there were complaints against him, UCF began an investigation.

49.    Negy learned about this investigation the way the rest of the general public did: through the media.

50.    Negy received no formal notice of this investigation until more than a month later, on July 17, 2020.

51.    On July 17, 2020, Defendant Myers sent Negy a letter notifying him that he was under investigation by UCF's Office of Institutional Equity ("OIE"), stating, "Beginning on June 4, 2020, OIE received multiple reports that you posted derogatory, discriminatory and unprofessional statements on a Twitter account, and that you subjected students to discriminatory harassment based on race, ethnicity, national origin, sexual orientation, religion, sex, gender identity/expression, and disability in the classroom."

52.    The June 4, 2020 date identified by Defendant Myers was no coincidence: it was the date on which Defendants Butler, Cartwright, and Johnson posted their missive on UCF's website soliciting people to come

14

forward with complaints against Negy in a pretextual effort to justify firing him.

53.    The notice provided to Negy on July 17, 2020, did not include enough information to allow him to prepare for his investigative interview.

54.    Pursuant to Department of Education guidance in effect at the time, "notice" in a disciplinary matter alleging sexual harassment must include "the identities of the parties involved, the specific section of the code of conduct allegedly violated, the precise conduct allegedly constituting the potential violation, and the date and location of the alleged incident." The representative "examples" provided by Defendant Myers did not satisfy this notice requirement.

55.    On July 21, 2020, Negy, through counsel, requested further information about the nature of the alleged misconduct, the dates and times of the alleged misconduct, and the parties involved. However, Defendant Myers continued to obfuscate and deny Negy the information he needed in order to prepare for an investigative interview.

56.    On July 31, 2020, Defendant Myers replied to Negy's request for further information by informing him that the alleged misconduct took place "from 2005 through 2020," and included additional examples of conduct that allegedly violated university policy. With regard to Negy's request for the identities of the parties involved, Defendant Myers provided him with a

partial list of names in a separate file, with no information about who had alleged what, or when.

57.     Upon information and belief, a large number of the complaints brought against Negy and considered by Defendant Myers were made anonymously.

58.     On August 4, 2020, Negy responded to Defendant Myers' email of July 31, expressing his concern that he would "like to produce witnesses who can attest that I did not say the things I am alleged to have said," but that "with no information about when in the past 15 years I am alleged to have made each of these statements, I have no way of identifying relevant witnesses."

59.     Negy's August 4, 2020 email to Defendant Myers also asked whether there were additional allegations of which he had not yet been informed.

60.     Defendant Myers responded to Negy's August 4 email on August 5, 2020. She did not address Negy's request for further information that would allow him to identify witnesses. In response to his question about additional allegations, Defendant Myers wrote simply that "OIE will not be providing additional details about the allegations … prior to your interview."

61.     On August 7, 2020, Negy had his first investigative interview with OIE, conducted by Defendant Myers.

62.    That interview lasted for more than four hours and concluded only when Negy, exhausted, asked Defendant Myers if the interview was almost finished and learned that she had not even gone through half of the allegations. Myers agreed to conduct the remainder of the interview on a second day of questioning.

63.    On August 14, 2020, Negy had his second investigative interview with OIE, conducted by Defendant Myers. That interview lasted for four hours.

64.    The courses that Negy teaches, including Cross-Cultural Psychology and Sexual Behavior, include discussions of controversial and sensitive topics.

65.    During her 8+ hours of interrogation, Defendant Myers barraged Negy with a litany of accusations spanning 15 years. Most of these allegations were simply objections to Negy's course content and pedagogy. For example, multiple individuals allegedly complained that he lectured about certain sexual practices specific to particular Native American and African tribes, despite the fact that this lecture on cross-cultural sexual practices is wholly germane to the subjects he teaches, has been a longstanding part of his pedagogy, and has never been the subject of a complaint in his student evaluations.

66.    It was also apparent that Defendant Myers had not even bothered to consolidate repetitive allegations, as many of the allegations she asked him about were variations of the same question. This repetitive questioning served no purpose other than to harass and intimidate Negy.

67.    Defendant Myers also asked Negy about a variety of allegations that had absolutely nothing to do with alleged discriminatory harassment, including whether he had ever bribed a health care official while traveling abroad and whether he used departmental resources while writing his book, demonstrating that this was not a good-faith investigation into allegations of harassment but rather a fishing expedition undertaken in the desperate hope of finding some basis to discipline Negy other than his constitutionally protected expression on Twitter.

68.    On August 27, 2020, several weeks after the second of Negy's two interrogation sessions, Defendant Myers informed Negy via email that she anticipated the investigative report would be completed "in September 2020."

69.    September 2020 came and went as Negy continued to live under the threat of punishment. On October 1, 2020, Defendant Myers wrote Negy again to state that, due to personal matters, she had been out of the office and now anticipated that "the report will be issued in October." She stated that she would "update [him] if that changes."

70.    October 2020 came and went with no report and no "update."

18

71.     At all times relevant to this complaint, UCF policy required that an investigation be completed within 90 days absent "good cause." Negy, through counsel, requested information regarding the cause of the delay on November 3, 2020 — 152 days after the university publicly announced it had "launched an inquiry" into Negy, and 109 days after Negy had formally received a notice of investigation.

72.     On November 6, 2020, Defendant Myers wrote Negy to say that she now anticipated her investigative report would be "issued in November," with no reason given for the continued delay. She stated that she would "update [him] if that changes."

73.     November 2020 came and went with no report and no "update."

74.     On December 1, 2020, with the investigation in its sixth month, Negy again wrote to Defendant Myers to request information about the delay. He explained that "This protracted investigation is taking a terrible toll on me both personally and professionally and is causing irreparable harm to my reputation and professional opportunities," and asked for "a meaningful update on the status of this investigation."

75.     Defendant Myers responded on December 7, 2020, that "The investigation of your matter remains pending and has taken longer than initially anticipated."

76.     Negy received no further updates from Defendant Myers.

However, on January 5, 2021, Negy was notified by Defendant Dupras that

following "internal discussions" of his case to which he was not privy, he was

being placed on administrative leave. While UCF's faculty CBA permits

employees to be placed on administrative leave at the *start* of an

investigation, the circumstances of UCF's sudden decision to place Negy at

this stage — with opaque reference to unspecified "internal discussions" —

was highly irregular, and was further evidence of Defendants' retaliation

against Negy for his protected speech.

### Defendant Myers Finds Negy Responsible for Misconduct in Violation of the First Amendment

77.     On January 13, 2021 — 180 days after Negy received his notice of

investigation — Defendant Myers issued her investigative report. Defendant

Myers' report concluded that Negy had engaged in discriminatory

harassment in the course of his classroom teaching. Defendant Myers also

concluded that in 2014, Negy had failed to report inappropriate behavior

allegedly committed by one of his teaching assistants.

78.     Defendant Myers also found that Negy — who repeatedly begged

for enough information about the allegations against him to allow him to

meaningfully prepare for his investigative interviews — had provided "false"

information during the investigation on account of his faulty memory in a few isolated instances.

79.     Many of the alleged incidents of "discriminatory harassment" for which Defendant Myers found Negy responsible were in fact instances of speech protected by academic freedom and the First Amendment.

80.     Indeed, in an unrelated lawsuit, the U.S. Court of Appeals for the Eleventh Circuit ruled in April 2022 that UCF's "discriminatory-harassment policy likely violates the First Amendment on the grounds that it is an overbroad and content- and viewpoint-based regulation of constitutionally protected expression."

***Defendant Dupras Fires Negy Without the Required Notice, Leaving Him Homeless and Without Income***

81.     Also on January 13, 2021, Defendant Dupras issued Negy a letter notifying him of the university's intent to terminate his employment at the close of business on January 25, 2021.

82.     Under UCF faculty's CBA, tenured faculty are ordinarily entitled to six months' notice of termination unless their continued presence "jeopardize[s] the safety or welfare of…students."

83.     However, Defendant Dupras determined that because Negy had once allegedly failed to report inappropriate touching by his teaching

assistant in 2014, his presence on campus in 2021 would "jeopardize the safety or welfare of…students" and thus he could be terminated immediately.

84. Defendant Dupras' letter cruelly treated Negy, who had been employed by UCF for more than 20 years, like a common criminal. She directed Negy to return any UCF property in his possession within two days or it "will be considered stolen," and informed him that before coming to campus to return said property, he would need to make prior arrangements to have an "escort" while on campus.

85. The immediate loss of income caused by the denial of six months' notice forced Negy to rapidly sell his home at significantly below market value. This was particularly difficult because Negy had just assumed responsibility for the care of his physically and mentally disabled brother following the death of their last parent. At the time of Negy's termination, his brother had just moved from Houston to Orlando to live with Negy.

86. Without income and now homeless, Negy and his brother were forced to move in with a relative.

87. Negy's mental health deteriorated significantly as a result of Defendants' actions. In April 2021, he was diagnosed with Major Depressive Disorder and Generalized Anxiety Disorder after he sought treatment for symptoms that began "following termination from his previous place of employment." Negy had no prior mental health history or diagnosis.

***UCF Loses in Arbitration***

88.     On February 12, 2021, Negy notified UCF of his intent to grieve his termination as a violation of his CBA.

89.     Negy's grievance argued that UCF violated the CBA by failing to provide him with six months' notice of his termination, and by disciplining him without "just cause."

90.     On March 19, 2021, Negy and his Union-appointed attorney attended a "Step 2" grievance meeting with UCF administrators at which Negy's attorney laid out the ways in which Defendants' termination of Negy violated the terms of the CBA.

91.     Under the CBA, the UCF Board of Trustees had 30 days to respond to the information that Negy's Union attorney presented at the Step 2 meeting. Just before the 30-day deadline, Negy was notified that the Board of Trustees was requesting a 30-day extension to respond.

92.     Having already been severely damaged by the repeated delays in the investigation process that preceded his termination, Negy — through counsel — asked the Board of Trustees why they were requesting the extension.

93.      Without giving any reason, the Board of Trustees simply said they were unable to respond by the deadline.

23

94. Under the CBA, Negy was therefore permitted to notify UCF of his intent to proceed to arbitration, the final stage of the grievance process. Negy submitted a Notice of Intent to Arbitrate on May 13, 2021.

95. After multiple delays, Negy's arbitration hearing took place in March 2022.

96. On May 16, 2022, the arbitrator issued an opinion awarding Negy "full reinstatement, with tenure, and with all compensation and benefits fully restored to that effect as of the termination date."

97. Specifically, the arbitrator determined that UCF had not been justified in overriding the 6-month notice requirement of the CBA by deeming Negy a "safety risk."

98. The arbitrator found that Negy had received "consistently outstanding annual evaluations" for the past two decades, until his tweets led to a "campaign by UCF" to gather potentially damaging information about his classroom behavior.

99. The arbitrator ruled that UCF's assessment that Negy was a "safety risk," when UCF had given him no opportunity to modify his behavior, did not justify denying him the required 6 months' notice. The arbitrator was unpersuaded by UCF's attempt to "buttress its claim" that Negy was a safety risk by pointing to his alleged 2014 failure to report unwanted conduct by a teaching assistant.

100.   Because the arbitrator concluded that UCF had violated the CBA by denying Negy the 6 months' notice, he did not reach the second question of whether Negy was actually responsible for the misconduct of which UCF accused him. He noted, however, that Negy's case raised issues such as "effective use of protected free speech texts" and "announcement pre-investigation that Dr. Negy was a pariah in the view of the administration."

101.   Adding insult to injury, UCF dragged its feet and took more than four months to pay Negy what he was awarded by the arbitrator in May 2022.

102.   This caused Negy to suffer additional financial hardship. Further, to his great embarrassment, he was forced to approach friends and family for loans during the period of time that UCF refused to pay him what he was owed.

## FIRST CAUSE OF ACTION

**Violation of Plaintiff's Right to Free Speech Under the First and Fourteenth Amendments (42 U.S.C § 1983) – Retaliation – Defendants Board of Trustees of UCF, Butler (individually), Cartwright (individually), Johnson (individually), Dupras (individually), Myers (individually)**

103.   Plaintiff repeats and realleges each of the foregoing allegations in this Complaint as if fully set forth herein.

104.   Plaintiff engaged in constitutionally protected speech and has been subjected to severe retaliation as a result. Defendants' actions would deter a person of ordinary firmness from exercising their right to free speech.

105.   Within days of Plaintiff's protected tweets, Defendants Butler, Cartwright, and Johnson publicly solicited complaints about Plaintiff's classroom teaching in an effort to establish a pretextual reason for terminating him. This solicitation was posted on UCF's website under the headline "Members of UCF's leadership urge current and former students to report discriminatory behavior they may have experienced from faculty and staff." The pretextual nature of Defendants' solicitation of complaints is evident both from the timing and from Defendants' contemporaneous remarks to students who were demanding Plaintiff's firing. Defendant Butler, for example, responded to the flood of #UCFFireHim tweets by posting a video to Twitter explaining that "the fact of the matter is it's not going to happen overnight." Similarly, Defendant Cartwright publicly agreed with a student protester who stated that "should have been fired before he got tenure."

106.   Also within days of Plaintiff's protected tweets, Defendant Dupras sent a message to the entire College of Sciences to inform them that "UCF leadership is aware of these tweets and are actively working to address this situation. I cannot speak to next steps until they are finalized, but I'm

reaching out to let you know that the administration is moving forward."
When the administration finished "moving forward," Defendant Dupras not
only imposed the most severe sanction of termination, but also deliberately
and maliciously deprived Plaintiff of the customary 6 months' notice of
termination afforded to tenured faculty. Instead, Defendant Dupras deemed
Plaintiff a danger to campus based on his alleged failure to report
inappropriate behavior on the part of one of his teaching assistants in 2014,
and provided him with only 12 days' notice.

107.   Defendant Myers conducted the investigation that resulted from
the solicitation of complaints against Plaintiff. Her investigation was
intrusive and harassing. She asked Plaintiff repetitive questions for over 8
hours. She delayed the investigation for months without explanation. When
Plaintiff repeatedly asked for sufficient information about the allegations to
allow him to prepare for his interviews with Defendant Myers, she denied
him that information — and then used his faulty memory to add a charge of
providing false information during an investigation to the list of charges
against him. Further, Defendant Myers concluded that Plaintiff had violated
UCF policy based on his protected classroom speech.

108.   The Board of Trustees was aware of Plaintiff's tweets and of the
demands for his termination that followed. They were first informed of the
controversy on June 4, 2020, in an email from UCF's Assistant Vice President

for Board Relations. The Trustees were further aware of Defendants'
mistreatment of Plaintiff in their solicitation of complaints, investigation,
and termination, as they vigorously defended the specific actions of each
Defendant in their arbitration brief.

109.    Defendants' actions have severely damaged Plaintiff.

110.    Negy was out of work for more than a year. He was forced to sell
his home at a significant loss and move in with a relative in order to be able
to provide care and shelter for his mentally and physically disabled brother,
for whom he is the sole caregiver.

111.    Negy was diagnosed with anxiety and major depressive disorder
and had to seek medical treatment.

112.    Defendants have destroyed Plaintiff's reputation and rendered
him virtually unemployable in his field at any institution other than UCF.

113.    Further, Defendants' actions — which they continue to defend to
this day — have had a severe chilling effect on Plaintiff's speech following his
reinstatement; he is fearful of teaching the controversial subjects covered in
his classes for fear of additional complaints and investigations.

114.    In retaliating against Plaintiff for his protected speech,
Defendants Butler, Johnson, Cartwright, Myers, and Dupras all acted in
violation of clearly established law.

115.    Therefore, Plaintiff is entitled to an award of monetary damages, including punitive damages, and equitable relief.

116.    Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiff is entitled to an award of monetary damages in an amount to be determined by the evidence and this Court and the reasonable costs of this lawsuit, including their reasonable attorneys' fees.

### SECOND CAUSE OF ACTION

**Violation of Plaintiff's Right to Free Speech Under the First and Fourteenth Amendments (42 U.S.C § 1983) – Defendants Board of Trustees of UCF, Myers (individually)**

117.    Plaintiff repeats and realleges paragraphs 1 through 102 of this complaint as if fully set forth herein.

118.    Plaintiff teaches courses on psychology, culture, and sexual behavior that necessarily include discussions of sensitive subject matter.

119.    During her 8+ hours of interrogation, Defendant Myers barraged Negy with a litany of accusations spanning 15 years. Most of these allegations were simply objections to Negy's course content and pedagogy.

120.    Ultimately, many of the alleged incidents of "discriminatory harassment" for which Defendant Myers found Plaintiff responsible were in fact instances of speech protected by academic freedom and the First Amendment.

121.    Defendants' actions have severely damaged Plaintiff.

122.    Negy was out of work for more than a year. He was forced to sell his home at a significant loss and move in with a relative in order to be able to provide care and shelter for his mentally and physically disabled brother, for whom he is the sole caregiver.

123.    Negy was diagnosed with anxiety and major depressive disorder and had to seek medical treatment.

124.    Defendants have destroyed Plaintiff's reputation and rendered him virtually unemployable in his field at any institution other than UCF.

125.    Further, Defendants' actions — which they continue to defend to this day — have had a severe chilling effect on Plaintiff's speech following his reinstatement; he is fearful of teaching the controversial subjects covered in his classes for fear of additional complaints and investigations.

126.    In finding Plaintiff responsible for "discriminatory harassment" based on his germane classroom speech, Defendant Myers acted in violation of clearly established law.

127.    Therefore, Plaintiff is entitled to an award of monetary damages, including punitive damages, and equitable relief.

128.    Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiff is entitled to an award of monetary damages in an amount to be determined by the evidence and this Court and the reasonable costs of this lawsuit, including their reasonable attorneys' fees.

## THIRD CAUSE OF ACTION

### Negligence – UCF Board of Trustees

129.    Plaintiff repeats and realleges paragraphs 1 through 102 in this Complaint as if fully set forth herein.

130.    Under Florida law, the elements of a negligence claim are (1) a duty by the defendant to conform to a certain standard of conduct; (2) a breach of the duty; (3) a reasonably close causal connection between the breach and the resulting injury; and (4) actual loss or damages.

131.    Under Florida law, the state and its agencies and subdivisions can be liable for torts committed "by the negligent or wrongful act or omission of any employee of the agency or subdivision while acting within the scope of the employee's office or employment." § 786.28, Fla. Stat. (2022).

132.    Defendant Board of Trustees of UCF has a duty to oversee the administration of UCF, including ensuring that the university complies with "laws, rules, regulations and requirements." Such a duty includes the responsibility of adopting reasonable employment practices in general and treating Plaintiff reasonably in particular.

133.    Additionally, Defendants have assumed numerous duties under the collective bargaining agreement that governs the relationship between UCF and its employees. These duties include not terminating a tenured faculty member without "just cause," and not limiting the right of employees

31

"to express their opinions to the larger community on any matter of social, political, economic, or other public interest."

134.    In violation of these duties, Defendants Butler, Cartwright, and Dupras made public statements implying that Plaintiff would face consequences for his constitutionally protected tweets.

135.    Defendant Butler released a video statement explaining to those demanding Plaintiff's firing that "it's not going to happen overnight." Defendant Cartwright publicly agreed with a student protester that Plaintiff "should have been fired before he got tenure."

136.    Defendant Dupras emailed the College of Sciences to state that the university "is aware of these tweets and are actively working to address this situation. I cannot speak to next steps until they are finalized, but I'm reaching out to let you know that the administration is moving forward."

137.    In violation of these duties, Defendants Butler, Cartwright, and Johnson retaliated against Plaintiff by posting a public solicitation on UCF's website inviting people to lodge complaints about Plaintiff's classroom conduct, even anonymously. They did this with the expectation that at least some of the many students loudly demanding that Plaintiff be fired for his tweets would file complaints.

138.    In violation of these duties, Defendant Myers conducted a deliberately punitive and harassing investigation. She denied Plaintiff

adequate notice of the allegations despite his repeated requests, and then when he failed to accurately recall things he had said in the classroom years ago, she charged him with providing false information during the investigation. She also subjected him to numerous unexplained delays in the investigation despite his repeated requests for information. She did this as part of Defendants' effort to penalize Plaintiff for his tweets after they generated significant negative attention and negative publicity for the university.

139.    In violation of these duties, Defendant Dupras terminated Plaintiff without just cause, as determined by an arbitrator on May 16, 2022.

140.    In violation of these duties, Defendant Board of Trustees not only failed to prevent the Individual Defendants from violating Plaintiff's rights under UCF policy and the law, it also (unsuccessfully) defended UCF's actions in subsequent arbitration proceedings.

141.    Defendants' actions have severely damaged Plaintiff. He was out of work for more than a year. He was forced to sell his home at a significant loss and move in with a relative in order to be able to provide care and shelter for his mentally and physically disabled brother, for whom he is the sole caregiver. He was diagnosed with anxiety and major depressive disorder and had to seek medical treatment. Furthermore, Defendants' very public actions

and denunciations have destroyed Plaintiff's reputation and rendered him virtually unemployable in his field at any institution other than UCF.

142.   Therefore, Plaintiff is entitled to an award of monetary damages, including punitive damages, and equitable relief.

### **FOURTH CAUSE OF ACTION**

### **Intentional Infliction of Emotional Distress – Defendants Board of Trustees of UCF, Myers (individually), and Dupras (individually)**

143.   Plaintiff repeats and realleges paragraphs 1 through 102 in this Complaint as if fully set forth herein.

144.   Under Florida law, the elements of a claim for intentional infliction of emotional distress are (1) the defendant's conduct was intentional or reckless; (2) the conduct was outrageous; (3) the conduct caused emotional distress; and (4) the emotional distress was severe.

145.   Under Florida law, the state and its agencies and subdivisions can be liable for torts committed "by the negligent or wrongful act or omission of any employee of the agency or subdivision while acting within the scope of the employee's office or employment." § 786.28, Fla. Stat. (2022).

146.   Under Florida law, state employees can also be individually liable for tort violations committed in the scope of their employment when they act "in bad faith or with malicious purpose." § 786.28, Fla. Stat. (2022).

147. Defendant Myers acted in bad faith or with malicious purpose when she intentionally subjected Plaintiff to more than 8 hours of repetitive and harassing questioning. She deliberately denied Plaintiff the information he needed to prepare for that interrogation despite his repeated requests, and then used his faulty memory to charge him with providing false information during an investigation.

148. Further, Defendant Myers acted in bad faith or with malicious purpose when she allowed her investigation to drag on for months without providing Plaintiff any information about the cause of the repeated delays, despite Plaintiff begging for updates because the protracted investigation was "taking a terrible toll on me both personally and professionally."

149. As a direct and proximate result of Defendant Myers' conduct, Plaintiff suffered severe emotional distress. Despite no prior history of mental illness, he was diagnosed with anxiety and major depressive disorder that required medical treatment. He was terminated from his position and deemed a danger to campus, forcing him to sell his home at a significant loss and move — along with the mentally and physically disabled brother for whom he is the sole caregiver — in with a relative.

150. Defendant Dupras acted in bad faith or with malicious purpose when she made the decision to terminate Plaintiff — a decision that the arbitrator later overturned, finding it was without just cause.

35

151.    Defendant Dupras did not simply terminate Plaintiff, however.
She also acted in bad faith or with malicious purpose when she intentionally
and maliciously denied Plaintiff the 6 months' notice he was entitled to prior
to termination. To accomplish this, she purposely distorted an inapplicable
section of UCF's collective bargaining agreement that allows the university to
deny the usual notice when a professor's continued employment would
"jeopardize the safety or welfare of… students." Defendant Dupras claimed
that because Plaintiff had allegedly failed to report inappropriate touching by
one of his teaching assistants *in 2014*, Plaintiff was a threat to student
safety. Instead of receiving 6 months' notice of his termination, therefore,
Plaintiff received 12 days' notice.

152.    Defendant Dupras acted in bad faith or with malicious purpose
when she further tormented Plaintiff by treating him like a common
criminal, requiring him to be escorted by campus police while retrieving his
belongings and informing him that any university property not returned
within 48 hours "will be considered stolen."

153.    Suddenly stripped of income, Plaintiff was forced to sell his home
just after he had assumed responsibility for the care of his mentally and
physically disabled brother following the death of their last parent.

154.    Defendant Dupras' bad faith or malicious conduct caused
Plaintiff to suffer severe emotional distress. The fear of being unable to house

and care for his dependent brother caused Plaintiff profound anxiety; indeed, despite no prior history of mental illness, he was diagnosed with anxiety and major depressive disorder.

155.   Defendants' very public actions and denunciations have destroyed Plaintiff's reputation and rendered him virtually unemployable in his field at any institution other than UCF.

156.   Ultimately, unable to find adequate housing without an income, Plaintiff and his brother had to move in with a relative.

157.   Defendant Board of Trustees not only failed to prevent the Individual Defendants from violating Plaintiff's rights under UCF policy and the law, it also (unsuccessfully) defended UCF's actions in subsequent arbitration proceedings.

158.   Defendants' actions have severely damaged Plaintiff. He was out of work for more than a year. He was forced to sell his home at a significant loss and move in with a relative in order to be able to provide care and shelter for his mentally and physically disabled brother, for whom he is the sole caregiver. He was diagnosed with anxiety and major depressive disorder and had to seek medical treatment as Defendants destroyed his chances of securing work elsewhere.

159.   Therefore, Plaintiff is entitled to an award of monetary damages, including punitive damages, and equitable relief.

## FIFTH CAUSE OF ACTION

### Abuse of Process –Defendants Board of Trustees, Myers (individually), Dupras (individually), Cartwright (individually), and Johnson (individually)

160.    Plaintiff repeats and realleges paragraphs 1 through 102 in this Complaint as if fully set forth herein.

161.    Under Florida law, the elements of a claim for abuse of process are (1) a willful and intentional misuse of process; (2) for some wrongful or unlawful object or collateral purpose; (3) damage to the plaintiff from the defendant's actions.

162.    Under Florida law, the state and its agencies and subdivisions can be liable for torts committed "by the negligent or wrongful act or omission of any employee of the agency or subdivision while acting within the scope of the employee's office or employment." § 786.28, Fla. Stat. (2022).

163.    Under Florida law, state employees can also be individually liable for tort violations committed in the scope of their employment when they act "in bad faith or with malicious purpose." § 786.28, Fla. Stat. (2022).

164.    Defendants Myers and Dupras acted in bad faith or with malicious purpose when they willfully and intentionally misused UCF's Prohibition of Discrimination, Harassment and Related Interpersonal Violence and UCF's Collective Bargaining Agreement to retaliate against Plaintiff for his expression of views on Twitter.

38

165.     Defendant Board of Trustees allowed this abuse of process to unfold over a period of seven months during which it could have intervened to require university administrators to abide by the applicable laws, rules, regulations and requirements. Defendant Board of Trustees further (unsuccessfully) defended UCF's actions in subsequent arbitration proceedings.

166.     Defendants Cartwright and Johnson acted in bad faith or with malicious purpose when they made public statements implying that Plaintiff would face consequences for his constitutionally protected tweets.

167.     Defendants Cartwright and Johnson acted in bad faith or with malicious purpose when they retaliated against Plaintiff by posting a public solicitation on UCF's website inviting people to lodge complaints about Plaintiff's classroom conduct, even anonymously. They did this with the expectation that at least some of the many students loudly demanding that Plaintiff be fired for his tweets would file complaints.

168.     Defendants' actions have severely damaged Plaintiff. He was out of work for more than a year. He was forced to sell his home at a significant loss and move in with a relative in order to be able to provide care and shelter for his mentally and physically disabled brother, for whom he is the sole caregiver. He was diagnosed with anxiety and major depressive disorder and had to seek medical treatment. Furthermore, Defendants' very public actions

and denunciations have destroyed Plaintiff's reputation and rendered him virtually unemployable in his field at any institution other than UCF.

169.    Therefore, Plaintiff is entitled to an award of monetary damages, including punitive damages, and equitable relief.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Charles Negy respectfully requests that the Court enter judgment against Defendants and provide Plaintiff with the following relief:

1.    A declaration that Defendants' actions violated Plaintiff's right to free speech on matters of public concern;

2.    A permanent injunction prohibiting Defendants from further retaliating against Plaintiff for his protected speech;

3.    Monetary damages, including punitive damages, in an amount to be determined by the Court to compensate Plaintiff for the deprivation of fundamental rights;

4.    Plaintiff's reasonable attorneys' fees, costs, and other costs and disbursements in this action pursuant to 42 U.S.C. §§ 1988 and 2000e-5(k); and

5.    Such further and additional relief as the Court shall deem just, proper and authorized by law, and that the costs of this action be taxed against Defendants.

**JURY DEMAND: PLAINTIFF DEMANDS A TRIAL BY JURY ON
ALL COUNTS SO TRIABLE**

Respectfully submitted,


Dated: April 12, 2023                    /s/ David R. Osborne
                                         David R. Osborne
                                         GOLDSTEIN LAW PARTNERS LLC
                                         4651 Salisbury Rd., Suite 400
                                         Jacksonville, FL  32256
                                         610-949-0444
                                         dosborne@goldsteinlp.com


                                         /s/ Samantha K. Harris
                                         Samantha Harris
                                         *pro hac vice admission to be sought*
                                         ALLEN HARRIS PLLC
                                         P.O. Box 673
                                         Narberth, PA 19072
                                         610-634-8258
                                         sharris@allenharrislaw.com

                                         *Attorneys for Plaintiff*

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Charles Negy

## DEFENDANTS

Bd. of Trustees of the Univ. of Central Fla., et al.

**(b)** County of Residence of First Listed Plaintiff    Orange
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant    Orange
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

David R. Osborne, Goldstein Law Partners, LLC, 4651 Salisbury Rd #400 Jacksonville, FL 32256, 610.949.0444

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1 U.S. Government Plaintiff
- [x] 3 Federal Question *(U.S. Government Not a Party)*
- [ ] 2 U.S. Government Defendant
- [ ] 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*    *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| [ ] 110 Insurance | **PERSONAL INJURY**    **PERSONAL INJURY** | [ ] 625 Drug Related Seizure of Property 21 USC 881 | [ ] 422 Appeal 28 USC 158 | [ ] 375 False Claims Act |
| [ ] 120 Marine | [ ] 310 Airplane    [ ] 365 Personal Injury - | [ ] 690 Other | [ ] 423 Withdrawal | [ ] 376 Qui Tam (31 USC |
| [ ] 130 Miller Act | [ ] 315 Airplane Product      Product Liability | |      28 USC 157 |      3729(a)) |
| [ ] 140 Negotiable Instrument |      Liability    [ ] 367 Health Care/ | | **INTELLECTUAL** | [ ] 400 State Reapportionment |
| [ ] 150 Recovery of Overpayment | [ ] 320 Assault, Libel &      Pharmaceutical | | **PROPERTY RIGHTS** | [ ] 410 Antitrust |
|      & Enforcement of Judgment |      Slander      Personal Injury | | [ ] 820 Copyrights | [ ] 430 Banks and Banking |
| [ ] 151 Medicare Act | [ ] 330 Federal Employers'      Product Liability | | [ ] 830 Patent | [ ] 450 Commerce |
| [ ] 152 Recovery of Defaulted |      Liability    [ ] 368 Asbestos Personal | | [ ] 835 Patent - Abbreviated | [ ] 460 Deportation |
|      Student Loans | [ ] 340 Marine      Injury Product | |      New Drug Application | [ ] 470 Racketeer Influenced and |
|      (Excludes Veterans) | [ ] 345 Marine Product      Liability | | [ ] 840 Trademark |      Corrupt Organizations |
| [ ] 153 Recovery of Overpayment |      Liability    **PERSONAL PROPERTY** | | [ ] 880 Defend Trade Secrets | [ ] 480 Consumer Credit |
|      of Veteran's Benefits | [ ] 350 Motor Vehicle    [ ] 370 Other Fraud | |      Act of 2016 |      (15 USC 1681 or 1692) |
| [ ] 160 Stockholders' Suits | [ ] 355 Motor Vehicle    [ ] 371 Truth in Lending | **LABOR** | | [ ] 485 Telephone Consumer |
| [ ] 190 Other Contract |      Product Liability    [ ] 380 Other Personal | [ ] 710 Fair Labor Standards | **SOCIAL SECURITY** |      Protection Act |
| [ ] 195 Contract Product Liability | [ ] 360 Other Personal      Property Damage |      Act | [ ] 861 HIA (1395ff) | [ ] 490 Cable/Sat TV |
| [ ] 196 Franchise |      Injury    [ ] 385 Property Damage | [ ] 720 Labor/Management | [ ] 862 Black Lung (923) | [ ] 850 Securities/Commodities/ |
| | [ ] 362 Personal Injury -      Product Liability |      Relations | [ ] 863 DIWC/DIWW (405(g)) |      Exchange |
| |      Medical Malpractice | [ ] 740 Railway Labor Act | [ ] 864 SSID Title XVI | [ ] 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS**    **PRISONER PETITIONS** | [ ] 751 Family and Medical | [ ] 865 RSI (405(g)) | [ ] 891 Agricultural Acts |
| [ ] 210 Land Condemnation | [x] 440 Other Civil Rights    **Habeas Corpus:** |      Leave Act | | [ ] 893 Environmental Matters |
| [ ] 220 Foreclosure | [ ] 441 Voting    [ ] 463 Alien Detainee | [ ] 790 Other Labor Litigation | **FEDERAL TAX SUITS** | [ ] 895 Freedom of Information |
| [ ] 230 Rent Lease & Ejectment | [ ] 442 Employment    [ ] 510 Motions to Vacate | [ ] 791 Employee Retirement | [ ] 870 Taxes (U.S. Plaintiff |      Act |
| [ ] 240 Torts to Land | [ ] 443 Housing/      Sentence |      Income Security Act |      or Defendant) | [ ] 896 Arbitration |
| [ ] 245 Tort Product Liability |      Accommodations    [ ] 530 General | | [ ] 871 IRS—Third Party | [ ] 899 Administrative Procedure |
| [ ] 290 All Other Real Property | [ ] 445 Amer. w/Disabilities -    [ ] 535 Death Penalty | **IMMIGRATION** |      26 USC 7609 |      Act/Review or Appeal of |
| |      Employment    **Other:** | [ ] 462 Naturalization Application | |      Agency Decision |
| | [ ] 446 Amer. w/Disabilities -    [ ] 540 Mandamus & Other | [ ] 465 Other Immigration | | [ ] 950 Constitutionality of |
| |      Other    [ ] 550 Civil Rights |      Actions | |      State Statutes |
| | [ ] 448 Education    [ ] 555 Prison Condition | | | |
| |      [ ] 560 Civil Detainee - | | | |
| |      Conditions of | | | |
| |      Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- [x] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
42 U.S.C. § 1983

Brief description of cause:
First Amendment violation

## VII. REQUESTED IN COMPLAINT:

- [ ] CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: [x] Yes   [ ] No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*    JUDGE _____    DOCKET NUMBER _____

DATE    4/12/2023

SIGNATURE OF ATTORNEY OF RECORD    /s/ David R. Osborne

**FOR OFFICE USE ONLY**

RECEIPT # _____    AMOUNT _____    APPLYING IFP _____    JUDGE _____    MAG. JUDGE _____

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

CHARLES NEGY,

     *Plaintiff,*

v.                           CASE NO.: 6:23-cv-00666-CEM-DCI

BOARD OF TRUSTEES OF THE
UNIVERSITY OF CENTRAL
FLORIDA; S. KENT BUTLER,
individually and in his official capacity;
ALEXANDER CARTWRIGHT,
individually and in his official capacity;
TOSHA DUPRAS, individually and in
her official capacity; MICHAEL
JOHNSON, individually and in his
official capacity; NANCY MYERS,
individually and in her official capacity,

     *Defendants.*

_____/

## DEFENDANTS' DISPOSITIVE MOTION TO DISMISS, OR ALTERNATIVELY, MOTION FOR MORE DEFINITE STATEMENT AND MOTION TO STRIKE PUNITIVE DAMAGES

     Defendants, Board of Trustees of the University of Central Florida ("Board"), S. Kent Butler, Alexander Cartwright, Tosha Dupras, Michael Johnson, and Nancy Myers ("Individual Defendants"), pursuant to Fed. R. Civ. P. 12(b)(1), 12(b)(6), and 12(e), respectfully request this Honorable Court to render an Order dismissing Plaintiff's Complaint in its entirety against the Board and the Individual Defendants, or alternatively, dismissing the entire Complaint as a shotgun pleading and directing Plaintiff to file a more definite statement, and striking the punitive

damages claim as more specifically set forth below, and in support of same, state[1]:

## I.   <u>Background</u>

Plaintiff, Charles Negy, is an Associate Professor of Psychology at the University of Central Florida ("UCF"). Plaintiff has sued UCF's Board, the 13-member board that governs UCF, and the Individual Defendants, current and former UCF officials, whom he alleges were responsible for his termination in January 2021. (Doc. 1 at 21). Plaintiff arbitrated his termination under the Collective Bargaining Agreement between UCF and the United Faculty of Florida ("CBA"), which resulted in his full reinstatement with back pay, tenure, and benefits from the date of his termination. (Doc. 1 at 24).

Here, Plaintiff seeks to re-litigate the same facts grieved in arbitration in an attempt to collect damages beyond what was bargained for in the CBA and awarded at arbitration.  In doing so, Plaintiff asserts two constitutional claims under 42 U.S.C. §1983 for alleged violations of his free speech rights under the First and Fourteenth Amendments and retaliation for his constitutionally-protected speech, or more specifically, comments he posted on Twitter (Counts I and II). (Doc. 1 at 25-28).

Plaintiff also asserts a state law claim in Count III against the Board for negligence.  That claim is premised on the Board's alleged breaches of UCF's duty to ensure it complies with "laws, rules, regulations, and requirements," which primarily

---

[1] Plaintiff filed his Complaint and Demand for Jury Trial (Doc. 1) on April 12, 2023. The Wavier of Service of Summons was sent to the Board on April 12, 2023 and the Individual Defendants on April 26, 2023. All Defendants waived service on April 26, 2023. Under Rule 4(d)(3), the deadline for the Board to respond to the Complaint is June 12, 2023 and the deadline for the Individual Defendants to respond to the Complaint is June 26, 2023. As such, this Motion filed on behalf of all Defendants timely responds to the Complaint.

stem from its duties under the CBA. (Doc. 1 at 31-34).

In Count IV, Plaintiff asserts a state law claim for intentional infliction of emotional distress ("IIED") against the Board, Myers, and Dupras. (Doc. 1 at 34). In this claim, Plaintiff asserts the Board is liable for the negligent or wrongful acts of its employees. (Doc. 1 at 34). Plaintiff alleges Myers subjected him "to more than 8 hours of repetitive and harassing questions," denied him information he "needed to prepare for that interrogation, . . . charge[d] him with providing false information during an investigation," and "allowed her investigation to drag on for months without providing Plaintiff any information about the cause of the repeated delays . . .." (Doc. 1 at 35). As to Dupras, Plaintiff alleges she not only terminated him, but "intentionally and maliciously" denied him six months' notice of his termination by "purposely distort[ing] an inapplicable section" of the CBA that permits termination without notice when "continued employment would 'jeopardize the safety or welfare of . . . students.'" (Doc. 1 at 36). Plaintiff also alleges Dupras "tormented Plaintiff by treating him like a common criminal, requiring him to be escorted by campus police while retrieving his belongings and informing him that any university property not returned within 48 hours 'will be considered stolen.'" (Doc. 1 at 36).

Finally, Plaintiff asserts a state law claim for abuse of process against the Board, Myers, Dupras, Cartwright, and Johnson. (Doc. 1 at 38-40). Again, Plaintiff alleges the Board is liable for the negligent or wrongful acts of its employees, but claims the actions of the individual defendants were committed "in bad faith or with malicious purpose." (Doc. 1 at 38). Plaintiff claims Myers and Dupras "willfully and

intentionally misused" the school's Prohibition of Discrimination, Harassment and Related Interpersonal Violence and the CBA "to retaliate against Plaintiff for his expression of views of Twitter," and that the Board permitted such retaliation. (Doc. 1 at 38-39). As to Cartwright and Johnson, Plaintiff claims they "made public statements implying that Plaintiff would face consequences for his constitutionally-protected tweets," and retaliated against him by "posting a public solicitation on UCF's website inviting people to lodge complaints about Plaintiff's classroom conduct, even anonymously[,] . . . with the expectation that at least some of the many students loudly demanding that Plaintiff be fired for his tweets would file complaints." (Doc. 1 at 39). Plaintiff appears to seek compensatory and punitive damages, as well as declaratory and injunctive relief, against all Defendants. (Doc. 1 at 40).

## II.   Summary of the Argument

Plaintiff's Complaint is subject to fatal procedural and substantive deficiencies. According to the Complaint's caption, Plaintiff has sued the Individual Defendants in both their individual and official capacities, but he does not identify any particular official capacity claim in his Complaint. Nor does he identify the particular types of relief sought against each named Defendant. In addition, Plaintiff incorporates each of the 102 paragraphs of factual allegations into each of his five causes of action. As such, the Complaint is subject to dismissal as a shot-gun pleading. Further, Plaintiff does not have standing to seek prospective injunctive relief as his claim is strictly limited to alleged past violations of his constitutional rights. His claims have been remedied through arbitration and he has not alleged the violations are ongoing.

The Board should be dismissed from this suit in its entirety based on the immunities conferred by the Eleventh Amendment to the United States Constitution, as well as Section 768.28, *Florida Statutes,* and the Individual Defendants sued in their individual capacities should be dismissed based on qualified immunity. Moreover, the claims asserted against the Individual Defendants in Counts IV and V should be dismissed with prejudice for failure to state a claim as Plaintiff has not and cannot assert all of the elements of these claims. In the alternative, Defendants move this Court to order Plaintiff to file a more definite statement based on the shotgun pleading grounds and request that any claim for punitive damages against the Board be stricken.

## III.  Argument

### A.  General Deficiencies Applicable to all Counts

#### i.  The Complaint should be dismissed as a shotgun pleading or, alternatively, this Court should order Plaintiff to file a more definite statement.

A "shotgun" pleading fails "to one degree or another, and in one way or another, to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests." *Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1323 (11th Cir. 2015). Plaintiff's Complaint should be dismissed as a shotgun pleading for two reasons.

First, Plaintiff asserts five causes of action, each of which incorporate all 102 paragraphs of factual allegations. (Doc. 1 at ¶¶103, 117, 129, 143, 160). "The result is that each count is replete with factual allegations that could not possibly be material to that specific count, and that any allegations that are material are buried beneath

innumerable pages of rambling irrelevancies." *Magluta v. Samples*, 256 F. 3d 1282, 1284 (11th Cir. 2001). Plaintiff's Complaint is a perfect example of a shotgun pleading "in that it is virtually impossible to know which allegations of fact are intended to support which claim(s) for relief." *Anderson v. Dist. Bd. of Trustees of Cent. Fla. Cmty. Coll.*, 77 F.3d 364, 366 (11th Cir. 1996); *c.f., Phillips v. FedEx Ground Package Sys., Inc.*, 2020 WL 10458522, at *1 (declining to dismiss complaint that "[a]lthough not perfectly pled, . . . separates each claim for relief into separate counts, incorporates only the facts for each claim, and includes facts relevant to Defendant's allegedly discriminatory conduct.").

Second, the Complaint indicates the Individual Defendants are sued both in their individual and official capacities (Doc. 1 at 1 and ¶¶9-13), but throughout his five causes of action, Plaintiff asserts only claims against them in their individual capacity. (Doc. 1 ¶¶103-69). A court must be able to determine whether a plaintiff is suing defendants in their individual or official capacities to ensure those defendants have received sufficient notice with respect to the capacity in which they are sued. *See Pinkston v. Univ. of S. Fla. Bd. of Trustees*, No. 8:15-CV-1724-T-33TBM, 2016 WL 3196474, at *6 (M.D. Fla. June 9, 2016); *Huggins v. Sch. Dist. of Manatee Cnty.*, No. 8:22-CV-1183-WFJ-TGW, 2022 WL 2343057, at *4 (M.D. Fla. June 29, 2022). Plaintiff's failure to distinguish which, if any claims, are directed against the Individual Defendants in their official capacity renders his Complaint a shotgun pleading, warranting dismissal.

Alternatively, Defendants respectfully request the Court to direct Plaintiff to file

a more definite statement[2] that: (i) contains a short and plain statement of each claim and the specific supporting factual allegations for each claim; (ii) incorporates into each Count just the factual allegations relevant to each such Count; and (iii) either identifies which claims are made against the individual Defendants in their official capacity or dismiss the individuals in their official capacity from this proceeding.

ii.    **Plaintiff lacks standing to seek injunctive relief against the Board or the Individual Defendants in their official capacity.**

To meet the case or controversy requirement of Article III, Plaintiff must assert "some threatened or actual injury resulting from the putatively illegal action before a federal court may assume jurisdiction." *O'Shea v. Littleton*, 414 U. S. 488, 493 (1974); *see also Jacobs v. The Fla. Bar*, 50 F.3d 901, 903 (11th Cir. 1995). A plaintiff seeking to invoke a federal court's jurisdiction must demonstrate three things to establish standing under Article III: injury-in-fact, causation, and redressability. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). More specifically, the asserted injury must arise out of the invasion of a legally protected interest that is sufficiently concrete and particularized, rather than abstract and indefinite. *See id.*

Plaintiff here lacks standing to seek prospective injunctive relief under *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983), because he does not and cannot allege that

---

2 Alternatively, Rule 12(e) provides that a party may move for a more definite statement if a "pleading to which a responsive pleading is allowed . . . is so vague or ambiguous that the party cannot reasonably prepare a response." Fed. R. Civ. P. 12(e). Although "motions for more definite statement are disfavored," they are "appropriate in response to a 'shotgun' pleading." *Doctrine v. Equifirst Corp.*, No. 1:09-CV-1389-RWS-RGV, 2009 WL 10712214, at *6 (N.D. Ga. Dec. 3, 2009), report and recommendation adopted *Ambrose Doctrine v. EquiFirst Corp.*, No. 1:09-CV-1389-RWS, 2010 WL 11647670 (N.D. Ga. Jan. 22, 2010).

there is an actual or imminent injury this Court could redress.  In *Lyons*, the Supreme

Court declared that, in most cases, a plaintiff seeking injunctive relief under Section

1983 must allege that he or she will be subject again to the challenged conduct. *See id.*

at 102. Absent such allegations, the Court held that a plaintiff does not have standing

to seek an injunction, and thus, that aspect of the case is not justiciable. *See id; Lynch

v. Baxley,* 744 F.2d 1452, 1456 (11th Cir. 1984). Instead, "[a] threatened injury must be

'certainly impending' to constitute injury in fact." *Whitmore v. Arkansas*, 495 U.S. 149,

158 (1990) (internal citations omitted).

Here, Plaintiff pleads 25 pages of factual allegations that he admits were

remedied through arbitration. (Doc. 1 ¶96). Plaintiff fails, however, to allege any

continuing constitutional violation or inability to currently exercise his constitutional

rights.[3] Moreover, because he seeks declaratory and injunctive relief, "the injury-in-

fact requirement insists that . . . [he] allege facts from which it appears there is a

substantial likelihood that he will suffer injury in the future." *Strickland v. Alexander*,

772 F.3d 876, 887 (11th Cir. 2014) (citations omitted). "This is because injunctions

regulate future conduct only. . . . So a plaintiff seeking declaratory or injunctive relief

must allege and ultimately prove a real and immediate—as opposed to a merely

hypothetical or conjectural—threat of future injury." *Id.*

In addition, as pleaded, the injunctive relief Plaintiff seeks would be nothing

---

[3] To the contrary, since his reinstatement at UCF, Plaintiff has actively engaged in expressing his personal views via his personal twitter account, as referenced in the Complaint.  (Doc. 1 ¶¶ 2, 3, 17); https://twitter.com/charlesnegy/.

more than an "'obey the law' injunction," which is "unenforceable." *Fla. Ass'n of Rehab. Facilities, Inc. v. State of Fla. Dep't of Health & Rehab. Servs.*, 225 F.3d 1208, 1222–23 (11th Cir. 2000); *see also Burton v. City of Belle Glade*, 178 F.3d 1175, 1200 (11th Cir. 1999). Therefore, Plaintiff fails to properly assert an actual or imminent injury in fact sufficient to establish standing under Article III for injunctive relief.

**B.     The Board and the individual defendants sued in their individual capacities should be dismissed from this action in their entirety based on Eleventh Amendment Immunity and Qualified Immunity.**

**i.     The Board[4] should be dismissed with prejudice from Counts I and II based on Eleventh Amendment Immunity.**

Plaintiff's Complaint raises both federal constitutional claims and state law tort claims against the Board. This Court lacks jurisdiction to hear either type of claim. UCF is a Florida state university and political subdivision of the State of Florida. *See* Fla. Stat. §§ 1000.21(6)(g), 1004.67, 1001.63.   Under the Eleventh Circuit's "arm of the state" test, the Board is entitled to Eleventh Amendment immunity as UCF is an instrumentality of the state. *See Univ. of S. Fla. Bd. of Trustees v. CoMentis, Inc.,* 861 F.3d 1234, 1235 (11th Cir. 2017).   Rule 12(b)(1) enables a defendant to move to dismiss a complaint for lack of subject matter jurisdiction based on Eleventh Amendment immunity. Fed. R. Civ. Pro. 12(b)(1); *Smith v. Avino*, 91 F.3d 105, 107 (11th Cir. 1996), *abrogated on other grounds by Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83 (1998).

The Eleventh Amendment has been interpreted to bar suits against a state, state

---

[4] As explained above, it is unclear to what extent the Individual Defendants have been sued in their official capacity. To the extent any of Plaintiff's claims are made against the Individual Defendants in their official capacity, they are also entitled to Eleventh Amendment immunity.

agency, or state official acting in their official capacity in federal court by its own citizens, as well as those of another State. *See Edelman v. Jordan*, 415 U.S. 651, 662–63 (1974); *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44 (1996). But three exceptions—none of which apply here—allow suits against a state, state agency, or state officials: (1) Congress may abrogate the States' immunity; (2) a state may waive its immunity; or (3) under the *Ex Parte Young*[5] doctrine, a plaintiff may file suit against state officials acting in their official capacities seeking prospective injunctive relief for ongoing violations of federal law. *Williams v. Bd. of Regents of Univ. Sys. of Georgia*, 477 F.3d 1282, 1301 (11th Cir. 2007); *Summit Med. Assocs., P.C. v. Pryor*, 180 F.3d 1326, 1336–42 (11th Cir. 1999) (applying *Ex Parte Young*).

"In Florida, sovereign immunity is the rule, rather than the exception." *Pan-Am Tobacco Corp. v. Dep't of Corr.*, 471 So. 2d 4, 5 (Fla. 1984). However, Section 768.28, *Florida Statutes*, provides a very narrow waiver of the State's sovereign immunity, only as to certain actions. And in *Hill v. Dep't. of Corr.*, the Florida Supreme Court held that Section 768.28 was not intended to waive immunity for "constitutional torts." 513 So.

---

[5] Based on a good-faith conferral with Plaintiff's counsel prior to filing this Motion, Defendants anticipate Plaintiff will argue *Ex Parte Young*, 209 U.S. 123 (1908) allows the Board, as an arm of the state, to be a defendant in an action for prospective injunctive relief. However, Plaintiff's argument that "*Ex parte Young* extends not only to state officials sued in their official capacities for prospective relief, but to States and state agencies . . . is simply incorrect. The theory behind *Ex Parte Young* is that 'a suit alleging a violation of the federal constitution against a state official in his official capacity for injunctive relief on a prospective basis is not a suit against the state, and, accordingly, does not violate the Eleventh Amendment. The exception does not extend to the state or state agencies." *Camm v. Scott*, 834 F. Supp. 2d 1342, 1348 (M.D. Fla. 2011) (internal citations omitted); *Eubank v. Leslie*, 210 Fed. Appx. 837, 844 (11th Cir. 2006).

Further, there is no "prospective relief" available against either the Board or the Individual Defendants in their official capacity as there is no ongoing constitutional violation and the Plaintiff's efforts to litigate a past event do not fall within the *Ex Parte Young* doctrine. *See supra* Section A(ii).

2d 129, 133 (Fla. 1987); *Lafleur v. State Univ. Sys. of Fla.*, No. 8:20-CV-1665-KKM-AAS, 2021 WL 3727832, at *6 (M.D. Fla. Aug. 2, 2021), *report and recommendation adopted*, No. 8:20-CV-1665-KKM-AAS, 2021 WL 3725243 (M.D. Fla. Aug. 23, 2021) (citing *Garcia v. Reyes*, 697 So. 2d 549, 550 (Fla. 4th DCA 1997)). "While Florida is at liberty to waive its immunity from section 1983 actions, it has not done so. The recovery ceilings in section 768.28 were intended to waive sovereign immunity for state tort actions, not federal civil rights actions commenced under section 1983." *Hill*, 513 So.2d at 129; s*ee also Shuler v. Bd. of Trustees of Univ. of Ala.*, 480 Fed. Appx. 540, 544 (11th Cir. 2012) (affirming district court's judgment in favor of board of trustees because it was entitled to Eleventh Amendment immunity).

Nor has Congress abrogated the Board's Eleventh Amendment immunity for Section 1983 claims.  To the contrary, the United States Supreme Court has clearly and unambiguously held that "a State is not a person within the meaning of § 1983." *See Will v. Michigan Dep't. of State Police*, 491 U.S. 58, 66 (1989) ("Congress, in passing § 1983, had no intention to disturb the States' Eleventh Amendment immunity.").

Finally, to the extent Plaintiff attempts to assert claims against the individual defendants in their official capacities under *Ex Parte Young*, Plaintiff has failed to allege an ongoing violation of federal law that could be remedied by prospective injunctive relief. Accordingly, the Board and the Individual Defendants in their official capacity should be dismissed, with prejudice, from Counts I and II under Section 1983 as they are clearly and unambiguously entitled to Eleventh Amendment sovereign immunity.

### ii.    The Individual Defendants should be dismissed with prejudice

**from Count I and Defendant Myers should be dismissed with prejudice from Count II based on qualified immunity.**

"Qualified immunity protects government officials performing discretionary functions from civil trials (and the other burdens of litigation, including discovery) and from liability if their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known." *Maggio v. Sipple*, 211 F.3d 1346, 1350 (11th Cir. 2000) (citations omitted). Qualified immunity may be raised and considered on a motion to dismiss. *St. George v. Pinellas Cnty.*, 285 F.3d 1334,1337 (11th Cir. 2002) (citing *Chesser v. Sparks*, 248 F.3d 1117, 1121 (11th Cir. 2001).

The question of qualified immunity should be resolved in the defendant's favor on a motion to dismiss if the plaintiff fails to allege the violation of a clearly established constitutional right. *Siegert v. Gilley*, 500 U.S. 226, 232–33 (1991); *Williams v. Ala. State Univ.*, 102 F.3d 1179, 1182 (11th Cir. 1997). This is a question of law, accepting the facts alleged in the complaint as true and drawing all reasonable inferences in the plaintiff's favor. *Williams,* 102 F.3d at 1182. To obtain qualified immunity, the defendant must first establish that he acted within his discretionary authority; "a court must ask whether the act complained of, if done for a proper purpose, would be within, or reasonably related to, the outer perimeter of an official's discretionary duties.'" *Harbert Int'l, Inc. v. James*, 157 F.3d 1271, 1282 (11th Cir. 1998) (citations omitted). Here, the Complaint's allegations clearly show that each of the Individual Defendants took action as UCF senior employees and acted within their discretionary authority.

When there is no dispute that a state officer was acting in his or her discretionary

capacity, the burden shifts to the plaintiff to show that qualified immunity is inappropriate. *Terrell v. Smith*, 668 F.3d 1244, 1250 (11th Cir. 2012). Overcoming the official's qualified immunity defense ordinarily involves a two-part inquiry: "(1) [whether] the facts, construed in the light most favorable to the plaintiff, show that a constitutional right has been violated; and (2) whether the right violated was clearly established." *Roberts v. Spielman*, 643 F.3d 899, 904 (11th Cir. 2011).

For Plaintiff to show his Free Speech rights were violated, he must, in accordance with the balancing test in *Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will. Cnty., Illinois*, 88 S.Ct. 1731, 1734–35 (1968), allege and show by a preponderance of the evidence that: (1) his speech is on a matter of public concern; (2) his First Amendment interest in engaging in the speech outweighs UCF's interest in prohibiting the speech to promote the efficiency of the public services it performs through its employees; and (3) the employee's speech played a "substantial part" UCF's decision to discharge Plaintiff. If he succeeds in showing these factors, UCF must prove by a preponderance of the evidence that (4) it would have reached the same decision even in the absence of the protected conduct. *Leslie v. Hancock Cnty. Bd. of Educ.,* 720 F.3d 1338 (11th Cir. 2023).

Because *Pickering* employs a balancing test rather than a bright-line rule to determine when a public employee's right to free speech is violated, "the employer is entitled to immunity except in the extraordinary case where *Pickering* balancing would lead to the inevitable conclusion that the discharge of the employee was unlawful." *Dartland v. Metro. Dade Cnty.*, 866 F.2d 1321, 1323 (11th Cir. 1989). In this case,

Plaintiff has not alleged, nor can he allege, sufficient facts to show his free speech rights as an employee override UCF's interest in maintaining an efficient and non-disruptive work environment. The Complaint clearly shows the disruption caused to UCF as a result of Plaintiff's comments was substantial. As such, Plaintiff cannot allege that his constitutional rights have been violated.

Even assuming Plaintiff is able to allege a violation of his First Amendment rights under *Pickering*, he cannot allege or show those rights were clearly established at the time of his termination. The controlling question in the "clearly established" prong of the analysis is whether the individual Defendants received "fair warning" that their conduct was unconstitutional. *Wade v. United States,* 13 F.4th 1217, 1225 (11th Cir. 2021). Plaintiff has failed to allege the existence of opinions by the Supreme Court, Court of Appeals for the Eleventh Circuit, or Florida Supreme Court finding a faculty member who makes public comments that cause substantial disruption to a university may not be fired for such comments without violating the First Amendment. He also cannot allege that a broader, clearly established principle is at stake, or that the conduct of the Individual Defendants "so obviously violate[ ] th[e] constitution that prior case law is unnecessary." *Mercado v. City of Orlando*, 407 F.3d 1152, 1159 (11th Cir. 2005). Because he cannot show his constitutional rights were clearly established, each Individual Defendant is entitled to qualified immunity and Counts I and II should be dismissed with prejudice.

> ### iii. The Board should be dismissed with prejudice from Counts III, IV, and V based on Eleventh Amendment Immunity.

The Board should also be dismissed from Counts III, IV, and V as it did not consent to suit for state tort actions in federal court. "[A]bsent an express waiver by the state, the Eleventh Amendment bars state law claims against a state in federal court." *Wells v. Bd. of Trustees of Fla. Gulf Coast Univ.*, 2021 WL 883333 (M.D. Fla 2021) (citing *Maynard v. Bd. of Regents of Div. of Univ. of Fla. Dep't of Educ.*, 342 F.3d 1281, 1287 (11th Cir. 2003)). "The test to determine if a state has waived its sovereign immunity 'is a stringent one.'" *Barnes v. Zaccari*, 669 F.3d 1295, 1308 (11th Cir. 2012). A "waiver of Eleventh Amendment immunity must specifically permit suits in federal court." *Id.* at 1308. "[A] waiver of sovereign immunity 'will be strictly construed, in terms of its scope, in favor of the sovereign.'" *Sossamon v. Texas*, 563 U.S. 277, 285 (2011).

Florida's sovereign immunity statute is clear that the State has not waived its Eleventh Amendment Immunity:

> ***No provision of this section, or of any other section of the Florida Statutes***, whether read separately or in conjunction with any other provision, ***shall be construed to waive the immunity of the state or any of its agencies from suit in federal court***, ***as such immunity is guaranteed by the Eleventh Amendment to the Constitution of the United States***, unless such waiver is explicitly and definitely stated to be a waiver of the immunity of the state and its agencies from suit in federal court . . .

Fla. Stat. § 768.28 (18) (emphasis added). And therefore, the plain language of the statute warrants dismissal of the Board from Counts III, IV, and V.

However, Plaintiff's inability to bring claims in federal court is not the only jurisdictional issue with these claims. Even if Plaintiff brought these claims in state court, his IIED (Count IV) and abuse of process (Count V) claims still fail against the Board as they are barred by sovereign immunity.

In addition to providing immunity from suit in federal court, Section 768.28 explicitly *reserves* sovereign immunity for actions committed by state employees "in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property." *Id.* at §768.28(9)(a). Any action against the state for such an act is expressly prohibited, and the wronged party's available recourse is limited to an action against the employee. *Id.; see also McGhee v. Volusia Cnty.*, 679 So. 2d 729, 730 (Fla. 1996).

Plaintiff cites Section 768.28 as a basis to hold the Board liable for torts committed by Myers, Dupras, Cartwright, and Johnson in the scope of their employment. (Doc. 1 at ¶¶145, 162). But Plaintiff cites a string of tortious acts allegedly committed by Myers, Dupras, Cartwright, and Johnson both *maliciously* and in *bad faith*. *Id.* at ¶¶147-48, 150-52, 154, 164, 166-67. In doing so, he misconstrues the language and intent of Section 768.28(9)(a). Courts have consistently dismissed claims against the state when the employee's conduct is alleged to be malicious or willful and wanton in nature. *See, e.g., Anderson v. City of Groveland*, No. 5:15-CV-26-OC-PRL, 2015 WL 6704516, at *8 (M.D. Fla. Nov. 2, 2015).[6] As such, Counts IV and V against the Board are subject to dismissal with prejudice.

### C. Alternatively, the Board should be dismissed with prejudice from Count III for failure to state a claim.

---

[6] *See also Weiland*, 792 F.3d at 1330 ("Florida courts have long recognized that Fla. Stat. § 768.28(9)(a) . . . bars claims for both [IIED] and malicious prosecution."); *Williams v. City of Minneola*, 619 So. 2d 983, 987 (Fla. 5th DCA 1993) (finding IIED claim constituted willful and wanton conduct and was barred by sovereign immunity); *Casado v. Miami-Dade Cnty.*, 340 F. Supp. 3d 1320, 1330 (S.D. Fla. 2018) (dismissing IIED claim with prejudice as barred by Section 768.28(9)(a)).

Plaintiff also sued the Board for negligence in Count III, asserting it is liable for the negligence of its employees (Butler, Cartwright, Johnson, Myers, and Dupras) acting within the scope of their employment, pursuant to Section 768.28.  As discussed above, the Board is a state agency immune from suit under Florida's sovereign immunity statute.  *See* Fla. Stat. §728.68. The statute clearly explains that tort actions may only be prosecuted "under circumstances in which the state or such agency or subdivision, if a private person, would be liable to the claimant, in accordance with the general laws of this state…subject to the limitations specified in this act." *Id.*

Moreover, Florida courts have routinely held that certain policy and planning level functions ("discretionary" functions) of the states and their agencies remain immune from tort liability, even if the claim is otherwise viable under Section 768.28. *Kaisner v. Kolb*, 543 So. 2d 732, 736–37 (Fla. 1989) ("[I]t would be an improper infringement of separation of powers for the judiciary, by way of tort law, to intervene in fundamental decision-making of the executive and legislative branches of government, including the agencies and municipal corporations they have created.") Accordingly, when a state agency is sued in negligence, a court must first determine whether the plaintiff's allegations would subject a private person to liability under Florida law.

The threshold issue here is whether any duty of care was owed in relation to the alleged negligent conduct because there can be no liability unless a common law or statutory duty existed that would have applied to an individual. *See Wallace v. Dean*, 3 So. 3d 1035, 1046 (Fla. 2009); Fla. Stat. §768.28(1).  The question of whether a duty

was owed to a plaintiff is a question of law. *Fla. Power & Light Co. v. Morris*, 944 So. 2d 407, 410 (Fla. 4th DCA 2006).  If the court finds there is no underlying common law or statutory duty, the process stops there. *Trianon Park Condo. Ass'n, Inc. v. City of Hialeah*, 468 So. 2d 912, 917 (Fla. 1985).

In this case, Plaintiff asserts a single negligence count against the Board, citing three separate underlying duties.  The first is the Board's purported duty to oversee the administration of UCF and ensure the school "complies with 'laws, rules, regulations and requirements." (Doc. 1 at ¶ 132). Plaintiff adds that "adopting reasonable employment practices in general" is specifically encompassed within this duty. *Id.* at ¶132.  He does not clarify the source of this alleged duty (i.e. arising from common law or statute), but it appears to derive from Board of Governors Regulation 1.001, which states: "Each board of trustees is responsible for compliance with all applicable laws, rules, regulations, and requirements." The Board of Governors is empowered to establish the duties and responsibilities of state university boards of trustees pursuant to Article IX, Section 7, of the Florida Constitution.

Based on Plaintiff's allegations, the Board has, at most, been endowed with some power to ensure compliance with "laws" by virtue of the Board of Governors Regulation. Ensuring compliance with laws is consistently deemed a discretionary function for which there is no applicable duty of care. "How a governmental entity . . . . exercises its discretionary power to enforce compliance with the laws . . . is a matter of governance, for which there never has been a common law duty of care." *Trianon Park*, 468 So. 2d at 919.  Moreover, "the enactment of a statute giving a governmental

entity the power to enforce compliance with the law does not, in and of itself, give individuals a new right of action that previously never existed." *Id.* at 922.  Similarly, determining whether to enact or adopt certain employment practices, as Plaintiff alleges, is a policy-making matter that would be considered discretionary. "Planning level functions are generally interpreted to be those requiring basic policy decisions, while operational level functions are those that *implement* policy." *Commercial Carrier Corp. v. Indian River Cnty.*, 371 So. 2d 1010, 1021 (Fla. 1979)(emphasis added).  Any claims relating to these underlying "duties" are clearly barred by sovereign immunity.

The other two duties cited in Count III are specifically alleged to arise by virtue of a contract: "Defendants have assumed numerous duties under the collective bargaining agreement that governs the relationship between UCF and its employees." (Doc. 1 at ¶133). Plaintiff identifies these contractual duties as "not terminating a tenured faculty member without 'just cause'" and "not limiting the rights of employees 'to express their opinions to the larger community on any matter of social, political, economic, or other public interest.'" *Id.*  In fact, Plaintiff directly *quotes* language from Sections 16.7 and 5.3 of the CBA. He then cites various acts committed by Butler, Cartwright, Johnson, Myers, and Dupras that supposedly breached these duties, such as conducting an administrative investigation Plaintiff felt was unnecessarily lengthy, and terminating him without "just cause." *Id.* at ¶¶134-39.

Under Florida's independent tort doctrine, a plaintiff may not recast causes of action that are otherwise breach-of-contract claims as tort claims. *HTP, Ltd. v. Lineas Aereas Costaricenses, S.A.*, 685 So. 2d 1238, 1239 (Fla. 1996); *Altamonte Pediatric*

*Associates, P.A. v. Greenway Health, LLC*, 8:20-CV-604-T-33JSS, 2020 WL 5350303, at

*5 (M.D. Fla. Sept. 4, 2020).  In other words, to set forth a claim in tort between parties

also in contractual privity, a plaintiff must allege an action that, standing alone,

amounts to an actionable tort. *Pastor v. Bank of Am., N.A.*, No. 22-24121-CIV, 2023

WL 2646817 (S.D. Fla. Mar. 27, 2023). Plaintiff has failed to adequately plead the

existence of an independent tort, as his negligence claim is based solely on duties

arising from the CBA, which is prohibited by Florida's independent tort doctrine.

Moreover, though currently pled as a tort claim, the same issues were arbitrated

as contract claims. As referenced in his Complaint, Plaintiff initiated arbitration

against the Board upon his termination and ultimately prevailed. (Doc. 1 at ¶¶139,

140).  During arbitration, Plaintiff contended the Board breached Sections 5, 6, and 16

of the CBA, which addressed the same subject matter at issue in his "negligence"

claim. Plaintiff's claim should be dismissed with prejudiced as barred by res judicata,

which prohibits parties from re-litigating claims previously decided in arbitration.

### D.   Counts IV and V should be dismissed against the Individual Defendants for failure to state a claim.

#### i.   Intentional Infliction of Emotional Distress (Count IV)

Plaintiff fails to state a claim upon which relief can be granted, as he has not

identified any conduct by Myers or Dupras that rises to the level of outrageousness

necessary to maintain an IIED claim under Florida law. Florida law requires that "a

plaintiff must prove that the wrongdoer's conduct was intentional or reckless; the

conduct was outrageous; the conduct caused emotional distress; and the emotional

distress was severe." *Horizons Rehab., Inc. v. Health Care and Ret. Corp.*, 810 So. 2d 958, 964 (Fla. 5th DCA 2002). "The standard in Florida for outrageous conduct—which is a question of law—is extremely high." *Cottam v. City of Wildwood*, 750 Fed. Appx. 791, 795 (11th Cir. 2018). The plaintiff must show the defendant's actions "were 'so extreme in degree as to go beyond all possible bounds of decency.'" *Id.* (citations omitted).

Here, Plaintiff claims Myers subjected him to a lengthy administrative investigation. (Doc. 1 at ¶¶146-47). As to Dupras, Plaintiff asserts she terminated him, failed to comply with the pre-termination notice in the CBA, and had police escort him on campus to collect his belongings. *Id.* at ¶¶149-51.

This conduct is insufficient to state a claim for IIED. A review of the Complaint shows that none of the claimed misconduct is "atrocious, and utterly intolerable in a civilized community.'" *Metro. Life Ins. Co. v. McCarson*, 467 So. 2d 277, 279 (Fla. 1985)); *see also Blount v. Sterling Healthcare Grp., Inc.*, 934 F. Supp. 1365, 1371 (S.D. Fla. 1996)(holding Florida and the Eleventh Circuit have been extremely reluctant to recognize outrageous conduct in the employment context); *Lay v. Roux Laboratories, Inc.*, 379 So. 2d 451, 452 (Fla. 1st DCA 1980)(finding no cause of action where employer threatened plaintiff with termination and verbally attacked him with racial epithets). Indeed, just the opposite is true. Terminations of employment and being escorted from the workplace following termination are common. *See Golden v. Complete Holdings, Inc.*, 818 F. Supp. 1495, 1499 (M.D. Fla. 1993)(termination of employment was not outrageous conduct sufficient to state a claim for IIED); *State Farm Mut. Auto.*

*Ins. Co. v. Novotny*, 657 So. 2d 1210 (Fla. 5th DCA 1995) (interview of employee regarding complaints about that employee deemed not sufficiently egregious to give rise to IIED). Plaintiff's IIED claim should be dismissed with prejudice.

### ii.    Abuse of Process (Count V)

Abuse of process "involves the use of criminal or civil legal proceedings against another primarily to accomplish a purpose for which it was not designed, such as extorting payment for a debt." *Bembry v. City of Tallahassee*, No. 4:05-CV-286-SPM, 2006 WL 1080676, at *8 (N.D. Fla. Apr. 24, 2006). Process includes actions initiated independently, such as the commencement of a suit, or those initiated collaterally, such as a counterclaim. *Peckins v. Kaye*, 443 So. 2d 1025, 1026 (Fla. 2d DCA 1983). The abuse facet "consists not in the issuance of process, but rather in the perversion of the process after its issuance." *Id.* Yet "[t]he fact that a party may be motivated by incidental or concurrent benefits of the use of process is not sufficient to constitute an abuse." *In re Fundamental Long Term Care, Inc.*, 873 F.3d 1325, 1346 (11th Cir. 2017).

In Florida, abuse of process consists of three elements: "(1) the defendant made an illegal, improper, or perverted use of process; (2) the defendant had an ulterior motive or purpose in exercising the illegal, improper or perverted process; and (3) the plaintiff was injured as a result of defendant's action." *EMI Sun Vill., Inc. v. Catledge*, 779 Fed. Appx. 627, 635 (11th Cir. 2019). Here, Plaintiff's abuse of process claim fails to satisfy the first element, as none of the allegations in his Complaint show "the defendant made an illegal, improper, or perverted use of process." *Id.* at 636.

In fact, at *no point* in the Complaint is there any allegation that Defendants abused any civil or criminal process. In Count V, Plaintiff simply recites the legal elements of an abuse of process claim, then entirely ignores those elements and instead pleads a hybridized version of Count III (Negligence) and Count IV (IIED).[7] Specifically, Plaintiff alleges Myers and Dupras "misused UCF's Prohibition of Discrimination, Harassment and Related Interpersonal Violence" and the CBA to retaliate against him for his speech on Twitter. (Doc. 1 at ¶ 164).  Lastly, Plaintiff claims Cartwright and Johnson "made public statements implying that Plaintiff would face consequences for his constitutionally protected tweets" and retaliated against him "by posting a public solicitation on UCF's website . . ." *Id.* at ¶¶ 166-67.

None of these allegations involve process. The law is clear that abuse of process requires "the use of criminal or civil legal process against another primarily to accomplish a purpose for which it was not designed." *Scozari v. Barone*, 546 So. 2d 750, 751 (Fla. 3d DCA 1989). A violation of a UCF campus policy does not constitute an abuse of civil or criminal process, nor does a breach of the CBA, an administrative investigation into Plaintiff's conduct, or a public post about his tweets. Such allegations are insufficient to state a claim for abuse of process. *See Miami Herald Pub. Co., Div. of Knight-Ridder Newspaper v. Ferre,* 636 F. Supp. 970, 975 (S.D. Fla. 1985); *Blue Dolphin, Inc. v. United States*, 666 F. Supp. 1538, 1541 (S.D. Fla. 1987). Accordingly, Count V should be dismissed with prejudice.

---

[7] Nearly identical allegations are asserted as the basis for Plaintiff's negligence and intentional infliction of emotional distress claims.  (Doc. 1 at ¶¶134, 137, 138, 140, 148, 151, 157).

**E.      Plaintiff's claim for punitive damages should be stricken to the extent he seeks such damages against the Board or the Individual Defendants in their Official Capacity.**

"The court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent or scandalous matter." Fed. R. Civ. P. 12(f). The purpose of a motion to strike "is to 'clean up the pleadings, streamline litigation, and avoid unnecessary forays into immaterial matters.'" *Wiand v. Wells Fargo Bank, N.A.*, 938 F. Supp. 2d 1238, 1250 (M.D. Fla. 2013) (citations omitted). Here, Plaintiff's claim for punitive damages should be stricken to the extent such damages are pleaded against the Board or are included among the relief sought against any Individual Defendant in their official capacity. *Young Apartments, Inc. v. Town of Jupiter*, 529 F.3d 1027, 1047 (11th Cir. 2008)("In a § 1983 action, punitive damages are only available from government officials when they are sued in their individual capacities.")(citing *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 267 (1981)).

Additionally, state agencies are not liable for punitive damages per subsection 768.28(5)(a), Florida Statutes, which provides that while the state and its agencies are liable for tort claims in the same manner and extent as private individuals, liability shall not include punitive damages.  Plaintiff is foreclosed from any award of punitive damages against the Board or the Individual Defendants in their official capacity.

**WHEREFORE**, the Board respectfully requests that the Court render an Order dismissing with prejudice Counts I-V of Plaintiff's Complaint for lack of subject matter jurisdiction, or alternatively, ordering Plaintiff to file a more definite statement and striking his claim for punitive damages against the Board.  The Individual Defendants

respectfully request that the Court render an Order dismissing with prejudice Counts I and II based on qualified immunity and Counts IV and V for failure to state a claim, or alternatively, ordering Plaintiff to file a more definite statement and striking his claim for punitive damages against the Individual Defendants in their official capacity.

## Local Rule 3.01(g) Certification

The undersigned counsel certify that on May 1, 2023, attorneys Spradley and Hatcher-Bolin conferred with counsel for Plaintiff, Samantha Harris (via phone and email) in an effort to resolve the issues raised in this motion, yet the parties were unable to agree on the resolution of any matters addressed in this motion.

Respectfully submitted on this 9th day of June, 2023.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY on June 9, 2023, a true and correct copy of the foregoing was filed through the CM/ECF system, which will serve an electronic copy on all parties of record.

|  | */s/  SUSAN T. SPRADLEY* |
|---|---|
| **KRISTIE HATCHER-BOLIN**<br>FLB No. 521388<br>Kristie.Hatcher-bolin@gray-robinson.com | **SUSAN T. SPRADLEY**<br>FLB No.: 0818712<br>Susan.Spradley@gray-robinson.com |

|  | **KATHERINE KATZ**<br>FLB No. 1022526<br>Katherine.Katz@gray-robinson.com | **JULIE M. ZOLTY**<br>FLB No.: 1036454<br>Julie.Zolty@gray-robinson.com |
|---|---|---|

| **GRAY ROBINSON, P.A.**<br>Post Office Box 3<br>Lakeland, Florida 33802<br>Telephone: (863) 284-2251<br>Facsimile: (863) 683-7462<br>*Counsel for Defendants* | **GRAY ROBINSON, P.A.**<br>Post Office Box 3068<br>Orlando, Florida  32802<br>Telephone:  (407) 843-8880<br>Facsimile:   (407) 244-5690<br>*Counsel for Defendants* |
|---|---|

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

CHARLES NEGY,

      Plaintiff,

v.

                                    No. 6:23-cv-00666-CEM-EJK

BOARD OF TRUSTEES OF THE
UNIVERSITY OF CENTRAL FLORIDA,
in their official capacities; and
S. KENT BUTLER, ALEXANDER
CARTWRIGHT, TOSHA DUPRAS,
MICHAEL JOHNSON, and NANCY
MYERS, in their individual capacities,

      Defendants.

## FIRST AMENDED COMPLAINT, DEMAND FOR A JURY TRIAL, REQUEST FOR DECLARATORY RELIEF, AND REQUEST FOR INJUNCTIVE RELIEF

Plaintiff Charles Negy, by and through his undersigned attorneys, files this First Amended Complaint for violations of the First and Fourteenth Amendments pursuant to 42 U.S.C. § 1983, as well as for negligence, abuse of process, and intentional infliction of severe emotional distress. In support of this complaint, Charles Negy respectfully alleges as follows:

## NATURE OF THE ACTION

1.      In the name of a crusade "to be actively anti-racist," as Defendant Alexander Cartwright announced on June 2, 2020, the University of Central Florida (UCF) harassed and retaliated against Professor Charles Negy because he dared to publicly express viewpoints out of step with the prevailing campus orthodoxy on anti-racism.

2.      After Charles Negy posted several tweets to his personal Twitter account expressing his view that, contrary to the ascendant orthodoxy on campus, Blacks are not systematically oppressed in the United States, he became the target of a Twitter mob that demanded he be fired. Protests erupted at UCF and even at Negy's home, leading him to require police protection.

3.      Forbidden by the First Amendment to explicitly fire him for his tweets, UCF administrators publicly solicited people to come forward with complaints of discrimination and harassment against Professor Negy and then launched a malicious, pretextual investigation into every aspect of his 22-year career at the university.

4.      UCF's investigation culminated in a 9-hour interrogation of Professor Negy, during which a senior UCF administrator barraged Negy with hundreds of allegations that she had previously refused to give him notice of, despite his repeated requests. The interrogation — which included wide-ranging allegations, many of which bordered on the absurd — made

2

clear that UCF was not merely investigating Negy for alleged harassment and discrimination, but rather was looking for any information it could use to get rid of a faculty member who had become politically inconvenient to the university administration.

5.    Following an investigation which dragged on, without good cause, for 7 months, UCF summarily terminated Negy in January 2021. Maliciously invoking an inapplicable exception to the collective bargaining agreement ("CBA") requiring that tenured faculty receive six months' notice of termination, UCF terminated Negy effective immediately. As a result of this sudden loss of income, Negy — who is the sole caretaker of his mentally and physically disabled brother — was forced to sell his home and move in with a relative.

6.    Negy pursued a grievance through his faculty union for violating the CBA, and in May 2022, an arbitrator ordered UCF to reinstate Negy with back pay and benefits, finding he was terminated without just cause. However, the award cannot compensate Negy for the massive loss he incurred on the sale of his home; for the out-of-pocket medical expenses he faced after UCF's destruction of his life led him to be diagnosed with anxiety and depression; or for the severe emotional distress he suffered for nearly two years at the hands of UCF administrators who, because they disliked his political views, treated him as less than human.

## THE PARTIES

7.    Plaintiff Charles Negy is, and was at all times relevant to this Complaint, an Associate Professor of Psychology at the University of Central Florida, where he has taught since 1998.

8.    Defendant Board of Trustees of the University of Central Florida ("the Trustees") is the 13-member governing body of UCF, a governmental entity, and is responsible for the administration of UCF, including but not limited to UCF's compliance with laws, rules, regulations, and requirements. At all times relevant to this complaint, the Trustees acted under color of state law and are sued in their official capacities.

9.    At all times relevant to the Complaint, Defendant S. Kent Butler was UCF's Interim Chief Equity, Inclusion and Diversity Officer. Immediately following Negy's expression of dissenting views on Twitter, Defendant Butler, along with Defendants Cartwright and Johnson, publicly announced an inquiry into Negy's classroom conduct and solicited UCF community members to come forward with complaints of bias and discrimination against Negy. Defendant Butler acted under color of state law and is sued in his individual capacity.

4

10.     Defendant Alexander Cartwright is the President of UCF. Immediately following Negy's expression of dissenting views on Twitter, Defendant Cartwright, along with Defendants Butler and Johnson, publicly announced an inquiry into Negy's classroom conduct and solicited UCF community members to come forward with complaints of bias and discrimination against Negy. Defendant Cartwright acted under color of state law and is sued in his individual capacity.

11.     Defendant Tosha Dupras was, at all times relevant to this Complaint, the Interim Dean of UCF's College of Sciences. Defendant Dupras issued Negy's notice of termination and invoked an inapposite provision of UCF's CBA to deny Negy the customary six months' notice of termination afforded to tenured faculty, causing him severe damage. Defendant Dupras acted under color of state law and is sued in her individual capacity.

12.     Defendant Michael Johnson is UCF's Provost and Executive Vice President for Academic Affairs. Immediately following Negy's expression of dissenting views on Twitter, Defendant Johnson, along with Defendants Butler and Cartwright, publicly announced an inquiry into Negy's classroom conduct and solicited UCF community members to come forward with complaints of bias and discrimination against Negy. Defendant Johnson acted under color of state law and is sued in his individual capacity.

13.     Defendant Nancy Myers is the Director of UCF's Office of
Institutional Equity ("OIE"). Defendant Myers served as the investigator in
the disciplinary proceedings against Negy, proceedings which were conducted
without affording Plaintiff due process of law. Defendant Myers acted under
color of state law and is sued in her individual capacity.

## JURISDICTION AND VENUE

14.     This case arises under the Constitution and laws of the United
States, specifically 42 U.S.C. § 1983. Accordingly, this Court has jurisdiction
pursuant to 28 U.S.C. §§ 1331 and 1343.

15.     Pursuant to 28 U.S.C. § 1367, this Court has supplemental
jurisdiction over all other claims so related to the claim in this action with
such original jurisdiction that they form part of the same case or controversy
under Article III of the U.S. Constitution.

16.     Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391.
The defendants are residents of the State in which this district is located and
a substantial part of the events or omissions giving rise to the claim occurred
in this district.

## FACTS

***Negy Engages in Political Expression on Twitter***

17.     At all times relevant to this Complaint, Professor Negy maintained a Twitter account for his personal use, using the handle @CharlesNegy. Negy's Twitter profile does not mention his affiliation with UCF and states "Opinions are my own."

18.     Negy is a minority, being both gay and Hispanic, and in fact was identified by UCF in 1998 as a "Diversity Enhancement Hire."

19.     However, Negy holds opinions that do not align with the way the way minority individuals are expected to think by those in power at America's colleges and universities, including UCF. In particular, Negy disagrees with the critical race theory that is ascendant on today's campuses.

20.     In light of national outrage over the fatal use of force by police against unarmed Black men and women, particularly the May 2020 murder of George Floyd, colleges and universities have come under tremendous pressure to take action to fight "systemic racism" on campus.

21.     UCF has not been immune to this pressure. On June 2, 2020, for example, Defendant Alexander Cartwright, UCF's president, issued a statement making "a commitment from our university to not merely celebrate our diversity, but to be actively anti-racist." Defendant Cartwright's message emphasized that education and reflection on these issues was insufficient, and that they "must be paired with action and a commitment to stand against racism in all its forms."

22.     In response to the national conversation around race happening at that time, Negy posted several tweets to his personal Twitter account between May 29 and June 3, 2020, expressing his view that Blacks are not systemically oppressed in the United States.

### UCF is Inundated by Demands to Fire Negy

23.     Negy's tweets garnered an angry response on social media. Almost immediately, the hashtag #UCFfirehim began trending on Twitter.

24.     UCF quickly came under media scrutiny because of Negy's tweets. *See, e.g.*, Jason Dill, "A UCF Professor Tweeted About 'Black Privilege.' Then #UCFFireHim Started Trending," Miami Herald (June 4, 2020), https://www.miamiherald.com/news/state/florida/article243261961.html.

25.     The pressure on UCF mounted immediately. On June 4, 2020, UCF's Assistant Vice President for Board Relations, Karen Monteleone, wrote UCF's Board of Trustees to say the following: "A UCF professor's personal Twitter posts have gone viral and have received significant media attention. Overnight, there have been thousands of posts on social media and hundreds of individuals have emailed university offices, including more than 175 submissions to the Board of Trustees account."

26.     One of these social media posts came from a Florida politician, Rep. Anna Eskamani, who has more than 80,000 followers on Twitter. On

June 5, 2020, Rep. Eskamani tweeted a request for "help," asking members of the UCF community to report "any abusive or discriminatory behavior at UCF by Dr. Negy," and noting that complaints could be "anonymous."

27.    On June 11, 2020, UCF's Student Senate passed a resolution calling on the university to fire Negy for his tweets. The resolution stated that "Negy's comments and views are, in fact, being supported and not condemned in the strongest terms if his employment is continued at this university."

28.    Also on June 11, 2020, the Psychology Department sent out an official departmental message stating that the opinions Negy expressed on Twitter were "insensitive, hurtful, offensive, and wrong," and urging students to come forward, even anonymously, with allegations of "classroom bias," since that — unlike Negy's constitutionally protected tweets — would be punishable.

29.    On June 14, 2020, protesters gathered on the UCF campus to demand Negy's firing, chanting "UCF, fire him!"

30.    An online petition demanding that UCF fire Negy received more than 34,000 signatures. *See* "UCF: Fire Psychology Professor Charles Negy," Change.org, https://www.change.org/p/university-of-central-florida-ucf-fire-psychology-professor-charles-negy.

### *UCF's Administration Rushes to Placate Those Angered by Negy's Tweets*

31.     The UCF administration acted immediately to mollify those demanding that Negy be fired for his protected speech.

32.     On June 4, 2020, for example, Defendant Butler released a video statement on UCF's official Twitter account effectively admitting that UCF hoped to have Negy fired. Butler stated, "We're trying to do the right thing. Sometimes that takes change and takes time … **The #UCFFirehim I understand all of that but the fact of the matter is it's not going to happen overnight.**" (Emphasis added.)

33.     On June 4, 2020, Defendant Cartwright attended a virtual town hall with students angry over Negy's tweets. Cartwright told them "I promise you this is a matter that has our full attention, and we have launched an inquiry to quickly — but fully — evaluate this situation."

34.     On June 4, 2020, Defendant Dupras sent an email message to all College of Sciences students, faculty, and staff about Negy's Twitter comments, stating that "UCF leadership is aware of these tweets and are actively working to address this situation. I cannot speak to next steps until they are finalized, but I'm reaching out to let you know that the administration is moving forward."

35.     Also on June 4, 2020, Defendants Butler, Cartwright, and Johnson posted a statement to the UCF website entitled "Addressing Intolerance in our Community." The headline underneath the title stated: "**Members of UCF's leadership urge current and former students to report discriminatory behavior they may have experienced from faculty and staff**." (Emphasis added).

36.     Defendants' post was intended to specifically target Negy. It stated that "we are disgusted by the racist posts one of our faculty members has shared on his personal Twitter account" and thanked students for speaking out about their outrage. Defendants' post then stated: "If any student, current or former, believes they may have experienced abusive or discriminatory behavior by any faculty or staff member, we want to know about it. UCF takes every report seriously. Concerns can be reported to UCF's IntegrityLine, which also takes anonymous complaints, at www.ucfintegrityline.com or 855-877-6049."

37.     On June 5, 2020, Negy was advised by UCF police that protesters were organizing to come to his home, and that he should be on guard for his safety. Negy wrote to Defendant Cartwright to say that "the way you have vilified me publicly has contributed to this situation," and to ask Defendant Cartwright to send out a message cautioning students against violence and

against protesting at people's private homes. Defendant Cartwright did not send any such message.

38.     Instead, on June 5, 2020, Defendants Cartwright, Butler, and Johnson hosted a "Virtual Conversation about Race and Unity." During that "conversation," Defendant Cartwright called Negy's tweets "abhorrent" and stated that "Although everyone has a right to their personal beliefs, we cannot allow that to cross over into our classrooms or into our workplace if it hurts people."

39.     The first question from a student during the June 5 "conversation" was "what avenues" UCF had open to fire Negy if his tweets were protected by the First Amendment.

40.     Defendant Johnson answered that if a faculty member is "offensive" in the classroom, "we have the capacity to act."

41.     Later in the conversation, an incoming student asked "what is going to be done" about Negy. Defendant Butler answered that "the wheels are in motion in terms of what needs to happen in regards to that… believe that by the time you get on the campus as a freshman, it will have been dealt with."

42.     On June 9, 2020, the staff of the Multicultural Student Center issued a letter addressed to all "UCF Knights" in response to the Twitter controversy stating that "Negy's discrimination against people of color is not

to be tolerated or taken lightly." The letter concluded by encouraging students to "report to the Just Knights Response Team," a team created to assist those "who have been impacted by hate or bias-related incidents."

43.     On June 13, 2020, egged on by UCF's repeated expressions of outrage, UCF students protested in front of Negy's home. After two hours of protesting at the entrance to Negy's neighborhood, they drove up and down his street for 40 minutes, blowing their horns non-stop, with a megaphone, shouting to all of his neighbors "Negy is a racist" and "UCF must Fire Racist Negy." Negy had six Orange County sheriff's officers at his home that day, four of them parked in front of his house to prevent the UCF protesters from coming onto his property.

44.     On June 14, Defendant Cartwright attended a protest held by students demanding Negy's firing.

45.     At the June 14 protest, one of the students in attendance said to Defendant Cartwright that Negy "should have been fired before he got tenure." Defendant Cartwright agreed with the student, responding **"[S]o, one thing is that.** One is also looking at the Office of Diversity, Equity, and Inclusion, I mean that office, honestly… is understaffed."[1] (Emphasis added.)

*UCF Subjects Negy to an Intrusive and Protracted Investigation*

---

[1] https://twitter.com/UCFKnightNews/status/1272310037617291264

46.     Negy has taught at UCF since 1998 and has received consistently superior performance reviews. In the four years leading up to his termination, he received an evaluation rating of "Outstanding" for his instruction and advising.

47.     Following the administration's public solicitation of complaints on June 4, 2020, however, UCF received a litany of allegations, many anonymous, about Negy's classroom teaching.

48.     Without informing Negy that there were complaints against him, UCF began an investigation.

49.     Negy learned about this investigation the way the rest of the general public did: through the media.

50.     Negy received no formal notice of this investigation until more than a month later, on July 17, 2020.

51.     On July 17, 2020, Defendant Myers sent Negy a letter notifying him that he was under investigation by UCF's Office of Institutional Equity ("OIE"), stating, "Beginning on June 4, 2020, OIE received multiple reports that you posted derogatory, discriminatory and unprofessional statements on a Twitter account, and that you subjected students to discriminatory harassment based on race, ethnicity, national origin, sexual orientation, religion, sex, gender identity/expression, and disability in the classroom."

14

52.     The June 4, 2020 date identified by Defendant Myers was no coincidence: it was the date on which Defendants Butler, Cartwright, and Johnson posted their missive on UCF's website soliciting people to come forward with complaints against Negy in a pretextual effort to justify firing him.

53.     The notice provided to Negy on July 17, 2020, did not include enough information to allow him to prepare for his investigative interview.

54.     Pursuant to Department of Education guidance in effect at the time, "notice" in a disciplinary matter alleging sexual harassment must include "the identities of the parties involved, the specific section of the code of conduct allegedly violated, the precise conduct allegedly constituting the potential violation, and the date and location of the alleged incident." The representative "examples" provided by Defendant Myers did not satisfy this notice requirement.

55.     On July 21, 2020, Negy, through counsel, requested further information about the nature of the alleged misconduct, the dates and times of the alleged misconduct, and the parties involved. However, Defendant Myers continued to obfuscate and deny Negy the information he needed in order to prepare for an investigative interview.

56.     On July 31, 2020, Defendant Myers replied to Negy's request for further information by informing him that the alleged misconduct took place

15

"from 2005 through 2020," and included additional examples of conduct that allegedly violated university policy. With regard to Negy's request for the identities of the parties involved, Defendant Myers provided him with a partial list of names in a separate file, with no information about who had alleged what, or when.

57.    Upon information and belief, a large number of the complaints brought against Negy and considered by Defendant Myers were made anonymously.

58.    On August 4, 2020, Negy responded to Defendant Myers' email of July 31, expressing his concern that he would "like to produce witnesses who can attest that I did not say the things I am alleged to have said," but that "with no information about when in the past 15 years I am alleged to have made each of these statements, I have no way of identifying relevant witnesses."

59.    Negy's August 4, 2020 email to Defendant Myers also asked whether there were additional allegations of which he had not yet been informed.

60.    Defendant Myers responded to Negy's August 4 email on August 5, 2020. She did not address Negy's request for further information that would allow him to identify witnesses. In response to his question about

16

additional allegations, Defendant Myers wrote simply that "OIE will not be providing additional details about the allegations … prior to your interview."

61.　On August 7, 2020, Negy had his first investigative interview with OIE, conducted by Defendant Myers.

62.　That interview lasted for more than four hours and concluded only when Negy, exhausted, asked Defendant Myers if the interview was almost finished and learned that she had not even gone through half of the allegations. Myers agreed to conduct the remainder of the interview on a second day of questioning.

63.　On August 14, 2020, Negy had his second investigative interview with OIE, conducted by Defendant Myers. That interview lasted for four hours.

64.　The courses that Negy teaches, including Cross-Cultural Psychology and Sexual Behavior, include discussions of controversial and sensitive topics.

65.　During her 8+ hours of interrogation, Defendant Myers barraged Negy with a litany of accusations spanning 15 years. Most of these allegations were simply objections to Negy's course content and pedagogy. For example, multiple individuals allegedly complained that he lectured about certain sexual practices specific to particular Native American and African tribes, despite the fact that this lecture on cross-cultural sexual

practices is wholly germane to the subjects he teaches, has been a

longstanding part of his pedagogy, and has never been the subject of a

complaint in his student evaluations.

66.    It was also apparent that Defendant Myers had not even

bothered to consolidate repetitive allegations, as many of the allegations she

asked him about were variations of the same question. This repetitive

questioning served no purpose other than to harass and intimidate Negy.

67.    Defendant Myers also asked Negy about a variety of allegations

that had absolutely nothing to do with alleged discriminatory harassment,

including whether he had ever bribed a health care official while traveling

abroad and whether he used departmental resources while writing his book,

demonstrating that this was not a good-faith investigation into allegations of

harassment but rather a fishing expedition undertaken in the desperate hope

of finding some basis to discipline Negy other than his constitutionally

protected expression on Twitter.

68.    On August 27, 2020, several weeks after the second of Negy's two

interrogation sessions, Defendant Myers informed Negy via email that she

anticipated the investigative report would be completed "in September 2020."

69.    September 2020 came and went as Negy continued to live under

the threat of punishment. On October 1, 2020, Defendant Myers wrote Negy

again to state that, due to personal matters, she had been out of the office

and now anticipated that "the report will be issued in October." She stated that she would "update [him] if that changes."

70.    October 2020 came and went with no report and no "update."

71.    At all times relevant to this complaint, UCF policy required that an investigation be completed within 90 days absent "good cause." Negy, through counsel, requested information regarding the cause of the delay on November 3, 2020 — 152 days after the university publicly announced it had "launched an inquiry" into Negy, and 109 days after Negy had formally received a notice of investigation.

72.    On November 6, 2020, Defendant Myers wrote Negy to say that she now anticipated her investigative report would be "issued in November," with no reason given for the continued delay. She stated that she would "update [him] if that changes."

73.    November 2020 came and went with no report and no "update."

74.    On December 1, 2020, with the investigation in its sixth month, Negy again wrote to Defendant Myers to request information about the delay. He explained that "This protracted investigation is taking a terrible toll on me both personally and professionally and is causing irreparable harm to my reputation and professional opportunities," and asked for "a meaningful update on the status of this investigation."

75.     Defendant Myers responded on December 7, 2020, that "The investigation of your matter remains pending and has taken longer than initially anticipated."

76.     Negy received no further updates from Defendant Myers. However, on January 5, 2021, Negy was notified by Defendant Dupras that following "internal discussions" of his case to which he was not privy, he was being placed on administrative leave. While UCF's faculty CBA permits employees to be placed on administrative leave at the *start* of an investigation, the circumstances of UCF's sudden decision to place Negy at this stage — with opaque reference to unspecified "internal discussions" — was highly irregular, and was further evidence of Defendants' retaliation against Negy for his protected speech.

### Defendant Myers Finds Negy Responsible for Misconduct in Violation of the First Amendment

77.     On January 13, 2021 — 180 days after Negy received his notice of investigation — Defendant Myers issued her investigative report. Defendant Myers' report concluded that Negy had engaged in discriminatory harassment in the course of his classroom teaching. Defendant Myers also concluded that in 2014, Negy had failed to report inappropriate behavior allegedly committed by one of his teaching assistants.

78.     Defendant Myers also found that Negy — who repeatedly begged for enough information about the allegations against him to allow him to meaningfully prepare for his investigative interviews — had provided "false" information during the investigation on account of his faulty memory in a few isolated instances.

79.     Many of the alleged incidents of "discriminatory harassment" for which Defendant Myers found Negy responsible were in fact instances of speech protected by academic freedom and the First Amendment.

80.     Indeed, in an unrelated lawsuit, the U.S. Court of Appeals for the Eleventh Circuit ruled in April 2022 that UCF's "discriminatory-harassment policy likely violates the First Amendment on the grounds that it is an overbroad and content- and viewpoint-based regulation of constitutionally protected expression."

### *Defendant Dupras Fires Negy Without the Required Notice, Leaving Him Homeless and Without Income*

81.     Also on January 13, 2021, Defendant Dupras issued Negy a letter notifying him of the university's intent to terminate his employment at the close of business on January 25, 2021.

82.     Under UCF faculty's CBA, tenured faculty are ordinarily entitled to six months' notice of termination unless their continued presence "jeopardize[s] the safety or welfare of…students."

21

83.   However, Defendant Dupras determined that because Negy had once allegedly failed to report inappropriate touching by his teaching assistant in 2014, his presence on campus in 2021 would "jeopardize the safety or welfare of…students" and thus he could be terminated immediately.

84.   Defendant Dupras' letter cruelly treated Negy, who had been employed by UCF for more than 20 years, like a common criminal. She directed Negy to return any UCF property in his possession within two days or it "will be considered stolen," and informed him that before coming to campus to return said property, he would need to make prior arrangements to have an "escort" while on campus.

85.   The immediate loss of income caused by the denial of six months' notice forced Negy to rapidly sell his home at significantly below market value. This was particularly difficult because Negy had just assumed responsibility for the care of his physically and mentally disabled brother following the death of their last parent. At the time of Negy's termination, his brother had just moved from Houston to Orlando to live with Negy.

86.   Without income and now homeless, Negy and his brother were forced to move in with a relative.

87.   Negy's mental health deteriorated significantly as a result of Defendants' actions. In April 2021, he was diagnosed with Major Depressive Disorder and Generalized Anxiety Disorder after he sought treatment for

symptoms that began "following termination from his previous place of employment." Negy had no prior mental health history or diagnosis.

### *UCF Loses in Arbitration*

88.　On February 12, 2021, Negy notified UCF of his intent to grieve his termination as a violation of his CBA.

89.　Negy's grievance argued that UCF violated the CBA by failing to provide him with six months' notice of his termination, and by disciplining him without "just cause."

90.　On March 19, 2021, Negy and his Union-appointed attorney attended a "Step 2" grievance meeting with UCF administrators at which Negy's attorney laid out the ways in which Defendants' termination of Negy violated the terms of the CBA.

91.　Under the CBA, the UCF Board of Trustees had 30 days to respond to the information that Negy's Union attorney presented at the Step 2 meeting. Just before the 30-day deadline, Negy was notified that the Board of Trustees was requesting a 30-day extension to respond.

92.　Having already been severely damaged by the repeated delays in the investigation process that preceded his termination, Negy — through counsel — asked the Board of Trustees why they were requesting the extension.

93.     Without giving any reason, the Board of Trustees simply said they were unable to respond by the deadline.

94.     Under the CBA, Negy was therefore permitted to notify UCF of his intent to proceed to arbitration, the final stage of the grievance process. Negy submitted a Notice of Intent to Arbitrate on May 13, 2021.

95.     After multiple delays, Negy's arbitration hearing took place in March 2022.

96.     On May 16, 2022, the arbitrator issued an opinion awarding Negy "full reinstatement, with tenure, and with all compensation and benefits fully restored to that effect as of the termination date."

97.     Specifically, the arbitrator determined that UCF had not been justified in overriding the 6-month notice requirement of the CBA by deeming Negy a "safety risk."

98.     The arbitrator found that Negy had received "consistently outstanding annual evaluations" for the past two decades, until his tweets led to a "campaign by UCF" to gather potentially damaging information about his classroom behavior.

99.     The arbitrator ruled that UCF's assessment that Negy was a "safety risk," when UCF had given him no opportunity to modify his behavior, did not justify denying him the required 6 months' notice. The arbitrator was unpersuaded by UCF's attempt to "buttress its claim" that

Negy was a safety risk by pointing to his alleged 2014 failure to report unwanted conduct by a teaching assistant.

100.   Because the arbitrator concluded that UCF had violated the CBA by denying Negy the 6 months' notice, he did not reach the second question of whether Negy was actually responsible for the misconduct of which UCF accused him. He noted, however, that Negy's case raised issues such as "effective use of protected free speech texts" and "announcement pre-investigation that Dr. Negy was a pariah in the view of the administration."

101.   Adding insult to injury, UCF dragged its feet and took more than four months to pay Negy what he was awarded by the arbitrator in May 2022.

102.   This caused Negy to suffer additional financial hardship. Further, to his great embarrassment, he was forced to approach friends and family for loans during the period of time that UCF refused to pay him what he was owed.

103.   Although forced by an arbitrator to reinstate Negy, UCF has made clear that it believes it did nothing wrong in retaliating against and ultimately terminating him for his protected speech.

104.   UCF has never voluntarily rescinded the misconduct that led to Negy's termination. *Amalgamated Transit Union Local 1593 v. Hillsborough*

*Area Reg'l Transit Auth.*, 2019 U.S. Dist. LEXIS 102138 (M.D. Fla. June 19, 2019).

105.   As a result, Negy continues to experience a significant chilling effect on his protected speech. The teaching that was once a source of joy for him is now a source of anxiety as there is a credible threat that UCF will again subject him to the same treatment based on his protected speech.

## FIRST CAUSE OF ACTION

**Violation of Plaintiff's Right to Free Speech Under the First and Fourteenth Amendments (42 U.S.C § 1983) – Retaliation – Defendants Board of Trustees of UCF (official capacity), Butler (individually), Cartwright (individually), Johnson (individually), Dupras (individually), Myers (individually)**

106.   Plaintiff repeats and realleges paragraphs 2-5, 7-13, 22-30, 31-36, 38-41, 44-45, 51-76, 77-79, 81-87, and 103-105 of this Complaint as if fully set forth herein.

107.   Plaintiff engaged in constitutionally protected speech and has been subjected to severe retaliation as a result. Defendants' actions would deter a person of ordinary firmness from exercising their right to free speech.

108.   Within days of Plaintiff's protected tweets, Defendants Butler, Cartwright, and Johnson publicly solicited complaints about Plaintiff's classroom teaching in an effort to establish a pretextual reason for terminating him. This solicitation was posted on UCF's website under the headline "Members of UCF's leadership urge current and former students to

26

report discriminatory behavior they may have experienced from faculty and staff." The pretextual nature of Defendants' solicitation of complaints is evident both from the timing and from Defendants' contemporaneous remarks to students who were demanding Plaintiff's firing. Defendant Butler, for example, responded to the flood of #UCFFireHim tweets by posting a video to Twitter explaining that "the fact of the matter is it's not going to happen overnight." Similarly, Defendant Cartwright publicly agreed with a student protester who stated that "should have been fired before he got tenure."

109.   Also within days of Plaintiff's protected tweets, Defendant Dupras sent a message to the entire College of Sciences to inform them that "UCF leadership is aware of these tweets and are actively working to address this situation. I cannot speak to next steps until they are finalized, but I'm reaching out to let you know that the administration is moving forward." When the administration finished "moving forward," Defendant Dupras not only imposed the most severe sanction of termination, but also deliberately and maliciously deprived Plaintiff of the customary 6 months' notice of termination afforded to tenured faculty. Instead, Defendant Dupras deemed Plaintiff a danger to campus based on his alleged failure to report inappropriate behavior on the part of one of his teaching assistants in 2014, and provided him with only 12 days' notice.

110.   Defendant Myers conducted the investigation that resulted from the solicitation of complaints against Plaintiff. Her investigation was intrusive and harassing. She asked Plaintiff repetitive questions for over 8 hours. She delayed the investigation for months without explanation. When Plaintiff repeatedly asked for sufficient information about the allegations to allow him to prepare for his interviews with Defendant Myers, she denied him that information — and then used his faulty memory to add a charge of providing false information during an investigation to the list of charges against him. Further, Defendant Myers concluded that Plaintiff had violated UCF policy based on his protected classroom speech.

111.   The Board of Trustees was aware of Plaintiff's tweets and of the demands for his termination that followed. They were first informed of the controversy on June 4, 2020, in an email from UCF's Assistant Vice President for Board Relations. The Trustees were further aware of Defendants' mistreatment of Plaintiff in their solicitation of complaints, investigation, and termination, as they vigorously defended the specific actions of each Defendant in their arbitration brief.

112.   Defendants' actions have severely damaged Plaintiff.

113.   Negy was out of work for more than a year. He was forced to sell his home at a significant loss and move in with a relative in order to be able

to provide care and shelter for his mentally and physically disabled brother, for whom he is the sole caregiver.

114.   Negy was diagnosed with anxiety and major depressive disorder and had to seek medical treatment.

115.   Defendants have destroyed Plaintiff's reputation and rendered him virtually unemployable in his field at any institution other than UCF.

116.   Further, Defendants' actions — which they continue to defend to this day — have had a severe chilling effect on Plaintiff's speech following his reinstatement; he is fearful of teaching the controversial subjects covered in his classes for fear of additional complaints and investigations.

117.   In retaliating against Plaintiff for his protected speech, Defendants Butler, Johnson, Cartwright, Myers, and Dupras all acted in violation of clearly established law.

118.   Therefore, Plaintiff is entitled to an award of monetary damages, including punitive damages, and equitable relief.

119.   Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiff is entitled to an award of monetary damages in an amount to be determined by the evidence and this Court and the reasonable costs of this lawsuit, including their reasonable attorneys' fees.

## SECOND CAUSE OF ACTION

**Violation of Plaintiff's Right to Free Speech Under the First and Fourteenth Amendments (42 U.S.C § 1983) – Defendants Board of Trustees of UCF (official capacity), Myers (individually)**

120.    Plaintiff repeats and realleges paragraphs 2-5, 7, 13, 64-65, 79-80, 85-87, and 103-105 of this Complaint as if fully set forth herein.

121.    Plaintiff teaches courses on psychology, culture, and sexual behavior that necessarily include discussions of sensitive subject matter.

122.    During her 8+ hours of interrogation, Defendant Myers barraged Negy with a litany of accusations spanning 15 years. Most of these allegations were simply objections to Negy's course content and pedagogy.

123.    Ultimately, many of the alleged incidents of "discriminatory harassment" for which Defendant Myers found Plaintiff responsible were in fact instances of speech protected by academic freedom and the First Amendment.

124.    Defendants' actions have severely damaged Plaintiff.

125.    Negy was out of work for more than a year. He was forced to sell his home at a significant loss and move in with a relative in order to be able to provide care and shelter for his mentally and physically disabled brother, for whom he is the sole caregiver.

126.    Negy was diagnosed with anxiety and major depressive disorder and had to seek medical treatment.

127.    Defendants have destroyed Plaintiff's reputation and rendered him virtually unemployable in his field at any institution other than UCF.

128.    Further, Defendants' actions — which they continue to defend to this day — have had a severe chilling effect on Plaintiff's speech following his reinstatement; he is fearful of teaching the controversial subjects covered in his classes for fear of additional complaints and investigations.

129.    In finding Plaintiff responsible for "discriminatory harassment" based on his germane classroom speech, Defendant Myers acted in violation of clearly established law.

130.    Therefore, Plaintiff is entitled to an award of monetary damages, including punitive damages, and equitable relief.

131.    Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiff is entitled to an award of monetary damages in an amount to be determined by the evidence and this Court and the reasonable costs of this lawsuit, including their reasonable attorneys' fees.

## THIRD CAUSE OF ACTION

### Negligence – UCF Board of Trustees (official capacity)

132.    Plaintiff repeats and realleges paragraphs 7-13, 22, 31-36, 51-80, 81-87, 89, 97, and 99 in this Complaint as if fully set forth herein.

133.    Under Florida law, the elements of a negligence claim are (1) a duty by the defendant to conform to a certain standard of conduct; (2) a breach

31

of the duty; (3) a reasonably close causal connection between the breach and the resulting injury; and (4) actual loss or damages.

134.   Under Florida law, the state and its agencies and subdivisions can be liable for torts committed "by the negligent or wrongful act or omission of any employee of the agency or subdivision while acting within the scope of the employee's office or employment." § 786.28, Fla. Stat. (2022).

135.   Defendant Board of Trustees of UCF has a duty of at least reasonable care in the governance of UCF, including the duty that it has taken upon itself to ensure that the university complies with "laws, rules, regulations and requirements." *About the Board*, UCF.edu, https://bot.ucf.edu/about-the-board/ (last visited Jun. 28, 2023). Such a duty includes the responsibility of adopting reasonable employment practices, reasonably overseeing employees, especially those who exercise investigatory and disciplinary authority over other employees, and treating Plaintiff reasonably in particular. *See McCain v. Fla. Power Corp.*, 593 So.2d 500, 503 (Fla. 1992) ("[E]ach defendant who creates a risk is required to exercise prudent foresight whenever others may be injured as a result."); *see also Slonin v. City of West Palm Beach*, 896 So.2d 883 (4th DCA 2005).

136.   Likewise, officers, employees, or agents of UCF have a reasonable duty of care in the performance of their duties at UCF. However, "[t]he exclusive remedy for injury or damage suffered as a result of an act, event, or

omission of an officer, employee, or agent of the state or any of its subdivisions or constitutional officers is by action against the governmental entity, or the head of such entity in her or his official capacity, or the constitutional officer of which the officer, employee, or agent is an employee." § 768.28(9)(a), Fla. Stat.

137.    In violation of these duties, Defendants Butler, Cartwright, and Dupras made public statements implying that Plaintiff would face consequences for his constitutionally protected tweets.

138.    Defendant Butler released a video statement explaining to those demanding Plaintiff's firing that "it's not going to happen overnight." Defendant Cartwright publicly agreed with a student protester that Plaintiff "should have been fired before he got tenure."

139.    Defendant Dupras emailed the College of Sciences to state that the university "is aware of these tweets and are actively working to address this situation. I cannot speak to next steps until they are finalized, but I'm reaching out to let you know that the administration is moving forward."

140.    In violation of these duties, Defendants Butler, Cartwright, and Johnson retaliated against Plaintiff by posting a public solicitation on UCF's website inviting people to lodge complaints about Plaintiff's classroom conduct, even anonymously. They did this with the expectation that at least

some of the many students loudly demanding that Plaintiff be fired for his tweets would file complaints.

141.    In violation of these duties, Defendant Myers conducted a deliberately punitive and harassing investigation. She denied Plaintiff adequate notice of the allegations despite his repeated requests, and then when he failed to accurately recall things he had said in the classroom years ago, she charged him with providing false information during the investigation. She also subjected him to numerous unexplained delays in the investigation despite his repeated requests for information. She did this as part of Defendants' effort to penalize Plaintiff for his tweets after they generated significant negative attention and negative publicity for the university.

142.    Upon information and belief, UCF was aware of problems with Defendant Myers' job performance and ability to observe others' individual rights. However, UCF failed to adequately train or supervise Defendant Myers.

143.    In violation of these duties, Defendant Dupras terminated Plaintiff without just cause, as determined by an arbitrator on May 16, 2022.

144.    In violation of these duties, Defendant Board of Trustees failed to prevent its employees from violating Plaintiff's rights under UCF policy and the law.

145. The harm to Plaintiff as a result of Defendant Board of Trustees' negligence was entirely foreseeable.

146. Indeed, Defendants' actions have severely damaged Plaintiff. He was out of work for more than a year. He was forced to sell his home at a significant loss and move in with a relative in order to be able to provide care and shelter for his mentally and physically disabled brother, for whom he is the sole caregiver. He was diagnosed with anxiety and major depressive disorder and had to seek medical treatment. Furthermore, Defendants' very public actions and denunciations have destroyed Plaintiff's reputation and rendered him virtually unemployable in his field at any institution other than UCF.

147. Therefore, Plaintiff is entitled to an award of monetary damages, including punitive damages, and equitable relief.

## FOURTH CAUSE OF ACTION

### Intentional Infliction of Emotional Distress – Defendants Myers and Dupras (individually) or, in the alternative, Board of Trustees of UCF (in their official capacity)

148. Plaintiff repeats and realleges paragraphs 7-13, 51-79, 81-87, and 88-102 in this Complaint as if fully set forth herein.

149. Under Florida law, the elements of a claim for intentional infliction of emotional distress are (1) the defendant's conduct was intentional

or reckless; (2) the conduct was outrageous; (3) the conduct caused emotional distress; and (4) the emotional distress was severe.

150.    Under Florida law, the state and its agencies and subdivisions can be liable for torts committed "by the negligent or wrongful act or omission of any employee of the agency or subdivision while acting within the scope of the employee's office or employment." § 786.28, Fla. Stat. (2022).

151.    Under Florida law, state employees can also be individually liable for tort violations committed in the scope of their employment when they act "in bad faith or with malicious purpose." § 786.28, Fla. Stat. (2022).

152.    Defendant Myers acted in bad faith or with malicious purpose when she intentionally subjected Plaintiff to more than 8 hours of repetitive and harassing questioning. She deliberately denied Plaintiff the information he needed to prepare for that interrogation despite his repeated requests, and then used his faulty memory to charge him with providing false information during an investigation.

153.    Further, Defendant Myers acted in bad faith or with malicious purpose when she allowed her investigation to drag on for months without providing Plaintiff any information about the cause of the repeated delays, despite Plaintiff begging for updates because the protracted investigation was "taking a terrible toll on me both personally and professionally."

154.    As a direct and proximate result of Defendant Myers' conduct, Plaintiff suffered severe emotional distress. Despite no prior history of mental illness, he was diagnosed with anxiety and major depressive disorder that required medical treatment. He was terminated from his position and deemed a danger to campus, forcing him to sell his home at a significant loss and move — along with the mentally and physically disabled brother for whom he is the sole caregiver — in with a relative.

155.    Defendant Dupras acted in bad faith or with malicious purpose when she made the decision to terminate Plaintiff — a decision that the arbitrator later overturned, finding it was without just cause.

156.    Defendant Dupras did not simply terminate Plaintiff, however. She also acted in bad faith or with malicious purpose when she intentionally and maliciously denied Plaintiff the 6 months' notice he was entitled to prior to termination. To accomplish this, she purposely distorted an inapplicable section of UCF's collective bargaining agreement that allows the university to deny the usual notice when a professor's continued employment would "jeopardize the safety or welfare of… students." Defendant Dupras claimed that because Plaintiff had allegedly failed to report inappropriate touching by one of his teaching assistants *in 2014*, Plaintiff was a threat to student safety. Instead of receiving 6 months' notice of his termination, therefore, Plaintiff received 12 days' notice.

157.     Defendant Dupras acted in bad faith or with malicious purpose when she further tormented Plaintiff by treating him like a common criminal, requiring him to be escorted by campus police while retrieving his belongings and informing him that any university property not returned within 48 hours "will be considered stolen."

158.     Suddenly stripped of income, Plaintiff was forced to sell his home just after he had assumed responsibility for the care of his mentally and physically disabled brother following the death of their last parent.

159.     Defendant Dupras' bad faith or malicious conduct caused Plaintiff to suffer severe emotional distress. The fear of being unable to house and care for his dependent brother caused Plaintiff profound anxiety; indeed, despite no prior history of mental illness, he was diagnosed with anxiety and major depressive disorder.

160.     Defendants' very public actions and denunciations have destroyed Plaintiff's reputation and rendered him virtually unemployable in his field at any institution other than UCF.

161.     Ultimately, unable to find adequate housing without an income, Plaintiff and his brother had to move in with a relative.

162.     Alternatively, Defendant Board of Trustees failed to prevent the Individual Defendants from wrongfully violating Plaintiff's rights under UCF policy and the law.

163.    Defendants' actions have severely damaged Plaintiff. He was out of work for more than a year. He was forced to sell his home at a significant loss and move in with a relative in order to be able to provide care and shelter for his mentally and physically disabled brother, for whom he is the sole caregiver. He was diagnosed with anxiety and major depressive disorder and had to seek medical treatment as Defendants destroyed his chances of securing work elsewhere.

164.    Therefore, Plaintiff is entitled to an award of monetary damages, including punitive damages, and equitable relief.

## FIFTH CAUSE OF ACTION

**Abuse of Process –Defendants Myers, Dupras, Cartwright, and Johnson (individually) or, in the alternative, Defendant Board of Trustees (in their official capacity)**

165.    Plaintiff repeats and realleges paragraphs 7-13, 51-79, 81-87, and 88-102 in this Complaint as if fully set forth herein.

166.    Under Florida law, the elements of a claim for abuse of process are (1) a willful and intentional misuse of process; (2) for some wrongful or unlawful object or collateral purpose; (3) damage to the plaintiff from the defendant's actions.

167.    Under Florida law, the state and its agencies and subdivisions can be liable for torts committed "by the negligent or wrongful act or omission

of any employee of the agency or subdivision while acting within the scope of the employee's office or employment." § 786.28, Fla. Stat. (2022).

168.   Under Florida law, state employees can also be individually liable for tort violations committed in the scope of their employment when they act "in bad faith or with malicious purpose." § 786.28, Fla. Stat. (2022).

169.   Defendants Myers and Dupras acted in bad faith or with malicious purpose when they willfully and intentionally misused UCF's Prohibition of Discrimination, Harassment and Related Interpersonal Violence and UCF's Collective Bargaining Agreement to retaliate against Plaintiff for his expression of views on Twitter.

170.   Alternatively, Defendant Board of Trustees allowed this wrongful abuse of process to unfold over a period of seven months during which it could have intervened to require university administrators to abide by the applicable laws, rules, regulations and requirements. Defendant Board of Trustees further (unsuccessfully) defended UCF's actions in subsequent arbitration proceedings.

171.   Defendants Cartwright and Johnson acted in bad faith or with malicious purpose when they made public statements implying that Plaintiff would face consequences for his constitutionally protected tweets.

172.   Defendants Cartwright and Johnson acted in bad faith or with malicious purpose when they retaliated against Plaintiff by posting a public

solicitation on UCF's website inviting people to lodge complaints about Plaintiff's classroom conduct, even anonymously. They did this with the expectation that at least some of the many students loudly demanding that Plaintiff be fired for his tweets would file complaints.

173.    Defendants' actions have severely damaged Plaintiff. He was out of work for more than a year. He was forced to sell his home at a significant loss and move in with a relative in order to be able to provide care and shelter for his mentally and physically disabled brother, for whom he is the sole caregiver. He was diagnosed with anxiety and major depressive disorder and had to seek medical treatment. Furthermore, Defendants' very public actions and denunciations have destroyed Plaintiff's reputation and rendered him virtually unemployable in his field at any institution other than UCF.

174.    Therefore, Plaintiff is entitled to an award of monetary damages, including punitive damages, and equitable relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Charles Negy respectfully requests that the Court enter judgment against Defendants and provide Plaintiff with the following relief:

1.    A declaration that Defendants' actions violated Plaintiff's right to free speech on matters of public concern;

2.    A permanent injunction prohibiting Defendants from publicly

soliciting complaints against Plaintiff in response to his expressions of opinion on matters of public concern;

3.      A permanent injunction prohibiting Defendants from investigating or punishing Plaintiff for speech protected by the First Amendment;

4.      Monetary damages, including punitive damages, in an amount to be determined by the Court to compensate Plaintiff for the deprivation of fundamental rights;

5.      Plaintiff's reasonable attorneys' fees, costs, and other costs and disbursements in this action pursuant to 42 U.S.C. §§ 1988 and 2000e-5(k); and

6.      Such further and additional relief as the Court shall deem just, proper and authorized by law, and that the costs of this action be taxed against Defendants.

7.

## JURY DEMAND: PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL COUNTS SO TRIABLE

Respectfully submitted,

Dated: June 29, 2023         /s/ David R. Osborne
                            David R. Osborne
                            GOLDSTEIN LAW PARTNERS LLC
                            4651 Salisbury Rd., Suite 400

Jacksonville, FL  32256
610-949-0444
dosborne@goldsteinlp.com


/s/ Samantha K. Harris
Samantha Harris
ALLEN HARRIS PLLC
P.O. Box 673
Narberth, PA 19072
610-634-8258
sharris@allenharrislaw.com

*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

CHARLES NEGY,

     *Plaintiff,*

v.                                                     CASE NO.: 6:23-cv-00666-CEM-DCI

BOARD OF TRUSTEES OF THE
UNIVERSITY OF CENTRAL
FLORIDA; in their official capacities;
S. KENT BUTLER, ALEXANDER
CARTWRIGHT, TOSHA DUPRAS,
MICHAEL JOHNSON, NANCY
MYERS, in their individual capacities,

     *Defendants.*

_____/

## DEFENDANTS' DISPOSITIVE MOTION TO DISMISS, OR ALTERNATIVELY, MOTION TO STRIKE PUNITIVE DAMAGES

     Defendants, Board of Trustees of the University of Central Florida ("Board"), S. Kent Butler, Alexander Cartwright, Tosha Dupras, Michael Johnson, and Nancy Myers ("Individual Defendants"), pursuant to Fed. R. Civ. P. 12(b)(1), 12(b)(6), and 12(e), request that this Honorable Court dismiss Plaintiff's Amended Complaint with prejudice, or alternatively, strike the punitive damages claim, and state:

## I.    Background

     Plaintiff, Charles Negy, is an Associate Professor of Psychology at the University of Central Florida ("UCF"). Plaintiff sued UCF's Board[1], the 13-member

---

[1] Plaintiff names the Board in its "official capacity." However, as an arm of the State, the Board is a "public body corporate," a legal entity pursuant to Section 1001.72, *Florida Statutes,* and does not have

board that governs UCF, and the Individual Defendants, current and former UCF officials, whom he alleges were responsible for his termination in January 2021. (Doc. 26 at 21). Plaintiff arbitrated his termination under the Collective Bargaining Agreement between UCF and the United Faculty of Florida ("CBA"), which resulted in his full reinstatement with back pay, tenure, and benefits from the date of his termination. (Doc. 26 at 24).

Here, Plaintiff seeks to re-litigate the same facts grieved in arbitration in an attempt to collect damages beyond what was bargained for in the CBA and awarded at arbitration.  He asserts two constitutional claims under 42 U.S.C. §1983 for alleged violations of his free speech rights under the First and Fourteenth Amendments and retaliation for his constitutionally-protected speech, or more specifically, comments he posted and continues to post on his personal Twitter account (Counts I and II). (Doc. 26 at 25-31).

Plaintiff also asserts a state law claim in Count III against the Board for negligence.  That claim is premised on the Board's alleged breaches of UCF's duty to ensure it complies with "laws, rules, regulations, and requirements." (Doc. 26 at 31-35). In Count IV, Plaintiff asserts a state law claim for intentional infliction of emotional distress ("IIED") against the Myers and Dupras or, "in the alternative," against the Board. (Doc. 26 at 35-39).  Finally, Plaintiff asserts a state law claim for abuse of process against Myers, Dupras, Cartwright, and Johnson, or "in the

---

official or individual capacities. Naming the Board in its "official capacity" is neither proper nor legally accurate.

alternative," against the Board. (Doc. 26 at 39-41). Plaintiff appears to seek compensatory and punitive damages, as well as declaratory and injunctive relief, against all Defendants. (Doc. 26 at 41-42).

## II.   <u>Summary of the Argument</u>

Plaintiff's Amended Complaint remains subject to fatal procedural and substantive deficiencies. While Plaintiff's Amended Complaint remedies the shot gun pleading issues found in the original, it fails to address the substantive deficiencies in each of his five causes of action. (Doc. 1, 19, and 26).  Because Plaintiff failed to remedy these defects, Defendants seek dismissal of Plaintiff's Amended Complaint with prejudice.  First, Plaintiff does not have standing to seek injunctive relief, as his claim is strictly limited to alleged past violations of his constitutional rights.  His claims have been remedied through arbitration and he has not alleged that Defendants have engaged in any conduct since his reinstatement, or that the alleged violations of his constitutional rights are ongoing.

Further, the Board should be dismissed from this suit in its entirety based on the immunities conferred by the Eleventh Amendment to the United States Constitution, as well as Section 768.28, *Florida Statutes*. The Individual Defendants sued in their individual capacities should be dismissed based on qualified immunity.  Moreover, the claims asserted against the Individual Defendants in Counts IV and V should be dismissed with prejudice for failure to state a claim as Plaintiff has not and cannot assert all of the elements of these claims. In the alternative, Defendants move this Court to strike Plaintiff's claim for punitive damages against the Board and that any

claims for injunctive relief be dismissed for lack of standing.

III.   **Argument**

A.   **Plaintiff lacks standing to seek injunctive relief against all Defendants.**

To meet the case or controversy requirement of Article III, Plaintiff must assert "some threatened or actual injury resulting from the putatively illegal action before a federal court may assume jurisdiction." *O'Shea v. Littleton*, 414 U.S. 488, 493 (1974); *see also Jacobs v. The Fla. Bar*, 50 F.3d 901, 903 (11th Cir. 1995). A plaintiff seeking to invoke a federal court's jurisdiction must demonstrate three things to establish standing under Article III: injury-in-fact, causation, and redressability. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). More specifically, the asserted injury must arise out of the invasion of a legally protected interest that is sufficiently concrete and particularized, rather than abstract and indefinite. *See id*.

Plaintiff here lacks standing to assert injunctive relief for two main reasons. First, Plaintiff lacks standing under *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983), because he does not and cannot allege that there is an actual or imminent injury this Court could redress.  In *Lyons*, the Supreme Court declared that, in most cases, a plaintiff seeking injunctive relief under Section 1983 must allege that he or she will be subject again to the challenged conduct. *See id*. at 102. Absent such allegations, a plaintiff does not have standing to seek an injunction, and thus, that aspect of the case is not justiciable. *See id; Lynch v. Baxley,* 744 F.2d 1452, 1456 (11th Cir. 1984). Instead, "[a] threatened injury must be 'certainly impending' to constitute injury in fact."

*Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990) (internal citations omitted).

Here, Plaintiff pleads 25 pages of factual allegations that he admits were remedied through arbitration. (Doc. 26 at 24, ¶ 96). Plaintiff fails, however, to allege any continuing constitutional violation or inability to currently exercise his constitutional rights, leaving him without any concrete or particularized injury in fact.[2] Moreover, because he seeks declaratory and injunctive relief, "the injury-in-fact requirement insists that [he] allege facts from which it appears there is a substantial likelihood that he will suffer injury in the future." *Strickland v. Alexander*, 772 F.3d 876, 887 (11th Cir. 2014) (citations omitted). "This is because injunctions regulate future conduct only . . . So a plaintiff seeking declaratory or injunctive relief must allege and ultimately prove a real and immediate—as opposed to a merely hypothetical or conjectural—threat of future injury." *Id.*

While the Eleventh Circuit has recognized that the chilling effect on speech and resulting self-censorship are types of injuries which may suffice for standing purposes, Plaintiff's bald assertions that Defendants' have chilled his speech cannot suffice as a concrete and particularized injury. *C.f. Pedro v. Equifax, Inc.*, 868 F.3d 1275, 1279 (11th Cir. 2017) ("[A] violation of the right to free speech, can be concrete."). Plaintiff has not alleged conduct by any of the Defendants that has chilled his speech since his termination over two years ago, for which he has already been made whole.

---

[2] To the contrary, since his reinstatement at UCF, Plaintiff has actively engaged in expressing his personal views via his personal twitter account, as referenced in the Amended Complaint. (Doc. 26 ¶¶ 2, 3, 17); https://twitter.com/charlesnegy/.

Therefore, "if no credible threat of prosecution looms, the chill is insufficient to sustain the burden that Article III imposes. A party's subjective fear that he may be prosecuted for engaging in expressive activity will not be held to constitute an injury for standing purposes unless that fear is objectively reasonable." *Wilson v. State Bar of Ga.*, 132 F.3d 1422, 1428 (11th Cir. 1998). In fact, as pleaded, the injunctive relief Plaintiff seeks would be nothing more than an "obey the law injunction," which is "unenforceable." *Fla. Ass'n of Rehab. Facilities, Inc. v. State of Fla. Dep't of Health & Rehab. Servs.*, 225 F.3d 1208, 1222–23 (11th Cir. 2000); *Burton v. City of Belle Glade*, 178 F.3d 1175, 1200 (11th Cir. 1999). Plaintiff fails to allege an actual or imminent injury in fact to establish standing for prospective injunctive relief.

Further, Plaintiff lacks standing to seek injunctive relief against Butler and Dupras in their individual capacities because injunctive relief against them individually would not redress the harms Plaintiff alleges. Individual capacity relief goes to both Defendants, individually, while official capacity injunctive relief goes to the entity as a whole. *Neville v. Classic Gardens*, 141 F. Supp. 2d 1377, 1379 (S.D. Ga. 2001). Butler is currently a professor for UCF, but he is being sued for his involvement as UCF's former Chief Equity, Inclusion, and Diversity Officer. (Doc. 26 at 4, ¶ 9). Similarly, Dupras is being sued for her involvement as UCF's former Interim Dean of the College of Science, a position she no longer holds. (Doc. 26 at 5, ¶ 11).

Neither Butler nor Dupras have the authority they once held in their former leadership roles to discipline or chill Plaintiff's speech. Further, since the requested relief is only against them individually, any injunction against them would not bind

the leadership offices they formerly held, but only them individually. As such, the claim for injunctive relief against Butler or Dupras lacks the redressability element as they have no power to direct or control Plaintiff's employment. *See, e.g.*, *Barnes v. Dunn*, No. 419CV00558ACASGC, 2022 WL 10264034, at *5 (N.D. Ala. Aug. 17, 2022), *report and recommendation adopted*, No. 419CV00558ACASGC, 2022 WL 4365709 (N.D. Ala. Sept. 21, 2022) (noting claims against former commissioners, who "have no power in their individual capacities to take any action with respect to the conditions of ADOC facilities" failed for lack of standing because "any order directing them as individuals to address prison conditions would not redress the plaintiff's alleged injury."). Again, any such injunction would be an "obey the law" injunction, which would not redress Plaintiff's alleged hypothetical harm because they are both powerless to "injure" Plaintiff for any protected speech in their current roles.

**B.    The Board and the Individual Defendants sued in their individual capacities should be dismissed from this action in their entirety based on Eleventh Amendment Immunity and Qualified Immunity.**

**i.    The Board should be dismissed with prejudice from Counts I and II based on Eleventh Amendment Immunity.**

Plaintiff's Amended Complaint raises both federal constitutional claims and state law tort claims against the Board. This Court lacks jurisdiction to hear either type of claim. UCF is a Florida state university and political subdivision of the State of Florida. *See* Fla. Stat. § 1000.21(6)(g).  The Board of Trustees is a public body corporate and public instrumentality and is the proper party defendant in any suit against UCF. *See* Fla. Stat. § 1001.72(1) and (2).  However, under the Eleventh Circuit's "arm of the

state" test, the Board is entitled to Eleventh Amendment immunity as an instrumentality of the state. *See Univ. of S. Fla. Bd. of Trustees v. CoMentis, Inc.,* 861 F.3d 1234, 1235 (11th Cir. 2017).   Rule 12(b)(1) enables a defendant to move to dismiss a complaint for lack of subject matter jurisdiction based on Eleventh Amendment immunity. Fed. R. Civ. Pro. 12(b)(1); *Smith v. Avino,* 91 F.3d 105, 107 (11th Cir. 1996), *abrogated on other grounds by Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83 (1998).

The Eleventh Amendment has been interpreted to bar suits against a state, state agency, or state official acting in their official capacity in federal court by its own citizens, as well as those of another State. *See Edelman v. Jordan,* 415 U.S. 651, 662–63 (1974); *Seminole Tribe of Fla. v. Fla.,* 517 U.S. 44 (1996). But three exceptions—none of which apply here—allow suits against a state: (1) Congress may abrogate the States' immunity; (2) a state may waive its immunity; or (3) under the *Ex Parte Young*[3] doctrine, a plaintiff may file suit against state officials acting in their official capacities seeking prospective injunctive relief for ongoing violations of federal law. *Williams v. Bd. of Regents of Univ. Sys. of Georgia,* 477 F.3d 1282, 1301 (11th Cir. 2007); *Summit Med.*

---

[3] To the extent Plaintiff argues *Ex Parte Young,* 209 U.S. 123 (1908) allows the Board, as an arm of the state, to be a defendant in an action for prospective injunctive relief, such an argument misses the mark.   An argument that "*Ex parte Young* extends not only to state officials sued in their official capacities for prospective relief, but to States and state agencies . . . is simply incorrect. The theory behind *Ex Parte Young* is that a suit alleging a violation of the federal constitution against a state official in his official capacity for injunctive relief on a prospective basis is not a suit against the state, and, accordingly, does not violate the Eleventh Amendment. The exception does not extend to the state or state agencies." *Camm v. Scott,* 834 F. Supp. 2d 1342, 1348 (M.D. Fla. 2011) (internal citations omitted); *Eubank v. Leslie,* 210 F. App'x. 837, 844 (11th Cir. 2006).

Further, there is no "prospective relief" available against either the Board or the Individual Defendants in their individual capacity as there is no ongoing constitutional violation and the Plaintiff's efforts to litigate a past event do not fall within the *Ex Parte Young* doctrine.   *See supra* Section A(ii).

*Assocs., P.C. v. Pryor*, 180 F.3d 1326, 1336–42 (11th Cir. 1999) (applying *Ex Parte Young*).

"In Florida, sovereign immunity is the rule, rather than the exception." *Pan-Am Tobacco Corp. v. Dep't of Corr.*, 471 So. 2d 4, 5 (Fla. 1984). However, Section 768.28, *Florida Statutes*, provides a very narrow waiver of the State's sovereign immunity, only as to certain actions. And, in *Hill v. Dep't. of Corr.*, the Florida Supreme Court held that Section 768.28 was not intended to waive immunity for "constitutional torts." 513 So. 2d 129, 133 (Fla. 1987); *Lafleur v. State Univ. Sys. of Fla.*, No. 8:20-CV-1665-KKM-AAS, 2021 WL 3727832, at *6 (M.D. Fla. Aug. 2, 2021), *report and recommendation adopted*, No. 8:20-CV-1665-KKM-AAS, 2021 WL 3725243 (M.D. Fla. Aug. 23, 2021) (citing *Garcia v. Reyes*, 697 So. 2d 549, 550 (Fla. 4th DCA 1997)). "While Florida is at liberty to waive its immunity from section 1983 actions, it has not done so. The recovery ceilings in section 768.28 were intended to waive sovereign immunity for state tort actions, not federal civil rights actions commenced under section 1983." *Hill*, 513 So.2d at 129; s*ee also Shuler v. Bd. of Trustees of Univ. of Ala.*, 480 F. App'x. 540, 544 (11th Cir. 2012) (affirming district court's judgment in favor of board of trustees because it was entitled to Eleventh Amendment immunity).

In fact, section 768.28 provides:

> **No provision of this section, or of any other section of the Florida Statutes**, whether read separately or in conjunction with any other provision, ***shall be construed to waive the immunity of the state or any of its agencies from suit in federal court, as such immunity is guaranteed by the Eleventh Amendment to the Constitution of the United States***, unless such waiver is explicitly and definitely stated to be a waiver of the immunity of the state and its

agencies from suit in federal court . . .

Fla. Stat. §768.28 (emphasis added).  Nor has Congress abrogated the Board's Eleventh Amendment immunity for Section 1983 claims.  To the contrary, the United States Supreme Court has clearly and unambiguously held that "a State is not a person within the meaning of § 1983." *See Will v. Michigan Dep't. of State Police*, 491 U.S. 58, 66 (1989) ("Congress, in passing § 1983, had no intention to disturb the States' Eleventh Amendment immunity.").

Finally, to the extent Plaintiff attempts to assert claims against the individual board of trustee members in their official capacities under *Ex Parte Young* by virtue of naming the Board, a state instrumentality, in its "official capacity," he has failed. Plaintiff has also failed to allege an ongoing violation of federal law that could be remedied by prospective injunctive relief. Accordingly, the Board should be dismissed, with prejudice, from Counts I and II under Section 1983 as it is clearly and unambiguously entitled to Eleventh Amendment sovereign immunity.

### ii. The Individual Defendants should be dismissed with prejudice from Count I and Defendant Myers should be dismissed with prejudice from Count II based on qualified immunity.

"Qualified immunity protects government officials performing discretionary functions from civil trials (and the other burdens of litigation, including discovery) and from liability if their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known." *Maggio v. Sipple*, 211 F.3d 1346, 1350 (11th Cir. 2000) (citations omitted). Qualified immunity may be raised and considered on a motion to dismiss. *St. George v. Pinellas Cnty.*, 285 F.3d 1334,1337 (11th

10

Cir. 2002) (citing *Chesser v. Sparks*, 248 F.3d 1117, 1121 (11th Cir. 2001).

The question of qualified immunity should be resolved in the defendant's favor on a motion to dismiss if the plaintiff fails to allege the violation of a clearly established constitutional right. *Siegert v. Gilley*, 500 U.S. 226, 232-33 (1991); *Williams v. Ala. State Univ.*, 102 F.3d 1179, 1182 (11th Cir. 1997). This is a question of law, accepting the facts alleged in the complaint as true and drawing all reasonable inferences in the plaintiff's favor. *Williams,* 102 F.3d at 1182. To obtain qualified immunity, the defendant must first establish that he acted within his discretionary authority; "a court must ask whether the act complained of, if done for a proper purpose, would be within, or reasonably related to, the outer perimeter of an official's discretionary duties." *Harbert Int'l, Inc. v. James*, 157 F.3d 1271, 1282 (11th Cir. 1998) (citations omitted).

Here, Plaintiff's allegations show the Individual Defendants were acting within the scope of their discretionary authority when they engaged in the allegedly wrongful acts that are the subject of Plaintiff's allegations. For instance, the Amended Complaint's allegations show each of the Individual Defendants took action as UCF senior employees and acted within their discretionary authority. (Doc. 26 ¶¶ 9-13, 32-41, 51, 56, 60-63, 65-68, 77-78, 81-83) (outlining the Individual Defendants' official positions and actions taken within their capacity as UCF administrators, including but not limited to, using UCF's official Twitter account and website to communicate on behalf of school leadership, conducting a town hall with and sending administration communications to students, conducting investigations of student allegations, and administering discipline).

11

The Eleventh Circuit in *Chesser*, *supra*, set forth the process for a court to determine on a motion to dismiss whether a plaintiff has alleged sufficient facts to overcome a state official's qualified immunity. The Court must utilize a two-step analysis of whether (1) the facts, construed in the light most favorable to the plaintiff, show a constitutional right has been violated and (2) that the right allegedly violated was clearly established. *Roberts v. Spielman*, 643 F.3d 899, 904 (11th Cir. 2011).  Where qualified immunity is raised and addressed on a motion to dismiss, the motion "will be granted if the complaint 'fails to allege the violation of a clearly established constitutional right.'" *Smith ex rel. Smith v. Siegelman*, 322 F.3d 1290, 1294 (11th Cir. 2003) (citing *Chesser,* 248 F.3d at 1122); *see also Jones v. United States,* 484 F. Supp. 3d 1238, 1247 (S.D. Fla. 2020) ("The qualified immunity defense may be raised in a motion to dismiss and will be granted if the complaint fails to allege the violation of a clearly established constitutional right.").  A constitutional right is clearly established if controlling precedent has recognized the right in a "concrete and factually defined context". *Chesser,* 248 F.3d at 1122; *see also Post v. City of Fort Lauderdale,* 7 F.3d 1552, 1557 (11th Cir.1993) ("If case law, in factual terms, has not staked out a bright line, qualified immunity almost always protects the defendant.").

For the Court to determine whether Plaintiff has alleged a violation of his clearly established Free Speech rights, it must determine, in accordance with the balancing test in *Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will. Cnty., Illinois*, 88 S. Ct. 1731, 1734–35 (1968), that he alleged: (1) his speech is on a matter of public concern; (2) his First Amendment interest in engaging in the speech outweighs UCF's interest

in prohibiting the speech to promote the efficiency of the public services it performs through its employees; and (3) his speech played a "substantial part" in UCF's decision to discharge him. *Chesser,* 248 F.3d at 1123. If the Court finds Plaintiff successfully alleged these facts, it must then analyze whether UCF would have reached the same decision even in the absence of the protected conduct. *Id.*

Because *Pickering* employs a balancing test rather than a bright-line rule to determine when a public employee's right to free speech is violated, "the employer is entitled to immunity except in the extraordinary case where *Pickering* balancing would lead to the inevitable conclusion that the discharge of the employee was unlawful." *Dartland v. Metro. Dade Cnty.*, 866 F.2d 1321, 1323 (11th Cir. 1989). In this case, Plaintiff has not alleged, nor can he allege, sufficient facts to show his free speech rights as an employee override UCF's interest in maintaining an efficient and non-disruptive work environment. The Amended Complaint clearly shows the disruption caused to UCF as a result of Plaintiff's comments was substantial, resulting in many student protests calling for Plaintiff's termination and complaints not only about Plaintiff's comments on Twitter, but comments he made during lectures that students found discriminatory, harassing, and demeaning. (Doc. 26 ¶¶ 23-27, 29-30, 33, 37, 39, 42, 45). Even assuming Plaintiff is able to allege a violation of his First Amendment rights under *Pickering*, he cannot allege or show those rights were clearly established at the time of his termination. *See Williams v. Alabama State Univ.*, 102 F.3d 1179, 1183–84 (11th Cir. 1997) (finding plaintiff's complaint had not shown a violation of clearly established law where, in addition to the professor's comments about a textbook not

being about a matter of public concern, the university, "just as clearly,  . . . had an interest in making efficient academic and administrative decisions," and "[g]iven these competing interests, we cannot say that the *Pickering* balancing test inevitably weighs in Williams's favor.") (citing *Dartland*, 866 F.2d at 1321).

The Court must ask whether the individual Defendants received "fair warning" that their alleged conduct was unconstitutional. *Wade v. United States,* 13 F.4th 1217, 1225 (11th Cir. 2021). Plaintiff has failed to allege the existence of opinions by the Supreme Court, Court of Appeals for the Eleventh Circuit, or Florida Supreme Court finding a faculty member who makes public comments that cause substantial disruption to a university may not be fired for such comments without violating the First Amendment. He also cannot allege that a broader, clearly established principle is at stake, or that the conduct of the Individual Defendants "so obviously violate[ ] th[e] constitution that prior case law is unnecessary." *Mercado v. City of Orlando*, 407 F.3d 1152, 1159 (11th Cir. 2005). Because he cannot show his constitutional rights were clearly established, each Individual Defendant is entitled to qualified immunity and Counts I and II should be dismissed with prejudice.

### iii.   The Board should be dismissed with prejudice from Counts III, IV, and V based on Eleventh Amendment Immunity.

The Board should also be dismissed from Counts III, IV, and V as it did not consent to suit for state tort actions in federal court. "[A]bsent an express waiver by the state, the Eleventh Amendment bars state law claims against a state in federal court." *Wells v. Bd. of Trustees of Fla. Gulf Coast Univ.*, No. 2:19-CV-859-JLB-NPM, 2021

WL 883333 (M.D. Fla 2021) (*citing Maynard v. Bd. of Regents of Div. of Univ. of Fla. Dep't of Educ.*, 342 F.3d 1281, 1287 (11th Cir. 2003)). "The test to determine if a state has waived its sovereign immunity 'is a stringent one.'" *Barnes v. Zaccari*, 669 F.3d 1295, 1308 (11th Cir. 2012). A "waiver of Eleventh Amendment immunity must specifically permit suits in federal court." *Id.* "[A] waiver of sovereign immunity 'will be strictly construed, in terms of its scope, in favor of the sovereign.'" *Sossamon v. Texas*, 563 U.S. 277, 285 (2011). Again, the language Florida's sovereign immunity statute is clear that the State has not waived its Eleventh Amendment Immunity. *See* Fla. Stat. § 768.28 (18). The plain language of the statute warrants dismissal of the Board from Counts III, IV, and V.

However, Plaintiff's inability to bring claims in federal court is not the only jurisdictional issue with these claims. Even if Plaintiff brought these claims in state court, his IIED (Count IV) and abuse of process (Count V) claims still fail against the Board as they are barred by sovereign immunity. In addition to providing immunity from suit in federal court, Section 768.28 explicitly *reserves* sovereign immunity for actions committed by state employees "in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property." *Id.* at § 768.28(9)(a). Any action against the state for such an act is expressly prohibited, and the wronged party's available recourse is limited to an action against the employee. *Id.; see also McGhee v. Volusia Cnty.*, 679 So. 2d 729, 730 (Fla. 1996).

In Count IV and Count V of the Amended Complaint, Plaintiff cites to Section 768.28 as an "alternative" basis to hold the Board liable for torts committed by Myers,

Dupras, Cartwright, and Johnson in the scope of their employment. (Doc. 26 at 36, ¶¶ 150-51, 167-68). However, he cites a string of tortious acts allegedly committed by Myers, Dupras, Cartwright, and Johnson both *maliciously* and in *bad faith*. *Id.* at ¶¶ 152-53, 155-57, 159, 169, 171-72. In doing so, Plaintiff misconstrues the language and intent of Section 768.28(9)(a). Courts have consistently dismissed claims against the state when the employee's conduct is alleged to be malicious or willful and wanton in nature. *See, e.g., Anderson v. City of Groveland*, No. 5:15-CV-26-OC-PRL, 2015 WL 6704516, at *8 (M.D. Fla. Nov. 2, 2015). In addition, Florida courts have routinely held that section 768.28(9)(a) bars claims against state agencies for IIED. *See Williams v. City of Minneola*, 619 So. 2d 983, 987 (Fla. 5th DCA 1993) (finding IIED claim constituted willful and wanton conduct and was barred by sovereign immunity); *Casado v. Miami-Dade Cnty.*, 340 F. Supp. 3d 1320, 1330 (S.D. Fla. 2018) (dismissing IIED claim with prejudice as barred by Section 768.28(9)(a)). As such, Counts IV and V against the Board, in the alternative, are subject to dismissal with prejudice.

### C. Alternatively, the Board should be dismissed with prejudice from Count III for failure to state a claim.

In Count III, Plaintiff has sued the Board for negligence on two grounds: first, that the Board is liable for breaching its own duty of care, and second, that the Board is liable under section 768.28 for the negligence of its employees (Butler, Cartwright, Johnson, Myers, and Dupras) acting within the scope of their employment. The Board is a state agency typically immune from suit under Florida's sovereign immunity statute, as discussed above. *See* Fla. Stat. § 728.68. The statute provides that tort actions

may be prosecuted only "under circumstances in which the state or such agency or subdivision, if a private person, would be liable to the claimant, in accordance with the general laws of this state . . . subject to the limitations specified in this act." *Id.*

However, even if a claim may otherwise be viable under Section 768.28, Florida courts have routinely held that certain policy and planning level functions ("discretionary" functions) of the State and its agencies remain immune from tort liability. *See Kaisner v. Kolb*, 543 So. 2d 732, 736–37 (Fla. 1989) ("[I]t would be an improper infringement of separation of powers for the judiciary, by way of tort law, to intervene in fundamental decision-making of the executive and legislative branches of government, including the agencies and municipal corporations they have created.").

It is for this reason that, when a state agency is sued in negligence, a court must first determine whether a plaintiff's allegations would subject a private person to liability under Florida law, and then determine if the claim is nonetheless barred because the underlying act was a discretionary function. *See Wallace v. Dean*, 3 So. 3d 1035, 1046 (Fla. 2009); Fla. Stat. § 768.28(1). This is a question of law for the court. *See Fla. Power & Light Co. v. Morris*, 944 So. 2d 407, 410 (Fla. 4th DCA 2006). If the court finds there is no underlying common law or statutory duty, the process stops there. *Trianon Park Condo. Ass'n, Inc. v. City of Hialeah*, 468 So. 2d 912, 917 (Fla. 1985).

Plaintiff claims the Board owed a duty of "of at least reasonable care in the governance of UCF, including the duty that it has taken upon itself to ensure that [UCF] complies with 'laws, rules, regulations and requirements.'" (Doc. 26 at 32, ¶ 135). This purportedly encompasses "adopting reasonable employment practices,

reasonably overseeing employees, especially those who exercise investigatory and disciplinary authority over other employees . . ." *Id.* He cites a page from UCF's website (https://bot.ucf.edu/about-the-board/) in support of his claim, which indicates the Board of Governors of the State University System endowed the Board with the power to ensure UCF's compliance with laws and regulations.

Ensuring compliance with laws is consistently deemed a discretionary function for which there is no applicable duty of care: "How a governmental entity . . . exercises its discretionary power to enforce compliance with the laws . . . is a matter of governance, for which there never has been a common law duty of care." *Trianon Park*, 468 So. 2d at 919. Also, the enactment of a "statute giving a governmental entity the power to enforce compliance with the law does not, in and of itself, give individuals a new right of action that previously never existed." *Id.* at 922. Likewise, determining whether to enact or adopt certain "reasonable employment practices" is a policy-making matter that would also be considered discretionary. *See Wilson v. Miami-Dade Cnty.*, 370 F. Supp. 2d 1250, 1255 (S.D. Fla. 2005) (holding County's decision whether or not to adopt or create program or policy for police officers was fundamental question of planning for which the County was immune from liability). Planning level functions "are generally interpreted to be those requiring basic policy decisions, while operational level functions are those that implement policy." *Commercial Carrier Corp. v. Indian River Cnty.*, 371 So. 2d 1010, 1021 (Fla. 1979). Plaintiff's claims against the Board are barred because the underlying acts amount to discretionary functions.

The Board does note that, in his Amended Complaint, Plaintiff has inserted a

new, seemingly unrelated, allegation that "[u]pon information and belief, UCF was aware of problems with Defendant Myers' job performance and ability to observe others' individual rights. However, UCF failed to adequately train or supervise Defendant Myers." (Doc. 26 at 33, ¶ 142). Plaintiff has provided no other allegations about these supposed "problems," nor does he give any detail about Myers' alleged lack of ability or the "others" whose rights were supposedly affected. If Plaintiff is attempting to introduce claims of negligent retention, hiring, training, or supervision against the Board in relation to Myers, his inclusion of legal buzz words and bald assertions in one paragraph of the Amended Complaint are insufficient. He has failed to plead the legal elements necessary to state these claims; thus, these claims should be dismissed.

Plaintiff also claims the Board is liable for the negligence of its employees committed in the scope of their employment. Specifically, he alleges "officers, employees, or agents of UCF have a reasonable duty of care in the performance of their duties at UCF," and that Butler, Cartwright, Dupras, Johnson, and Myers all breached those duties. Importantly, he does not cite any common law or statutory duties owed by the Individual Defendants. Instead, his claim is founded entirely on alleged breaches of duties under the CBA. For example, he claims Myers breached her duty of care as an employee of the Board by conducting an investigation into Plaintiff's work history, not giving him "adequate notice" of the allegations against him, and subjecting him to "numerous unexplained delays in the investigation." (Doc. 26 at 34, ¶141). Any such duties arose *purely* by virtue of the CBA.

Under Florida's independent tort doctrine, a plaintiff may not recast causes of action that are otherwise breach-of-contract claims as tort claims. *HTP, Ltd. v. Lineas Aereas Costarricenses, S.A.*, 685 So. 2d 1238, 1239 (Fla. 1996); *Altamonte Pediatric Assocs., P.A. v. Greenway Health, LLC*, 8:20-CV-604-T-33JSS, 2020 WL 5350303, at *5 (M.D. Fla. Sept. 4, 2020).  In other words, to state a claim in tort between parties also in privity, a plaintiff must allege an action that, standing alone, constitutes an actionable tort. *Pastor v. Bank of Am., N.A.*, No. 22-24121-CIV, 2023 WL 2646817 (S.D. Fla. Mar. 27, 2023). Plaintiff here has failed to plead the existence of any independent tort, as his negligence claim is based solely on duties arising from the CBA, which is prohibited by Florida's independent tort doctrine.

Moreover, though currently pled as a tort claim, the same issues were previously arbitrated as contract claims. As referenced in his Amended Complaint, Plaintiff initiated arbitration against the Board upon his termination and ultimately prevailed. (Doc. 26 at 24,  ¶¶ 96-100).  During arbitration, Plaintiff contended the Board breached the CBA, which addressed the same subject matter at issue in his current "negligence" claim. Plaintiff's claim should be dismissed with prejudiced as barred by res judicata, which prohibits parties from re-litigating claims previously decided in arbitration.

### D. Counts IV and V should be dismissed against the Individual Defendants for failure to state a claim.[4]

#### i. Intentional Infliction of Emotional Distress (Count IV)

---

[4] Plaintiff asserts his claims in Counts IV and V, "in the alternative," against the Board as well. (Doc. 26 at 35, 38, 39, 40).  Such "alternative" claims against the Board likewise fail to state a claim for the same reasons set forth in this Section D.

Plaintiff fails to state a claim upon which relief can be granted, as he has not identified any conduct by Myers or Dupras that rises to the level of outrageousness necessary to maintain an IIED claim under Florida law. Florida law requires that "a plaintiff must prove that the wrongdoer's conduct was intentional or reckless; the conduct was outrageous; the conduct caused emotional distress; and the emotional distress was severe." *Horizons Rehab., Inc. v. Health Care and Ret. Corp.*, 810 So. 2d 958, 964 (Fla. 5th DCA 2002). "The standard in Florida for outrageous conduct—which is a question of law—is extremely high." *Cottam v. City of Wildwood*, 750 F. App'x. 791, 795 (11th Cir. 2018). The plaintiff must show the defendant's actions "were 'so extreme in degree as to go beyond all possible bounds of decency.'" *Id.* (citations omitted).

Here, Plaintiff claims Myers subjected him to a lengthy administrative investigation. (Doc. 26 at 36, ¶¶ 152-53). As to Dupras, Plaintiff asserts she terminated him, failed to comply with the pre-termination notice in the CBA, and had police escort him on campus to collect his belongings. *Id.* at ¶¶ 156-57.

This conduct is insufficient to state a claim for IIED. A review of the Amended Complaint shows that none of the claimed misconduct is "atrocious, and utterly intolerable in a civilized community.'" *Metro. Life Ins. Co. v. McCarson*, 467 So. 2d 277, 279 (Fla. 1985)); *see also Blount v. Sterling Healthcare Grp., Inc.*, 934 F. Supp. 1365, 1371 (S.D. Fla. 1996) (holding Florida and the Eleventh Circuit have been extremely reluctant to recognize outrageous conduct in the employment context); *Lay v. Roux Laboratories, Inc.*, 379 So. 2d 451, 452 (Fla. 1st DCA 1980) (finding no cause of action where employer threatened plaintiff with termination and verbally attacked him with

racial epithets). Indeed, just the opposite is true. Terminations of employment and being escorted from the workplace following termination are common. *See Golden v. Complete Holdings, Inc.*, 818 F. Supp. 1495, 1499 (M.D. Fla. 1993) (termination of employment was not outrageous conduct sufficient to state a claim for IIED); *State Farm Mut. Auto. Ins. Co. v. Novotny*, 657 So. 2d 1210 (Fla. 5th DCA 1995) (interview of employee regarding complaints about that employee deemed not sufficiently egregious to give rise to IIED). Plaintiff's IIED claim should be dismissed with prejudice.

### ii.    Abuse of Process (Count V)

Abuse of process "involves the use of criminal or civil legal proceedings against another primarily to accomplish a purpose for which it was not designed, such as extorting payment for a debt." *Bembry v. City of Tallahassee*, No. 4:05-CV-286-SPM, 2006 WL 1080676, at *8 (N.D. Fla. Apr. 24, 2006). Process includes actions initiated independently, such as the commencement of a suit, or those initiated collaterally, such as a counterclaim. *Peckins v. Kaye*, 443 So. 2d 1025, 1026 (Fla. 2d DCA 1983). The abuse facet "consists not in the issuance of process, but rather in the perversion of the process after its issuance." *Id.* Yet "[t]he fact that a party may be motivated by incidental or concurrent benefits of the use of process is not sufficient to constitute an abuse." *In re Fundamental Long Term Care, Inc.*, 873 F.3d 1325, 1346 (11th Cir. 2017).

In Florida, abuse of process consists of three elements: "(1) the defendant made an illegal, improper, or perverted use of process; (2) the defendant had an ulterior motive or purpose in exercising the illegal, improper or perverted process; and (3) the

plaintiff was injured as a result of defendant's action." *EMI Sun Vill., Inc. v. Catledge*, 779 F. App'x. 627, 635 (11th Cir. 2019). Here, Plaintiff's abuse of process claim fails to satisfy the first element, as none of the allegations in his Amended Complaint show "the defendant made an illegal, improper, or perverted use of process." *Id.* at 636.

In fact, at *no point* in the Amended Complaint is there any allegation that Defendants abused any civil or criminal process. In Count V, Plaintiff recites the elements of an abuse of process claim, then ignores those elements and instead pleads a hybridized version of Count III (Negligence) and Count IV (IIED).[5] Specifically, he alleges Myers and Dupras "misused UCF's Prohibition of Discrimination, Harassment and Related Interpersonal Violence" and the CBA to retaliate against him for his speech. (Doc. 26 at 40, ¶ 169). He claims Cartwright and Johnson "made public statements implying that Plaintiff would face consequences for his constitutionally protected tweets." *Id.* at ¶ 171. Lastly, he alleges Cartwright and Johnson retaliated against him "by posting a public solicitation on UCF's website." *Id.* at ¶ 172.

None of these allegations involve process. The law is clear that abuse of process requires "the use of criminal or civil legal process against another primarily to accomplish a purpose for which it was not designed." *Scozari v. Barone*, 546 So. 2d 750, 751 (Fla. 3d DCA 1989). A violation of a UCF campus policy does not constitute an abuse of civil or criminal process, nor does a breach of the CBA, an administrative investigation into Plaintiff's conduct, or a public post about his tweets. Such

---

[5] Nearly identical allegations are asserted as the basis for Plaintiff's negligence and intentional infliction of emotional distress claims. (*See* Doc. 26 at 33-34 ¶¶ 137, 140; at 37, ¶ 156).

allegations are insufficient to state a claim for abuse of process. *See Miami Herald Pub. Co., Div. of Knight-Ridder Newspaper v. Ferre,* 636 F. Supp. 970, 975 (S.D. Fla. 1985); *Blue Dolphin, Inc. v. United States*, 666 F. Supp. 1538, 1541 (S.D. Fla. 1987). Accordingly, Count V should be dismissed with prejudice.

### E.   Plaintiff's claim for punitive damages should be stricken to the extent he seeks such damages against the Board.

"The court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent or scandalous matter." Fed. R. Civ. P. 12(f). The purpose of a motion to strike "is to 'clean up the pleadings, streamline litigation, and avoid unnecessary forays into immaterial matters.'" *Wiand v. Wells Fargo Bank, N.A.*, 938 F. Supp. 2d 1238, 1250 (M.D. Fla. 2013) (citations omitted). Here, Plaintiff's claim for punitive damages should be stricken to the extent such damages are pleaded against the Board. *Young Apartments, Inc. v. Town of Jupiter*, 529 F.3d 1027, 1047 (11th Cir. 2008) ("In a §1983 action, punitive damages are only available from government officials when they are sued in their individual capacities.") (citing *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 267 (1981)).

Additionally, state agencies are not liable for punitive damages per section 768.28(5)(a), *Florida Statutes*, which provides that while the State and its agencies are liable for torts in the same manner and extent as private individuals, liability shall not include punitive damages.  Punitive damages are not available against the Board.

**WHEREFORE**, the Board respectfully requests that the Court dismiss with prejudice Counts I-V of Plaintiff's Amended Complaint, or alternatively, strike

Plaintiff's claim for punitive damages against the Board. The Individual Defendants respectfully request that the Court dismiss with prejudice Counts I and II based on qualified immunity and Counts IV and V for failure to state a claim.

### Local Rule 3.01(g) Certification

The undersigned certify that on July 10, 2023, attorneys Spradley and Hatcher-Bolin conferred with counsel for Plaintiff, Samantha Harris and David Osborne, via phone in an effort to resolve the issues in this motion; the parties were unable to do so.

Respectfully submitted on this 21st day of July, 2023.

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY on July 21, 2023, a true and correct copy of the foregoing was filed through the CM/ECF system, which will serve an electronic copy on all parties of record.

*/s/ SUSAN T. SPRADLEY*

| | |
|---|---|
| **KRISTIE HATCHER-BOLIN**<br>FLB No. 521388<br>Kristie.Hatcher-bolin@gray-robinson.com | **SUSAN T. SPRADLEY**<br>FLB No.: 0818712<br>Susan.Spradley@gray-robinson.com |

| | |
|---|---|
| **KATHERINE KATZ**<br>FLB No. 1022526<br>Katherine.Katz@gray-robinson.com | **JULIE M. ZOLTY**<br>FLB No.: 1036454<br>Julie.Zolty@gray-robinson.com |

| | |
|---|---|
| **GRAY ROBINSON, P.A.**<br>Post Office Box 3<br>Lakeland, Florida 33802<br>Telephone: (863) 284-2251<br>Facsimile: (863) 683-7462<br>*Counsel for Defendants* | **GRAY ROBINSON, P.A.**<br>Post Office Box 3068<br>Orlando, Florida 32802<br>Telephone: (407) 843-8880<br>Facsimile: (407) 244-5690<br>*Counsel for Defendants* |

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

**CHARLES NEGY,**

**Plaintiff,**

v. **Case No. 6:23-cv-666-CEM-DCI**

**BOARD OF TRUSTEES OF THE
UNIVERSITY OF CENTRAL
FLORIDA, S. KENT BUTLER,
ALEXANDER CARTWRIGHT,
TOSHA DUPRAS, MICHAEL
JOHNSON, and NANCY MYERS,**

 **Defendants.**
_____/

### ORDER

THIS CAUSE is before the Court on Defendants' Dispositive Motion to Dismiss, or Alternatively, Motion to Strike Punitive Damages ("Motion," Doc. 32), to which Plaintiff filed a Response (Doc. 34). As set forth below, the Motion will be granted in part and denied in part.

### I. BACKGROUND

Plaintiff is an associate professor at the University of Central Florida ("UCF"). (Am. Compl., Doc. 26, at 4). Defendants are the Board of Trustees of the University of Central Florida ("the Board") and several UCF administrators ("individual Defendants")—S. Kent Butler, Alexander Cartwright, Tosha Dupras,

Michael Johnson, and Nancy Myers—in their individual capacities. (*Id.* at 4–6). The events leading to up to this lawsuit began after Plaintiff posted tweets using his personal account that were "contrary to the ascendant orthodoxy on campus," such as "Blacks are not systematically oppressed in the United States." (*Id.* at 2). According to Plaintiff, after these tweets, he "became the target of a Twitter mob that demanded he be fired." (*Id.*). Defendants posted a statement to the university website: "Members of UCF's leadership urge current and former students to report discriminatory behavior they may have experienced from faculty and staff." (*Id.* at 11). Plaintiff alleges the post targeted him because it included the statement: "we are disgusted by the racist posts one of our faculty members has shared on his personal Twitter account." (*Id.*). Complaints against Plaintiff then surfaced. (*Id.* at 16).

After an investigation lasting several months, Defendant Myers issued a report finding that Plaintiff "had engaged in discriminatory harassment in the course of his classroom teaching," "had failed to report inappropriate behavior allegedly committed by one of his teaching assistants," and had provided false information during the investigation. (*Id.* at 20–21). Plaintiff alleges that any purportedly false information he provided during the investigation were "on account of his faulty memory in a few isolated instances." (*Id.* at 21). He further claims "[m]any of the alleged incidents of 'discriminatory behavior' . . . were instances of speech protected by academic freedom and the First Amendment." (*Id.*). UCF then

terminated Plaintiff. (*Id.* at 3). Plaintiff entered arbitration through the faculty union, asserting that UCF violated the collective bargaining agreement requiring six months' notice prior to termination for tenured faculty. (*Id.* at 3). An arbitrator ordered his reinstatement to the UCF faculty. (*Id.* at 3). Plaintiff now seeks damages as well as declaratory and injunctive relief against Defendants. (*Id.* at 41–42). Defendant moves for dismissal of all counts pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), and in the alternative, Defendant moves to strike the punitive damages claim pursuant to Federal Rule of Civil Procedure 12(f).

## II. LEGAL STANDARD

Defendants first challenge Plaintiff's Article III standing. A challenge to Article III standing implicates subject matter jurisdiction. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559–60 (1992). Pursuant to Federal Rule of Civil Procedure 12(b)(1), a party may move to dismiss the claims against it for "lack of subject-matter jurisdiction."

"Attacks on subject matter jurisdiction . . . come in two forms: 'facial attacks' and 'factual attacks.'" *Garcia v. Copenhaver, Bell & Assocs., M.D.'s, P.A.*, 104 F.3d 1256, 1260–61 (11th Cir. 1997) (quoting *Lawrence v. Dunbar*, 919 F.2d 1525, 1529 (11th Cir. 1990)). Here, Defendants make only a facial attack. "Facial attacks challenge subject matter jurisdiction based on the allegations in the complaint, and

the district court takes the allegations as true in deciding whether to grant the motion." *Morrison v. Amway Corp.*, 323 F.3d 920, 925 n.5 (11th Cir. 2003).

The remainder of Defendants' Motion argues that Plaintiffs have failed to state a claim, which is analyzed under Federal Rule of Civil Procedure 12(b)(6). "A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). In determining whether to dismiss under Rule 12(b)(6), a court accepts the factual allegations in the complaint as true and construes them in a light most favorable to the non-moving party. *See United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1269 (11th Cir. 2009).

Nonetheless, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions," and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Furthermore, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id*. (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. Generally, in deciding a motion to dismiss, "[t]he scope of the review

must be limited to the four corners of the complaint." *St. George v. Pinellas Cnty.*,

285 F.3d 1334, 1337 (11th Cir. 2002).

### III.   ANALYSIS

### A.   Standing for Injunctive Relief

Article III standing is a threshold inquiry, *Steel Co. v. Citizens for a Better

Env't*, 523 U.S. 83, 94–95 (1998), so the Court addresses it first. To bring a case in

federal court, a plaintiff must establish standing under Article III of the United States

Constitution. *Lujan*, 504 U.S. at 559–60. Article III standing requires that "[t]he

plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the

challenged conduct of the defendant, and (3) that is likely to be redressed by a

favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citing

*Lujan*, 504 U.S. at 560–61). Defendants challenge the first element—injury in fact.

"To establish injury in fact, a plaintiff must show that he or she suffered 'an

invasion of a legally protected interest' that is 'concrete and particularized' and

'actual or imminent, not conjectural or hypothetical.'" *Spokeo*, 578 U.S. at 339

(quoting *Lujan*, 504 U.S. at 560). For an injury in fact in the context of injunctive

relief, a plaintiff must demonstrate a "real and immediate threat of future injury."

*Kennedy v. Floridian Hotel, Inc.*, 998 F.3d 1221, 1233 (11th Cir. 2021) (quoting

*Houston v. Marod Supermarkets, Inc.*, 733 F.3d 1323, 1329 (11th Cir. 2013)).

Plaintiff alleges "he is fearful of teaching the controversial subjects covered in his classes for fear of additional complaints and investigations," (Doc. 26 at 29), and therefore requests the Court enjoin Defendants from "publicly soliciting complaints against [him] in response to his expressions of opinion on matters of public concern" and "from investigating or punishing Plaintiff for speech protected by the First Amendment." (Doc 26 at 41–42). Plaintiff relies on *Strickland v. Alexander*, 772 F.3d 876 (11th Cir. 2014), to argue that he has alleged a sufficiently real and immediate threat of future injury. In *Strickland*, the plaintiff had been subject to an unlawful garnishment proceeding and alleged with specificity that he had several more judgment creditors, that he did not have the ability to pay, and that in a very real and concrete way, it was inevitable that those creditors would be seeking garnishment in the future. *Id.* at 885. Plaintiff has not alleged any such concrete facts. Indeed, Plaintiff alleges that after the May 2022 arbitration, he was awarded "full reinstatement, with tenure, and with all compensation and benefits fully restored to that effect as of the termination date," (Doc. 26 at 24), and according to the allegations set forth in the complaint, no such repetition by Defendants has occurred in the nearly two years since Plaintiff's reinstatement. (*See generally id.*).

"It is the *reality* of the threat of repeated injury that is relevant to the standing inquiry, not the plaintiff's subjective apprehensions." *City of L.A. v. Lyons*, 461 U.S. 95, 107 n.8 (1983). "[P]ast exposure to illegal conduct does not in itself show a

present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects." *Id.* at 102 (quoting *O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974)). Beyond noting his subjective fears, Plaintiff has not shown— via alleging objective facts in the complaint—that "he is realistically threatened by a repetition of his experience." *Lyons*, 461 U.S. at 109; *see also Shed v. USF Bd. of Trs.*, No. 8:22-cv-1327-KKM-TGW, 2023 U.S. Dist. LEXIS 118370, at *6-7 (M.D. Fla. July 10, 2023) (determining that the plaintiff, who was a Ph.D. student dismissed from the defendant university, lacked standing to bring a claim for injunctive relief where the plaintiff was concerned about the university continuing to retaliate against him by continuing to tarnish his academic and employment reputation, noting that "whether the effects of [the university's] past alleged retaliation are ongoing is beside the point" because the plaintiff failed "to allege that [the university] continue[d] to retaliate against him").

Additionally, Plaintiff has failed to establish redressability as to the individual Defendants.[1] They are government officials being sued in their individual capacities and therefore do not have the power to address any of Plaintiff's purported future injuries. *See Barnes v. Dunn*, 2022 WL 10264034, at *5 (N.D. Ala. Aug. 17, 2022),

---

[1] Although Defendants make this argument specifically as to Defendants Butler and Dupras, it applies equally to all individual Defendants, and because standing is jurisdictional, the Court is permitted to raise it *sua sponte. Fitzgerald v. Seaboard Sys. R.R.*, 760 F.2d 1249, 1251 (11th Cir. 1985).

*report and recommendation adopted*, No. 4:19-CV-00558-ACA-SGC, 2022 WL 4365709 (N.D. Ala. Sept. 21, 2022); *Scott v. Taylor*, 405 F.3d 1251, 1259 (11th Cir. 2005) (Jordan, D.J., sitting by designation, concurring) ("Standing, moreover, concerns the congruence or fit between the plaintiff and the defendants . . . . Thus, in a suit against state officials for injunctive relief, a plaintiff does not have Article III standing with respect to those officials who are powerless to remedy the alleged injury.") ); *see also Okpalobi v. Foster*, 244 F.3d 405, 427 (5th Cir. 2001) (en banc) ("Because these defendants have no powers to redress the injuries alleged, the plaintiffs have no case or controversy with these defendants that will permit them to maintain this action in this court."). This is particularly true for Defendants Butler and Dupras, who no longer hold the positions at UCF they did during the times relevant to the complaint. (Doc. 26 at 4–5). So, even if an injunction against them in their individual capacities somehow bound their leadership roles, neither holds the authority as administrators they once did, and therefore, they certainly could not remedy or prevent any future injury. *See Scott*, 405 F.3d at 1259; *see also Okpalobi*, 244 F.3d at 427.

Accordingly, Plaintiff does not have standing to seek injunctive relief. But he continues to have Article III standing to seek damages, which Defendants do not dispute. Defendants next argue the Board should be dismissed from this action because of Eleventh Amendment immunity.

**B.      Eleventh Amendment Immunity**

Eleventh Amendment immunity, like standing, touches upon subject matter jurisdiction. *See Seaborn v. State of Fla., Dep't of Corr.*, 143 F.3d 1405, 1407 (11th Cir. 1998). It bars suits against states by its own citizens in federal court. *Williams v. Dist. Bd. of Trs. of Edison Cmty. Coll., Fla.*, 421 F.3d 1190, 1192 (11th Cir. 2005). And it "protects a State from being sued in federal court without the State's consent." *Manders v. Lee*, 338 F.3d 1304, 1308 (11th Cir. 2003), *cert. denied*, 540 U.S. 1107 (2004). "It is well settled in Florida that state universities, and their boards of trustees, are arms of the state that are entitled to Eleventh Amendment immunity." *Baker v. Univ. Med. Serv. Ass'n.*, No. 8:16-cv-2978-T-30MAP, 2016 WL 7385811, at *2 (M.D. Fla. Dec. 21, 2016) (citing *Crisman v. Fla. Atl. Univ. Bd. of Trs.*, 572 F. App'x 946, 949 (11th Cir. 2014); *Irwin v. Mia.-Dade Cnty. Pub. Schs., et al.*, 398 F. App'x 503, 507 (11th Cir. 2010)). UCF is a state university and, therefore, an arm of the state. *See Hilleman v. Univ. of Cent. Fla.*, 167 F. App'x 747, 748 (11th Cir. 2006) ("UCF is a state entity"). Thus, the UCF Board is immune under the Eleventh Amendment unless the state waived or Congress abrogated such immunity. *See Edelman v Jordan*, 415 U.S. 651 (1974).

*1.      Counts I and II – Plaintiff's Federal Claims*

As to Counts I and II, "Florida has not waived its Eleventh Amendment immunity, nor has Congress abrogated that immunity in § 1983 cases." *Hart v.*

*Florida*, No. 8:13-cv-2533-T-30MAP, 2013 WL 5525644, at *1 (M.D. Fla. Oct. 4, 2013) (citing *Zatler v. Wainwright*, 802 F.2d 397, 400 (11th Cir. 1986)).[2] One other exception remains. Under the *Ex parte Young* exception, a plaintiff may sue a state official seeking prospective injunctive relief for ongoing violations of federal law. *See Friends of Everglades v. S. Fla. Water Mgmt. Dist.*, 570 F.3d 1210, 1215 (11th Cir. 2009).

As discussed above, Plaintiff does not have standing to seek prospective injunctive relief against the Board. Additionally, even if he did, the *Ex parte Young* exception, "does not permit suit against state agencies or the state itself, even when the relief is prospective." *Eubank v. Leslie*, 210 F. App'x 837, 844 (11th Cir. 2006) (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100–03 (1984)). As noted, the Board is an arm of the state, and therefore, the *Ex parte Young* exception does not apply. *See Page v. Hicks*, 773 F. App'x 514, 518 (11th Cir. 2019)

---

[2] Section 768.28 does not waive Florida's Eleventh Amendment immunity. *Hamm v. Powell*, 874 F.2d 766, 770 n.3 (11th Cir.1989); *Hill v. Dept. of Corrections*, 513 So.2d 129, 133 (Fla.1987). Section 768.28(18) reads:

> No provision of this section, or of any other section of the Florida Statutes, whether read separately or in conjunction with any other provision, shall be construed to waive the immunity of the state or any of its agencies from suit in federal court, as such immunity is guaranteed by the Eleventh Amendment to the Constitution of the United States, unless such waiver is explicitly and definitely stated to be a waiver of the immunity of the state and its agencies from suit in federal court. This subsection shall not be construed to mean that the state has at any time previously waived, by implication, its immunity, or that of any of its agencies, from suit in federal court through any statute in existence prior to June 24, 1984.

(determining that "[b]ecause the Board is an 'arm of the state' itself—and not an individual officer—[the plaintiff's] request for injunctive relief against the Board" was not subject to the *Ex parte Young* exception and failed).

Plaintiff attempts to argue that he is suing the individual members of the Board, rather than the Board itself, in an effort to circumvent this precise outcome. This is a red herring. Based on the way it is currently pleaded—naming the Board and not providing the names of the individual members—it is not apparent that Plaintiff was attempting to name the members. Regardless, even assuming he was, Plaintiff makes clear that he would be suing the Board members in their official capacities. And even Plaintiff acknowledges that suits against an individual officer in their official capacity is "simply another way of pleading an action against an entity of which [the] officer is an agent" (Doc. 34 at 8 (quoting *Busby v. City of Orlando*, 931 F.2d 764, 776 (11th Cir. 1991)). Thus, whether Plaintiff is suing the individual Board members in their official capacity or the Board itself, it is a distinction without a difference—both ways of pleading ultimately name the entity itself and *Ex parte Young* does not apply. Accordingly, the Board is entitled to Eleventh Amendment immunity as to Plaintiff's federal claims.

### 2.   *Counts III, IV, and V—Plaintiff's State Law Claims*

Defendants also argue that the Board is protected by Eleventh Amendment immunity against Plaintiff's state law claims brought here—comprising the

remaining Counts III, IV, and V. (Doc. 32 at 14–16). Because Florida has not waived its Eleventh Amendment immunity under section 768.28, this Court agrees. *See Schopler v. Bliss*, 903 F.2d 1373, 1379 (11th Cir. 1990). Plaintiff's state law claims, Counts III, IV, and V, against the Board are barred by Eleventh Amendment immunity.

### 3.   *Motion to Strike Punitive Damages*

Defendants seeks to strike Plaintiff's claim for punitive damages against the Board pursuant to Federal Rule of Civil Procedure 12(f). Under Rule 12(f), "[t]he court may strike from a pleading . . . any redundant, immaterial, impertinent, or scandalous matter." "Motions to strike are generally disfavored and are considered to be a 'drastic remedy to be resorted to only when required for the purposes of justice.'" *Wiand v. Wells Fargo Bank, N.A.*, 938 F. Supp. 2d 1238, 1250–51 (M.D. Fla. 2013) (citation omitted) (quoting *Augustus v. Bd. of Pub. Instruction of Escambia Cty.*, 306 F.2d 862, 868 (5th Cir. 1962)). Therefore, "[a] motion to strike should be granted only if the matter sought to be omitted has no possible relationship to the controversy, may confuse the issues, or otherwise prejudice a party." *U.S. ex rel. Chabot v. MLU Servs., Inc.*, 544 F. Supp. 2d 1326, 1330 (M.D. Fla. 2008) (quotation omitted).

Defendants argue punitive damages are unavailable against the Board because under Fla. Stat. § 768.28(5)(a), the state and its agencies are not liable for punitive

damages. (Doc. 32 at 24). This Court agrees. *See Shedrick v. Dist. Bd. of Trs. Of Miami-Dade College*, 941 F. Supp. 2d 1348, 1360 (holding punitive damages unavailable against community college because such relief is not authorized against state agencies); *D.L. ex rel. S.L. and R.L. v. Hernando Cnty. Sheriff's Office*, 620 F. Supp. 3d 1182, 1203 (M.D. Fla. 2022) (holding, under Florida law, punitive damages are unavailable against a municipality). But as previously discussed—under the Eleventh Amendment—the Board is immune from Plaintiff's federal claims, and Plaintiff's state claims are barred. Therefore, the motion will be denied as moot because all claims against the Board will be dismissed. Next, Defendants argue that the individual Defendants are entitled to qualified immunity on Plaintiff's § 1983 claims.

### C.    Qualified Immunity

Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person should have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). To be entitled to qualified immunity, a government official must first show that "he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Sebastian v. Ortiz*, 918 F.3d 1301, 1307 (11th Cir. 2019) (internal quotation marks omitted).

Defendants argue that Plaintiff's allegations against the individual Defendants only cover acts that were within the scope of their discretion as UCF administrators. (Doc. 32 at 11). This point is uncontested by Plaintiff. And the Court agrees. *See Harbert Int'l, Inc. v. James*, 157 F.3d 1271, 1283 (11th Cir. 1998) ("[W]e did not ask whether it was within the defendants' authority to suspend an employee for an improper reason; instead, we asked whether their discretionary duties included the administration of discipline." (discussing the Eleventh Circuit's finding in *Sims v. Metropolitan Dade Cnty.*, 972 F.2d 1230, 1236 (11th Cir. 1992))).

"After the defendant makes this showing, the burden shifts to the plaintiff to show that qualified immunity is not appropriate." *Sebastian*, 918 F.3d at 1307 (internal quotation marks omitted). "To deny qualified immunity at the motion to dismiss stage, we must conclude both that the allegations in the complaint, accepted as true, establish a constitutional violation <u>and</u> that the constitutional violation was clearly established." *Id.* (emphasis in original) (internal quotation marks omitted). "We may consider these two prongs in either order, and a public official is entitled to qualified immunity if the plaintiff fails to establish either one." *Jacoby v. Baldwin Cnty.*, 835 F.3d 1338, 1344 (11th Cir. 2016) (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).

Now, the burden shifts to Plaintiff to show Defendants violated clearly established law. The Court will address the "clearly established" prong first.

### 1.   Clearly Established

"For a constitutional right to be clearly established, its contours 'must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). An officer may not be entitled to qualified immunity "even if there is no reported case 'directly on point.' But 'in light of pre-existing law,' the unlawfulness of the officer's conduct 'must be apparent.'" *Ziglar v. Abbasi*, 582 U.S. 120, 151 (2017) (quoting *Iqbal*, 556 U.S. at 741, and *Anderson*, 483 U.S. at 640). The Court must determine if a reasonable public official would understand that investigating and terminating Plaintiff because of his Twitter posts and the subsequently solicited complaints violated Plaintiff's First Amendment rights.

It is clearly established that a state employer may not retaliate against a state employee for engaging in constitutionally protected speech. *Rankin v. McPherson*, 483 U.S. 378, 383 (1987). The First Amendment protects a public employee's speech that was "(1) spoken as a citizen and (2) addressed a matter of public concern." *See Boyce v. Andrew*, 510 F.3d 1333, 1341 (11th Cir. 2007). It does not protect statements made pursuant to the employee's official duties. *See id.* at 1342–43 (discussing *Garcetti v. Ceballos*, 547 U.S. 410 (2006)). A matter of public concern relates "to any matter of political, social, or other concern to the

community." *Connick v. Myers*, 461 U.S. 138, 146 (1983). "In making this determination, we examine the content, form, and context of the employee's speech." *Chesser v. Sparks*, 248 F.3d 1117, 1123 (11th Cir. 2001).

Insofar as Plaintiff's statements were made in the classroom pursuant to his official duties as a professor at UCF, the First Amendment affords him no protection. *See Boyce*, 510 F.3d at 1342–43. As to Plaintiff's statements made outside the classroom, Defendants do not contest that Plaintiff's Twitter posts were made as a citizen on a matter of public concern. Plaintiff posted from his personal account, which was unaffiliated with his role as a UCF professor and disclaims "Opinions are my own." (Doc. 26 at 7). Therefore, those statements were in his capacity as a citizen rather than as a state employee. *See Boyce*, 510 F.3d at 1341. The exact content of the speech is not in the complaint, but Plaintiff alleges the speech argued that Black people were not systemically oppressed in the United States. (*See* Doc. 26 at 2). Twitter is often used by members of the public to air their views on wide-ranging topics. And to provide context, Plaintiff alleges the posts were "[i]n response to the national conversation around race." (Doc. 26 at 8). Therefore, Plaintiff has adequately alleged his speech was on a matter of public concern. *See Chesser*, 248 F.3d at 1123.

If the employee's speech can be "fairly characterized as constituting speech on a matter of public concern," the Court must use the *Pickering* balancing test.

*Connick*, 461 U.S. at 146. *Pickering* requires courts balance the employee's interest in speaking against the government's interest, "as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Bd. of Ed. High Sch. Dist. 205*, 391 U.S. 563, 568 (1968).

Courts must consider three factors when conducting a *Pickering* balancing analysis: "(1) whether the speech at issue impedes the government's ability to perform its duties efficiently, (2) the manner, time and place of the speech, and (3) the context within which the speech was made." *Bryson v. City of Waycross*, 888 F.2d 1562, 1567 (11th Cir. 1989). "Because no bright-line standard puts the reasonable public employer on notice of a constitutional violation, the employer is entitled to immunity except in the extraordinary case where *Pickering* balancing would lead to the inevitable conclusion that the discharge of the employee was unlawful." *Dartland v. Metro. Dade County,* 866 F.2d 1321, 1323 (11th Cir.1989). When "an employee serves no confidential, policymaking, or public contact role, the danger to the agency's successful functioning from that employee's private speech is minimal." *Rankin*, 483 U.S. at 390–91.

Plaintiff cites *McCullars v. Maloy*, No. 6:17-cv-1587-Orl-40GJK, 2018 U.S. Dist. LEXIS 55393, *10 (M.D. Fla. Apr. 2, 2018), in arguing that it is clearly established "that students' subjective offense at [Plaintiff]'s political expression, which was made as a private citizen and did not target anyone at UCF, does not

outweigh [Plaintiff]'s interest in expressing his views." (Doc. 34 at 15). In *McCullars*, after a state attorney stated she would never seek the death penalty in any case, the plaintiff made a social media post that "maybe she should get the death penalty," and "she should be tarred and feathered if not hung from a tree." *Id.* at *3. The court, while finding the statements "rude and insulting," held that *Pickering* balancing favored the employee's interest in free speech because "the Complaint is devoid of allegations that the Post impacted on Defendant Maloy's 'need to maintain loyalty, discipline[,] and good working relationships among those he supervises.'" *Id.* at *10 (quoting *Dartland*, 866 F.2d at 1324). And that is so here.

Defendants argue Plaintiff's statements caused great disruption on campus, impeding "UCF's interest in maintaining an efficient and non-disruptive work environment." (Doc. 32 at 13). These disruptions are well documented in Plaintiff's allegations—including protests by current students and calls for Plaintiff to be fired, (*see* Doc. 26 at 8–13), and current and incoming UCF students voicing concerns about the situation on campus, (*see id.* at 12). Even if the speech caused protests and campus unrest, it does not necessarily equate to an inefficient functioning of the university's public service: delivering education to its students. Disruption, debate, disagreement, and protest happen at educational institutions—whether the result of athletic wins and losses, controversial speakers and texts, or current national and

global events. But Plaintiff does not allege resulting disharmony within his UCF workplace. *See Dartland*, 866 F.2d at 1324.

This speech was also not a criticism of the university, its functioning, or his superiors—which are hallmarks of cases involving *Pickering* balancing in the higher education setting. *See Williams v. Ala. State Univ.*, 102 F.3d 1179, 1182–84 (11th Cir. 1997) (balancing did not favor professor who faced adverse action after criticizing textbook written by university administrator); *Maples v. Martin*, 858 F.2d 1546, 1552–54 (11th Cir. 1988) (balancing favored employer which took adverse action against professors who wrote report criticizing department head, despite the document critiquing the department's curriculum, facilities, and graduate performance on professional licensing exams). Plaintiff made statements on his personal Twitter account, did not attribute them in any way to UCF, and further alleges they were made "[i]n response to the national conversation around race." (Doc. 26 at 7, 8). While his job was not clerical in nature and he had to interact with students, Plaintiff served no confidential or policymaking role and was not required to interact with members of the public. *See Rankin*, 483 U.S at 389–92.

The Court now examines Plaintiff's interest in freedom of expression. The Eleventh Circuit has held that "[s]peech by members of an academic community, even when critical in nature, should not be easily denied constitutional protection." *Maples v. Martin*, 858 F.2d 1546, 1553 (11th Cir. 1988) (citing *Tinker v. Des Moines*

*Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969)). Although Plaintiff made statements that offended a significant portion of the UCF population, the First Amendment protects speech without regard for its social worth or if it is acceptable in the mainstream. *See Stanley v. Georgia*, 394 U.S. 557, 564–66. Nowhere is this more important than at an institution of higher learning. "Our Nation is deeply committed to safeguarding academic freedom, which is of transcendent value to all of us and not merely to the teachers concerned. That freedom is therefore a special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom." *Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 603 (1967).

The state interest here is not strong enough to outweigh Plaintiff's interest in free expression. This is one of the extraordinary circumstances where *Pickering* balancing shows Defendants' conduct was unconstitutional. The need to give in to the demands an offended, angry student body is not a basis to knowingly engage in content discrimination.[3] Therefore, at this early stage of the process, Plaintiff has met his burden of pleading that Defendants' conduct was forbidden by clearly established law. The Court will now proceed to the constitutional violation prong.

---

[3] "If the First Amendment is intended to protect anything, it's intended to protect offensive speech. If you're not going to offend anyone, you don't need protection." Larry Flynt.

> ### 2.   *Constitutional Violation*

To state a claim for First Amendment retaliation, Plaintiff alleges must satisfy the four elements of the test set forth in *Bryson v. City of Waycross*. 888 F.2d at1565–66. First, the Court asks if the speech may be fairly characterized as on a matter of public concern. Second, the Court must conduct a *Pickering* balancing analysis. Third, if the employee's interests win out, the Court asks if the speech "played a 'substantial part' in the government's decision to discharge the employee." *Chesser*, 248 F.3d at 1123 (quoting *Fikes v. City of Daphne*, 79 F.3d 1079, 1084 (11th Cir. 1996)). Fourth, if so, the government must show by a preponderance of the evidence that it would have terminated the employee even without the protected conduct. *See id.* Because the clearly established prong was resolved in Plaintiff's favor, Plaintiff has shown the first two elements.

As for the third and fourth elements, the Court finds that Plaintiff's allegations meet these requirements. Defendants assert that "Plaintiff has failed to allege the existence of [precedential] opinions . . . finding a faculty member who makes public comments that cause substantial disruption to a university may not be fired for such comments without violating the First Amendment." (Doc. 32 at 14). Prior to his Twitter posts, Plaintiff alleges that he "received consistently superior performance reviews. In the four years leading up to his termination, he received an evaluation rating of 'Outstanding' for his instruction and advising." (Doc. 26 at 14). Within less

than a year, he was fired. (*Id.* at 21). The Eleventh Circuit has held, however, that "[c]omments that occur in the context of a longstanding dispute over internal policies have been held to justify drastic administrative action." *Maples*, 858 F.2d at 1554. There are no allegations of tensions between Plaintiff and his department or the administration.

Defendants do argue that the campus disruptions were "not only about Plaintiff's comments on Twitter, but comments he made during lectures that students found discriminatory, harassing, and demeaning." (Doc. 32 at 13). In the investigative report that led to his termination, Plaintiff was found to have "engaged in discriminatory harassment in the course of his classroom teaching" and "failed to report inappropriate behavior allegedly committed by one of his teaching assistants." (Doc. 26 at 20). But Plaintiff argues many of the instances of alleged harassment were protected under the First Amendment because the Eleventh Circuit has found that UCF's "discriminatory-harassment policy likely violates the First Amendment on the grounds that it is an overbroad and content- and viewpoint-based regulation of constitutionally protected expression." (*Id.* at 21 (quoting *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1113 (11th Cir. 2022)). And the Eleventh Circuit has held that granting qualified immunity is inappropriate where the record suggests the employer fired an employee for pretextual reasons. *See Tindal v. Montgomery Cnty. Comm'n*, 32 F. 3d 1535, 1540 (11th Cir. 1994). Plaintiff's allegations suggest the

investigation was a pretext to terminate him for his Twitter posts based on the timing of the investigation and Defendants' remarks to the angry student population. (Doc. 26 at 26–27).

Accepting the allegations in the Amended Complaint as true, Plaintiff was terminated in substantial part because of his controversial Twitter posts, and Defendants have been unable to show by a preponderance of the evidence that they would have terminated him absent that speech. Therefore, a reasonable official should have known that terminating an employee based on those Twitter posts violated the First Amendment. Thus, based on Plaintiff's allegations, individual Defendants are not entitled to qualified immunity on Plaintiff's § 1983 claims at this stage of the proceedings.

## D.    Failure to State a Claim—Counts IV and V

Defendants further contend that Plaintiff fails to state a claim for the state law causes of action. Because Count III was leveled only against the Board, and all claims against the Board will be dismissed, the Court will only examine Counts IV and V—intentional infliction of emotional distress and abuse of process, respectively—against the individual Defendants.

### 1.    *Intentional Infliction of Emotional Distress*

Defendants argue that Plaintiff fails to state a claim for intentional infliction of emotional distress pursuant to Federal Rule of Civil Procedure 12(b)(6). Under

Florida law, intentional infliction of emotional distress requires Plaintiff show: "(1) deliberate or reckless infliction of mental suffering; (2) outrageous conduct; (3) the conduct caused the emotional distress; and (4) the distress was severe." *Nettles v. City of Leesburg--Police Dept.*, 415 F. App'x 116, 122 (11th Cir. 2010) (quoting *Hart v. United States*, 894 F.2d 1539, 1548 (11th Cir. 1990)).

"Outrageous conduct is conduct which 'is so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Hart*, 894 F.2d at 1548 (quoting *Metropolitan Life Ins. Co. v. McCarson*, 467 So. 2d 277, 278–79 (Fla. 1985)). "In Florida, the issue of whether or not the activities of the defendant rise to the level of being extreme and outrageous so as to permit a claim for intentional infliction of emotional distress is a legal question in the first instance for the court to decide as a matter of law." *Vance v. Southern Bell Tel. & Tel. Co.*, 983 F.2d 1573, 1575 n.7 (internal quotation marks omitted). In *Vance*, the court found that the employer's conduct did not rise to the necessary level of outrageous when a black employee found nooses hung above her work station and was subjected to racial epithets while at work. *See id.* at 1575 n.7, 1583.

The Florida Supreme Court acknowledged that "[i]t has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been

characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort." *McCarson*, 467 So.2d at 278. Defendants cite to two cases in the employee termination context to underscore this point: *Golden v. Complete Holdings, Inc.*, 818 F. Supp. 1495 (M.D. Fla. 1993) and *State Farm Mut. Auto. Ins. Co. v. Novotny*, 657 So. 2d 1210 (Fla. 5th DCA 1995). (Doc. 32 at 22).

*Golden* is distinguishable because, there, the plaintiff was terminated after experience a series of incidents suggesting age discrimination. 818 F. Supp. at 1496. The court found the employer's conduct was not outrageous despite allegations that the employer "induced Plaintiff to forego other employment opportunities, . . . systematically eliminated older employees, including the Plaintiff, . . . discharged Plaintiff without warning, ejected him from his office without giving him an opportunity to collect his personal effects (which Defendants destroyed), and refused for months to pay Plaintiff severance pay and other entitlements." *Id.* at 1499–1500.

The facts of *Novotny* are more readily analogous to the instant case. There, the employee was investigated over the course of a month; interviewed away from the office for forty-five minutes; and given the chance to resign, which she did. *Novotny*, 657 So. 2d 1211–12. The employee threatened suicide when she was driven back to the office and later received psychiatric treatment. *Id.* at 1212.

Because the employer had a legal right to pursue an investigation into the employee's conduct after receiving complaints and an interest in conducting interviews away from the office, the court held that the employer's conduct did not rise to the requisite level of outrageousness. *See id.* at 1212–13.

Here, Plaintiff was the subject of an allegedly pretextual investigation that lasted seven months, was interviewed for eight hours over two days, and was then terminated without adequate notice. (Doc. 26 at 3, 17, 37). He was later diagnosed with anxiety and major depressive disorder. (*Id.* at 38). Every factually analogous situation can be distinguished from *Novotny* in that, here, it is more extreme. But the conduct still falls short of the employer's conduct in *Vance*, which the Eleventh Circuit found was not outrageous. Despite the allegations of pretext, Defendants here also had the legal right purse an investigation into an employee's conduct. *See Novotny*, 657 So. 2d at 1212. Even conduct committed with criminal intent or that is malicious may not be "Outrageous!" *McCarson*, 467 So. 2d at 279. This Court cannot say that the individual Defendants' conduct rose to the level that is "utterly intolerable in a civilized community." *Id.* Therefore, this Count will be dismissed.

   2.   *Abuse of Process*

Defendants argue that Plaintiff fails to state a claim for abuse of process pursuant to Federal Rule of Civil Procedure 12(b)(6). Under Florida law, abuse of process requires the following: "(1) the defendant made an illegal, improper, or

perverted use of process; (2) the defendant had an ulterior motive or purpose in exercising the illegal, improper or perverted process; and (3) the plaintiff was injured as a result of defendant's action." *EMI Sun Village, Inc. v. Catledge*, 779 F. App'x 627, 635 (11th Cir. 2019). "Abuse of process involves the use of criminal or civil legal process against another primarily to accomplish a purpose for which it was not designed." *Aulicino v. McBride*, No. 6:16–cv–878–Orl–31TBS, 2017 WL 1113475, at *3 (M.D. Fla. Mar. 23, 2017).

Plaintiff argues that the process in question here was the months-long investigation. (Doc. 26 at 40). Defendants assert, and this Court agrees, Plaintiff fails to establish the first element of this claim. Here, Plaintiff does not allege that Defendants ever instituted any kind of legal proceedings against him—civil or criminal. *See Aulicino*, 2017 WL 1113475, at *3 (dismissing abuse of process claim where defendants nor anyone else filed a lawsuit against plaintiff). Therefore, this Count will be dismissed.

## IV.   CONCLUSION

In accordance with the foregoing, it is **ORDERED** and **ADJUDGED** as follows:

1. Defendants' Motion to Dismiss is **GRANTED in part** and **DENIED in part**.

    a.  Plaintiff does not have standing to pursue injunctive relief.

b. All claims asserted against the Board are **DISMISSED without prejudice** based on Eleventh Amendment immunity.[4]

c. Counts IV and V are **DISMISSED without prejudice**.

d. The Motion is otherwise **DENIED**.

**DONE** and **ORDERED** in Orlando, Florida on April 29, 2024.



CARLOS E. MENDOZA
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record

---

[4] Defendants seek dismissal of these claims with prejudice, but "a dismissal based on Eleventh Amendment immunity is without prejudice." *Parker-Hall v. UF Bd. of Trs.*, No. 1:21-cv-138-AW-GRJ, 2021 U.S. Dist. LEXIS 264347, at *5 (N.D. Fla. Nov. 17, 2021) (citing *Nichols v. Ala. State Bar*, 815 F.3d 726, 733 (11th Cir. 2016); *Crisman v. Florida Atl. Univ. Bd. of Trs.*, 659 F. App'x 572, 577 (11th Cir. 2016)).

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

CHARLES NEGY,

     *Plaintiff,*                             CASE NO.: 6:23-cv-00666-RBD-EJK

v.

BOARD OF TRUSTEES OF THE
UNIVERSITY OF CENTRAL FLORIDA;
in their official capacities; and S. KENT
BUTLER, ALEXANDER
CARTWRIGHT, TOSHA DUPRAS,
MICHAEL JOHNSON, and NANCY
MYERS, in their individual capacity,

     *Defendants.*

_____/

### DEFENDANT ALEXANDER CARTWRIGHT'S ANSWER AND AFFIRMATIVE DEFENSES TO PLAINTIFF'S FIRST AMENDED COMPLAINT, DEMAND FOR JURY TRIAL, REQUEST FOR DECLARATORY RELIEF, AND REQUEST FOR INJUNCTIVE RELIEF

     Defendant ALEXANDER CARTWRIGHT,[1] by and through the undersigned counsel, hereby submits his Answer and Affirmative Defenses to Plaintiff's First Amended Complaint, Demand for Jury Trial, Request for Declaratory Relief, and Request for Injunctive Relief.

     Plaintiff's First Amended Complaint purports to bring claims under the First and

---

[1] Defendant BOARD OF TRUSTEES OF THE  UNIVERSITY OF CENTRAL FLORIDA is no longer a party to this action, the Court having dismissed all claims against it by Order dated April 29, 2024.  (Doc. 38). In its April 29, 2024 Order, this Court further clarified that the individual defendants were sued in their individual, not official, capacities, and therefore Defendant files this Answer in that capacity.

Fourteenth Amendments, pursuant to 42 U.S.C. § 1983 (Counts I and II), as well as common-law state claims for negligence (Count III), intentional infliction of emotional distress (Count IV), and abuse of process (Count V). But Plaintiff's claims for negligence, abuse of process, and intentional infliction of emotional distress (Counts III, IV, and V) were dismissed in their entirety, by Order dated April 29, 2024. (Doc. 38). Accordingly, Defendant files this Answer and Affirmative Defenses in response to Plaintiff's remaining claims in Counts I and II in his individual capacity.

As a general denial, Defendant denies all allegations of wrongdoing, and denies all of Plaintiff's allegations, arguments, contentions, characterizations, implications, facts, and conclusions not specifically and explicitly admitted herein.

## NATURE OF THE ACTION

1.     Denied.

2.     Defendant is without knowledge of the alleged "Twitter mob;" Defendant admits that many called for Plaintiff's termination, and that there were protests; otherwise without knowledge and therefore denied.

3.     Denied.

4.     Admitted that during the investigation of complaints regarding Plaintiff's classroom conduct, UCF's Office of Institutional Equity ("OIE") and University Compliance, Ethics, and Risk ("UCE") interviewed Plaintiff; otherwise denied.

5.     Admitted that following the OIE/UCE investigation, UCF terminated Plaintiff in January 2021, effective immediately; otherwise denied.

6.      Admitted that Plaintiff pursued a grievance under the Collective Bargaining Agreement ("CBA"), that an arbitrator overturned Plaintiff's termination for the reasons stated in the arbitration award, and that Plaintiff was reinstated with back pay and benefits; otherwise denied.

## THE PARTIES

7.      Admitted.

8.      Admitted; however, Defendant would show that the Board was dismissed from this action by this Court's April 29, 2024 Order, and therefore, is no longer a party to this action. (Doc. 38).

9.      Admitted that at all times relevant to the First Amended Complaint, S. Kent Butler was UCF's Interim Chief Equity, Including and Diversity Officer, from approximately June of 2019 to July of 2021; otherwise, denied.

10.     Admitted that Defendant is the President of UCF; otherwise, denied.

11.     Admitted that at all times relevant to the First Amended Complaint, Tosha Dupras was the Interim Dean at UCF's College of Sciences until October 31, 2021; otherwise, denied.

12.     Admitted that at all times relevant to the First Amended Complaint, Defendant Johnson was UCF's Interim Provost and Vice President for Academic Affairs, from January 2020 to January 18, 2022. After January 18, 2022, Defendant Johnson was Provost and Executive Vice President of Academic Affairs; otherwise, denied.

13.     Admitted that Nancy Myers is the Director of UCF's Office of Institutional Equity ("OIE"); otherwise, denied.

## JURISDICTION AND VENUE

14.     Admitted for jurisdictional purposes only; the remaining allegations in paragraph 14 are denied.

15.     Denied; the Court dismissed all state law claims in its April 29, 2024 Order, and this Court no longer has supplemental jurisdiction over such claims.

16.     Admitted for purposes of venue only; the remaining allegations in paragraph 16 are denied.

## FACTS

17.     Admitted that Plaintiff had a Twitter account; otherwise without knowledge and therefore denied.

18.     Without knowledge and therefore denied.

19.     Without knowledge and therefore denied.

20.     Without knowledge and therefore denied.

21.     Admitted that Defendant issued a statement on June 2, 2020, which speaks for itself. Defendant denies Plaintiff's characterizations and conclusions regarding the statement as the quotation is incomplete and out of context; otherwise denied.

22.     Admitted that Plaintiff posted several tweets to his personal Twitter account between May 29 and June 3, 2020 expressing his views, but Defendant is without knowledge of the reasons for these posts and therefore denies the remainder

of paragraph 22.

23.     Admitted that the hashtag #UCFfirehim was used on Twitter. Defendant denies the remainder of paragraph 23. Defendant further denies that he had any input, review, or control over the hashtag.

24.     Defendant is without knowledge of the article referenced in paragraph 24 and therefore denies the balance of paragraph 24. Defendant further denies that he had any input, review, or control over the article referenced in paragraph 24; otherwise denied.

25.     Admitted that UCF's Assistant Vice President for Board Relations, Karen Monteleone, issued a statement on June 4, 2020, which speaks for itself. Defendant denies Plaintiff's characterizations and conclusions regarding the statement as the quotation is incomplete and out of context. Defendant further denies that he had any input, review, or control over Ms. Monteleone's statement; otherwise denied.

26.     Without knowledge and therefore denied.

27.     Admitted that UCF's Student Senate passed a resolution regarding Plaintiff. Defendant denies Plaintiff's characterizations and conclusions regarding the resolution as the quotation is incomplete and out of context. Defendant further denies that he had any input, review, or control over the Student Senate's resolution; otherwise denied.

28.     Without knowledge and therefore denied.

29.     Admitted that protestors gathered on the UCF campus on June 14, 2020 and that some protesters purportedly chanted "UCF, fire him;" Defendant is without

knowledge as to all reasons for the protesters' gathering and therefore denies the remainder of the allegations in paragraph 29. Defendant further denies that he had any input, review, or control of the protesters; otherwise denied.

30.     Admitted that there was an online petition demanding that UCF terminate Plaintiff, but Defendant is without knowledge of the total number of signatures the petition received, and therefore, denies the balance of paragraph 30. Defendant further denies that he had any input, review, or control over the online petition; otherwise denied.

31.     Denied.

32.     Admitted that UCF released a video statement from Defendant S. Kent Butler, portions of which are quoted in paragraph 32. Defendant denies Plaintiff's characterizations and conclusions regarding the video statement as the quotation is incomplete and out of context; otherwise denied.

33.     Admitted that Defendant attended a virtual town hall intended to address the COVID-19 pandemic with students, and that during that town hall, Defendant made certain statements, portions of which are quoted in paragraph 33. Defendant denies that the purpose of the town hall was to address Plaintiff or his tweets, and further denies Plaintiff's characterizations and conclusions regarding Defendant's statements as the quotation is incomplete and out of context; otherwise denied.

34.     Without knowledge and therefore denied.

35.     Admitted that an article titled "Addressing Intolerance in Our

Community," signed by Defendants Butler, Cartwright, and Johnson, was posted to the UCF website, portions of which are quoted in paragraph 35. Defendant denies Plaintiff's characterizations and conclusions regarding the statement as the quotation is incomplete and out of context; otherwise denied.

36.     Admitted that an article titled "Addressing Intolerance in Our Community," signed by Defendants Butler, Cartwright, and Johnson, was posted to the UCF website, portions of which are quoted in paragraph 36. Defendant denies Plaintiff's characterizations and conclusions regarding the statement as the quotation is incomplete and out of context; otherwise denied.

37.     Admitted that Plaintiff emailed Defendant about protestors at Plaintiff's home; otherwise denied. Defendant further denies that he had any control over those protesting at Plaintiff's home.

38.     Admitted that Defendants Butler, Cartwright, and Johnson, and other individuals, hosted a "Virtual Conversation about Race and Unity," and that during that conversation, Defendant made certain statements, portions of which are quoted in paragraph 38. Defendant denies that the purpose of that virtual conversation was to address Plaintiff specifically, and further deny Plaintiff's characterizations and conclusions regarding Defendant's statements as the quotation is incomplete and out of context; otherwise denied.

39.     Admitted that students asked questions about Plaintiff during the "Virtual Conversation on Race and Unity." Defendant denies that he had any input, review, or control of the student questions; otherwise denied.

40.     Admitted that Defendant Michael Johnson addressed a student's question. Defendant denies Plaintiff's characterizations and conclusions regarding Defendant Johnson's answer as the quotation in  paragraph 40 is incomplete and out of context. Defendant further denies that he had any input, review, or control of the student questions; otherwise denied.

41.     Admitted that Defendant S. Kent Butler addressed a question from an incoming student. Defendant denies Plaintiff's characterizations and conclusions regarding Defendant Butler's answer as the quotation is incomplete and out of context. Defendant further denies that he had any input, review, or control of the student questions; otherwise denied.

42.     Admitted that the Multicultural Student Center issued a statement on June 9, 2020, portions of which are quoted in paragraph 42. Defendant denies Plaintiff's characterizations and conclusions regarding the statement as the quotation is incomplete and out of context; Defendant further denies that he had any input, review, or control of the statements made by the Multicultural Student Center; otherwise denied.

43.     Without knowledge and therefore denied.

44.     Admitted that protestors gathered on the UCF campus on June 14, 2020 outside of the building where Defendant's office is located, and that he met with the protestors, some of whom called for Plaintiff's termination; otherwise denied.

45.     Defendant denies Plaintiff's characterizations and conclusions regarding the statement as the quotation is incomplete, contains incorrect punctuation, and is

quoted out of context. Defendant denies the remainder of this paragraph, and further denies that he had any input, review, or control of the protesters.

46.     Admitted that Plaintiff has taught at UCF for many years; otherwise, without knowledge and therefore denied.

47.     Admitted that UCF received hundreds of complaints, including anonymous complaints, about Plaintiff's classroom teaching; Defendant denies the remaining allegations in paragraph 47.

48.     Admitted that UCF's Office of Institutional Equity ("OIE") and University Compliance, Ethics, and Risk ("UCE") reviewed allegations against Plaintiff. Defendant, however, did not participate in the inquiry or subsequent investigation, is without knowledge of the specifics of the inquiry or investigation, and therefore, denies the remaining allegations in paragraph 48.

49.     Admitted that OIE/UCE reviewed allegations against Plaintiff. Defendant, however, did not participate in the inquiry or investigation, is without knowledge of the specifics of the inquiry or investigation, and therefore, denies the remaining allegations in paragraph 49.

50.     Admitted that OIE/UCE conducted an inquiry and investigated allegations against Plaintiff. Defendant, however, did not participate in the inquiry or investigation, is without knowledge of the specifics of the inquiry or investigation, and therefore, denies the remaining allegations in paragraph 50.

51.     Admitted that OIE/UCE reviewed allegations and subsequently investigated those allegations against Plaintiff. Defendant, however, did not participate

in the inquiry or investigation, is without knowledge of the specifics of the inquiry or investigation, and therefore, denies the remaining allegations in paragraph 51.

52.    Denied.

53.    Without knowledge and therefore denied.

54.    Admitted that OIE/UCE investigated allegations against Plaintiff. Defendant, however, did not participate in the investigation, is without knowledge of the specifics of the investigation, and therefore, denies the allegations in this paragraph.

55.    Without knowledge and therefore denied.

56.    Without knowledge and therefore denied.

57.    Admitted that many complaints against Plaintiff were anonymous; Defendant denies the remaining allegations in this paragraph.

58.    Without knowledge and therefore denied.

59.    Without knowledge and therefore denied.

60.    Without knowledge and therefore denied.

61.    Admitted that OIE/UCE investigated allegations against Plaintiff and that the investigation included an interview of Plaintiff. Defendant, however, did not participate in the investigation, is without knowledge of the specifics of the investigation, and therefore, denies the allegations in this paragraph.

62.    Admitted that OIE/UCE investigated allegations against Plaintiff and that the investigation included an interview of Plaintiff. Defendant, however, did not participate in the investigation, is without knowledge of the specifics of the investigation, and therefore, denies the allegations in this paragraph.

63.     Admitted that OIE/UCE investigated allegations against Plaintiff and that the investigation included an interview of Plaintiff. Defendant, however, did not participate in the investigation, is without knowledge of the specifics of the investigation, and therefore, denies the allegations in this paragraph.

64.     Without knowledge and therefore denied.

65.     Admitted that OIE/UCE investigated allegations against Plaintiff and that the investigation included an interview of Plaintiff. Defendant, however, did not participate in the investigation, is without knowledge of the specifics of the investigation, and therefore, denies the allegations in this paragraph.

66.     Admitted that OIE/UCE investigated allegations against Plaintiff and that the investigation included an interview of Plaintiff. Defendant, however, did not participate in the investigation, is without knowledge of the specifics of the investigation, and therefore, denies the allegations in this paragraph.

67.     Admitted that OIE/UCE investigated allegations against Plaintiff and that the investigation included an interview of Plaintiff. Defendant, however, did not participate in the investigation, is without knowledge of the specifics of the investigation, and therefore, denies the allegations in this paragraph.

68.     Without knowledge and therefore denied.

69.     Without knowledge and therefore denied.

70.     Without knowledge and therefore denied.

71.     Without knowledge and therefore denied.

72.     Without knowledge and therefore denied.

73.     Without knowledge and therefore denied.

74.     Without knowledge and therefore denied.

75.     Without knowledge and therefore denied.

76.     Admitted that Defendant Dupras' January 5, 2021 letter to Plaintiff speaks for itself; otherwise denied.

77.     Admitted that OIE/UCE issued an investigative report on January 13, 2021, which report speaks for itself; otherwise denied.

78.     Admitted that the investigative report speaks for itself; otherwise denied.

79.     Denied.

80.     Admitted that the Eleventh Circuit's opinion speaks for itself, that UCF subsequently amended portions of its policies to address concerns raised in the lawsuit, and settled that lawsuit; otherwise denied.

81.     Admitted that Defendant Dupras' January 13, 2021 letter to Plaintiff speaks for itself; otherwise denied.

82.     Admitted that the CBA, portions of which are quoted in paragraph 82, speaks for itself. Defendant denies Plaintiff's characterizations and conclusions regarding the CBA; otherwise denied.

83.     Admitted that Defendant Dupras' January 13, 2021 letter to Plaintiff speaks for itself; otherwise denied.

84.     Admitted that Defendant Dupras' January 13, 2021 letter to Plaintiff speaks for itself; otherwise denied.

85.     Without knowledge and therefore denied.

86.     Without knowledge and therefore denied.

87.     Without knowledge and therefore denied.

88.     Admitted.

89.     Admitted that Plaintiff challenged his termination through the grievance process; otherwise, without knowledge and therefore denied.

90.     Admitted that Plaintiff challenged his termination through the grievance process; otherwise, without knowledge and therefore denied.

91.     Admitted that the CBA, portions of which are paraphrased in paragraph 91, speaks for itself, and that the Board requested an extension to respond; Defendant denies the remaining allegations in this paragraph.

92.     Admitted that Plaintiff challenged his termination through the grievance process; otherwise without knowledge and therefore denied.

93.     Admitted that Plaintiff challenged his termination through the grievance process; otherwise without knowledge and therefore denied.

94.     Admitted that Plaintiff challenged his termination through the grievance process and ultimately arbitrated his grievance; otherwise, without knowledge and therefore denied.

95.     Admitted that Plaintiff challenged his termination through the grievance process and ultimately arbitrated his grievance; otherwise, without knowledge and therefore denied.

96.     Admitted that the arbitration resulted in Plaintiff's reinstatement and that the arbitration award speaks for itself; otherwise, denied.

97.     Admitted that the arbitration resulted in Plaintiff's reinstatement and that the arbitration award speaks for itself; otherwise, denied.

98.     Admitted that the arbitration resulted in Plaintiff's reinstatement and that the arbitration award speaks for itself; otherwise, denied.

99.     Admitted that the arbitration resulted in Plaintiff's reinstatement and that the arbitration award speaks for itself; otherwise, denied.

100.     Admitted that the arbitration resulted in Plaintiff's reinstatement and that the arbitration award speaks for itself; otherwise, denied.

101.   Denied.

102.   Denied.

103.   Denied.

104.   Denied.

105.   Denied.

## <u>FIRST CAUSE OF ACTION</u>

**Violation of Plaintiff's Right to Free Speech Under the First and Fourteenth Amendments (42. U.S.C. § 1983) – Retaliation – Defendants Board of Trustees of UCF (official capacity--DISMISSED), Butler (individually), Cartwright (individually), Johnson (individually), Dupras (individually), Myers (individually)**

106.   Defendant re-states and incorporates by reference his responses to paragraphs 2-5, 7-13, 22-30, 31-36, 38-41, 44-45, 51-76, 77-79, 81-87, and 103-105 of Plaintiff's First Amended Complaint as if fully set forth herein.

107.   Admitted that Plaintiff engaged in some protected speech, but Defendant denies that he took any action against Plaintiff based on his constitutionally protected speech; Defendant further denies the remaining allegations in paragraph 107.

108.   Admitted that Defendants Butler, Cartwright, and Johnson posted a state on UCF's website, portions of which are quoted in paragraph 108. Defendant denies Plaintiff's characterizations and conclusions regarding the statement as the quotations are incomplete and out of context, and further denies the remaining allegations in paragraph 108.

109.   Without knowledge and therefore denied.

110.   Admitted that OIE/UCE conducted an investigation into multiple complaints about Plaintiff's classroom conduct and other allegations of misconduct, not Plaintiff's protected speech; otherwise denied.

111.   The allegations in this paragraph pertain to the Board, which was dismissed as a party defendant as set forth in the Court's April 29, 2024 Order; otherwise, Defendants deny the allegations in paragraph 111.

112.   Denied.

113.   Without knowledge and therefore denied.

114.   Without knowledge and therefore denied.

115.   Denied.

116.  Denied.

117.  Denied.

118.  Denied.

119.  Denied.

## SECOND CAUSE OF ACTION

### Violation of Plaintiff's Right to Free Speech Under the First and Fourteenth Amendments (42. U.S.C. § 1983) – Defendants Board of Trustees of UCF (official capacity), Myers (individually)

Plaintiff's Second Cause of Action is not asserted against this Defendant.

Defendant, however, denies each and every allegation in Plaintiff's Second Cause

of Action and demands strict proof of same.

## THIRD CAUSE OF ACTION

### Negligence, UCF Board of Trustees (official capacity)

Defendant, UCF Board of Trustees, is no longer a party to this action,

pursuant to the Court's Order entered April 29, 2024, dismissing Plaintiff's claims

asserted against the Board, including Plaintiff's Third Cause of Action.

## FOURTH CAUSE OF ACTION

### Intentional Infliction of Emotional Distress – Defendants Myers and Dupras (individually) or, in the alternative, Board of Trustees of UCF (in their official capacity)

Pursuant to the Court's Order entered April 29, 2024, Plaintiff's Fourth Cause

of Action was dismissed in its entirety.

## FIFTH CAUSE OF ACTION

### Abuse of Process – Defendants Myers, Dupras, Cartwright, and Johnson (individually or, in the alternative, Defendant Board of Trustees (in their official capacity)

Pursuant to the Court's Order entered April 29, 2024, Plaintiff's Fifth Cause of Action was dismissed in its entirety.

## PRAYER FOR RELIEF

Denied that Plaintiff is entitled to seek or receive any of the relief requested in the Prayer for Relief.

## AFFIRMATIVE DEFENSES

Without admitting, acknowledging or assuming any burden of proof that Defendant would not otherwise bear under law, and reserving the right to assert additional or other defenses or matters in avoidance after discovery progresses in this case, Defendants, S. Kent Butler, Alexander Cartwright, Tosha Dupras, Michael Johnson and Nancy Myers hereby asserts the following affirmative defenses against Plaintiff's First Amended Complaint:

## FIRST AFFIRMATIVE DEFENSE

Defendant is not liable for Plaintiff's claims arising under 42 U.S.C. §1983 and the First and Fourteenth Amendments based on the doctrine of qualified immunity because Defendant's actions, which were performed in good faith, were within the course and scope of his duties and his discretionary authority, and did not violate clearly established law.

17

## SECOND AFFIRMATIVE DEFENSE

Plaintiff lacks standing to assert the claims in his First Amended Complaint because, among other reasons, he lacks a concrete, particularized injury that is either actual or imminent, or an injury likely to be redressed by a favorable decision of this Court as Plaintiff was restored to his position, with backpay and benefits, and has not been subject to any further alleged violations of his First Amendment rights since his reinstatement.

## THIRD AFFIRMATIVE DEFENSE

Plaintiff's claims are moot because there is no longer a live controversy as Plaintiff was restored to his position, with backpay and benefits, and has not been subject to any further alleged violations of his First Amendment rights since his reinstatement.

## FOURTH AFFIRMATIVE DEFENSE

Plaintiff elected his remedy by challenging his termination through the grievance process under the CBA, including the final step of arbitration, as opposed to challenging his termination in court, and was thereby fully restored to his position, with backpay, benefits, and interest.  Plaintiff is estopped from pursuing damages in this matter, having elected to pursue his grievance through its conclusion in arbitration under the CBA, which provides the sole and exclusive remedy for resolving his grievance, which includes his termination.

## FIFTH AFFIRMATIVE DEFENSE

Plaintiff is not entitled to an award of punitive damages as a matter of law. Defendant has not acted maliciously or with reckless indifference to Plaintiff or his rights, Defendant's actions were in good faith and in an effort to comply with federal law, including but not limited to Title VI and Title IX, and Defendant had a reasonable basis for believing his actions did not violate any law, let alone Plaintiff's constitutional rights.

## SIXTH AFFIRMATIVE DEFENSE

Defendant's actions were in furtherance of his obligations to protect students from discrimination and harassment under federal law, including but not limited to Title VI and Title IX.

## SEVENTH AFFIRMATIVE DEFENSE

To the extent Plaintiff's claims are premised upon the Defendant's statements, Defendant would show that he has a competing First Amendment right to express his disagreement with Plaintiff's statements and to inform students of the process for making complaints of discrimination and harassment.

## EIGHTH AFFIRMATIVE DEFENSE

Plaintiff failed to comply with his ongoing duty to mitigate or reasonably attempt to mitigate his damages, entitlement to which Defendant expressly denies.

**WHEREFORE,** Defendant ALEXANDER CARTWRIGHT respectfully requests this Honorable Court to render a Final Judgment in favor of Defendants and against Plaintiff dismissing his First Amended Complaint with prejudice, awarding

Defendant his taxable costs of this action, reserving jurisdiction to determine Defendant's entitlement to an award of attorneys' fees against Plaintiff upon proper motion, and awarding all other relief the Court deems just and proper.

Respectfully submitted on May 23, 2024.

/s/*Kristie L. Hatcher-Bolin*
**SUSAN T. SPRADLEY**
Florida Bar No.: 0818712
Susan.Spradley@gray-robinson.com
**JASON A. ZIMMERMAN, ESQ.**
Florida Bar No. 104392
Jason.Zimmerman@gray-robinson.com
**KATHERINE W. KATZ, ESQ.**
Florida Bar No. 1022526
Katherine.Katz@gray-robinson.com
**JULIE M. ZOLTY**
Florida Bar No.: 1036454
Julie.Zolty@gray-robinson.com
**GRAY ROBINSON, P.A.**
Post Office Box 3068
Orlando, Florida  32802-3068
Telephone:  (407) 843-8880
Facsimile:   (407) 244-5690
And
**KRISTIE HATCHER-BOLIN**
Florida Bar No. 521388
Kristie.Hatcher-bolin@gray-robinson.com
**GRAY ROBINSON, P.A.**
Post Office Box 3
Lakeland, Florida 33802-0003
Telephone: (863) 284-2251
Facsimile: (863) 683-7462
*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on May 23, 2024, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system.

/s/*Kristie L. Hatcher-Bolin*
**KRISTIE HATCHER-BOLIN**
Florida Bar No. 521388

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

CHARLES NEGY,

     *Plaintiff,*                               CASE NO.: 6:23-cv-00666-RBD-EJK

v.

BOARD OF TRUSTEES OF THE
UNIVERSITY OF CENTRAL
FLORIDA; in their official capacities;
and S. KENT BUTLER, ALEXANDER
CARTWRIGHT, TOSHA DUPRAS,
MICHAEL JOHNSON,  and NANCY
MYERS, in their individual capacity,

     *Defendants.*

_____/

## DEFENDANT TOSHA DUPRAS' ANSWER AND AFFIRMATIVE DEFENSES TO PLAINTIFF'S FIRST AMENDED COMPLAINT, DEMAND FOR JURY TRIAL, REQUEST FOR DECLARATORY RELIEF, AND REQUEST FOR INJUNCTIVE RELIEF

     Defendant TOSHA DUPRAS[1] ("Defendant"), by and through the undersigned

counsel, hereby submits her Answer and Affirmative Defenses to Plaintiff, CHARLES

NEGY's ("Plaintiff"), First Amended Complaint, Demand for Jury Trial, Request for

Declaratory Relief, and Request for Injunctive Relief.

     Plaintiff's First Amended Complaint purports to bring claims under the First and

---

[1] Defendant BOARD OF TRUSTEES OF THE UNIVERSITY OF CENTRAL FLORIDA is no longer a party to this action, the Court having dismissed all claims against it by Order dated April 29, 2024.  (Doc. 38). In its April 29, 2024 Order, this Court further clarified that the individual defendants were sued in their individual, not official, capacities, and therefore, Defendant files this Answer in that capacity.

Fourteenth Amendments, pursuant to 42 U.S.C. § 1983 (Counts I and II), as well as common-law state claims for negligence (Count III), intentional infliction of emotional distress (Count IV), and abuse of process (Count V).   But Plaintiff's claims for negligence, abuse of process, and intentional infliction of emotional distress (Counts III, IV, and V) were dismissed in their entirety by Order dated April 29, 2024. (Doc. 38).  Accordingly, Defendant files this Answer and Affirmative Defenses in response to Plaintiff's remaining claims in Counts I and II in her individual capacity.

As a general denial, Defendant denies all allegations of wrongdoing, and denies all of Plaintiff's allegations, arguments, contentions, characterizations, implications, facts, and conclusions not specifically and explicitly admitted herein.

## <u>NATURE OF THE ACTION</u>

1.      Denied.

2.      Without knowledge and therefore denied.

3.      Denied.

4.      Admitted that during the investigation of complaints regarding Plaintiff's classroom conduct, UCF's Office of Institutional Equity ("OIE") and University Compliance, Ethics, and Risk ("UCE") interviewed Plaintiff; otherwise denied.

5.      Admitted that following the OIE/UCE investigation, UCF terminated Plaintiff in January 2021, effective immediately; otherwise denied.

6.      Admitted that Plaintiff pursued a grievance under the Collective Bargaining Agreement ("CBA") and that the arbitrator overturned the Plaintiff's

termination for the reasons stated in the arbitration award. Defendant is without knowledge as to the remainder of the allegations in this paragraph; therefore, denied.

## THE PARTIES

7. Admitted.

8. Admitted; however, Defendant would show that the Board was dismissed from this action by this Court's April 29, 2024 Order, and therefore, is no longer a party to this action. (Doc. 38).

9. Admitted that S. Kent Butler was UCF's Interim Chief Equity, Inclusion and Diversity Officer at all times relevant to the Amended Complaint; otherwise, denied.

10. Admitted that Alexander Cartwright was the President of UCF at all times relevant to the Amended Complaint; otherwise, denied.

11. Admitted that at all times relevant to the Amended Complaint, Defendant was the Interim Dean at UCF's College of Sciences, until October 31, 2021; otherwise, denied.

12. Admitted that Michael Johnson was UCF's Interim Provost and Executive Vice President for Academic Affairs at all times relevant to the Amended Complaint; otherwise, denied.

13. Admitted that Nancy Myers was the Director of UCF's OIE at all times relevant to the Amended Complaint; otherwise, denied.

## JURISDICTION AND VENUE

14.     Admitted for jurisdictional purposes only; the remaining allegations in this paragraph are denied.

15.     Denied; the Court dismissed all state law claims in its April 29, 2024 Order, and this Court no longer has supplemental jurisdiction over such claims.

16.     Denied that Defendant is a resident of the State in which the Middle District Court is located.  Defendant is without knowledge as to the residence of other Defendants. The remaining allegations in paragraph 16 are denied.

## FACTS

17.     Admitted that Plaintiff had a Twitter account; otherwise, without knowledge and therefore denied.

18.     Without knowledge and therefore denied.

19.     Without knowledge and therefore denied.

20.     Without knowledge and therefore denied.

21.     Without knowledge and therefore denied.

22.     Admitted that Plaintiff posted several tweets to his personal Twitter account, but Defendant is without knowledge of the reasons for these posts and therefore denies the remainder of this paragraph.

23.     Admitted that Plaintiff's tweets garnered an angry response on social media. Defendant is without knowledge and therefore denies the remainder of this paragraph. Defendant further denies that she had any input, review, or control over the "angry response on social media" or any hashtag.

4

24.     Defendant is without knowledge of the article referenced in this paragraph and therefore denies the balance this paragraph. Defendant further denies that she had any input, review, or control over the article referenced in this paragraph; otherwise denied.

25.     Without knowledge and therefore denied.

26.     Defendant is without knowledge of the tweet alleged in this paragraph and therefore denies same. Defendant further denies that she had any input, review, or control over the tweet referenced in this paragraph.

27.     Without knowledge and therefore denied.

28.     Without knowledge and therefore denied.

29.      Without knowledge and therefore denied.

30.     Without knowledge and therefore denied.

31.     Denied.

32.     Without knowledge and therefore denied.

33.     Without knowledge and therefore denied.

34.     Admitted that Defendant sent an email message to all College of Sciences students, faculty, staff, alumni, and supporters on June 4, 2020, portions of which are quoted in this paragraph. Defendant denies Plaintiff's characterizations and conclusions regarding the message as the quotation is incomplete and out of context; otherwise denied.

35.     Without knowledge and therefore denied.

36.     Without knowledge and therefore denied.

37.    Without knowledge and therefore denied.

38.    Without knowledge and therefore denied.

39.    Without knowledge and therefore denied.

40.    Without knowledge and therefore denied.

41.    Without knowledge and therefore, denied.

42.    Without knowledge and therefore denied.

43.    Without knowledge and therefore denied.

44.    Without knowledge and therefore denied.

45.    Without knowledge and therefore denied.

46.    Admitted that Plaintiff has taught at UCF for many years; otherwise, without knowledge and therefore denied.

47.    Admitted that UCF received hundreds of complaints, including anonymous complaints, about Plaintiff's classroom teaching; Defendant denies the remaining allegations in that paragraph.

48.    Admitted that UCF's Office of Institutional Equity ("OIE") and University Compliance, Ethics, and Risk ("UCE") reviewed allegations against Plaintiff. Defendant, however, did not participate in the inquiry or subsequent investigation, is without knowledge of the specifics of the inquiry or investigation, and therefore, denies the remaining allegations in this paragraph.

49.    Admitted that OIE/UCE reviewed allegations against Plaintiff. Defendant, however, did not participate in the inquiry or investigation, is without knowledge of the specifics of the inquiry or investigation, and therefore, denies the

remaining allegations in this paragraph.

50.     Admitted that OIE/UCE conducted an inquiry and investigated allegations against Plaintiff. Defendant, however, did not participate in the inquiry or investigation, is without knowledge of the specifics of the inquiry or investigation, and therefore, denies the remaining allegations in this paragraph.

51.     Admitted that OIE/UCE reviewed allegations and subsequently investigated those allegations against Plaintiff. Defendant, however, did not participate in the inquiry or investigation, is without knowledge of the specifics of the inquiry or investigation, and therefore, denies the remaining allegations in this paragraph.

52.     Denied.

53.     Without knowledge and therefore denied.

54.     Admitted that OIE/UCE investigated allegations against Plaintiff. Defendant, however, did not participate in the investigation, is without knowledge of the specifics of the investigation, and therefore, denies the allegations in this paragraph.

55.     Without knowledge and therefore denied.

56.     Without knowledge and therefore denied.

57.     Admitted that many complaints that were made against Plaintiff were anonymous; Defendant is without knowledge and therefore denies the remaining allegations in this paragraph.

58.     Without knowledge, and therefore denied.

59.     Without knowledge, and therefore denied.

60.     Without knowledge, and therefore denied.

61.     Admitted that OIE/UCE investigated allegations against Plaintiff and that the investigation included an interview of Plaintiff. Defendant, however, did not participate in the investigation, is without knowledge of the specifics of the investigation, and therefore, denies the allegations in this paragraph.

62.     Admitted that OIE/UCE investigated allegations against Plaintiff and that the investigation included an interview of Plaintiff. Defendant, however, did not participate in the investigation, is without knowledge of the specifics of the investigation, and therefore, denies the allegations in this paragraph.

63.     Admitted that OIE/UCE investigated allegations against Plaintiff and that the investigation included an interview of Plaintiff. Defendant, however, did not participate in the investigation, is without knowledge of the specifics of the investigation, and therefore, denies the allegations in this paragraph.

64.     Admitted that Plaintiff taught Cross-Cultural Psychology and Sexual Behavior; otherwise without knowledge and therefore denied.

65.     Admitted that OIE/UCE investigated allegations against Plaintiff and that the investigation included an interview of Plaintiff. Defendant, however, did not participate in the investigation, is without knowledge of the specifics of the investigation, and therefore, denies the allegations in this paragraph.

66.     Admitted that OIE/UCE investigated allegations against Plaintiff and that the investigation included an interview of Plaintiff. Defendant, however, did not participate in the investigation, is without knowledge of the specifics of the

investigation, and therefore, denies the allegations in this paragraph.

67. Admitted that OIE/UCE investigated allegations against Plaintiff and that the investigation included an interview of Plaintiff. Defendant, however, did not participate in the investigation, is without knowledge of the specifics of the investigation, and therefore, denies the allegations in paragraph 67.

68. Without knowledge and therefore denied.

69. Without knowledge and therefore denied.

70. Without knowledge and therefore denied.

71. Without knowledge and therefore denied.

72. Without knowledge and therefore denied.

73. Without knowledge and therefore denied.

74. Without knowledge and therefore denied.

75. Without knowledge and therefore denied.

76. Admitted that Defendant's January 5, 2021 letter to Plaintiff speaks for itself. Defendant is without knowledge as to the updates provided by Defendant Myers as alleged in this paragraph. The remaining allegations in this paragraph are denied.

77. Admitted that the OIE/UCE investigative report was issued on or about January 13, 2021, which report speaks for itself; otherwise denied.

78. Admitted that the investigative report speaks for itself; otherwise denied.

79. Denied.

80. Without knowledge and therefore denied.

81. Admitted that Defendant's January 13, 2021 letter to Plaintiff speaks for

itself; otherwise denied.

82.     Admitted that the CBA, portions of which are quoted in paragraph 82, speaks for itself. Defendant denies Plaintiff's characterizations and conclusions regarding the CBA; otherwise denied.

83.     Admitted that Defendant's January 13, 2021 letter to Plaintiff speaks for itself; otherwise denied.

84.     Admitted that Defendant's January 13, 2021 letter to Plaintiff speaks for itself; otherwise denied.

85.     Without knowledge and therefore denied.

86.     Without knowledge and therefore denied.

87.     Without knowledge and therefore denied.

88.     Admitted.

89.     Admitted that Plaintiff challenged his termination through the grievance process; otherwise, without knowledge and therefore denied.

90.     Admitted that Plaintiff challenged his termination through the grievance process; otherwise, without knowledge and therefore denied.

91.     Admitted that the CBA speaks for itself, and that the Board requested an extension to respond; Defendant denies the remaining allegations in this paragraph.

92.     Without knowledge and therefore denied.

93.     Without knowledge and therefore denied.

94.     Admitted that Plaintiff challenged his termination through the grievance process and ultimately arbitrated his grievance. Otherwise, without knowledge and

therefore denied.

95.   Admitted that Plaintiff challenged his termination through the grievance process and ultimately arbitrated his grievance; otherwise, without knowledge and therefore denied.

96.   Admitted that the arbitration resulted in the arbitrator overturning the termination of Plaintiff's employment, and that the arbitrator's award speaks for itself; otherwise, denied.

97.   Admitted that the arbitration resulted in the arbitrator overturning the termination of Plaintiff's employment, and that the arbitrator's award speaks for itself; otherwise, denied.

98.   Admitted that the arbitration resulted in the arbitrator overturning the termination of Plaintiff's employment, and that the arbitrator's award speaks for itself; otherwise, denied.

99.   Admitted that the arbitration resulted in the arbitrator overturning the termination of Plaintiff's employment, and that the arbitrator's award speaks for itself; otherwise, denied.

100.   Admitted that the arbitration resulted in the arbitrator overturning the termination of Plaintiff's employment, and that the arbitrator's award speaks for itself; otherwise, denied.

101.   Denied.

102.   Denied.

103.   Denied.

104.   Denied.

105.   Denied.

### FIRST CAUSE OF ACTION

**Violation of Plaintiff's Right to Free Speech Under the First and Fourteenth Amendments (42. U.S.C. § 1983) – Retaliation – Defendants Board of Trustees of UCF (official capacity--DISMISSED), Butler (individually), Cartwright (individually), Johnson (individually), Dupras (individually), Myers (individually)**

106.   Defendant re-states and incorporates by reference her responses to paragraphs 2-5, 7-13, 22-30, 31-36, 38-41, 44-45, 51-76, 77-79, 81-87, and 103-105 of Plaintiff's First Amended Complaint as if fully set forth herein.

107.   Admitted that Plaintiff engaged in some protected speech, but denied that Defendant took any action against Plaintiff based on his engagement in constitutionally protected speech. Defendant further denies the remaining allegations in this paragraph.

108.   Without knowledge and therefore denied.

109.   Admitted that Defendant sent an email on June 4, 2020 to College of Sciences student, faculty, staff, alumni, and supporters, portions of which are quoted in this paragraph. Defendant denies Plaintiff's characterizations and conclusions regarding Defendant's email as the quotations are incomplete and out of context, and further denies the remaining allegations in this paragraph.

110.   Admitted that OIE/UCE conducted an inquiry and then an investigation into multiple complaints about Plaintiff's classroom conduct and other allegations of misconduct, not Plaintiff's protected speech; otherwise, denied.

111.   The allegations in this paragraph pertain to the Board, which was dismissed as a party Defendant as set forth in the Court's April 29, 2024 Order.  To the extent any response is required from Defendant, Defendant denies the allegations in this paragraph.

112.   Denied.

113.   Without knowledge and therefore denied.

114.   Without knowledge and therefore, denied.

115.   Denied.

116.   Denied.

117.   Denied.

118.   Denied.

119.   Denied.

## SECOND CAUSE OF ACTION

**Violation of Plaintiff's Right to Free Speech Under the First and Fourteenth Amendments (42. U.S.C. § 1983) – Defendants Board of Trustees of UCF (official capacity), Myers (individually)**

Paragraphs 120-131: Plaintiff's Second Cause of Action is not asserted against this Defendant.  Defendant, however, denies each and every allegation in Plaintiff's Second Cause of Action and demands strict proof of same.

## THIRD CAUSE OF ACTION

### Negligence, UCF Board of Trustees (official capacity)

Paragraphs 132-147: Defendant, UCF Board of Trustees, is no longer a party to this action, pursuant to the Court's Order entered April 29, 2024, dismissing Plaintiff's claims asserted against the Board, including Plaintiff's Third Cause of Action.

## FOURTH CAUSE OF ACTION

### Intentional Infliction of Emotional Distress – Defendants Myers and Dupras (individually) or, in the alternative, Board of Trustees of UCF (in their official capacity)

Paragraphs 148-164: Pursuant to the Court's Order entered April 29, 2024, Plaintiff's Fourth Cause of Action was dismissed in its entirety; therefore, no response is required from Defendant.

## FIFTH CAUSE OF ACTION

### Abuse of Process – Defendants Myers, Dupras, Cartwright, and Johnson (individually or, in the alternative, Defendant Board of Trustees (in their official capacity)

Paragraphs 165-174: Pursuant to the Court's Order entered April 29, 2024, Plaintiff's Fifth Cause of Action was dismissed in its entirety; therefore, no response is required from Defendant.

## PRAYER FOR RELIEF

Denied that Plaintiff is entitled to seek or receive any of the relief requested in the Prayer for Relief.

## AFFIRMATIVE DEFENSES

Without admitting, acknowledging or assuming any burden of proof that Defendant would not otherwise bear under law, and reserving the right to assert additional or other defenses or matters in avoidance after discovery progresses in this case, Defendant hereby asserts the following affirmative defenses against Plaintiff's First Amended Complaint:

## FIRST AFFIRMATIVE DEFENSE

Defendant is not liable for Plaintiff's claims arising under 42 U.S.C. §1983 and the First and Fourteenth Amendments based on the doctrine of qualified immunity because Defendant's actions, which were performed in good faith, were within the course and scope of her duties and her discretionary authority, and did not violate clearly established law.

## SECOND AFFIRMATIVE DEFENSE

Plaintiff lacks standing to assert the claims in his First Amended Complaint because, among other reasons, he lacks a concrete, particularized injury that is either actual or imminent, or an injury likely to be redressed by a favorable decision of this Court. Plaintiff's Amended Complaint states he was restored to his position, with backpay and benefits, and has not been subject to any further alleged violations of his

First Amendment rights since his reinstatement, nor could he be with respect to this Defendant as she is no longer an interim dean for or employed by UCF.

### THIRD AFFIRMATIVE DEFENSE

Plaintiff's claims are moot because there is no longer a live controversy as Plaintiff was restored to his position, with backpay and benefits, and has not been subject to any further alleged violations of his First Amendment rights since his reinstatement, nor could he be with respect to this Defendant as she is no longer an interim dean for or employed by UCF.

### FOURTH AFFIRMATIVE DEFENSE

Plaintiff elected his remedy by challenging his termination through the grievance process under the CBA, including the final step of arbitration, as opposed to challenging his termination in court, and was thereby fully restored to his position, with backpay, benefits, and interest. Plaintiff is estopped from pursuing damages in this matter, having elected to pursue his grievance through its conclusion in arbitration under the CBA, which provides the sole and exclusive remedy for resolving his grievance, which includes his termination.

### FIFTH AFFIRMATIVE DEFENSE

Plaintiff is not entitled to an award of punitive damages as a matter of law. Defendant has not acted maliciously or with reckless indifference to Plaintiff or his rights, Defendant's actions were in good faith and in an effort to comply with federal law, including but not limited to Title VI and Title IX, and Defendant had a reasonable

basis for believing his actions did not violate any law, let alone Plaintiff's constitutional rights.

**SIXTH AFFIRMATIVE DEFENSE**

Defendant's actions were in furtherance of her obligations to protect students from discrimination and harassment under federal law, including but not limited to Title VI and Title IX.

**SEVENTH AFFIRMATIVE DEFENSE**

To the extent Plaintiff's claims are premised upon the Defendant's statements, Defendant would show that she has a competing First Amendment right to express her disagreement with Plaintiff's statements and to inform students of the process for making complaints of discrimination and harassment.

**EIGHTH AFFIRMATIVE DEFENSE**

Plaintiff failed to comply with his ongoing duty to mitigate or reasonably attempt to mitigate his damages, entitlement to which Defendant expressly denies.

**WHEREFORE,** Defendant, TOSHA DUPRAS, respectfully requests this Honorable Court to render a Final Judgment in favor of Defendant and against Plaintiff dismissing his First Amended Complaint with prejudice, awarding Defendant her taxable costs of this action, reserving jurisdiction to determine Defendant's entitlement to an award of attorneys' fees against Plaintiff upon proper motion, and awarding all other relief the Court deems just and proper.

Respectfully submitted on May 23, 2024.

/s/ *Kristie L. Hatcher-Bolin*
**SUSAN T. SPRADLEY**
Florida Bar No.: 0818712
Susan.Spradley@gray-robinson.com
**JASON A. ZIMMERMAN, ESQ.**
Florida Bar No. 104392
Jason.Zimmerman@gray-robinson.com
**KATHERINE W. KATZ, ESQ.**
Florida Bar No. 1022526
Katherine.Katz@gray-robinson.com
**JULIE M. ZOLTY**
Florida Bar No.: 1036454
Julie.Zolty@gray-robinson.com
**GRAY ROBINSON, P.A.**
Post Office Box 3068
Orlando, Florida  32802-3068
Telephone:  (407) 843-8880
Facsimile:   (407) 244-5690
                    And
**KRISTIE HATCHER-BOLIN**
Florida Bar No. 521388
Kristie.Hatcher-bolin@gray-robinson.com
**GRAY ROBINSON, P.A.**
Post Office Box 3
Lakeland, Florida 33802-0003
Telephone: (863) 284-2251
Facsimile: (863) 683-7462
*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on May 23, 2024, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system.

/s/ *Kristie L. Hatcher-Bolin*
**KRISTIE HATCHER-BOLIN**
Florida Bar No. 521388