CASE NO. 25-11929

# 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔠𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰
# 𝔣𝔬𝔯 𝔱𝔥𝔢
# 𝔢𝔩𝔢𝔳𝔢𝔫𝔱𝔥 𝔠𝔦𝔯𝔠𝔲𝔦𝔱

**CHARLES NEGY**

*Plaintiff-Appellee*

v.

**ALEXANDER CARTWRIGHT, ET AL**

*Defendants-Appellants*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
Civil Action No. 6:23-CV-00666
Honorable Carlos E. Mendoza, United States District Judge, presiding

**BRIEF OF PLAINTIFF-APPELLEE CHARLES NEGY**

/s/ Joshua Adam Engel
Joshua Adam Engel (OH 0075769)
ENGEL & MARTIN, LLC
4660 Duke Drive, Ste. 101
Mason, OH 45040
 (513) 445-9600
engel@engelandmartin.com

/s/ Samantha Harris
Samantha Harris
ALLEN HARRIS PLLC
P.O. Box 673
Narberth, PA 19072
610-634-8258
sharris@allenharrislaw.com

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE

Appellee is not a subsidiary or affiliate of a publicly owned corporation.  There is no publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome.  Pursuant to 11th Cir. R. 26.1, Appellee Charles Negy respectfully provides the following list of all trial judges, attorneys, persons, associations of persons, firms,  partnerships, or corporations that have an interest in the outcome of this case or appeal, and other identifiable legal entities related to a party.

1.    Allen Harris Law, Attorneys for Plaintiff/Appellee;

2.    Barry, Richard L. Attorney for Defendants/Appellants;

3.    Butler, S. Kent, Former Defendant;

4.    Cartwright, Alexander, Defendant/Appellant;

5.    Dupras, Tosha, Defendant/Appellant;

6.    Engel, Joshua A., Attorney for Plaintiff/Appellee;

7.    Engel & Martin, LLC, Attorneys for Plaintiff/Appellee;

8.    Goldstein Law Partners, LLC, Attorneys for Plaintiff/Appellee;

9.    GrayRobinson, P.A., Attorneys for Defendants/Appellants;

10.    Harris, Samantha, Attorney for Plaintiff/Appellee;

11.    Hatcher-Bolin, Kristie, Attorney for Defendants/Appellants;

12.    Irick, Daniel C., United States Magistrate Judge, Middle District of Florida;

13.    Johnson, Michael, Defendant/Appellant;

14.   Katz, Katherine W., Attorney for Defendants/Appellants;

15.   Lauten, Jr., Frederick James, Mediator;

16.   Mendoza, Carlos E., United States District Judge, Middle District of Florida;

17.   Myers, Nancy, Defendant/Appellant;

18.   Negy, Charles, Plaintiff/Appellee;

19.   Osborne, David R., Attorney for Plaintiff/Appellee;

20.   Spradley, Susan T., Former Attorney for Defendants/Appellants;

21.   University of Central Florida Board of Trustees, Former Defendant; and

22.   Zolty, Julie M., Attorney for Defendants/Appellants.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE
DISCLOSURE .................................................................................................ii

STATEMENT IN SUPPORT OF ORAL ARGUMENT ...........................................1

JURISDICTIONAL STATEMENT ..................................................................2

STATEMENT OF ISSUES .................................................................................3

STATEMENT OF THE CASE ............................................................................4

I.    FACTUAL BACKGROUND.........................................................................5

    A.    NEGY'S TWEETS GENERATE WIDESPREAD OUTRAGE ....................5

    B.    UNIVERSITY OFFICIALS LAUNCH A COORDINATED ATTACK ON
        NEGY ...........................................................................................7

    C.    OIE LAUNCHES A PRETEXTUAL INVESTIGATION ..........................11

    D.    OIE'S INVESTIGATIVE REPORT: SHOW ME THE MAN, AND I'LL
        FIND YOU THE CRIME ................................................................15

    E.    NEGY IS IMMEDIATELY TERMINATED ........................................21

    F.    NEGY IS REINSTATED BY AN ARBITRATOR..................................22

II.   PROCEDURAL BACKGROUND ...............................................................23

SUMMARY OF ARGUMENT............................................................................25

ARGUMENT ...................................................................................................28

I.    THIS COURT LACKS JURISDICTION.......................................................28

II.   APPELLANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY.................29

    A.    STANDARD FOR QUALIFIED IMMUNITY ......................................29

    B.    APPELLANTS' ACTIONS VIOLATED NEGY'S CLEARLY
        ESTABLISHED CONSTITUTIONAL RIGHTS.........................................30

        1.    NEGY'S SPEECH INVOLVED A MATTER OF PUBLIC
            CONCERN, AND DID NOT MEANINGFULLY INTERFERE
            WITH THE PERFORMANCE OF HIS DUTIES OR WITH THE
            SCHOOL'S GENERAL OPERATIONS ...........................................31

        2.    NEGY'S PROTECTED SPEECH WAS A SUBSTANTIAL
            MOTIVATING FACTOR IN APPELLANTS' DECISION TO
            INVESTIGATE AND TERMINATE HIM.......................................31

         a.    TIMING AND COMMENTS SUPPORT THE INFERENCE THAT NEGY'S SPEECH WAS A SUBSTANTIAL MOTIVATING FACTOR ........................................................33

         b.    THE RIGGED INVESTIGATION SUPPORTS THE INFERENCE THAT NEGY'S SPEECH WAS A SUBSTANTIAL MOTIVATING FACTOR ........................................................37

    3.    THE DISTRICT COURT APPLIED THE APPROPRIATE LEVEL OF SPECIFICITY ..............................................................39

    4.    A MIXED MOTIVE ANALYSIS IS INAPPLICABLE WHERE THERE IS EVIDENCE OF PRETEXT ..........................................45

C.    MYERS WAS A DECISION-MAKER ....................................47

D.    THE DISTRICT COURT CONDUCTED THE CORRECT INDIVIDUALIZED ANALYSIS ............................................49

E.    NEGY'S FREE SPEECH RIGHTS IN THE CLASSROOM ARE CLEARLY ESTABLISHED ......................................................51

CONCLUSION ........................................................................53

CERTIFICATE OF COMPLIANCE ........................................54

CERTIFICATE OF SERVICE ..................................................54

# TABLE OF AUTHORITIES

CASES

*Adams v. Trs. of the Univ. of N.C. – Wilmington*, 640 F.3d 550 (4th Cir. 2011) .................53

*Alcocer v. Mills*, 906 F.3d 944 (11th Cir. 2018) ....................................49

*Alexandre v. Ortiz*, 789 F. App'x 169 (11th Cir. 2019) ............................50

*Anderson v. Burke Cnty.*, 239 F.3d 1216 (11th Cir. 2001) ....................................41

*Bailey v. Baldwin Cty. Bd. of Educ.*, Civ. No. 14-0305, 2016 U.S. Dist. LEXIS 1441 (S.D. Ala. Jan. 6, 2016) ....................................35

*Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963) ....................................33

*Berdin v. Duggan*, 701 F.2d 909 (11th Cir. 1983) ............................ 40, 42

*Bishop v. Aronov*, 926 F.2d 1066 (11th Cir. 1991) ....................................51

*Blash v. City of Hawkinsville*, No. 5:17-cv-00380, 2018 U.S. Dist. LEXIS 146920 (M.D. Ga. Aug. 29, 2018) ....................................46

*Brannon v. Finkelstein*, 754 F.3d 1269 (11th Cir. 2014) ....................................41

*Bryson v. City of Waycross*, 888 F.2d 1562 (11th Cir. 1989) ............................31

*Buchanan v. Alexander*, 919 F.3d 847 (5th Cir. 2019) ....................................53

*Cook v. Gwinnett Cty. School Dist.*, 414 F.3d 1313 (11th Cir. 2005) ........................... 40, 42

*Connick v. Myers*, 461 U.S. 138 (1983) ............................................ 25, 30

*Cromartie v. Cent. Ala. Food Services*, No. 2:22-CV-106, 2023 U.S. Dist. LEXIS 140318 (M.D. Ala. Aug. 11, 2023) ....................................48

*D.H. v. Clayton County Sch. Dist.*, 830 F.3d 1306 (11th Cir. 2016) ....................................29

*Demers v. Austin*, 746 F.3d 402 (9th Cir. 2014) ....................................53

*Drake v. Avent*, No. 8:18-cv-2257, 2019 U.S. Dist. LEXIS 249211 (M.D. Fl. May 3, 2019) ....................................40

*English v. City of Gainesville*, 75 F.4th 1151 (11th Cir. 2023) ..............................28

*Forsyth Cnty., Ga. v. Nationalist Movement*, 505 U.S. 123 (1992) ..........................27

*Foy v. Holston*, 94 F.3d 1528 (11th Cir. 1996) ............................................ 45, 46

*Gaines v. Wardynski*, 871 F.3d 1203 (11th Cir. 2017) ....................................41

*Garcetti v. Ceballos*, 547 U.S. 410 (2006) ............................................ 25, 30

*Gilmore v. Georgia Dept. of Corr.*, 144 F.4th 1246 (11th Cir. 2025) ............................... 30, 52

*Grutter v. Bollinger*, 539 U.S. 306 (2003) ...................................................................... 25

*Hannah P. v. Haines*, 80 F.4th 236 (4th Cir. 2023) ....................................................... 32

*Hanner v. City of E. Point,* No. 1:18-CV-01050, 2020 U.S. Dist. LEXIS
    269085 (N.D. Ga. Jan. 31, 2020) ........................................................................... 46

*Hansen v. Soldenwagner*, 19 F.3d 573 (11th Cir. 1994) ............................................... 42

*Harrington v. Wells*, No. 2:13-cv-103, 2015 U.S. Dist. LEXIS 152602 (S.D.
    Ga. Nov. 10, 2015) ................................................................................................ 46

*Hartman v. Moore*, 547 U.S. 250 (2006) ....................................................................... 40

*Heim v. Daniel,* 81 F.4th 212 (2d Cir. 2023) ................................................................. 53

*Hellwig v. Cty. of Saratoga,* No. 1:22-cv-488, 2024 U.S. Dist. LEXIS 144224
    (N.D.N.Y. Aug. 13, 2024) ..................................................................................... 44

*Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252 (11th Cir. 2004) .................... 42

*Howe v. Magellan Health Servs.*, No. 11-2006, 2016 U.S. Dist. LEXIS 72704
    (D. N.J. May 31, 2016) .......................................................................................... 37

*Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286 (11th Cir. 2006) ........... 33

*In re Debs*, 158 U.S. 564 (1895) ................................................................................... 27

*Jackson v. Humphrey*, 776 F.3d 1232 (11th Cir. 2015) ................................................ 46

*Jenkins v. Talladega City Bd. of Educ.*, 115 F.3d 821 (11th Cir. 1997) ....................... 30

*Johnson v. City of Ft. Lauderdale*, 126 F.3d 1372 (11th Cir.1997) ............................. 47

*Keyishian v. Bd. of Regents*, 385 U.S. 589 (1967) ......................................................... 51

*Labriola v. Miami-Dade Cnty.*, 142 F.4th 1305 (11th Cir. 2025) ................................ 43

*Liberty Cty. Officers Ass'n v. Stewart*, 903 F. Supp. 1046 (E.D. Tex. 1995) ............... 44

*Maggio v. Sipple*, 211 F.3d 1346 (11th Cir. 2000) ....................................................... 41

*Meriwether v. Hartop*, 992 F.3d 492 (6th Cir. 2021) .................................................... 52

*Mitchell v. Forsyth*, 472 U.S. 511 (1985) ..................................................................... 28

*Mitchell v. Hillsborough Cty.*, 468 F.3d 1276 (11th Cir. 2006) .................................... 43

*Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739 (11th Cir. 1996) ............................... 35

*Moss v. City of Pembroke Pines*, 782 F.3d 613 (11th Cir. 2015) .................................. 34

*Norris v. Williams*, 776 F. App'x 619 (11th Cir. 2019) ................................................ 49

*NRA of Am. v. Vullo*, 602 U.S. 175 (2024)........................................................33

*Pattee v. Ga. Ports Auth.*, 477 F. Supp. 2d 1253 (S.D. Ga. 2006).........................46

*Pernell v. Fla. Bd. of Governors of the State Univ. Sys.,* 641 F. Supp. 3d 1218 (N.D. Fla. 2022) ................................................................................................52

*Pickering v. Board of Education*, 391 U.S. 563 (1968)......................................*passim*

*Polion v. City of Greensboro*, 614 F. Appx. 396 (11th Cir. 2015) ..........................34

*Rankin v. McPherson*, 483 U.S. 378 (1987) ...................................................... 40, 43

*Roberts v. Spielman*, 643 F.3d 899 (11th Cir. 2011) ...........................................29

*Scallet v. Rosenblum*, 911 F. Supp. 999 (W.D. Va. 1996) ....................................52

*Shelton v. Tucker*, 364 U.S. 479 (1960).............................................................27

*Sherrod v. Johnson*, 667 F.3d 1359 (11th Cir. 2012) ......................................... 32, 46

*Speech First v. Cartwright*, 32 F.4th 1110 (11th Cir. 2022) .................................15

*Stanley v. City of Dalton*, 219 F.3d 1280 (11th Cir. 2000) ...................................35

*Stanley v. City of Dalton, Ga.*, 219 F.3d 1280 (11th Cir. 2000) .............................47

*Staub v. Proctor Hosp.*, 562 U.S. 411 (2011)......................................................34

*Stewart v. Baldwin Cnty. Bd. of Educ.*, 809 F.2d 1499 (11th Cir 2000) .................39

*Stimpson v. City of Tuscaloosa*, 186 F.3d 1328 (11th Cir. 1999)............................48

*Swain v. Town of Wappinger*, No. 17-cv-5420, 2019 U.S. Dist. LEXIS 114640 (S.D.N.Y. July 9, 2019) ....................................................................................44

*Tindal v. Montgomery Cnty. Comm'n*, 32 F.3d 1535 (11th Cir. 1994) ...................44

*Torres v. Gonzalez*, 71 F. Supp. 2d 14 (D.P.R. 1999) ..........................................45

*Travers v. Jones*, 323 F.3d 1294 (11th Cir. 2003) ...............................................43

*United States Postal Serv. Bd. of Governors v. Aikens,* 460 U.S. 711 (1983)............32

*United States v. Eicher*, Crim. No. 22-38, 2023 U.S. Dist. LEXIS 90103 (D.D.C. May 23, 2023)......................................................................................37

*United States v. North*, 910 F.2d 843 (D.C Cir. 1990)..........................................37

*Wade v. United States*, 13 F.4th 1217 (11th Cir. 2021) ........................................29

*Ward v. Members of the Bd. of Control of E. Michigan Univ.*, 700 F.Supp.2d 803 (E.D. Mich. 2010) .............................................................................................44

*Wyman v. City of Dalla*s, No. 3:02-CV-2496, 2004 U.S. Dist. LEXIS 18892
(N.D. Tex. Sept. 21, 2004) ................................................................44

*Zaklama v. Mt. Sinai Med. Ctr.*, 842 F.2d 291 (11th Cir. 1988) ........................................48

## STATUTES AND OTHER AUTHORITIES

Neil Gorsuch, *Over Ruled* (2024) ........................................................................19

Michael A. Olivas, *Reflections on Professorial Academic Freedom: Second Thoughts on the Third "Essential Freedom,"* 45 Stan. L. Rev. 1835 (1993) ......................................52

28 U.S.C. § 1343 ..............................................................................................2

28 U.S.C. § 1331 ..............................................................................................2

42 U.S.C. § 1983 ........................................................................................ 2, 23

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

Appellee respectfully suggests that the Court would benefit from hearing oral argument in this matter.  Appellee believes oral argument will assist the Court in its analysis of the disputed issues presented on appeal and will enable counsel to address any questions the Court may have.

## JURISDICTIONAL STATEMENT

This case arose, in part, under the laws of the United States, specifically the free speech and due process guarantees of the United States Constitution, and 42 U.S.C. § 1983. Accordingly, the District Court had jurisdiction in this matter pursuant to 28 U.S.C. §§ 1331 and 1343.

This is an interlocutory appeal from a decision of a district court of the United States denying a motion for a summary judgment on grounds of qualified immunity. As set forth in Appellee's Response to Jurisdictional Question, Appellee's Position is that this Court lacks jurisdiction over this interlocutory appeal of denial of qualified immunity because the only issues appealed are evidentiary sufficiency issues. (App. Doc.18.)

## STATEMENT OF ISSUES

Whether the District Court properly concluded that summary judgment based on qualified immunity was not available where there are disputed issues of material fact about whether a university professor's protected speech on matters of public concern was a substantial motivating factor in university administrators' decision to investigate and terminate the professor.

## STATEMENT OF THE CASE

Plaintiff-Appellee Charles Negy is an Associate Professor of Psychology at the University of Central Florida.  Negy has taught at UCF since August 1998 and received tenure in 2001.[1]

This case involves a claim that university administrators sought to punish Negy for expressing controversial viewpoints about matters of public concern on Twitter/X. The District Court held that qualified immunity was not available because a reasonable official should have known that terminating a government employee based on these Twitter posts violated the First Amendment.  The District Court said:

> A reasonable jury… could find that Defendants' motives were entirely unlawful. … [T]here is evidence showing they were motivated by their distaste for Plaintiff and his views along with public pressure. But in the words of Noam Chomsky: "If we don't believe in freedom of expression for people we despise, we don't believe in it at all."

(Order, R.100, PageID#7966.)[2]

---

[1] In May 2019, Negy was offered a faculty position at another institution; he received a raise to instead remain at UCF. (Exhibit, Doc.87-1, PageID#7431.) When asked why he wanted to retain Negy, one of the Appellants testified that he understood him to be a "good faculty member who successfully taught controversial subjects." (Johnson Dep., Doc.68, PageID#3028.)

[2] The District Court recognized a fundamental truth: the First Amendment is not concerned with whether speech is conservative, moderate, liberal, progressive, or somewhere in between. What matters is that Americans, despite their views, will not be censored or suppressed by the Government.  Negy was attacked for expressing conservative ideas, but times and the prevailing political winds change.

## I.    FACTUAL BACKGROUND

### A.    NEGY'S TWEETS GENERATE WIDESPREAD OUTRAGE

In March 2019, Negy joined the social media platform X, then known as Twitter, where he began regularly expressing controversial views.  In early 2020, however, America became engulfed in racial tension following the high-profile deaths of George Floyd, Breonna Taylor, and Ahmaud Arbery. As part of this nationwide racial reckoning, UCF administrators expressed support for "anti-racism." On May 29, 2020, for example, former Defendant Kent Butler, then UCF's Interim Chief Equity, Inclusion and Diversity Officer, sent a university-wide email entitled "Now Is Our Time to be Actively Anti-Racist." (Butler Dep. Ex. 2, Doc.63, PageID#1085.) On June 2, 2020, Appellant Alexander Cartwright, UCF's president, issued a similar statement making "a commitment from our university to not merely celebrate our diversity, but to be actively anti-racist." (Cartwright Dep. Ex. 2, Doc.64, PageID#1276.)  Cartwright's message emphasized that education and reflection on these issues was insufficient, and that they "must be paired with action and a commitment to stand against racism in all its forms." (*Id.*) On June 3, 2020, Appellant Tosha Dupras, then the Interim Dean of the College of Sciences, sent a message to all faculty, staff, and students in the College of Sciences decrying the "embedded systemic and institutional racism found throughout our nation." (Dupras Dep. Ex. 2, Doc.66, PageID#2541-42.) Dupras wrote that "by the virtue of my skin color, I recognize my role as one of power and privilege," and committed to using her power and privilege to "condemn hatred in any form." (*Id.*)

5

She concluded her message by encouraging students to report any "social or racial bias" to the administration. (*Id.*)

At the same time, Negy was tweeting about his personal views on race in America. On May 29, 2020, Negy tweeted a link to a *New York Times* article entitled "The State is Failing Black People" and wrote "Yeah, it's not like Black people have any agency of their own, to stay in school, be the best student, abstain from crime, gangs, unwanted pregnancies, etc. It's all the 'state's fault.'" (Johnson Dep. Ex. 7, Doc.68, PageID#3301.) On June 3, he tweeted: "Black privilege is real. Besides affirm. action, special scholarships and other set asides, being shielded from legitimate criticism is a privilege. But as a group, they're missing out on much needed feedback." (Johnson Dep. Ex. 6, Doc.68, PageID#3300.)

These tweets garnered significant attention that exploded into full-blown outrage by students, alumni, members of the public, and the media. On June 4, 2020, UCF's Assistant Vice President for Board Relations, Karen Monteleone, wrote UCF's Board of Trustees to say the following:

> A UCF professor's personal Twitter posts have gone viral and have received significant media attention. Overnight, there have been thousands of posts on social media and hundreds of individuals have emailed university offices, including more than 175 submissions to the Board of Trustees account.

(Email, Doc.87-2, PageID#7432.)[3] The hashtag #UCFFireHim quickly began trending on Twitter. (Am. Complaint, Doc.26, PageID#121; Butler Dep., Doc.63, PageID#968-969.)  A Change.org petition called on UCF "to dismiss psychology professor Charles Negy due to abhorrent racist comments he has made and continues to make on his personal Twitter account." (Petition, Doc.70, PageID#5376-5381.)

## B.  UNIVERSITY OFFICIALS LAUNCH A COORDINATED ATTACK ON NEGY

University officials rushed to publicly condemn Negy's tweets and, importantly for this case, promised a response. On June 4, 2020, Dupras emailed the entire College of Sciences in response to the "many emails expressing concern and outrage regarding the Twitter content belonging to Dr. Charles Negy." (Email, Doc.66, PageID#2539-40.)  She assured the community that "UCF leadership is aware of these tweets and are actively working to address this situation. I cannot speak to next steps until they are finalized, but I'm reaching out to let you know that the administration is moving foward [sic]." (*Id.*)  She encouraged the community to "speak up" and shared anonymous reporting resources. (*Id.*) While an earlier draft of Dupras' message stated that UCF was "being mindful of the First Amendment" when reviewing the situation, Dupras

---

[3] Many of these emails used identical language to demand an investigation and termination of Negy, suggesting that "As a University that prides itself on its diversity and inclusion, we can no longer stand idly by while Professor Negy continues to make abhorrent racist remarks."  (Exhibit, Doc.87-3, PageID#7433-34.)

ultimately decided to remove that language from her final statement. (Dupras Dep., Doc.66, PageID#2398.) UCF administrators knew they could not, consistent with the First Amendment, act against Negy because of his tweets. But there is no question they disapproved of his statements, were fearful of student anger, and were determined to act. They sought to circumvent their constitutional obligations using students who, given only a hint, correctly perceived that UCF's cause could be aided by the submission of complaints — no matter how old and unreliable — about Negy's classroom conduct. To that end, on June 4, 2020, Butler, Cartwright and Johnson posted a statement to the UCF website entitled "Addressing Intolerance in our Community." (Email, Doc.64, PageID#1278-79.) Appellants stated they were "disgusted" by Negy's "racist posts" and then made clear — wink wink — that while Negy had the right to his "personal beliefs" outside of the classroom, his classroom behavior could be actionable. The post instructed students on how to report "abusive or discriminatory" behavior by a faculty member, even anonymously. The email states:

> Everyone has the right to their personal beliefs, but no university employee may mistreat or discriminate against students in their classes or in any other setting. No student should fear they will be treated differently because of others' personal biases.

> We have been receiving complaints alleging bias and unfair treatment in Dr. Negy's classroom and have launched an inquiry to gather more information.

> If any student, current or former, believes they may have experienced abusive or discriminatory behavior by any faculty or staff member, we want to know about it. UCF takes every report seriously.

(Email, Doc.64, PageID#1278-79.)[4]

Individuals and groups wishing to see Negy fired for his tweets quickly seized on this invitation. Myers' Office of Institutional Equity (OIE) began to receive "reports from multiple sources alleging that Negy had subjected students to discriminatory harassment in the classroom." (Report, Doc.66, PageID#2819.) Some of these allegations dated back as far as 2005. (*Id.,* PageID#2624.) A recent UCF graduate and her roommate created a Google Form, with the UCF logo emblazoned across the top, inviting people to report Negy for — just like Cartwright and Johnson said — "abusive or discriminatory behavior."[5] (Form, Doc.70, PageID#3991-93.) In a July 16, 2020 Facebook post, one of the two women explained: "Hey! My roommate & I have been working on trying to get an openly racist, xenophobic, bigoted Professor at our

---

[4] While the email suggests that UCF had "been receiving complaints alleging bias and unfair treatment in Dr. Negy's classroom," the record does not reflect that these complaints were received before June 4, 2020. The Report states that reports about classroom conduct were received "From June 4, 2020 through August 2020." (Report, Doc.66, PageID#2619.) Cartwright testified that the school "started getting complaints about behavior within the classroom" on this date. (Cartwright Depo., Doc.64, PageID#1168.) This is unsurprising, since Negy had won several teaching awards at UCF and, in the five years preceding his termination, received an overall rating of "outstanding" on his annual evaluations. (Report, Doc. 66, PageID#2634.)

[5] An OIE staffer expressed concern to the two women on June 12, 2020, that the logo made "it feel that your form is an official reporting mechanism for the University when in fact it is not" (Myers Dep., Doc.70, PageID#3994-95), However, neither Myers nor Johnson ever insisted the women stop using it. (Myers Dep., Doc.70, PageID#3789; Johnson Dep., Doc.68, PageID#3169-70.) In fact, the "Student Google Form," with the UCF logo at the top, is still available online as of November 2025. https://docs.google.com/forms/d/e/1FAIpQLSfEWEzVRR7RgSlgTyYZYlqBuirG CXnQ_-Mx9JfegBAtVzy-Sg/viewform

University fired for the past 2 months. If you look at the twitter thread I attached, you'll see why." (Post, Doc.70, PageID#5384.)

Cartwright, Dupras, and Johnson continued to insinuate that Negy's firing was just a matter of time.  At a Virtual Student Forum on June 4, 2020, Cartwright gave opening remarks in which he stated that while the original purpose of the forum had been to discuss UCF's response to the pandemic, they would instead be discussing "the offensive and hurtful Twitter posts that Professor Charles Negy has shared on his personal page." (Cartwright Dep., Doc.80, USB Drive.)  He told students:

> I understand the anger it has caused many of our students, staff, and faculty. I promise you, this is a matter that has our full attention, and we have launched an inquiry to quickly, but fully, evaluate this situation.

(*Id.*)  Addressing the Negy situation at a Virtual Forum on Race and Unity on June 5, 2020, Cartwright told students that "we are going to do everything we can, we will continue to push forward," but that "sometimes we have to go through a process, as frustrating as that process is to me." (*Id.*)

A video statement on UCF's official Twitter feed stated, "We're trying to do the right thing.  Sometimes that takes change and takes time… The #UCFFirehim I understand all of that but the fact of the matter is it's not going to happen overnight."[6]

---

[6] In contrast, UCF officials ignored the very real threat to Negy's safety that the controversy over his tweets generated. (Negy Dep., Doc.72, PageID#6163.)  Negy reached out to Cartwright and Johnson to say that UCF police had advised him that protestors were planning to come to his home that day and that he needed to be "on guard for [his] safety." Negy expressed concern that UCF's public vilification of him had contributed to the risk, and asked Cartwright to send out a "message that violence

(Doc.26 at ¶32, Doc.42 at ¶32.) Dupras received an email from a UCF professor stating that "Any faculty, tenured or not, that promotes this hate rhetoric and allows it to spill into the classroom ought not be part of our university community," and asked that "that students (and faculty and staff) are protected moving forward by his removal from the classroom." (Dupras Dep., Doc.66, PageID#2549-50.)   In response, Dupras assured the professor that "I agree with the thoughts you have expressed in your email," and that the UCF administration was "presently working to address this situation as you have asked in your message." (*Id.*)

## C.    OIE LAUNCHES A PRETEXTUAL INVESTIGATION

The same day (June 4, 2020) that "Addressing Intolerance in our Community" was posted to the UCF website, OIE began the process that concluded with Negy's termination more than 7 months later.   (Dupras Dep., Doc.66, PageID#2819.)   OIE initially referred to the process as an "inquiry," which allowed it to defer providing notice to Negy (notice is not required until an "investigation" begins.)   Although Myers testified that the purpose of an "inquiry" is to gather enough information "to determine whether we're going to move into the investigation phase" (Myers Dep., Doc.70, PageID#3779), the reality is that during the "inquiry" phase, OIE interviewed more than 115 individuals and reached out to more than 300 others. (Report, Doc.66,

---

AND going to protest at people's private homes are unacceptable." (Cartwright Dep., Doc.64, PageID#1302.) Cartwright sent no such message, and neither he nor Johnson even responded to Negy's email. (Cartwright Dep., Doc.64, PageID#1231; Johnson Dep., Doc.68, PageID#3142.)

PageID#2819-2843.)[7]  OIE even reached out to Negy's former students and TAs to solicit information on "their experiences in [Negy's] classroom."  (Report, Doc.66, PageID#2819.)

Myers collected complaints from the Student Google Form and referenced them in her report:

> On June 9, 2020, two witnesses created a Google form called "Report UCF Professor [Respondent]" and this form was published in a Knight News article and on Twitter… These witnesses, in turn, agreed to relay the information provided by others to OIE. These witnesses provided two lists based upon responses they received – a list of anonymous (unnamed by request) reports and a list of named individuals with concerns.

(Report, Doc.66, PageID#2629.) The Student Google Form is referenced 33 times in Myers' report; the report repeatedly cites allegations against Negy that came in via anonymous submissions. (*Id.*) While OIE was able to independently contact some of the individuals who submitted complaints via the Student Google Form, Myers also accepted 9 pages of anonymous complaints. (Myers Dep., Doc.70, PageID#4241-49.) Myers testified that she simply accepted these anonymous complaints at face value:

> Q: Sure. So looking at the subject line, these are anonymous complaints submitted by these two students, correct?
>
> A: Correct.
>
> Q: Okay. And taking a look at these – just kind of taking a look at these complaints, what steps did your office take to ensure that these complaints were unaltered by these two students?

---

[7] Ultimately, of the 112 witness statements collected by OIE during its investigation, 89 percent of them (100 statements) were collected during this supposed "inquiry" phase.

A: We did not do further steps in terms of assessing the authenticity to compare. We used the information they provided to us.

Q: Okay. So theoretically, they [the students who set up the form] could have written all of these complaints themselves, right?

A: Theoretically, sure.

(Myers Dep., Doc.70, PageID#3793-94.)

On July 17, 2020, after OIE had conducted nearly 90% of its interviews, Myers finally notified Negy that he was under investigation. (Letter, Doc.70, PageID#5217-20.) This notice, however, included only a handful of the hundreds of allegations that Myers was investigating — even though applicable UCF policy clearly stated that "Respondents will be informed of the allegations against them." (Myers Dep. Ex. 8, Doc.70, PageID#5211-16.) Myers acknowledged that this notice needed to be given before a Respondent is interviewed by OIE, but claimed that even though the policy *said,* "the allegations," it really *meant* "the nature of the allegations." (Myers Dep., Doc.70, PageID#3805, 3809.)

Negy asked Myers for additional information to help him prepare for his upcoming interview. He wrote:

Preparing a response involves reviewing lecture notes, videos (to the extent any of the allegations involve lectures I gave over Zoom last semester, many of which were recorded), and identifying witnesses, to the extent you provide me with enough information to do so. I should not be required to defend myself in the blind. If you are not willing to give me this information, please explain how I am expected to defend myself against these allegations, some of which apparently date back 15 years?

(Email, Doc.70, PageID#5228-30.)  Myers responded that "OIE will not be providing additional details about the allegations nor its assessment of the evidence prior to your interview." (*Id.*)  This impacted Negy's ability to prepare for his investigative interview: "I wanted to see all the allegations so I could prepare for them for the interview and she said no, you're not getting them."  (Negy Dep., Doc.72, PageID#6163.)

On August 7 and 14, 2020, Myers interrogated Negy for a total of nearly 9 hours. (Negy Dep., Doc.72, PageID#6094.)  This was not a good-faith investigation into allegations of harassment, but rather a fishing expedition undertaken in an effort to find some basis to discipline Negy other than his constitutionally protected expression on Twitter. [8]  She barraged him with a litany of accusations spanning 15 years. Most of these allegations were simply objections to Negy's course content and pedagogy, and many were repetitive.  She also asked him about a variety of allegations unrelated to the original charge of discriminatory harassment.

---

[8] When Negy's memory proved inaccurate and conflicted with recordings that Myers had, but did not share, she added a charge of "Providing False Information During a University Investigation."  These violations were picayune.  Example: Negy denied the absurd allegation that he said Blacks do not have cerebral cortices, telling Myers that he never mentioned cerebral cortices during his lectures. While she found no evidence in support of the allegation at issue, Myers found a recorded lecture in which Negy mentioned cerebral cortices generally, and cited this as evidence that he had provided false information. (Report, Doc.66, PageID#2737, 2807; Myers Dep., Doc.70, PageID#3912.)

### D.     OIE'S INVESTIGATIVE REPORT: SHOW ME THE MAN, AND I'LL FIND YOU THE CRIME

On January 13, 2021, Myers issued her investigative report. (Report, Doc.66, PageID#2618.) Myers concluded that Negy had engaged in discriminatory harassment in the classroom, as well as numerous other offenses that were not part of the original set of allegations. (*Id.*)

In finding Negy responsible for discriminatory harassment, Myers manipulated the definition of harassment, applying her own standard that was supported neither by law nor university policy. Specifically, she took isolated comments made in many different classes over a period of many years and aggregated them to conclude that they rose to the level of pervasiveness necessary to create a hostile environment in violation of UCF policy at the time.[9]  She never found that he harassed an identifiable person or group of people in a particular year, semester, or class. Rather, she found pervasiveness because there were "allegations of conduct over the course of many semesters and many courses." (Myers Dep., Doc.70, PageID#3847.) To conclude that Negy engaged in discriminatory harassment based on gender identity, for example, Myers cited

---

[9] This Court in *Speech First v. Cartwright*, 32 F.4th 1110, 1128 (11th Cir. 2022), found the discriminatory harassment policy in place at the time of Negy's case unconstitutionally restricted student speech, observing: "Nowhere is free speech more important than in our leading institutions of higher learning."

comments "made sporadically during courses in 2005-2006, 2014, 2015, 2018, 2019 and 2020." (Report, Doc.66, PageID#2801.)[10]

Myers applied a different standard to Negy than to other faculty she investigated. Myers claimed she spoke with unidentified people who said they dropped Negy's course or "expressed difficulty enduring the course." (Report, Doc.66, PageID#2800.) But in other discriminatory harassment cases investigated by Myers' OIE, she found that equally or more serious educational consequences to an identifiable victim did not rise to the level of a hostile environment. (Reports, Doc.70, PageID#5270-5297, 5324-5340.) Myers also identified certain comments as examples of discriminatory harassment even when the recipient of the comment did not report experiencing *any* subjective offense.[11]

Perhaps the most extreme example of Myers' overreach was her effort to find Negy responsible for a policy violation requiring faculty to "observe and uphold the

---

[10] UCF policy at the time defined prohibited discriminatory harassment as conduct "so severe or pervasive that it unreasonably interferes with, limits, deprives, or alters the terms or conditions of education (e.g., admission, academic standing, grades, assignment) … or participation in a university program or activity (e.g., campus housing.)" (Policy, Doc.70, PageID#5233-61.)

[11] Myers concluded it was harassment that Negy allegedly joked with a male graduate teaching assistant that the GTA "should be compensated with sexual favors by a female GTA when the male GTA covered her exam proctoring tasks." (Report, Doc.66, PageID#2800.) In his interview, however, this GTA did not even state that he was offended by the joke, let alone suggest that it in any way interfered with, limited, altered, or deprived him of educational opportunities or benefits. (Statement, Doc.70, PageID#5266-69.)

ethical standards of their disciplines in the pursuit and communication of scientific and scholarly knowledge" based on an anecdote he shared in his book, *White Shaming*, about paying a Peruvian airport worker $17 for a yellow fever vaccination certificate in 2011.[12] (Report, Doc.66, PageID#2808.)  When asked how Negy's conduct related to scientific and scholarly knowledge, Myers admitted: "I can't connect it to the scientific scholarly knowledge piece." (Myers Dep., Doc.70, PageID#3929.)

There were also multiple issues with the credibility of witness statements in Myers' investigation and with the way in which Myers performed credibility assessments concerning disputed allegations. All these irregularities disfavored Negy. First, because Negy vigorously denied ever making many of the statements reported by students and others, Myers imputed to Negy a motive to lie to "protect his status as a tenured professor, and his reputation"— a motive that she never imputed to any other professor

---

[12] Negy explained:

> The funniest, if it weren't so serious, thing that [Myers] obsessed on and even put — I think it's listed as one of the reasons I was fired was because I bribed a healthcare worker. That happened nine years earlier. I'm in South America. I'm on vacation. No one from UCF knew anything about that, except they read it in my book and she doesn't know the details about it. It was a case of an extortion where you end up having to give someone money or else you're not going to get to do what you're entitled to do, and yet — you know, no one complained. No student complained… Again, she read it in a book and she's trying to fish to get information about that to justify firing me in the end.

(Negy Dep., Doc.72, PageID#6095-6096.)

she had previously investigated.[13] (Report, Doc.66, PageID#2671)  Myers, relatedly, stated that she found Negy had a motive to lie because he was "interested in the outcome of the investigation." (Myers Dep., Doc.70, PageID#3798.) Yet she failed to apply the same analysis to a student who was agitating on social media for Negy's firing and who solicited complaints against Negy, even though she believed the student was also "very interested in what the outcome of this investigation was going to be." (*Id.* at PageID#3797-3799.)

Second, the "witness statements" OIE collected were not actual interview recordings or transcripts, but rather were summaries written by OIE investigators. (*Id.* at PageID#3820.) Witnesses were given an opportunity to review and sign their summaries to confirm their accuracy, but the majority did not (only 51 of the 112 summaries were signed). (Report, Doc.66, PageID#2819-2843.)  More than 20 percent of the witnesses who reviewed their statements provided corrections or clarifications prior to signing, yet *unsigned* summaries were simply "adopted into the record" and given the same weight as signed summaries. (*Id.*; Myers Dep., Doc.70, PageID#3822.)

Third, Myers' report ignored glaring credibility issues in critical witness statements. One reason Negy was disciplined was because, in 2014, Negy allegedly failed

---

[13] Myers produced seven other investigative reports into UCF faculty conducted during her time as OIE head. Unlike the Negy report, none of these seven reports found that the faculty respondents had an inherent motive to lie protect their job or reputation. (Reports, Doc.70, PageID#5270, 5345, 5324; Doc.87-5, PageID#7445; Doc.87-6, PageID#7464; Doc.87-7, PageID#7486; Doc.87-8, PageID#7676.)

to properly report that one of his students allegedly reported unwanted sexual touching by one of his TAs. (Report, Doc.66, PageID#2816.) Negy vigorously disputed this charge.[14] Myers credited the former student's account of events over Negy's, failing to consider critical information undermining the former student's credibility.[15] Moreover, none of the other UCF employees who were aware of the allegations but took no action were ever disciplined. (Myers Dep., Doc.70, PageID#3889.)

Myers' "show me the man, and I'll find you the crime"[16] investigation found Negy responsible for a host of other alleged misdeeds of which he was never given notice. She found him responsible for "Providing False Information During a

---

[14] According to Negy, two students shared with him that they had been at an off-campus gathering with one of his TAs, who spoke to them in a way that made them uncomfortable. He asked the students if the TA had touched them, and they said he had not. He told the students that they could sit at the front of the lecture hall for the test that day, and that he would send the TA to the back of the lecture hall to monitor for cheating. (Report, Doc.66, PageID#2772.)

[15] During her OIE interview, the former student complained that the TA's unwanted touching had ruined her undergraduate career at UCF and left her with $30,000 in debt. At the end of her interview, she asked OIE's investigator whether UCF could do anything to "help [her] with respect to [her] outstanding debt." (Statement, Doc.70, PageID#5342-44.) Myers' report made no mention of the witness' financial ask, nor of her questionable allegations against a multitude of other UCF officials, when evaluating her credibility. (Report, Doc.66, PageID#2771-2772.)

[16] This expression is usually applied to efforts by authoritarian regimes to uncover any infraction a political enemy might possibly have committed over a lifetime in order to justify prosecution. The saying is commonly attributed to the Stalinist-era secret police chief Lavrentiy Beria; however, documentary evidence for attribution is scarce. *Cf.* Neil Gorsuch, *Over Ruled* at 17 (2024) ("It's… hard not to wonder how far we have left to travel to a world described by Lavrentiy Beria, the chief of Joseph Stalin's secret police, who was reputed to have bragged, 'Show me the man and I'll show you the crime.'").

University Investigation" solely because "OIE identified instances wherein the documentary or audio evidence clearly conflicted with what the Respondent had represented to OIE." (Report, Doc.66, PageID#2807.) These "instances" were a handful of things that Negy got wrong when attempting to recall 15 years' worth of classroom teaching on the spot without having been provided any information about most of the allegations. (*Id.*) Negy explained:

> Q. And are you aware, as you sit here today, that there are recordings made of your classroom conduct that refuted your statements made during the two interview sessions with Dr. Myers?
>
> A. If I thought I had not said a comment, because these were asking me about years in the past, I made the mistake of saying I don't think I ever said that and yet she had a recording and she had it sitting in her hands during the investigative interview and she wouldn't share with me.

(Negy Dep., Doc.72, PageID#3825.)    Myers also found that Negy had provided "misinformation" to his classes in violation of the Code of Conduct. She reached this conclusion by doing her own independent research and then making a subjective determination that her interpretation of the facts was more accurate than Negy's.[17]

---

[17] In Summer 2019, Negy told one of his classes that "I used to be able to say that female circumcision is illegal in the United States, but now it is legal." (Report, Doc.66, PageID#2807.) Negy's statement was about the fact that in 2018, a federal judge struck down the Female Genital Mutilation Act as unconstitutional.  Myers did her own research, however, and concluded that Negy's statement was "not an accurate representation of the law" and thus violated UCF's conduct code because "female circumcision is illegal in 39 of the 50 states." (*Id.*)

### E.    NEGY IS IMMEDIATELY TERMINATED

Myers issued her final investigative report on January 13, 2021.  The decision to terminate Negy was made at a group meeting in which Dupras, Johnson, and Myers all participated. (Johnson Dep., Doc.68, PageID#3213.)[18]  The termination decision was made in a "consultative" and "collective" way; all participants in the meeting "discussed it and came to a conclusion without objections from members of the group that this was the path to go down." (*Id.* at PageID#3146.)

Dupras sent Negy a Notice of Intent to Terminate on January 13, 2021. The letter notified him that he was being terminated "at the close of business on Monday, January 25, 2021, for misconduct." (Letter, Doc.66, PageID#2580-83.) Negy's Collective Bargaining Agreement ordinarily provided for tenured faculty to receive 6 months' notice of termination.  Dupras testified that the group of people who decided to terminate Negy also "agreed collectively to make the decision not to give six months." (Dupras Dep., Doc.66, PageID#2476.)  Dupras directed Negy to return any UCF property in his possession within two days or it "will be considered stolen," and informed him that before coming to campus to return said property, he would need to make prior arrangements to have an "escort" while on campus. (Dupras Dep. Ex. 19, Doc.66, PageID#2580-83.) When Negy arrived to clear out his office in the Psychology

---

[18] There is some confusion about whether Cartwright attended that meeting. Dupras testified that he did, others testified that he did not. (Dupras Dep., Doc.66, PageID#2476; Johnson Dep., Doc.68, PageID#3146.)

Department building, he was accompanied by a police escort who stood outside his office door, watching him pack his boxes. (Negy Dep., Doc.72, PageID#6171.)

### F.    NEGY IS REINSTATED BY AN ARBITRATOR

Negy grieved his termination through his union and the case went to arbitration in March 2022.  On May 16, 2022, the arbitrator awarded Negy "full reinstatement, with tenure, and with all compensation and benefits fully restored to that effect as of the termination date." (Decision, Doc.87-10, PageID#7697-7707.)  Specifically, the arbitrator determined that UCF had not been justified in overriding the 6-month notice requirement of the CBA by deeming Negy a "safety risk." (*Id.* at 7706.) He found that Negy had received "consistently outstanding annual evaluations" for the past two decades, until his tweets led to a "campaign by UCF" to gather potentially damaging information about his classroom behavior. (*Id.* at 7705.) Because the arbitrator concluded that UCF had violated the CBA by denying Negy the 6 months' notice, he did not reach the second question of whether Negy was responsible for the misconduct of which UCF accused him. He noted, however, that Negy's case raised free-speech issues. (*Id.* at 7704.)

## II.    PROCEDURAL BACKGROUND

Negy asserted claims under 42 U.S.C. § 1983 against the Individual Defendants (Butler, Cartwright, Johnson, Dupras, and Myers) and the UCF Board of Trustees. (Amended Complaint, Doc. 26.)  The District Court dismissed Negy's official-capacity claims against the Board, holding he did not have standing to pursue injunctive relief. (Order, Doc. 38.)  The District Court also held that Negy could not pursue a free speech claim based on alleged statements made in the classroom.  (Order, Doc. 38 at PageID#253.)    However, the District Court allowed Negy's First Amendment retaliation claims against the Individual Defendants to proceed, holding that a reasonable official would know that terminating a public employee based on controversial Twitter posts violated the First Amendment. (Order, Doc.38 at PageID#260.)

Following discovery, the Individual Defendants moved for summary judgment. Doc.59, Doc.60, Doc.61.)  The District Court granted Butler's motion, denied the motions from Cartwright, Dupras, and Johnson, and granted in part and denied in part the motion by Myers.  The District Court explained:

> Defendants maintain the evidence establishes they were solely motivated by lawful concerns regarding in-classroom harassment because the Investigative Report upon which they based the decision to fire Plaintiff specifically found the Twitter posts "were protected by the First Amendment and could not be the basis for a finding of misconduct or disciplinary action." (Doc.70 at 267–68.) But Plaintiff has created an issue of fact as to whether Defendants' investigation was rigged from the start.

(Order, Doc.100, PageID#7966.)[19]

Defendants subsequently filed a notice of appeal.

---

[19] The District Court found that Myers was entitled to qualified immunity on claims related to Negy's in-class speech.  The court said,

> Myers was not entitled to qualified immunity in Count I because the retaliation claim alleges Plaintiff was terminated after a pretextual investigation based on his tweets. But in Count II the free speech claim is about her findings that his in-class comments violated UCF policy. That distinction makes all the difference.

(Order, Doc. 100, PageID#7969.)

## SUMMARY OF ARGUMENT

"[A] public employee does not relinquish First Amendment rights to comment on matters of public interest by virtue of government employment." *Connick v. Myers*, 461 U.S. 138, 140 (1983); *See also Garcetti v. Ceballos*, 547 U.S. 410 (2006); *Pickering v. Board of Education*, 391 U.S. 563 (1968). Nowhere is this truer than on the public university campus; the Supreme Court has emphasized "that given the important purpose of public education and the expansive freedoms of speech and thought associated with the university environment, universities occupy a special niche in our constitutional tradition." *Grutter v. Bollinger*, 539 U.S. 306, 329 (2003) (listing cases).

Appellants argue they are entitled to qualified immunity because they assert they were motivated by lawful concerns regarding in-classroom harassment based on the findings in Myers' Report. The District Court correctly rejected this argument, concluding that there are genuine disputes of material fact about whether, despite Appellants' claims that they were motivated by lawful concerns, they were motivated in substantial part by his protected speech and would not have made the same decision in the absence of his protected speech. The District Court correctly concluded that Negy has a clearly established right to express his views on matters of public concern via his personal Twitter account, and that no reasonable official in Appellants' positions would have believed it was lawful to discharge Negy for his tweets. (Order, R.100.)

Unlike many of the cases Appellants cite to argue for qualified immunity, this is not a case in which a state official facing a split-second decision made a bad call. Instead,

this was a coldly calculated effort — which unfolded over the better part of a year — to rid UCF of a professor whose tweets led an online mob to exert massive pressure on the university to fire him. Cartwright, Dupras, and Johnson publicly solicited people to come forward with complaints against Negy the day after #UCFFireHim began trending on Twitter.[20] Their contemporaneous statements about being "frustrated" by having to go through a process to fire Negy, and agreeing with those calling for his termination, provide powerful circumstantial evidence of their true motivations. Myers, for her part, 'understood the brief' when she opened an investigation into Negy. She: solicited information from former students; accepted anonymous complaints gathered by individuals campaigning online for his firing; manipulated the definition of harassment by aggregating complaints from different courses, semesters, and years to manufacture grounds for discipline; and held Negy to standards she had never applied to any other professor. Cartwright, Dupras, and Johnson then claimed to have relied on this flawed report. Any reasonable official in Appellants' positions would have known this was wrong. For this reason, the District Court correctly held that this is one of those "extraordinary case[s]" where, if a jury decides the factual issues in Negy's

---

[20] Butler admitted: "of course I would be concerned that people were just joining a bandwagon and doing something to hurt someone and intentionally doing so. That's human nature. That's what people do." (Butler Dep., Doc.63, PageID#968-969.)

favor, the *Pickering* balancing would lead to the inevitable conclusion that the Appellants' conduct was unlawful.[21] (Order, R.100, PageID#7964.)

Appellants essentially claim an unfettered right to prohibit professors from expressing unpopular viewpoints with which a school disagrees by encouraging student complaints and then using those complaints as leverage to justify the termination of a professor after a virtually unprecedented investigation.  But it has long been clearly established that "[t]he vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools." *Shelton v. Tucker*, 364 U.S. 479, 487 (1960.)  Particularly where college and university professors, because of their education and experience, bring unique perspectives to the public debate on matters outside of the classroom, the rights afforded by the First Amendment cannot be defeated "simply because [the rights exercised] might offend a hostile mob." *Forsyth Cnty., Ga. v. Nationalist Movement*, 505 U.S. 123, 134-35 (1992).  The Supreme Court noted 130 years ago "that no wrong, real or fancied, carries with it legal warrant to invite as a means of redress the cooperation of a mob…" *In re Debs*, 158 U.S. 564, 599 (1895).  This remains true today.

---

[21] Contrary to Appellants' suggestion, the District Court did perform an individual qualified immunity analysis for each Defendant, granting qualified immunity to one Defendant while denying it to others. (Order, R.100, PageID#7954-7955.)

# ARGUMENT

## I.    THIS COURT LACKS JURISDICTION

Appellee incorporates his Response to this Court's Jurisdictional Question. (App.Doc.18.)  This appeal does not raise questions about whether the law was clearly established, since Appellants have never suggested that terminating Negy for his tweets, if true, would not violate clearly established law.  Instead, the only issues on appeal are whether there are genuine issues of material fact about whether Negy's protected speech was a substantial motivating factor in Appellants' employment decision. Those questions are not enough to confer interlocutory jurisdiction over an appeal from the denial of qualified immunity.  *See*, *e.g.*, *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985); *English v. City of Gainesville*, 75 F.4th 1151, 1156 (11th Cir. 2023).

## II.    APPELLANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY

The salient question in this case is whether the state of the law gave Appellants fair warning that their treatment of Negy was unconstitutional.  The answer to that question is yes.  *Garcetti* and *Connick* demonstrate that if Negy prevails on the factual disputes, the *Pickering* test inevitably would weigh in his favor and, thus, his right was clearly established at the time of his termination.

### A.    STANDARD FOR QUALIFIED IMMUNITY

Overcoming a state official's qualified immunity defense ordinarily involves a two-part inquiry. This Court must consider: (1) "[whether] the facts, construed in the light most favorable to the plaintiff, show that a constitutional right has been violated; and (2) whether the right violated was clearly established." *Roberts v. Spielman*, 643 F.3d 899, 904 (11th Cir. 2011) (quotation omitted.) The controlling question in the "clearly established" prong of the qualified immunity analysis is whether the individual defendants received "fair warning" that their conduct was unconstitutional.  *Wade v. United States*, 13 F.4th 1217, 1225 (11th Cir. 2021).

"A right may be clearly established for qualified immunity purposes in one of three ways: (1) case law with indistinguishable facts clearly establishing the constitutional right; (2) a broad statement of principle within the Constitution, statute, or case law that clearly establishes a constitutional right; or (3) conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law." *D.H. v. Clayton County Sch. Dist.*, 830 F.3d 1306, 1318 (11th Cir. 2016). Under the first

method, the law can be said to be 'clearly established' for qualified immunity purposes only by decisions of the U.S. Supreme Court, this Court, or the highest court of the state where the case arose. *Jenkins v. Talladega City Bd. of Educ.*, 115 F.3d 821, 826 n.4 (11th Cir. 1997). Under the second and third methods, the general principle of law must apply with "obvious clarity" to the circumstances of the case. *Crocker v. Beatty*, 995 F.3d 1232, 1240 (11th Cir. 2021). This Court has recently clarified that "persuasive decisions from other circuits can be considered in determining whether a violation was one of 'obvious clarity' for purposes of qualified immunity." *Gilmore v. Georgia Dept. of Corr.*, 144 F.4th 1246, 1264 (11th Cir. 2025).

## B.  APPELLANTS' ACTIONS VIOLATED NEGY'S CLEARLY ESTABLISHED CONSTITUTIONAL RIGHTS

In *Connick*, the Supreme Court held that a "public employee does not relinquish First Amendment rights to comment on matters of public interest by virtue of government employment." 461 U.S. at 140. In *Garcetti*, the Court reaffirmed that "the First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." 547 U.S. at 417. In *Garcetti*, the Supreme Court narrowed the circumstances under which a public employee can speak "as a citizen," but expressly acknowledged that "expression related to academic scholarship or classroom instruction [arguably] implicates additional constitutional interests…" *Id.* at 425. *See also Id.* at 438 (Souter, J., dissenting) ("I have to hope that

today's majority does not mean to imperil First Amendment protection of academic freedom in public colleges and universities…").

This Court employs the analysis set forth in *Pickering* to evaluate government employee free speech claims. *Bryson v. City of Waycross*, 888 F.2d 1562 (11th Cir. 1989). To prevail under this analysis, an employee must show that: (1) the speech involved a matter of public concern; (2) the employee's free speech interests outweighed the employer's interest in effective and efficient fulfillment of its responsibilities; and (3) the speech played a substantial part in the adverse employment action. 888 F.2d at 1565-66. If an employee satisfies the burden on the first three steps, the burden then shifts to the employer to show by a preponderance of the evidence that it would have made the same decision even in the absence of the protected speech. *Id.*

### 1. NEGY'S SPEECH INVOLVED A MATTER OF PUBLIC CONCERN, AND DID NOT MEANINGFULLY INTERFERE WITH THE PERFORMANCE OF HIS DUTIES OR WITH THE SCHOOL'S GENERAL OPERATIONS

Appellants do not contest that that Negy's speech on Twitter involved a matter of public concern, nor do they argue that Negy's comments online meaningfully interfered with the performance of his duties or with the school's general operations.

### 2. NEGY'S PROTECTED SPEECH WAS A SUBSTANTIAL MOTIVATING FACTOR IN APPELLANTS' DECISION TO INVESTIGATE AND TERMINATE HIM

The crux of Appellants' Brief is the assertion that "Negy was investigated and subsequently terminated based on complaints of classroom misconduct separate from

31

his speech on Twitter." Appellants Br. at 25.[22]  Appellants repeat this claim numerous times, often with the added suggestion that they were "obligated" under Title VI and Title IX to undertake the investigation and discipline in response to these complaints. *See*, *e.g.*, Appellants Br. at 29, 32, 48.[23]  Left unsaid is that the *reason* the university received so many complaints about Negy was because Appellants *solicited them* in response to his protected speech.  Cartwright and Johnson posted a statement on UCF's website expressing that they were "disgusted by the racist posts" that Negy had shared on his Twitter account, and in the same breath provided students with information on how to report Negy, even anonymously, for classroom behavior. (Email, Doc. 64, PageID#1278-79.) Dupras, meanwhile, sent a similar message to the entire College of Sciences criticizing Negy's tweets and sharing anonymous reporting resources. (Email, Doc. 66, PageID#2539-40.)  In other words, the complaints about Negy's classroom behavior did not come in a vacuum: they came because Cartwright, Dupras, and Johnson asked for them.

---

[22] Tellingly, Appellants cite only their own testimony for this factual conclusion.  But "an employer rarely admits it took an action solely for unlawful reasons."  *Hannah P. v. Haines*, 80 F.4th 236, 257 (4th Cir. 2023).  *Cf. United States Postal Serv. Bd. of Governors v. Aikens,* 460 U.S. 711, 716 (1983) ("There will seldom be 'eyewitness' testimony as to the employer's mental processes.").

[23] Appellants' reliance on *Sherrod v. Johnson*, 667 F.3d 1359, 1364 (11th Cir. 2012), is misplaced.  In that case, the record did not reveal that school administrators had, like in this case, solicited complaints against the teacher in order to justify a flawed investigation into allegations of misconduct.

The District Court correctly declined to accept Appellants' claims that Negy "was dismissed solely for his in-classroom behavior" and proceeded to examine whether the claims were pretextual.[24]  (Order, R.100, PageID#7961.)  In doing so, the District Court recognized the fundamental flaw in much of Appellant's argument on a summary judgment standard: Appellants beg the question by assuming that their self-serving denials about their motives are true and accurate, while ignoring the significant contrary evidence that creates an issue of fact about whether Negy's speech played a substantial part in the adverse employment action and that the same decision would not have been made in the absence of the protected speech.

### a.  TIMING AND COMMENTS SUPPORT THE INFERENCE THAT NEGY'S SPEECH WAS A SUBSTANTIAL MOTIVATING FACTOR

Negy does not contest that Appellants had a right to criticize his tweets — but to suggest that they simply followed policies designed to comply with UCF's obligations under Title VI and Title IX to advise "students how they might register their complaints" severely mischaracterizes the record.  Appellants Br. at 48.  As the Supreme Court recently noted, "a government official cannot do indirectly what she is barred from doing directly…" *NRA of Am. v. Vullo*, 602 U.S. 175, 190 (2024).[25]  The claim in

---

[24] Pretext means that the reasons given were not the real reasons for the decision. *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1298 (11th Cir. 2006).

[25] *NRA of Am.* relied, in part, on *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963).  *Bantam Books* concerned a Rhode Island commission which had the power to "educate the public concerning literature containing obscene material."  The Court found a First Amendment violation even though the Commission did "not regulate or suppress

this case is not the straw man that Appellants are prohibited from investigating or terminating a professor "merely because that faculty member also engaged in protected speech." Appellants Br. at 32. Rather, Appellants are prohibited from investigating or terminating a professor where the professor's protected speech "was a substantial motivating factor" in the decision to investigate or terminate him. *Moss v. City of Pembroke Pines*, 782 F.3d 613, 618 (11th Cir. 2015). Thus, Appellants can be liable if, motivated by a desire to retaliate against Negy for his protected speech, they took actions with the intent that such actions would lead to an adverse employment action, regardless of whether they *claim* to have legitimate motives. *See Staub v. Proctor Hosp.*, 562 U.S. 411, 419-22 (2011) (cautioning against tactics that "effectively shielded from discriminatory acts and recommendations of supervisors that were designed and intended to produce the adverse action"); *Polion v. City of Greensboro*, 614 F. Appx. 396, 399 (11th Cir. 2015) (considering whether a retaliatory motive for initiating an investigation infected the termination process).

Contrary to Appellants' claim that the investigation into Negy was "initiated… based on lawful motivations to comply with federal law," Appellants Br. at 32, the record contains significant evidence that the stated reason for investigating and

---

obscenity but simply exhorts booksellers and advises them of their legal rights." The Court found that, like the Appellants in this case, the Commission deliberately set about to achieve the suppression of publications deemed "objectionable" through various means, including "persuasion." 372 U.S. at 66-67.

terminating Negy — his alleged misconduct in the classroom — was pretextual. Start, where this Court traditionally has, with timing. Where an adverse action "closely follows protected activity, it is usually reasonable to infer that the activity was the cause of the adverse employment decision." *Stanley v. City of Dalton*, 219 F.3d 1280, 1291 n. 20 (11th Cir. 2000), *citing Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 745 (11th Cir. 1996). In this case, Appellants' call for complaints and the inquiry that led to Negy's termination began the same day that #UCFFireHim began trending on Twitter and a Change.org petition appeared calling on UCF "to dismiss psychology professor Charles Negy due to abhorrent racist comments he has made and continues to make on his personal Twitter account." (Petition, Doc.70, PageID#5376-5381.)

In addition to considering timing, this Court also looks to "any comments made, or actions taken, by the employer indicating that the discharge was related to the protected speech." *Stanley*, 219 F.3d at 1291 n. 20. The record here is replete with comments and actions suggesting that Appellants intended to initiate a campaign of complaints that would provide pretext for them to investigate and eventually terminate Negy. Appellants would have this Court believe their statements and the deluge of complaints against Negy was a coincidence.[26] But Cartwright, Dupras, and Johnson made public statements, the day after Negy's tweets went viral, encouraging the

---

[26] "In the words of Buffy the Vampire Slayer…, 'there are two things I don't believe in: coincidences and leprechauns.'" *Bailey v. Baldwin Cty. Bd. of Educ.*, Civ. No. 14-0305, 2016 U.S. Dist. LEXIS 1441, at *47 (S.D. Ala. Jan. 6, 2016).

community to "speak up" and sharing anonymous reporting resources. (Report, Doc.66, PageID#2819.)  OIE also obtained class rosters and reached out to former students and TAs.  (Report, Doc.66, PageID#2819.)  And, as intended, current and former students began filing complaints (some dating back as far as 15 years) *en masse*, aided, in part, by a former student who explicitly stated her aim to ensure Negy was fired for his tweets. (Report, Doc.66, PageID#2819.)  In fact, the investigative report itself indicates clearly that it is based on complaints received from multiple sources starting on June 4 — the date that Cartwright and Johnson posted "Addressing Intolerance in our Community," and the date Dupras admitted she "encourage[d] students to come forward…" (Dupras Depo, Doc. 66, PageID#2395; Report, Doc.66, PageID#2619.)

Appellants' Brief is noncommittal on how these hundreds of complaints appeared, often relying on the passive voice and suggesting Appellants were merely recipients of student complaints which they then dutifully investigated.  *See*, *e.g.*, Appellants Br. at 18 (suggesting that complaints just happened to arrive "around the same time" as Negy's protected speech).  In this way, Appellants took the Henry II approach by 'educating' students on what the school could do after they filed complaints and hoping that they would take the hint. One court explains:

> This may be considered an example of the Henry II management style. The Plantagenet king is reported to have fulminated, "Will no one rid me of this troublesome priest?" Hearing that, four knights took it upon themselves to murder Thomas Becket on December 29, 1170. The

quotation is a byword for what became known in the era of cold war espionage as "plausible deniability."

*Howe v. Magellan Health Servs.*, No. 11-2006, 2016 U.S. Dist. LEXIS 72704, at *45 fn. 12

(D. N.J. May 31, 2016).[27]

### b. THE RIGGED INVESTIGATION SUPPORTS THE INFERENCE THAT NEGY'S SPEECH WAS A SUBSTANTIAL MOTIVATING FACTOR

Appellants suggest that the investigation was perfect. Appellants Br. at 43 ("Even assuming, arguendo, the investigation was imperfect (which Appellants deny)…".) The facts, however, establish otherwise. Myers took numerous steps to rig the investigation to ensure that Negy would be found responsible regardless of the evidence. As set forth in detail *supra*, Myers knowingly manipulated the definition of harassment by aggregating sporadic comments made over a period of years in many different classes. She manipulated credibility assessments by attributing a "motive to lie" to Negy based on his status as a tenured professor, while not attributing a motive to lie to witnesses who explicitly cited Negy's tweets as a reason he should be fired. She treated his case differently from other cases she investigated: UCF was unable to produce a single other investigative report in which a respondent was found to have a motive to lie simply to protect their job and reputation. She dug up old incidents that the university had known of and not acted upon, and treated them as new grounds for

---

[27] The D.C. Circuit has referred to this as a "'Becket' defense." *United States v. Eicher*, Crim. No. 22-38, 2023 U.S. Dist. LEXIS 90103, at *8 fn. 4 (D.D.C. May 23, 2023), c*iting inter alia United States v. North*, 910 F.2d 843, 883 (D.C Cir. 1990).

discipline. She denied him notice of the allegations and then added additional penalties for his faulty memory.

Myers' investigation found Negy responsible not only for the original charge of discriminatory harassment, but also for a host of other alleged misdeeds of which he was never given notice. She found him responsible for "Providing False Information During a University Investigation" solely because "OIE identified instances wherein the documentary or audio evidence clearly conflicted with what the Respondent had represented to OIE." (Report, Doc.66, PageID#2807.)  These "instances" were a handful of things that Negy got wrong when attempting to recall 15 years' worth of classroom teaching on the spot without having been provided any information about most of the allegations. (*Id.*)

Myers also dug up an irrelevant anecdote from Negy's 2019 book to support an allegation of a $17 "bribe" to an individual at a Peru health care clinic.  (Report, Doc.66, PageID#2808.)   Myers also found that Negy had provided "misinformation" to his classes in violation of the Code of Conduct by doing her own independent research in an area where she had no expertise and then making a subjective determination that her interpretation of the facts was more accurate than Negy's.  (Myers Dep., Doc.70, PageID#3927-3928.)

### 3.    THE DISTRICT COURT APPLIED THE APPROPRIATE LEVEL OF SPECIFICITY

Appellants argue that the District Court erred in conducting its qualified immunity analysis at too high a level of generality. Appellants Br. at 22. But the District Court analyzed this case using the same framework used by this Court in other public employee First Amendment retaliation cases, asking:

1. Did Negy have a clearly established right to express his views on his personal Twitter account?

2. Would any reasonable official in Appellants' positions have believed it was acceptable to fire Negy for his tweets?

3. Are there genuine issues of material fact as to whether Appellants terminated Negy for his tweets, rather than for his classroom speech?

*See, e.g., Stewart v. Baldwin Cnty. Bd. of Educ.*, 809 F.2d 1499, 1506 (11th Cir 2000). Applying this framework, the District Court concluded that "if a jury makes findings of fact in favor of Plaintiff, this is one of those rare cases where *Pickering* balancing shows Defendants' conduct was unconstitutional." (Order, Doc.100, PageID#7964.)

The District Court's framework for analysis and its conclusion were both correct. The answer to the first question is indisputably "yes." This Court has observed that "the Supreme Court and Eleventh Circuit recognized a public employee's clearly established right to speak on matters of public concern that are outside her job duties." *Drake v. Avent*, No. 8:18-cv-2257, 2019 U.S. Dist. LEXIS 249211, at *11 (M.D. Fl. May

39

3, 2019), *citing Carollo v. Boria*, 833 F.3d 1322, 1334-35 (11th Cir. 2016). It has long been clearly established that, absent a disruption of government operations, a public employer may not sanction an employee for speaking on issues of social or political concern. *See*, *e.g.*, *Rankin v. McPherson*, 483 U.S. 378, 380, 383 (1987) (clerk in sheriff's office wrongfully fired for saying that she hoped next assassination attempt on President Reagan was successful); *Pickering*, 391 U.S. at 574 (teacher could not be fired for publicly criticizing school's athletic budget or for questioning character of school administrators). The District Court correctly quoted *Hartman v. Moore*, 547 U.S. 250, 256 (2006), for the principle that "the law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions… for speaking out." (Order, Doc.100, PageID#7965.)

The answer to the second question is clearly "no." This Court has recognized that *Pickering* gives reasonable public officials fair warning that it violates the First Amendment to "terminate a colleague for speaking about matters of public concern that are outside the scope of his ordinary job responsibilities." *Carollo* , 833 F.3d at 1334 (11th Cir. 2016). In *Cook v. Gwinnett Cty. School Dist.*, 414 F.3d 1313, 1318 (11th Cir. 2005), this Court held that the law "is clearly established that a public employer may not retaliate against an employee for an employee's exercise of constitutionally protected speech." And in *Berdin v. Duggan*, 701 F.2d 909, 913 (11th Cir. 1983), this Court said that the disciplining of a public employee, for exercising his first amendment right to speak, clearly contravenes established law."

A fatal error in Appellants' argument pertains to the third question. Appellants ask this Court to treat it as a question of law and require a case clearly establishing that no reasonable official would have believed it was acceptable to fire Negy for the reasons set forth in the investigative report. Appellants' Br. at 29. But, as the District Court noted, there are numerous issues of material fact — concerning the timing of the discipline, Appellants' public statements, and the irregularities in the investigation — that, if resolved in Negy's favor, would permit a jury to conclude that the investigation was pretextual and that his tweets were the real reason for his termination. These are factual, not legal, questions that a jury is entitled to decide.

Appellants suggest otherwise, arguing that "Courts have recognized that First Amendment rights are rarely clearly established." Appellants Br. at 24, *citing Anderson v. Burke Cnty.*, 239 F.3d 1216, 1222 (11th Cir. 2001). This is because, generally, "In the context of a First Amendment retaliation claim,… the *Pickering* balancing 'involves legal determinations that are intensely fact-specific and do not lend themselves to clear, bright-line rules.'"[28] *Brannon v. Finkelstein*, 754 F.3d 1269, 1278 (11th Cir. 2014), *quoting Maggio v. Sipple*, 211 F.3d 1346, 1354 (11th Cir. 2000). But this Court has also held that

---

[28] The cases cited by Appellants illustrate the limited nature of the assertion that First Amendment rights are rarely clearly established because of the fact-specific nature of the inquiry. Appellants Br. at 24. *Anderson,* 239 F.3d at 1222 , for example, concerned speech within the context of "a paramilitary organization, such as a fire department." *Gaines v. Wardynski*, 871 F.3d 1203, 1212 (11th Cir. 2017), involved a question of whether it was clearly established that it would violate an employee's free speech rights to take adverse action because her father had engaged in protected speech.

there is an exception to this general rule when the *Pickering* balance inevitably would favor an employee.[29] *Hansen v. Soldenwagner*, 19 F.3d 573, 578 (11th Cir. 1994). This Court has not hesitated to find scenarios in which a factually analogous precedent clearly established the disputed First Amendment activity in schools as unconstitutional. In *Carrollo*, this Court concluded that a "robust consensus of our precedent confirms that" *Pickering* and *Garcetti* provided fair warning to city officials that terminating an employee who had reported allegations of financial misconduct was unlawful. 833 F.3d at 1334 (11th Cir. 2016). In *Cook*, this Court concluded that the *Pickering* balance tilted conclusively in favor of a school bus driver who had been transferred after raising safety concerns "such that the defendants had fair and clear warning that their actions were unconstitutional." 414 F.3d at 1320 (collecting cases). And in *Berdin*, this Court said that *Pickering* clearly established that a mayor could not terminate a city employee for complaining that more maintenance workers were needed. 701 F.2d at 913. *Cf. Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252 (11th Cir. 2004) (student had a clearly established right to silently raise his fist instead of reciting the pledge of allegiance).

---

[29] This is consistent with the view of district courts in this Circuit that "individual defendants cannot hide under the Eleventh Circuit's broad qualified immunity rule" when the clear rule was established "years ago and its implications in the present matter are readily apparent." *Thomas v. McKee*, 205 F.Supp.2d 1275, 1288 (M.D. Ala. 2002).

Appellants criticize the District Court's view of the law as "highly generalized." Appellants Br. at 25.[30]  Not so.  The District Court, in denying Appellants' motion to dismiss, correctly noted that "The need to give in to the demands of an offended, angry student body is not a basis to knowingly engage in content discrimination."  (Order, Doc.38, PageID#257.)   The District Court, in denying the motions for summary judgment, concluded that "there is evidence showing [Appellants] were motivated by their distaste for [Negy] and his views along with public pressure."  (Order, R.100, PageID#7966.)   In doing so, the District Court expressed the view of law with the precise specificity that this Court did over twenty years ago in *Travers v. Jones*, when it held that "[t]he law is clearly established that an employer may not demote or discharge a public employee for engaging in protected speech." 323 F.3d 1294, 1295 (11th Cir. 2003), *citing Rankin*, 483 U.S. at 383 (1987).  *See also Mitchell v. Hillsborough Cty.*, 468 F.3d 1276, 1283 (11th Cir. 2006)("A government employer may not demote or discharge a public employee in retaliation for speech protected under the First Amendment.").  The District Court's conclusion is also consistent with this Court's holding that granting qualified immunity is inappropriate where the factual record suggests an employer fired an employee for pretextual reasons. In *Tindal v. Montgomery Cnty. Comm'n*, 32 F. 3d 1535

---

[30]*Labriola v. Miami-Dade Cnty.*, 142 F.4th 1305 (11th Cir. 2025), is not to the contrary because the record in that case, unlike the record in this case, established with certainty that the employee's outside speech impeded the government's ability to perform its duties efficiently.

(11th Cir. 1994)*,* a plaintiff claimed that she had been terminated by the sheriff's department after charging the local sheriff with sex and race discrimination. This Court affirmed the district court's ruling that the former sheriff was not entitled to qualified immunity from the First Amendment retaliatory discharge claim, in part because the sheriff had used a policy violation as pretext for the termination.  32 F.3d at 1540.  This same analysis has been applied by other courts to deny qualified immunity in pretext cases at the summary judgment stage. *See Hellwig v. Cty. of Saratoga,* No. 1:22-cv-488, 2024 U.S. Dist. LEXIS 144224, at *41 (N.D.N.Y. Aug. 13, 2024) ("Here, there are material issues of fact as to whether [the] stated reason for replacing Plaintiff… was a pretext for retaliation. Since factual issues remain that bear on the qualified immunity analysis, qualified immunity is precluded at this stage."); *Liberty Cty. Officers Ass'n v. Stewart*, 903 F. Supp. 1046, 1054 (E.D. Tex. 1995) (fact issue regarding whether poor performance was merely a pretext for termination precluded application of qualified immunity defense); *Wyman v. City of Dalla*s, No. 3:02-cv-2496, 2004 U.S. Dist. LEXIS 18892, at *11 (N.D. Tex. Sept. 21, 2004) (fact issue regarding an employer's intent in a First Amendment claim precluded summary judgment on the basis of qualified immunity); *Swain v. Town of Wappinger*, No. 17-cv-5420, 2019 U.S. Dist. LEXIS 114640, at *37-38 (S.D.N.Y. July 9, 2019) (denying summary judgment on qualified immunity where although defendants claimed they "did not act with retaliatory intent, a reasonable juror could find that these reasons are pretextual…"); *Ward v. Members of the Bd. of Control of E. Michigan Univ.*, 700 F.Supp.2d 803, 819 (E.D. Mich. 2010) (summary

judgment on the issue of qualified immunity was precluded where plaintiff alleged university officials defendants used alleged misconduct "as a pretext to discriminate against [plaintiff] for her religious views"); *Torres v. Gonzalez*, 71 F. Supp. 2d 14, 23 (D.P.R. 1999) ("What is in controversy and precludes this Court's shielding of defendants' actions with qualified immunity is whether her dismissal… was a mere pretext for defendants' real motive for dismissing plaintiff, her political affiliation with the former administration.").

### 4.    A MIXED MOTIVE ANALYSIS IS INAPPLICABLE WHERE THERE IS EVIDENCE OF PRETEXT

Appellants argue that this is a "mixed motives case" where the existence of a biased motive is not a bar to immunity, and that, as a result, they are entitled to qualified immunity under *Foy v. Holston*, 94 F.3d 1528 (11th Cir. 1996). Appellants Br. at 45-46. Applying *Foy* to this case would have the practical effect of giving a veneer of legality to those school administrators who generate pretextual reasons for the termination of a faculty member so long as the record contains self-serving declarations that could also support a lawful reason for that termination.

*Foy* is inapposite. *Foy* applies only where it is *undisputed* that the employment action was motivated, at least in part, by lawful considerations. Where the lawful motive is disputed, *Foy* is inapplicable because the case retains the possibility of being a pretext case — *i.e.* that objectively valid reasons for termination existed but did not motivate the termination. As one district court explained succinctly: "*Foy* only applies where the

undisputed summary judgment facts establish mixed motives, as opposed to pretext." *Pattee v. Ga. Ports Auth.*, 477 F. Supp. 2d 1253, 1267 (S.D. Ga. 2006).[31]  In other words, even if Appellants undisputedly had lawful grounds to act, *Foy* is inapplicable because it is disputed whether they actually relied on those grounds.[32]

Subsequent decisions of this Court have limited *Foy*'s reach where, as in this case, allegations of pretext preclude a finding that the defendant's proffered nondiscriminatory reason indisputably established the existence of a nondiscriminatory motive.  Most notably, in *Bogle v. McClure*, 332 F.3d 1347, 1355 (11th Cir. 2003), this Court rejected a claim of qualified immunity based on *Foy* in a racial discrimination claim brought by librarians.  As in this case, the decision-makers in *Bogle* argued that their actions were motivated by a permissible reorganization plan designed to provide more services in the branch libraries. This Court affirmed the denial of qualified immunity where the evidence supported a finding that the actions were based on impermissible racial considerations and the reorganization plan was a sham or cover-

---

[31] The *Pattee* court's view of *Foy* has been followed by numerous district courts in this Circuit.  *See, e.g., Blash v. City of Hawkinsville*, No. 5:17-cv-00380, 2018 U.S. Dist. LEXIS 146920, at *6 (M.D. Ga. Aug. 29, 2018); *Harrington v. Wells*, No. 2:13-cv-103, 2015 U.S. Dist. LEXIS 152602, at *9 (S.D. Ga. Nov. 10, 2015); *Hanner v. City of E. Point,* No. 1:18-CV-01050, 2020 U.S. Dist. LEXIS 269085, at *42 (N.D. Ga. Jan. 31, 2020).

[32] Appellants also rely on *Sherrod*, *supra*, and *Jackson v. Humphrey*, 776 F.3d 1232, 1240 (11th Cir. 2015).  In *Sherrod*, this Court appears to have rejected the conclusion of the district court that the proffered reasons for the termination of a teacher were pretextual. 667 F.3d at 1363.  In *Jackson*, there was no discussion about whether the reasons proffered by the defendants were pretextual.

up.  In *Stanley v. City of Dalton, Ga.*, 219 F.3d 1280, 1296 (11th Cir. 2000), this Court explained that a defendant is entitled to qualified immunity under the *Foy* rationale "only where… the record indisputably establishes that the defendant in fact was motivated, at least in part, by lawful considerations."  This Court in *Stanley* "emphasize[d]" that it is not sufficient for a defendant "to establish that there exists a lawful basis" for the employment action: "in order for *Foy* to apply," this Court held, the defendant "must have been actually motivated, at least in part, by that lawful basis."  *Stanley*, 219 F.3d at 1296 n.29.  Finally, in *Johnson v. City of Ft. Lauderdale*, 126 F.3d 1372, 1379 (11th Cir.1997), this Court observed that the holding in *Foy* "rested primarily on the existence of an indisputable and adequate lawful motive on the part of [defendants] such that reasonable officials would disagree as to the legality of their conduct."

Here, *Foy* does not apply because while Appellants maintain they were motivated by Negy's in-class behavior, "Plaintiff has offered evidence that the real reason was his protected speech. This is a material issue of fact that is for the jury to determine, not the Court." (Order, Doc.100, PageID#7963).

## C.     MYERS WAS A DECISION-MAKER

Appellants concede that Cartwright, Dupras, and Johnson were all official decisionmakers, but argue that Myers was not. This is contradicted by record evidence. The termination decision was made at a group meeting at which Dupras, Johnson, and Myers were all present. (Johnson Dep., Doc.68, PageID#3213.) Johnson testified that at that meeting, the termination decision was made in a "consultative" and "collective"

way, where all participants "discussed it and came to a conclusion without objections from members of the group that this was the path to go down." (*Id.* at 3146.)

Even if Myers did not have the ultimate authority to *effectuate* Negy's termination, under this Court's precedents "a discharge recommendation by a party with no power to actually discharge the employee may be actionable if the plaintiff proves that the recommendation directly resulted in the employee's discharge." *Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1331 (11th Cir. 1999). *See also Zaklama v. Mt. Sinai Med. Ctr.*, 842 F.2d 291, 295 (11th Cir. 1988) (defendant was in a position to affect plaintiff's employment "and did affect his employment with its adverse evaluations"). In such cases, "the plaintiff must prove that the discriminatory animus behind the recommendation, and not the underlying employee misconduct identified in the recommendation, was an actual cause of the other party's decision to terminate the employee." *Stimpson*, 186 F.3d at 1331.

Myers argues that there is no evidence of retaliatory animus here because "[t]here were no comments by Myers about Plaintiff's tweets." (Myers MSJ, Doc.61, PageID#445.) This assumes that Negy is entitled to prove his case only with *direct* evidence of Myers' retaliatory animus — something that is nearly impossible to do "given that only the most incompetent discriminators directly admit to their wrongdoing." *Cromartie v. Cent. Ala. Food Services*, No. 2:22-CV-106, 2023 U.S. Dist. LEXIS 140318, *12 (M.D. Ala. Aug. 11, 2023). And as explained *supra,* the record is replete with circumstantial evidence sufficient to allow a reasonable fact-finder to

conclude that, when she recommended Negy's termination, Myers was motivated by retaliatory animus. And it is undisputed that the other decisionmakers relied on Myers' recommendation: Cartwright, Dupras, and Johnson all admit that "they based their decision on the OIE Report's findings." (Cartwright, Dupras, Johnson MSJ, Doc.60, PageID#423.)

### D. THE DISTRICT COURT CONDUCTED THE CORRECT INDIVIDUALIZED ANALYSIS

Contrary to Appellants' argument, this is not a case where the District Court failed to distinguish the actions of each Appellant, instead relying on generalized allegations against them collectively. In other cases where this Court has found a qualified immunity analysis insufficiently individualized, a District Court, unlike in this case, "referred to Defendants collectively throughout its analysis and assumed that each Defendant participated in each alleged action." *Norris v. Williams*, 776 F. App'x 619, 622 (11th Cir. 2019). Nor did the District Court fail to "parse the actions" each defendant "undertook and omitted." *Alcocer v. Mills*, 906 F.3d 944, 951 (11th Cir. 2018). Rather, the District Court identified particular actions by each Defendant which could support a finding that Negy's protected speech was a substantial motivating factor in the decision to fire him. The District Court noted, for example, that at the same time the initial inquiry began, "Cartwright and Johnson publicly condemned Plaintiff's tweets, and Dupras emailed the College of Sciences that the administration was 'aware of these tweets and [ ] actively working to address this situation.'" (Order, Doc.100,

PageID#7960.)  The District Court then separately analyzed Myers' conduct, noting that she had "found that Plaintiff's tweets were protected speech, but nonetheless recommended discipline" and that "there is an issue of fact as to whether Myers skewed the investigation against Plaintiff."  (Order, Doc.100, PageID#7961.)  Indeed, after performing an individualized analysis of each Defendant's actions, the District Court granted qualified immunity to one Defendant — Butler — while denying it to the rest.

Individualized analysis only goes so far in a case, like this, where Appellants were all decision-makers.  This is not a case, like *Alcocer*, *supra*, where each defendant's actions and knowledge could be analyzed separately.  Rather, the District Court, after reviewing the record, noted that "there is no dispute that Cartwright, Dupras, and Johnson were decisionmakers."  (Order, R. 100, PageID#7957-7958.)   That makes this case more like *Alexandre v. Ortiz*, 789 F. App'x 169, 176 (11th Cir. 2019), where this Court noted that an individualized qualified immunity analysis was not required where it was "impossible to separate the actions of [individual defendants] from the larger group."  As decision-makers, Appellants were aware of the clearly established law prohibiting the termination of an employee for protected speech.  *See supra*.  To the extent that Appellants argue that they are entitled to qualified immunity because they acted in concert rather than individually, they fail to explain why this fact should exonerate them.  Rather, where, the District Court found that based on Myers' recommendation, "everyone… agreed that [Negy] should be terminated," the qualified immunity analysis may be applied in the same manner to defendants acting in concert, without examining

50

whether the underlying case that clearly established the right at issue involved an individual defendant or a group of defendants.

### E.    NEGY'S FREE SPEECH RIGHTS IN THE CLASSROOM ARE CLEARLY ESTABLISHED

The First Amendment tolerates neither laws nor other means of coercion, persuasion, or intimidation "that cast a pall of orthodoxy" over the free exchange of ideas in the classroom. *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967). This provides an independent ground to find that Appellees are not entitled to qualified immunity.

The District Court cited *Bishop v. Aronov*, 926 F.2d 1066 (11th Cir. 1991), for the proposition that a "professors' speech may be reasonably restricted during class time."[33] *Bishop* involved a professor who sought to inject his personal religious beliefs into class discussions on exercise physiology. The District Court was incorrect in referring to this as "controlling authority" because the decision stands only for the limited proposition that the state's interest in the effective administration of classrooms outweighs a professor's interest in teaching religiously-based material, where teaching that religious material hampers the State's ability to effectively educate its students. The religion-based claim is the key to understanding that case, as the school's "chief

---

[33] *Bishop* may be distinguished on the facts. In *Bishop*, the professor told students that his religious beliefs are more important than academic performance and sought to teach "optional" classes which undermined the science of evolution. Unlike the allegations in this case, the school's concern in *Bishop* was that the professor avoid giving "the impression of official sanction, which might have unduly pressured students into attending and… adopting the beliefs expressed by" the professor. 926 F.2d at 1076-1077.

concern" was that "courses be taught without personal religious bias." 926 F.2d at 1076. Other courts have declined to follow *Bishop* "because [of] the Establishment Clause concerns that lurked throughout the analysis in that case." *Scallet v. Rosenblum*, 911 F. Supp. 999, 1011 fn. 13 (W.D. Va. 1996), *citing* Michael A. Olivas, *Reflections on Professorial Academic Freedom: Second Thoughts on the Third "Essential Freedom,"* 45 Stan. L. Rev. 1835, 1847 (1993) (suggesting that "religion is *sui generis*…"). *See also Pernell v. Fla. Bd. of Governors of the State Univ. Sys.,* 641 F. Supp. 3d 1218, 1270 (N.D. Fla. 2022) ("the Eleventh Circuit [in Bishop] acknowledged the University had a valid and weighty interest in regulating the course curriculum and avoiding an establishment violation").

The District Court acknowledged that other circuits in the past thirty-plus years have held that professors at public universities retain First Amendment protections at least when engaged in core academic functions, such as teaching, but concluded that "case law from other circuits fails to create a right that is clearly established in the Eleventh Circuit." (Order, Doc.100, PageID#7698, *quoting Meriwether v. Hartop*, 992 F.3d 492, 505 (6th Cir. 2021).) However, this Court has subsequently clarified that persuasive decisions from other circuits can also be considered, noting that in such cases persuasive authority from other circuits may prove helpful in determining whether qualified immunity applies." *Gilmore*, 144 F.4th at 1264. To the extent that Appellants allege that it was purely Negy's classroom speech that motivated the employment decision, persuasive authority from other circuits clearly establishes that a professor's speech related to scholarship or teaching is protected speech under the First Amendment. *See,*

*e.g.*, *Meriwether*, 992 F.3d 492; *Heim v. Daniel*, 81 F.4th 212, 225-26 (2d Cir. 2023); *Demers v. Austin*, 746 F.3d 402, 416 (9th Cir. 2014); *Adams v. Trustees of the Univ. of N. Carolina-Wilmington*, 640 F.3d 550, 563 (4th Cir. 2011); *Buchanan v. Alexander*, 919 F.3d 847, 852-53 (5th Cir. 2019).

## CONCLUSION

The Decision of the District Court should be affirmed.

Respectfully submitted,

_____/s/ Joshua Adam Engel_____
Joshua Adam Engel (0075769)
ENGEL AND MARTIN, LLC
4660 Duke Drive, Suite 101
Mason, OH 45040
(513) 445-9600
engel@engelandmartin.com

_____/s/ Samantha Harris_____
Samantha Harris
ALLEN HARRIS PLLC
P.O. Box 673
Narberth, PA 19072
610-634-8258
sharris@allenharrislaw.com

## CERTIFICATE OF COMPLIANCE

I hereby certify that this document complies with the type-volume limitation. This document contains 12,828 words, excluding the portions listed in Fed R. App P. 32(f), as calculated by Microsoft Word.

<u>/s/ Joshua Adam Engel</u>
Joshua Adam Engel (0075769)

## CERTIFICATE OF SERVICE

I hereby certify that on November 25, 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to counsel for all parties.

<u>/s/ Joshua Adam Engel</u>
Joshua Adam Engel (0075769)