CASE NO. 25-11929

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

---

**ALEXANDER CARTWRIGHT, TOSHA DUPRAS,
MICHAEL JOHNSON, AND NANCY MYERS,**
**Defendants/Appellants,**

v.

**CHARLES NEGY,**
**Plaintiff/Appellee.**

---

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### District Court Case No. 6:23-CV-00666-CEM-DCI

---

### APPELLANTS' REPLY BRIEF

---

**GRAYROBINSON, P.A.**

KRISTIE HATCHER-BOLIN, ESQ.
Florida Bar No.: 521388
One Lake Morton Drive
Lakeland, Florida 33801
(863) 284-2251 telephone
(863) 683-7462 facsimile

RICHARD L. BARRY, ESQ.
Florida Bar No. 360650
KATHERINE KATZ, ESQ.
Florida Bar No. 1022526
301 East Pine Street, Suite 1400
Orlando, Florida 32801
(407) 843-8880 telephone
(407) 244-5690 facsimile

*Attorneys for Appellants, Alexander Cartwright, Tosha Dupras, Michael Johnson, Nancy Myers*

## <u>CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to 11th Cir. R. 26.1-1(a), Appellants certify the following is a complete list of the district court judges, attorneys, persons, associations of persons, firms, partnerships, corporations (including subsidiaries, conglomerates, affiliates, parent corporations, and any publicly held corporation owning 10% or more of the party's stock), and other identifiable legal entities related to a party that have an interest in this case.

1.    Allen Harris Law—Attorneys for Plaintiff/Appellee;

2.    Barry, Richard L.—Attorney for Defendants/Appellants;

3.    Butler, S. Kent—Defendant;

4.    Cartwright, Alexander—Defendant/Appellant;

5.    Dupras, Tosha—Defendant/Appellant;

6.    Engel, Joshua A.—Attorney for Plaintiff/Appellee;

7.    Engel & Martin, LLC—Attorneys for Plaintiff/Appellee;

8.    Goldstein Law Partners, LLC—Attorneys for Plaintiff/Appellee;

9.    GrayRobinson, P.A.—Attorneys for Defendants/Appellants;

10.    Harris, Samantha—Attorney for Plaintiff/Appellee;

11.    Hatcher-Bolin, Kristie—Attorney for Defendants/Appellants;

12. Irick, Daniel C. – United States Magistrate Judge, Middle District of Florida, Orlando Division;

13. Johnson, Michael—Defendant/Appellant;

14. Katz, Katherine W.—Attorney for Defendants/Appellants;

15. Lauten, Jr., Frederick James—Mediator;

16. Mendoza, Carlos E.—United States District Judge, Middle District of Florida, Orlando Division;

17. Myers, Nancy—Defendant/Appellant;

18. Negy, Charles—Plaintiff/Appellee;

19. Osborne, David R.—Attorney for Plaintiff/Appellee;

20. Spradley, Susan T.—Former Attorney for Defendants/Appellants;

21. The University of Central Florida Board of Trustees—Defendant;

22. Zimmerman, Jason—Former Attorney for Defendants/Appellants;

23. Zolty, Julie M.—Former Attorney for Defendants/Appellants;

## TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT ...................................................................... ii

TABLE OF CONTENTS.......................................................................... iv

TABLE OF CITATIONS ......................................................................... vi

INTRODUCTION ...................................................................................1

I.    Reply to Negy's Fact Section .........................................................1

      A.    "Negy's Tweets Generate Widespread Outrage"..................1

      B.    "University Officials Launch a Coordinated Attack on Negy" ...........2

      C.    "OIE Launches a Pretextual Investigation" ...........................4

      D.    "OIE's Investigate Report: Show Me the Man, and I'll Find You the Crime"........................................................................6

      E.    "Negy is Immediately Terminated" .......................................7

II.   Appellants are Entitled to Qualified Immunity ..............................7

      A.    The District Court failed to conduct an individualized assessment of qualified immunity ................................................................7

      B.    Negy's allegations of Solicitation do not establish a substantial motivating factor..........................................................9

      C.    *Foy's* mixed motive analysis applies and demonstrates Appellants are entitled to qualified immunity .......................................11

      D.    Myers was not a decisionmaker and cannot be liable for Negy's termination ..............................................................19

      E.    Negy's speech rights in the classroom were not clearly established ......
            ..............................................................................24

CONCLUSION ....................................................................................27

CERTIFICATE OF COMPLIANCE ........................................................................28

CERTIFICATE OF SERVICE .................................................................................29

## TABLE OF CITATIONS

### UNITED STATES SUPREME COURT

*Bantam Books, Inc. v. Sullivan*,
372 U.S. 58 (1963) ........................................................................10, 11

*Keyishian v. Board of Regents*,
385 U.S. 589 (1967) ..............................................................................25

*Nat'l Rifle Ass'n of Am. v. Vullo*,
602 U.S. 175 (2024) ..................................................................9, 10, 11

### UNITED STATES CIRCUIT COURT OF APPEALS

*Berry v. Crestwood Healthcare LP*,
84 F.4th 1300 (11th Cir. 2023) ..........................................................22, 23

*Bishop v. Aronov*,
926 F.2d 1066 (11th Cir. 1991) ..............................................24, 25, 26, 27

*Bogle v. McClure*,
332 F.3d 1347 (11th Cir. 2003) ..............................................14, 15, 17

*Castle v. Appalachian Tech. Coll.*,
631 F.3d 1194 (11th Cir. 2011) ...............................................................16

*Elver v. Hendry Cnty. Sheriff's Office*,
791 Fed. Appx. 56 (11th Cir. 2019) .......................................................22

*Foy v. Holston*,
94 F. 3d 1528 (11th Cir. 1996) ....................................11, 12, 15, 16, 18

*Furcron v. Mail Centers Plus, LLC*,
843 F.3d 1295 (11th Cir. 2016) ........................................................12, 16

*Gilmore v. Ga. Dep't of Corr.*,
144 F.4th 1246 (11th Cir. 2025) ..............................................................24

*Gilroy v. Baldwin*,
843 F. App'x 194 (11th Cir. 2021) ..........................................................20

*Huggins v. Sch. Dist. of Manatee Cnty.*,
151 F.4th 1268 ...........................................................................................8

*Jackson v. Humphrey*,
776 F.3d 1232 (11th Cir. 2015) ...............................................................24

*Johnson v. City of Ft. Lauderdale*,
126 F. 3d 1372 (11th Cir. 1997) ...............................................................18

*Leslie v. Hancock Cnty. Bd. of Educ.*,
720 F.3d 1338 (11th Cir. 2013) ................................................................19

*Rioux v. City of Atlanta,*
520 F.3d 1269 (11th Cir. 2008) ................................................................17

*Stimpson v. City of Tuscaloosa,*
186 F. 3d 1328 (11th Cir. 1999) ...............................................................21

*VanDeWalle v. Leon Cnty. Florida*,
661 Fed. Appx. 581 (11th Cir. 2016)...................................................22, 23

*Zaklama v. Mt. Sinai Med, Ctr.,*
842 F.2d 291 (11th Cir 1988) ...................................................................21

## UNITED STATES DISTRICT COURTS

*Blash v. City of Hawkinsville*,
2018WL4119986 (M.D. Ga. Sept. 29, 2018) ...........................................14

*Castle v. Marquardt,*
632 F.Supp.2d 1317 (N.D. Ga. 2009).......................................................15

*Elver v. Whidden*,
2019 WL 144916  (M.D. Fla. Jan. 9, 2019)..............................................22

*Hanner v. City of East Point*,
2020 WL 13653835, (N.D. Ga. Jan. 31, 2020).........................................13

*Harrington v. Wells*,
2015 WL 6966389 (S.D. Ga. Nov. 10, 2015).........................................................13

*Pattee v. Georgia Ports Authority*,
477 F.Supp.2d 1253 (S.D. Ga. 2006)...............................................................12, 13

## INTRODUCTION

Negy does not dispute and largely ignores the substantiated findings of discriminatory and harassing classroom conduct detailed in OIE's Report. Negy does not contest that Myers lacked decision-making authority to terminate him. He cannot point to any record evidence that Cartwright, Dupras, or Johnson directed or influenced Myers's investigation, let alone were involved in it. Nor can he point to any evidence that the investigation was conducted with a predetermined outcome. Nor did the District Court.

Negy's "Factual Background" is a recitation of his beliefs, disguised as facts. While he attempts to create the appearance of material factual disputes to avoid this Court's jurisdiction, the District Court's Order (the "Order") should be reversed for the legal errors identified in the Initial Brief. There is not sufficient space to address every statement without record support or legal argument without foundation, but Appellants offer the following, in addition to their Initial Brief:

## I.    Reply to Negy's Fact Section

### A. "Negy's Tweets Generate Widespread Outrage"

As Negy's own brief headings make clear, and as he acknowledged in his June 3, 2020 email to Florian Jentsch, *his own tweets* generated complaints about him. (Doc. 72 at 74-78, 271). Negy's tweets generated "outrage," some of this "outrage" was in the form of complaints that Negy frequently made discriminatory or harassing

1

comments in class, and many of these complaints were copied to President Cartwright and other UCF officials before they ever commented on his tweets.[1] (Doc. 70 at 40-43; Doc. 63 at 205-206; Doc. 74 at 379-380; Doc. 78 at 210-211, 227-228).

### B. "University Officials Launch a Coordinated Attack on Negy"

Negy argues Cartwright, Dupras, and Johnson "launched a coordinated attack" by soliciting complaints about him to concoct a legitimate reason to fire him eight months later. Not only is Negy's theory unsupported by record evidence, but it could not have occurred, since none of them publicly commented about Negy's tweets until *after* the University had received numerous complaints about his classroom conduct and OIE opened an inquiry:

- **May 25, 2020 –** George Floyd is killed shortly after the controversial deaths of Breonna Taylor and Ahmaud Arbery became widely-known, sparking nation-wide protests and prompting conversations about racial justice.

- **May 29, 2020** – Negy tweets his views on race. (A.B. 6).

- **May 29, 2020 at 6:05 PM** – Butler's Statement, "Now is Our Time to be Actively Anti-Racist," directs students and faculty to different channels for support. It does not mention Negy. (Doc. 63 at 205-06).

- **June 2, 2020 at 2:28 PM –** Cartwright's Statement, "Our Future is Inclusion," explains that "hate or bias-related incidents" may be reported to the Just Knights Response Team. It does not mention Negy. (Doc. 64 at 165-66).

---

[1]  Complaints in the Summer of 2020 included hundreds of complaints about Negy's classroom conduct; this is unlike the December 2019 complaint solely about Negy's tweets (tweets OIE determined were protected speech). (Doc. 70 at 39; Doc. 72 at 23-25, 33-34).

- **June 3, 2020 at 7:06 PM** – Dupras's "Message from the Interim Dean" includes advice on how students could report "social or racial bias" incidents. It does not mention Negy. (Doc. 66 at 195-96).

- **June 4, 2020 at 3:00 AM –** Email from alumni to Cartwright complaining of Negy's classroom behavior. (Doc. 78 at 228-29).

- **June 4, 2020 before 8:00 AM** – Rhonda Bishop, Vice President for Compliance & Risk, calls Myers, Director of OIE, to inform her UCF received complaints overnight about Negy's tweets and classroom conduct. (Doc. 62 at 33-35; Doc. 70 at 40-43, 267, 467-468; Doc. 78 at 212-229).

- **June 4, 2020 (morning)** – Myers opens an OIE inquiry into Negy based on complaints. (Doc. 70 at 40-45).

- **June 4, 2020 at 9:07 AM –** Email from alumni forwarded to Cartwright complaining of Negy's religious discrimination in the classroom. (Doc. 78 at 210-11).

- **June 4, 2020 at 12:10 PM –** Email from alumni to Jentsch, Dupras, and Johnson complaining of Negy's religious discrimination in the classroom. (Doc. 78 at 227).

- **June 4, 2020 at 9:28 PM** – Cartwright, Johnson, and Butler's Joint Statement "Addressing Intolerance in Our Community," addresses Negy, that they have received complaints about discrimination "in Dr. Negy's classroom," and explains that "abusive or discriminatory behavior *by any faculty or staff member*" may be reported to the IntegrityLine. (Doc. 64 at 167-68).

This timeline illustrates not only that these individuals did not "solicit" complaints about Negy, but also that OIE had already opened an inquiry before any public mention of Negy. After all, UCF had a legal and ethical obligation to investigate complaints implicating classroom conduct, which Negy does not dispute. (Doc. 72 at 39-40, 88-90). Simply put, the administrators were addressing social

issues and where to report discriminatory behavior on campus <u>before</u> Negy was part of the conversation. (Doc. 63 at 205-206; Doc. 64 at 76-77, 86-87, 165-66; Doc. 66 at 195-96).

### C. "OIE Launches a Pretextual Investigation"

Cartwright, Dupras, and Johnson had nothing to do with OIE's opening the inquiry, deciding to investigate, or conducting the investigation. (Doc. 68 at 67; Doc. 70 at 43-45; Doc. 71 at 15; Doc. 73 at 9, 13; Doc. 74 at 10). Neither Negy nor the Order point to any evidence that Myers, Cartwright, Dupras, or Johnson acted in concert regarding the opening of the inquiry, or the investigation. Nor did either point to any evidence, because none exists, that Cartwright, Dupras, or Johnson suggested the investigation's result or that Negy should be terminated. (Doc. 62 at 48-49; Doc. 68 at 67; Doc. 70 at 31-32, 43-45, 47-48; Doc. 71 at 15; Doc. 73 at 9, 13; Doc. 74 at 10). While Negy argued, and the District Court agreed Negy created an issue of fact as to whether OIE's investigation was biased, both generally criticized *how* OIE, and Myers specifically, conducted the investigation. (A.B. 9, 11-14; Doc. 100 at 8-9). But none of the facts Negy or the Order cites show Myers's investigation was pretextual—that the real reason for the investigation was her bias against Negy's protected speech.

For instance, Negy complains Myers did not provide him every complaint or memorialize her witness credibility assessments, but neither he nor the Order cites

any rule or policy requiring Myers to do either. (A.B. 13-14; Doc. 100 at 8-9). Negy and the District Court's Order also fault Myers for finding he provided false information and had a motive to lie, which Negy contends was merely his faulty memory. (Doc. 100 at 8). But the District Court in its Order simultaneously concluded Negy "was certainly dishonest." (Doc. 100 at 9).

None of these alleged faults show Myers had any bias against Negy based on his speech. None of these alleged faults demonstrate OIE's substantiated findings of classroom misconduct (Negy's numerous discriminatory comments based on race, sex, and religion) were false. Neither the Order nor Negy attempt to address those substantiated complaints. Negy does not rebut these findings, acknowledges the existence of recordings of several of his statements, admits making many comments or simply quibbles with the exact phrasing, yet contests his statements created a hostile environment. (Doc. 72 at 25-32, 94-104, 138-146).

Negy admits Myers, acting for OIE, is the "gatekeeper" tasked with determining not only whether an investigation will be opened, but whether the claims have merit. (Doc. 72 at 92-93, 134). Negy also admits UCF had an obligation under state and federal law to investigate claims of discrimination and harassment and that it received over 500 complaints of discrimination and harassment, many of which were unrelated to his tweets. (Doc. 72 at 65, 88-90, 133-136).

### D. "OIE's Investigative Report: Show Me the Man, and I'll Find You the Crime"

Negy uses this section again to argue his theories, not record evidence. There is no evidence Myers made any comment about his speech or was motivated by any public pressure. Negy, lacking any record evidence, resorts to nitpicking Myers's investigation in an attempt to show pretext.

Negy's argument that Myers manipulated the definition of harassment does not hold water. Even the District Court noted his assertion was premised on a Title VII employment case, not UCF's harassment policy, and granted Myers summary judgment on Count II of Negy's Complaint.

Moreover, the OIE Report explained that multiple students said they dropped Negy's class "due to the impact of [Negy's] derogatory statements;" others "expressed difficulty enduring the course;" and many "indicated a hesitancy to participate in class because of [Negy's] classroom conduct." (Doc. 66 at 454). Based on the information it gathered, "including the highly offensive and derogatory protected-class statements combined, the pattern and frequency of derogatory protected-class statements that were outside the protection of academic freedom, and the significant impact this had on students," OIE found Negy's conduct "constitutes discriminatory harassment" in violation of UCF policy. *Id.* at 456. This conduct also violated UCF's code of conduct because it "fell woefully short of UCF's expectations regarding respect, inclusion and professionalism." *Id.*

Negy also argues he was treated differently than other faculty members OIE investigated. (A.B. 16). However, he cannot point to any other similarly-situated individual because no other faculty member was the subject of hundreds of complaints of pervasive discriminatory conduct. The faculty members referenced in the Response were not accused of either the same quantity or type of misconduct. *Id.* at n.5. Even so, in two of the four cases he identifies, OIE recommended discipline up to and including termination, just as it did for Negy. (Doc. 87-5 at 18-19; Doc. 87-7 at 48).

### E. "Negy is Immediately Terminated"

Finally, Negy attempts to argue Myers was a decision-maker solely because she was present when Negy's termination was discussed eight months after she opened the OIE inquiry. This argument falls flat in the face of the uncontroverted testimony of Myers and Bishop, as well as his own testimony, that Myers was not a decision-maker, did not have authority to terminate him, and did not even recommend termination. (Doc. 72 at 40-43; Doc. 62 at 102; Doc. 70 at 31, 34).

## II.    Appellants are Entitled to Qualified Immunity

### A. The District Court failed to conduct an individualized assessment of qualified immunity.

The District Court erred by treating this case like an employer-liability case instead of an individual capacity-liability case under §1983. Each Appellant is entitled to an individualized qualified immunity analysis; the District Court cannot

impute the statement of one Appellant onto another, let alone impute the purported motivations and statements of nonparties onto Appellants, individually or collectively. *Huggins v. Sch. Dist. of Manatee Cnty.*, 151 F.4th 1268, 1284 (11th Cir. 2025)(because there is no vicarious liability under §1983, plaintiff must show each defendant, through his own actions, violated the Constitution, and allege "a factual connection between his speech and each individual official's conduct for both his speech-restriction and First Amendment retaliation claims.").

Negy and the District Court's Order rely on statements purportedly made, and knowledge allegedly held by, others (i.e., Butler, students, UCF's Assistant Vice-President for Board Relations, unnamed members of "UCF administration," "counsel") to impute unlawful intent onto all Appellants even absent record evidence indicating any Appellant had such knowledge or held such views. (Doc. 100 at 9, 15; A.B. 5-7, 9-11). For instance, the District Court's Order imputes to Appellants knowledge that unnamed members of *UCF Administration"* purportedly had known of Negy's alleged role in failing to report a sexual assault or Negy's purported long-standing history of making discriminatory statements, without record evidence any Appellant had such knowledge. *Id.* Neither Negy nor the Order point to evidence that any Appellant had such knowledge.

The Order also ignores the distinct positions, responsibilities, knowledge, and actions of the individual Appellants, conflating their roles and authority. For

8

example, it states "Defendants had ample time to make reasoned, thoughtful decisions regarding *how they wished to proceed with the investigation*" (Doc. 100 at 17), ignoring the unrefuted record evidence that Cartwright, Dupras, and Johnson had no involvement in determining whether to open an inquiry or investigation, or conducting the investigation. (Doc. 68 at 67; Doc. 70 at 43-45; Doc. 71 at 15; Doc. 72 at 36, 134; Doc. 73 at 9, 13; Doc. 74 at 10). The Order likewise imputes Dupras's, Cartwright's, and Johnson's allegedly biased statements to Myers, finding the record demonstrated "***they*** were motivated by their distaste for Plaintiff and his views along with public pressure" (Doc. 100 at 18), despite the absence of evidence that Myers was offended by Negy's tweets, or made any statements about them. (Doc. 70 at 40). The failure to evaluate each Appellant's conduct to perform an individualized qualified immunity analysis permeated the District Court's legal conclusions.

**B. Negy's allegations of solicitation do not establish a substantial motivating factor.**

Negy maintains that telling students where they may complain about discrimination and harassment *by any staff member* demonstrates his speech was a substantial motivating factor in the investigation and his eventual discipline, and pretext.[2] In doing so, Negy relies in part on *Nat'l Rifle Ass'n of Am. v. Vullo*, 602

---

[2] Presumably, Negy refers only to Cartwright, Dupras, and Johnson, as there is no evidence Myers ever commented on Negy or advised students where they could complain about any professor. (Doc. 72 at 43-44)(acknowledging Myers did not

U.S. 175 (2024) and *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963). This reliance is misplaced.

In *Vullo*, the official "could not wield her power . . . *to threaten enforcement actions* against DFS-regulated entities in order to punish or suppress the NRA's gun-promotion advocacy." 602 U.S. at 187 (emphasis added). There, the official made threats and offered inducements—that the state would forego investigating violations of insurance regulations if insurers stopped writing certain NRA-backed policies. *Id.* at 183-184.

And as the *Vullo* Court explained, in *Bantam*, although the state commission that threatened the plaintiff "lacked the 'power to apply formal legal sanctions,'" the coerced party (the distributor) "reasonably understood" the commission <u>threatened</u> adverse action, and its "compliance with the [c]ommission's directives was not voluntary." *Id.* at 176-177 (citing *Bantam*, 372 U.S. at 66-68). The *Bantam* Court observed the commission threatened to institute criminal action even while lacking prosecution authority, noting its "notices, phrased virtually as orders, reasonably understood to be such by the distributor, invariably followed up by police visitations, in fact stopped the circulation of the listed publications." 372 U.S. 68.

---

solicit complaints). Rather, Negy argues the manner in which Myers conducted the investigation—not her ultimate findings—demonstrates pretext.

Neither Negy nor the District Court cited evidence that Cartwright, Dupras, or Johnson exerted any pressure on anyone to complain, directed OIE's investigation or any particular conclusion, or that any person, including Myers, felt pressure to do so. There was no evidence of threats or inducements. There was no carrot or stick. Telling students where they may complain about discriminatory or harassing conduct by any faculty is not equivalent to threatening enforcement actions or promising to forego such action in exchange for compliance, as the officials did in *Bantam* and *Vullo*. Negy even acknowledged that universities cannot ignore student complaints of discrimination. (Doc. 72 at 39-40, 88-90).

### C. *Foy*'s mixed motive analysis applies and demonstrates Appellants are entitled to qualified immunity.

Negy says applying *Foy v. Holston*, 94 F. 3d 1528 (11th Cir. 1996) would give "a veneer of legality to those school administrators who generate pretextual reasons for the termination of a faculty member so long as the record contains self-serving declarations that could also support a lawful reason for that termination." (A.B. at 45). This argument is premised on multiple misstatements.

First, Appellants' defense is not premised on purported "self-serving declarations." Negy ignores the numerous substantiated findings of his classroom misconduct—comments about race, sex, religion—based on third-party complaints OIE investigated, the substance of which he largely does not dispute and some of which he even admits.

11

Second, unlike this case, the cases Negy cites to distinguish *Foy* contained clear evidence of pretext—a sham justification—as opposed to mixed motives. There, the purported non-retaliatory, non-discriminatory reasons did not arise from non-party complainants, but were premised mostly, if not entirely, on the defendants' own statements.

More importantly, the plaintiffs in these cases did not merely offer an alternative explanation for the adverse employment action (as Negy does here). Rather, they produced *evidence* showing the explanation for the action was false. *Furcron v. Mail Centers Plus, LLC*, 843 F.3d 1295, 1313 (11th Cir. 2016)(pretext requires plaintiff to produce *evidence* "reveal[ing] such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions" rendering the employer's proffered reasons "unworthy of credence").

For instance, Negy cites *Pattee v. Georgia Ports Authority*, 477 F.Supp.2d 1253 (S.D. Ga. 2006), where an officer (Pattee) complained to the state inspector general about security deficiencies at Port of Savannah. Pattee was obligated by the IG's investigation and a state executive order to disclose the contact information of officers who could corroborate his allegations. *Id.* at 1259. The IG even warned the port authority director and deputy director against retaliating, providing them the same executive order requiring cooperation in investigations, including disclosure of witness information. *Id.* Despite this knowledge, the defendants investigated and

12

terminated Pattee for breach of a policy prohibiting disclosure of officer information. *Id.* at 1259-60. Relevant to the motivating factor, the defendants knew when they began investigating that *Pattee could not be fired for disclosing officer information*. *Id.* at 1264. And the defendants never determined Pattee lied or denied disclosing officer information. *Id.* The court determined this evidence provided sufficient grounds for a jury to determine his speech was a substantial or motivating factor in his termination. *Id.* at 1265.

In *Harrington v. Wells*, 2015 WL6966389, *1 (S.D. Ga. Nov. 10, 2015), the court denied summary judgment based on qualified immunity, noting evidence that the defendant "threatened to fire [the plaintiff] . . . if he did not abandon his unpaid wages request," told the plaintiff "he would regret" pursuing it, and reduced the plaintiff from full-time to part-time that same day. *Id.* at *4.

In *Hanner v. City of East Point*, 2020 WL 13653835, *1 (N.D. Ga. Jan. 31, 2020), the plaintiff officer sued the police chief under Sections 1981 and 1983 for failure to promote based on race discrimination. While the defendant's proffered reason for denying the promotion was that the plaintiff had not worked in the uniform patrol division since 2008, the plaintiff presented evidence of the chief's "contradictory and shifting explanations" for the promotion decision, calling into question his proffered reason. *Id.* at *10. That evidence included the chief's sworn interrogatory answers and deposition testimony in which he did *not* state his

proffered reason, *but instead* testified "he made the decisions based on the 'needs of the department.'" *Id.* at *11, 13.[3]

Similarly, in *Bogle v. McClure*, 332 F.3d 1347 (11th Cir. 2003), the defendants' non-discriminatory reason was supported merely by their own statements, not third-party complaints or independent investigations. There, seven white librarians sued the Atlanta-Fulton Public Library System, its board members, and director, for race discrimination when they were transferred from the Central Library to "dead-end jobs at branch libraries." *Id.* at 1347. In rejecting the qualified immunity defense, this Court cited "the Librarians' evidence suggesting the reorganization plan was a sham designed to cover up the race-based transfers." *Id.* at 1356. Importantly, the plaintiffs presented evidence that the defendant director, at the urging of the defendant board members, generated a "re-organization" plan, and that board members stated a desire to move more Black librarians to the Central Library as part of that plan, which plan "'was to move people from Central out to the branches and maybe do a swap and bring some black managers into Central.'" *Id.* at 1351.

---

[3] The district court in *Blash v. City of Hawkinsville*, 2018 WL 4119986, *1 (M.D. Ga. Sept. 29, 2018), denied a motion to dismiss (not a summary judgment motion) asserting qualified immunity because the court was "mandated by the requirement to accept Plaintiff's allegation as true," including the allegation he was fired "because he is black." *Id.* at 2.

These cases, cited by Negy, are not comparable to *Foy* or this matter, where the complaints supporting the disciplinary action originated from nonparties. While Negy accuses Appellants of relying on so-called "self-serving declarations," he ignores the 244-plus page OIE report documenting substantiated allegations from third parties of discriminatory and harassing classroom statements based on race, sex, religion, and other protected categories—other than to complain *how* Myers conducted the investigation. As the District Court noted (and as Negy concedes), Negy's in-class conduct "was the content of the investigation." (Doc. 100 at 13; Doc. 72 at 22, 84-85).

But more importantly, unlike the plaintiffs in the above cases, Negy does not present evidence *negating or proving as false* Appellants' proffered lawful explanations—that he was investigated and ultimately terminated based on substantiated third-party complaints he engaged in discriminatory and harassing classroom conduct. *See Castle v. Marquardt*, 632 F.Supp.2d 1317, 1340 n. 26 (N.D. Ga. 2009)(explaining in a "typical mixed-motive case, both the plaintiff and the defendant present evidence supporting their allegations regarding the basis" for the adverse action, but in *Bogle*, "the plaintiffs went a step further, presenting evidence that negated the defendants' proffered lawful explanation.").

Negy "merely present[s] a plausible alternative theory (as in a typical mixed-motives case)" for his termination—that Appellants were motivated to terminate him

in January 2021, after an eight-month investigation into hundreds of complaints about his classroom conduct, based on some Appellants' immediate public responses to tweets he posted in late May 2020. *Id.* But presenting a "plausible alternative theory" is different than "actually rebutting the defendant's explanation." *Id.* Negy does not offer evidence that the substantiated allegations of misconduct were false, and indeed, he admitted or was recorded saying many of the classroom comments documented in the OIE report. (Doc. 70 at 287-88, 292-93, 295, 298-302, 365-70, 373-80, 386-91, 424-28; Doc. 72 at 25-32, 94-104, 138-146).

So, on this record, Appellants "did in fact also possess a lawful motive" for investigating and ultimately terminating Negy, and he fails to show Appellants, or any reasonable official, would not have taken the same action absent his protected speech based on the numerous substantiated (and admitted) allegations of classroom misconduct violating UCF policies. *See Castle v. Appalachian Tech. Coll.*, 631 F.3d 1194, 1199 (11th Cir. 2011)("Assuming for the sake of argument that there was a retaliatory motive, this record, however, establishes that Thompson and Dr. Boteler did in fact also possess a lawful motive for suspending Castle, and that they reasonably believed that they would have suspended Castle in the absence of her protected speech because of her other conduct.")(citing *Foy*, 94 F.3d at 1534–35); *see also Furcron*, 843 F.3d at 1313–14 ("Far from addressing each of MCP's rationales 'head on,' Furcron argues, matter-of-factly, that she violated no work

rules," and merely quarreled with the wisdom of the employer's decision); *Rioux v. City of Atlanta,* 520 F.3d 1269, 1285 (11th Cir. 2008)("We cannot say that, even assuming Appellees were acting with improper race-based animus . . ., reasonable officials faced with the same evidence of Rioux's violations of work rules would have known that demoting Rioux violated clearly established federal law.").

Unlike the *Bogle* plaintiffs, Negy offers no record evidence that Appellants fabricated these allegations, threatened or induced students and alumni to complain about his classroom conduct, or that the decisionmakers directed or interfered with OIE's investigation. Nor does he offer evidence of shifting explanations by Appellants.[4] He may dispute that his conduct constitutes discrimination or harassment, but he does not dispute many of the substantiated allegations. Negy cannot show pretext without establishing the reasons articulated in the OIE report are false. He does not even attempt to do so.

In fact, based on Negy's concessions that he made numerous statements deemed discriminatory or harassing under UCF policies, this case is much closer not

---

[4] To the extent the District Court cited Cartwright's purported inability to identify what about the "process" of reviewing complaints frustrated him, or Dupras's statement that she agreed with a professor's thoughts regarding Negy, including his classroom comments, these statements were made on June 4 and 5, 2020, *after* UCF began receiving complaints about Negy's tweets and classroom conduct, and *after* OIE opened its inquiry. (Doc. 64 at 91-95; Doc. 66 at 203-204). These statements did not address the decision to terminate, which was not made until eight months later, and do not demonstrate inconsistencies in the reasons for termination.

only to *Foy*, but to *Johnson v. City of Ft. Lauderdale*, 126 F. 3d 1372, 1379 (11th Cir. 1997). In *Johnson*, because the transcripts of a disciplinary hearing supported the claimed lawful motives for demonstrating and discharging the plaintiff—he admitted disobeying orders and lying during the hearing—the Court explained that "[e]ven assuming that the defendants acted with some discriminatory or retaliatory motives," it was not clearly established "that a reasonable official faced with the same evidence of disobedience and deception should not have disciplined [the plaintiff] in the same manner." *Id.*

The qualified immunity analysis is not a purity test; the question is "whether the defendant's conduct was nonetheless 'objectively reasonable.'" *Johnson*, 126 F.3d at 1378; *see also Foy,* 94 F.3d at 1535, 1536 n. 10 ("Never has the Supreme Court or this circuit . . . held that a social worker cannot act to protect children— when faced with circumstances that would warrant a pure-hearted reasonable person to act—if the particular social worker's motivations are, in fact, mixed, some lawful and some not."). Regardless of whether some Appellants may have been motivated in part by distaste for Negy's views, it was not clearly established that reasonable officials, when faced with the same evidence of pervasive, consistent comments by Negy in the classroom about race, sex, and religion, would not have terminated him.

The District Court could not find "'that every objectively reasonable government official facing the circumstances'" Appellants faced "'would know that

[investigating student complaints of classroom discrimination and terminating Negy for such conduct] did violate federal law when the official acted.'" *Leslie v. Hancock Cnty. Bd. of Educ.*, 720 F.3d 1338, 1345, 1349 (11th Cir. 2013). It is not clearly established that Myers was precluded from investigating complaints about classroom conduct—Negy admits UCF cannot ignore such complaints—or that Cartwright, Dupras, and Johnson were precluded from relying on the investigation's substantiated findings of classroom conduct to terminate Negy. This is especially true given the District Court's conclusion that Myers was entitled to qualified immunity based on her findings regarding Negy's classroom comments, including that his conduct "demonstrated harassment under the University's Policies," *and* its finding that "the decisionmakers here based their decision to terminate Plaintiff on the Investigative Report." (Doc. 100 at 9, 20-21).  Appellants are entitled to qualified immunity.

### D. Myers was not a decisionmaker and cannot be liable for Negy's termination.

Myers was performing her discretionary job duties as OIE's director when she investigated the complaints about Negy's classroom conduct.  The Order correctly states, "[a]s an initial matter, only a person who has 'the power to make official decisions' can be individually liable for [ ] discrimination under section 1983." (Doc. 100 at 6).  The undisputed record evidence shows Myers: (i) had no authority to make official decisions, including taking any adverse action against Negy; (ii) was

not an official decisionmaker; and (iii) took no adverse action against Negy. (Doc. 70 at 31, 34; Doc. 72 at 40-43, 105; Doc. 75 at 6). She is not individually liable and is entitled to qualified immunity.

Negy fails to defend the District Court's application of cat's paw, including its reliance on *Gilroy v. Baldwin*, 843 F. App'x 194 (11th Cir. 2021)(decided after Negy's termination). He also does not contest Appellants' arguments that Myers cannot be held liable through cat's paw theory. Negy fails to cite any clearly established law that would hold Myers liable under these circumstances.

Instead, Negy (contrary to his prior testimony) now seeks to hold Myers liable as a decisionmaker because she was present at a meeting where her *supervisor* recommended termination, and that recommendation was discussed by Dupras and Johnson. (A.B. at 47). Even the District Court did not go so far as to find Myers was a decisionmaker, nor could it, as the undisputed evidence shows she had no authority over discipline. (Doc. 100 at 8; Doc. 72 at 40-43; Doc. 70 at 31, 34). Negy cites no cases supporting that one's mere presence in a room where employment decisions are discussed or made by others with authority, bestows decisionmaker status on that person. The District Court did not find, and there are no facts to establish, that Myers had the power to, or did, effectuate Negy's termination. (Doc. 100 at 7).

Negy asserts, without evidentiary support, that Myers recommended his termination. (A.B. at 48). The District Court did not find Myers made the

recommendation. It found "Rhonda Bishop, Myers's supervisor, [ ] made the recommendation Plaintiff be fired." (Doc. 100 at 8)(Doc. 62 at 102). It then relied on Negy's subjective belief that the investigation had flaws to erroneously apply cat's paw theory to find an issue of fact as to whether Myers was biased.

Negy relies on *Stimpson v. City of Tuscaloosa*, 186 F. 3d 1328 (11th Cir. 1999), and *Zaklama v. Mt. Sinai Med, Ctr.,* 842 F.2d 291 (11th Cir 1988), both Title VII cases, for the proposition that Myers was in a position to affect Negy's employment. Neither case, however, addresses individual liability under §1983. Nor do the facts support that Myers took any action against Negy. The record evidence establishes she had no power to terminate Negy, and only had the power to recommend *possible* discipline for others to consider. (Doc. 70 at 31, 34; Doc. 62 at 102; Doc. 72 at 40-43).

As to the investigation, Negy does not dispute Myers's obligation to investigate, or the many substantiated findings in her Report. (Doc. 70 at 287-88, 292-93, 295, 298-301, 365-70, 373-80, 386-91, 424-27; Doc. 72 at 25-32, 65, 39-40, 94-104, 138-146). Negy instead argues faults in the investigation serve as circumstantial evidence of bias. However, those alleged faults do not show bias premised on Negy's speech; they are not connected to his tweets nor are they sufficient to constitute circumstantial evidence of discriminatory animus based on his speech. Appellants previously addressed these alleged faults in detail. *See Reply*

*Brief supra* at 5; (Doc. 93 at 5-8, 17-21; I.B. at 40-41). The alleged faults are neither circumstantial evidence of bias, nor of pretext; they do not show the reasons for the investigation—the many complaints of classroom discrimination—were false.

Likewise, Negy's vague allegation that the timing of his tweets and Myers's opening of an inquiry is sufficiently close to establish pretext fails. Timing alone is insufficient to demonstrate pretext, especially when Negy does nothing to demonstrate the reasons for the investigation and termination—the complaints and substantiated findings of classroom misconduct—were false, and the discovery of such misconduct breaks the causal connection. *See Berry v. Crestwood Healthcare LP*, 84 F.4th 1300, 1310-11 (11th Cir. 2023)(rejecting assertion that "suspicious timing" was circumstantial evidence of retaliatory motive, and finding "intervening discovery" of misconduct "fatally undermine[d] the probative value of temporal proximity between [her] protected activity and her termination."). Nor does Negy point to record evidence to support his own speculative conclusions. *See Elver v. Whidden*, 2019 WL 144916, at *1 (M.D. Fla. Jan. 9, 2019), *aff'd sub nom. Elver v. Hendry Cnty. Sheriff's Office*, 791 Fed. App'x 56 (11th Cir. 2019)"[W]hile suspicious timing may establish an inference of a causal connection, timing alone is insufficient to demonstrate pretext…'[t]he inquiry into pretext centers on the employer's beliefs, not the employee's beliefs and…not on reality as it exists outside of the decision maker's head.'")(citations omitted); *VanDeWalle v. Leon Cnty.*

*Florida*, 661 Fed. Appx. 581, 587 (11th Cir. 2016)(rejecting plaintiff's argument that timing of her termination was "suspect because [defendant] capitalized on the first opportunity to get rid of [plaintiff] after she engaged in protected activity'…the not-particularly-close timing alone is insufficient" to establish pretext given "the defendants' evidence that they terminated her for a permissible reason."). While OIE opened the inquiry close in time to Negy's tweets, it also (and indisputably) opened the inquiry shortly after various UCF officials received complaints about his classroom behavior.

Moreover, as Negy acknowledged, UCF cannot ignore students' discrimination complaints, and OIE is the "gatekeeper" that reviews and decides whether the complaints require investigation. (Doc. 72 at 39-40, 88-90, 92-93, 134). UCF's policies require a "prompt" response to reports of prohibited conduct, consistent with Title IX, so Myers did not have the option to ignore or delay responding to complaints. (Doc. 78 at 69); *see, e.g.*, 34 C.F.R. § 106.44.

Neither can Negy create pretext by bare assertions he was treated differently than other professors.  Negy can point to no other professors who had the breadth or scope of complaints against them as he did. (Doc. 87-5 at 18-19; Doc. 87-7 at 48); *Berry*, 84 F.4th at 1309-12 (noting plaintiff could not show other employees who were not terminated were "similarly situated in all material respects.").

Negy has not cited a single case that clearly establishes Myers violated his constitutional rights. Nor does he refute her arguments, or otherwise show her conduct (recommending a potential range of discipline) violated clearly established law. Negy does not refute that Myers had a competing duty to timely investigate the complaints against him under UCF policy and federal law. Myers is entitled to qualified immunity.

### E. Negy's speech rights in the classroom were not clearly established.

Negy also argues the District Court erred in referencing *Bishop v. Aronov*, 926 F.2d 1066 (11th Cir. 1991) as "controlling authority" in finding his free speech rights in the classroom were not clearly established and granting Myers summary judgment on Count II. (A.B. 51).[5]  Negy's arguments should be rejected.

First, Negy relies on *Gilmore v. Ga. Dep't of Corr.*, 144 F.4th 1246, 1264 (11th Cir. 2025), stating this Court has "clarified that persuasive decisions from other circuits can also be considered" in "determining whether qualified immunity applies," and urges the Court to apply not its own precedent but decisions from other

---

[5] To the extent Negy challenges the summary judgment for Myers on Count II, he failed to invoke this Court's jurisdiction. While a challenge to an order granting summary judgment based on qualified immunity may be heard in an interlocutory appeal of an order denying qualified immunity where the two issues are sufficiently intertwined legally and factually, to invoke the Court's pendent jurisdiction, Negy was required to a file a cross-appeal, which he did not do. *Jackson v. Humphrey*, 776 F.3d 1232, 1239-40 (11th Cir. 2015). Negy cannot use Appellants' appeal to increase his rights, including reversing the ruling on Count II.  *Id.*

courts. (A.B. 52). This Court specifically stated that decisions outside this Circuit "can be considered in determining whether a violation was one of 'obvious clarity.'" *Id.* at 1263. But this Court left "for another day . . . whether such a consensus can by itself create clearly established law under the other two methods *in the absence of Supreme Court or Eleventh Circuit precedent*." *Id.* at n. 6.

Second, Negy's attempts to distinguish *Bishop* are unavailing. This Court in *Bishop* did not disclaim academic freedom, but considered "the strong predilection for academic freedom as an adjunct of the free speech rights of the First Amendment." *Id.* at 1075 (citing *Keyishian v. Board of Regents*, 385 U.S. 589 (1967), and noting *Keyishian* "dealt with that brand of regulation most offensive to a free society: loyalty oaths."). This Court, however, found "academic freedom in that context . . . cannot be extrapolated to deny schools command of their own courses," and that academic freedom principles "translate into a degree of deference to school officials who seek to reasonably regulate speech and campus activities in furtherance of the school's educational mission." *Id.*

Similar to this case, the university in *Bishop* was "respond[ing] to [student] complaints" about a professor's classroom conduct. *Id.* Here, UCF was inundated with complaints about Negy's discriminatory classroom comments. Like the university in *Bishop*, the OIE report reflects UCF's concern that students in Negy's

classes are not subject to discriminatory statements violating state or federal law or UCF policies. 926 F.2d at 1076.

Negy also ignores *Bishop*'s balancing test, which considers the context of the speech, the university's position as employer, the professor's interest in "academic freedom as an adjunct of the free speech rights of the First Amendment," as well as the "the coercive effect" on students that "a professor's speech inherently possesses," which the University may want to avoid. 926 F.2d at 1074-75. A careful review of the OIE report shows it found several statements were protected by academic freedom (Doc. 70 at 268-269), but multiple other comments were not.

All Appellants had an interest in ensuring students were not subjected to bias based on any protected characteristic. Indeed, that was the very basis for most of Myers's work as OIE's Director. But both Myers, in investigating the complaints, and Cartwright, Dupras, and Johnson, in terminating Negy based on OIE's findings, had an interest in avoiding the appearance of endorsing speech that may violate students' constitutional and statutory rights and UCF policies, and responding to substantiated findings of discriminatory conduct. Negy's interest in making such statements in his psychology classes, purportedly part of his interest in academic freedom, "do[es] not displace the University's interest inside the classroom." 926 F.2d at 1076.

Given these competing interests, Myers was not on notice that investigating Negy for his classroom comments violated his First Amendment rights, nor were Cartwright, Dupras, and Johnson on notice that disciplining Negy for this same classroom misconduct violated his constitutional rights, let alone that it violated clearly established law. *Bishop* supports the proposition that universities may limit a professor's classroom speech that may expose it to federal claims, including but not limited to, statements Negy was found to have made here.

Finally, and notably, neither in the District Court, nor in this appeal, does Negy make any effort to demonstrate how his interest in academic freedom applies to a single substantiated comment he made, or how such comments relate to his psychology courses. (Doc. 88 at 62-63). Rather, he effectively defines academic freedom as the right to say whatever he wants, whenever he wants, regardless of whether it applies to his discipline, psychology.[6]

## **<u>CONCLUSION</u>**

Appellants respectfully request that this Court reverse the Order on Appeal to the extent it denied them summary judgment on Count I, and remand for entry of judgment in their favor on Count I of Negy's Amended Complaint.

---

[6] During his deposition, Negy described his academic freedom as such: "I have free speech to cover and say things that are related to [my] course." (Doc. 72 at 41).

27

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned attorneys certify that Appellants' Reply Brief complies with the page limitation and type-volume limitation of Fed. R. App. P. 32(a)(7). This Reply Brief contains 6,441 words, excluding the parts exempted by Fed. R. App. P. 32(f) and 11th Cir. R. 32-4. The undersigned attorneys also certify that Appellants' Reply Brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5), (a)(6) as it was prepared with Times New Roman 14-point font.

*/s/ Richard L. Barry*
**RICHARD L. BARRY, ESQ.**
Florida Bar No. 360650
Richard.Barry@gray-robinson.com
Lead Trial Counsel
**KATHERINE W. KATZ, ESQ.**
Florida Bar No. 1022526
Katherine.Katz@gray-robinson.com
**GRAY ROBINSON, P.A.**
Post Office Box 3068
Orlando, Florida  32802-3068
Telephone:  (407) 843-8880
Facsimile:   (407) 244-5690

*/s/ Kristie Hatcher-Bolin*
**KRISTIE HATCHER-BOLIN**
Florida Bar No. 521388
Kristie.Hatcher-bolin@gray-robinson.com
**GRAY ROBINSON, P.A.**
Post Office Box 3
Lakeland, Florida 33802-0003
Telephone: (863) 284-2251
Facsimile: (863) 683-7462
*Counsel for Defendants/Appellants*

# CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing was electronically filed on January 15, 2025 using the ECF system which will automatically transmit a copy to:

*Counsel for Plaintiff/Appellee*
*Charles Negy*
c/o David R. Osborne, Esq.
Goldstein Law Partners, LLC
200 School Alley, Suite 5
Green Lane, PA 18054
dosborne@goldsteinlp.com

*Co-counsel for Charles Negy*
c/o Joshua Engel, Esq.
Engel & Martin, LLC
4660 Duke Drive, Ste. 101
Mason, OH 45040
engel@engelandmartin.com

*Co-counsel for Charles Negy*
Samantha Harris, Esq.
Allen Harris PLLC
P.O. Box 673
Narberth, PA 19072
sharris@allenharrislaw.com

/s/ Richard L. Barry
**RICHARD L. BARRY, ESQ.**
Florida Bar No. 360650
Richard.Barry@gray-robinson.com
Lead Trial Counsel
**KATHERINE W. KATZ, ESQ.**
Florida Bar No. 1022526
Katherine.Katz@gray-robinson.com
**GRAY ROBINSON, P.A.**
Post Office Box 3068
Orlando, Florida  32802-3068
Telephone:  (407) 843-8880
Facsimile:   (407) 244-5690

/s/ Kristie Hatcher-Bolin
**KRISTIE HATCHER-BOLIN**
Florida Bar No. 521388
Kristie.Hatcher-bolin@gray-robinson.com
**GRAY ROBINSON, P.A.**
Post Office Box 3
Lakeland, Florida 33802-0003
Telephone: (863) 284-2251
Facsimile: (863) 683-7462
*Counsel for Defendants/Appellants*