CASE NO. 25-11929

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT**

---

**ALEXANDER CARTWRIGHT, TOSHA DUPRAS, MICHAEL JOHNSON,
AND NANCY MYERS,
Defendants/Appellants,**

v.

**CHARLES NEGY,
Plaintiff/Appellee.**

---

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
District Court Case No. 6:23-CV-00666-CEM-DCI**

---

**APPELLANTS' SUPPLEMENTAL APPENDIX TO REPLY BRIEF
VOLUME 1**

---

**GRAYROBINSON, P.A.**

KRISTIE HATCHER-BOLIN, ESQ.
Florida Bar No.:  521388
One Lake Morton Drive
Lakeland, Florida 33801
(863) 284-2251 telephone
(863) 683-7462 facsimile

RICHARD L. BARRY, ESQ.
Florida Bar No. 360650
KATHERINE KATZ, ESQ.
Florida Bar No. 1022526
301 East Pine Street, Suite 1400
Orlando, Florida 32801
(407) 843-8880 telephone
(407) 244-5690 facsimile

*Attorneys for Appellants Alexander Cartwright, Tosha Dupras, Michael Johnson,
and Nancy Myers*

## INDEX TO APPENDIX - VOLUME 1

**Volume 1**                                          **Docket/Tab #**

District Court Civil Docket .......................................................................A

Doc. 63 – Notice of Filing Deposition of S. Kent Butler, Deposition of S. Kent Butler, and exhibits ..........................................................................63

Doc. 78 – Notice of Filing Nancy Myers' Responses to Plaintiff's First Request for Production to Defendant ...........................................................78

**Volume 2**                                          **Docket/Tab #**

Continue Doc. 78 – Notice of Filing Nancy Myers' Responses to Plaintiff's First Request for Production to Defendant ...................................................78

Doc. 87-5 Exhibit to Plaintiff's Response to Defendants' Summary Judgment Motions ........................................................................... 87-5

**Volume 3**                                          **Docket/Tab #**

Doc. 87-7 Exhibit to Plaintiff's Response to Defendants' Summary Judgment Motions ........................................................................... 87-7

**Volume 4**                                          **Docket/Tab #**

Continue Doc. 87-7 Exhibit to Plaintiff's Response to Defendants' Summary Judgment Motions ............................................................. 87-7

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Pursuant to 11th Cir. R. 26.1-1(a), Appellants certify the following is a complete list of the district court judges, attorneys, persons, associations of persons, firms, partnerships, corporations (including subsidiaries, conglomerates, affiliates, parent corporations, and any publicly held corporation owning 10% or more of the party's stock), and other identifiable legal entities related to a party that have an interest in this case.

1. Allen Harris Law—Attorneys for Plaintiff/Appellee;

2. Barry, Richard L.—Attorney for Defendants/Appellants;

3. Butler, S. Kent—Defendant;

4. Cartwright, Alexander—Defendant/Appellant;

5. Dupras, Tosha—Defendant/Appellant;

6. Engel, Joshua A.—Attorney for Plaintiff/Appellee;

7. Engel & Martin, LLC—Attorneys for Plaintiff/Appellee;

8. Goldstein Law Partners, LLC—Attorneys for Plaintiff/Appellee;

9. GrayRobinson, P.A.—Attorneys for Defendants/Appellants;

10. Harris, Samantha—Attorney for Plaintiff/Appellee;

11. Hatcher-Bolin, Kristie—Attorney for Defendants/Appellants;

12. Irick, Daniel C. – United States Magistrate Judge, Middle District of Florida, Orlando Division;

13.     Johnson, Michael—Defendant/Appellant;

14.     Katz, Katherine W.—Attorney for Defendants/Appellants;

15.     Lauten, Jr., Frederick James—Mediator;

16.     Mendoza, Carlos E.—United States District Judge, Middle District of Florida, Orlando Division;

17.     Myers, Nancy—Defendant/Appellant;

18.     Negy, Charles—Plaintiff/Appellee;

19.     Osborne, David R.—Attorney for Plaintiff/Appellee;

20.     Spradley, Susan T.—Former Attorney for Defendants/Appellants;

21.     The University of Central Florida Board of Trustees—Defendant;

22.     Zimmerman, Jason—Former Attorney for Defendants/Appellants;

23.     Zolty, Julie M.—Attorney for Defendants/Appellants.

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that a true and correct copy of the foregoing was electronically filed on January 16, 2025 using the ECF system which will automatically transmit a copy to:

*Counsel for Plaintiff/Appellee*
*Charles Negy*
c/o David R. Osborne, Esq.
Goldstein Law Partners, LLC
200 School Alley, Suite 5
Green Lane, PA 18054
dosborne@goldsteinlp.com

*Co-counsel for Charles Negy*
Samantha Harris, Esq.

*Co-counsel for Charles Negy*
c/o Joshua Engel, Esq.
Engel & Martin, LLC
4660 Duke Drive, Ste. 101
Mason, OH 45040
engel@engelandmartin.com

Allen Harris PLLC
P.O. Box 673
Narberth, PA 19072
sharris@allenharrislaw.com


*/s/ Richard L. Barry*

**RICHARD L. BARRY, ESQ.**
Florida Bar No. 360650
Richard.Barry@gray-robinson.com
Lead Trial Counsel
**KATHERINE W. KATZ, ESQ.**
Florida Bar No. 1022526
Katherine.Katz@gray-robinson.com
**JULIE M. ZOLTY**
Florida Bar No.: 1036454
Julie.Zolty@gray-robinson.com
**GRAY ROBINSON, P.A.**
Post Office Box 3068
Orlando, Florida  32802-3068
Telephone:  (407) 843-8880
Facsimile:   (407) 244-5690

*/s/ Kristie Hatcher-Bolin*

**KRISTIE HATCHER-BOLIN**
Florida Bar No. 521388
Kristie.Hatcher-bolin@gray-robinson.com
**GRAY ROBINSON, P.A.**
Post Office Box 3
Lakeland, Florida 33802-0003
Telephone: (863) 284-2251
Facsimile: (863) 683-7462
*Counsel for Defendants/Appellants*

/57110/93#65713503

ADMCLOSED,APPEAL,MEDIATION,STAYED,TANGIBLE

# U.S. District Court
## Middle District of Florida (Orlando)
## CIVIL DOCKET FOR CASE #: 6:23-cv-00666-CEM-DCI

| | |
|---|---|
| Negy v. Board of Trustees of the University of Central Florida et al | Date Filed: 04/12/2023 |
| Assigned to: Judge Carlos E. Mendoza | Date Terminated: 06/10/2025 |
| Referred to: Magistrate Judge Daniel C. Irick | Jury Demand: Plaintiff |
| Case in other court: 11th Circuit, 25-11929 | Nature of Suit: 440 Civil Rights: Other |
| Cause: 42:1983 Civil Rights Act | Jurisdiction: Federal Question |

**Plaintiff**

**Charles Negy**            represented by    **Samantha K. Harris**
Allen Harris PLLC
PO Box 673
Narberth, PA 19072
267-304-4538
Email: sharris@allenharrislaw.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joshua Engel**
Engel & Martin LLC
Suite 101
4660 Duke Dr
Mason, OH 45040
513/445-9600
Fax: 513/492-8989
Email: engel@engelandmartin.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**David Randel Osborne**
Goldstein Law Partners, LLC
1200 Riverplace Blvd.
Suite 105-1110
Jacksonville, FL 32207
610-949-0444
Fax: 610-296-7730
Email: dosborne@goldsteinlp.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Board of Trustees of the University of**      represented by    **Richard L. Barry**
**Central Florida**                                    GrayRobinson, PA
301 E Pine St Ste 1400
Orlando, FL 32801

407-843-8880
Fax: 407-244-5690
Email: richard.barry@gray-robinson.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Susan T. Spradley**
GrayRobinson, PA
301 E Pine St Ste 1400
Orlando, FL 32801
407/843-8880
Fax: 407/244-5690
Email: susan.spradley@gray-robinson.com
*TERMINATED: 08/08/2024*
*LEAD ATTORNEY*

**Jason Alec Zimmerman**
GrayRobinson, PA
301 E Pine St Ste 1400
Orlando, FL 32801
407-843-8880
Fax: 407/244-5690
Email: jason.zimmerman@gray-robinson.com
*TERMINATED: 01/23/2025*
*ATTORNEY TO BE NOTICED*

**Julie Zolty**
GrayRobinson, P.A.
301 E. Pine Street
Suite 1400
Orlando, FL 32801
407-204-3195
Email: julie.zolty@gray-robinson.com
*TERMINATED: 12/23/2025*
*ATTORNEY TO BE NOTICED*

**Katherine Williams Katz**
GrayRobinson, P.A.
301 E Pine Street
Suite 1400
Orlando, FL 32801
407-843-8880
Email: katherine.katz@gray-robinson.com
*ATTORNEY TO BE NOTICED*

**Kristie Hatcher-Bolin**
GrayRobinson, PA
One Lake Morton Dr
PO Box 3
Lakeland, FL 33802-0003
863/284-2200 Ext 2256
Fax: 863/683-7462
Email: kristie.hatcher-bolin@gray-

*robinson.com*
*ATTORNEY TO BE NOTICED*

**Defendant**

**S. Kent Butler**                          represented by    **Richard L. Barry**
*individually and in his official capacity*                  (See above for address)
*TERMINATED: 05/29/2025*                                     *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Susan T. Spradley**
                                                             (See above for address)
                                                             *TERMINATED: 08/08/2024*
                                                             *LEAD ATTORNEY*

                                                             **Jason Alec Zimmerman**
                                                             (See above for address)
                                                             *TERMINATED: 01/23/2025*
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Julie Zolty**
                                                             (See above for address)
                                                             *TERMINATED: 12/23/2025*
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Katherine Williams Katz**
                                                             (See above for address)
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Kristie Hatcher-Bolin**
                                                             (See above for address)
                                                             *ATTORNEY TO BE NOTICED*

**Defendant**

**Alexander Cartwright**                    represented by    **Richard L. Barry**
*individually and in his official capacity*                  (See above for address)
                                                             *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Susan T. Spradley**
                                                             (See above for address)
                                                             *TERMINATED: 08/08/2024*
                                                             *LEAD ATTORNEY*

                                                             **Jason Alec Zimmerman**
                                                             (See above for address)
                                                             *TERMINATED: 01/23/2025*
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Julie Zolty**
                                                             (See above for address)
                                                             *TERMINATED: 12/23/2025*
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Katherine Williams Katz**

(See above for address)
*ATTORNEY TO BE NOTICED*

**Kristie Hatcher-Bolin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Tosha Dupras**                    represented by    **Richard L. Barry**
*individually and in her official capacity*                (See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Susan T. Spradley**
(See above for address)
*TERMINATED: 08/08/2024*
*LEAD ATTORNEY*

**Jason Alec Zimmerman**
(See above for address)
*TERMINATED: 01/23/2025*
*ATTORNEY TO BE NOTICED*

**Julie Zolty**
(See above for address)
*TERMINATED: 12/23/2025*
*ATTORNEY TO BE NOTICED*

**Katherine Williams Katz**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kristie Hatcher-Bolin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Michael Johnson**                    represented by    **Richard L. Barry**
*individually and in his official capacity*                (See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Susan T. Spradley**
(See above for address)
*TERMINATED: 08/08/2024*
*LEAD ATTORNEY*

**Jason Alec Zimmerman**
(See above for address)
*TERMINATED: 01/23/2025*
*ATTORNEY TO BE NOTICED*

**Julie Zolty**
(See above for address)

*TERMINATED: 12/23/2025*
*ATTORNEY TO BE NOTICED*

**Katherine Williams Katz**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kristie Hatcher-Bolin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

| | | |
|---|---|---|
| **Nancy Myers**<br>*individually and in her official capacity* | represented by | **Richard L. Barry**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Susan T. Spradley**
(See above for address)
*TERMINATED: 08/08/2024*
*LEAD ATTORNEY*

**Jason Alec Zimmerman**
(See above for address)
*TERMINATED: 01/23/2025*
*ATTORNEY TO BE NOTICED*

**Julie Zolty**
(See above for address)
*TERMINATED: 12/23/2025*
*ATTORNEY TO BE NOTICED*

**Katherine Williams Katz**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kristie Hatcher-Bolin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Mediator**

| | | |
|---|---|---|
| **Frederick J. Lauten**<br>*TERMINATED: 01/15/2025* | represented by | **Frederick James Lauten , Jr.**<br>Upchurch, Watson, White and Max<br>1060 Maitland Center Commons., Suite 440<br>Maitland, FL 32751<br>407-432-6124<br>Fax: 407-661-5743<br>Email: flauten@uww-adr.com<br>*TERMINATED: 01/15/2025* |

| Date Filed | # | Docket Text |
|---|---|---|

| 04/12/2023 | 1 | COMPLAINT against Board of Trustees of the University of Central Florida, S. Kent Butler, Alexander Cartwright, Tosha Dupras, Michael Johnson, Nancy Myers with Jury Demand (Filing fee $402 receipt number AFLMDC-20718503) filed by Charles Negy. (Attachments: # 1 Civil Cover Sheet)(Osborne, David) (Entered: 04/12/2023) |
|---|---|---|
| 04/13/2023 | 2 | NEW CASE ASSIGNED to Judge Roy B. Dalton, Jr. and Magistrate Judge Embry J. Kidd. New case number: 6:23-cv-666-RBD-EJK. (ARC) (Entered: 04/13/2023) |
| 04/13/2023 | 3 | NOTICE of a related action per Local Rule 1.07(c) by Charles Negy. Related case(s): Yes (Osborne, David) (Entered: 04/13/2023) |
| 04/13/2023 | | REFUND for duplicate payment. Receipt number AFLMDC-20718488 refunded in the amount of $ $402.00 paid to David Randel Osborne.. (NLC) (Entered: 04/13/2023) |
| 04/13/2023 | 4 | CORPORATE Disclosure Statement by Charles Negy. (Osborne, David) (Entered: 04/13/2023) |
| 04/14/2023 | 5 | **ORDER ON DISCOVERY MOTIONS. Signed by Magistrate Judge Embry J. Kidd on 4/14/2023. (JOR)** (Entered: 04/14/2023) |
| 04/14/2023 | 6 | NOTICE TO COUNSEL Samantha K. Harris Local Rule 2.01(c), Special Admission of Non-Resident Lawyer - File a Motion to Appear Pro Hac Vice. Co-counsel with filing rights may electronically file the motion on behalf of the non-resident lawyer or the motion may be filed on paper; Pay the Special Admission Fee; Submit a Pro Hac Vice E-File Registration through PACER. Visit www.flmd.uscourts.gov/for-lawyers for details (Signed by Deputy Clerk). (KNC) (Entered: 04/14/2023) |
| 04/14/2023 | 7 | **ORDER reassigning this case to the Honorable Carlos E. Mendoza, with his consent, in light of Case No. 6:23-cv-488-CEM-DCI. Signed by Judge Roy B. Dalton, Jr. on 4/14/2023. (ALL)** (Entered: 04/14/2023) |
| 04/14/2023 | 8 | MOTION for Samantha K. Harris to appear pro hac vice, Special Admission fee paid, Receipt No. AFLMDC-20728362 for $150 by Charles Negy. (Osborne, David) Motions referred to Magistrate Judge Embry J. Kidd. (Entered: 04/14/2023) |
| 04/17/2023 | 9 | Case Reassigned to Judge Carlos E. Mendoza. New case number: 6:23-cv-666-CEM-EJK. Judge Roy B. Dalton, Jr. no longer assigned to the case. (RPB) (Entered: 04/17/2023) |
| 04/17/2023 | 10 | **ORDER granting 8 Motion to Appear Pro Hac Vice. Signed by Magistrate Judge Embry J. Kidd on 4/17/2023. (AS)** (Entered: 04/17/2023) |
| 04/17/2023 | 11 | **INITIAL ORDER re: Case Management and Deadlines. Signed by Judge Carlos E. Mendoza on 4/17/2023. (MEH)** (Entered: 04/17/2023) |
| 04/17/2023 | 12 | **NOTICE TO COUNSEL AND PARTIES: Failure to comply with ANY Local Rules or Court Orders may result in the imposition of sanctions including, but not limited to, the dismissal of this action or entry of default without further notice. Signed by Judge Carlos E. Mendoza on 4/17/2023. (MEH)** (Entered: 04/17/2023) |
| 04/17/2023 | 13 | **NOTICE TO COUNSEL AND PARTIES: The Orlando Division of the Middle District of Florida is currently operating in a Judicial Emergency due to a judicial vacancy and the number of cases in the division. Accordingly, civil cases, and especially newly filed civil cases, will be the Court's lowest priority unless emergency issues are presented. Counsel and the parties are encouraged to consider consenting to the Magistrate Judge for the entire case or disposition of any dispositive motions in order to have their case considered on a more timely basis. Signed by Judge Carlos E. Mendoza on 4/17/2023. (MEH)** (Entered: 04/17/2023) |

| | | |
|---|---|---|
| 04/20/2023 | 14 | NOTICE of a related action per Local Rule 1.07(c) by Charles Negy. Related case(s): Yes (Osborne, David) (Entered: 04/20/2023) |
| 04/20/2023 | 15 | CORPORATE Disclosure Statement by Charles Negy. (Osborne, David) (Entered: 04/20/2023) |
| 04/28/2023 | 16 | CORPORATE Disclosure Statement by Charles Negy. (Osborne, David) (Entered: 04/28/2023) |
| 05/01/2023 | 17 | **ORDER transferring this case to the Honorable Daniel C. Irick, with his consent, for all further proceedings. Signed by Magistrate Judge Embry J. Kidd on 5/1/2023. (AS)** (Entered: 05/01/2023) |
| 05/01/2023 | 18 | Case Reassigned to Magistrate Judge Daniel C. Irick. New case number: 6:23-cv-666-CEM-DCI. Magistrate Judge Embry J. Kidd no longer assigned to the case. (RPB) (Entered: 05/01/2023) |
| 06/09/2023 | 19 | MOTION to Dismiss Plaintiff's Complaint *or Alternatively, Motion for More Definite Statement and Motion to Strike Punitive Damages* by All Defendants. (Spradley, Susan) (Entered: 06/09/2023) |
| 06/09/2023 | 20 | CORPORATE Disclosure Statement by Board of Trustees of the University of Central Florida, S. Kent Butler, Alexander Cartwright, Tosha Dupras, Michael Johnson, Nancy Myers. (Spradley, Susan) (Entered: 06/09/2023) |
| 06/09/2023 | 21 | NOTICE of a related action per Local Rule 1.07(c) by Board of Trustees of the University of Central Florida, S. Kent Butler, Alexander Cartwright, Tosha Dupras, Michael Johnson, Nancy Myers. Related case(s): Yes (Spradley, Susan) (Entered: 06/09/2023) |
| 06/12/2023 | 22 | NOTICE of Appearance by Julie Zolty on behalf of Board of Trustees of the University of Central Florida, S. Kent Butler, Alexander Cartwright, Tosha Dupras, Michael Johnson, Nancy Myers (Zolty, Julie) (Entered: 06/12/2023) |
| 06/12/2023 | 23 | NOTICE of Appearance by Kristie Hatcher-Bolin on behalf of Board of Trustees of the University of Central Florida, S. Kent Butler, Alexander Cartwright, Tosha Dupras, Michael Johnson, Nancy Myers (Hatcher-Bolin, Kristie) (Entered: 06/12/2023) |
| 06/12/2023 | 24 | NOTICE of Appearance by Susan T. Spradley on behalf of Board of Trustees of the University of Central Florida, S. Kent Butler, Alexander Cartwright, Tosha Dupras, Michael Johnson, Nancy Myers (Spradley, Susan) (Entered: 06/12/2023) |
| 06/12/2023 | 25 | NOTICE of Appearance by Katherine Williams Katz on behalf of Board of Trustees of the University of Central Florida, S. Kent Butler, Alexander Cartwright, Tosha Dupras, Michael Johnson, Nancy Myers (Katz, Katherine) (Entered: 06/12/2023) |
| 06/29/2023 | 26 | AMENDED COMPLAINT against All Defendants with Jury Demand. : "Related document: 1 Complaint filed by Charles Negy. (Harris, Samantha) Modified on 6/30/2023 (JTM). (Entered: 06/29/2023) |
| 06/29/2023 | 27 | CERTIFICATE of service by Charles Negy re 26 Amended Complaint . (Harris, Samantha) (Entered: 06/29/2023) |
| 07/04/2023 | 28 | **ENDORSED ORDER denying as moot 19 Defendants' Motion to Dismiss in light of 26 Plaintiff's First Amended Complaint. Signed by Judge Carlos E. Mendoza on 7/4/2023. (VLC)** (Entered: 07/04/2023) |
| 07/10/2023 | 29 | Unopposed MOTION for Extension of Time to File Response/Reply as to 26 Amended Complaint by All Defendants. (Spradley, Susan) (Entered: 07/10/2023) |

USCA11 Case: 25-11929     Document: 34-1     Date Filed: 01/16/2026     Page: 13 of 250

| | | |
|---|---|---|
| 07/13/2023 | 30 | **ENDORSED ORDER granting** 29 **Unopposed Motion for Extension of Time. Defendants Board of Trustees of the University of Central Florida, S. Kent Butler, Alexander Cartwright, Tosha Dupras, Michael Johnson, and Nancy Myers must respond to the Amended Complaint by 7/21/2023. Signed by Magistrate Judge Daniel C. Irick on 7/13/2023. (Irick, Daniel)** (Entered: 07/13/2023) |
| 07/20/2023 | 31 | CASE MANAGEMENT REPORT. (Harris, Samantha) (Entered: 07/20/2023) |
| 07/21/2023 | 32 | MOTION to Dismiss Plaintiff's Amended Complaint , *or Alternatively, Motion to Strike Punitive Damages* by All Defendants. (Spradley, Susan) (Entered: 07/21/2023) |
| 08/07/2023 | 33 | **CASE MANAGEMENT AND SCHEDULING ORDER: Amended Pleadings due by 10/6/2023 Joinder of Parties due by 10/6/2023 Discovery due by 11/29/2024 Dispositive motions due by 12/31/2024 Pretrial statement due by 5/5/2025 All other motions due by 5/5/2025 Plaintiff disclosure of expert report due by 10/1/2024 Defendant disclosure of expert report due by 10/31/2024 Trial Status Conference set for 5/15/2025 at 10:00 AM in Orlando Courtroom 5B before Judge Carlos E. Mendoza Jury Trial set for the June 2025 trial term in Orlando Courtroom 5B before Judge Carlos E. Mendoza. Conduct mediation hearing by 12/13/2024. Lead counsel to coordinate dates. Signed by Judge Carlos E. Mendoza on 8/7/2023. (MEH)** (Entered: 08/07/2023) |
| 08/11/2023 | 34 | RESPONSE in Opposition re 32 MOTION to Dismiss Plaintiff's Amended Complaint , *or Alternatively, Motion to Strike Punitive Damages* filed by Charles Negy. (Attachments: # 1 Exhibit Declaration of Charles Negy)(Harris, Samantha) (Entered: 08/11/2023) |
| 08/11/2023 | 35 | CERTIFICATE of service by Charles Negy re 34 Response in Opposition to Motion . (Harris, Samantha) (Entered: 08/11/2023) |
| 04/17/2024 | 36 | NOTICE of Appearance by Jason Alec Zimmerman on behalf of Board of Trustees of the University of Central Florida, S. Kent Butler, Alexander Cartwright, Tosha Dupras, Michael Johnson, Nancy Myers (Zimmerman, Jason) (Entered: 04/17/2024) |
| 04/19/2024 | 37 | Unopposed MOTION to Stay *Discovery and Pretrial Deadlines* by Board of Trustees of the University of Central Florida, S. Kent Butler, Alexander Cartwright, Tosha Dupras, Michael Johnson, Nancy Myers. (Zolty, Julie) (Entered: 04/19/2024) |
| 04/29/2024 | 38 | **ORDER granting in part and denying in part** 32 **Motion to Dismiss. Plaintiff does not have standing to pursue injunctive relief. All claims asserted against the Board are DISMISSED without prejudice based on Eleventh Amendment immunity. Counts IV and V are DISMISSED without prejudice. The Motion is otherwise DENIED. Signed by Judge Carlos E. Mendoza on 4/29/2024. (MEH)** (Entered: 04/29/2024) |
| 04/29/2024 | 39 | **ENDORSED ORDER denying as moot** 37 **Defendants' Unopposed Motion to Stay Discovery and Pretrial Deadlines in light of** 38 **Order granting in part and denying in part Defendants' Motion to Dismiss. Signed by Judge Carlos E. Mendoza on 4/29/2024. (RRM)** (Entered: 04/29/2024) |
| 05/08/2024 | 40 | Unopposed MOTION for Extension of Time to File Answer re 26 Amended Complaint by Board of Trustees of the University of Central Florida, S. Kent Butler, Alexander Cartwright, Tosha Dupras, Michael Johnson, Nancy Myers. (Zolty, Julie) Motions referred to Magistrate Judge Daniel C. Irick. (Entered: 05/08/2024) |
| 05/13/2024 | 41 | **ENDORSED ORDER granting** 40 **Unopposed Motion for Extension of Time. Defendants S. Kent Butler, Alexander Cartwright, Tosha Dupras, Michael Johnson, and Nancy Myers must respond to the Amended Complaint by 5/23/2024. Signed by Magistrate Judge Daniel C. Irick on 5/13/2024. (Irick, Daniel)** (Entered: 05/13/2024) |

| | | |
|---|---|---|
| 05/23/2024 | 42 | ANSWER and affirmative defenses to 26 Amended Complaint by S. Kent Butler. (Hatcher-Bolin, Kristie) (Entered: 05/23/2024) |
| 05/23/2024 | 43 | ANSWER and affirmative defenses to 26 Amended Complaint by Alexander Cartwright. (Hatcher-Bolin, Kristie) (Entered: 05/23/2024) |
| 05/23/2024 | 44 | ANSWER and affirmative defenses to 26 Amended Complaint by Tosha Dupras. (Hatcher-Bolin, Kristie) (Entered: 05/23/2024) |
| 05/23/2024 | 45 | ANSWER and affirmative defenses to 26 Amended Complaint by Michael Johnson. (Hatcher-Bolin, Kristie) (Entered: 05/23/2024) |
| 05/23/2024 | 46 | ANSWER and affirmative defenses to 26 Amended Complaint by Nancy Myers.(Hatcher-Bolin, Kristie) (Entered: 05/23/2024) |
| 06/24/2024 | 47 | Unopposed MOTION for Extension of Time to Complete Discovery by Charles Negy. (Harris, Samantha) Motions referred to Magistrate Judge Daniel C. Irick. (Entered: 06/24/2024) |
| 07/07/2024 | 48 | **ENDORSED ORDER denying 47 Unopposed Motion to Extend Case Management Deadlines. The Motion seeks to extend all the CMSO deadlines in this case yet fails to identify, let alone meet, the good cause standard (and the related showing of diligence) applicable to the extension of a CMSO deadline. See Fed.R.Civ.P. 16(b)(4); 33 CMSO at 2-3. Signed by Magistrate Judge Daniel C. Irick on 7/7/2024. (Irick, Daniel)** (Entered: 07/07/2024) |
| 08/08/2024 | 49 | Unopposed MOTION for Susan T. Spradley to Withdraw as Attorney by All Defendants. (Spradley, Susan) Motions referred to Magistrate Judge Daniel C. Irick. (Entered: 08/08/2024) |
| 08/08/2024 | 50 | **ENDORSED ORDER granting 49 Motion to Withdraw as Attorney. Susan T. Spradley is terminated as counsel in this case. Signed by Magistrate Judge Daniel C. Irick on 8/8/2024. (Irick, Daniel)** (Entered: 08/08/2024) |
| 12/04/2024 | 51 | Joint MOTION for Miscellaneous Relief, specifically Extend Mediation Deadline by Charles Negy. (Harris, Samantha) (Entered: 12/04/2024) |
| 12/05/2024 | 52 | **ENDORSED ORDER granting 51 Joint Motion to Extend Mediation Deadline. The mediation deadline is extended until January 15, 2025. No further extensions of the deadline will be granted absent a showing of good cause. Signed by Judge Carlos E. Mendoza on 12/5/2024. (RRM)** (Entered: 12/05/2024) |
| 12/05/2024 | 53 | NOTICE of mediation conference/hearing to be held on January 14, 2025, 9 AM before Frederick Lauten. (Harris, Samantha) (Entered: 12/05/2024) |
| 12/12/2024 | 54 | Unopposed MOTION for Extension of Time to File Dispositive motion deadline by All Defendants. (Hatcher-Bolin, Kristie) (Entered: 12/12/2024) |
| 12/17/2024 | 55 | **ENDORSED ORDER granting 54 Defendants' Unopposed Motion for Extension. On or before January 21, 2025, the parties may file their dispositive motions. Signed by Judge Carlos E. Mendoza on 12/17/2024. (RRM)** (Entered: 12/17/2024) |
| 01/13/2025 | 56 | NOTICE of Lead Counsel Designation by Kristie Hatcher-Bolin on behalf of Board of Trustees of the University of Central Florida, S. Kent Butler, Alexander Cartwright, Tosha Dupras, Michael Johnson, Nancy Myers. Lead Counsel: Kristie Hatcher-Bolin. (Hatcher-Bolin, Kristie) (Entered: 01/13/2025) |
| 01/15/2025 | 57 | MEDIATION report Hearing held on 1/14/2025. Hearing outcome: Impasse. (Lauten, Frederick) Modified punctuation on 1/15/2025 (JK). (Entered: 01/15/2025) |

| | | |
|---|---|---|
| 01/20/2025 | 58 | UNOPPOSED MOTION for Jason Zimmerman to Withdraw as Attorney by All Defendants. (Zimmerman, Jason) Motions referred to Magistrate Judge Daniel C. Irick. Modified on 1/21/2025 to edit docket text (JDR). (Entered: 01/20/2025) |
| 01/21/2025 | 59 | MOTION for Summary Judgment by S. Kent Butler. (Hatcher-Bolin, Kristie) (Entered: 01/21/2025) |
| 01/21/2025 | 60 | MOTION for Summary Judgment by Alexander Cartwright, Tosha Dupras, Michael Johnson. (Hatcher-Bolin, Kristie) (Entered: 01/21/2025) |
| 01/21/2025 | 61 | MOTION for Summary Judgment by Nancy Myers. (Hatcher-Bolin, Kristie) (Entered: 01/21/2025) |
| 01/21/2025 | 62 | DEPOSITION of RHONDA BISHOP taken on 11/20/24 re 61 MOTION for Summary Judgment , 59 MOTION for Summary Judgment , 60 MOTION for Summary Judgment by S. Kent Butler, Alexander Cartwright, Tosha Dupras, Michael Johnson, Nancy Myers. . (Hatcher-Bolin, Kristie) (Entered: 01/21/2025) |
| 01/21/2025 | 63 | DEPOSITION of S. KENT BUTLER taken on 10/21/24 re 61 MOTION for Summary Judgment , 59 MOTION for Summary Judgment , 60 MOTION for Summary Judgment by S. Kent Butler, Alexander Cartwright, Tosha Dupras, Michael Johnson, Nancy Myers. . (Hatcher-Bolin, Kristie) (Entered: 01/21/2025) |
| 01/21/2025 | 64 | DEPOSITION of ALEXANDER CARTWRIGHT taken on 11/04/24 re 61 MOTION for Summary Judgment , 59 MOTION for Summary Judgment , 60 MOTION for Summary Judgment by S. Kent Butler, Alexander Cartwright, Tosha Dupras, Michael Johnson, Nancy Myers. . (Hatcher-Bolin, Kristie) (Entered: 01/21/2025) |
| 01/21/2025 | 65 | DEPOSITION of ALEXANDER CARTWRIGHT taken on 11/05/24 re 61 MOTION for Summary Judgment , 59 MOTION for Summary Judgment , 60 MOTION for Summary Judgment by S. Kent Butler, Alexander Cartwright, Tosha Dupras, Michael Johnson, Nancy Myers. . (Hatcher-Bolin, Kristie) (Entered: 01/21/2025) |
| 01/21/2025 | 66 | DEPOSITION of TOSHA DUPRAS taken on 09/17/24 re 61 MOTION for Summary Judgment , 59 MOTION for Summary Judgment , 60 MOTION for Summary Judgment by S. Kent Butler, Alexander Cartwright, Tosha Dupras, Michael Johnson, Nancy Myers. . (Hatcher-Bolin, Kristie) (Entered: 01/21/2025) |
| 01/21/2025 | 67 | DEPOSITION of FLORIAN JENTSCH taken on 11/08/24 re 61 MOTION for Summary Judgment , 59 MOTION for Summary Judgment , 60 MOTION for Summary Judgment by S. Kent Butler, Alexander Cartwright, Tosha Dupras, Michael Johnson, Nancy Myers. . (Hatcher-Bolin, Kristie) (Entered: 01/21/2025) |
| 01/21/2025 | 68 | DEPOSITION of MICHAEL JOHNSON taken on 10/31/24 re 61 MOTION for Summary Judgment , 59 MOTION for Summary Judgment , 60 MOTION for Summary Judgment by S. Kent Butler, Alexander Cartwright, Tosha Dupras, Michael Johnson, Nancy Myers. . (Hatcher-Bolin, Kristie) (Entered: 01/21/2025) |
| 01/21/2025 | 69 | NOTICE by S. Kent Butler, Alexander Cartwright, Tosha Dupras, Michael Johnson, Nancy Myers re 61 MOTION for Summary Judgment , 59 MOTION for Summary Judgment , 60 MOTION for Summary Judgment *Butler's Answers to Interrogatories* (Katz, Katherine) (Entered: 01/21/2025) |
| 01/21/2025 | 70 | DEPOSITION of NANCY MYERS taken on 09/27/24 re 61 MOTION for Summary Judgment , 59 MOTION for Summary Judgment , 60 MOTION for Summary Judgment by S. Kent Butler, Alexander Cartwright, Tosha Dupras, Michael Johnson, Nancy Myers. . (Hatcher-Bolin, Kristie) (Entered: 01/21/2025) |

| 01/21/2025 | 71 | NOTICE by S. Kent Butler, Alexander Cartwright, Tosha Dupras, Michael Johnson, Nancy Myers re 61 MOTION for Summary Judgment , 59 MOTION for Summary Judgment , 60 MOTION for Summary Judgment *Cartwright's Answers to Interrogatories* (Katz, Katherine) (Entered: 01/21/2025) |
|---|---|---|
| 01/21/2025 | 72 | DEPOSITION of CHARLES NEGY taken on 10/28/24 re 61 MOTION for Summary Judgment , 59 MOTION for Summary Judgment , 60 MOTION for Summary Judgment by S. Kent Butler, Alexander Cartwright, Tosha Dupras, Michael Johnson, Nancy Myers. . (Hatcher-Bolin, Kristie) (Entered: 01/21/2025) |
| 01/21/2025 | 73 | NOTICE by S. Kent Butler, Alexander Cartwright, Tosha Dupras, Michael Johnson, Nancy Myers re 61 MOTION for Summary Judgment , 59 MOTION for Summary Judgment , 60 MOTION for Summary Judgment *Dupras' Answers to Interrogatories* (Katz, Katherine) (Entered: 01/21/2025) |
| 01/21/2025 | 74 | NOTICE by S. Kent Butler, Alexander Cartwright, Tosha Dupras, Michael Johnson, Nancy Myers re 61 MOTION for Summary Judgment , 59 MOTION for Summary Judgment , 60 MOTION for Summary Judgment *Johnson's Answers to Interrogatories* (Katz, Katherine) (Entered: 01/21/2025) |
| 01/21/2025 | 75 | NOTICE by S. Kent Butler, Alexander Cartwright, Tosha Dupras, Michael Johnson, Nancy Myers re 61 MOTION for Summary Judgment , 59 MOTION for Summary Judgment , 60 MOTION for Summary Judgment *Myers' Answers to Interrogatories* (Katz, Katherine) (Entered: 01/21/2025) |
| 01/21/2025 | 76 | NOTICE by S. Kent Butler, Alexander Cartwright, Tosha Dupras, Michael Johnson, Nancy Myers re 61 MOTION for Summary Judgment , 59 MOTION for Summary Judgment , 60 MOTION for Summary Judgment *Cartwright's Responses to Plaintiff's First Request for Production* (Katz, Katherine) (Entered: 01/21/2025) |
| 01/21/2025 | 77 | NOTICE by S. Kent Butler, Alexander Cartwright, Tosha Dupras, Michael Johnson, Nancy Myers re 61 MOTION for Summary Judgment , 59 MOTION for Summary Judgment , 60 MOTION for Summary Judgment *Johnson's Responses to Plaintiff's First Request for Production* (Katz, Katherine) (Entered: 01/21/2025) |
| 01/21/2025 | 78 | NOTICE by S. Kent Butler, Alexander Cartwright, Tosha Dupras, Michael Johnson, Nancy Myers re 61 MOTION for Summary Judgment , 59 MOTION for Summary Judgment , 60 MOTION for Summary Judgment *Myers' Responses to Plaintiff's First Request for Production* (Katz, Katherine) (Entered: 01/21/2025) |
| 01/22/2025 | 80 | Remark: USB received re 59, 60, 61 Motions for Summary Judgment and placed on shelf in Clerk's Office (JOS) (Entered: 01/23/2025) |
| 01/23/2025 | 79 | **ENDORSED ORDER granting 58 Motion to Withdraw as Attorney. Jason Alec Zimmerman is terminated as counsel in this case. Signed by Magistrate Judge Daniel C. Irick on 1/23/2025. (Irick, Daniel)** (Entered: 01/23/2025) |
| 01/28/2025 | 81 | UNOPPOSED MOTION for Extension of Time to File Response/Reply as to 61 MOTION for Summary Judgment , 59 MOTION for Summary Judgment , 60 MOTION for Summary Judgment by Charles Negy. (Harris, Samantha) Modified on 1/29/2025 to edit text (ELA). (Entered: 01/28/2025) |
| 01/29/2025 | 82 | **ENDORSED ORDER granting 81 Plaintiff's Unopposed Motion for Extension of Time. On or before March 4, 2025, Plaintiff may file responses. Signed by Judge Carlos E. Mendoza on 1/29/2025. (RRM)** (Entered: 01/29/2025) |
| 02/12/2025 | 83 | MOTION to File Excess Pages *and a Consolidated Response to Defendants' Summary Judgment Motions* by Charles Negy. (Harris, Samantha) (Entered: 02/12/2025) |

USCA11 Case: 25-11929     Document: 34-1     Date Filed: 01/16/2026     Page: 17 of 250

| | | |
|---|---|---|
| 02/13/2025 | 84 | **ENDORSED ORDER granting 83 Plaintiff's Motion for Leave to File Consolidated Opposition Brief. On or before March 4, 2025, Plaintiff may file a single response of no more than 60 pages to 59 Defendant Butler's Motion for Summary Judgment, 60 Defendants Cartwright, Dupras, and Johnson's Motion for Summary Judgment, and 61 Defendant Myers's Motion for Summary Judgment. Signed by Judge Carlos E. Mendoza on 2/13/2025. (RRM)** (Entered: 02/13/2025) |
| 02/24/2025 | 85 | Unopposed MOTION for Joshua A Engel to appear pro hac vice, Special Admission fee paid, Receipt No. AFLMDC-23054574 for $150 by Charles Negy. (Engel, Joshua) Motions referred to Magistrate Judge Daniel C. Irick. (Entered: 02/24/2025) |
| 02/25/2025 | 86 | **ENDORSED ORDER granting 85 Motion to Appear Pro Hac Vice. Joshua A. Engel is granted special admission to practice in the Middle District for purposes of this action pursuant to Local Rule 2.01(c), provided counsel shall register for and use the electronic filing system as adopted by the Court. Signed by Magistrate Judge Daniel C. Irick on 2/25/2025. (Irick, Daniel)** (Entered: 02/25/2025) |
| 03/04/2025 | 87 | NOTICE of Filing Exhibits by Charles Negy (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12)(Harris, Samantha) Modified on 3/4/2025 to edit docket text and description (JDR). (Entered: 03/04/2025) |
| 03/04/2025 | 88 | RESPONSE in Opposition re 61 MOTION for Summary Judgment , 59 MOTION for Summary Judgment , 60 MOTION for Summary Judgment filed by Charles Negy. (Harris, Samantha) (Entered: 03/04/2025) |
| 03/06/2025 | 89 | Unopposed MOTION for Leave to File Single reply by all Defendant's to Plaintiff's combined response to motion for summary judgment by All Defendants. (Hatcher-Bolin, Kristie) (Entered: 03/06/2025) |
| 03/06/2025 | 90 | **ENDORSED ORDER granting 89 Defendants' Unopposed Motion for Leave to File a Single Reply. On or before March 18, 2025, Defendants may file a single reply of no more than 21 pages. Signed by Judge Carlos E. Mendoza on 3/6/2025. (RRM)** (Entered: 03/06/2025) |
| 03/13/2025 | 91 | Unopposed MOTION for Extension of Time to File Response/Reply by All Defendants. (Hatcher-Bolin, Kristie) (Entered: 03/13/2025) |
| 03/13/2025 | 92 | **ENDORSED ORDER granting 91 Defendants' Motion for Extension. On or before March 21, 2025, Defendants may file a reply. Signed by Judge Carlos E. Mendoza on 3/13/2025. (RRM)** (Entered: 03/13/2025) |
| 03/21/2025 | 93 | REPLY to Response to Motion re 61 MOTION for Summary Judgment , 59 MOTION for Summary Judgment , 60 MOTION for Summary Judgment filed by S. Kent Butler, Alexander Cartwright, Tosha Dupras, Michael Johnson, Nancy Myers. (Hatcher-Bolin, Kristie) (Entered: 03/21/2025) |
| 03/25/2025 | 94 | NOTICE of Appearance of Lead Counsel by Richard L. Barry on behalf of Board of Trustees of the University of Central Florida, S. Kent Butler, Alexander Cartwright, Tosha Dupras, Michael Johnson, Nancy Myers (Barry, Richard) Modified text on 3/25/2025 (BD). (Entered: 03/25/2025) |
| 04/08/2025 | 95 | Unopposed MOTION to Stay *Case Management Deadlines and Trial Setting* by Charles Negy. (Harris, Samantha) (Entered: 04/08/2025) |
| 04/25/2025 | 96 | Unopposed MOTION for Joshua Engel to appear by video *at trial status conference* by Charles Negy. (Engel, Joshua) (Entered: 04/25/2025) |

| 04/25/2025 | 97 | **ENDORSED ORDER granting 96 Unopposed Motion for Attorney Joshua Engel to Appear Telephonically for Trial Status Conference. Attorney Joshua Engel shall call 855-244-8681 five minutes before the hearing is scheduled to begin. Access Code: 2317 253 2024. Signed by Judge Carlos E. Mendoza on 4/25/2025. (ALL)** (Entered: 04/25/2025) |
|---|---|---|
| 05/05/2025 | 98 | MOTION In Limine by S. Kent Butler, Alexander Cartwright, Tosha Dupras, Michael Johnson, Nancy Myers. (Barry, Richard) (Entered: 05/05/2025) |
| 05/05/2025 | 99 | PRETRIAL statement by S. Kent Butler, Alexander Cartwright, Tosha Dupras, Michael Johnson. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G)(Barry, Richard) (Entered: 05/05/2025) |
| 05/12/2025 | 100 | **It is ORDERED and ADJUDGED that Defendant S. Kent Butler's Motion for Summary Judgment (Doc. 59) is GRANTED. The Clerk is directed to enter judgment in favor of Defendant S. Kent Butler and against Plaintiff. Defendants Alexander Cartwright, Tosha Dupras, and Michael Johnson's Motion for Summary Judgment (Doc. 60) is DENIED. Defendant Nancy Myers's Motion for Summary Judgment (Doc. 61) is GRANTED in part and DENIED in part. The Clerk is directed to enter judgment in favor of Defendant Nancy Myers and against Plaintiff as to Count II. Plaintiff's Unopposed Motion to Stay (Doc. 95) is DENIED as moot. Signed by Judge Carlos E. Mendoza on 5/12/2025. (ALL)** (Entered: 05/12/2025) |
| 05/13/2025 | 101 | **JUDGMENT entered in favor of Defendant S. Kent Butler against Plaintiff. Signed by Deputy Clerk 5/13/2025. (JKB)** (Entered: 05/13/2025) |
| 05/13/2025 | 102 | **JUDGMENT entered in favor of Defendant Nancy Myers against Plaintiff as to Count II. Signed by Deputy Clerk on 5/13/25. (JKB)** (Entered: 05/13/2025) |
| 05/13/2025 | 103 | Time Sensitive MOTION for Samantha K. Harris to appear by video by Charles Negy. (Harris, Samantha) (Entered: 05/13/2025) |
| 05/14/2025 | 104 | **ENDORSED ORDER granting 103 Unopposed Motion for Attorney Samantha Harris to Appear Telephonically for Trial Status Conference. Attorney Samantha Harris shall call 855-244-8681 five minutes before the hearing is scheduled to begin. Access Code: 2317 253 2024. Signed by Judge Carlos E. Mendoza on 5/14/2025. (ALL)** (Entered: 05/14/2025) |
| 05/15/2025 | 105 | Minute Entry for In Person Proceedings held before Judge Carlos E. Mendoza: STATUS CONFERENCE held on 5/15/2025. Court Reporter: Suzanne L. Trimble. (ALL) (Entered: 05/15/2025) |
| 05/15/2025 | 106 | NOTICE of hearing: Status Conference set for 6/18/2025 at 10:00 AM in Orlando Courtroom 5 B before Judge Carlos E. Mendoza. (ALL) (Entered: 05/15/2025) |
| 05/19/2025 | 107 | RESPONSE in Opposition re 98 MOTION In Limine filed by Charles Negy. (Engel, Joshua) (Entered: 05/19/2025) |
| 05/27/2025 | 108 | PROPOSED BILL OF COSTS by S. Kent Butler. (Attachments: # 1 Exhibit A)(Barry, Richard) (Entered: 05/27/2025) |
| 05/30/2025 | 109 | NOTICE OF RESCHEDULING HEARING: The Trial Status Conference previously scheduled for 6/18/2025 is rescheduled. New scheduling date and time: TELEPHONIC Trial Status Conference set for 6/18/2025 at 09:00 AM in Orlando Courtroom 5 B before Judge Carlos E. Mendoza. The parties shall call 855-244-8681 five minutes before the hearing is scheduled to begin. Access Code: 2308 007 8635.(ALL) (Entered: 05/30/2025) |
| 06/06/2025 | 110 | NOTICE OF APPEAL as to 100 Order on Motion for Summary Judgment, Order on Motion to Stay by Alexander Cartwright, Tosha Dupras, Michael Johnson, Nancy Myers. |

| 06/09/2025 | [111] | TRANSMITTAL of initial appeal package to USCA consisting of copies of notice of appeal, docket sheet, order/judgment being appealed, and motion, if applicable to USCA re [110] Notice of Appeal. Eleventh Circuit Transcript information form forwarded to pro se litigants and available to counsel at www.flmd.uscourts.gov under Forms and Publications/General. (Attachments: # [1] Notice of Appeal, # [2] Order, # [3] Judgment, # [4] Judgment, # [5] Docket sheet)(ELA) (Entered: 06/09/2025) |
|---|---|---|
| 06/10/2025 | [112] | TRANSCRIPT information form filed by S. Kent Butler, Alexander Cartwright, Tosha Dupras, Michael Johnson, Nancy Myers re [110] Notice of Appeal. USCA number: 25-11929-A. No transcript(s) requested. (Hatcher-Bolin, Kristie) (Entered: 06/10/2025) |
| 06/10/2025 | 113 | **ENDORSED ORDER staying this case in light of the [110] Notice of Appeal. The Clerk is directed to administratively close this case. Signed by Judge Carlos E. Mendoza on 6/10/2025. (KMD)** (Entered: 06/10/2025) |
| 06/11/2025 | 114 | NOTICE canceling Trial Status Conference scheduled for 6/18/2025. (ALL) (Entered: 06/11/2025) |
| 06/11/2025 | | USCA appeal fees received $605, receipt number ORL 115441 re [110] Notice of Appeal filed by Tosha Dupras, Nancy Myers, Alexander Cartwright, Michael Johnson. (MSN) (Entered: 06/11/2025) |
| 06/12/2025 | [115] | BILL OF COSTS taxed against Charles Negy in the amount of $2,819.70. Signed by Deputy Clerk. (ALL) (Entered: 06/12/2025) |
| 09/08/2025 | [116] | Pursuant to F.R.A.P. 11(c), the Clerk of the District Court for the Middle District of Florida certifies that the record is complete for the purposes of this appeal re: [110] Notice of Appeal. The following documents will be forwarded upon the request for the record on appeal by the USCA in addition to the electronic record. 1 Volume of exhibits: 1 USB referenced as Video Exhibits for Deposition Transcripts in Support of Defendants' Motions for Summary Judgment located at docket entry no. 80. USCA number: 25-11929(LJC) Modified on 9/8/2025 to add document and edit docket text (LJC). (Main Document 116 replaced on 9/8/2025) (LJC). (Entered: 09/08/2025) |
| 09/08/2025 | | RECORD on appeal sent via USPS Certified Mail (Tracking No. 7011 2000 0001 8792 3832) to USCA re [110] Notice of Appeal. Transmittal includes 1 volume of exhibits: 1 USB referenced as Video Exhibits for Deposition Transcripts in Support of Defendants' Motions for Summary Judgment located at docket entry no. 80. USCA number 25-11929. (LJC) (Entered: 09/08/2025) |
| 09/17/2025 | | ACKNOWLEDGMENT by USCA of receiving RECORD ON APPEAL on 09/12/2025 re [110] Notice of Appeal. USCA number: 25-11929. (LJC) (Entered: 09/17/2025) |
| 12/19/2025 | [117] | Unopposed MOTION for Julie M. Zolty to Withdraw as Attorney by Alexander Cartwright, Tosha Dupras, Michael Johnson, Nancy Myers. (Zolty, Julie) Motions referred to Magistrate Judge Daniel C. Irick. (Entered: 12/19/2025) |
| 12/23/2025 | 118 | **ENDORSED ORDER granting [117] Unopposed Motion to Withdraw as Attorney. Julie Zolty is terminated as counsel in this case. Signed by Magistrate Judge Daniel C. Irick on 12/23/2025. (Irick, Daniel)** (Entered: 12/23/2025) |

| PACER Service Center |
|---|
| **Transaction Receipt** |
| 01/14/2026 10:09:29 |

| PACER Login: | khatcherbolin0521388 | Client Code: | |
|---|---|---|---|
| Description: | Docket Report | Search Criteria: | 6:23-cv-00666-CEM-DCI |
| Billable Pages: | 14 | Cost: | 1.40 |

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

CHARLES NEGY,

     *Plaintiff,*

v.                     CASE NO.: 6:23-cv-00666-CEM-DCI

BOARD OF TRUSTEES OF THE
UNIVERSITY OF CENTRAL
FLORIDA; in their official capacities;
S. KENT BUTLER, ALEXANDER
CARTWRIGHT, TOSHA DUPRAS,
MICHAEL JOHNSON, NANCY
MYERS, in their individual capacities,

     *Defendants.*

_____/

## NOTICE OF FILING

Defendants, S. KENT BUTLER, ALEXANDER CARTWRIGHT, TOSHA

DUPRAS, MICHAEL JOHNSON, and NANCY MYERS, in their individual

capacities ("Defendants"), by and through their legal counsel, hereby give Notice of

Filing the Deposition Transcript of S. KENT BUTLER, Ph.D., taken on October 21,

2024 with Exhibits 1-16[1].

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY on January 21, 2025, a true and correct copy of the

foregoing was filed through the CM/ECF system, which will serve an electronic copy

on all parties of record.

_____

[1] Exhibits 6 and 7 are videos and are submitted via a thumb drive to the Middle District Clerk.

**GRAY ROBINSON, P.A.**

*/s/ Kristie Hatcher-Bolin*

**KRISTIE HATCHER-BOLIN**
Florida Bar No. 521388
Kristie.Hatcher-bolin@gray-robinson.com
Post Office Box 3
Lakeland, Florida 33802-0003
Telephone: (863) 284-2251
Facsimile: (863) 683-7462

*/s/ Katherine W. Katz*

**KATHERINE W. KATZ**
Florida Bar No. 1022526
Katherine.Katz@gray-robinson.com
**JULIE M. ZOLTY**
Florida Bar No.: 1036454
Julie.Zolty@gray-robinson.com
Post Office Box 3068
Orlando, Florida  32802-3068
Telephone:  (407) 843-8880
Facsimile:   (407) 244-5690
*Counsel for Defendants*



# Transcript of S. Kent Butler, Ph.D.

**Date:** October 21, 2024

**Case:** Negy -v- Board of Trustees of University of Central Florida, et al.

**Planet Depos**

**Phone:** 888.433.3767 **| Email:** transcripts@planetdepos.com

www.planetdepos.com

Michigan #8598 | Nevada #089F | New Mexico #566

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

```
 1              UNITED STATES DISTRICT COURT

 2                MIDDLE DISTRICT OF FLORIDA

 3    ----------------------------x

 4    CHARLES NEGY,                :

 5                  Plaintiff,     :

 6      v.                         :  Case No.

 7    BOARD OF TRUSTEES OF THE     :  6:23-cv-00666-CEM-DCI

 8    UNIVERSITY OF CENTRAL        :

 9    FLORIDA, in their official   :

10    capacities; and S. KENT      :

11    BUTLER, ALEXANDER            :

12    CARTWRIGHT, TOSHA DUPRAS,    :

13    MICHAEL JOHNSON, and NANCY   :

14    MYERS, in their individual   :

15    capacities,                  :

16                  Defendants.    :

17    ----------------------------x

18        Virtual Deposition of S. KENT BUTLER, Ph.D.

19              Monday, October 21, 2024

20                  8:01 a.m. CST

21

22    Job No.:  557351

23    Pages:  1 - 153

24    Reported Stenographically by:

25    Tiffany M. Pietrzyk, CSR RPR CRR
```

Case 6:23-cv-00666-CEM-DCI   Document 63   Filed 01/21/25   Page 5 of 231 PageID 885
USCA11 Case: 25-11929   Document: 34-1   Date Filed: 01/16/2026   Page: 25 of 250

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024                    2

```
 1              Virtual deposition of S. KENT BUTLER, Ph.D.,

 2    pursuant to notice, before Tiffany M. Pietrzyk, a

 3    Certified Shorthand Reporter in the States of

 4    Illinois, Texas, and California, Registered

 5    Professional Reporter, Certified Realtime Reporter,

 6    and a Notary Public in and for the State of

 7    Illinois.

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024                    3

```
 1              A P P E A R A N C E S

 2   ON BEHALF OF THE PLAINTIFF:

 3        SAMANTHA K. HARRIS, ESQUIRE

 4        ALLEN HARRIS LAW

 5        PO Box 673

 6        Narberth, Pennsylvania 19072

 7        860.499.3399

 8

 9   ON BEHALF OF THE DEFENDANTS:

10        KRISTIE HATCHER-BOLIN, ESQUIRE

11        JULIE ZOLTY, ESQUIRE

12        GRAYROBINSON, P.A.

13        One Lake Morton Drive

14        Lakeland, Florida 33801

15        863.284.2200

16

17   ALSO PRESENT:

18        Charles Negy

19        Craig Novick, Esq. (UCF)

20        Brad Sydorick, Planet Depos Remote Technician

21

22

23

24

25
```

Case 6:23-cv-00666-CEM-DCI   Document 63   Filed 01/21/25   Page 7 of 231 PageID 887
USCA11 Case: 25-11929   Document: 34-1   Date Filed: 01/16/2026   Page: 27 of 250

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024                    4

```
 1                    C O N T E N T S

 2    EXAMINATION OF S. KENT BUTLER, Ph.D.        PAGE

 3      By Ms. Harris                               8

 4

 5                    E X H I B I T S

 6              (Attached to transcript.)

 7    DEPOSITION EXHIBITS                         PAGE
```

```
 8    Exhibit 1     University Community Campus    23

 9                  Climate Conversation script,

10                  dated 8/13/20, Bates numbers

11                  BUTLER R-RFP1_1746 to 1753

12    Exhibit 2     Email chain, top email to S.    27

13                  Kent Butler, dated 6/4/20,

14                  Bates numbers BUTLER

15                  R-RFP1_0001 to 0002

16    Exhibit 3     Email chain, top email from     34

17                  S. Kent Butler, dated

18                  6/4/20, Bates numbers BUTLER

19                  R-RFP1_0476 to 0477

20    Exhibit 4     Email chain, top email to       49

21                  Alexander Cartwright, dated

22                  6/4/20, Bates numbers

23                  CARTWRIGHT R-RFP1_0124 to

24                  0125
```

```
25
```

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024                5

```
1                      E X H I B I T S (Cont.)

2    DEPOSITION EXHIBITS                              PAGE

3     Exhibit 5      Email chain, top email from      67

4                    Diversity and Inclusion,

5                    dated 6/4/20, Bates number

6                    BUTLER R-RFP1_0220

7     Exhibit 6      UCF Student Virtual Forum         90

8                    video, dated 6/4/20

9     Exhibit 7      Virtual Conversation About        93

10                   Race and Unity video, dated

11                   6/5/20

12    Exhibit 8      A document entitled,              98

13                   "Summary of Meetings with

14                   Black RSO Student Leaders &

15                   Black Students," dated 6/5,

16                   6/8, and 6/14, Bates numbers

17                   BUTLER R-RFP1_0169 to 0170

18    Exhibit 9      Email chain, top email from      100

19                   Michael Johnson, dated

20                   6/8/20, Bates numbers BUTLER

21                   R-RFP1_0827 to 0828

22    Exhibit 10     Email chain, top email from      104

23                   S. Kent Butler, dated

24                   6/18/20, Bates number BUTLER

25                   R-RFP1_1447
```

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024                    6

```
 1              E X H I B I T S (Cont.)

 2    DEPOSITION EXHIBITS                         PAGE

 3     Exhibit 11    Email chain, top email from    110

 4                   Constance Goodman, dated

 5                   6/6/20, Bates numbers BUTLER

 6                   R-RFP1_0785 to 0786

 7     Exhibit 12    Email chain with attachment,   121

 8                   top email from Andrea Gandy,

 9                   dated 6/11/20, Bates numbers

10                   BUTLER R-RFP1_1147 to 1150

11     Exhibit 13    Email chain, top email from    127

12                   Andrea Gandy, dated 6/12/20,

13                   Bates numbers BUTLER

14                   R-RFP1_1417 to 1418

15     Exhibit 14    Email chain, top email from    129

16                   S. Kent Butler, dated

17                   6/18/20, Bates numbers

18                   BUTLER R-RFP1_1445 to 1446

19     Exhibit 15    Email chain, top email from    133

20                   S. Kent Butler, dated

21                   7/27/20, Bates number BUTLER

22                   R-RFP1_0180

23

24

25
```

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024                           7

```
 1               E X H I B I T S (Cont.)

 2    DEPOSITION EXHIBITS                          PAGE

 3     Exhibit 16      Email chain, top email from    135

 4                     Christine Dellert, dated

 5                     8/13/20, Bates numbers

 6                     BUTLER R-RFP1_1728 to 1729

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024                    8

```
 1                  P R O C E E D I N G S
 2                     (Witness sworn.)
 3   WHEREUPON:
 4                  S. KENT BUTLER, Ph.D.,
 5   called as a witness herein, having been first duly
 6   sworn, was examined and testified as follows:
 7                        EXAMINATION
 8   BY MS. HARRIS:
 9       Q. Good morning, Dr. Butler.  My name is
10   Samantha Harris.  I am the attorney for Charles Negy
11   and will be taking your deposition today.  Have
12   you -- before we start the substance of the
13   deposition, I'm just gonna sort of ask some
14   background questions and go through some
15   instructions for the deposition.
16           Have you ever been deposed before?
17       A. Yes.
18       Q. Okay.  What was the nature of the case in
19   which you were deposed?
20       A. I'm not sure the relevance of that, but I
21   had a case for my ankle being broken.  And I sued
22   the company where I was.
23       Q. Okay.  So it was a medical malpractice case
24   and you were the plaintiff?
25       A. Yes.
```

Transcript of S. Kent Butler, Ph.D.

Conducted on October 21, 2024                    9

1          MS. HATCHER-BOLIN:  Objection to form.

2      Q. Okay.  So some of this background, then,

3   that I'm gonna give may be redundant.  You may have

4   heard it before when you were deposed.  But I'm

5   still gonna go through the things that I go through

6   with a witness before a deposition.

7          So -- and especially because we're doing

8   this via Zoom so the format is a little bit

9   different and it can be a little bit harder to read

10  one another's, sort of, cues.

11         So as you can see, this is being transcribed

12  by a court reporter, and the court reporter can only

13  make a record of spoken words.  So it's important

14  that both you and I speak only verbally rather than

15  by nodding or shaking our heads.  And these are all

16  just sort of things to remember.  We will likely

17  both make mistakes during the deposition and nod or

18  shake our heads, but to the extent -- and if that

19  happens, the court reporter will ask us to repeat

20  what we have said or answer verbally.  But just, you

21  know, as best you can, give me a yes or a no rather

22  than a nod or a shake of the head.

23         On a similar note, it's also hard if we talk

24  over each other.  So I am going to do my best to

25  wait until you finish answering a question to ask

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024

10

1    any kind of follow-up, and I'd like you to do your

2    best to wait until I finish asking you a question

3    before you begin answering.  Again, we're likely not

4    to be perfect on that point, but just something to

5    keep in mind.  And the court reporter will, again,

6    let us know if we need to repeat something.

7         My job is to ask understandable questions,

8    so if you don't understand a question that I ask,

9    just let me know so that I can rephrase it.  If you

10   say you don't understand a question I've asked, I

11   will try to ask a clearer question.

12        And on a similar note, unless I specifically

13   direct you to, I don't want you to try to guess or

14   speculate at answers that you don't actually know.

15   If you genuinely don't know the answer to a

16   question, "I don't know" is a perfectly acceptable

17   answer.

18        You will hear and, in fact, have already

19   heard your attorney object to some of my questions.

20   These are objections for the record.  And unless

21   your attorney specifically directs you not to

22   answer, you still have to answer after the objection

23   is made.  The objections are so that the judge can

24   later decide what questions and what answers will be

25   allowed to be used in future proceedings.

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024                    11

```
 1          Now, there may be times -- I think it's
 2    unlikely -- but where your counsel is gonna say,
 3    "Objection.  Don't answer," and that will primarily
 4    be if I ask for privileged information, which I'm
 5    going to do my best not to do.  But unless your
 6    counsel explicitly directs you not to answer, you
 7    can answer after an objection is made.
 8          This is not supposed to be an inquisition,
 9    so if you need a break, if you have to use the
10    bathroom, just say the word and we can take a break.
11    I'll try to take breaks approximately every hour or
12    so.  The only thing I would ask is that we take
13    breaks after you've answered a question.  So not
14    with a question outstanding or pending.  But other
15    than that, you know, any time you need a break, just
16    feel free to say so.
17          And you were likely asked this question when
18    you had a deposition previously, but it's always
19    something that attorneys ask before beginning a
20    deposition.  Is there anything today that is
21    impacting your ability to give truthful and accurate
22    testimony?
23       A. No, there is not.
24       Q. Okay.  No medications that might impact
25    memory, anything like that?
```

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024                    12

1        A. No, there is not.

2        Q. Okay.  And I know that always feels like an

3    awkward question.  I think the reason everyone has

4    to ask is that so somebody can't later come back and

5    say, "Oh, I didn't mean to say that, I was taking

6    this medication that interfered with my memory," or

7    something like that.  I'm never suggesting that

8    anyone is on anything, and it always feels like an

9    awkward question to ask.

10        And, you know, after the deposition, when

11    the transcript comes out, you will have an

12    opportunity to read and sign the deposition

13    transcript and make any corrections that you believe

14    are necessary.

15        Now, did you forward any documents to UCF's

16    attorneys as a result of my discovery requests?  And

17    I'm not asking for anything to do with your

18    communications with them, just whether you provided

19    documents in connection with this litigation.

20        A. Not aware of anything that they didn't

21    already have.

22        Q. Okay.  So you didn't search your email for

23    documents relevant to the case?

24        A. Those documents were already created and

25    supplied to the university and the attorneys.

PLANET DEPOS
888.433.3767 | WWW.PLANETDEPOS.COM

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024                    13

```
 1        Q. Did you at any point delete any emails that
 2    might have contained information about this case?
 3        A. No, I have not.
 4        Q. Did you ever communicate with anyone about
 5    Dr. Negy's case using a personal email address?
 6        A. No, I have not.
 7        Q. Did you ever communicate with anyone about
 8    Dr. Negy's case on an ephemeral messaging app like
 9    WhatsApp or Signal?
10        A. No, I have not.
11        Q. Did you ever communicate with anyone about
12    Dr. Negy's investigation via text message?
13        A. Maybe my wife once.
14        Q. Okay.  Do you recall that when there was a
15    public records request related to the case, someone
16    at UCF asked you for text messages?
17        A. No, I do not.
18        Q. Okay.  Just so make sure that we kind of
19    have covered everything that might be relevant here,
20    could you --
21            MS. HARRIS:  Brad, could you pull up the
22    document that has been labeled -- you know what?  I
23    don't have it in my exhibits folder so we will come
24    back to that if need be.
25            ///
```

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024                    14

```
 1   BY MS. HARRIS:
 2       Q. So you don't recall being asked for any text
 3   messages related to this case?
 4       A. There weren't really no text messages.  It
 5   was more a response, and so I'm not sure what it
 6   was.  I may have been going into a meeting and
 7   saying that I'm going to a meeting, something like
 8   that.  That was it.
 9       Q. Okay.  Now I would just like to go through
10   some questions about your background at UCF.
11          When did you begin working at UCF?
12       A. I think it was August of 2008.
13       Q. And what was your position when you were
14   first hired?
15       A. Associate professor.
16       Q. Associate professor of what?
17       A. Counselor education.
18       Q. Counselor education?
19       A. Yes.
20       Q. Okay.  And what's your degree in, your
21   Ph.D. -- sorry.
22       A. Educational psychology with a background in
23   counseling psychology.
24       Q. Okay.  What was your position at UCF at the
25   time of Dr. Negy's investigation?
```

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024                    15

1          A. I think I was full professor at that time.

2          Q. Were you also the director of diversity, the

3      chief equity, diversity, and inclusion officer?

4          A. I was no longer in that position during his

5      investigation.

6          Q. When were you in the position of chief

7      equity, diversity, and inclusion officer at UCF?

8          A. Approximately two years, from maybe July of

9      2019 to the summer, June-ish of 2020-'21.

10         Q. So Dr. Negy was terminated, as you know, in

11     January of 2021.  So were you in that position,

12     chief equity, diversity, and inclusion officer,

13     during his investigation?

14         A. I'd have to go back and look at my

15     employment records, but I believe maybe for that

16     about six months, probably.

17         Q. Six months --

18         A. For that amount of six months, probably.  If

19     you're saying it was January.

20         Q. Okay.  So you said you assumed that position

21     in July of 2019 approximately?

22         A. Approximately.

23         Q. And prior to that, you were still an

24     associate professor or a full professor?

25             Well, scratch that.  Let me ask you this.

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024                                    16

1           When you came to UCF as an associate

2      professor, were you tenured or not yet?

3           A. I was not tenured yet, no.

4           Q. And when did you get tenure?

5           A. I don't recall the year.

6           Q. Were you tenured in 2019?

7           A. Yes.

8           Q. Okay.  So when you assumed the position of

9      chief equity, diversity, and inclusion officer, did

10     you take that role over from someone or was it a

11     newly created position?

12          A. It was a newly created position.

13          Q. And who, if you know, who created that

14     position?

15          A. It was then-provost Elizabeth Dooley and

16     then-acting president Thad Seymour.

17          Q. What's your understanding of why that

18     position was created?

19          A. I can't answer that.

20          Q. Why can't you answer that?

21          A. I don't know.

22          Q. Did you apply for that position, or were you

23     asked by someone to fill that role?

24          A. I probably somewhat applied for it, yes.  I

25     was aware of it and made my intentions known.

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024                    17

```
1        Q. Okay.  And you said that you are no longer

2    in that position; is that correct?

3        A. Correct.

4        Q. Why not?

5        A. Because I'm not in the position.  I wasn't

6    hired for the full-time position.

7        Q. I see.  So at the time you were in the

8    position, it was not a full-time position?

9        A. That's not what I said.

10       Q. You said you were not hired for the

11   full-time position.  So I asked you --

12       A. It was an interim position I was in.

13       Q. It was an interim position.  And at some

14   point, did UCF create a full-time position?

15       A. Yes, I believe so.  You have to go back and

16   look at UCF's office.  I don't know what it's called

17   now.  It's a position that I assume that they hired

18   someone for.

19       Q. Did you apply for that position?

20       A. Yes, I did.

21       Q. Okay.  Do you know who did get that the

22   position?

23       A. Yes.

24       Q. Who is that?

25       A. I don't recall her first name, but something
```

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024                    18

```
 1    Guzman.
 2        Q. So when I asked you if you knew who got that
 3    position, you said yes, but -- okay.  So I asked you
 4    do you know who did get that the position.  And your
 5    answer was yes; correct?
 6        A. I believe you asked me and I said yes, I
 7    knew someone was hired in that position, yes, I do.
 8    I'm not sure what your question is asking me right
 9    now.
10        Q. I asked you if you knew who got the position
11    of equity, diversity, and inclusion officer.
12        A. Yes.  And I said her last name is Guzman.
13    Did you not hear me say that?
14        Q. I heard you say that.  But you're not aware
15    of her first name; is that correct?
16        A. I'm not recalling it right now.  I'm not
17    really -- I don't know.  I can't really tell you who
18    that is.  It's doctor something.  I can't remember
19    her first name.
20        Q. Is she someone you know personally?
21        A. I do not.  If I knew her personally, I would
22    know her first name I think.
23        Q. What was your -- what is your role at UCF
24    now?
25        A. Full professor.
```

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024                                    19

```
1          Q. Full professor of what?

2          A. Counselor education.

3          Q. When you were in the interim chief equity,

4     diversity, and inclusion officer position, who did

5     you report to?

6          A. President Cartwright, and I believe there

7     was some connection with the provost.  So it would

8     have been two different -- three different people at

9     one point.  Or four, actually.  It was President

10    Seymour, Acting President Seymour, and Elizabeth

11    Dooley.  There was some kind of dual role there with

12    that supervision, I guess.  And then when

13    Dr. Cartwright was hired and when Dr. Mike Johnson

14    took over as interim provost at the time.

15         Q. And when did Alexander Cartwright become

16    president?

17         A. I am not sure.

18         Q. Well, when do you recall first meeting

19    Dr. Cartwright?

20         A. I don't know.  If you have a record, I don't

21    recall.

22         Q. Did you have -- in your role as chief

23    equity, diversity, and inclusion officer, did you

24    have more interaction with President Cartwright than

25    with the previous UCF president?
```

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024                                        20

```
 1        A. Only in the length of days perhaps, but not
 2   necessarily more or less.  We had meetings.  So I
 3   had meetings with both that were cabinet meetings.
 4   And so I don't know how to answer that question
 5   other than I already went to the meetings that were
 6   appropriate for me to be in for being on the
 7   cabinet.  And there wasn't anything more or less
 8   that I had meetings with them for privately or
 9   separate from that.
10        Q. What was the cabinet?
11        A. Cabinet is a list of, I guess, assorted
12   individuals across the campus who had vice president
13   positions and/or other related positions that
14   reported to the president and answered or helped in
15   whatever roles they were assigned to do.
16        Q. Okay.  So that was the -- the cabinet refers
17   to the president's cabinet?
18        A. Yeah, that's what I called it.
19        Q. How often, approximately, would you say the
20   president's cabinet met during your time as chief
21   equity, diversity, and inclusion officer?
22        A. I believe we were scheduled to meet once a
23   week.
24        Q. And is that approximately how often you did
25   meet?
```

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024                    21

```
 1        A. I guess the best way I can answer that is,

 2    if a meeting wasn't canceled, yes, we met once a

 3    week.

 4        Q. Okay.  Did President Cartwright express that

 5    diversity, equity, and inclusion was a high priority

 6    for him?

 7        A. I wouldn't necessarily say that it was a

 8    high priority, but it was something that was

 9    probably on the list of things that he was -- had on

10    his docket.

11        Q. Did it seem to you that it was more of a

12    priority to him than to the previous president?

13        A. I can't speak for him.

14           MS. HATCHER-BOLIN:  Objection to form.

15           MS. HARRIS:  Sorry?  I didn't hear you.

16           MS. HATCHER-BOLIN:  Oh, I just objected to

17    the form.

18           But you can answer.

19           I think he did.

20        A. I don't -- I can't presume to speak on

21    behalf of Dr. Cartwright.

22        Q. Well, I was asking about your perception of

23    your relationship with the two individuals in that

24    role.

25        A. I don't typically think in that -- in those
```

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024                                    22

```
 1    terms, and so I can't answer that question.

 2         Q. In what terms do you not typically think?

 3         A. In the question that you asked me, you asked

 4    me what was his -- what he -- I don't know what his

 5    position was on it.  I don't know.

 6         Q. So you don't know what President

 7    Cartwright's position was on diversity and equity

 8    and inclusion; is that correct?

 9         A. I can't speak to what his position is.  If

10    you want to ask me if he ever spoke to it and was --

11    did he have it on his docket, I can say yes.  In

12    terms of how he felt about it, there's no way I can

13    answer that question.  I don't know.

14         Q. Did you work with President Cartwright on a

15    university plan of action on diversity, equity, and

16    inclusion?

17         A. Can you be more specific about what that

18    question is asking?  I don't know what that means.

19         Q. Okay.

20         MS. HARRIS:  Could we pull up, Brad, a

21    document that is numbered BUTLER_1746?

22         REMOTE TECHNICIAN:  Stand by.

23         MS. HATCHER-BOLIN:  Could you say again what

24    that exhibit was?  I'm sorry.  Or you said it was

25    labeled something?
```

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024                    23

```
 1              MS. HARRIS:  BUTLER_1746.

 2              MS. HATCHER-BOLIN:  Thank you.

 3          (Exhibit 1 was marked for identification

 4     and is attached to the transcript.)

 5              MS. HARRIS:  Okay.  And let me find -- I

 6     think I have the control of the screen so let me

 7     just take a moment here and find the part of this

 8     document that I would like you to look at.

 9          A. Could you please enlarge it?

10          Q. Yes.  So what we're looking at is a script

11     from a university community campus climate

12     conversation that was held on August 13, 2020, and

13     the language that I wanted to ask you about is down

14     here -- one, two, three, four, five -- six

15     paragraphs down under 3:30 p.m.  I don't know if

16     this highlighting shows, but this is where I wanted

17     to -- this is what I wanted to -- the plan I wanted

18     to ask you about.  So just have a look at that.

19          A. Okay.

20          Q. Okay.  So this statement from you refers to,

21     quote, the work that we are doing to formalize a

22     university plan of action on diversity, equity, and

23     inclusion.

24          A. Uh-huh.

25          Q. "Earlier this summer, President Cartwright
```

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024                    24

1    announced the creation of this plan."

2         A. Uh-huh.

3         Q. So after seeing this document, do you recall

4    working with President Cartwright in the summer of

5    2020 on a plan of action on diversity, equity, and

6    inclusion?

7         A. I'm quite sure we worked on quite a few

8    things.  I am not remembering exactly what this was.

9    I do know, if you look at the next paragraph, it

10   talks about the leadership council.  So there were

11   things that I was in charge of.  It wasn't

12   necessarily his plan, but what I was doing in the

13   office of diversity, equity, and inclusion to create

14   a better understanding for the University of what we

15   were working on.

16        There are plans that were done before

17   President Cartwright arrived at the university.

18   There was an action plan that was created.  And I

19   think it was stemming from those types of things.

20   There were different charges that each of the vice

21   presidents received, and I believe my charge was to

22   create a plan of action that really supported

23   diversity, equity, and inclusion on campus.  And one

24   of the things that I was tasked to do was the

25   climate survey that looked at what was happening on

Transcript of S. Kent Butler, Ph.D.

Conducted on October 21, 2024                              25

1    campus from the eyes of the students, the staff, and

2    the faculty and other administrators.

3        Q. So did you create a climate survey in

4    connection with this plan?

5        A. Yes.

6        Q. When was that survey given to students --

7    you said students, faculty, and staff?

8        A. Yes.

9        Q. When was that survey given to students,

10   faculty, and staff?

11       A. I think it started being administered in

12   either February or March, maybe 2020.

13       Q. What do you recall about the results of the

14   survey?

15       A. That the university had some work to do with

16   regards to how individuals felt they were being

17   treated on campus.  There was a sense of belonging

18   that needed to be worked on.  There were different

19   things that the students and the staff and the

20   faculty were seeking so that they could feel that

21   they were a part of the university culture.

22       Q. Can you give me some examples of things they

23   were seeking?

24       A. I can't recall those.  It was a long

25   document.

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024          26

```
 1         Fairness.
 2         I don't -- I really don't remember.  I
 3    haven't looked at that document in over two years,
 4    over more.
 5         Q. And you mentioned -- I had highlighted this
 6    paragraph here.  You mentioned, down here in this
 7    paragraph, the ODI leadership council.  Is that --
 8    does ODI stand for office of diversity and
 9    inclusion?
10         A. Yes.
11         Q. Were you involved with that leadership
12    council?
13         A. I led it.
14         Q. You led it.  And what was the purpose of
15    that council?
16         A. To provide me with counsel.
17         Q. To provide you with counsel about what?
18         A. The leadership council for ODI, the office
19    of diversity and inclusion.
20         Q. Right.  What did the ODI leadership council
21    provide you with, as you said, counsel about?
22         A. Things that were going on in the office, the
23    work that we were doing, any programming, anything
24    that was necessary.  They were like my sounding
25    board.  They were like the president's cabinet.
```

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024                    27

```
 1        Q. How often did you meet with the leadership
 2    council?
 3        A. Perhaps maybe once a month.
 4        Q. Once a month you said?
 5        A. Yes.
 6        Q. Okay.
 7            MS. HARRIS:  I would like, Brad, now to pull
 8    up a document that is labeled BUTLER_0001.
 9            (Exhibit 2 was marked for identification
10    and is attached to the transcript.)
11        Q. Dr. Butler, what I would like to ask you
12    about is not this email at the top but this
13    statement of yours from -- from May 29, 2020.  Would
14    you like to review this before I ask you some
15    questions about it?  If so, just let me know when
16    you're ready to answer some questions.  And you can
17    also let me know when you'd like me to scroll.
18        A. What was the date of this again?
19        Q. May 29, 2020.
20        A. All right.  Can you go back just for the
21    last paragraph?
22            I have a sense of what this is, so do you
23    have a question?
24        Q. Well, I do.  I have several questions about
25    this.  First, I would like to know just why you
```

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024                                    28

```
 1   decided to release this statement on May 29th.
 2        A. As you can see from the second paragraph,
 3   there were quite a few things that were happening in
 4   the world at that time, and there was concern on
 5   campus with regards to the death of George Floyd,
 6   and so it was important to put that out.
 7        Q. Who was expressing concern on campus at the
 8   time?
 9        A. Pretty much everybody.  Students, staff,
10   faculty, anybody who saw what was happening in the
11   world.
12        Q. And did you make the decision to issue the
13   statement on your own or in consultation with
14   others?
15        A. I don't recall.  I'm quite sure that I
16   talked with the communications department.
17        Q. Was the communications department ordinarily
18   involved in the release of statements to the
19   university community?
20        A. I think they're the only ones that are
21   involved with the release of statements to the
22   university.
23        Q. Was the communications department involved
24   in drafting this statement?
25        A. They may have supported it.  I'm quite sure
```

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024                    29

```
 1   that I may have written most of this.

 2       Q. Okay.  So you drafted this statement?

 3       A. From my memory, I believe yes.

 4       Q. And I want to go down to this sentence here,

 5   which says, "We also need to be comfortable with the

 6   discomfort born from honest, difficult dialogues

 7   about race and culture."

 8       A. Sure.

 9       Q. So you believe that it is okay for people to

10   feel uncomfortable when having difficult dialogues

11   about race and culture; is that correct?

12       A. Of course.  It's the only way that you can

13   have real conversation around race and culture.

14       Q. Would you say that a discussion about, for

15   example, the treatment of women in Islam is a

16   difficult dialogue about culture?

17       A. For some it may be, yes.

18       Q. Would you say that a discussion of

19   affirmative action is difficult dialogue about race?

20       A. For some, yes.

21       Q. When Dr. Negy initiated dialogues like this

22   in the classroom, students reported feeling

23   uncomfortable; correct?

24       A. I can't speak to that.  I don't know.

25           MS. HATCHER-BOLIN:  Objection to form.
```

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024                     30

1        Q. You can't speak to that.  Did you ever see

2     any of the complaints against Dr. Negy?

3        A. I received a bunch of emails at the point of

4     the -- when he came into being with regards to my

5     life.  I don't necessarily -- I didn't read a lot of

6     those after because I was receiving them and I was

7     told to forward them.  So the majority of them I

8     didn't really read.  And anything that came with

9     regards to any incident towards Dr. Negy, I didn't

10    see any of those.  They were something that went

11    somewhere else.  They didn't come to me.

12       Q. So as you sit here today, you don't recall

13    whether the complaints about Dr. Negy related to

14    difficult dialogues about race and culture?

15       A. Oh, I definitely can't answer that.  I don't

16    know what happened in his classroom.

17       Q. So you are not aware of the substance of the

18    complaints brought against Dr. Negy; is that

19    correct?

20       A. What would you mean by "substance"?

21       Q. Many -- after June 4, 2020, many students

22    came forward with complaints about Dr. Negy;

23    correct?

24          MS. HATCHER-BOLIN:  Object to the form.

25       A. Sure.  But can you go back up to the top of

Transcript of S. Kent Butler, Ph.D.

Conducted on October 21, 2024                    31

```
 1   that?  What date was this again?
 2        Q. This is May 29th.
 3        A. So you're asking me something about
 4   June 4th.  It has nothing to do with this.
 5        Q. Well, I'm asking you -- I asked you, on
 6   May 29th, you made a statement.
 7        A. Okay.
 8        Q. "We also need to be comfortable with the
 9   discomfort born from honest, difficult dialogues
10   about race and culture; correct?
11        A. Yes that's part of the statement I made,
12   yes.
13        Q. Did you still believe that on June 4th?
14        A. Sure.  I mean, I'm not sure what you're
15   asking.
16        Q. I'm asking --
17        A. I don't --
18        Q. I'm asking if you still believed, on June
19   4th, we need to be comfortable with the discomfort
20   born from honest --
21        A. Yes.  That's my position.  I am -- that's
22   what I do as a diversity, equity, and inclusion
23   person, I believe in difficult dialogue.  So my
24   position hasn't change and it won't change.  So it
25   will not change.
```

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024                        32

1        Q. Okay.  But you do not recall, as you sit
2    here today, whether any of the complaints against
3    Dr. Negy involved his discussions about race and
4    culture in the classroom; is that correct?
5        A. As I stated earlier, I don't know what
6    happened in his classroom.  I don't know.  I can't
7    answer that question for you in the way that you
8    would like me to.  I don't know.
9        Q. Did you read any of the emails you received
10   from students containing complaints about Dr. Negy?
11       A. They were not directed to me.  I don't
12   recall.  All I do know is that most of the emails
13   that were sent to me early on was about the Twitter
14   exchange, and then there were people who were
15   complaining, but those didn't no longer come to me.
16   I was not getting those emails.  So I don't recall.
17   And if I did get emails, I stopped reading them.  I
18   just forwarded them.  There was no need for me to
19   read them.  I was asked to forward them.
20       Q. Okay.  Well, we'll get into that a little
21   bit more later.
22           How did you first learn about the
23   controversy over Charles Negy's tweets?
24           MS. HARRIS:  We can take this document down,
25   Brad, just so that we can all see each other a

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024                    33

```
 1    little bit better.
 2         A. So there was an email that I received one
 3    evening, really late into the evening.  I'm a late
 4    night person.  And I opened it, and that's when I
 5    was first made aware.  I can't remember the date.
 6    It might have been around the 29th.  I don't know.
 7         Q. Who was that email from?
 8         A. I don't know.
 9         Q. So you don't remember who first told you
10    about Dr. Negy's tweets?
11         A. I started receiving a series of emails from
12    people -- I don't know who they were, per se --
13    about the Twitter exchange, yes.
14         Q. Did you know Charles Negy before June 2020?
15         A. I had met him.
16         Q. When had you met him?
17         A. I don't know.  We sat on a panel together at
18    one point, but I don't remember exactly when I met
19    him.
20         Q. Do you remember what the panel was about?
21         A. Something to do with diversity.  It was from
22    the multicultural student association, something
23    like that.  He's on the call.  You can ask him.  I
24    don't recall the substance of it.  All I know it was
25    held, I believe, at the Rosen Hotel somewhere down
```

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024                           34

1    in Orlando, and we were on the panel.

2        Q. Just to sort of establish the ground rules

3    here, Dr. Butler, this is your deposition, so I'm

4    asking questions about you and your recollections.

5    Professor Negy --

6        A. I'm answering it.  I'm answering and telling

7    you what I remember from that.  That's really -- may

8    have been the first and only interaction I had with

9    him.  I may have had other along, but I don't

10   recall.  We didn't really know each other and still

11   don't.

12       Q. Okay.  But just to be clear, Dr. Negy can't

13   answer any questions during your deposition.

14          MS. HARRIS:  So, Brad, I'd like to pull up a

15   document that is labeled BUTLER_0476.

16          (Exhibit 3 was marked for identification

17   and is attached to the transcript.)

18       Q. Okay.  So, Dr. Butler, I'd like you to

19   review this from -- first, I'd like you to -- it

20   starts at the bottom.  So I will start here with

21   Dr. Negy's email, and then tell me when you are

22   ready for me to scroll up --

23       A. Okay.

24       Q. -- to your email.

25       A. Okay.

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024                                    35

```
1        Q. I'm sorry.  Just to show you, this is from

2    November 2019.

3        A. Okay.

4           Okay.

5        Q. Okay.

6        A. Okay.  What date was it again?

7        Q. So the email was -- Charles Negy's email to

8    you is November 2019.

9        A. Uh-huh.

10        Q. And then on June 4th, you forwarded it to --

11    first to President Cartwright and then also to

12    Rhonda Bishop.

13        A. Okay.

14        Q. So turning to the email itself, Dr. Negy

15    references a conversation that the two of you had at

16    the study abroad fair, it looks like, in October of

17    2019.

18           Do you recall having a conversation with him

19    at the study abroad fair that year?

20        A. I remember it now, yes.

21        Q. What do you -- what can you recall about

22    that conversation?

23        A. Basically what he has written here.  It

24    wasn't very long because I was -- I was at a

25    station.  I was doing something, had a booth or
```

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024

36

```
 1    something that was there.  I think it was more
 2    pleasantry than anything else, remembering that we
 3    were on a panel together.  He may have mentioned
 4    some of this information, but I don't recall the
 5    conversation, though.
 6         Q. And going back to that panel for just a
 7    second, do you know why Dr. Negy would have been on
 8    a multicultural student association panel?
 9         A. Because he was asked to be on it.  I don't
10    know the reasons behind it.
11         Q. Okay.  In this email, Dr. Negy expresses
12    that as a Hispanic person, he felt that the term
13    "Latinx" was being foisted on him by white
14    progressives; correct?
15              MS. HATCHER-BOLIN:  Objection to form.
16         A. I can't speak to the intent of his thoughts.
17         Q. Well, okay.  So he says, "I had mentioned
18    during my -- our conversation my displeasure over
19    the term 'Latinx' and how it seemingly is being
20    foisted on UCF Hispanics such as myself."
21              Correct?
22         A. Okay.  Yes.
23         Q. And he says that -- he references a study in
24    which he finds that 98 percent of Hispanic and
25    Latino participants resent that the term is being
```

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024                                    37

```
 1   imposed on them often by white progressives;
 2   correct?
 3        A. That's what I see written there, yes.
 4        Q. So do you think that this concern that
 5   Dr. Negy expresses here is a legitimate one?
 6        A. It's his concern, yes.  It's legitimate.
 7   It's his concern.
 8        Q. Would a concern like this have been within
 9   your purview as the director of equity, diversity,
10   and inclusion?
11        A. What's that mean, ma'am?
12        Q. Was it part of your job as director of
13   equity, diversity, and inclusion to respond to
14   concerns expressed by minority students and faculty
15   at UCF?
16        A. Sure.  If it was something that was
17   necessary to take care of, I think it would have
18   been something that would have been within my
19   purview.
20        Q. And Dr. Negy is expressing here how he feels
21   that at UCF, the term "Latinx" is being imposed on
22   Hispanics at the university; correct?
23        A. That's what it looks like, yes.
24        Q. So is that something that you believe would
25   have needed to be taken care of?
```

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024                                     38

1        A. What do you mean by "taken care of"?  He was

2    expressing his thoughts.  Taken care of in what way?

3        Q. Well, when I asked you, sir, whether

4    concerns like this -- responding to concerns like

5    this was part of your job as director of equity,

6    diversity, and inclusion, you said yes, if it was

7    something that needed to be taken care of.

8        A. Okay.

9        Q. So I guess I should ask you, what, in

10   your -- in your time in that role, how did you make

11   a determination whether a concern was something that

12   needed to be taken care of?

13       A. I'm not necessarily sure how to respond to

14   that question, other than I guess all concerns were

15   taken seriously.  It may have gone -- something like

16   this may have gone and discussed with the leadership

17   council, may have been discussed with folks on my

18   staff.  It may have been something that was -- there

19   was another person who worked on my staff with

20   Latinx concerns.  I may have communicated with them

21   about something along these lines.

22           I really don't recall.  I don't even

23   remember really this email coming.  As you saw, I

24   didn't respond to it, so it may have been something

25   I looked over and just kept going.  I don't know.  I

Transcript of S. Kent Butler, Ph.D.

Conducted on October 21, 2024

39

```
1   can't think of what my mindset was back at the time

2   that this was sent to me, and so I really have no

3   other answer than that.

4       Q. Under what circumstances would you look at a

5   concern someone had expressed and decide to, as you

6   say, keep going?

7       A. I would assume that if it was something that

8   was of any significant nature, the conversation

9   would have kept going.  I don't -- I don't recall

10  this going any further than this right here.  I

11  don't recall ever speaking with him again concerning

12  this or he sharing with me that this was something

13  that he wanted me to take care of.  I think, as I

14  read this, this is more something that he was

15  sharing information with to me, and that was it.

16      Q. So would it be fair to say that did you not

17  share Dr. Negy's concern that the use of the term

18  "Latinx" was inappropriate?

19      A. I would not say I felt one way or the other

20  about how the "Latinx" term is.  I'm not Latinx.

21      Q. But as you wrote here, you did not respond

22  to this email; correct?

23      A. Yes.  During the time when I was asked to

24  forward emails, I was asked if there was any time

25  that I received anything or had been in
```

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024                    40

1    communication with Dr. Negy, and so my response

2    here, I forwarded this to them because I found in my

3    emails -- I may not -- again, like I said, I don't

4    recall the email at the time, and so that doesn't

5    mean that I didn't read it.  I just don't recall it.

6          And so when I was asked to share any

7    correspondence or anything that I had with Dr. Negy,

8    I was asked to forward that to President Cartwright

9    and/or Rhonda Bishop and I did.  So that's the only

10   way that I can really answer that is it was an email

11   that came across my email account, and this is what

12   was the actions that was taken because of it.

13       Q. Would it be fair to say that if you had felt

14   in November 2019 that Dr. Negy's concern was

15   important, that you would have responded to his

16   email?

17       A. I'm not gonna respond to that in that I

18   don't remember the email so I don't know that I

19   would or would not have responded to it.

20       Q. That wasn't responsive to my question.  I'm

21   gonna repeat my question.

22          Would it be fair to say that if you had felt

23   in November 2019 that his concern about the use of

24   "Latinx" was important, that you would have

25   responded to the email?

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024                    41

```
 1            MS. HATCHER-BOLIN:  Object to the form.
 2        A. What was that?
 3            MS. HATCHER-BOLIN:  You can answer.  You can
 4     answer.
 5        A. Oh, I just said I don't recall the email.
 6     So I hear what you're saying in terms of if I
 7     felt -- of course, I probably should have responded.
 8     I don't recall.  I don't even know why I did or did
 9     not respond.  I just -- I don't recall the email.
10     And then, when I was asked to search my emails for
11     any correspondence, this is what I found.
12        Q. Who asked you to search your emails for
13     correspondence?
14        A. The university.  I don't know exactly whom,
15     but I was asked to send anything that I had, any
16     interactions with Dr. Negy, anything that I
17     recalled, I needed to share with them.  And I shared
18     with them that I was on the panel with him or
19     offered when I had met him.  And so that was
20     basically it.  And then I guess I searched my emails
21     and found this and I forwarded it.
22            I don't recall a lot of what was happening
23     right then and there.  All I can tell you is my
24     interpretation of this particular point in time was
25     this is why I shared this with them.  The only
```

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024                     42

```
 1    reason why I would ever have to share this with them

 2    is because of the investigation that was going on,

 3    and so I shared it with them.

 4         Q. And that investigation was being conducted

 5    by the office of institutional equity; correct?

 6            MS. HATCHER-BOLIN:  Object to the form.

 7         A. I don't know who actually was doing it.

 8         Q. When you were the director of equity,

 9    diversity, and inclusion --

10         A. Uh-huh.

11         Q. -- were you aware of which university office

12    investigated claims of harassment and

13    discrimination?

14         A. So there's a series of offices that did

15    that.  I believe one was Rhonda Bishop's office.

16    Another was one that was headed up by Nancy Myers.

17    So I don't know for sure where -- how to respond to

18    that in regards to who would have received this.

19    Again, I sent it to Nancy -- I mean, not Nancy.  I

20    sent to Rhonda Bishop's office.  I'm assuming that's

21    where it was.  I don't recall, though.

22         Q. Did President Cartwright's office

23    investigate claims of harassment and discrimination?

24         A. I can't speak to that.  I don't know what

25    his office did with regards to that.
```

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024                                    43

```
 1        Q. So as far as you know, President Cartwright

 2    may have been involved in the investigation into

 3    Dr. Negy?

 4            MS. HATCHER-BOLIN:  Object to the form.

 5        A. I can't answer that.  I don't know how to

 6    answer that.  I don't -- I mean, he's the

 7    president's office.  I work under him.  I don't know

 8    what he did.

 9        Q. You don't know what the president of UCF

10    did?  Is that your testimony?

11        A. With regards to this, yes, I don't know.

12    You're asking me was he involved in the

13    investigation.  I can't answer that.  I don't know.

14    I don't know where that went.  I think -- no, never

15    mind.  I'm gonna stop there.  I don't know.

16        Q. So why did you forward President Cartwright

17    specifically this email on June 4th?

18        A. Because I was asked if I had any

19    interactions with -- that's the only thing I can

20    think of at this particular point in time.

21        Q. Who asked you?  Did President Cartwright ask

22    you if you had had any interactions with Dr. Negy?

23        A. Perhaps.  I would assume maybe.  I don't

24    know.  Again, I don't remember specifics as to why I

25    would have sent this.  I don't know how to answer
```

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024                    44

1    any differently.  All I know is, as you see here, I

2    sent it.

3         Q. And you said that --

4         A. At 2:35 a.m., by the way, again.  So I know

5    I didn't have any conversation with him at that

6    point in time.  It was early morning.

7         Q. But you said just now that you would assume,

8    given that you sent it to him, that he asked you for

9    any communications you had with Dr. Negy?

10         MS. HATCHER-BOLIN:  Objection to form.

11        A. You know, I don't -- I can't answer that.

12   Maybe there was a conversation about what type of

13   communications that you have.  I don't know.  At

14   2:35 a.m. in the morning, to send that, I don't know

15   what my thought's process was.  I don't.  I can't

16   answer that.  I'm sorry.

17        All I know is that it was something that

18   maybe I was scrolling and doing some research, and I

19   saw this, and I said, "Oops," and I sent it.  I

20   don't know.  It could have just been I came across

21   this and I said, "Okay, let me send this" because I

22   came across this.  I don't know that I was asked to

23   send it.  I just know that when I got it, I sent it.

24   And so -- and here it's at 2:35 a.m.  I know he and

25   I did not have any conversations that late into the

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024                                          45

```
 1    day.
 2        Q. So as you sit here today, Dr. Butler, you do
 3    not know why you chose to send this email to
 4    President Cartwright?
 5        A. Again, I am not aware of why I did it.  I
 6    can only say that it was because I came across it.
 7    And he was my supervisor, my immediate supervisor,
 8    and so I sent it because it was something that was
 9    shared with me from Dr. Negy.  That's all I can
10    think of.
11        Q. So at the time that you were chief equity,
12    diversity, and inclusion officer, President
13    Cartwright was your direct supervisor?
14        A. Correct.
15        Q. Okay.  Was there anyone else you reported to
16    or President Cartwright alone?
17        A. As I shared earlier, I did the provost as
18    well.
19        Q. But the provost was not your direct
20    supervisor?
21        A. There was some type of dotted lines.  I
22    don't know.  In terms of who I reported to, if you
23    were to say I was being -- if I was to receive some
24    type of an evaluation, it would have been from
25    Dr. Cartwright.
```

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024                                46

1        Q. And then it looks like, about six hours

2    after you sent this to President Cartwright, you

3    sent it to Rhonda Bishop.  Who was Rhonda Bishop?

4        A. Compliance.  I think she works in the office

5    of compliance or some sort.  I don't know what her

6    exact title was right now.

7        Q. And after sharing this with President

8    Cartwright, why did you decide to also send it to

9    Rhonda Bishop?

10       A. I was probably asked to.

11       Q. Was it Dr. Cartwright who asked you to send

12    it to Rhonda Bishop?

13       A. It could have only been him since this is

14    who I sent it to.

15       Q. Okay.  Thank you.

16           Tell me what you remember about how the

17    controversy over Dr. Negy's tweets unfolded over,

18    let's say, the first few days, June 3rd through

19    June 6th.

20       A. Okay.

21       Q. Just kind of tell me what you remember about

22    how everything unfolded on campus.

23       A. Wow.  On campus.  There were a series of

24    emails that were sent out.  It was like an email --

25    I don't know how these students got on, I guess

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024                    47

```
 1   social media or whatever, but there was a campaign.

 2   A majority of the emails, I think they stated pretty

 3   much the same exact thing.  I think they copy and

 4   pasted.  I'm not sure.  I didn't read them after the

 5   first couple days.

 6          Students started to assemble on campus, I

 7   believe, with regards to the stuff that was going

 8   on.  There may have been meetings with senior staff,

 9   meaning the cabinet members of some sort, about --

10   about the emails.  I do know that on the 4th, this

11   day that I sent this, there was the Town Hall.  In

12   preparation for that, we knew that that would come

13   up, I would assume.  I guess really all I can answer

14   there.  Do you have any other add-ons to that

15   question?

16       Q. So you said --

17          MS. HARRIS:  You know what, Brad, you can

18   take this document down.  I'm finished with this.

19   BY MS. HARRIS:

20       Q. So you said it seemed to you as though it

21   was a coordinated campaign, the emails?

22       A. From the students?

23       Q. Yes.

24       A. Yeah, it seemed like they -- yeah, I

25   don't -- students were quick to do whatever they
```

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024                     48

```
1    were doing.  I mean, they flooded the emails.  What

2    I found out later was that the same persons that

3    were sending it to me were sending it to various

4    people on campus.  So I wasn't the only one that

5    received the emails.  I was just cc'd and/or sent

6    it.

7         Q. So were you receiving a lot of emails

8    related to Dr. Negy in those days?

9         A. There were quite a few, yes.

10        Q. And this was happening at a time when racial

11   tension was already high on campus; is that right?

12          MS. HATCHER-BOLIN:  Object to the form.

13        A. Yes.

14        Q. Were you concerned that Dr. Negy's tweets

15   would cause students to lose trust in UCF?

16        A. I don't recall thinking that, no.

17        Q. What do you recall thinking about the tweets

18   when you first learned of them?

19        A. You know, I don't recall the tweets right

20   now.  Can you share what they were?  I don't even

21   recall.  I just knew that people were upset by it.

22   That's all I remember right now.  I don't even

23   remember the content of the tweets.

24        Q. Okay.

25          MS. HARRIS:  You know, we've been going for
```

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024                              49

```
 1   about an hour, and I'm about to get into a statement
 2   that I'd like to ask a bunch of questions about.  So
 3   would this be a good time for maybe a five-minute
 4   break?  Yeah?
 5            THE WITNESS:  Sorry.  Yes.
 6            MS. HARRIS:  So come back at 10:05.  Does
 7   that work for everyone?
 8            THE WITNESS:  Sure.
 9            (A short break was had.)
10            MS. HARRIS:  So I would like, Brad, to pull
11   up a document that is labeled CARTWRIGHT_0124.
12            (Exhibit 4 was marked for identification
13   and is attached to the transcript.)
14       Q. Okay.  So, Dr. Butler, I'd like you to
15   just -- I'm sure you recall this statement, but so
16   that I can ask you some specific questions about it,
17   I'd like you to just take whatever time you need to
18   refresh your memory and ask me to scroll down if
19   you'd like.
20       A. All right.
21            Okay.
22       Q. So this is a joint statement that you issued
23   on June 4th with President Cartwright and Provost
24   Johnson about Dr. Negy; correct?
25       A. Yes.  I'm seeing that was part of it, yes.
```

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024

50

1      Q. That was part of it.  What do you mean by

2    that?

3      A. There was quite a few things that was

4    discussed in this.  He was one of the -- one of the

5    things that was a part of that.  It talks about the

6    conversation of race and unity.  It talks about that

7    students were concerned about any other issues that

8    were going on on campus with any other faculty

9    member.  So it addressed a number of things.

10     Q. I see.  So what you meant is that this

11    statement was about Dr. Negy and other things; is

12    that correct?

13     A. Yes.

14     Q. Okay.  Who first proposed the idea of this

15    joint statement?

16     A. I do not recall.

17     Q. Do you recall whether it was a discussion

18    had over email or over the phone?

19     A. I don't recall.  I do know that a lot of the

20    things maybe that were initiated were initiated from

21    the communications office.  I don't -- I don't know

22    who headed this up.  I can't answer that question.

23     Q. So you are not aware of whose idea it was to

24    issue this joint statement?

25     A. I am not aware of whose idea it was to issue

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024                          51

```
 1    this joint statement.
 2         Q. But it was not your idea, I assume, from
 3    what you're telling me; is that correct?
 4         A. It was not mine.
 5         Q. Do you recall who asked you to participate?
 6         A. I don't recall.
 7         Q. When did you and President Cartwright first
 8    have a discussion about Dr. Negy's tweets?
 9             MS. HATCHER-BOLIN:  Object to the form.
10             MS. HARRIS:  Okay.  I'll rephrase that.
11    BY MS. HARRIS:
12         Q. Did you have any conversations -- prior to
13    issuing this statement, did you have any
14    conversations with President Cartwright about
15    Dr. Negy's tweets?
16         A. I can only make an assumption there that we
17    did because I -- it would be -- there would have to
18    be something that happened prior to, of course, this
19    letter or email coming out.  So yes, I would assume
20    that we did have some communication.  I don't
21    know -- I can't answer when.  I don't know.  I
22    really don't.
23             All I -- I do know that it had to have been
24    within hours of the first emails I received about
25    this.  Again, the conversations probably happened
```

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024                    52

```
 1   because of the students starting to send those

 2   emails, the first one I received that Wednesday

 3   evening.

 4        Q. And would you also assume that you had a

 5   conversation with Provost Johnson prior to

 6   collaborating on this statement?

 7          MS. HATCHER-BOLIN:  Object to the form.

 8        A. Probably more of my contact was not with

 9   Dr. Johnson, but I can imagine that we were in

10   communication.

11        Q. Why do you say that it is likely that your

12   contact was less so with Dr. Johnson?

13        A. Because more of my interactions, most

14   likely, were with Dr. Cartwright.  We weren't -- I

15   mean, we weren't enjoined at the hip, and I

16   didn't -- I mean, most of my information or contact

17   was with, most likely, Dr. Cartwright.

18        Q. Okay.  So most of the information and

19   communication that you received related to this case

20   was from Dr. Cartwright?

21        A. I don't recall.

22        Q. Who drafted this statement?

23        A. I am not aware of who drafted it.  I --

24   again, I believe there's a team of people in the

25   communications office that do things like this.  But
```

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024                                            53

```
 1   who drafted it, who started it, I don't know.

 2        Q. So you did not start this draft?

 3        A. I did not.  I was a part -- I agreed to sign

 4   on to it.  I did not draft it.  I may have had some

 5   say in it.  I don't even recall that.

 6        Q. To the best of your knowledge, was this

 7   statement drafted by someone in UCF's communications

 8   department?

 9        A. I believe that's what I just shared.

10        Q. Is that a yes?

11        A. As much as a yes as I can make on that.  I

12   don't know.  I can't tell you who drafted this or

13   where they were or what office they worked out of.

14        Q. Okay.  So as you sit here today --

15        A. Uh-huh.

16        Q. -- do you recall whether you were involved

17   in drafting the statement that you signed on to?

18        A. So just for the record, I'm looking through

19   this again.

20        Q. Uh-huh.  Let me know if you'd like me to

21   scroll up or down.

22        A. Hold on.

23            Okay.  Can you go up, please?  Oh, not that

24   much.

25        Q. Sorry.
```

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024                                    54

```
 1        A. No, I'm just saying it wasn't much more to

 2   go up.

 3           Okay.

 4        Q. Okay.  So my question was, as you sit here

 5   today, do you recall taking part in drafting this

 6   statement that you signed on to?

 7        A. I don't recall editing it, because looking

 8   at it, while it has things I remember seeing, I --

 9   there are words in here that probably wouldn't be my

10   words, so no, I didn't think I edited it much.

11        Q. What words in here do you say probably

12   wouldn't be your words?

13        A. Probably within the first sentence.  I know

14   people were hurting.  I don't know that I would

15   say -- it wouldn't be my first go-to word to say

16   that we are disgusted.  I don't know what I would

17   have used in its place, but that's not a word that I

18   typically use.

19        Q. Do you feel that that word is too harsh?

20        A. I don't know that it's harsh.  It's just

21   what the -- it was just what was written, and I

22   didn't have reason to say yea or nay to it.  Again,

23   I have to say this is not a word that would be my

24   first go-to word.

25        Q. As you sit here today, do you recall whether
```

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024                    55

```
1    you reviewed this statement before signing on to it?

2         A. Oh, sure, I did see it, yes.

3         Q. Okay.  So would it be fair to say that you

4    approved of it before signing on to it?

5         A. Yes, I believe that I approved, too.

6         Q. What did you understand to be the purpose of

7    issuing this statement?

8         A. I believe the purpose was to have a response

9    to the forum that we had earlier in the day.  It was

10   just a written account that we heard what was being

11   shared with us during that forum.

12        Q. And what forum was that?

13        A. Oh, Lord.  What date was this, the 4th?

14        Q. June 4th, yes.

15        A. So I guess very similar to what the title

16   is.  Something that would be addressing what was

17   happening in our university community.  I don't

18   recall the exact title, but I think it was very

19   close to that, the title of this "Addressing

20   Intolerance in Our Community."

21        Q. I see.  But it was not -- this email refers

22   to Friday's conversation on race and unity, and that

23   was something that took place --

24        A. That was happening the next day, yes.  Yes.

25   So I didn't --
```

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024                           56

```
 1              (Unreportable crosstalk.)

 2         A. Sorry.

 3         Q. Sorry.  No, so I was just gonna ask, so

 4    there was a forum that took place prior to this

 5    statement going out; is that correct?

 6         A. On this day, there was a Town Hall type of

 7    event that occurred.  It was already on the books to

 8    happen.  It was about the pandemic and other things,

 9    and we were probably aware that there would be some

10    questions that come up because of the emails that we

11    were receiving from students.  However, the forum

12    was already in place.  Again, it was a lot of it

13    about the unrest and some other things.  But ...

14              So the very next day, there was one that I

15    was facilitating -- I may have facilitated both of

16    them.  I don't remember -- that was more addressing

17    race and unity.

18              So this email was multifaceted.  It was to

19    address that we had the meeting earlier that day to

20    address thoughts about that meeting and things that

21    were going on and to also invite people to join in

22    in a conversation the next day.

23         Q. Okay.  Did Provost Johnson ever indicate to

24    you that he wanted Dr. Negy to be fired?

25         A. I don't recall that ever being a
```

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024                    57

```
 1    conversation.
 2         Q. But you don't know for certain?
 3         A. I don't recall that ever being a part of our
 4    conversation.
 5         Q. Did President Cartwright ever indicate to
 6    you that he wanted Dr. Negy to be fired?
 7         A. Never did he ever say that to me.
 8         Q. Okay.  So you are -- it sounds as if --
 9    would it be fair to say that you are more certain
10    that President Cartwright never indicated he wanted
11    Dr. Negy to be fired than Provost Johnson?
12             MS. HATCHER-BOLIN:  Objection to form.
13         A. I'm answering the question the way that you
14    asked the question.  You asked me did he ever, and I
15    said no.
16         Q. Okay.  Did Provost Johnson ever indicate to
17    you that he wanted --
18         A. I don't recall us ever having a conversation
19    about that.  I would have never probably had a
20    conversation with him about that.
21         Q. Okay.  Okay.  So scrolling up to the first
22    paragraph of this, the statement says "Many of
23    Associate Professor Charles Negy's online comments
24    run completely counter to our university's core
25    values of diversity and inclusion."
```

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024

58

1          How do you define diversity?

2          A. Oh, wow.  So diversity, to me, is the scope

3     of individuals and people and cultures and world

4     views that we have about the world.  I think each of

5     us, our intersections, create who we are as

6     individuals and how we kind of develop a mosaic of

7     the world or maybe the immediate proximity in which

8     we are in.  I think that it has a lot to do with our

9     upbringing and, you know, where we are, whether it's

10    from an geographical region or whether we are in a

11    family that is fully intact with mother and father

12    or single parenting or growing up with people who

13    are other caregivers.  There's so much that is

14    involved with diversity of who a person is.  So it's

15    multifaceted to me.

16         Q. So would it be fair to say that you believe

17    diversity includes viewpoint diversity?

18         A. Yeah.  I mean, I think I said that.

19         Q. So then how did Charles Negy's comments run

20    counter to the university's value of diversity?

21         A. It just wasn't something that I think that

22    the university would say in regards to being open

23    and honest and fair and inclusive of all individuals

24    who are on the campus.

25         Q. So you felt that Dr. Negy's comments were

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024                    59

```
1    not open, honest, inclusive, and fair of everyone on

2    campus.  Is that --

3        A. Well, the question was, was it the values of

4    the university, and I said whatever he shared --

5    and, again, I don't remember what he said -- ran

6    counter to what the university would say.

7            So if you were having two people who were

8    putting out a statement, so one being Charles Negy

9    and the other being the university, it wouldn't be

10   what the university would say.  I guess that's the

11   clearest I can make of that.  So they run counter to

12   each other.  Not saying that he can't have his

13   statement.  It's just not what the university would

14   say.

15       Q. So I guess I should have asked -- I asked

16   about how you would define diversity.  But at the

17   time that you wrote that Dr. Negy's comments ran

18   counter to the university's value of diversity, how

19   did you understand the university to define

20   diversity?

21       A. All right.  So let me first say that I did

22   not say that I wrote this, and I was a part of a

23   team that was a part of this.  And so to say how the

24   university defines diversity would go with our core

25   values, our creed, the things that are in our
```

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024                    60

1     written statements in regards to how we treat one

2     another on campus would probably be the closest to

3     how our values are defined.

4          Q. What is your creed, the university's creed?

5          A. Oh, the university has a creed, and please

6     don't ask me that one.  The creed is five or six or

7     seven things that students are to adhere to.  It

8     involves integrity -- oh, God.  I don't remember.

9     There's, like, five or six different things.  Hold

10    on.  Let me -- if you don't mind, I'm gonna look it

11    up real quick.  Trying to make me look bad because

12    I'm probably supposed to know it.

13         All right.  So.  So the creed, so there's

14    a -- oh, this is interesting.  I'm gonna just put

15    this in the chat for you and you can do whatever you

16    will with it.  But so the creed, there's a history

17    behind the creed.  And the creed itself -- oh,

18    God --

19         Q. Okay.  I see the creed.  Integrity,

20    scholarship, community --

21         A. Yeah, yeah, I'm not finding it.  So yeah --

22    so those are the values of which the university says

23    that it stands upon.  And they encourage the

24    students to do that.  Like here it says honesty,

25    trust, fairness, respect, responsibility, and

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024                    61

```
1    courage as fundamental values to it.
2         Q. Okay.  And so at the time that you signed
3    this statement, you believed that Dr. Negy's tweets
4    ran counter to the creed.  Is that your testimony?
5         A. That would be the statement that was in
6    there, yes.
7         Q. Okay.  I want to just sort of clarify
8    something for the record because --
9         A. Okay.
10        Q. -- when I ask you about the statement, you
11   have reiterated several times that you did not write
12   it.  But you signed it; correct?
13        A. Yes.
14        Q. And it came from yourself, Alexander
15   Cartwright, and Michael Johnson; correct?
16        A. Correct.
17        Q. So as far as anyone who received this
18   message is concerned, you were one of the authors of
19   this document; correct?
20        A. Correct.
21        Q. Okay.  Now, we talked a little bit about
22   diversity, and the statement here also says that
23   Charles Negy's online comments run completely
24   counter to the university's value of inclusion.
25            Can you tell me at this time how you
```

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024                    62

1    understood the university to define inclusion?

2         A. Let me see where you're saying that from.

3    Where -- could you highlight --

4         Q. Many -- oh, sure.  Here we go.

5         A. Counter to the core values, diversity and

6    inclusion.  I think if you read that, I think what

7    it is saying that what most people do, especially

8    individuals who are of Caucasian background, they

9    include both those together.  It was the office of

10   diversity and inclusion.  I think that's really what

11   that was stating.  So I think that you can't say

12   that it was about inclusion as much as it was about

13   the use of those two words in conjunction with one

14   another.

15        Q. And you said that those words used in

16   conjunction with one another is something that is

17   done primarily by people of Caucasian background?

18        A. I think that in terms of how it is written

19   here, those words were in conjunction with one

20   another.  I don't think that it was a separate

21   and/or.  I think, because of how this was being

22   written, it was being written because it was coming

23   from the office of diversity and inclusion as

24   diversity and inclusion.  I don't think that it was

25   to say that Professor Negy's core values were

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024                          63

```
 1   against diversity, core against -- core against
 2   inclusion.  I'm just thinking that it was just the
 3   two words were combined.  That's my thought process
 4   on that.
 5       Q. I want to ask you about this sentence here.
 6   "No student should fear they will be treated
 7   differently because of others' personal biases."
 8       A. Okay.
 9       Q. Does that mean that if someone expresses
10   what you believe to be biased on, say, a Twitter
11   account, they should not be permitted to teach
12   students?
13       A. I can't --
14          MS. HATCHER-BOLIN:  Object to the form.
15          You can answer.
16       A. Yeah, I can't speak to that.  I don't know
17   if that is the intent behind that statement.
18       Q. Do you believe that someone who expresses
19   personal bias on a Twitter account, for example,
20   should be allowed to teach students in the
21   classroom?
22       A. I think someone's behavior in the classroom
23   is really what I'm more concerned about, not
24   necessarily a tweet.
25       Q. So if a student feared because of a tweet
```

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024                    64

1   that they would be treated differently because of

2   someone's personal bias, what should be done to

3   prevent students from having that fear?

4        A. I don't know that this statement is in

5   conjunction to a tweet.  It said no student should

6   fear that they will be treated differently because

7   of other person's biases.  That does not have

8   anything that's in direct connection to the tweet.

9        Q. So it's your testimony that this statement

10  is unrelated to Dr. Negy's tweets?

11       A. I'm saying that this statement is a

12  standalone statement that tells students that if you

13  feel you are being treated unfairly in the

14  classroom, that that is not something that we stand

15  behind.

16       Q. Did you say if you feel that you are being

17  treated unfairly or if you fear?  I'm sorry.  I

18  couldn't -- it's because of the connection.

19       A. Both of those works.  I said fear, I

20  believe.  I can't remember.  It was two seconds ago.

21  But I will honestly sit here and say that I believe

22  fear or feel that they are being treated unfairly,

23  that that would be unwarranted in the classroom.

24  And I don't think that it has to be because of a

25  tweet, I think it has to be just how they feel

Transcript of S. Kent Butler, Ph.D.

Conducted on October 21, 2024                    65

```
 1   because of behaviors towards them in the classroom.
 2   And I believe that's what -- the sentiment behind
 3   that statement.
 4       Q. But this says "because of others' personal
 5   biases"; correct?
 6       A. That can come up in the classroom.
 7       Q. Can it come up on Twitter?
 8          MS. HATCHER-BOLIN:  Object to the form.
 9       A. I'm not sure how to -- can it come up in
10   Twitter?
11       Q. Can someone's personal bias --
12       A. Let me just say it this way.  I'll answer it
13   this way.  Most students who are in the classroom
14   are not looking at a Twitter statement to define how
15   they feel in the classroom.  Now, how they may go
16   into a classroom with regards to whether they are
17   cautious because of a tweet, that is one thing.  I
18   think that is fair that that could happen.  But the
19   treatment of someone in the classroom is something
20   that's behavioral, and if they feel as though
21   someone is treating them poorly in the classroom, I
22   don't believe that that's connected to a tweet.
23   That's how they feel in the classroom.
24       Q. At the time that you issued this statement,
25   had you received emails from students demanding that
```

Transcript of S. Kent Butler, Ph.D.

Conducted on October 21, 2024                    66

1   Dr. Negy be fired because of his tweets?

2        A. Oh, my Lord.  I believe they were all over

3   the place.  So I can -- not seeing any of them in

4   front of me right now, I believe there was, as they

5   said, there was some "hashtag fire him."  And I

6   believe that there were students that were aware or

7   not aware or joined on or became alarmed or

8   concerned or just curious about what was happening

9   and stated, along with the other students in

10  solidarity, that they should fire him.

11       And so I think it was basically because of

12  the tweets, but also students were learning from

13  other students that it was more than just the

14  tweets, that there was things that were happening

15  that students felt uncomfortable in the classroom

16  and that was also being included in those -- in

17  those emails.

18       Q. Did you receive any emails calling for

19  Dr. Negy to be fired because of his tweets?

20       A. I can't recall if they were specifically

21  because of his tweets.

22       Q. Okay.

23       MS. HARRIS:  Could we take five minutes?  I

24  just would like -- since Dr. Butler is having

25  difficulty recalling some things, I would just like

Transcript of S. Kent Butler, Ph.D.

Conducted on October 21, 2024                              67

```
 1    to add a couple of documents that might help refresh

 2    his recollection.  Is that okay?

 3              THE WITNESS:  Sure.

 4              MS. HATCHER-BOLIN:  Sure.

 5              MS. HARRIS:  All right.  Thank you.

 6              (A short break was had.)

 7    BY MS. HARRIS:

 8         Q. So, Dr. Butler, before the break, you said

 9    you did not recall whether you had received any

10    emails asking that Charles Negy be fired for his

11    tweets; is that correct?

12              MS. HATCHER-BOLIN:  Object to the form.

13         A. I don't recall that being the content of the

14    emails specifically, no.

15         Q. Okay.

16              MS. HARRIS:  Brad, I dropped two files in

17    the tweets.  Could you open the first of them?

18              REMOTE TECHNICIAN:  Sure.  Just give me a

19    moment to download them.

20              MS. HARRIS:  Thank you.

21              (Exhibit 5 was marked for identification

22    and is attached to the transcript.)

23    BY MS. HARRIS:

24         Q. Okay.  So, Dr. Butler, I'll just ask you to

25    review this message which I've posted.
```

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024                                68

```
1          A. A little bit larger, please.

2          Q. Sure.

3          A. Whoa.

4             Okay.

5          Q. Okay.  So this email, which was sent to you

6    on --

7          A. June 4th.

8          Q. -- June 4th --

9          A. Uh-huh.

10         Q. -- refers to the unacceptable and appalling

11   online actions displayed by psychology professor

12   Charles Negy; correct?

13         A. Okay.

14         Q. Is that correct?

15         A. Yes.

16         Q. And this email urges that Professor Negy be

17   removed from his position effective immediately;

18   correct?

19         A. That's what it says, yes.  That doesn't mean

20   fired.

21         Q. So it's your testimony that this individual

22   is not asking that Charles Negy be fired for his

23   tweets?

24         A. That's not what I'm saying.  I'm saying that

25   isn't the only inference I would make from that.  I
```

Transcript of S. Kent Butler, Ph.D.

Conducted on October 21, 2024                    69

 1    will share with you that this was -- so you asked me
 2    earlier if I recall these.  And so these seem to be,
 3    like, the form emails that I was sharing earlier
 4    that students were sending out, and I didn't
 5    necessarily read these after a certain date.  So I
 6    don't even -- I think I was just forwarding them as
 7    I was getting them, as I was asked to do.
 8          And if I were to, as an individual reading
 9    that particular statement that you just shared --
10    let me see if I can find it again -- "I am urging
11    that immediate action is taken and Professor Negy is
12    removed from his position effective immediately," it
13    can be in the classroom.  There can be other
14    punitive measures that maybe perhaps that someone
15    could have.  I don't know that this necessarily
16    leads to someone being fired, just that statement
17    alone.
18        Q. If someone urged that you be removed from
19    your position --
20        A. Uh-huh.
21        Q. -- would you think that they were calling
22    for you to be fired?
23        A. As I said, I believe that could stem from a
24    number -- any number of things.  Again, I'm not
25    saying that it doesn't mean that.  I'm saying that

Transcript of S. Kent Butler, Ph.D.

Conducted on October 21, 2024                    70

```
 1   it could stem from a whole bunch of things that an
 2   individual could be -- could be -- people are
 3   demoted.  People are put into different positions
 4   all the time.
 5        Q. Do you believe this person might be asking
 6   for Charles Negy to be placed in a different
 7   position?
 8        A. I can't speak for this person.
 9        Q. But you can explain -- you can tell me your
10   understanding of it.
11        A. I said --
12        Q. And your understanding is that this person
13   might be asking for Charles Negy to be moved to a
14   different position?
15        A. No.  What I'm saying to you is that this
16   statement does not necessarily -- you asked me if
17   somebody -- your question to me was, was there
18   anything that came to me that said that someone
19   should be fired.  And I said that statement does not
20   say that.  That's what I said.  That's how I
21   answered that question.
22        Q. Okay.
23          MS. HARRIS:  Could we pull back up, Brad,
24   the exhibit that we previously had up, the
25   Cartwright, I believe it was CARTWRIGHT_0124?  Okay.
```

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024                    71

```
 1   BY MS. HARRIS:
 2       Q. So I just want to confirm a few things based
 3   on the testimony that you have given me.  So at the
 4   time that you sent this message to the university
 5   community, you were not actually aware of what
 6   students were complaining about with regard to
 7   Charles Negy; is that correct?
 8       A. That would be untrue.
 9       Q. Well, you testified that you didn't read the
10   emails --
11       A. That's not correct.  But those are two
12   separate things, ma'am.  And what -- I've known that
13   students were upset with Negy since the first one I
14   received in May of -- May 29th.  So your question is
15   not being truthful with regards to my understanding.
16   I answered that I did not know what was in the
17   emails.  But I did not say that I did not know that
18   students were not upset.  You asked me specifically
19   about this particular email you showed and you said
20   that said he should be fired, and I said I don't
21   know that.
22       Q. Did you previously testify that you did not
23   know what students were saying about Charles Negy's
24   classroom behavior?
25       A. You would have to go back and find that in
```

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024                    72

```
 1    the record.  I don't recall saying that.
 2        Q. Okay.  So are you aware of what students
 3    were saying about Charles Negy's classroom behavior
 4    at the time you sent out this message?
 5        A. Am I aware of what students --
 6        Q. Were you -- let me rephrase that.
 7            At the time you sent this message to the
 8    university community --
 9        A. On June 4th, yes.
10        Q. -- on June 4th, what did you understand the
11    complaints against Charles Negy to consist of?
12        A. That there were students who were calling
13    for him to be removed and there were students who
14    were talking about his behavior in the classroom.
15        Q. Are you aware -- were you, on June 4th,
16    aware of any specific allegations made with regard
17    to his behavior in the classroom?
18        A. Again, none of that came to me.  I was not a
19    part of any investigation.  I don't know what
20    students were saying other than what was in the
21    email.  And you saw the same email I just saw.
22        Q. Did you read the emails you received from
23    students regarding Charles Negy?
24        A. Not after a certain point I did not.
25        Q. Do you recall what that point was?
```

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024                    73

1        A. Probably the June 1st, June 2nd.  Whenever I

2   was told to just forward them, I just started

3   forwarding them.  I did not read them.

4        Q. Okay.  So at the time that you sent this

5   statement to the university community, you were not

6   reading any of the complaints related to Charles

7   Negy?

8        A. I wasn't reading them further.  Right.  I

9   may have read the first day or so when I was getting

10  them.  But when I was asked to just forward them and

11  not respond to them, I didn't read them any further.

12  I just -- I had other things to do.  I did not read

13  them.

14       Q. What other things did you have to do?

15       A. My job.

16       Q. And what was your job at that time?  I mean,

17  I understand your title, but tell me about, you

18  know, your responsibilities in that role.

19       A. So at the time of this going on, I was

20  working to solidify the information that we had

21  received from the climate survey.  I was working

22  with the OIR office, Office of Institutional

23  Research, I believe, is what it was called.  I was

24  doing day-to-day operations for our organization.

25  What I was doing in particular, I don't recall, but

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024                    74

```
1    it wasn't just this.  My life wasn't consumed with
2    this because I was -- at that point, I wasn't really
3    involved any longer.  I was just told to forward the
4    emails.
5        Q. And when you say day-to-day operations of
6    our organization, what organization are you
7    referring to?
8        A. The office of diversity and inclusion.
9        Q. Okay.  I would like to just take a look
10   quickly at this sentence, which says "We have been
11   receiving complaints alleging bias and unfair
12   treatment in Dr. Negy's classroom and have launched
13   an inquiry to gather more information."
14       A. Okay.
15       Q. Why did you decide to announce -- and by
16   "you," I mean you, Dr. Cartwright, and Dr. Johnson.
17       A. Gotcha.
18       Q. Why did you decide to announce publicly that
19   you had received complaints against Charles Negy?
20       A. Because we were asked publicly.
21       Q. Asked by whom?
22       A. Students.  "What are you gonna do?  What's
23   going on?"  And that was the response.
24       Q. What -- students were asking what are you
25   going to do in response to what, to his tweets?
```

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024                    75

```
1          A. No.  His classroom behavior.

2          Q. So at the -- and you're referring to

3     comments that were made at the forum earlier that

4     day?

5          A. Probably.

6          Q. Probably?  Are there other statements you

7     may be referring to?

8          A. Let's leave it at that.  I don't know.  I

9     don't recall.

10          Q. So there were statements -- at the virtual

11     forum earlier that day, there were statements made

12     about Dr. Negy's classroom behavior?

13          A. Yes.

14          Q. Okay.

15          A. You know what?  I don't want to say yes.  I

16     don't know.  I can't recall.  I can only assume that

17     there were, but I haven't gone back and watched that

18     whole thing.

19          Q. So, again, I'm gonna ask why you decided to

20     announce that you had received complaints about

21     Dr. Negy.

22          A. Because it's honest and we were transparent

23     about what was going on on campus.  I mean, we truly

24     received complaints.  So why would we not share

25     that?
```

Case 6:23-cv-00666-CEM-DCI    Document 63    Filed 01/21/25    Page 79 of 231 PageID
USCA11 Case: 25-11929    Document: 34-959    Date Filed: 01/16/2026    Page: 99 of 250

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024                                    76

1          Q. Are there privacy requirements that you're

2    aware of related to ongoing university

3    investigations?

4          A. There was no investigation.

5              MS. HATCHER-BOLIN:  Objection to form.

6              Go ahead.  You can answer.

7          A. There was no investigation.  There was a

8    response to a question.

9          Q. There was -- so you said you have launched

10   an inquiry; is that correct?

11         A. Launched an inquiry to gather more

12   information.  So what happened during -- from my

13   recollection, what happened during the forum was

14   what was to be done with regards to any type of

15   inappropriate behavior someone says that a faculty,

16   staff, or any university official did.  And at that

17   particular point in time, it was told to the

18   students that they would need to, at that particular

19   point in time, send anything to the IntegrityLine or

20   other forms of disclosure of information that they

21   were feeling that was burdensome or problematic to

22   them.  And so that statement right there is

23   regarding that.

24             And so any student -- and this wasn't

25   necessarily pertaining to Dr. Negy's situation.  Any

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024                    77

```
1    student who felt that they were being bullied or
2    anything in a classroom or any of those types of
3    things, that was the question -- that was some of
4    the things that came up.  And it was in general.
5    The statement was made that if anyone felt that
6    there was anyone who has done anything that they
7    wanted to bring attention to, that the proper
8    channels, in order to do that, was to go through the
9    IntegrityLine.  That is what I believe that
10   statement is in reference to.
11        Q. This statement here about launching an
12   inquiry to gather more information?
13        A. Again --
14        Q. Or are you referring to the paragraph below
15   about if any student, current or former, believes
16   they may have experienced --
17        A. I think they were all one and the same.  I
18   don't separate what happened with Dr. Negy from the
19   other statement.  Those are parts and parcel for
20   that.  The --
21        Q. So is your --
22        A. It would not change regardless if it was
23   Dr. Negy or any other individual, that is the
24   procedure that you do.  And so what we -- I guess,
25   again, looking at that, launching an inquiry would
```

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024                78

1    mean that if anything came through the IntegrityLine

2    with regards to Dr. Negy, then that would be

3    something that would be looked into.

4        Q. So is it your testimony that "launched an

5    inquiry" does not mean that the university had

6    opened any kind of investigation into Dr. Negy at

7    this time?

8        MS. HATCHER-BOLIN:  Objection to form.

9        A. It is my belief that there was not an

10   inquiry into his investigation.  What was stated

11   during the Town Hall, or however we are classifying

12   that, was that if you have any information that you

13   would like to share with regards to this situation,

14   that you would put it into that.  And so I believe

15   that that is what that statement was intending.  And

16   so that if you have anything, the proper channels

17   was to go through the IntegrityLine.  That is my

18   understanding of what that is.

19       Q. So at the time you stated that UCF had

20   launched -- that you, "we," have launched an inquiry

21   to gather more information, is it your testimony

22   that you did not believe there was an inquiry

23   ongoing at that point?

24       MS. HATCHER-BOLIN:  Object to the form.

25       A. I don't know what that question is even

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024

79

```
1    asking me.
2        Q. Let's just go back to the sentence.  "We
3    have been receiving complaints alleging bias and
4    unfair treatment in Dr. Negy's classroom and have
5    launched an inquiry to gather more information."
6            So let's start with "we."  Who is "we" in
7    this sentence?
8        A. I would just say that's the university.
9        Q. The university.  So that is not -- that "we"
10   did not refer to yourself, Dr. Cartwright, and
11   doctor Johnson?
12       A. That's my understanding, yes.
13       Q. Okay.  So "We have launched an inquiry to
14   gather more information."
15       A. Yes.
16       Q. Do you understand that to mean launched an
17   inquiry into complaints alleging bias and unfair
18   treatment in Dr. Negy's classroom?
19       A. No.  What I believe that to be, as I stated
20   earlier, is that we had told anyone who had any
21   information that they want to share, that that was
22   the channels to use.  That was it.  And that we
23   could not do anything unless there was something
24   there.  Something that we can work from in terms of
25   responding to anything.  There was no inquiry into
```

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024

80

1    whether or not he should be fired or anything along

2    those lines.  It was an inquiry into what these

3    students were asking or sharing.

4         But we had no information.  We could not --

5    we had nothing to do on.  We were saying, if you

6    have information that you want to share, this is how

7    you go about sharing it.  That is all that I was

8    privy to.

9         Q. You testified earlier when I showed you --

10   do you recall -- do you recall earlier -- and if

11   not, we can pull it up again -- that I showed you an

12   email from Dr. Negy concerning the term "Latinx"

13   that you forwarded to Alexander Cartwright and

14   Rhonda Bishop on June 4th?

15        A. Okay.

16        Q. Do you recall that you testified that you

17   had been instructed to share any emails that you had

18   related to Charles Negy?

19        A. Yes.  And that was one of them, I guess.

20   I'm assuming that's what you're asking me.  I don't

21   know what you're asking me right here.

22        Q. Well, I'm asking you because you just

23   testified that there was no inquiry going on on

24   June 4th; correct?

25        A. Yeah.  There was none.

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024                               81

1        Q. But you also testified that by June 4th,

2    someone at UCF had directed you to forward them any

3    emails you had related to Charles Negy; is that

4    correct?

5        A. Right.  And so when I went back through my

6    emails, there wasn't an inquiry into Charles Negy.

7    It was, if I had anything to do with -- anything

8    that I had in my inbox that had any concern with

9    Negy, that I would forward that.  So I happened

10   across that again.  Again, like I said, it was 2:35

11   in the morning, I saw that, and I just sent it.

12        So I don't know that anybody asked me

13   specifically to send anything.  All I know is that

14   when I went through my emails and I had -- I

15   probably put a search in.  I would have had to have

16   put a search in to get that one, and so it came up

17   and so I sent it.  That was it.  It wasn't

18   investigation.  It was just that it was in my email

19   and I sent it.  Because I was asked to send anything

20   that was being forwarded to me or that was being

21   sent to me with regards to the situation that

22   happened from May 29th on, and that just happened to

23   be in my inbox as well so I sent it.

24        Q. Okay.  Thank you.

25        A. So that's probably the even better

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024                                    82

1   explanation for why I sent it in the first place.  I

2   wasn't asked to send it.  It was that I saw it in

3   there and I sent it.

4        Q. So you just happened to search your email

5   that night for Charles Negy's name or someone asked

6   you to?

7        A. What was asked of me was that I would send

8   any correspondence that was concerning Negy.  And

9   what I did at that particular point in time was a

10  search to make sure that every email that was coming

11  to me -- and I was basically looking for things that

12  were coming from May 29th on, and that one showed

13  up.  You know when you put something in a search --

14       Q. Uh-huh.

15       A. -- it comes up?

16       Q. Yeah, yeah, I understand.

17       A. That is what happened.

18       Q. So I want to go down to the language of this

19  next line.

20       A. Okay.

21       Q. "If any student, current or former, believes

22  they may have experienced abusive or discriminatory

23  behavior by any faculty or staff member, we want to

24  know about it."

25       A. Uh-huh.

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024                                    83

1        Q. So this says "believes they may have
2    experienced" rather than "believes they have
3    experienced."
4        A. Okay.
5        Q. Why did you want anyone who believed that
6    they might have experienced or may have experienced
7    abusive or discriminatory behavior to come forward?
8        A. Because -- that's because you think you have
9    something that happened to you doesn't mean that it
10   did.  So I think that was the sentiment behind that
11   statement.  If you believe that this is something
12   that occurred to you, send it.  I think that's just
13   standard language.
14       Q. Okay.  Would it be fair to say that you were
15   trying to cast a wide net here?
16       A. It would be fair to say this wasn't
17   targeting any particular individual and that if you
18   want -- so part of being a part of a university
19   community is to tell people what the procedures are.
20   And so that was not about a casting of a net.  It
21   was to inform students of what the process was.
22       Q. And what is -- as I see it says here
23   concerns can be reported to UCF's IntegrityLine.
24   You mentioned it earlier.  What is the
25   IntegrityLine?

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024                    84

```
 1        A. Exactly what it says right there.  A place

 2   to put your complaints.

 3        Q. Who monitors the IntegrityLine?  If I submit

 4   a complaint to the IntegrityLine, who receives it?

 5        A. I have no clue.

 6        Q. Okay.  Is it your testimony that, other than

 7   a place where students can submit complaints, you

 8   don't know what the IntegrityLine is?

 9           MS. HATCHER-BOLIN:  Objection to form.

10        A. I never said I didn't know what it was.  You

11   asked a question about who sees it.  I said I don't

12   know.

13        Q. Well, I asked what the -- let me ask you

14   again.  What is the IntegrityLine?

15        A. A place for people to put complaints.

16        Q. Complaints about what?

17        A. Whatever they want to complain about.

18        Q. So if I wanted to complain about the food in

19   the cafeteria, I could submit it to the

20   IntegrityLine?

21        A. I assume yes.  I don't know.  I don't work

22   in that office.  I don't know what the -- I don't

23   know what they receive.

24        Q. In what office?

25        A. All I know -- the office of wherever they
```

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024                                    85

```
 1    get that.  It doesn't come to my office.  I don't

 2    know.  I don't know who the recipient of this is.  I

 3    believe it's Nancy Myers' office, but you asked

 4    specifically who gets it.  I don't know.  I don't

 5    know.

 6        Q. Okay.  So you believe that the IntegrityLine

 7    is administered by the office for institutional

 8    equity, which is Nancy Myers' office?

 9        A. I believe that's where it's housed, yes.  I

10    don't know that specifically for sure, but I believe

11    that's where it's housed because she's the -- I

12    think she's legal counsel or something.  I don't

13    know what she does on campus.  But I think that is

14    part of her role.  Right?  Or their role.

15        Q. When you sent this email, were you aware

16    that there was already a change.org petition calling

17    for Dr. Negy to be fired?

18        MS. HATCHER-BOLIN:  Objection to form.

19        A. I don't recall any petition.

20        Q. You never saw a change.org petition

21    concerning Dr. Negy?

22        A. Not that I remember, no.

23        Q. At the time you sent this email, were you

24    aware of the "hashtag UCF fire him" Twitter

25    campaign?
```

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024                    86

```
 1        A. Yes.
 2           MS. HATCHER-BOLIN:  Object to form.
 3        A. I had heard of that.
 4        Q. Were you concerned about false reporting of
 5     complaints against Dr. Negy?
 6        A. Of course.
 7        Q. Did you express that concern to anyone?
 8        A. Like who?
 9        Q. Who were you -- well, how about President
10     Cartwright?  Let's start there.
11        A. Of course.  So let me -- let me bounce back
12     a little bit because I'm not necessarily liking
13     where this is going.  I am about integrity and
14     fairness in all processes.  Right?  So of course I
15     would be concerned that people were just joining a
16     bandwagon and doing something to hurt someone and
17     intentionally doing so.  That's human nature.
18     That's what people do.
19           But as an individual, I'm really starting to
20     be concerned that what's being pointed towards me is
21     that I would want somebody to be unjustly
22     characterized or hurt or harmed.  That's not me.
23     That's never been me.  And so these questions seem
24     to lean that way, and it's really problematic for
25     me.
```

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024                87

```
1           So what I'm sharing with you is that I
2    personally, as a faculty member, was trying to share
3    with students what the process was because I do
4    believe in due process.  And so anything that was
5    coming from me was -- especially with regards to
6    statements like any faculty member or staff member
7    you're concerned about that you would put something
8    in, I wanted students to understand that there was a
9    process.
10          Part of my whole conversation with students
11   all along was that if we have the information that's
12   necessary to move forward, then that's what we could
13   do.  It was not ever any type of a witch hunt type
14   of a situation.  I wanted people to understand what
15   the process was.  And that is, for me, is about
16   fairness.  And letting them know what -- what were
17   the routes that people needed to do in order to try
18   to have something that they wanted to have seen or
19   heard or taken into consideration that they would
20   do.  And it was only for imparting information about
21   what the process is, not to say that you do this or
22   you have to do this.  It was more about the process.
23      Q. Well, you say this email was only about
24   process, but --
25      A. No, I said me.  I stated that that was my
```

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024                 88

1    full intent throughout this whole process was to

2    inform people what due process was.  That was how I

3    operated.  And so if you want to know where I'm

4    coming from, that's where I was coming from.  Do not

5    associate that with this "we."

6        Q. So if you had to do it over again, would you

7    not have put your name to this statement?

8            MS. HATCHER-BOLIN:  Object to the form.

9        A. Yeah.  What I was stating was the process.

10   That was my -- that was my mindset when I put this

11   statement out or I was a part of this statement,

12   that I was informing the community of what is the

13   right way to go about something.  I always stated

14   that.  And you can go back and hear some of the

15   clips in which that's what I was -- that was my

16   intent the whole time ever was to say this is what

17   the process is.

18       Q. But the intent of this statement was also to

19   call Charles Negy's posts racist and to condemn

20   them; correct?

21           MS. HATCHER-BOLIN:  Objection to form.

22       A. So I actually refuse to answer that question

23   because I don't know what the intent was in terms of

24   calling it racist.  I don't think -- I think what it

25   says is that -- excuse me.  Let me read it again.  I

```
 1   don't think anybody ever called it racist.
 2        Q. Okay.  Well, first of all, Dr. Butler, you
 3   can't refuse to answer my questions.
 4        A. Wait, wait, wait.  No, that's not what I
 5   meant by that.  But, again, "At a time when so many
 6   of our community members are hurting, we are
 7   disgusted by the racist posts of one faculty
 8   member."  So I don't think they called him a racist.
 9        Q. No, I said to call -- I said the purpose was
10   to call Dr. Negy's tweets racist and to condemn
11   them; correct?
12        A. That's what that statement said, yes.
13        Q. Okay.  And that was part of the purpose of
14   this statement, correct, was to call his posts
15   racist and to, quote, condemn them in the strongest
16   terms; correct?
17        A. That's what that statement says.
18        Q. Okay.  And your name is on the statement;
19   correct?
20        A. Yes, my name is on the statement.
21        Q. Okay.
22        MS. HARRIS:  I would like now -- Brad, I'm
23   hoping you might be able to play a few video clips
24   from two videos that I uploaded to the platform.
25   One is called virtual student forum.
```

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024                    90

1        Q. Well -- actually, so yes, let's start with

2    the virtual student forum because I believe, from

3    what you are telling me, Dr. Butler, that that was

4    prior to -- that that was the June 4th meeting and

5    that the virtual conversation on race and unity was

6    the June 5th meeting.  So let's start with the

7    virtual student forum.

8        A. Okay.

9            (Exhibit 6 was marked for identification

10    and is attached to the transcript.)

11           MS. HARRIS:  And, Brad, I'm looking to play

12    that from 1 hour, 17 minutes, and, let's say,

13    25 seconds.  And then I can just sort of tell you

14    when to stop.

15           (Video was played.)

16           MS. HARRIS:  Okay.  You can stop it now.

17    BY MS. HARRIS:

18        Q. So, Dr. Butler, I wanted first to

19    understand, when you said, you know, "The UCF fire

20    him, I understand all of that, but it's not going to

21    happen overnight."

22        A. Right.

23        Q. What did you mean by that?

24           MS. HATCHER-BOLIN:  Object to the form.

25        A. So in conjunction with all the statements

Transcript of S. Kent Butler, Ph.D.

Conducted on October 21, 2024

91

```
 1    that I was making, I think that it's -- I think that
 2    that is unfair to just start it right there and just
 3    say that clip.  It was in conjunction with a slew of
 4    statements that I was making at the time about all
 5    the things that we were talking about in this
 6    particular forum.  And I was just stating that I
 7    understood, at that particular point in time, about
 8    those tweets being out there.
 9         Again, goes back to what I was sharing
10    earlier.  My whole conversation or my thought
11    process during this particular point in time was
12    about informing students about what is going on in
13    the world and how we can move forward, that we just
14    couldn't just fire someone or do whatever.  That was
15    never my intent there.  As a person who works in
16    diversity, equity, and inclusion and a person who
17    understood what's happened with the civil rights
18    movement, I always know that things move slowly and
19    that it takes time to go through and do any type
20    of -- any type of change that may occur in the
21    world.  Right?
22         And so when students were coming and saying
23    fire him or do whatever, they wanted immediate
24    response.  Again, my whole thought process was due
25    process and that we just can't just fire somebody or
```

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024                                    92

1    do anything along those lines.  That was my intent

2    behind that statement.  And so I'll leave it there.

3        Q. Did you personally believe that UCF should

4    have fired him for his tweets?

5        A. I don't think my personal feelings about any

6    of that is of any relevance, but I don't think

7    anybody should be fired.

8        Q. You don't think anybody should be fired,

9    period?

10       A. With regards to what you just asked me.

11       Q. You don't believe that UCF should have fired

12   Dr. Negy for his tweets?

13       MS. HATCHER-BOLIN:  Objection to form.

14       A. You asked me -- right.  I don't know that it

15   is -- okay.  Let's put it into context.  I don't

16   know that they should or shouldn't.  That's not my

17   role, whether or not they could or they couldn't.

18   Now, people may feel that way and people may say

19   those types of things.  But at the time of the

20   situation, it was more about due process.  If there

21   was a concern for someone to be fired, then it

22   should be on due process.

23       We never or I never thought that free speech

24   was something that someone should be fired over.

25   And so if you're asking me if it's about free speech

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024                    93

1    and about what someone may have put into a tweet,

2    then no, I don't think that's something that's a

3    fireable offense, but that doesn't mean that people

4    shouldn't be fired, the second part of your question

5    to me.

6        Q. Okay.

7            MS. HARRIS:  I'd like, now, to pull up the

8    other video file, which is the virtual conversation

9    on race and unity.

10           (Exhibit 7 was marked for identification

11   and is attached to the transcript.)

12           MS. HARRIS:  Okay.  And could you go to

13   about a minute 23, I think that's about where I want

14   to start from the first clip but may need to back up

15   a little from there.

16           Okay.  Yes.  All right.  This is where we

17   can start.

18           (Video was played.)

19           MS. HARRIS:  Okay.  You can stop it now.

20   BY MS. HARRIS:

21       Q. So, Dr. Butler, when this student asked what

22   the university was doing to protect her and you

23   responded, quote, the wheels are in motion in terms

24   of what needs to happen with regard to that --

25       A. Okay.

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024                    94

```
 1        Q. -- what wheels were in motion?
 2            MS. HATCHER-BOLIN:  Object to the form.
 3        A. So maybe not the best choice of words, but
 4    what I meant by that and what I couldn't say out
 5    loud in front of the students at that particular
 6    point in time was that we were looking into making
 7    multiple courses available that he was teaching.  So
 8    if he was teaching a general psychology course -- it
 9    wasn't appropriate to say that on the forum.
10            And so what the wheels in motion were, were
11    that any course that he was teaching, students would
12    have an opportunity to opt out of whether or not to
13    take the course with him or to take the other
14    section that was created.  And so that was really
15    where that was coming from.
16        Q. Okay.  And is that also what you meant by,
17    "By the time you get to campus as a freshman, it
18    will have been dealt with"?
19        A. Yes, that there would be an ability for them
20    to make a choice for what course they wanted to
21    take.
22        Q. Okay.  So your testimony is that those
23    comments relate to a plan to open up alternative
24    courses to Dr. Negy's?
25        A. Yes.
```

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024                    95

```
 1        Q. And is there anything else you were
 2    referring to with those statements?
 3        A. No.
 4        Q. Okay.
 5            MS. HARRIS:  I'd like, now, in the same
 6    video to go to I think it's minute 39.  39:25, and I
 7    want to see if that's the right spot or if we need
 8    to back up a little bit because I'd like to include
 9    the student's statement.
10            Okay.  So let's back up.  Let's back up.
11    Maybe a lit bit more.  Beginning of this student's
12    statement.  Okay.  Perfect.  Next up we have ███████
13    ███████.  You can play from there.
14            (Video was played.)
15            MS. HARRIS:  Okay.  You can pause it now.
16    BY MS. HARRIS:
17        Q. So, Dr. Butler, after this student,
18    █████████ speaks, you just respond that you'll be
19    in touch.
20        A. Uh-huh.
21        Q. Do you recall whether you had any
22    communication with ████████████ following the
23    Zoom?
24        A. I did not.
25        Q. You did not.  Okay.  And then I have one
```

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024                    96

```
 1   more clip from this video that I'd like to share.
 2          MS. HARRIS:  And it starts, I believe,
 3   around 1 hour and 8 minutes.  See if that's right.
 4          (Video was played.)
 5          MS. HARRIS:  Okay.  So you know what?  Let's
 6   back up.  I'm sorry.  Because I want to get the
 7   student comment that Dr. Butler is responding to
 8   here.  Okay.  Thank you.
 9          (Video was played.)
10          MS. HARRIS:  Oh, you know what?  It must
11   be ...
12          (Video was played.)
13          MS. HARRIS:  All right.  You can pause it
14   now.
15   BY MS. HARRIS:
16      Q. So, Dr. Butler, the statement that I wanted
17   to ask you about is when you say to the student, "I
18   can see what your responses to him being are and I
19   can fight for you."
20      A. Uh-huh.
21      Q. What did you mean by "I can fight for you"
22   in response to --
23      A. I'm associate justice advocate.  I fight for
24   all individuals who feel they are unjustly being
25   treated.
```

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024                           97

```
1          Q. So how would you fight for someone who was

2     uncomfortable with Charles Negy's presence on

3     campus?

4          A. I would speak to -- I would be their voice.

5     That's what my role is.

6          Q. So if they asked for him to be fired, you

7     would be their voice in advocating for that?

8          MS. HATCHER-BOLIN:  Objection to form.

9          A. No, that's not what -- you're putting words

10    in my mouth.  What I said is if a student shared

11    with me what their concern was, I would share what

12    their concerns are and I would fight for them to be

13    heard.  That doesn't mean I would say to them that

14    the person should be fired.

15         Q. Okay.

16         MS. HARRIS:  The next document I'd like to

17    ask you about, Brad, is a document labeled

18    BUTLER_0169.

19         A. I'm gonna mute myself for a second because

20    I've got kind of frog in my throat.

21         Q. Do you need a break?

22         A. No, I don't need a break.  I'm just letting

23    you know I'm going to be coughing.

24         Q. Okay.

25            ///
```

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024                    98

```
 1              (Exhibit 8 was marked for identification
 2      and is attached to the transcript.)
 3          MS. HATCHER-BOLIN:  Samantha, I'm sorry.  Is
 4      this labeled?  I just want to make sure I'm right
 5      with the exhibits.  Thank you so much.
 6      BY MS. HARRIS:
 7          Q. So, Dr. Butler, this is taken from the
 8      documents produced in response to our discovery
 9      requests to you.  So I assume that these are
10      documents that you have -- that were in your
11      possession at some point.  This document is a
12      summary of meetings with Black RSO student leaders
13      and Black students held on June 5th, June 8th, and
14      June 14th.
15              Do you recognize this document?
16          A. No, not really.  I don't know that I was in
17      these meetings.
18          Q. Do you recall attending meetings in
19      June 2020 with Black RSO student leaders and Black
20      students specifically?
21          A. Not specifically I don't recall.  That
22      doesn't mean that I wasn't.  I just don't recall.
23          Q. All right.  So you don't --
24          A. Can you scroll up, please?
25          Q. Up, sure.  This is the top of the document.
```

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024                99

```
1         A. Yeah, no, I mean down.

2         Q. Oh, down, sure.

3         A. Yeah, I don't -- I don't think I was

4    involved with these meetings.  Keep going.

5         Q. Okay.

6         A. I don't know that this is the first time

7    I've seen this document, but I don't think that

8    those meetings I was involved in.  I just don't

9    recall.

10        Q. Okay.  Do you know why this document would

11   have been in your possession?

12        A. Not quite sure.  Maybe it was sent to me.

13   Because it looks like maybe it was minutes.

14        Q. Okay.

15        A. I don't have any role with the RSOs.  They

16   don't work under me.

17        Q. Okay.

18        A. Or they didn't work under me, I should say.

19        Q. So you don't recall personally -- what I was

20   looking at is up here.  You don't recall personally

21   being asked by any students for weekly updates on

22   Professor Negy?

23        A. I surely don't.  I wasn't involved with

24   that.

25        Q. Did you provide anyone with weekly updates
```

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024

100

```
 1    on Dr. Negy?

 2        A. I didn't have any updates to provide them

 3    with.

 4        Q. Okay.

 5            MS. HARRIS:  Could we pull up next a

 6    document labeled BUTLER_0827.

 7            (Exhibit 9 was marked for identification

 8    and is attached to the transcript.)

 9            MS. HARRIS:  Okay.

10    BY MS. HARRIS:

11        Q. Let me give you a moment to read this

12    document.  Tell me when you would like me to scroll

13    down.  You don't need to read the email above it.

14        A. Okay.

15        Q. You want me to scroll down?

16        A. Yeah.

17        Q. Okay.  You can ignore the highlighting.

18    That was in the document when I received it so ...

19        A. Okay.

20        Q. Okay.  I think that's it.

21            So this appears to be an agenda for a

22    June 8th cabinet meeting on which you were copied.

23            Is this President Cartwright's cabinet?

24        A. Yes.

25        Q. Okay.  And that was the cabinet that you
```

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024

101

```
 1   were referring to earlier in our -- in our

 2   conversation?

 3        A. Correct.

 4        Q. What were your -- what were the expectations

 5   of a cabinet member at these meetings?

 6        A. Attendance.

 7        Q. Were you asked to provide specific

 8   information to President Cartwright?

 9        A. Only if I was on the docket.

10        Q. Okay.

11        A. Let me pull back.  I can interject if I

12   wanted to on any comment on anything that was going

13   on there.  But typically, you know, you go, you're

14   in the meeting.  You know what meetings are.  You

15   know what I mean by that.

16        Q. Yes, I do.

17           Okay.  So the first thing that I'm looking

18   at, it appears that President Cartwright gave an

19   update on Professor Negy at this meeting.

20        A. Okay.

21        Q. Do you recall what he told the cabinet about

22   Charles Negy at this meeting?

23           MS. HATCHER-BOLIN:  Objection to form.

24           You can answer.

25        A. I'm not not trying to answer.  Sorry.  I'm
```

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024

102

1    just trying to -- I looked at the date to see.  I

2    can only imagine -- these were after the meetings

3    that we had, the Town Halls -- probably an update to

4    the cabinet about what has been happening with

5    regards to that situation.  That -- I think to --

6    this might have been the first meeting that we had

7    as a cabinet since the whole thing kind of came into

8    being.  And so it could have been that he was

9    informing them on -- pretty much from day one.  I

10   don't remember exactly everything that was stated

11   there.  But I'm only stating that based on the

12   June 8th date that he probably was making sure that

13   everybody on the cabinet was up to speed on what had

14   occurred.

15      Q. Did President Cartwright continue to keep

16   the cabinet up to speed on the investigation into

17   Dr. Negy following this cabinet meeting?

18      A. So you're saying "investigation," and I

19   would say no because I don't think that he was even

20   involved in the investigation.  I think that, again,

21   with the process that's in play, whatever goes

22   through the IntegrityLine and whatever office it

23   goes through, that he was to receive the information

24   maybe, but he wasn't involved in it.  So -- but I

25   can't -- I'm speaking off nothing to go on.

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024

103

```
1        Q. You don't actually know whether he was

2    involved with the investigation?

3        A. I don't know exactly.

4        Q. Okay.  Now, does this mean that at this

5    meeting, you, President Cartwright, and Mary Beth --

6    I don't know how to pronounce her name -- Ehasz --

7        A. Ehasz.

8        Q. -- gave an update on virtual Town Halls and

9    engagements?

10        A. I think probably not an update but maybe a

11    synopsis of what happened at those two meetings.

12        Q. Who was Mary Beth Ehasz?

13        A. She, at the time, was the vice president of

14    student affairs, student activities.

15        Q. Okay.  And this references -- and this goes

16    back a little bit to what we were looking at

17    previously, BFSA and Black Caucus Engagements.  Do

18    you recall attending those engagements?

19        A. I don't know what the Black Caucus

20    Engagements are, but BFSA is a Black faculty staff

21    association.  And I believe I was a member at the

22    time, but I typically wasn't in attendance all the

23    time, I think.

24        Q. Do you recall whether you attended any BFSA

25    meetings at which Charles Negy was discussed?
```

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024

104

```
 1        A. I don't recall.

 2        Q. Okay.  Okay.

 3           MS. HARRIS:  I would like, now, to pull up a

 4     document numbered BUTLER_1447.

 5           (Exhibit 10 was marked for identification

 6     and is attached to the transcript.)

 7        Q. Okay.  And I am going to ask you to read

 8     this email from Brittny James and then your

 9     response.  And let me know -- tell me when you need

10     me to scroll up.

11        A. So I was having the flashback.  When you

12     said that just now, I was thinking you wanted me to

13     read it to everybody.

14        Q. No, no.

15        A. I got you.  Could you make a little bit

16     larger, please?

17        Q. Sure.  No, I'm not going to make you read

18     anything out loud.  If that needs to happen, I'll do

19     it.

20        A. Okay.

21        Q. And here, let me scroll up to show you your

22     response here.

23        A. Okay.

24        Q. Okay.  So in your response to Ms. James --

25     or Dr. James, I'm not sure which it is -- you tell
```

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024                    105

```
1    her that "I agree with all that you have proffered";
2    correct?
3        A. Okay.
4        Q. And she states that "I do hope that you and
5    university leadership identify a way to separate
6    free speech from hate speech."
7            Do you agree with -- it looks like doctor --
8    do you agree with Dr. James that free speech and
9    hate speech are distinct categories?
10           MS. HATCHER-BOLIN:  Object to the form.
11       A. Can you state that differently?  I don't
12   know what you're asking.
13       Q. So Dr. James here says, "I do hope that you
14   and university leadership identify a way to separate
15   free speech from hate speech."
16           So do you believe that hate speech can be
17   free speech?
18           MS. HATCHER-BOLIN:  Object to the form.
19       A. I think all speech is free speech, but I
20   think that maybe what is being stated here is, just
21   like with any type of violent crime or hate crime
22   that someone does that is a way that the law
23   distinguishes between whether something is just a
24   crime and whether something is a hate crime; right?
25   And so that's the essence in which I take that, and
```

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024

106

```
1    I don't know how else to take it.
2        Q. Do you believe that Dr. Negy engaged in hate
3    speech?
4        A. Again, I don't remember the --
5            MS. HATCHER-BOLIN:  Object to form.
6        A. I don't remember what he tweeted.  I don't
7    even know that I knew then really.  I don't remember
8    what he tweeted.  If you want to share with me what
9    that was, I can answer that, but I don't know.
10       Q. I don't think that's necessary at this
11   point.
12           And then you also said, "I want you to know
13   that we are doing all that we can to rectify this
14   situation."
15           So what did you mean by "this situation" in
16   the context of her email?
17       A. In the context of her email and in the
18   context of what I shared with you earlier, my whole
19   mode of operandi is to try to create an environment
20   where we can look at the systemic racism that is in
21   the system and to try to rectify that.  And that was
22   probably where I was coming from with this.
23       Q. So, quote, this situation does not refer to
24   Dr. Negy?
25       A. She talks about more than Dr. Negy in this
```

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024

107

```
 1    conversation, and so yes, it was more than just

 2    about Dr. Negy.

 3        Q. Where does she -- show me in the email where

 4    she talks about more than Dr. Negy.

 5        A. I think her whole statement is about what

 6    was happening with students in the classroom.  This

 7    is not necessarily -- I wouldn't -- it talks about

 8    formal complaints that was made against him but --

 9    in the past and what she knew about there.  But then

10    she goes on, in my mind, to say -- to talk about

11    what the leadership was going to do and, to me,

12    that's different because I didn't see -- again, I

13    did not see that as being directed directly at him,

14    especially with my mindset, to try to open up the

15    door.  So whenever I see something about systemic

16    racism or anything along those lines, whether they

17    are in the classroom -- I didn't attribute it or I

18    don't attribute it to him.  I hope that makes sense.

19        Q. So it's your testimony that you did not

20    understand Dr. James' email to be exclusively about

21    Dr. Negy?

22        A. I don't think that every portion of it was

23    about him.  I think she was talking about -- she was

24    talking -- to me, I took it more globally,

25    especially with the last statements.  Right?  When
```

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024

108

1    she's talking about students and their mental health

2    and educational opportunities, I looked at it

3    more -- I took it beyond the context of just him.

4    And I have to.  That's part of my role.  I think as

5    a human being that's my role.  I don't necessarily

6    associate it with that.

7            Now, I get it and I see what you're talking

8    about with regards to it being addressed about some

9    of the comments that he has made.  I get that.  But,

10   again, I can't think so one-dimensionally.  I don't

11   think one-dimensionally.  And so my response has

12   always been about trying to open up the door, the

13   platform, for talking about the systemic system that

14   is at play.  I hope that makes sense.

15       Q. So is it your testimony, then, that when you

16   said "we are doing all that we can to rectify this

17   situation," that you were not referring to Dr. Negy?

18       A. I think it was one of those statements that

19   you send to somebody to put them at ease.  I don't

20   know that I -- I just wanted to know -- I let her

21   know that I heard her and what her concerns were and

22   that -- you know, that there were things that were

23   being looked into.  There were avenues, but I

24   couldn't say that to her.  You know, it wasn't my

25   place to say to her what was happening on campus.

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024

109

```
1    Just to reassure her that we weren't taking it

2    lightly.

3        Q. All right.  I'd like to pull up -- I think

4    we can go through one more document.  And then

5    maybe -- it's about 10 to 12.  Maybe after this

6    document, we can take a break for lunch.  I don't

7    think we'll have "too" too much left after the lunch

8    break.  This is not gonna be a full-day deposition.

9    But I think maybe makes sense, we've been going for

10   a while, to go through one more document and then to

11   take a short lunch break before wrapping up.

12       A. Well, I'll say that if it's not gonna be

13   much longer than that, I don't need to stop for

14   lunch if you don't need to stop for lunch.

15       Q. I mean, it may be another hour, hour and a

16   half.  I think generally --

17       A. It's up to you all.

18       Q. -- people like to take a lunch.  I don't

19   want to deprive anyone of a lunch break.

20       A. I hear you.  I understand.

21       Q. I think it will make sense -- I appreciate

22   that.  I think, given the number of people on the

23   call, it will make sense to take a brief lunch

24   break.

25       A. That's fine.
```

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024                    110

1      Q. Okay.

2          MS. HARRIS:  So let's pull up the document

3    labeled BUTLER_0785.

4          (Exhibit 11 was marked for identification

5    and is attached to the transcript.)

6          MS. HARRIS:  Okay.

7    BY MS. HARRIS:

8      Q. This is a slightly longer conversation, but

9    I'd like you to read it.  So I'll start with the

10   bottom --

11     A. Okay.

12     Q. -- this email from Dr. Goodman, and tell me

13   when you're ready for me to just scroll up.

14     A. Okay.

15     Q. You want me to scroll up?

16     A. No, no, no.

17     Q. Oh, I thought you said okay.  Sorry.

18     A. I did.  I remember this and I don't remember

19   this.  So just the first couple of statements I was

20   just saying oh, okay.

21          Okay.

22          Okay.

23          Okay.

24          Okay.

25     Q. Okay.  So starting down here with

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024

111

1    Dr. Goodman's original email, do you understand her

2    to be saying that -- to be recommending that rather

3    than Charles Negy being terminated, he should be in

4    some way rehabilitated?

5        A. Your words, not mine.  Yes, I think that's

6    kind of leaning towards that.

7        Q. Okay.  And you respond that you think this

8    is a great perspective but, quote, the issue is that

9    it may not play well with the masses.

10       A. Okay.

11       Q. So tell me what you meant by that.

12       A. That there was so many upset students that

13   how do you get them to come to grips with that?  I

14   didn't say that it wasn't a possibility.  I just

15   think that -- I guess I was looking at it from a PR

16   point of view.

17       Q. And your view was that the students who were

18   upset over Dr. Negy's tweets might not want to see

19   him rehabilitated, so to speak?

20       A. Rehabilitated?  So I guess the context of

21   what I was thinking was not just the students.  It

22   was the cat was out of the bag.  There was so much

23   that was going on, people had really, really -- I

24   don't know -- their positions were locked in.

25   Right?  So I think I was speaking from that

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024                                    112

1    perspective.  How do you get a person who's so

2    locked in to -- to go along with whatever the

3    decision was?

4        Q. Do you think that the masses should have a

5    say in faculty disciplinary matters?

6            MS. HATCHER-BOLIN:  Object to form.

7        A. I don't -- I don't know that I have any -- I

8    don't know.  I mean, public opinion is always out

9    there.  I think that's what I'm speaking to.  I

10   don't think anyone should have, you know -- that

11   would be considered a witch hunt.  I mean, we see

12   that every day, even in today's political

13   environment, we're seeing that where people have

14   these strong feelings one way or the other about how

15   things should be done.  People should not be taking

16   matters into their own hands.  Of course there

17   should be a vehicle that's in place to -- that helps

18   to come up with the proper way to handle a

19   situation.  I think that's where my mind thought was

20   with that.

21           So whatever the decision was, and I think

22   that's what I -- the tenor of what I was sharing

23   was, whatever the decision was, there was gonna be

24   fallout.  And I think that's where I was coming

25   from.

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024

113

1        Q. But were you saying in particular that not

2    terminating Charles Negy would not play well with

3    the masses?

4        MS. HATCHER-BOLIN:  Objection to form.

5        A. Oh, I don't think that's what I was saying.

6    I wasn't talking about whether he should be

7    terminated or not.  I don't think that was ever a

8    thought process for me.

9        Q. So tell me, then, what might not have played

10   well with the masses in your view here.

11       A. So -- all right.  So if I give you a

12   scenario, the scenario would be this.  As a social

13   justice advocate looking at all things, I always

14   kind of harken back to the 1960s when there was all

15   of the unrest and all the things that were going on

16   about how to make things right for people.  And

17   regardless of what final decisions were made or

18   would be made, people were going to have feelings

19   one way or the other.

20       And so when I think about that, change is

21   slow.  And I've always had that process, and I've

22   been trying to share that with other individuals and

23   I think that it gets misinterpreted.  When I say

24   change is slow, what I mean by that is it takes time

25   for people to get on board or for people to

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024

114

```
1    understand the things that are happening, whether it
2    be in the world or in their own individual
3    circumstances.
4         And so for me, when I think about the masses
5    in this particular state, I am thinking about what
6    is -- what is it that -- is it gonna take for people
7    to recognize that the best way to handle a situation
8    was done.  Right?  Regardless of where they come
9    from or how they see it, what is the best way to
10   move forward once a decision has been made?
11        And so -- and looking at that and looking at
12   how -- from, again, a social justice perspective,
13   people see the world, that has always been my --
14   where I come from.  And when I say change is slow
15   and that people are slow to get on board with
16   certain things, I'm thinking about those things and
17   how do you get people included on that conversation.
18   We talked about it earlier.  Right?  How do you have
19   those difficult, uncomfortable conversations,
20   whether it sides with you or it doesn't.  And so
21   that's always been in my mindset -- or that is my
22   mindset.
23      Q.  In this email, you also say, "I am
24   wondering, and I do not control this, is that the
25   same premise be put into place to reach the rest of
```

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024

115

1    our campus if, in fact, he is terminated."

2        A. Okay.

3        Q. "There are messages that are at play here.

4    So an alternative may be that the same strategy that

5    you suggest be implemented.  Both together may send

6    a stronger message to the community."

7            So when you say "there are messages at play

8    here," what messages are you referring to?

9        A. Again, I think I look at it more globally.

10   For me, this is not about Dr. Negy.  I really

11   truly -- at the time, there was so much unrest.  You

12   have to understand what was happening.  My mindset

13   wasn't on him.  It was really about George Floyd's

14   murder.  It was about all the stuff that was

15   happening with Black Lives Matter.  It was the

16   students on our campus who were upset, not just

17   about this but about other things.  And so that's

18   where I was coming from.  So the message is how do

19   you heal?  How do you heal a community, right,

20   regardless of where the message is coming from?

21       Q. So is it your testimony that your response

22   to Dr. Goodman here is not about Dr. Negy?

23       A. Well, of course portions of what I'm saying

24   here is me playing devil's advocate with one way or

25   the other.

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024

116

1          Q. When you say "both together may send a

2     stronger message to the community," what are "both

3     together"?  What two things are you referring to?

4          A. I was trying to figure that out myself.  I

5     don't know.  I don't know where my head space was

6     there.  I don't -- I can't even think about it in

7     regards to that.  I think her scenario and my

8     scenario maybe.

9          Q. So is one of those things Dr. Negy being

10    terminated?

11         MS. HATCHER-BOLIN:  Objection to form.

12         A. Yeah, I think I was talking about whether or

13    not if he was or he wasn't.  Again, I had no control

14    over it one way or the other.  And so what to do

15    regardless of what the circumstances turn out to be.

16         Q. And when you say "the lion is out of the

17    cage now," what are you referring to as the lion?

18         A. Just on the campus, we were in that state.

19    I mean, the lion out of the cage is that we now have

20    to deal with this regardless.  Before it wasn't

21    something that people thought about.  And now it was

22    something that we have to put energy into.

23         Q. What are you referring to as "this" when you

24    say "now we have to deal with this"?

25         A. Again, I don't know.  I'm thinking whatever

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024                    117

```
1    her comments were.  I mean, we're talking about her

2    email.  She's the one who initiated it.  We are

3    talking about that.

4        Q. Well, no, I'm asking about the comment you

5    just made.  Because when I asked you, "What did you

6    mean 'the lion is out of the cage now'?"

7            You said, "It means we will have to deal

8    with this."

9            So I was asking you, right now, when you

10   said "it means we will have to deal with this," what

11   do you mean by "this"?

12       A. Again, the same thing I just said.  It

13   doesn't change.

14       Q. So you don't know what you mean by "this" is

15   your testimony?

16       A. No.  I'm saying the response to any type of

17   civil unrest, I think that's what this is.  I

18   think -- I don't know if we're on the same page.  I

19   actually don't know what you're asking me anymore.

20       Q. And was there civil unrest related to

21   Dr. Negy's tweets?

22       A. I believe so.  I think there was civil

23   unrest, period, and I think that this only -- this

24   was only a part of it.  It contributed to it.

25       Q. Okay.  Looking quickly at her second email
```

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024

118

```
 1    to you, she continues to reiterate that some sort of

 2    what she calls a cultural sensitivity growth plan

 3    for Negy --

 4        A. Okay.

 5        Q. -- would be, in her view, the best option;

 6    correct?

 7        A. Okay.

 8        Q. Is that correct?

 9        A. I can't speak for her, but I think that's

10    what she's saying.

11        Q. And in your response, you say, "I will

12    definitely share your perspective with leadership.

13    Unfortunately, I think they feel obligated to act

14    for the greater good."

15        A. Okay.

16        Q. So when you said "I think they feel

17    obligated to act for the greater good," were you

18    referring to terminating Charles Negy, that they

19    feel obligated to terminate Charles Negy?

20            MS. HATCHER-BOLIN:  Objection to form.

21        A. That actually was never any conversation I

22    had with anyone that I can answer that question in

23    that way.  I never ever had a conversation with

24    anyone about the termination of Charles Negy.

25    Again, I think, when I'm talking about the greater
```

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024

119

```
 1   good, I'm talking about of the situation.  Again, my
 2   way of thinking in this world is in the full
 3   picture, the context of what was happening on campus
 4   at the time.
 5       Q. So what did you mean when you said "I think
 6   they feel obligated to act for the greater good"?
 7       A. Well, I'm thinking about her initial
 8   question or her initial mode of operandi.  And so
 9   whether they choose to do that or not, like I said,
10   I will share your perspective with them.  Again, I
11   don't know if they will take it or not.  That's
12   really what my answer was.
13       Q. And why did you feel that that was
14   unfortunate?  "Unfortunately, I think they feel
15   obligated to act for the greater good."
16       A. Because, again, I -- personally, I don't
17   know that that is something that they would take on.
18   I don't know.  I don't know what the -- so I don't
19   know that -- that they have in their process
20   remediation that way.  I don't know.  I don't.  I
21   can't speak for them because I've never been in that
22   situation or in those rooms to have that
23   conversation.  And so I think that they are looking
24   at it -- and when I think about it, I think they
25   wanted to do what was best for the university.
```

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024                    120

```
 1   That's what the context of my conversation was.  I

 2   didn't know how else to respond to her in terms of

 3   it.  I get it, I told her I would share it, I know

 4   where she was coming from, and that was it.  I don't

 5   know how they would respond.

 6       Q. Did anyone in UCF leadership ever convey to

 7   you that they felt obligated to fire Charles Negy?

 8       A. No.

 9       Q. Okay.

10           MS. HARRIS:  I think that this is a good

11   time.  It's just a couple minutes after 12.  Should

12   we take 45 minutes and come back at 10 to 1?

13           THE WITNESS:  How about a half hour?

14           MS. HARRIS:  What do others want to do?

15   People can take lunch if they want.  Is a half

16   hour -- does anyone need more than a half hour?

17   Let's say that.

18           MS. HATCHER-BOLIN:  No.

19           MS. HARRIS:  Okay.  Then let's return at

20   12:35.

21           THE WITNESS:  All right.

22           (A short break was had.)

23           MS. HARRIS:  Hope everyone had a nice little

24   break.

25           I would like to pull up a document now that
```

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024

121

```
 1   has been labeled BUTLER_1147.

 2           (Exhibit 12 was marked for identification

 3   and is attached to the transcript.)

 4   BY MS. HARRIS:

 5       Q. Okay.  So looking at the subject of this

 6   email, which you were copied on, EICRT discussion,

 7   what is the EICRT?

 8           Oh, you're muted.

 9           MS. HATCHER-BOLIN:  You're muted.

10       Q. You're muted, Dr. Butler.

11       A. So one turn deserves another.  I got you.

12   Now you've gotten me.

13           So I knew you would ask this.  I knew the

14   minute you opened this up that that would be the

15   question that you would ask.  I don't know.  I think

16   this EICRT.  Right?  So there's something that --

17   it's strange.  There's something through Rhonda

18   Bishop's office.  Oh, God.  I don't know.  It's like

19   certification of something or whatever.  I -- I'm

20   not the one to ask.  I don't know.

21           MS. HATCHER-BOLIN:  Dr. Butler, your video

22   is off.

23           MS. HARRIS:  Your video is off.

24           MS. HATCHER-BOLIN:  I just wanted to point

25   that out.  I'm sorry.
```

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024                      122

```
1              THE WITNESS:  Oops.  Oops.

2              MS. HATCHER-BOLIN:  There you go.

3              THE WITNESS:  So I hit the wrong thing.  So

4    instead of hitting mute, I hit that.  Is that what

5    happened?  My bad.  Sorry.

6         A. Sorry, Attorney Harris.

7         Q. You can call me Samantha.  I'm not that

8    formal.

9              So you don't know what the EICRT was?

10        A. Hold on a second.  I really truly don't.  I

11   know it has something to do, again, like I said,

12   with Rhonda's office.

13        Q. Do you know whether the list of recipients

14   to this email was the EICRT group?

15        A. So looking at it -- okay.  So I don't know

16   what Mike Kilbride's position was at that point in

17   time, but he was assistant to the president.  A good

18   chunk of the people on there were cabinet board

19   members.  Chad Binette works for communication.

20   William Self, I believe at that time, might have

21   been a trustee.  I don't know who Joseph Trubacz is.

22   And Nancy Myers was in her office space.  The people

23   who are cc'd are, I think, administrative staff.

24        Q. And do you know who Andrea Gandy is?

25        A. No.
```

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024

123

```
 1        Q. The person who sent the message, that's not
 2   someone you're familiar with?
 3        A. Not familiar with her, no.
 4        Q. Okay.  So the email says "Team for today's
 5   discussion."
 6        A. Yeah.
 7        Q. To your knowledge, were you part of a team
 8   called the EICRT?
 9        A. I don't recall.  I think I might have just
10   been on there because -- I don't know.  I don't -- I
11   don't -- I don't recall.  Can you scroll down?
12        Q. Yeah.
13        A. Keep going.
14        Q. This is the end of that email, and I'm going
15   to ask you some questions about the next page, but I
16   wanted to ask you about the email first.
17            So it looks like first was an email from
18   Andrea Gandy to a smaller group of recipients
19   including yourself.
20        A. Uh-huh.
21        Q. It says "Team, this meeting is nonCOVID-19
22   related so we have reduced the participants."  So do
23   you know what she's referring to when she refers to
24   you as "team" here?
25        A. I do not.
```

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024

124

1      Q. Okay.  So as you sit here today, you do not

2    know what team this refers to?

3      A. No, I don't recall this email at all.

4      Q. Okay.  And do you know whether you attended

5    any other EICRT meetings on other dates?

6      A. I can't answer that because I don't know

7    what those initials are, that acronym is for.  I

8    don't know how to answer that.

9      Q. Now, I would also like to ask you about the

10   form that is attached to this email.

11     A. Okay.

12     Q. Have you seen this form before?

13     A. "If you have experienced abusive or

14   discriminatory behavior ..."  I don't -- I mean,

15   being a recipient of the email, I probably looked at

16   it.  I don't recall it, though.

17     Q. Do you know who ███ and ███ are?

18     A. No.

19     Q. No.  And you cannot recall sitting here

20   today whether you saw this form before?

21     A. This doesn't ring a bell.

22     Q. Is this -- is that the University of Central

23   Florida's logo at the top of the form?

24     A. Yes.

25     Q. Would that lead you to conclude that this

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024

125

```
 1   was some sort of form created by someone at the
 2   University of Central Florida?
 3        A. No.
 4           MS. HATCHER-BOLIN:  Object to form.
 5        Q. Why not?
 6        A. Because the logo is public access.  People
 7   can get it.  I wouldn't say -- I mean, to answer
 8   your question, I don't know that that is.  Actually,
 9   it says "We are two students with a Zoom meeting
10   scheduled."  So yeah, that's probably why I was on
11   it because they sent it to me, the students sent it
12   to me.  That's probably who ███ and ██████ are.
13        Q. So when you say the university logo is
14   public access, does that mean that I could put out a
15   letter with the UCF logo at the top and that would
16   be permissible?
17        A. I think that would be a mischaracterization
18   of what I just said.  But if you want to take it
19   that far, I guess then whatever were to come up
20   because of that would be whatever comes up.  I
21   don't -- I don't know.
22        Q. Well, what did you mean --
23        A. People have used AI and other things to
24   create whatever they wanted to.  I think you can do
25   whatever you want with something.  It doesn't mean
```

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024

126

```
 1    that it's within your right to do it.
 2        Q. Do you think students had the right to
 3    disseminate a form with the UCF logo at the top?
 4        A. That's not within my purview to answer that.
 5    I don't know.  It's a student.  I guess they can
 6    present themselves however they would like.  I don't
 7    know that there's a rule or there's a regulation for
 8    how to utilize it.
 9        I do know -- the only thing I do know about
10    the logo is that there is a certain color, like when
11    this yellow, that you have to use or you have to use
12    the prescribed one when you're doing university
13    business.  But who can use it, I don't know.  I
14    don't know the ramifications for that.
15        Q. But so there are at least some regulations
16    around the use of the university logo that you're
17    aware of?
18        A. Yes, what I just stated, the color.
19        Q. Okay.  But you are not personally familiar
20    with ████ or ██████?
21        A. No.
22        Q. You have never spoken to them?
23        A. Not in my recollection.
24        MS. HARRIS:  Could we pull up a document
25    numbered BUTLER_1417.
```

Transcript of S. Kent Butler, Ph.D.

Conducted on October 21, 2024

127

```
 1              (Exhibit 13 was marked for identification
 2      and is attached to the transcript.)
 3              MS. HARRIS:   Thank you.
 4          Q. So I'd like you to just read these two --
 5      these two emails and then ...
 6          A. Yeah, I guess I didn't go to the meeting.
 7          Q. Okay.  So -- and you -- does this refresh
 8      your recollection as to who Andrea Gandy is?
 9          A. No.
10          Q. Okay.  So looking at this today, you still
11      do not know who she is?
12          A. I don't know.  The only thing I can think
13      that she is, is an assistant to Rhonda because she's
14      asking on her behalf.
15          Q. Okay.  So this email says "Rhonda and I
16      thought it made sense to have you in the discussion
17      regarding the latest with Professor Negy."
18              Do you know why Andrea and Rhonda wanted you
19      to be part of a discussion regarding Professor Negy?
20              MS. HATCHER-BOLIN:  Object to the form.
21          A. The only thing I can think of is it relates
22      to the email you just sent me that I didn't respond
23      to.
24          Q. Now, Andrea says, "I can give you a call to
25      discuss some of the items outlined."
```

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024

128

```
1          Do you remember whether you had a call with
2     Andrea or Rhonda?
3          A. Did I respond to this email?
4          Q. I don't have a response from you to this
5     email but I don't know that that means you didn't
6     respond.  I'm asking if you remember a call --
7          A. I understand that.  I'm just saying I don't
8     have a recollection of calling or talking with her
9     about this, but I'm saying that would kind of
10    trigger.
11         Q. Okay.  So as you sit here today, you do not
12    remember having a call with Rhonda Bishop or Andrea
13    Gandy related to Professor Negy?
14         A. No.
15         Q. Okay.
16         A. And, again, like I said, it must be in
17    reference to the student petition.  Right?
18         Q. Were you --
19         A. I'm not supposed to ask you questions.  I'm
20    sorry.
21         Q. Were you aware of the student petition at
22    this time?
23         A. No.  I don't think I knew about it.  That's
24    why I said.  I'm looking at this and I said I don't
25    necessarily recall it.  I think that's probably why.
```

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024

129

```
1    And, again, I mean, just logically looking at this,

2    it was sent to me because they thought I should be

3    in on the meeting.  I didn't attend the meeting, it

4    looks like, and that is why I am responding in the

5    way that I did.

6         MS. HARRIS:  Next, I'd like to pull up a

7    document that is labeled BUTLER_1445.

8         (Exhibit 14 was marked for identification

9    and is attached to the transcript.)

10        MS. HARRIS:  Okay.

11    Q. So I'm just gonna scroll down --

12    A. Okay.

13    Q. -- to this email.  And then we can look at

14    your response.  So tell me when you're ready for me

15    to scroll up.

16    A. This is addressed to me?

17    Q. Well, I don't know who it's addressed to but

18    you responded to it.  So --

19    A. Okay.

20    Q. And it was in your documents --

21    A. Okay.

22    Q. -- so I'm --

23    A. Okay.

24    Q. -- you know.

25    A. Okay.
```

PLANET DEPOS
888.433.3767 | WWW.PLANETDEPOS.COM

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024                    130

1        Q. Let's just scroll up to your response here.

2        A. Okay.

3        Q. So ███████ email concerns a student

4   government resolution calling for Charles Negy's

5   termination; correct?

6        A. Yes.

7        Q. So when you say "thank you all for your

8   diligence on this matter" --

9        A. Okay.

10       Q. -- what are you referring to as "this

11   matter"?

12       A. The email.  Whatever he sent me.

13       Q. The resolution calling for Charles Negy's

14   termination?

15       A. Yes.

16       Q. And why did you appreciate their diligence

17   on passing a resolution to terminate Charles Negy?

18           MS. HATCHER-BOLIN:  Object to form.

19       A. Because I'm a courteous person, so when

20   someone asks me a question or sends me an email and

21   I respond to them, I thank them for the work that

22   they put into it.  This is a student.  I wanted to

23   let them know that I respected their position and

24   moved on from that.

25       Q. But when students or faculty reach out to

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024

131

```
 1   share their position with you, you don't always
 2   respond; correct?
 3       A. Correct.
 4       Q. When Charles Negy reached out to you in
 5   November 2019 to share his concerns as a Hispanic
 6   professor at UCF, you did not respond to his email;
 7   correct?
 8       A. Looks that way.
 9       Q. So you say, "The resolution and the strong
10   call from the student government will definitely be
11   taken under advisement."
12       A. Okay.
13       Q. Who were you telling ███████ would take the
14   resolution under advisement?
15       A. I have no clue.  I guess the powers that be.
16   The leaders of the university.
17       Q. And how did you know that the leaders of the
18   university would take the resolution under
19   advisement?
20       A. Because that's what people who work for
21   students do.  They don't just let things fall by the
22   wayside.
23       Q. So do you believe that students should have
24   a say in faculty discipline?
25       A. I think --
```

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024

132

```
 1          MS. HATCHER-BOLIN:  Objection to form.
 2      A. I think students should have a say in their
 3  university, yes.
 4      Q. Do you believe that students should have a
 5  say in faculty discipline?
 6      A. As I stated, I believe students should have
 7  a say in anything they want to say.  We are at the
 8  university because of the students.  The students --
 9  the university, in my mind, exists because we are
10  there to educate students.  We wouldn't be there
11  otherwise.  And so if they have a concern, I think
12  they have a right to state it, yes.
13      Q. So in deciding whether to terminate a
14  faculty member, do you believe that university
15  leadership should consider students' opinions on
16  termination?
17      A. Yes, I do.
18          MS. HATCHER-BOLIN:  Objection to form.
19      Q. Okay.  Do you know whether the leadership of
20  UCF did take the student government resolution under
21  advisement?
22          MS. HATCHER-BOLIN:  Objection to form.
23      A. I do not.
24      Q. Did you participate in any meetings where
25  the student government resolution was discussed?
```

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024

133

```
1        A. I was not.

2        Q. Okay.

3            MS. HARRIS:  Next, I would like to pull up a

4    document marked BUTLER_0180.

5            (Exhibit 15 was marked for identification

6    and is attached to the transcript.)

7            MS. HARRIS:  Okay.

8        Q. So take a look at this and let me know when

9    you're ready for me to scroll up to your response.

10       A. Okay.

11           Can you go back down for a quick second?

12   All right.  Go back up.  That's over a month.

13           Okay.

14       Q. Okay.  So in her email, she asks you for

15   your take on recent events surrounding Dr. Negy.

16       A. Yes.

17       Q. And you reply, "As for Negy, I am really not

18   at liberty to discuss."

19       A. Okay.

20       Q. And this was on July 27th.  So on July 27,

21   2020, what information did you have about Dr. Negy

22   that you were not at liberty to discuss?

23       A. I just was not at liberty to discuss

24   anything about -- I had no information.  It was not

25   my place --
```

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024

134

```
1        Q. And why --
2        A. -- because I wasn't a part of the
3    investigation.
4        Q. Were you aware of facts related to the
5    investigation?
6        A. No.
7        Q. So when you say "I am really not at liberty
8    to discuss," were you --
9        A. It wasn't my place.
10       Q. -- were you withholding any information from
11   her that you were aware of?
12          MS. HATCHER-BOLIN:  Objection to form.
13       A. As I shared with you, it wasn't my place to
14   discuss anything about Negy.  It wasn't my place.
15   Her question was sent to the wrong individual.  I
16   couldn't respond to it.
17       Q. Were you receiving, in July of 2020, any
18   updates on the investigation into Dr. Negy?
19       A. I was not.
20       Q. Did you ever communicate with the office of
21   institutional equity concerning the investigation
22   into Dr. Negy?
23       A. I did not.
24       Q. Did you ever communicate with Alexander
25   Cartwright concerning the investigation into
```

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024                    135

```
 1    Dr. Negy?
 2         A. I did not.
 3         Q. Okay.
 4            MS. HARRIS:  The next document I'd like you
 5    to take a look at is labeled BUTLER_1728.
 6            THE WITNESS:  Okay.
 7            (Exhibit 16 was marked for identification
 8    and is attached to the transcript.)
 9            MS. HARRIS:  Scroll down to the bottom of
10    this.
11         Q. This is the first email so let me know when
12    you're ready to scroll up.
13         A. Okay.
14            Okay.
15            Okay.
16         Q. So the first --
17         A. Wait, wait.  Go back up.  I'm sorry, I
18    didn't --
19         Q. Oh, sorry.
20         A. Okay.
21         Q. In the first line of your email here, you
22    say, "Love it!  Anything to divert from today's
23    fiasco."
24         A. Uh-huh.
25         Q. What were you referring to on August 13,
```

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024                                136

```
1    2020, as "today's fiasco"?

2        A. I have no clue.

3        Q. Do you recall whether there was a public

4    forum of some kind held on August 13, 2020?

5        A. I think there was one that was going to be

6    held.  I have no clue.  I honestly cannot answer

7    that question for you.

8        Q. So as you sit here today, you have no

9    recollection of anything in August 2020 that you

10   would have referred to as a fiasco?

11       A. No.

12       Q. Okay.

13       A. I'm willing to find out, but I don't.

14       Q. Now, here in the second paragraph, you say,

15   "Why don't we invite Negy ...  let him field his own

16   questions."

17       A. Right.

18       Q. And then "back to reality."

19       A. Okay.

20       Q. So does "back to reality" mean that your

21   statement about Dr. Negy was intended as a joke?

22       A. Yep, because I knew that they didn't want to

23   have him, I guess.  Because the obvious thing would

24   be to invite him so that he can be a part of it, but

25   it looked like that wasn't -- that, you know, I
```

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024

137

1     wasn't at liberty to say that he could be one of the

2     members of the panel.  I guess.  That's my take on

3     it.  Christine and I have a pretty good relationship

4     or had a pretty good relationship.  I thought it was

5     funny and I put that in there.

6         Q. Who is Christine?

7         A. She works out of the president's office.

8     I'm not sure what her title was at the time.

9         Q. So did you personally feel that it would

10    have been valuable to ask Dr. Negy to come on a

11    panel and defend his views?

12        A. I believe in free speech.  Yes.

13        Q. And you said that you didn't think they --

14    or you intimated a moment ago that you thought that

15    others would not allow that to happen.

16            What gave you that idea?

17        A. I don't think that was what the panel was

18    for.  I think -- I think they wanted to put faculty

19    up there that could speak to it from their own

20    perspectives, and I just -- at the time, I just --

21    personally, I didn't think that it was appropriate

22    to have him on there because it would be unfair to

23    him.  I mean, why put him into that type of a

24    predicament where he had to field questions from

25    folks?

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024

138

```
 1        Q. Why would giving him an opportunity to

 2   address student questions put him in a bad position?

 3           MS. HATCHER-BOLIN:  Objection to form.

 4        A. Not necessarily a bad position for him, but

 5   it's uncomfortable.  I mean, why would we subject

 6   him to that?  If that's something he would like to

 7   do, that's fine.  But it wasn't anything that this

 8   particular forum, for whatever reason why it was up,

 9   seems to have been to have panelists to talk about

10   whatever we were supposed to be talking about.  So I

11   just answered the question that was proposed to me

12   and went there.

13        Q. In your role, were you involved in

14   organizing panel discussions on issues like race and

15   culture?

16        A. At times, yes.  I think I facilitated this

17   one, looks like.

18        Q. Did you ever consider inviting Dr. Negy to

19   be on one of these panels?

20        A. It looks like I did here.

21        Q. But you said that this was intended as a

22   joke; correct?

23        A. You asked me did I ever consider it.

24   Whether it was a joke or not, that seems to be a

25   consideration.
```

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024

139

```
1        Q. Did you ever seriously consider inviting
2    Charles Negy to come on a panel to discuss the
3    controversy surrounding his tweets?
4        A. I don't recall how I thought back then, but
5    I think I would have invited him, yes.
6        Q. Why didn't you?
7        A. Because as I said earlier, I don't think
8    this is what that was about.  Again, I'm trying to
9    remember what the context of this was, and I don't
10   necessarily remember the context of this.  So it may
11   or may not have been appropriate for him to be a
12   part of this particular conversation.  I don't know.
13   Again, I don't remember what the August 13th thing
14   was, so maybe that had something to do with it.  I
15   have no clue.
16       Q. But this was not the only conversation about
17   racial issues on campus that occurred in this time
18   frame; correct?
19       A. Correct.
20       Q. And you were involved in facilitating other
21   similar conversations?
22       A. Yeah, a lot.  Especially a lot around the
23   murder of George Floyd.
24       Q. But you never invited Charles Negy to speak
25   on any of these panels; correct?
```

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024

140

```
1        A. I didn't invite anyone.  I was asked who
2    might be good.
3        Q. Other than in this email, did you ever
4    propose inviting Dr. Negy on a panel?
5        A. I never had reason to.  I don't think that
6    was ever a conversation about any panels that came
7    up.
8        Q. You just said that you were asked to provide
9    input on who would be good to serve on these panels;
10   correct?
11       A. Yes, but that doesn't answer the question
12   you just asked me.
13       Q. And you never suggested Dr. Negy, other than
14   in this email; correct?
15       A. That I can recall, yes.
16       Q. Okay.
17          MS. HARRIS:  I'd like to pull up one more
18   document that is labeled BUTLER_1746.
19          You know, looking at this, I'm realizing
20   we may have used the same document as an exhibit
21   earlier, a copy of it from elsewhere in the set.
22       A. No, I think this is -- this is -- now it
23   makes sense.  This is the campus climate survey.
24   And I guess I had a conversation with -- see, now
25   it's coming back to me.  So --
```

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024                    141

```
 1            REMOTE TECHNICIAN:  Counsel, would you like
 2    me to pull up the -- if we already previously marked
 3    this, pull up the old exhibit?
 4            MS. HARRIS:  Yes.  I think it doesn't make
 5    sense to have two of the same exhibits.
 6            THE WITNESS:  No, I don't think that was the
 7    same exhibit.  That looked like it was the script
 8    for the climate survey.
 9            MS. HATCHER-BOLIN:  Let's look at them just
10    to see.
11            MS. HARRIS:  Okay.  That's fine.  We can
12    just continue to use this one.
13            MS. HATCHER-BOLIN:  You might not need to
14    mark another exhibit.  You might just go back to the
15    one you had.
16            REMOTE TECHNICIAN:  Yes, this was previously
17    marked.  I'll pull up the old exhibit.
18            THE WITNESS:  Oh, something I saw earlier?
19    Oh, I see what you're saying, yes.
20            MS. HATCHER-BOLIN:  So we don't need to mark
21    another one.  We can just use Butler 1.
22            MS. HARRIS:  Okay.
23            MS. HATCHER-BOLIN:  Okay.
24    BY MS. HARRIS:
25       Q. So does this refresh your recollection at
```

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024                    142

```
 1   all as to what -- as to say whether something
 2   happened at this meeting that you would characterize
 3   as a fiasco?
 4       A. I don't.  I really don't.  I don't remember
 5   what that was.  But this looks like -- so this is
 6   the script for me sharing the results of the climate
 7   survey.  That's what this is.
 8       Q. Okay.  I'm gonna scroll down to a point in
 9   this script where it talks about what to do if
10   questions are asked about Dr. Negy.
11       A. Oh, okay.
12       Q. I'll give you time to read that, but I'm
13   gonna scroll down first.  Obviously, if you'd like
14   to read this entire thing, I'm happy to give you
15   time to do so.  But what I'm gonna ask you about is
16   this separate page here that says "Topics that may
17   come up."
18       A. Right.
19       Q. So just take a moment and read this page,
20   and then I'll ask you what I was gonna ask you.
21       A. I remember this so I don't know that I need
22   to read the whole thing.
23       Q. Okay.  And this script was for you; correct?
24   You facilitated this meeting?
25       A. I facilitated the meeting because it was
```

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024

143

```
1    about the climate survey, correct.
2        Q. Okay.  So the point that I want to ask you
3    about here is this talking point.  "I know it's
4    frustrating for you ...  it's frustrating for me,
5    too.  But we have a process that we need to follow."
6            So what was frustrating for you about
7    needing to follow a process?
8        A. I didn't write this so I don't know what she
9    was referring to.  I would tell you that I think
10   just having to talk about this when I was dealing
11   with the climate survey is probably what she was
12   referring to.  I can't speak for her.  I never told
13   her I was frustrated.
14       Q. So but you agree that this -- these
15   suggested responses relate to potential questions
16   about Charles Negy; correct?
17       A. Right.  So as you can see from this full
18   script, this was designed for me to have talking
19   points throughout from start to finish of this -- I
20   don't know -- Town Hall, whatever it was.  And so
21   then they took it upon themselves, whoever it was,
22   Christine and the people from the communications
23   department, to share with me things that -- if these
24   things came up, this is how they wanted me to
25   respond.  And that's how I interpret this document
```

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024                144

```
 1    completely.
 2         Q. And so --
 3         A. And so what's written in there has nothing
 4    to do with me other than that they wanted me -- if
 5    there was things that were coming up, this is how I
 6    should respond.
 7         Q. And would you have said anything that they
 8    wanted you to say?
 9         A. What do you mean?
10         MS. HATCHER-BOLIN:  Objection to form.
11         Q. If they gave you a talking point that you
12    personally disagreed with, would you still have made
13    that talking point?
14         A. I think that is irrelevant to this.  I think
15    what they were asking me to do was to share where
16    the university was, wherever they were on this
17    situation.  I don't think it was about talking
18    points that were for or against my -- my way of
19    thinking.
20         Q. But whoever wrote this for you suggested
21    that you say to students "it's frustrating for me,
22    too"; correct?
23         MS. HATCHER-BOLIN:  Object to the form.
24         A. That isn't how I read that.  I thought it
25    said "I know it's frustrating for you ...  it's
```

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024

145

```
 1   frustrating for me, too."  I think that she was

 2   talking about herself.  That's how I read that.

 3       Q. You think that these suggested responses are

 4   from Christine herself and reflect her views?

 5       A. Oh, how I read this just now -- see, I'm

 6   totally off.  So how I read this whole thing was

 7   that she was saying to me, "I know it's frustrating

 8   for you, it's frustrating for me, too."  I was

 9   thinking -- what I read that just now, I was

10   thinking that she was saying that about me.  I

11   thought that was your line of questioning.

12       Q. Oh, okay.  Well, let's look up here.  So

13   these are a list of suggested responses?

14       A. Yeah, okay.  Again, I wasn't thinking that

15   way.  All right.

16       Q. So you see now that these are a list --

17       A. I get it.

18       Q. -- of suggested responses to questions about

19   Charles Negy; correct?

20       A. Right, but I also thought it was

21   generalizations --

22           (Unreportable crosstalk.)

23   BY MS. HARRIS:

24       Q. I'll just repeat my previous question for

25   the court reporter.  So you see that this is a list
```

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024

146

```
 1    of suggested responses to potential questions about

 2    Charles Negy; correct?

 3        A. Yes.

 4        Q. And one of the suggested responses to

 5    potential questions about Charles Negy is "I know

 6    it's frustrating for you ...  it's frustrating for

 7    me, too"; correct?

 8        A. Right.  Uh-huh.  I never said it.

 9        Q. So you recall what you said at this meeting;

10    is that correct?

11        A. No.  You're asking if it was a suggested

12    response.  I don't believe I said it as a suggested

13    response.  These are things that, if it comes up, I

14    should say, if I felt the need to say it.  I don't

15    think I ever felt the need to say it.

16        Q. Do you recall whether Dr. Negy came up at

17    the August 13th meeting?

18        A. I don't recall.

19        Q. So you don't recall whether you made any of

20    these suggested responses; correct?

21        A. Correct, yes.  I do not recall.

22            So just so you understand --

23        Q. If you --

24        A. -- in reading this document, I would have

25    read it and then I would have moved onto the forum
```

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024

147

```
 1    itself.  And so I don't know that I would even have
 2    remembered that these were things to be suggested
 3    responses.  Hopefully, I would have, but I probably
 4    read through them and put it to the side.
 5        Q. If you disagreed with one of these suggested
 6    responses --
 7        A. Uh-huh.
 8        Q. -- would you have refused to say it?
 9        A. I -- I can't answer that because I don't
10    know -- it didn't come up.
11        Q. So you are not -- it is now your testimony
12    that Dr. Negy did not come up at the meeting?
13            MS. HATCHER-BOLIN:  Object to the form.
14        A. I don't recall.
15        Q. Well, Dr. Butler, there's a difference
16    between "it didn't come up" and "I don't recall."
17    And I'm trying, through my questions, to understand
18    whether your testimony is that Dr. Negy and these
19    suggested responses did not come up at the meeting
20    or whether you don't recall whether Dr. Negy --
21        A. I don't recall.  And it sounds like, from
22    what you're saying, I didn't say it.  So I'm trying
23    to answer your question the way that you're asking
24    me the question.  I don't recall saying it, and I
25    don't recall them coming up.
```

Transcript of S. Kent Butler, Ph.D.

Conducted on October 21, 2024                          148

```
 1        Q. When you say it sounds like, from what I am
 2   saying, like you didn't say it, can you explain what
 3   you mean by that?
 4        A. I'm trying to --
 5            MS. HATCHER-BOLIN:  Objection to form.
 6        A. -- to answer your question.  Your question
 7   was if I would say it if I didn't feel it.  I'm
 8   saying it didn't come up so there's no reason for me
 9   to say it.  Unless you show me that I said this, I
10   have no recollection of it.  I don't recall saying
11   it, and I don't recall it being needed to be said.
12   I'm just trying to follow your line of questioning.
13   I don't ...
14        Q. Were you frustrated by the process that the
15   university followed regarding Dr. Negy?
16        A. Again, I think it's unfair to ask me --
17            MS. HATCHER-BOLIN:  Object to form.
18        A. -- a question about something that's
19   suggested responses.  I didn't create this document.
20        Q. I'm now not asking you about this document.
21   I'm asking you about your personal feelings.  Were
22   you frustrated by the process that the university
23   had to follow regarding Dr. Negy?
24            MS. HATCHER-BOLIN:  Objection to form.
25        A. I felt no one way or the other about it.  I
```

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024

149

1    was really out of the loop.  I didn't -- I was so

2    far removed from that.  There was nothing about this

3    situation that I had any control over or any

4    involvement in.  So there was no reason to be

5    frustrated with any of it.

6        Q. Students expressed the pain they felt at

7    Dr. Negy's words to you; correct?

8        A. At times, yes.

9        Q. Did that impact you emotionally?

10       A. I'm a human being and all things impact me

11   one way or the other.  But this continuum of how I

12   was impacted, I can't recall.  But I'm quite sure I

13   have compassion for people if people are upset or

14   angry or whatever have you, I work from that

15   perspective.

16       Q. Did students express frustration to you that

17   the university could not act more quickly?

18       A. Students were frustrated about a whole lot

19   of things, and I'm quite sure they wanted this to

20   be -- I mean, like I said from the very beginning,

21   they had been calling for something that I said you

22   need to follow the process.  So I'm quite sure that

23   they were not happy with however it rolled out,

24   whether it was a response two minutes after or a

25   response 45 days after or a year after.  I don't

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024

150

```
1    think the students were going to be happy.  But I

2    can't speak for the students.  I can only speak for

3    myself.

4        Q. Did you receive a copy of OIE's

5    investigative report into Dr. Negy?

6        A. I don't recall receiving.  I think that

7    might be something that was posted on -- I don't

8    know.  I don't think I personally received anything,

9    no.

10       Q. Have you read the university's investigative

11   report into Dr. Negy?

12       A. I surely have not.

13       Q. Did anyone at UCF ask for your opinion on

14   whether Dr. Negy should be terminated?

15       A. No.

16       Q. Okay.

17           MS. HARRIS:  I believe that is all of the

18   questions that I have.

19           I don't know if you have any redirect.

20           MS. HATCHER-BOLIN:  No, but he'll read.

21           MS. HARRIS:  Okay.

22           THE WITNESS:  I will read?

23           MS. HATCHER-BOLIN:  You will have an

24   opportunity to read a transcript of your testimony;

25   and if you find that there is inaccuracy in it, you
```

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024                    151

```
 1    can write it down on what they call an errata sheet.

 2            THE WITNESS:  Okay.

 3            (Off the record at 12:20 p.m.)

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Re:    Deposition of **S. Kent Butler, Ph.D.**
Date: 10/21/2024
Case: Negy -v- Board of Trustees of University of Central Florida, et al.
Return to: transcripts@planetdepos.com

| Page | Line | Correction/Change and Reason |
|------|------|------------------------------|
| 14 | 4 | Replace the word "no" with "any". |
| 14 | 22 | Replace the word "background" with "concentration". |
| 15 | 15/16 | Replace the words "that about" with "about that". |
| 15 | 18 | Delete "that amount of". |
| 31 | 24 | Replace the word "hasn't change" with "hasn't changed". |
| 52 | 15 | Replace the word "enjoined" with "joined". |
| 80 | 5 | Replace the word "do" with "go". |
| 96 | 23 | Replace the word "associate" with "a social". |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

12/3/2024
_____
(Date)

_____
(Signature)

Re:     Deposition of **S. Kent Butler, Ph.D.**
        Date: 10/21/2024
        Case: Negy -v- Board of Trustees of University of Central Florida, et al.
        Return to: transcripts@planetdepos.com

ACKNOWLEDGMENT OF DEPONENT

I, S. Kent Butler, Ph.D., do hereby

acknowledge that I have read and examined the

foregoing testimony, and the same is a true, correct

and complete transcription of the testimony given by

me and any corrections appear on the attached Errata

sheet signed by me.

___12/3/2024___          ___SKB___

(Date)                    (Signature)

PLANET DEPOS
888.433.3767 | WWW.PLANETDEPOS.COM

Transcript of S. Kent Butler, Ph.D.
Conducted on October 21, 2024

153

```
 1        CERTIFICATE OF SHORTHAND REPORTER-NOTARY PUBLIC

 2

 3           I, Tiffany M. Pietrzyk, CSR RPR CRR, the

 4    officer before whom the foregoing deposition was

 5    taken, do hereby certify that the foregoing

 6    transcript is a true and correct record of the

 7    testimony given; that said testimony was taken by me

 8    stenographically and thereafter reduced to

 9    typewriting under my direction; that reading and

10    signing was requested; and that I am neither counsel

11    for, related to, nor employed by any of the parties

12    to this case and have no interest, financial or

13    otherwise, in its outcome.

14

15           IN WITNESS WHEREOF, I have hereunto set my

16    hand and affixed my notarial seal this 4th of

17    November, 2024.

18

19

20

21

22    _____

23           My commission expires:

24           February 28th, 2028

25
```



**University Community Campus Climate Conversation**
Thursday, August 13, 3:30 to 5 p.m.

<mark>ROLES</mark>

**3:00 p.m.**      Moderators, support staff and panelists join practice session. Test microphones, troubleshoot, expectations, etc. As we near 3:30 p.m. [PANELISTS MUTE AND STOP VIDEO and display WELCOME GRAPHIC]

**3:30 p.m.**      Begin meeting. [PANELISTS UNMUTE AND START VIDEO]

**Kent:** Good afternoon, and welcome to today's virtual conversation about our recent university campus climate survey and a discussion on how we can work together toward building a more inclusive culture at UCF.

I am S. Kent Butler, Interim Chief Equity, Inclusion and Diversity Officer, and I appreciate you being with us today.

I will be the facilitator for our conversation, which I hope will be a time for us to elevate each other's voices, candidly talk about life, and share our experiences. In some respect, this is a continuation of the virtual conversation we had on race and unity in June … and it is a space to share thoughts, provide comfort and support, and be there for each other.

Our initial focus will be talking about the results of the campus climate survey that many members of our community took earlier this year. Then I would like for us to share our reactions to the survey, starting with several members of our Office of Diversity and Inclusion Leadership Council, whom I will introduce in a second.

After that, we will be opening up the conversation to you, to provide an opportunity for those who either did not participate in the survey or have additional experiences they would like to share.

We want and need to hear from you to build a better UCF together. Your thoughts, ideas, and questions will help to inform the work that we are doing to formalize a university plan of action on diversity, equity and inclusion. Earlier this summer, President Cartwright announced the creation of this plan. The work we are doing today is one of the first steps in that process.

I'd like to introduce our listeners and the other faces you see on the screen right now. These are members of our ODI Leadership Council, a group that has come together to think about and improve diversity and inclusion efforts at UCF:

- Dr. LeeAnn Roberts, Interim Director of Diversity and Inclusion in the College of Engineering and Computer Science;
- Dr. Devon Jensen, Associate Dean for the College of Graduate Studies;
- Dr. Jeff Jones, Vice Provost for UCF Connect and UCF Global;
- Commander Pablo Vargas, of the UCF Police Department;
- ███████████████, our Student Body Vice President;
- Dr. Jana Jasinski, Vice Provost for Faculty Excellence and Pegasus Professor of Sociology; and

BUTLER R-RFP1_1746

- Dr. Fernando Rivera, Professor of Sociology and Director of the Puerto Rico Research Hub

We're also joined by Dr. Pat Lancey, Assistant Vice President for Operational Excellence and Assessment Support, and Uday Nair, OEAS' director. Together, they helped with the analysis of the climate survey results.

And listening in today are President Alexander Cartwright and Interim Provost Michael Johnson.

I know there are many who would like to participate, and we will work to be equitable with time to allow voices to be heard. Please be thoughtful and respectful with your comments, and we ask that you only take 2 to 3 minutes each to share them. I will interrupt in the interest of time if necessary.

We must acknowledge that events such as these have been targeted by hateful individuals spewing racist, biased, and crude remarks, and we hope to not be interrupted.

To everyone listening and watching on Zoom, please use the "Raise Your Hand" feature to share your story or remarks. We will work with you to turn on your camera and microphone. We will hear from individuals in the order in which hands are raised.

On Zoom, there also is a "Q&A" feature at the bottom. Please use the Q&A to ask questions or to share your thoughts, and we will share them with the listeners. If you do have a question, you can also designate who the question is for.

You'll also note an "upvote" option in the Q&A, so if you see someone has already asked a question or shared an idea you are interested in, upvote it. We will be saving the questions and ideas shared with us, and will work to provide you with the answers or get back in touch with you.

We are simulcasting on UCF's YouTube channel. If any attendees are hearing from colleagues having trouble with Zoom, please direct them there. You can also find the direct YouTube link at events.ucf.edu.

So, let's get started by talking about the results of our campus survey:

[POWERPOINT PRESENTATION ON CAMPUS CLIMATE SURVEY]

Slide 1 – Title Slide

- In mid-Spring earlier this year, UCF asked all students, faculty, and staff to participate in a climate survey to help measure perceptions and inform our planning around campus diversity and inclusion.
  - *To ADD -- What did _you_ hope to get out of the survey in your role? Why do it?*

- We contracted with the national group Viewfinder Campus Climate Surveys to help develop and conduct the survey. Viewfinder was created by INSIGHT into Diversity magazine and is used at universities across the country.

University Community Campus Climate Conversation_Butler Script v1.docx

BUTLER R-RFP1_1747

- The survey measured a few broad categories, such as:
  - Overall climate at UCF
  - How welcoming UCF is
  - Work or learning experience
  - Personal experiences of discrimination, bias, or harassment
  - Campus diversity plan, and
  - Safety on campus and in surrounding community

## Slide 2 – Survey Participation

- We heard from many across campus, but not all voices – that's one of the reasons we are hosting these events starting today.

- Only about 16% of faculty; 23% of staff; and just under 2% of students participated.

- _Briefly_ share reasons for problem with timing – presidential search, Spring Break, pandemic approaching

- Also, important to note that answers were collected shortly before university shifted to remote learning and during Spring Break for students … and we collected responses prior to the true impacts and inequities of pandemic hitting us and the national protests against racism, oppression, brutality and bigotry – which have influenced and shaped our national narrative this summer.

- Still, very grateful to all of those who did provide us their responses.

- While the numbers of individuals who took the survey are important, more important are the narratives that come through all the things we have learned.

- As President Cartwright has said, becoming more inclusive requires us to be honest about where we are as an institution and where we have work to do. You don't get better unless you hold yourself up in the mirror and take a hard look at your challenges.

## Slide 3 – UCF Creed

- Before I unpack some of the results of the survey, I want to share our UCF Creed.

- Guides each of us and establishes our values as a university – all of us expected to follow these principles.

- Note specially the values around "community," which says "I will promote an open and supportive campus environment by respecting the rights and contributions of every individual."

- It's one thing to see these words; it's different to live by them and hold each other accountable to them. But that's what we need to do, together.

BUTLER R-RFP1_1748

University Community Campus Climate Conversation_Butler Script v1.docx

## Slide 4 – Overall Climate, Faculty and Staff – Part 1

- For the next several slides, I'm going to share a few of the high-level findings from the survey.

- But I encourage you to read the full reports, which you can access from diversity.ucf.edu. These include more of the data, the demographic characteristics of the respondents, and analysis from the team in Operational Excellence and Assessment Support, and they cover more of the survey responses than I will be doing today.

- I want to start with a few slides on the overall climate from the faculty, administrator, and staff perspective – which was generally positive.

- But it's important for us to look at the numbers of negative or "don't know" responses, because those also tell a story. And on key issues like this, it's really important – why do people feel this way? Or if they "don't know," why is that?

## Slide 5 – Overall Climate, Faculty and Staff – Part 2

- These next two slides show not only the aggregate responses to several climate questions from faculty, administrators, and staff across the top, but also the breakdowns of responses among different groups on the bottom.

- We need to pay special attention to what those stories are and why people who come from different intersectionalities are saying different things.

- For example, almost half of the respondents indicated that all personnel, including campus leadership, are not held to the same code of professional ethics and conduct.

- And we can see that employees of color had even lower rates of positive endorsements for both of these questions.

## Slide 6 – Overall Climate, Faculty and Staff – Part 3

- This slide echoes some of the work I did before this role as a faculty fellow for Inclusive Excellence, and the discrepancies I found in how different groups perceive they are treated at UCF … including concerns that their contributions are not being recognized.

- These findings are similar to what we heard when we hosted faculty focus groups last year on some of the same topics, as well as the results of our last COACHE survey among faculty.
  - *What else do you want to add here from your work?*

- Fewer than 40% of respondents felt that their contributions to campus diversity had been recognized.
  - *Could add in a line here about the work of inclusion needing to be inclusive…*

BUTLER R-RFP1_1749

University Community Campus Climate Conversation_ Butler Script v1.docx

- Again, I want to point out the discrepancies here among women and employee of color, particularly among faculty.

- For a more detailed table with the listing of questions on overall climate, as well as a breakdown of the respondent groups and their standard deviations above or below the mean, I encourage you to look at the full faculty and staff comparison report posted on our website.

## Slide 7 – Overall Climate, Students – Part 1

- The next two slides cover some of our student responses. But I want to point out that because of the lower participation rate among our students, we cannot generalize this data … nor did OEAS do a robust comparison of the responses with our faculty and staff reports.

- Good to see that students overwhelming are satisfied with their learning experience at UCF.

- We also saw majority positive responses around students recommending UCF to other students or that faculty created a welcoming experience in the classroom, where students were encouraged to interact with one another.

- And about three-quarters of respondents said they felt safe among other students expressing their views and opinions in the classroom.

- But was alarmed to see the high percentage of those who did not agree or did not know if they felt a great sense of belonging.

- That's something we need to unpack together. And hear those stories to discover why.

## Slide 8 – Overall Climate, Students – Part 2

- This slide provides further takeaways from student responses to the overall climate, including:
  - Diversity in their coursework
  - Feeling that they will be heard
  - Whether they believe leaders are held accountable
  - And multiculturalism as a core value

- What's interesting here is that students validate the importance of multiculturalism and diversity, but fewer than half agree that their voices will be heard or that leaders are held accountable for the campus climate.

## Slide 9 – Welcome Perceptions

- Our survey also found that UCF is perceived by our employees – and our students – to be more welcoming to certain groups compared to others.

BUTLER R-RFP1_1750

- You can see that there were several groups that faculty and staff felt were not welcomed at the same high rates, including:
  - African Americans,
  - People with Disabilities,
  - People from the Middle East,
  - Muslims,
  - and Undocumented students.

- While not displayed on the screen, our students' responses showed similar trends and rates.

- Again, I want to point out the increasing rates of "I don't know" responses as you move down the rows on this slide.

## Slide 10 – Negative Experiences, Faculty and Staff

- This slide shows the rates at which our faculty and staff have experienced or witnessed discrimination, bias, or harassment. More than half reported they had.

- On the right, in the box in gray, you can see the breakout of the most prevalent types of bias or discrimination, bias, or harassment … with gender and race leading.

- Among faculty, women and faculty of color reported experiencing or witnessing discrimination, bias, or harassment more often compared to their peers … and higher rates were also found among staff of color, when compared with their peers.

## Slide 11 – Negative Experiences, Students

- Among our students, a little over half said they have not witnessed or experienced discrimination, bias, or harassment … including illegal activity, bullying, relationship or sexual violence, stalking or retaliation.

- Although a majority of respondents (56%) said they knew where to report the incident at UCF, less than 1 in 7 said they did. When they did, however, typically they reported it to a faculty member, UCF Police, or a friend.

- The right-hand side of the screen shows the reasons that students said they did not report … which in a time of us encouraging each other to speak out … and efforts the university is taking to improve its reporting processes and awareness of those measures … is important for us to see.

## Slide 12 – Upcoming Conversations

- Before we open it up for discussion, I want to remind you of three upcoming opportunities we'll have to talk about the survey again, through conversations geared toward specific groups.

BUTLER R-RFP1_1751

University Community Campus Climate Conversation_Butler Script v1.docx

- You can see those dates and times on the screen, and I encourage you to participate if you have more questions, or want to share your experiences.

- You can also see the link to where you can read the full reports. And shortly, we'll put this presentation on that same page, as well, for anyone who wants to download or view it later.

## ODI Leadership Council Conversation

Now, I'd like to briefly open it up to the members of our ODI Leadership Council who have joined us today.

While we are doing that, I hope those of you in the audience will raise your hand and let us know if you would like to share a story or an idea. Our team will reach out to you via the Zoom chat to get you set up.

So, Leadership Council members … let's start with an easy one: What were your greatest takeaways from this survey?

[KENT OPENS IT UP AND FACILITATES CONVESATION WITH LEADERSHIP COUNCIL FOR UP TO 10 MINUTES… IF WE HAVE A LOT OF FOLKS STARTING TO RAISE THEIR HANDS, CHRISTINE WILL LET KENT KNOW WHEN WE'RE READY]

**4:00 p.m.    Virtual Conversation Opens for Audience Members**

**4:45 p.m.**    [KENT ANNOUNCES FINAL AUDIENCE SPEAKER]

**4:55 p.m.**

**Kent:** This concludes our time for sharing today.

We'd like to thank you for joining us and for sharing and listening. These conversations are incredibly important as we all work together to move UCF and our society forward.

We will again post the link to the full campus climate survey reports on the graphic that ends this program. You also can find a recording of this event on UCF's YouTube page.

You are welcome to join us for our upcoming campus climate conversations, with two next week for staff and faculty, and a separate event on September 1 for students.

Until then, please stay well and have a great day, everyone.

[ALL PARTICIPANTS END VIDEO AND MUTE YOURSELVES]

[ENDING GRAPHIC]

BUTLER R-RFP1_1752

## TOPICS THAT MAY COME UP

**Negy:** *If questions are asked in the chat about Prof. Negy, Christine will share them with you to respond to; we believe it's better to proactively address this one, and then move the conversation along.*

### Suggested responses:

- Thank you for speaking up on this issue. It is an important and complicated one, and I know it has captured the attention of many people.
- The university's investigation into this faculty member is still ongoing. I do not have a timeline for when it will be finished, and I am not part of the investigation.
- Like other university leaders, including our President and Provost, I am disgusted by the comments that he has made on his personal Twitter page; they certainly do not represent my views … and they don't represent our university's values or those of our community.
- I have heard many students, faculty, and staff also speak out against what he has said online. And it's up to us to call out this type of speech when we see it.
- But just because we do not like what someone says, or we find it offensive and repulsive, does not means the university can immediately fire them. We have to look at their behavior, especially in the classroom and the workplace – and that's what this investigation is doing.
- I know it's frustrating for you … it's frustrating for me, too. But we have a process that we need to follow.
- I also think that this incident has shed light on the necessity of reporting behavior when we see something we think is not right, and using the official channels to do so … through the Office of Institutional Equity and our IntegrityLine. From the survey, we saw that people did always not report because they didn't believe it would be taken seriously, or they weren't sure it was important enough. Always report. Always call. Always help to hold your peers or leaders accountable; that makes us all better, together.

BUTLER R-RFP1_1753

**From:** _____@Knights.ucf.edu>
**Sent time:** 06/04/2020 12:39:22 PM
**To:** S. Kent Butler <skbutler@ucf.edu>
**Subject:** RE: Now Is Our Time to be Actively Anti-Racist

Dr. Butler,

Thank you for this message. I am proud to see my school stand up for its black students. I am a psychology Ph.D. graduate student, and I have enjoyed and admired the inclusive, diverse community that makes up UCF. I want to submit something for your consideration on this matter of creating an intentionally anti-racist community that welcomes black students and all students of color. You may be aware of Dr. Charles Negy's behavior on Twitter, at least his present comments if not his previous tweets. He is a professor in the psychology program and teaches multicultural psychology (among other courses). Though I don't believe he identifies as white himself, his message is still clear: he believes that black people have nothing to complain about in this country and dismisses the very real concerns of the black community. As a current professor, he is an agent of racist ideals and makes our students uncomfortable. I can attest to this because I worked for him as a graduate teaching assistant, and remember feeling distinctly uncomfortable talking with him about any topic related to my diverse background.  I urge you to take stronger action than the status quo would have us take. Please, consider the impact this professor has on our student body, and black students just starting their adult lives. At the very least, please consider the impact this professor has on students learning about multicultural psychology, and the impacts that may have on their future trajectories.

Thank you for hearing my concerns,

███████████████

**From:** S. Kent Butler <skbutler@ucf.edu>
**Sent:** Friday, May 29, 2020 6:05 PM
**To:** ███████████████████@Knights.ucf.edu>
**Subject:** Now Is Our Time to be Actively Anti-Racist



# Now Is Our Time to be Actively Anti-Racist

COVID-19 has exposed societal inequities and impacted us all in some way, and recent high-profile instances of bias and racism just add to the difficulties so many of us are already facing.

From the deaths of Breonna, Ahmaud and George to our brothers and sisters of Asian descent who are being unfairly discriminated against in connection to the pandemic, racism is painfully real and something so many of us live with every day.

Leaving the house is an action that may seem ordinary for some, but for individuals who deal with regular hatred and judgment — just for looking how they look, being who they are, loving who they love, or living according to their faith — we live with anxiety and fear about walking into unwelcoming spaces.

Yet, we still leave our homes. Our lived experiences and our histories are still worth listening to. Our stories matter.

At UCF, in my corner of the world, I try to bring this awareness to those with whom I interact daily.

With more than 80,000 students and faculty and staff members, each of us has a story and a part to play in building this inclusive community. We **all** need to be listened to and learned from.

We also need to be comfortable with the discomfort born from honest, difficult dialogues about race and culture. And these conversations must happen regularly, not just in reaction to tragic and gut-wrenching headline-grabbing incidents of racism.

We do not want to imagine something terrible or tragic happening close to home or to a person



Exhibit #

Butler 02

10/21/2024 - BS

would be easier to spin ful thoughts, to choose less challenging areas to prepare our
thoughts, but others do not have that luxury to escape reality.

But it is time we share those stories, and more importantly, that we truly listen to them.
Ultimately, we all have a need to express our feelings about the discrimination and violence we
have been inundated with recently, especially those we experience firsthand.

Sharing our stories helps us understand the humanity of those around us and, hopefully, leads us
to embrace differences. Most importantly, it reminds us to treat everyone the way we would
want to be treated, as stated in the UCF Creed and the values that guide us.

Breaking down barriers is not easy, but as Knights, we have the power to do it together by
creating an environment that encourages a space for our stories and embraces equity, inclusion
and diversity.

It is going to take all of us to do better — to be better — to change our society.

I look forward to sharing more in the near future about plans for engaging our campus
community in discussions about these topics and our plans for investing in UCF's inclusion and
diversity initiatives.

For now, students who are affected by recent events and would like support can reach out to
CAPS or contact UCF's Office of Social Justice and Advocacy. Employees can call 877-240-
6863 or go to HealthAdvocate.com/members for support through UCF's Employee Assistance
Program.

Please stay vigilant and safe, and be mindful of the stories and realities of those around you.
They matter, they are worth listening to and they contribute to the fabric of the UCF that we all
love.

**S. Kent Butler**
Interim Chief Equity, Inclusion and Diversity Officer

@SKButler

---

### UNIVERSITY OF CENTRAL FLORIDA

4000 Central Florida Blvd.

Orlando, FL 32816

unsubscribe from this email.

BUTLER R-RFP1_0002

**From:**              skbutler@ucf.edu
**Sent time:**         06/04/2020 08:57:03 AM
**To:**                Rhonda Bishop <Rhonda.Bishop@ucf.edu>
**Subject:**           Fwd: the term "Latinx"

FYI

**Dr. S. Kent Butler**
Interim Chief Equity, Inclusion and Diversity Officer
Professor, Counselor Education
University of Central Florida

Barbara Ying Center
12701 Scholarship Drive
Building 81
Orlando, FL 32816-0031

Office: 407.823.6479

**ucf.edu**

*Please note: Florida has a very broad open records law (F. S. 119). E-mails may be subject to public disclosure*

Begin forwarded message:

> **From:** "S. Kent Butler" <skbutler@ucf.edu>
> **Date:** June 4, 2020 at 2:35:00 AM EDT
> **To:** Alexander Cartwright <Alexander.Cartwright@ucf.edu>
> **Subject: Fwd: the term "Latinx"**
>
>
> FYI
>
> I did not respond to this email.
>
> KB
>
> **Dr. S. Kent Butler**
> Interim Chief Equity, Inclusion and Diversity Officer
> Professor, Counselor Education
> University of Central Florida
>
> Barbara Ying Center
> 12701 Scholarship Drive
> Building 81
> Orlando, FL 32816-0031
>
> Office: 407.823.6479
>
> **ucf.edu**
>
> *Please note: Florida has a very broad open records law (F. S. 119). E-mails may be subject to public disclosure*
>
> Begin forwarded message:
>
> > **From:** Charles Negy <Charles.Negy@ucf.edu>
> > **Date:** November 3, 2019 at 7:17:21 PM EST
> > **Subject: re: the term "Latinx"**



Good evening, Dr. Butler.

I had the pleasure of chatting with you a bit at the Study Abroad Fair two weeks ago. I had mentioned during our conversation my displeasure over the term "Latinx" and how it seemingly is being foisted on UCF Hispanics such as myself.

I believe I had mentioned that I had unofficially polled my Hispanic/Latino/a students in my courses (a grand total of about....100+ Hispanic students).  **None of them** (zero) identified as "Latinx" and most did not even understand it.  They also reported that no one at UCF had consulted with them about UCF's newfound usage of that term.

I found a study just conducted across the country (over 500 Hispanic/Latino/a participants). **98% of participants do *not* accept "Latinx"** as the way they refer to themselves and actually resent that the term is being imposed on them (often by "white progressives" or "liberals").

I just thought I'd share with you the results of my class surveys (I had not conducted the survey in all three classes when you and I had spoken), and the website of that national survey.

My "gripe" (if you will) is how individuals from minority groups who might be described as...."militant," or "extreme" in their views think they can decide for the larger cultural group how we are to be called, and to add insult to injury, mostly white administrators who (this is my opinion, of course) are eager to display their virtue as "anti-racists" cave in to the militants and comply with their demands.

Here is the website.

**https://medium.com/@ThinkNowTweets/progressive-latino-pollster-trust-me-latinos-do-not-identify-with-latinx-63229adebcea**

Hope all is well at your end.

Respectfully,
Charles
(p.s.  I included my Chair on this because he had an interest in this topic)


Charles Negy, Ph.D.

Associate Professor and

   Fulbright Scholar

Department of Psychology

University of Central Florida

Orlando, FL 32816

(407) 823-5861

**From:**
**Sent:** ... 30:49 ...
**To:** Alexander Cartwright <Alexander.Cartwright@ucf.edu>
**Subject:** Re: Addressing Intolerance in Our Community

is there a good reason why he is not fired yet? seems like the same thing as the police department having to 'investigate' the george floyd murder even thought it is on camera clearly. i appreciate the message but i think i speak for a lot of us students when i say i would appreciate much more some real action. much love and im so proud to be a part of this amazing community! UCF for life charge on

Get Outlook for iOS

**From:** President Alexander Cartwright <alexander.cartwright@ucf.edu>
**Sent:** Thursday, June 4, 2020 9:28:09 PM
**To:**
**Subject:** Addressing Intolerance in Our Community



# Addressing Intolerance in Our Community

At a time when so many of our community members are hurting, we are disgusted by the racist posts one of our faculty members has shared on his personal Twitter account. Many of Associate Professor Charles Negy's online comments run completely counter to our university's core values of diversity and inclusion, and we condemn them in the strongest terms.

Many people have shared their outrage with us today, and we want to especially thank our students for speaking out.

At all times, we uphold the principles of academic freedom, but we have a responsibility to denounce intolerance. Racism is an undeniable reality across our society, and people of color frequently experience overt and covert racism. That is why Dr. Negy's words are not only wrong, but particularly painful.

Everyone has the right to their personal beliefs, but no university employee may mistreat or discriminate against students in their classes or in any other setting. No student should fear they will be treated differently because of others' personal biases.

We have been receiving complaints alleging bias and unfair treatment in Dr. Negy's classroom and have launched an inquiry to gather more information.

If any student, current or former, believes they may have experienced abusive or discriminatory behavior by any faculty or staff member, we want to know about it. UCF takes every report seriously.

Concerns can be reported to UCF's IntegrityLine, which also takes anonymous complaints, at www.ucfintegrityline.com or 855-877-6049.

### Friday's Conversation on Race and Unity

We have heard from so many members of our campus community anguished by the horrific recent killings and long history of racial injustices who want to support our Black students, faculty and staff and other underrepresented communities at UCF.

Friday's virtual conversation from 2 to 3:30 p.m. will give our campus community



Exhibit #

Butler 04

10/21/2024 - BS

CARTWRIGHT R-RFP1 0124

an opportunity to listen to each other's stories and suggestions for how UCF can fully commit to inclusion in our actions. These difficult conversations do have value and need to be treated with respect for those hurting who want to be heard.

Students who would like support can reach out to CAPS or contact UCF's Office of Social Justice and Advocacy. Employees can call 877-240-6863 or go to HealthAdvocate.com/members for support through UCF's Employee Assistance Program.

As was shared this week, UCF is not perfect, but we must all work together to make changes here that will serve as a model for the rest of our nation.

Together,

      

*Alexander Cartwright*

**Alexander N. Cartwright, Ph.D.**

President

**Michael D. Johnson, Ph.D.**

Interim Provost and Vice President for Academic Affairs

**S. Kent Butler, Ph.D.**

Interim Chief Equity, Inclusion and Diversity Officer

---

**UNIVERSITY OF CENTRAL FLORIDA**

4000 Central Florida Blvd.

Orlando, FL 32816

unsubscribe from this email.

CARTWRIGHT R-RFP1 0125

| **From:** | Diversity and Inclusion <diverse@ucf.edu> |
| **Sent time:** | 06/04/2020 02:53:58 PM |
| **To:** | Office of Institutional Equity <oie@ucf.edu> |
| **Cc:** | S. Kent Butler <skbutler@ucf.edu>; Christine Dellert <Christine.Dellert@ucf.edu> |
| **Subject:** | FW: Charles Negy is Racist |

FYI-

-----Original Message-----
From: Grace Garrison
Sent: Thursday, June 4, 2020 2:27 PM
To: Diversity and Inclusion
Subject: Charles Negy is Racist

To whom it may concern,

I am writing to call your attention to the unacceptable and appalling online actions displayed by one of the members of your faculty, Psychology Professor Charles Negy. Professor Negy posted countless tweets in which he targeted the black community.

These despicable actions and words from Professor Negy do not align with UCF's Creed of Community. The UCF Creed of Community states "I will promote an open and supportive campus environment by respecting the rights and contributions of every individual." Professor Negy is no exception to this and his words are a direct violation of these core principles.

His behavior also violates the UCF Office of Institutional Equity's Mission Statement to "support a living, learning, and work environment that is free from discrimination, discriminatory harassment and retaliation where all members of the UCF community feel welcomed and valued".

Professor Negy's actions foster a dangerous learning environment for black students attending your institution.

I am urging that immediate action is taken and Professor Negy be removed from his position effective immediately.

Regards from a concerned individual,
Grace Garrison



Exhibit #

Butler 05

10/21/2024 - BS

**PLACEHOLDER**

**S. KENT BUTLER - EXHIBIT 6**

Student Virtual Forum Video, Thurs. June 4, 2020 (USB will be sent via hand delivery)

**PLACEHOLDER**

**S. KENT BUTLER - EXHIBIT 7**


Virtual Conversation About Race And Unity Video, Friday June 5 (USB will be sent via hand delivery)

Student Suggestions kpw.docx

Page: 195 of 250    Date Filed: 01/16/2026    Document: 34-1    USCA11 Case: 25-11929

**SUMMARY OF MEETINGS WITH BLACK RSO STUDENT LEADERS & BLACK STUDENTS**
**June 5th, June 8th, and June 14th**

## ACTIONS FOR CONSIDERATION:

- Mental Health Day for all…day of reflection
- Juneteenth Campus Celebration – June 19, student leaders to plan with Office of Student Involvement
- Transparency Reporting- Revamp the methods in which students submit reports:
  - Ensuring that those resources will respond and our complaints/requests won't get lost in the dust
  - Consider implementing a process where we can visually see where our requests are in the system
- Dedicated Space
  - Black Wednesday – new location, Memory Mall
  - Black student organization gathering place
  - NPHC – Visual Flag Poles in Greek Park
- Anti-racism/Diversity and Inclusion training for all – mandatory training
  - Develop a pre-enrollment training for students – currently alcohol and drug training, integrity training, and hazing
  - Web Course Requirement – Immediately
  - Student portals – MyUCF, Self-Service
  - New student orientation – add to WebCourse
  - SGA plan to adapt Green DOT bystander information
- Availability of Black/African American Mentors in faculty and staff
- Professor Negy review
  - Weekly updates
  - Take Prof Negy out of classroom asap
  - Change Negy's teaching assignment- not cross cultural, required courses
  - Stop requiring Negy's book for all students
- Faculty
  - Diversity statement as a syllabus requirement
  - Diversity & Inclusion course required for all faculty and staff
  - Incorporate African American History as an option to meet the GEP requirement
  - Establishing an evaluation process to ensure staff/faculty are upholding the values of the institution and exemplifying acceptable performance
    - What ways are used to conduct evaluation on faculty and staff behavior?
  - Extensive training including diversity & inclusion for faculty, staff, and UCFPD
  - UCF Faculty encouraged, supported, and trained on how to incorporate inclusivity in course curriculum ensuring students are learning about diverse voices within their program of study
- Increase the frequency for campus conversation around topics such as race, gender, socioeconomics, etc.
- Regular student meetings (monthly) with President Cartwright, Provost Johnson and VP Dr. Ehasz
- Inclusive marketing (of the institution and within the institution)
- BSU President as a standing committee member on committees including but not limited to Public Safety and Transportation, Student Body President Advisory Council, Faculty Hiring Committee
- Establish BSU as an SGA Agency

**Exhibit #**

**Butler 08**

10/21/2024 - BS

- Increase resources for Black and multicultural initiatives at UCF. Potentially unite the three diversity and inclusion offices into one central department and house them in a bigger space / their own building like most other universities

**Student Comments & Questions:**

- Accountability of the administration
- How Many "Negys" (faculty with offensive views and language)?
  - Who supports Negy?
  - Fighting for UCF to fire all of them
  - Complaints about Negy not a surprise, been going on for years
  - "Enjoyed stirring students up and making them cry"
- Working on it is frustrating for students
- Increase transparency, the process shouldn't take this long
- Embarrassing
- Power should shift to students
- Why is UCF in a tough position?
- White shaming doesn't broaden perspectives
- What is the point to the exit survey if nothing happens?
- What happens to anonymous complaints on Integrity line?
- "We are immune to discrimination, mistreatment, and bias – so we do not report."
- "We do not believe that anything will be done."

**From:** Michael Johnson <Michael.Johnson@ucf.edu>
**Sent time:** 06/08/2020 02:41:03 PM
**To:** Mike Kilbride <Mike.Kilbride@ucf.edu>; Deborah German <deb@ucf.edu>; Elizabeth Klonoff <Elizabeth.Klonoff@ucf.edu>; Janet Owen <Janet.Owen@ucf.edu>; Joel Hartman <Joel.Hartman@ucf.edu>; Joseph Trubacz <Joseph.Trubacz@ucf.edu>; Maribeth Ehasz <Maribeth.Ehasz@ucf.edu>; Michael Morsberger <Mike.Mors@ucf.edu>; Misty Shepherd <Misty.Shepherd@ucf.edu>; Rhonda Bishop <Rhonda.Bishop@ucf.edu>; S. Kent Butler <skbutler@ucf.edu>; Scott Cole <Scott.Cole@ucf.edu>; Danny White <dwhite@athletics.ucf.edu>; Patrick Burt <Patrick.Burt@ucf.edu>
**Cc:** Alexander Cartwright <Alexander.Cartwright@ucf.edu>; Lindsey La Chiana <Lindsey.LaChiana@ucf.edu>
**Subject:** Re: Cabinet Agenda - June 8, 2020

---

IU Provost statement: https://provost.indiana.edu/statements/archive/first-amendment.html

Michael D. Johnson
Interim Provost and Vice President for Academic Affairs
University of Central Florida

---

**From:** Mike Kilbride <Mike.Kilbride@ucf.edu>
**Date:** Monday, June 8, 2020 at 1:59 PM
**To:** Deborah German <deb@ucf.edu>, Liz Klonoff <Elizabeth.Klonoff@ucf.edu>, Janet Owen <Janet.Owen@ucf.edu>, Joel Hartman <Joel.Hartman@ucf.edu>, Joseph Trubacz <Joseph.Trubacz@ucf.edu>, Maribeth Ehasz <Maribeth.Ehasz@ucf.edu>, Michael Johnson <Michael.Johnson@ucf.edu>, Michael Morsberger <Mike.Mors@ucf.edu>, Misty Shepherd <Misty.Shepherd@ucf.edu>, Rhonda Bishop <Rhonda.Bishop@ucf.edu>, "S. Kent Butler" <skbutler@ucf.edu>, Scott Cole <Scott.Cole@ucf.edu>, Danny White <dwhite@athletics.ucf.edu>, Patrick Burt <Patrick.Burt@ucf.edu>
**Cc:** Alexander Cartwright <Alexander.Cartwright@ucf.edu>, Lindsey La Chiana <Lindsey.LaChiana@ucf.edu>
**Subject:** Cabinet Agenda - June 8, 2020

1. **UPDATES and DISCUSSION**

   - **Update on Conversations regarding Race, Diversity, Equity and Inclusion**
     - Professor Charles Negy (Cartwright)
     - Virtual Town Halls and Engagements (Cartwright, Butler, and Ehasz)
       - Race & Unity Conversation
       - BFSA and Black Caucus Engagements
     - Next Steps and Actions (Cartwright, Butler and Discussion)

   - **Faculty Senate on Thursday (Johnson)**

   - **June 17/18 Board of Trustees Meetings (Kilbride)**

2. **COVID-19**

   - **Enrollment and Registration Update (Ehasz)**

   - **Draft Plan for Returning to Campus (Bishop)**
     - Staff and Student Hall (Ehasz and Shepherd)
     - Review of Draft Plan (Bishop)
     - President's Virtual Forum on Wednesday

   - **Virtual Commencement (Kilbride)**

     The State University System of Florida has directed UCF and all state universities to develop alternate plans for summer commencement ceremonies. Regrettably, this means we will be unable to host a traditional, in-person ceremony for our summer graduates until it is safe to do so.

     We understand that commencement ceremonies are a major milestone in the lives of our graduates and the loved ones who have supported them on their educational journey. That's why we are working with Student Government to ensure that we creatively celebrate our students' accomplishments on August 1. We will share more information as soon as it's available. UCF alumnus and top Disney executive George Kalogridis will deliver video remarks to graduates.

     As with the Spring 2020 virtual commencement, this acknowledgement is meant to complement, not replace, the traditional ceremony. We are committed to rescheduling in-person Summer and Spring commencements at a future date.

     ==In the meantime, cap and gown costs will be reimbursed by the vendor, Herff Jones. More information about commencement and reimbursements is available on UCF's coronavirus website.==

3. **VP UPDATES**



Exhibit #

Butler 09

10/21/2024 - BS

BUTLER R-RFP1_0828

**From:** S. Kent Butler <skbutler@ucf.edu>
**Sent time:** 06/18/2020 12:18:50 PM
**To:** Brittny James <Brittny.James@uncf.org>
**Subject:** RE: Dr. Charles Negy
**Attachments:** image001.jpg

Greetings Dr. James!

I truly miss having you here. I looked around one day and you were gone. We need to still be in touch! Here is my cell 407-790-0622.

I am so sorry that my response has been delayed. The past few weeks have been trying at best. I agree with all that you have proffered and want you to know that we are doing all that we can to rectify this situation. Not sure (not really) how it ever got to this point, but it definitely is not acceptable. This has sparked a renewed effort in America to make systemic changes to racism. UCF is being held accountable and I am deeply invested in making sure we do better.

Please call when you can! I would love to catch up!

Be well,

KB

–
**Dr. S. Kent Butler**
Interim Chief Equity, Inclusion and Diversity Officer
Professor, Counselor Education
University of Central Florida

Barbara Ying Center
12701 Scholarship Drive
Building 81
Orlando, FL 32816-0031

Office: 407.823.6479

ucf.edu

*Please note: Florida has a very broad open records law (F. S. 119). E-mails may be subject to public disclosure*

**From:** Brittny James [mailto:Brittny.James@uncf.org]
**Sent:** Thursday, June 4, 2020 12:06 PM
**To:** S. Kent Butler <skbutler@ucf.edu>
**Cc:** Michael Johnson <Michael.Johnson@ucf.edu>; Tosha Dupras <Tosha.Dupras@ucf.edu>
**Subject:** Dr. Charles Negy

Good afternoon, Dr. Butler,

I hope all is well! I miss you, UCF, and all of the work that you are doing there. Your mentorship during my brief tenure as an Assistant Professor of Health Sciences was much appreciated.

I am writing to express my deep concern related to the comments that have been publicized regarding Dr. Negy. I had been informed several times while at UCF of the offensive comments that he has made towards Black students in his classes, as well as offense taken by non-Black students. As a Black academic, it is incredibly triggering to know that in 2020 students are still having to endure racism in the classroom. Posts have been made online, and to my understanding, formal complaints have been made against him in the past. I don't know what the answer is considering that he is tenured, but I do hope that you and university leadership identify a way to separate "free speech" from hate speech. I also hope that a message is sent to students stating how racist speech will not be tolerated from anyone – students AND faculty/staff. This is a trying time in the nation for everyone, but our students' mental health and educational opportunities should not be affected by the personal views and beliefs of faculty.

Warmly,

Brittny A. James, DrPH, MEd
Data Analyst

Exhibit #
Butler 10
10/21/2024 - BS

BUTLER R-RFP1_1447

**From:** Constance Goodman <Constance.Goodman@ucf.edu>
**Sent Time:** 06/06/2020 02:56:27 PM
**To:** S. Kent Butler <skbutler@ucf.edu>
**Subject:** Re: Forum and question

I get it.. i do.  I know you have more specifics. Stay safe


Dr. Connie Goodman
Lecturer/STEP Program Coordinator
ED 110
407.823.2959
"The whole world opened to me when I learned to read"......Dr. Mary McLeod Bethune

**From:** S. Kent Butler <skbutler@ucf.edu>
**Sent:** Saturday, June 6, 2020 2:46 PM
**To:** Constance Goodman <Constance.Goodman@ucf.edu>
**Subject:** Re: Forum and question

Not my call. The damage is done in some respect. My understanding is that many have tried to reach him. He is one. He is not the only one here. Sometimes one needs to hit rock bottom to figure it out. He may perceive staying as a win and just placate the rest. I hear you and I agree. The ultimate decision is not mine in this case. Even now he does not seem to be showing remorse. When does the work university call it quits on folks? They have a duty to uphold for all, while helping to educate him is a wonderful thing to do, how do we heal the people who wanted him gone? How do we regain their trust? Just playing the opposite side of the coin.

I will definitely share your perspective with leadership. Unfortunately, I think they feel obligated to act for the greater good.

KB


**Dr. S. Kent Butler**
Interim Chief Equity, Inclusion and Diversity Officer
Professor, Counselor Education
University of Central Florida

Barbara Ying Center
12701 Scholarship Drive
Building 81
Orlando, FL 32816-0031

Office: 407.823.6479

**ucf.edu**

*Please note: Florida has a very broad open records law (F. S. 119). E-mails may be subject to public disclosure*

On Jun 6, 2020, at 12:47 PM, Constance Goodman <Constance.Goodman@ucf.edu> wrote:


Thanks for your reply Kent. Im very passionate about this issue.  I believe the best way to reach a group of people is to speak to them through one of their own. I have every confidence that you could design an effective cultural sensitivity  growtv plan for Negy, to include having him engage with students to learn the impact of his actions.  If racism is as deep seated as we believe,  then its our responsibility to help him unlearn those behaviors.  I pray he would be willing to do the work towards our shared values at UCF. Then, only then, could he go out an impact those who hold racists beliefs....thats how we change the nation.. thats how we treat this virus and manage its abiltty to spread. Termination is not a cure.  Just my two cents.

Dr. Connie Goodman
Lecturer/STEP Program Coordinator

Exhibit #
Butler 11
10/21/2024 - BS

BUTLER R-RFP1_0785

Case 6:23-cv-00666-CEM-DCI     Document 63     Filed 01/21/25     Page 220 of 231 PageID
407.823.2959
USCA11 Case: 25-11929     Document: 34-4100     Date Filed: 01/16/2026     Page: 201 of 250
"The whole world opened to me when I learned to read"......Dr. Mary McLeod Bethune

---

**From:** S. Kent Butler <skbutler@ucf.edu>
**Sent:** Saturday, June 6, 2020 12:00 PM
**To:** Constance Goodman <Constance.Goodman@ucf.edu>
**Subject:** Re: Forum and question

Thanks Connie!

Great perspective and I will share. The issue is that it may not play well with the masses. I am wondering, and I do not control this, is that the same premise be put into place to reach the rest of our campus if in fact he is terminated. There are messages that are at play here. So, an alternative may be that the same strategies that you suggest be implemented. Both together may send a stronger message to the community. Regardless of the outcome, what you suggest is the direction we are moving towards.

Please keep me honest! Keep providing me with perspective. The lion is out of the cage now, so I am unsure how to change the momentum now in place. It's now about building trust with the community.

Be well,

KB

**Dr. S. Kent Butler**
Interim Chief Equity, Inclusion and Diversity Officer
Professor, Counselor Education
University of Central Florida

Barbara Ying Center
12701 Scholarship Drive
Building 81
Orlando, FL 32816-0031

Office: 407.823.6479

**ucf.edu**

*Please note: Florida has a very broad open records law (F. S. 119). E-mails may be subject to public disclosure*

On Jun 6, 2020, at 9:10 AM, Constance Goodman <Constance.Goodman@ucf.edu> wrote:

good morning dr. Butler.  First let me say that you are blessed with a burden my colleague.  You are blessed with a burden. I was encouraged by the students' comments and their push to hold us accountable.  I have a thought regarding Charles Negy that i hope you will consider.  Rather than seek termination,  i would like to see us develop a growth plan, one centered on aspects of social justice,  to include strategies to enhance intercultural competence and intercultural sensitivity.  Thus, such a plan could give Negy an opportunity to align his voice with the true mission and vision of UCF.  Termination is not the answer. This scene provides an opportunity for him to grow and develop . If he does not consent to a growth plan then that would be his choice. But lets see if we can help Negy and others like him understand what it means to be inclusive.  Termination does not stop the spread of this virus. Stay safe

Dr. Connie Goodman
Lecturer/STEP Program Coordinator
ED 110
407.823.2959
"The whole world opened to me when I learned to read"......Dr. Mary McLeod Bethune

BUTLER R-RFP1_0786

| From: | Andrea Gandy <Andrea.Gandy@ucf.edu> |
|---|---|
| Sent time: | 06/11/2020 03:04:27 PM |
| To: | Rhonda Bishop <Rhonda.Bishop@ucf.edu>; Scott Cole <Scott.Cole@ucf.edu>; Chad Binette <Chad.Binette@ucf.edu>; Mike Kilbride <Mike.Kilbride@ucf.edu>; Misty Shepherd <Misty.Shepherd@ucf.edu>; Janet Owen <Janet.Owen@ucf.edu>; Michael Johnson <Michael.Johnson@ucf.edu>; William Self <William.Self@ucf.edu>; Maribeth Ehasz <Maribeth.Ehasz@ucf.edu>; Joseph Trubacz <Joseph.Trubacz@ucf.edu>; Nancy Myers <Nancy.Myers@ucf.edu>; S. Kent Butler <skbutler@ucf.edu> |
| Cc: | Debra Copertino <Debbie.Copertino@ucf.edu>; Karen Smith <karen@ucf.edu>; Carolyn Standner <Carolyn.Standner@ucf.edu> |
| Subject: | RE: EICRT Discussion |
| Attachments: | Matties - Google form created to obtain complaints.pdf |

Team for today's discussion.

Thanks.

https://knightnews.com/2020/06/students-take-action-ask-for-input-as-ucf-investigates-charles-negy/

Andrea

(407) 823-0691

-----Original Appointment-----
**From:** Andrea Gandy
**Sent:** Thursday, June 11, 2020 10:57 AM
**To:** Andrea Gandy; Rhonda Bishop; Scott Cole; Chad Binette; Mike Kilbride; Misty Shepherd; Janet Owen; Michael Johnson; William Self; Maribeth Ehasz; Joseph Trubacz; Nancy Myers; S. Kent Butler
**Cc:** Debra Copertino; Karen Smith; Carolyn Standner
**Subject:** EICRT Discussion
**When:** Thursday, June 11, 2020 5:00 PM-6:00 PM (UTC-05:00) Eastern Time (US & Canada).
**Where:** Skype Meeting

Team,

This meeting is non-COVID19 related so we have reduced the participants.

Please let me know if you have any questions.

Thanks.

································································································································

## Join Skype Meeting

Trouble Joining? Try Skype Web App

Join by phone

(407) 823-0080,,4774583# (Orlando, FL)            English (United States)

Find a local number

Conference ID: 4774583
Forgot your dial-in PIN? | Help

································································································································

Exhibit #

**Butler 12**

10/21/2024 - BS



# UNIVERSITY OF CENTRAL FLORIDA

# Report UCF Professor Dr. Charles Negy

If you have experienced abusive or discriminatory behavior at UCF by Dr. Charles Negy, share your experience and tell your story here. We are 2 UCF students with a Zoom meeting scheduled with the office investigating Charles Negy and want to make sure your voices + stories are heard.

If you have ANY documents- syllabus, course materials, emails, screenshots, etc.- that you feel are relevant or would would help us understand, you can e-mail them to ██████████@knights.ucf.edu with the subject: NEGY.

We stand with you in solidarity and support you.
-████ and ████

\* Required

---

Have you experienced abusive or discriminatory behavior or been mistreated by Dr. Charles Negy at UCF? *

○ Yes

○ No

○ Someone I know has

---

Did this happen during class or outside of the classroom? *

○ During class

○ Outside the classroom

○ Other: _____

6/10/2020                    Against UCF Professor Dr. Charles Negy

Case 6:23-cv-00666-CEM-DCI     Document 63   Filed 01/21/25   Page 223 of 231 PageID
USCA11 Case: 25-11929     Document: 34-4   Date Filed: 01/16/2026     Page: 204 of 250
4103

What semester and year did this incident occur? *

Your answer

---

Are you a current or former UCF student? *

○ Current Student

○ Former Student

---

Share your story and experience regarding Dr. Negy here: *

Your answer

---

Are you willing to be reached out to by the students who have a meeting with the department investigating Dr. Negy? *

This is just in case we have follow up questions. If you are not willing, we understand and we will not use your phone number or e-mail in any capacity.

○ Yes

○ No

---

What is your name? *

If you would like your story to be told but remain anonymous, please see the section below.

BUTLER R-RFP1_1149

Your answer

---

**Do you want your story and voice to be heard, but want to remain anonymous?**

This means we will share your story and experience with the office investigating Dr. Negy to help build our case and make sure your voice is heard, but will leave ALL of your personal information out of it (your name and of course, your contact information).

○ Yes

○ No

---

**What is your phone number?** *

Again, this is just in case we have follow up questions. (Only we can see this information.)

Your answer

---

**What is your e-mail address?** *

Again, this is just in case we have follow up questions. (Only we can see this information.)

Your answer

---

Submit

Never submit passwords through Google Forms.

This content is neither created nor endorsed by Google. Report Abuse - Terms of Service - Privacy Policy

Google Forms

**From:** Andrea Gandy <Andrea.Gandy@ucf.edu>
**Sent time:** 06/12/2020 09:45:46 AM
**To:** S. Kent Butler <skbutler@ucf.edu>
**Subject:** Re: EICRT Discussion

Good Morning Kent,

My apologies for just responding. Rhonda and I thought it made sense to have you in the discussion regarding the latest with Professor Negy. I can give you a call to discuss some of the items outlined. We'll be sure to include you if we need to move forward with another discussion on the topic.

Thanks.

Andrea

Get Outlook for Android

---

**From:** S. Kent Butler <skbutler@ucf.edu>
**Sent:** Thursday, June 11, 2020, 8:50 PM
**To:** Andrea Gandy
**Subject:** Re: EICRT Discussion

Hello Andrea!

Am so sorry, I am just seeing this email and was not told that the meeting was accepted by my admin. Is there anything I can be of help with now, I know it is after the fact.

KB

**Dr. S. Kent Butler**
Interim Chief Equity, Inclusion and Diversity Officer
Professor, Counselor Education
University of Central Florida

Barbara Ying Center
12701 Scholarship Drive
Building 81
Orlando, FL 32816-0031

Office: 407.823.6479

ucf.edu

*Please note: Florida has a very broad open records law (F. S. 119). E-mails may be subject to public disclosure*

> On Jun 11, 2020, at 5:16 PM, Andrea Gandy <Andrea.Gandy@ucf.edu> wrote:
>
>
> Hi Kent,
>
> Wanted to touch base on the EICRT meeting for today's discussion.
>
> Let me know if you can make it.
>
> Thanks!
>
> Andrea
>
> (407) 823-0691
>
> -----Original Appointment-----
> **From:** Kavita Sawh <Kavita.Sawh@ucf.edu> **On Behalf Of** S. Kent Butler



BUTLER R-RFP1_1417

Sent: Thursday, June 11, 2020 1:12 AM
To: Andrew Gendron

**Subject:** Accepted: EICRT Discussion

**When:** Thursday, June 11, 2020 5:00 PM-6:00 PM (UTC-05:00) Eastern Time (US & Canada).

**Where:** Skype Meeting

BUTLER R-RFP1_1418

**From:** skbutler@ucf.edu
**Sent time:** 06/18/2020 09:58:07 AM
**To:** SGA Senator Eng. & Comp. Sci. seat 4 <sga_ecs4@ucf.edu>
**Cc:** Alexander Cartwright <Alexander.Cartwright@ucf.edu>; College of Sciences Dean <COSDean@ucf.edu>; Beverly Seay <Beverly.Seay@ucf.edu>; Michael Johnson <Michael.Johnson@ucf.edu>; SGA Speaker of the Senate <sga_spkr@ucf.edu>; ████████████████
**Subject:** Re: Student Government Resolution Regarding Charles Negy

Greetings ████!

Thank you to you all for your diligence on this matter. I appreciate you sharing this resolution with me. The resolution and the strong call from the Student Government will definitely be taken under advisement.

Be well,

KB

**Dr. S. Kent Butler**
Interim Chief Equity, Inclusion and Diversity Officer
Professor, Counselor Education
University of Central Florida

Barbara Ying Center
12701 Scholarship Drive
Building 81
Orlando, FL 32816-0031

Office: 407.823.6479

**ucf.edu**

*Please note: Florida has a very broad open records law (F. S. 119). E-mails may be subject to public disclosure*

On Jun 17, 2020, at 5:47 PM, SGA Senator Eng. & Comp. Sci. seat 4 <sga_ecs4@ucf.edu> wrote:

Good Afternoon,

This past Thursday, Student Government Senate unanimously passed a resolution in favor of terminating Associate Professor Negy's employment at the University of Central Florida.

This issue has tarnished UCF's reputation and the university's inaction has spoke volumes. In bringing his offensive comments into the classroom, by encouraging his students to follow him on twitter, Negy is no longer be able to facilitate conversations on the sensitive subjects in which he educates students on; thus, interfering with the functioning of his workplace.

To resolve this issue, the Student Government Senate requests that Charles Negy be placed on administrative leave while he is investigated, and ultimately, for his employment at the university terminated.

There has been several news articles written about Resolution 52-38, which is attached, and I encourage you to read the resolution in its entirety to gain more insight on the sentiments of the student body.

I will be transitioning into a different position within Student Government, pending confirmation tomorrow, and will lose access to this email. So, I have CC'd my personal email and Senate President ████████ for you to contact. I look forward to communicating with you further.

Regards,

████████████ (he, him, his)
Student Senator, CECS #4
Student Government
University of Central Florida



BUTLER R-RFP1_1445

ucfsga.com

*Please note:* Florida has a very broad open records law (F.S. 119). Emails may be subject to public disclosure.

&lt;Resolution 52-38 Resolution Regarding Associate Professor Charles Negy's Employment at the University of Central Florida.pdf&gt;

**From:** S. Kent Butler
**Sent time:** 07/27/2020 11:31:12 PM
**To:** Jennifer Chavez <chavezannaj@gmail.com>
**Subject:** RE: Racial Injustice and Trauma

Greetings Jennifer,

I hope that this email finds you well. I first must apologize for the delay in the response. I have been inundated with emails as of late and some got by me. I am going through many of my emails and finding ones that I missed. I truly appreciate the sentiments expressed in your email and wanted you to know that it was received and valued.

As for Negy, I am really not at liberty to discuss, but will share that I am dismayed by the turn of events and am hopeful that here at UCF we will eventually win the battle of dismantling systemic racism. We have no other choice!

I am open to discussing this with you further if you would like.

Be well,

KB


**Dr. S. Kent Butler**
Interim Chief Equity, Inclusion and Diversity Officer
Professor, Counselor Education
President-Elect, American Counseling Association
Fellow, National Association of Diversity Officers in Higher Education
University of Central Florida

Barbara Ying Center
12701 Scholarship Drive
Building 81
Orlando, FL 32816-0031

Office: 407.823.6479


**ucf.edu**


*Please note: Florida has a very broad open records law (F. S. 119). E-mails may be subject to public disclosure*

---

**From:** Jennifer Chavez <chavezannaj@gmail.com>
**Sent:** Friday, June 12, 2020 3:00 PM
**To:** S. Kent Butler <skbutler@ucf.edu>
**Subject:** Racial Injustice and Trauma

Hello Dr. Butler,

I recently viewed your video on 'Racial Injustice and Trauma' that was sent out to myself and colleagues yesterday; I currently work at a DV shelter in San Diego, CA. First, I want to thank you for providing such an informative and useful session; I found your demeanor to be very calming, but also direct and passionate ( I also agree 100% with your statements regarding #45, and really didn't think of that perspective until you mentioned it).

As a UCF Alumni, I was interested on your take on the recent events surrounding UCF's professor Dr. Negy. There is so much information out there, and with the current climate surrounding anti-racism, I am interested in your opinion. I am not sure if this is permitted of you to comment, but I figured I would ask. Thank you again for sharing your time and wisdom.

Very Respectfully.
Jennifer Chavez.



Exhibit #

**Butler 15**

10/21/2024 - BS

BUTLER R-RFP1_0180

**From:**          Christine Dellert <Christine.Dellert@ucf.edu>
**Sent time:**     08/13/2020 08:51:18 PM
**To:**            S. Kent Butler <skbutler@ucf.edu>
**Subject:**       Re: I got some additional feedback...
**Attachments:**   Wednesday's Faculty Campus Climate Conversation

Sent out emails individually to Linda, Marie, Lindsay and Malcolm. Will let you know what I hear back! One of them is attached so you can see.

Feel free to reach out to these folks, too, if you want to give them an extra nudge

---

**From:** "S. Kent Butler" <skbutler@ucf.edu>
**Date:** Thursday, August 13, 2020 at 7:15 PM
**To:** Christine Dellert <Christine.Dellert@ucf.edu>
**Subject:** RE: I got some additional feedback...

Love it! Anything to divert from today's fiasco.

Will we also keep the other panelist?

I would go with tenured professors as opposed to non-tenured (for the obvious reasons). Linda is good, I also think Malcolm Butler (no relation might be good), Why don't we invite Negy…let him field his own questions. Back to reality… Dr. Marie Laticee may be willing. Bill Self, Joe Harrington, or Reid Oetjen leadership (current and former chairs) to give perspective from the Faculty Senate. Dr. Charles Dziuban comes to mind, he is outspoken and have been here a while. Richard Lapchick may be a good addition. I am thinking Lindsey Neblock has been outspoken, she is tight with Jennifer Sandoval. If seeking a Latina perspective I like Linda as you already suggested. Linda Walters could bring on the woman perspective. I am not sure of who may be a willing faculty member from the LGBTQ community.

Preliminary thoughts.

KB

**Dr. S. Kent Butler**
Interim Chief Equity, Inclusion and Diversity Officer
Professor, Counselor Education
President-Elect, American Counseling Association
Fellow, National Association of Diversity Officers in Higher Education
University of Central Florida

Barbara Ying Center
12701 Scholarship Drive
Building 81
Orlando, FL 32816-0031

Office: 407.823.6479

ucf.edu

*Please note: Florida has a very broad open records law (F. S. 119). E-mails may be subject to public disclosure*

---

**From:** Christine Dellert <Christine.Dellert@ucf.edu>
**Sent:** Thursday, August 13, 2020 6:59 PM
**To:** S. Kent Butler <skbutler@ucf.edu>
**Subject:** I got some additional feedback...



From Alex.

Can we add a few faculty members to the Wednesday forum, so that they can talk about their own experiences. Who would you recommend who are vocal in this area or have made great strides at UCF, passionate about diversity? Linda Rosa-Lugo is one who comes to mind immediately. Other suggestions. Need to reach out to 2-3 of them. And then we facilitate this more as a conversation with them, too, if we don't have people volunteer to speak.

Christine

**Christine Dellert**
Deputy Chief of Staff for Communications and Operations
Office of the President
University of Central Florida

Office: 407.823.1898
Cell: 407.718.0199
christine.dellert@ucf.edu
**ucf.edu**

*Please note:* Florida has a very broad open records law (F.S. 119). Emails may be subject to public disclosure.

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

CHARLES NEGY,

     *Plaintiff,*

v.                                                            CASE NO.: 6:23-cv-00666-CEM-DCI

BOARD OF TRUSTEES OF THE
UNIVERSITY OF CENTRAL
FLORIDA; in their official capacities;
S. KENT BUTLER, ALEXANDER
CARTWRIGHT, TOSHA DUPRAS,
MICHAEL JOHNSON, NANCY
MYERS, in their individual capacities,

     *Defendants.*
_____/

**NOTICE OF FILING**

     Defendants, S. KENT BUTLER, ALEXANDER CARTWRIGHT, TOSHA

DUPRAS, MICHAEL JOHNSON, and NANCY MYERS, in their individual

capacities ("Defendants"), by and through their legal counsel, hereby give Notice of

Filing the following:

    1. Defendant Nancy Myers' Responses to Plaintiff's First Request for

       Production to Defendant;

    2. Myers 0001-0119;

    3. Myers 0202-0208;

    4. Myers 0215-0253;

    5. Myers 0310-0334;

#62632250 v1

6. Myers 0663-0666;

7. Myers 0703;

8. Myers 1828-1829;

9. Myers 1915-1916;

10. Myers 1925-1937;

11. Myers 2147; and,

12. Myers 2202-2203.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY on January 21, 2025, a true and correct copy of the foregoing was filed through the CM/ECF system, which will serve an electronic copy on all parties of record.

**GRAY ROBINSON, P.A.**

*/s/Kristie Hatcher-Bolin*
**KRISTIE HATCHER-BOLIN**
Florida Bar No. 521388
Kristie.Hatcher-bolin@gray-robinson.com
Post Office Box 3
Lakeland, Florida 33802-0003
Telephone: (863) 284-2251
Facsimile: (863) 683-7462

*/s/ Katherine W. Katz*
**KATHERINE W. KATZ**
Florida Bar No. 1022526
Katherine.Katz@gray-robinson.com
**JULIE M. ZOLTY**
Florida Bar No.: 1036454
Julie.Zolty@gray-robinson.com
Post Office Box 3068
Orlando, Florida 32802-3068
Telephone: (407) 843-8880
Facsimile: (407) 244-5690
*Counsel for Defendants*

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

CHARLES NEGY,

 *Plaintiff,*

v.           CASE NO.: 6:23-cv-00666-CEM-DCI

BOARD OF TRUSTEES OF THE
UNIVERSITY OF CENTRAL
FLORIDA; in their official capacities;
S. KENT BUTLER, ALEXANDER
CARTWRIGHT, TOSHA DUPRAS,
MICHAEL JOHNSON, NANCY
MYERS, in their individual capacities,

 *Defendants.*

_____/

## DEFENDANT NANCY MYERS' RESPONSE TO PLAINTIFF'S FIRST REQUEST FOR PRODUCTION TO DEFENDANT

 Defendant NANCY MYERS, in her individual capacity ("Defendant"),

pursuant to Rule 34, *Federal Rules of Civil Procedure*, hereby provides her responses to

Plaintiff, Charles Negy's First Request for Production to Defendant Nancy Myers,

dated April 30, 2024.

## DOCUMENTS

 1. All documents referred to or relied upon in responding to any

Interrogatory, or which otherwise relate to your answers to any Interrogatories.

   **Response:** Documents Defendant relied upon or referred to in her

   Interrogatory Answers are attached to those answers and are being

   produced in response to this Request to Produce, in particular, the OIE

file produced with this response. But the phrase "otherwise relate to" is vague and Defendant is unaware of any other documents, aside from those she specifically "referred to or relied upon" in answering the Interrogatories, that would "otherwise relate to" her answers.

2.    All employment policies, guidelines, procedures, continuing education, or actual employment or work practices and rules of conduct relating to personnel, discipline, hiring, promotion, performance reviews or evaluations, harassment or antiharassment, termination, compensation, discrimination, antidiscrimination, retaliation, diversity, equity, or inclusion that applied to YOU during YOUR employment at the University, including but not limited to training manuals, presentations, training materials, brochures, handbooks, and/or memoranda detailing policies and procedures.

**Response:** Defendant will produce all non-privileged documents responsive to this request.

3.    All documents relating to past instances in which OIE has investigated a UCF faculty member for alleged discrimination or harassment based on their classroom or public speech.

**Response:** Responding in my individual capacity and not as a corporate representative for UCF, OIE has not investigated a UCF faculty member for classroom or public speech. However, to the best of my personal knowledge, and responding in my individual capacity and not as a corporate representative for UCF, documents regarding OIE

2

investigations for alleged discrimination or harassment by UCF faculty members during my time as Director, are being produced with this request.

4.       Any document or communication establishing or discussing precedent or past practice within OIE for handling cases where protected speech was alleged to intersect with discrimination or harassment claims.

> **Response:** Responding in my individual capacity and not as a corporate representative for UCF, OIE has not investigated a UCF faculty member for protected speech. However, to the best of my personal knowledge, and responding in my individual capacity and not as a corporate representative for UCF, documents regarding OIE's precedent and practices for investigating claims alleging discrimination or harassment are included in those documents responsive to Request No. 2, in particular, but not limited to, the OIE Investigative Procedures and the Nondiscrimination Policies.

5.       Any documents and communications setting forth or discussing the policies or procedures used by OIE to determine whether a complaint against a faculty member warrants a formal investigation, including the process by which OIE determines the credibility of complaints against faculty members.

> **Response:** To the best of my personal knowledge, and responding in my individual capacity and not as a corporate representative for UCF, documents regarding OIE's policies and procedures regarding

investigations are included in those documents responsive to Request

No. 2, in particular, but not limited to, the OIE Investigative Procedures.

6.      All documents related to any OIE complaints, formal or informal, in

which NEGY was the respondent, potential respondent, complainant, or witness,

including but not limited to all documents generated in the investigation, any decision,

evidence gathered or submitted, and any appeal.

> **Response:**   To the best of my personal knowledge, and responding in
> my individual capacity and not as a corporate representative for UCF,
> responsive documents are included in the response to Request No. 3,
> specifically, the 2020 investigative file for Plaintiff, and additional
> responsive documents are being produced in response to this request.

7.      All documents pertaining to the interview or investigation of witnesses in

any OIE complaint in which NEGY was either the respondent, potential respondent,

complainant, or witness, including but not limited to any affidavits, declarations,

interviews, transcripts, summaries and notes, declarations, or statements (whether

written or unwritten, recorded or unrecorded), and including audio or video

recordings.

> **Response:**   Please see the documents produced in response to Request
> Nos. 3 and 6.

8.      All documents or communications authored, sent, or received by YOU

between May 25, 2020 and June 5, 2020 concerning UCF's response to the death of

George Floyd and the resulting protests.

**Response:** Defendant will produce all non-privileged documents responsive to this request.

9.      All documents in YOUR possession, including but not limited to emails, letters, reports, recordings, notes, and memoranda, that reference NEGY, his conduct, his Twitter posts, or the subsequent investigation, termination, grievance, arbitration, and/or reinstatement.

**Response:** Please see the documents produced in response to Requests Nos. 3 and 6, and additional documents produced in response to this request.

10.      All communications between YOU and external parties, including but not limited to state or federal entities, government officials, donors, legislators, and/or members of the media, that reference NEGY, his Twitter posts, or the subsequent investigation, termination, grievance, arbitration, and/or reinstatement, as well as any documentation related to those communications.

**Response:** Documents responsive to this request are included in the documents produced in response to Request No. 9.

11.      All documents (including but not limited to emails, notes made in preparation for the meeting, attendance records, letters, reports, recordings, presentations, minutes from the meeting, and memoranda) relating to any UCF Board of Trustees meetings YOU attended or participated in where NEGY and/or his statements, conduct, investigation, termination, grievance, arbitration, and/or reinstatement were discussed.

**Response:** None.

12.    All documents and communications that reference or discuss the potential or actual impact of NEGY's tweets on UCF's public image, student enrollment or retention, donations, funding, legislative support, legal position, or liability.

> **Response:** Defendant objects to the production of any documents that address Defendants' legal position or liability as calling for a legal conclusion or as calling for the production of documents protected by the attorney client and work product privileges. Documents responsive to the remainder of this request, however, are included in the documents produced in response to Request No. 9.

13.    All documents and communications that reference or discuss the risk of public or media backlash as a factor in the decision to initiate disciplinary proceedings against NEGY.

> **Response:** None.

14.    All documents and communications that reference or discuss the potential for using allegations of discrimination or harassment as a basis for disciplinary action against NEGY, including but not limited to non-privileged documents and communications that discuss or analyze the potential legal implications of doing so.

> **Response:** None.

15.     All documents and communications relating to every person, including any UCF student, alumni, non-party, or faculty member, who contacted you or whom you contacted concerning NEGY. This should include all notes, transcripts, written or digital records (whether formally composed or informally noted), recordings, and summaries prepared in anticipation of, during, or following any interview, meeting, or anything else related to the investigation.

   **Response:**   Documents responsive to this request are included in the documents produced in response to Requests Nos. 3, 6, and 9.

16.     All policies, procedures, guidelines, training, or communications that you relied upon or were bound by in conducting the investigation into NEGY.

   **Response:**   Documents responsive to this request are included in the documents produced in response to Request No. 2.

17.     All documents or communications authored, sent, or received by you, any Defendant, faculty, or any other non-party discussing or relating to the "internal discussions" referenced in Defendant Dupras' January 5, 2021, email placing NEGY on administrative leave, including any documents or communications concerning the substance of the internal discussions as well as any communications related to scheduling the internal discussions or identifying their participants.

   **Response:**   Documents responsive to this request are included in the documents produced in response to Requests Nos. 3, 6, and 9, in particular the OIE Investigative Report.

18.     All documents or communications authored, sent, or received by you, any Defendant, faculty, or any other non-party discussing or relating to the application of UCF's faculty Collective Bargaining Agreement 16.7, Termination, to NEGY's case.

> **Response:** Documents responsive to this request are included in the documents produced in response to Request No. 17.

19.     All documents or communications authored, sent, or received by you, any Defendant, any faculty, or any other non-party discussing or relating to Defendant Dupras' January 13, 2021 email notifying NEGY of UCF's intent to terminate his employment on at the close of business of January 25, 2021, including but not limited to preparatory steps such as drafts, discussions, revisions, or approvals, as well as emails or other communications received in response to the email.

> **Response:**  Documents responsive to this request are included in the documents produced in response to Request Nos. 3, 6, and 9, in particular the OIE Investigative Report.

20.     All documents and communications authored, sent, or received by you pertaining to, prepared in anticipation of, or generated during the grievance process initiated by NEGY regarding his termination.

> **Response:**  Documents responsive to this request are included in the documents produced in response to Request Nos. 6 and 9.

21.     All documents you intend to or believe you may introduce, use as exhibits, and/or use for impeachment or rebuttal purposes during depositions or at

trial in this matter, or in support of or in opposition to any dispositive motion filed in

this case concerning Plaintiff's claims against any Defendant or Defendant's defenses,

whether or not you will seek to admit the exhibits into evidence.

> **Response:** Defendant has not yet identified the exhibits to be used at any
> deposition, in support of any dispositive motion, or at trial. Such
> decisions will be addressed with Defendant's counsel, and as such,
> Defendant objects to this request as seeking the production of attorney
> work product.

22.     Your federal and state income tax returns for the years 2018, 2019, 2020,

2021, and 2022 (after completion and filing with the IRS), including all schedules and

attachments.

> **Response:** Defendant objects to this Request on the grounds that it is
> overbroad and not proportional or reasonably tailored to the needs of this
> case, as well as unduly burdensome in scope and time frame. *See* Fed. R.
> Civ. P. 34; Middle District Handbook on Civil Discovery at Pg. 4.
> Should it be determined that Plaintiff is entitled to seek certain discovery
> relating to Defendant's net worth, the scope of such information must be
> limited to the current net worth of Defendant and Defendant only, not
> the net worth of Defendant's spouse or dependent(s). The request for tax
> returns for 2018 through 2022 has no bearing on the net worth of
> Defendant at the time of this action, and is therefore neither reasonably
> tailored to Plaintiff's claims against Defendant nor reasonably calculated

to lead to the discovery of admissible evidence. Further, should it be determined that Plaintiff is entitled to seek certain discovery relating to Defendant's net worth, Defendant shall produce such information for inspection by Plaintiff's counsel only, after execution of a confidentiality agreement and protective order, as necessary to protect the sensitive financial and personally identifiable information of Defendant, Defendant's spouse and/or dependent(s), and other individuals having privacy interests in such information.

Respectfully submitted on this 1st day of July, 2024.

*/s/ Kristie Hatcher-Bolin*
**SUSAN T. SPRADLEY**
Florida Bar No.: 0818712
Susan.Spradley@gray-robinson.com
**KATHERINE W. KATZ, ESQ.**
Florida Bar No. 1022526
Katherine.Katz@gray-robinson.com
**JULIE M. ZOLTY**
Florida Bar No.: 1036454
Julie.Zolty@gray-robinson.com
**GRAY ROBINSON, P.A.**
Post Office Box 3068
Orlando, Florida  32802-3068
Telephone:  (407) 843-8880
Facsimile:  (407) 244-5690
                    And
**KRISTIE HATCHER-BOLIN**
Florida Bar No. 521388
Kristie.Hatcher-bolin@gray-robinson.com
**GRAY ROBINSON, P.A.**
Post Office Box 3
Lakeland, Florida 33802-0003
Telephone: (863) 284-2251
Facsimile: (863) 683-7462
*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY on July 1, 2024, a true and correct copy of the foregoing

was served on David R. Osborne, Esq. and Samantha K. Harris, Esq., Counsel for

Plaintiff,    by    electronic    mail    at    dosborne@goldsteinlp.com    and

sharris@allenharrislaw.com.

<div align="right">

*/s/ Kristie Hatcher-Bolin*
**KRISTIE HATCHER-BOLIN**
Florida Bar No. 521388

</div>

7110/93#60509672 v5



UNIVERSITY OF CENTRAL FLORIDA

**Office of the President**

| SUBJECT: | Effective Date: | Policy Number | |
|---|---|---|---|
| Prohibition of Discrimination, Harassment and Related Interpersonal Violence | 6/9/2017 | **2-004** | |
| | **Supersedes:** | **Page** | **Of** |
| | | 1 | 29 |
| | **Responsible Authority:** Director, Institutional Equity | | |

**TABLE OF CONTENTS**

I.       APPLICABILITY/ACCOUNTABILITY
II.      DEFINITIONS
III.     POLICY STATEMENT
IV.      PROHIBITED CONDUCT UNDER THIS POLICY
         A.      DISCRIMINATION
         B.      DISCRIMINATORY HARASSMENT
         C.      SEXUAL OR GENDER-BASED HARASSMENT
         D.      SEXUAL ASSAULT
         E.      SEXUAL EXPLOITATION
         F.      RELATIONSHIP VIOLENCE
         G.      STALKING
         H.      RETALIATION
         I.      COMPLICITY
V.       UNDERSTANDING THE DIFFERENCE BETWEEN PRIVACY AND CONFIDENTIALITY
VI.      EMPLOYEE REPORTING RESPONSIBILITIES
         A.      TITLE IX REPORTING OBLIGATIONS (RESPONSIBLE EMPLOYEES)
         B.      DEAN, DIRECTOR, DEPARTMENT HEAD, AND SUPERVISOR REPORTING
                 OBLIGATIONS
         C.      CLERY REPORTING OBLIGATIONS (CAMPUS SECURITY AUTHORITY
                 EMPLOYEES)
         D.      CHILD ABUSE REPORTING OBLIGATIONS (ALL EMPLOYEES)

Phone: 407.823.1823 • Fax: 407.823.2264 • Web: president.ucf.edu
An Equal Opportunity and Affirmative Action Institution

MYERS R-RFP1_0001

VII.    COMPLAINANT OPTIONS FOR REPORTING PROHIBITED CONDUCT
        A.      REPORTING TO LAW ENFORCEMENT
        B.      REPORTING TO THE UNIVERSITY
VIII.   ACCESSING CAMPUS AND COMMUNITY RESOURCES
        A.      REMEDIAL AND PROTECTIVE MEASURES
        B.      INTERIM ACTIONS
IX.     INAPPROPRIATE AMOROUS RELATIONSHIPS
        A.      STUDENT CONTEXT
        B.      EMPLOYMENT CONTEXT
X.      PREVENTION, AWARENESS AND TRAINING PROGRAMS
XI.     OBLIGATION TO PROVIDE TRUTHFUL INFORMATION
XII.    PROCEDURES
        A.      WHERE THE RESPONDENT IS A STUDENT OR REGISTERED STUDENT
                ORGANIZATION
        B.      WHERE THE RESPONDENT IS AN EMPLOYEE OR A DIRECT SUPPORT
                ORGANIZATION EMPLOYEE
        C.      WHERE THE RESPONDENT IS BOTH A STUDENT AND AN EMPLOYEE
        D.      WHERE THE RESPONDENT IS A THIRD-PARTY
XIII.   RELATED INFORMATION
        A.      STUDENTS AS RESPONDENTS
        B.      EMPLOYEE AND THIRD-PARTIES AS RESPONDENTS
        C.      STATE AND FEDERAL LAW
XIV.    CONTACTS: TITLE IX COORDINATOR
XV.     POLICY REVIEW
XVI.    INITIATING AUTHORITY

## I.    APPLICABILITY/ACCOUNTABILITY

This policy applies to the university community, which includes all students, employees, registered student organizations; direct support organizations' non-student employees (DSOs), and third-parties. This policy pertains to acts of prohibited conduct[1] committed by or against students, employees, registered student organizations, DSOs, and third-parties when:

1.      the conduct occurs on campus or other property owned by, controlled by, or affiliated with the university;

2.      the conduct occurs in the context of a university employment or education program or activity, including, but not limited to, university-sponsored study abroad, research, on-line, or internship programs; or

---

[1] The university prohibits discrimination, as well as discriminatory harassment, sexual assault, sexual exploitation, relationship violence, stalking, sexual or gender-based harassment, complicity in the commission of any act prohibited by this policy, retaliation against a person for reporting, in good faith, any of these forms of conduct or participating in or being a party to any investigation or proceeding under this policy (collectively, "Prohibited Conduct"). Definitions for all forms of prohibited conduct can be found in Section IV of this policy.

3.     the conduct occurs outside the context of a university employment or
education program or activity, but has continuing adverse effects on or
creates a hostile environment for students, employees, DSOs, or third-parties
while on campus or other property owned by, controlled by or affiliated with
the university or in any university employment or education program or
activity.  This means that the university may take action against students,
registered student organizations, DSOs, and third-parties for off-campus
conduct if the conduct is specifically prohibited by law or university policies
and regulations; may take action against employees for activities which fall
outside the scope of employment but adversely affect the legitimate interests
of the university; and may take action against students, employees,
registered student organizations, DSOs, and third-parties if the conduct poses
(or demonstrates that the student's, employee's or third-party's continued
presence on university premises poses) a danger to the health, safety or
welfare of the university community; or if the conduct is disruptive to the
orderly processes and functions of the university.

## II.     DEFINITIONS

**Campus Security Authority (CSA).** Individuals who are members of the campus police
department; any individual who has responsibility for campus security but who does not
constitute a member of the campus police department; any individual or organization
specified in the university's statement of campus security policy as an individual or
organization to which students and employees should report criminal offenses; and any
employee of the university who has significant responsibility for student and campus
activities, including but not limited to, student housing, student discipline and campus
judicial proceedings.  CSAs at UCF include members of the campus police department, any
individual who has the authority and the duty to take action or respond to particular issues
on behalf of the university, and any individual who has significant responsibility for
students and campus activities.  CSAs at UCF include but are not limited to the following:
Student Affairs officials, Housing and Residence Life officials, Coordinator of Greek Affairs
(or related positions), athletic administrators (including Director, Assistant Directors,
Coaches, and Trainers), Student Conduct officials, faculty and staff advisors to student
organizations, and administrators at any UCF campus and instructional site.

**Coercion.**  An unreasonable pressure for sexual activity. Coercion is more than an effort to
persuade, entice, or attract another person to have sex. Conduct does not constitute
coercion unless it impairs an individual's freedom of will to choose whether to participate
in the sexual activity.

**Complainant.**  An individual who discloses having been subjected to any prohibited
conduct under this policy, regardless of whether that person makes a report or seeks action

under this policy.[2]

**Confidential Employee.** Any employee who is entitled under state law to have privileged communications. Confidential employees will not disclose information about prohibited conduct to the university without the permission of the student or employee (subject to the exceptions set forth in the confidentiality section of this policy). Confidential employees and resources at the University of Central Florida are the following:

- Health Services employees
- Counseling and Mental Health Services employees
- Employee Assistance Program employees
- Ombuds Office employees
- Victim Services employees
- Student Legal Services employees
- Volunteer chaplains

**Consent.** An understandable exchange of affirmative words or actions, which indicate a willingness to participate in mutually agreed upon sexual activity. Consent must be informed, freely and actively given. It is the responsibility of the initiator to obtain clear and affirmative responses at each stage of sexual involvement. Consent to one form of sexual activity does not imply consent to other forms of sexual activity. The lack of a negative response, lack of resistance or protest, and silence are not consent. An individual who is incapacitated by alcohol and/or other drugs both voluntarily or involuntarily consumed may not give consent. Past consent to sexual activity does not imply ongoing future consent. Consent cannot be given if any of the following are present: force, coercion, or incapacitation.

**Course of conduct.** Two or more acts, including but not limited to acts in which a person directly, indirectly, or through third-parties, by any action, method, device, or means, follows, monitors, observes, surveils, threatens, or communicates to or about another person, or interferes with another person's property.

**Direct Support Organization.** Organization that is certified by the University of Central Florida Board of Trustees as operating in a manner consistent with the goals of the university and the best interest of the state of Florida.

**Employee.** Any individual employed by the University of Central Florida, including all full-time and part-time faculty, employees classified as Administrative and Professional (A&P), employees classified as University Support Personnel System (USPS), post-doctoral employees, resident assistants, graduate students with classroom responsibilities, professional research assistants, and OPS non-student employees.

**Force.** The use of physical violence and/or imposing on someone physically to gain sexual access. Force also includes threats, intimidation (implied threats) and/or coercion that

---

[2] The university recognizes that an individual may choose to self-identify as a victim or a survivor. For consistency in this policy, the university uses the term complainant to maintain the neutrality of the policy and procedures.

MYERS R-RFP1_0004

overcome resistance.

**Hostile Environment Harassment**: Discriminatory harassment that is so severe or pervasive that it unreasonably interferes with, limits, deprives, or alters the terms or conditions of education (e.g., admission, academic standing, grades, assignment); employment (e.g., hiring, advancement, assignment); or participation in a university program or activity (e.g., campus housing), when viewed from both a subjective and objective perspective.

In evaluating whether a hostile environment exists, the university will consider the totality of known circumstances, including, but not limited to:

- The frequency, nature and severity of the conduct;
- Whether the conduct was physically threatening;
- The effect of the conduct on the complainant's mental or emotional state;
- Whether the conduct was directed at more than one person;
- Whether the conduct arose in the context of other discriminatory conduct or other misconduct;
- Whether the conduct unreasonably interfered with the complainant's educational or work performance and/or university programs or activities; and
- Whether the conduct implicates concerns related to academic freedom or protected speech.

A hostile environment can be created by pervasive conduct or by a single or isolated incident, if sufficiently severe. The more severe the conduct, the less need there is to show a repetitive series of incidents to prove a hostile environment, particularly if the conduct is physical.  An isolated incident, unless sufficiently serious, does not amount to Hostile Environment Harassment.

**Incapacitation.**  A state where an individual cannot make rational, reasonable decisions because of mental or physical helplessness, sleep, unconsciousness, or lack of awareness that sexual activity is taking place. A person may be incapacitated due to the consumption of alcohol or other drugs, or due to a temporary or permanent physical or mental health condition. A person who is incapacitated lacks the capacity to give consent because they cannot understand the "who, what, when, where, why, or how" of their sexual interaction.

**Privileged Communication.**  A private statement that must be kept in confidence by the recipient for the benefit of the communicator.  Some examples of a privileged communication are statements made between an attorney and a client, a doctor and a patient, and a priest and a penitent.

**Prohibited Conduct.** For purposes of this policy, prohibited conduct refers to discrimination, as well as discriminatory harassment, sexual assault, sexual exploitation, relationship violence, stalking, sexual or gender-based harassment, complicity in the commission of any act prohibited by this policy, retaliation against a person for reporting,

in good faith, any of these forms of conduct or participating in or being a party to any investigation or proceeding under this policy.

**Quid Pro Quo Harassment**: Discriminatory harassment where submission to or rejection of unwelcome conduct is used, explicitly or implicitly, as the basis for decisions affecting an individual's education (e.g., admission, academic standing, grades, assignment); employment (e.g., hiring, advancement, assignment); or participation in a university program or activity (e.g., campus housing).

**Respondent.** Any individual or group who has been accused of violating this policy.

**Responsible Employee.** Any employee and DSO who is not a confidential employee. Responsible employees include (but are not necessarily limited to) faculty (full-time and part-time), staff (full-time and part-time), resident assistants, and graduate students with classroom responsibilities. Responsible employees also include all those employees identified as Campus Security Authorities (CSAs). The university reserves the right to designate other individuals involved in university-sponsored/related activities as responsible employees on a case-by-case basis.

**Student.** Any individual defined as a student in the University of Central Florida's Regulation UCF-5.007(4)(s) and *The Golden Rule Student Handbook*.

**Substantial Emotional Distress.** Significant mental suffering or anguish that may, but does not necessarily, require medical or other professional treatment or counseling.

**Third-Party.** Any contractor, vendor, visitor, applicant or other non-student or non-employee affiliated with the university.

## III. POLICY STATEMENT

The University of Central Florida is committed to maintaining a safe and non-discriminatory learning, living and working environment for all students, employees, registered student organizations, DSOs, and third-parties. Academic and professional excellence can exist only when each member of our community is assured an atmosphere of safety and mutual respect. All members of the university community are responsible for the maintenance of an environment in which people are free to learn and work without fear of discrimination, discriminatory harassment, or interpersonal violence. Discrimination diminishes individual dignity and impedes equal employment and educational opportunities.

The university does not unlawfully discriminate in any of its education or employment programs and activities on the basis of an individual's race, color, ethnicity, national origin, religion, or non-religion, age, genetic information, sex (including pregnancy and parental status), gender identity or expression, sexual orientation, marital status, physical or mental disability (including learning disabilities, intellectual disabilities, and past or present

history of mental illness), political affiliations, prior conviction of a crime, veteran's status (as protected under the Vietnam Era Veterans' Readjustment Assistant Act), or membership in any other protected classes as set forth in state or federal law. To that end, this Policy Against Discrimination, Harassment and Related Interpersonal Violence (the "Policy") prohibits specific forms of behavior that violate state and federal laws, including but not limited to Title VII of the Civil Rights Act of 1964 ("Title VII"), Title IX of the Education Amendments of 1972 ("Title IX"), the Violence Against Women Reauthorization Act of 2013 ("VAWA"), Florida's Civil Rights Act (Sections 760.10 and 110.1221) and related state and federal anti-discrimination laws. Such behavior may also require the university to fulfill certain reporting obligations under the Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act (the "Clery Act"), as amended by VAWA, and Florida state law regarding reporting suspected child abuse and neglect.

The university prohibits discrimination, as well as discriminatory harassment, sexual assault, sexual exploitation, relationship violence, stalking, sexual or gender-based harassment, complicity in the commission of any act prohibited by this Policy, retaliation against a person for reporting, in good faith, any of these forms of conduct or participating in or being a party to any investigation or proceeding under this Policy (collectively, "Prohibited Conduct"). Religious discrimination includes failing to reasonably accommodate an employee's or student's religious practices where the accommodation does not impose an undue hardship.  Disability discrimination includes not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability where the accommodations do not impose an undue hardship.  These forms of Prohibited Conduct are unlawful and undermine the mission and values of our academic community. In addition, inappropriate amorous relationships with employees in positions of authority can undermine the university's mission when those in positions of authority abuse or appear to abuse their authority.

The university adopts this Policy with a commitment to: (1) eliminating, preventing, and addressing the effects of Prohibited Conduct; (2) fostering a safe and respectful university community; (3) cultivating a climate where all individuals are well-informed and supported in reporting Prohibited Conduct; (4) providing a fair and impartial process for all parties in the investigation and resolution of such reports; and (5) identifying the standards by which violations of this Policy will be evaluated and disciplinary action may be imposed. In addition, the university conducts ongoing prevention, awareness, and training programs for employees and students to facilitate the goals of this Policy.

A student, employee, or registered student organization determined by the university to have committed an act of Prohibited Conduct is subject to disciplinary action, up to and including permanent separation from the university. Third-parties or DSOs who commit acts of Prohibited Conduct may have their relationships with the university terminated and/or their privileges of being on university premises withdrawn.

It is the responsibility of every member of the university community to foster an environment free of Prohibited Conduct. All members of the university community are encouraged to take reasonable and prudent actions to prevent or stop an act of Prohibited

Conduct. The university will support and assist community members who take such actions.  Also, many university employees must report Prohibited Conduct to the university (see Section IX below).

Retaliation against any individual who, in good faith, reports or participates in the reporting, investigation, or adjudication of and/or is a party to an investigation related to Prohibited Conduct is impermissible, unlawful and will not be tolerated by the university.

This Policy applies to all reports of Prohibited Conduct occurring on or after the effective date of this Policy. Where the date of the Prohibited Conduct precedes the effective date of this Policy, the definitions of misconduct in effect at the time of the alleged incident(s) will be applied. The procedures under this Policy, however, will be used to investigate and resolve all reports made on or after the effective date of this Policy, regardless of when the incident(s) occurred.

## IV.   PROHIBITED CONDUCT UNDER THIS POLICY[3]

Conduct under this Policy is prohibited regardless of the sex, sexual orientation and/or gender identity/expression of the complainant or respondent. Prohibited Conduct includes the following specifically defined forms of behavior: discrimination, discriminatory harassment, sexual or gender-based harassment, sexual assault, sexual exploitation, relationship violence, stalking, complicity, and retaliation.

### A.   DISCRIMINATION

Discrimination is any unlawful distinction, preference, or detriment to an individual that is based upon an individual's race, color, ethnicity, national origin, religion, non-religion, age, genetic information, sex (including pregnancy and parental status), gender identity or expression, sexual orientation, marital status, physical or mental disability (including learning disabilities, intellectual disabilities, and past or present history of mental illness), political affiliations, prior conviction of a crime, veteran's status (as protected under the Vietnam Era Veterans' Readjustment Assistant Act), or membership in other protected classes set forth in state or federal law and that: (1) excludes an individual from participation in; (2) denies the individual the benefits of; (3) treats the individual differently with regard to; or (4) otherwise adversely affects a term or condition of an individual's employment, education, living environment or participation in a university program or activity.

Discrimination includes failing to provide a reasonable accommodation, consistent with state and federal law, to persons with disabilities. The

---

[3] These definitions may overlap with Florida criminal statutes in some cases, and provide greater protection in other instances.

University of Central Florida is committed to achieving equal educational and employment opportunity and full participation for persons with disabilities. Also, discrimination includes failing to reasonably accommodate an employee's or student's religious practices where the accommodation does not impose an undue hardship. For more information regarding discrimination, please visit www.oie.ucf.edu.

B.    DISCRIMINATORY HARASSMENT

Discriminatory harassment consists of verbal, physical, electronic or other conduct based upon an individual's race, color, ethnicity, national origin, religion, non-religion, age, genetic information, sex (including pregnancy and parental status), gender identity or expression, sexual orientation, marital status, physical or mental disability (including learning disabilities, intellectual disabilities, and past or present history of mental illness), political affiliations, prior conviction of a crime, veteran's status (as protected under the Vietnam Era Veterans' Readjustment Assistant Act), or membership in other protected classes set forth in state or federal law that interferes with that individual's educational or employment opportunities, participation in a university program or activity, or receipt of legitimately-requested services meeting the description of either *Hostile Environment Harassment* or *Quid Pro Quo Harassment*, as defined above.

Discriminatory harassment may take many forms, including verbal acts, name-calling, graphic or written statements (including the use of cell phones or the Internet), or other conduct that may be humiliating or physically threatening.

C.    SEXUAL OR GENDER-BASED HARASSMENT

Sexual harassment is any unwelcome sexual advance, request for sexual favors, or other unwanted conduct of a sexual nature, whether verbal, non-verbal, graphic, physical, or otherwise, when the conditions for *Hostile Environment Harassment* or *Quid Pro Quo Harassment*, as defined above, are present.

Sexual harassment also may include inappropriate touching, acts of sexual violence, suggestive comments and public display of pornographic or suggestive calendars, posters, or signs where such images are not connected to any academic purpose. A single incident of sexual assault (as defined below) may be sufficiently severe to constitute a hostile environment.

Gender-based harassment includes harassment based on gender, sexual orientation, gender identity, or gender expression, which may include acts of aggression, intimidation, or hostility, whether verbal or non-verbal, graphic, physical, or otherwise, even if the acts do not involve conduct of a sexual

nature, when the conditions for *Hostile Environment Harassment* or *Quid Pro Quo Harassment*, as defined above, are present.

D.     SEXUAL ASSAULT

Sexual assault consists of sexual contact that occurs without consent.  Sexual contact includes but is not limited to the following behaviors:

1. touching, kissing, fondling (whether over or under clothing) of an individual for the purpose of sexual gratification; and/or
2. contact, however slight, between the mouth, anus, or sex organ of one individual with either the anus or sex organ of another individual; and/or
3. contact, however slight, between the anus or sex organ of one individual and any other object.

**The university offers the following guidance on consent and assessing incapacitation:**

A person who wants to engage in a specific sexual activity is responsible for obtaining consent for that activity. The lack of a negative response or protest does not constitute consent. Lack of resistance does not constitute consent. Silence and/or passivity also do not constitute consent. Relying solely on non-verbal communication before or during sexual activity can lead to a misunderstanding and may result in a violation of this Policy. It is important not to make assumptions about whether a potential partner is consenting. In order to avoid confusion or ambiguity, participants are encouraged to talk with one another before engaging in sexual activity. If confusion or ambiguity arises during sexual activity, participants are encouraged to stop and clarify a mutual willingness to continue that activity.

Consent to one form of sexual activity does not, by itself, constitute consent to another form of sexual activity. For example, one should not presume that consent to oral-genital contact constitutes consent to vaginal or anal penetration. Consent to sexual activity on a prior occasion does not, by itself, constitute consent to future sexual activity. In cases of prior relationships, the manner and nature of prior communications between the parties and the context of the relationship may have a bearing on the presence of consent.

Once consent has been given to a particular sexual activity, it may be withdrawn at any time. An individual who seeks to withdraw consent must communicate, through clear words or actions, a decision to cease the sexual activity. Once consent is withdrawn, the sexual activity must cease immediately.

In evaluating consent in cases of alleged incapacitation, the university asks two questions: (1) Did the person initiating sexual activity know that the other party was incapacitated? and if not, (2) Should a sober, reasonable person in the same situation have known that the other party was incapacitated? If the answer to either of these questions is "YES," consent

was absent and the conduct is likely a violation of this Policy.

A person may or may not be incapacitated as a result of drinking or using drugs. Alcohol-related or recreational drug-related incapacity results from a level of alcohol/drug ingestion that is more severe than minor impairment, being under the influence, drunkenness, or intoxication. A person could be incapacitated due to other reasons which may include: sleep, prescribed or over the counter medication, mental, or physical disability. The impact of alcohol and drugs varies from person to person.

A person seeking to initiate sexual activity is not expected to be a medical expert in assessing incapacitation. The potential initiator must look for the common and obvious warning signs that show that a person may be incapacitated or approaching incapacitation. Although every individual may manifest signs of incapacitation differently, evidence of incapacity may be detected from context clues, such as:

- Slurred or incomprehensible speech;
- Bloodshot eyes;
- The smell of alcohol on their breath;
- Shaky equilibrium or unsteady gait;
- Vomiting;
- Incontinence;
- Combativeness or emotional volatility;
- Unusual behavior; and/or
- Unconsciousness.

Context clues are important in helping to determine incapacitation. These signs alone do not necessarily indicate incapacitation. A person who is incapacitated may not be able to understand some or all of the following questions:

- *"Do you know where you are?"*
- *"Do you know how you got here?"*
- *"Do you know what is happening?"*
- *"Do you know who is here with you?"*

One should be cautious before engaging in sexual contact when either party has been drinking alcohol or using other drugs. The introduction of alcohol or other drugs may create ambiguity for either party as to whether consent has been sought or given. If one has doubt about either party's level of intoxication, the safe thing to do is to abstain from all sexual activity.

**Being impaired by alcohol or other drugs is no defense to any violation of this Policy.**

    E.    <u>SEXUAL EXPLOITATION</u>

    Sexual exploitation is purposely or knowingly doing or attempting to do any of the following:

- Recording or photographing private sexual activity and/or a person's

intimate parts (including genitalia, groin, breasts or buttocks) without consent;
- Disseminating or posting images of private sexual activity and/or a person's intimate parts (including genitalia, groin, breasts, or buttocks) without consent;
- Allowing third-parties to observe private sexual activity from a hidden location (e.g., closet) or through electronic means (e.g., Skype or livestreaming of images);
- Subjecting another person to human trafficking; or
- Exposing another person to a sexually transmitted infection or virus without the other's knowledge.

## F.    RELATIONSHIP VIOLENCE

Relationship violence includes any act of violence or threatened act of violence that occurs between individuals who are involved or have been involved in a sexual, dating, spousal, domestic, or other intimate relationship.[4] Relationship violence may include any form of Prohibited Conduct under this Policy, including sexual assault, stalking, and physical assault. Relationship violence may involve a pattern of behavior used to establish power and control over another person through fear and intimidation or may involve one-time conduct. A pattern of behavior is typically determined based on the repeated use of words and/or actions and inactions in order to demean, intimidate, and/or control another person. This behavior can be verbal, emotional, and/or physical and may be directed towards the former partner, their property, or other individuals. Examples of relationship violence may include, but are not limited to:
- Slapping;
- Pulling hair;
- Punching;
- Damaging another person's property;
- Driving recklessly to scare someone;
- Name calling;
- Humiliating another person in public;
- Harassment directed toward a current or former partner or spouse; and/or
- Threats of abuse such as threatening to hit, harm, or use a weapon on another (whether complainant or acquaintance, friend, or family member of the complainant), or other forms of verbal threats.

Harmful behavior that includes, but is not limited to, the true threat of or

---

[4] Relationship violence includes "dating violence" and "domestic violence," as defined by VAWA. Consistent with VAWA, the university will evaluate the existence of an intimate relationship based upon the complainant's statement and taking into consideration the length of the relationship, the type of relationship, and the frequency of interaction between the persons involved in the relationship.

actual physical assault or abuse and also includes harassment, is prohibited pursuant to *The Golden Rule*. Harmful behavior will be addressed under this Policy if it involves discriminatory harassment, sexual or gender-based harassment, relationship violence, or is part of a course of conduct under the stalking definition.

G.    STALKING

Stalking occurs when a person engages in a course of conduct directed at a specific person under circumstances that would cause a reasonable person to fear for the person's safety or the safety of others, or to experience substantial emotional distress.  Stalking includes "cyber-stalking," a particular form of stalking in which a person uses electronic media, such as the internet, social networks, blogs, phones, texts, or other similar devices or forms of contact.

Stalking may include, but is not limited to:
- Non-consensual communications (face-to-face, telephone, email);
- Threatening or obscene gestures;
- Surveillance/following/pursuit;
- Showing up outside the targeted individual's classroom or workplace;
- Sending gifts and/or notes (romantic, bizarre, sinister, or perverted); and/or
- Making threats.

H.    RETALIATION

Retaliation means any adverse action taken against a person for making a good faith report of Prohibited Conduct or participating in or being a party to any proceeding under this Policy.  Retaliation includes threatening, intimidating, harassing, coercing and any other conduct that would discourage a reasonable person from engaging in activity protected under this Policy. Retaliation may be present even where there is a finding of "no responsibility" on the allegations of Prohibited Conduct.  Also, an individual may be found to have engaged in retaliation when they were not a party to the initial report of discrimination. Retaliation does not include good faith actions lawfully pursued in response to a report of Prohibited Conduct.

Retaliation can include, but is not limited to, actions taken by the university, actions taken by one student against another student, actions taken by an employee against another employee or student, or actions taken by a third-party against a student or employee.  See the university's *Reporting Misconduct and Protection from Retaliation Policy*.

I.    COMPLICITY

> Complicity is any act taken with the purpose of aiding, facilitating, promoting or encouraging the commission of an act of Prohibited Conduct by another person.

## V.   UNDERSTANDING THE DIFFERENCE BETWEEN PRIVACY AND CONFIDENTIALITY

The university is committed to protecting the privacy of all individuals involved in the investigation and resolution of a report under this Policy. The university also is committed to providing assistance to help students, employees, DSOs, and third-parties make informed choices. With respect to any report under this Policy, the university will take reasonable efforts to protect the privacy of participants, in accordance with applicable state and federal law, while balancing the need to gather information to assess the report and to take steps to eliminate Prohibited Conduct, prevent its recurrence, and remedy its effects. Privacy and confidentiality have distinct meanings under this Policy.

> **Privacy**: Privacy means that information related to a report of Prohibited Conduct will be shared with a limited number of university employees who "need to know" in order to assist in support of the complainant and in the assessment, investigation, and resolution of the report. All employees who are involved in the university's response to reports of Prohibited Conduct receive specific training and guidance about sharing and safeguarding private information in accordance with state and federal law.

> The privacy of student education records will be protected in accordance with the Family Educational Rights and Privacy Act ("FERPA"), as outlined at http://registrar.ucf.edu/ferpa. The privacy of an individual's medical and related records generally is protected by the Health Insurance Portability and Accountability Act ("HIPAA") and/or state laws governing protection of medical records.  Access to an employee's personnel records may be restricted in accordance with Florida law and applicable collective bargaining agreements.

> **Confidentiality**: Confidentiality exists in the context of laws that protect certain relationships, including with medical and clinical care providers (and those who provide administrative services related to the provision of medical and clinical care), mental health providers, counselors, victim advocates, and ordained clergy, all of whom may engage in confidential communications under Florida law.[5] The university has designated individuals who have the ability to have privileged

---

[5] Under Florida law, these confidential employees must report to authorities if an individual discloses she/he is a minor (under 18), a judge subpoenas the university to release information to the court, an individual expresses homicidal or suicidal intent, or the confidential employee receives knowledge that a minor (under 18), elder, or person with an intellectual disability is at risk for abuse.

communications as "confidential employees." When information is shared by an individual with a confidential employee or a community professional with the same legal protections, the confidential employee (and/or such community professional) cannot reveal any information that could identify the individual to any third-party except where required or permitted by law. For example, information may be disclosed when: (i) the individual gives written consent for its disclosure; (ii) there is a concern that the individual will likely cause serious physical harm to self or others; or (iii) the information concerns conduct involving suspected abuse or neglect of a minor under the age of 18.

## VI.   EMPLOYEE REPORTING RESPONSIBILITIES

### A.   TITLE IX REPORTING OBLIGATIONS

An employee's responsibility to report under this Policy is governed by her/his role at the university. Confidential employees are not required to report Prohibited Conduct to the university when the disclosure is made while serving in the role that entitles them under state law to have privileged communications. Responsible employees are required to immediately report to the University's Office of Institutional Equity all relevant details (obtained directly or indirectly) about an incident of sex/gender-based discrimination or harassment, sexual harassment, sexual assault, sexual exploitation, relationship violence, and/or stalking (as defined herein) that involves any student as a complainant, respondent, and/or witness, including dates, times, locations, and names of parties and witnesses.[6]  Reporting is required when the responsible employee knows (by reason of a direct or indirect disclosure) or should have known of such sex/gender-based discrimination or harassment, sexual harassment, sexual assault, sexual exploitation, relationship violence, and/or stalking. Responsible employees include (but are not necessarily limited to) faculty (full-time and part-time), staff (full-time and part-time), resident assistants, graduate students with classroom responsibilities, Campus Security Authorities, and DSOs. This manner of reporting may help inform the university of the general extent and nature of Prohibited Conduct on and off campus so the university can track patterns, evaluate the scope of the problem, and formulate appropriate campus-wide responses.  If a responsible employee is uncertain if specific conduct constitutes conduct that must be reported, the responsible employee should contact the Office of Institutional Equity for assistance with making this determination.

Responsible employees are not required to report information disclosed (1) at public awareness events (e.g., "Light Up the Night," Clothesline Project,

---

[6] Although this Policy is directed primarily to disclosures by students, as explained herein certain supervisory employees are obligated to report disclosures about all types of Prohibited Conduct involving a university employee.

candlelight vigils, protests, "survivor speak-outs" or other public forums in which students may disclose incidents of Prohibited Conduct; collectively, "Public Awareness Events"); (2) during a student's participation as a subject in an Institutional Review Board-approved human subjects research protocol ("IRB Research"); or (3) as part of coursework submitted to an instructor in connection with a course assignment. Even in the absence of such obligation, all employees are encouraged to contact the Title IX coordinator if they become aware of information that suggests a safety risk to the university community or any member thereof. The university may provide information about students' Title IX and/or other civil rights and about available university and community resources and support at Public Awareness Events.  Also, Institutional Review Boards may, in appropriate cases, require researchers to provide such information to all student subjects of IRB Research.

B.    DEAN, DIRECTOR, DEPARTMENT HEAD, AND SUPERVISOR REPORTING OBLIGATIONS

Under this Policy, deans, directors, department heads, and supervisors are required to report to the Office of Institutional Equity all relevant details about an incident of Prohibited Conduct where either the complainant or the respondent is an employee or DSO. Reporting is required when such deans, directors, department heads and supervisors know (by reason of direct or indirect disclosure) or should have known of such Prohibited Conduct.  If a dean, director, department head or supervisor is uncertain if specific conduct constitutes conduct that must be reported, the Office of Institutional Equity should nevertheless be contacted for assistance with making this determination.

All university employees are strongly encouraged to report to law enforcement any conduct that could potentially present a danger to the community or may be a crime under Florida law.

C.    CLERY REPORTING OBLIGATIONS

Under the Clery Act, certain university employees are designated as Campus Security Authorities (CSAs). The function of a CSA is to report to the UCF Police Department those allegations of Clery Act crimes that they receive and believe were made in good faith.  This includes crimes where the victim chooses to remain anonymous.  Based on information reported to CSAs, the university includes statistics about certain criminal offenses in its annual security report and provides those statistics to the United States Department of Education in a manner that does not include any personally identifying information about individuals involved in an incident. The Clery Act also requires the university to issue timely warnings to the university community about certain reported crimes that may pose a serious or continuing threat to

students and employees. Consistent with the Clery Act, the university withholds the names and other personally identifying information of complainants when issuing timely warnings to the university community. Pastoral counselors and professional counselors are exempt from reporting when a crime is reported and they are functioning within the scope of that recognition or licensure.

D.    CHILD ABUSE REPORTING OBLIGATIONS

All university employees and DSOs are mandated reporters of child abuse, neglect or abandonment as defined by Chapter 39 of the Florida Statutes and must comply with Florida's mandated reporting laws. *See* Florida Statutes Sections 39.201 to 39.205. These laws require any person who knows, or has reasonable cause to suspect, that a child is abused, abandoned, or neglected to report such knowledge or suspicion to the Department of Children and Families (DCF), regardless of where it occurs. For purposes of this section, the age of the person at the time of the incident of child abuse, neglect, or abandonment (not the time when the employee is made aware or has reasonable cause to suspect the abuse) triggers the reporting duty. In addition, Florida Statutes and Board of Governors Regulation require the UCF Police Department and certain administrators (president, provost, senior/executive vice presidents, vice presidents, associate vice presidents, associate/vice provosts, deans, chief of police, equal opportunity programs director, intercollegiate athletics director, internal audit director, Title IX coordinator, and university compliance officer) upon receiving information from faculty, staff, or other institutional employees of known or suspected child abuse, abandonment, or neglect committed on university property, or during a university-sponsored event or function to report such knowledge or suspicion to the DCF. The law further prohibits UCF administrators from knowingly and willfully preventing another person from reporting such activity. Report to the DCF by:
- Fax: 1-800-914-0004 (Form available at http://www.dcf.state.fl.us/programs/abuse/docs/faxreport.pdf)
- Web: https://reportabuse.dcf.state.fl.us/
- Florida Abuse Hotline: 1-800-96ABUSE (1-800-962-2873) (Or TDD: 1-800-453-5145)

If a child is in imminent danger, dial 911 first and then report to DCF.

## VII.    COMPLAINANT OPTIONS FOR REPORTING PROHIBITED CONDUCT

There are two channels for reporting Prohibited Conduct – to the university and/or to law enforcement. A complainant may choose to report through either channel or to both as these reporting options are not mutually exclusive. Therefore, complainants may choose to

pursue both the university process and the criminal process concurrently. The university will support complainants in understanding, assessing, and pursuing these options.

The first priority for any individual should be personal safety and well-being. In addition to seeking immediate medical care, the university encourages all individuals to seek immediate assistance from 911, UCF Police, and/or local law enforcement. This is the best option to ensure preservation of evidence. The university also strongly urges that law enforcement be notified immediately in situations that may present imminent or ongoing danger.

A.    REPORTING TO LAW ENFORCEMENT

Conduct that violates this Policy may also constitute a crime under the laws of the jurisdiction in which the incident occurred. For example, the State of Florida criminalizes and punishes some forms of sexual assault, relationship violence, sexual exploitation, stalking, and physical assault. *See* Chapters 741, 784, and 794 of the Florida statutes. Whether or not any specific incident of Prohibited Conduct may constitute a crime is a decision made solely by law enforcement. Similarly, the decision to arrest any individual for engaging in any incident of Prohibited Conduct is determined solely by the law enforcement agency responsible for investigating the incident. Such decisions are based on a number of factors, including availability of admissible evidence.

Complainants have the right to notify or decline to notify law enforcement. In keeping with its commitment to take all appropriate steps to eliminate, prevent, and remedy all Prohibited Conduct, the university urges complainants (or others who become aware of potential criminal conduct) to report Prohibited Conduct immediately to local law enforcement by contacting:

i.      911 (for emergencies)
ii.     University Police (for non-emergencies): (407) 823-5555
        24/7 Emergency Abroad Hotline:  (407) 823-0595
iii.    State Police (for conduct occurring off campus) (850) 410-7000
iv.     Orange County Sheriff's Office:  (407) 254-7000
v.      Seminole County Sheriff's Office:  (407) 665-6600
vi.     City of Orlando Police Department:  (407) 246-2470
vii.    Brevard County Sheriff's Office:  (321) 264-5201
viii.   Osceola County Sheriff's Office:  (407) 348-1100
ix.     Volusia County Sheriff's Office:  (386) 943-7866
x.      Lake County Sheriff's Office:  (352) 343-2101
xi.     Marion County Sheriff's Office:  (352) 402-6000

Police have unique legal authority, including the power to seek and execute

MYERS R-RFP1_0018

search warrants, collect forensic evidence, make arrests, and assist in seeking an injunction. Although a police report may be made at any time, complainants should be aware that delayed reporting may diminish law enforcement's ability to take certain actions, including collecting forensic evidence and making arrests. The university will assist complainants in notifying law enforcement if they choose to do so. Under limited circumstances posing a threat to the health or safety of any university community member, the university may independently notify law enforcement.

B.    REPORTING TO THE UNIVERSITY

Complainants (or others who become aware of an incident of Prohibited Conduct) are encouraged to report the incident to the university by contacting the Office of Institutional Equity by telephone, email, or in person during regular office hours (8am-5pm, M-F):

Office of Institutional Equity
12692 Gemini Boulevard S., Suite 123
Orlando, FL 32816-0030
(407) 823-1336
oie@ucf.edu; http://eeo.ucf.edu/; https://shield.ucf.edu

There is no time limit for a complainant to report Prohibited Conduct to the university under this Policy;[7] however, the university's ability to respond may diminish over time, as evidence may erode, memories may fade, and respondents may no longer be affiliated with the university. If the respondent is no longer a student, employee, or DSO, the university will provide reasonably appropriate remedial measures, assist the complainant in identifying external reporting options, and take reasonable steps to eliminate Prohibited Conduct, prevent its recurrence, and remedy its effects.

To encourage reporting, any individual (including a bystander or third-party) who makes a good faith report of Prohibited Conduct will not be subject to disciplinary action by the university for the reporter's own personal use of alcohol or drugs at or near the time of the incident provided any such violations did not harm or place the health or safety of any other person at risk.  The university may offer support, resources, and educational counseling to such an individual.

---

[7] This statement does not relieve responsible employees of their obligation to report sex/gender-based discrimination or harassment, sexual harassment sexual assault, relationship violence, sexual exploitation and/or stalking involving a student immediately to the Office of Institutional Equity.

**VIII.    ACCESSING CAMPUS AND COMMUNITY RESOURCES**

The university offers a wide range of resources for all students and employees to provide support and guidance in response to any incident of Prohibited Conduct. Comprehensive information on accessing university and community resources is contained online at the following sites:

- UCF Shield: https://shield.ucf.edu/
- Discrimination and discriminatory harassment where the respondent is an employee, DSO, or third-party: http://eeo.ucf.edu/
- Related student code violations where the respondent is a student: http://eeo.ucf.edu/ or http://osrr.sdes.ucf.edu/
- Office of Student Rights and Responsibilities: http://osrr.sdes.ucf.edu
- Office of Student Conduct: http://osc.sdes.ucf.edu
- Victim Services: http://victimservices.ucf.edu
- Student Care Services: http://scs.sdes.ucf.edu

Available resources include: emergency and ongoing assistance; health, mental health, and victim-advocacy services; options for reporting Prohibited Conduct to the university and/or law enforcement; and available support with academics, housing, and employment.

A.    REMEDIAL AND PROTECTIVE MEASURES

The university offers a wide range of resources for students, employees, and DSOs whether as complainants, witnesses, or respondents, to provide support and guidance throughout the initiation, investigation, and resolution of a report of Prohibited Conduct. The university will offer reasonable and appropriate measures to protect a complainant and facilitate the complainant's continued access to university employment or education programs and activities. These measures may be both remedial (designed to address a complainant's safety and well-being and continued access to educational opportunities) or protective (designed to reduce the risk of harm to an individual or community). Remedial and protective measures, which may be temporary or permanent, may include no-contact directives, residence modifications, academic modifications and support, work schedule modifications, suspension from employment, and pre-disciplinary leave from employment (with or without pay). Remedial and protective measures are available regardless of whether a complainant pursues a complaint or investigation under this Policy.  Also, remedial measures may be taken before the university's determination of whether the Prohibited Conduct occurred, as well as when the respondent is not affiliated with the university.

The university will maintain the privacy of any remedial and protective measures provided under this Policy to the extent practicable and will promptly address any violation of the remedial and protective measures. The

university has the discretion to impose and/or modify any remedial or
protective measure based on all available information, and is available to
meet with a complainant or respondent to address any concerns about the
provision of remedial or protective measures.

The university will provide reasonable remedial and protective measures to
third-parties as appropriate and available, taking into account the role of the
third-party and the nature of any contractual relationship with the
university.

B.    INTERIM ACTIONS

In addition to remedial and protective measures, an interim action may be
imposed on a student or student organization in accordance with *The Golden
Rule* prior to the resolution of an investigation. Also, an employee may be
placed on paid or unpaid administrative leave prior to the resolution of an
investigation.  Such actions may be taken when, in the professional judgment
of a university official, a threat of imminent harm to persons or property
exists. Interim administrative action is not a sanction. It is taken in an effort
to protect the safety and well-being of the complainant and/or respondent, of
others, of the university, or of property. Interim administrative action is
preliminary in nature; it is in effect only until there is a resolution of the
student or employee conduct matter.

With regard to a student, university officials designated to impose an interim
action through *The Golden Rule* include, but are not limited to, the vice
president of Student Development and Enrollment Services (SDES) or
designee, and the director of the Office of Student Conduct or designee, upon
notifying the vice president of SDES.  With regard to an employee, the
provost or designee and/or Human Resources will impose an interim action.

## IX.    INAPPROPRIATE AMOROUS RELATIONSHIPS

For the purposes of this Policy, "amorous relationships" are defined as intimate, sexual,
and/or any other type of amorous encounter or relationship, whether casual or serious,
short-term or long- term.

A.    STUDENT CONTEXT

All faculty and staff must be aware that amorous relationships with students are likely to
lead to difficulties and have the potential to place faculty and staff at great personal and
professional risk. The power difference inherent in the faculty-student or staff-student
relationship means that any amorous relationship between a faculty or staff member and a
student is potentially exploitative or could at any time be perceived as exploitative and
should be avoided. Faculty and staff engaged in such relationships should be sensitive to

the continuous possibility that they may unexpectedly be placed in a position of
responsibility for the student's instruction or evaluation. In the event of a charge of Sexual
Harassment arising from such circumstances, the university will in general be
unsympathetic to a defense based upon consent when the facts establish that a faculty-
student or staff-student power differential existed within the relationship.

     1.     Undergraduate Students

Subject to the limited exceptions herein, all employees and DSOs are prohibited from
pursuing or engaging in an amorous relationship with any undergraduate student.

     2.     Graduate Students

With respect to graduate students (defined as any student enrolled at the university for
post-baccalaureate education in any discipline or professional program), all employees and
DSOs are prohibited from pursuing or engaging in an amorous relationship with a graduate
student under that individual's authority. Situations of authority include, but are not
limited to: teaching; formal mentoring or advising; supervision of research; employment of
a student as a research or teaching assistant; exercising substantial responsibility for
grades, honors, or degrees; and involvement in disciplinary action related to the student.

Students and employees/DSOs alike should be aware that pursuing or engaging in an
amorous relationship with any graduate student will limit the employees' or DSO's ability
to teach, mentor, advise, direct work, employ, and promote the career of the student
involved.

     3.     Graduate Students in Positions of Authority

Like faculty and staff members, graduate students may themselves be in a position of
authority over other students; for example, when serving as a teaching assistant in a course
or when serving as a research assistant and supervising other students in research. The
power difference inherent in such relationships means that any amorous relationship
between a graduate student and another student over whom they have authority is
potentially exploitative and should be avoided. All graduate students currently or
previously engaged in an amorous relationship with another student are prohibited from
serving in a position of authority over that student. Graduate students also should be
sensitive to the continuous possibility that they may unexpectedly be placed in a position of
responsibility for another student's instruction or evaluation.

     4.     Pre-existing Relationships with Any Student

The university recognizes that an amorous relationship with an employee or DSO may exist
prior to the time that an undergraduate student enrolls at the university or may have
existed and terminated prior to the undergraduate student's enrollment.  Similarly, the
university recognizes that with graduate students, an amorous relationship with an
employee or DSO may exist (or have previously existed and terminated) prior to the time

the employee or DSO is placed in a position of authority over the graduate student. A "position of authority" includes teaching; formal mentoring or advising; supervising research; exercising responsibility for grades, honors, or degrees; considering disciplinary action involving the student; or employing the student in any capacity - including but not limited to student employment and internships, work study, or as a research or teaching assistant. Where there is a pre-existing amorous relationship that relationship must be disclosed to the Office of Institutional Equity, which may alert other offices as appropriate (i.e., Human Resources or the Office of the Provost). This disclosure must be made by the employee in a position of authority immediately if the student is an undergraduate, and prior to accepting a supervisory role of any type over any graduate student.

Unless effective steps have been taken in conjunction with Human Resources and/or the applicable dean or vice president to eliminate any potential conflict of interest in accordance with this Policy, all employees and DSOs currently or previously engaged in an amorous relationship with a student are prohibited from being in a position of authority over that student.

Similarly, all graduate students currently or previously engaged in an amorous relationship with another student are prohibited from serving in a position of authority over that student.

Following disclosure of an existing amorous relationship to the university, if the amorous relationship ends, the employee in a position of authority must immediately advise the Office of Institutional Equity and relevant dean or vice president.

     5.     If an Amorous Relationship Occurs with Any Student

If, despite these warnings, an employee, DSO, or graduate student becomes involved in an amorous relationship with a student in violation of this Policy, the employee, DSO, or graduate student must disclose the relationship immediately to the Office of Institutional Equity, which may alert other offices as appropriate (i.e., Human Resources or the Office of the Provost). Absent an extraordinary circumstance, no relationships in violation of this Policy will be permitted while the student is enrolled or the faculty or staff member is employed by the university. In most cases, it will be unlikely that an acceptable resolution to the conflict of interest will be possible, and the employees' or DSO's employment standing or the graduate student's position of authority may need to be adjusted until she or he no longer has supervisory or other authority over the student.

In addition to the amorous relationship itself, an employee, DSO, or graduate student's failure to report the existence of an amorous relationship that is prohibited by this Policy is also a violation of this Policy and may be cause for separation from the university. The university encourages immediate self-reporting, and will consider this factor in the context of any resolution that may be able to be reached.

Following disclosure of an existing amorous relationship to the university, if the amorous relationship ends, the employee in a position of authority must immediately advise the

Office of Institutional Equity and relevant dean or vice president.

## B.    EMPLOYMENT CONTEXT

Amorous relationships between supervisors and their subordinate employees often adversely affect decisions, distort judgment, and undermine workplace morale for all employees, including those not directly engaged in the relationship. Any university employee who participates in supervisory or administrative decisions concerning an employee with whom she or he has or has had an amorous relationship has a conflict of interest in those situations. These types of relationships, specifically those involving spouses and/or individuals who reside together, also may violate the State Code of Ethics for Public Officials as well as the University's *Policy on Employment of Relatives*.

Accordingly, the university prohibits all employees and DSOs from pursuing or engaging in amorous relationships with employees whom they supervise. No supervisor shall initiate or participate in institutional decisions involving a direct benefit or penalty (employment, retention, promotion, tenure, salary, leave of absence, etc.) to a person with whom that individual has or has had an amorous relationship. The individual in a position of authority can be held accountable for creating a sexually hostile environment or failing to address a sexually hostile environment and thus should avoid creating or failing to address a situation that adversely impacts the working environment of others.

1.    Pre-existing Amorous Relationships Between Supervisors and Subordinate Employees

The university recognizes that an amorous relationship may exist prior to the time an individual is assigned to a supervisor. Supervisory, decision-making, oversight, evaluative or advisory relationships for someone with whom there exists or previously has existed an amorous relationship is unacceptable unless effective steps have been taken to eliminate any potential conflict of interest in accordance with this Policy. The current or prior existence of such a relationship must be disclosed by the employee in a position of authority prior to accepting supervision of the subordinate employee to the Office of Institutional Equity (OIE), which may alert other offices as appropriate (i.e., Human Resources or the Office of the Provost).

Once OIE, Human Resources or Office of the Provost has determined that the disclosed relationship constitutes a conflict of interest, in consultation with the appropriate university administrators, the relevant dean or vice president will determine, at her or his sole discretion, whether and how the conflict of interest can be eliminated through termination of the situation of authority.

Following disclosure of an existing amorous relationship to the university, if the amorous relationship ends, the employee in a position of authority must immediately advise the Office of Institutional Equity and relevant dean or vice president.