Kristie Hatcher-Bolin | Kristie.Hatcher-Bolin@gray-robinson.com | **D** 863.284.2256
One Lake Morton Drive, Lakeland, Florida 33801 | **T** 863.284.2200 | **F** 863.688.0310

September 14, 2026

**VIA CM/ECF**

David. J. Smith
Clerk of Court
United States Court of Appeals for the Eleventh Circuit
56 Forsyth Street, NW
Atlanta, Georgia 30303

Re: *Supplemental Authority*
Appeal Case No.: 25-11929
Alexander Cartwright, et al. v. Charles Negy
District Court Docket Number: 6:23-cv-00666-CEM-DCI

Mr. Smith:

Appellants, Alexander Cartwright, Tosha Dupras, Michael Johnson, and Nancy Myers, pursuant to FRAP 28(j) and 11th Cir. R. 28-1, I.O.P. 6, submit as supplemental authority the attached decisions, *Zorn v. Linton*, 607 U.S. 568 (2026), which addresses the application of qualified immunity, and *Pernell v. Fla. Bd. of Governors of State Univ.*, 181 F.4th 1135, 1159 (11th Cir. 2026), which addresses, among other things, a professor's First Amendment interests in classroom speech.

In *Zorn*, the Supreme Court addressed whether a defendant official should have known his actions violated the plaintiff's Fourth Amendment rights. Because the Second Circuit did not identify "a case where an officer taking similar actions in similar circumstances 'was held to have violated' the Constitution," the Court concluded the officer was entitled to qualified immunity. *Id.* at 572, 574.

In *Pernell*, this Court addressed, among other things, the case-specific inquiry concerning the balance between a university's authority to control curriculum or classroom conduct and a professor's interests in free speech and academic freedom, under *Bishop v. Aronov*, 926 F.2d 1066 (11th Cir. 1991).

*Zorn* is pertinent to Appellants' contention that the District Court defined "clearly established law" at a high level of generality and did not consider the law in the light of the specific circumstances of this case. (Initial Brief pp. 22-33; Reply Brief pp. 7-9, 24-27). *Pernell* is relevant to Appellants' contention that it was not

clearly established that Appellee's interests in free speech and academic freedom precluded Appellants from investigating and taking disciplinary action based on complaints about in-class conduct that violated UCF policies. (Initial Brief pp. 25-32, 44, 48-49; Reply Brief pp. 7-9, 24-27).

Respectfully submitted,

*/s/ Kristie Hatcher-Bolin*

Kristie Hatcher-Bolin

KHB/la
Enclosures
cc: David R. Osborne, Esq.
Joshua Engel, Esq.
Samantha Harris, Esq.
Richard L. Barry, Esq.
Katherine Katz, Esq.

146 S.Ct. 926
Supreme Court of the United States.

Jacob P. ZORN
v.
Shela M. LINTON

No. 25–297.
|
Decided March 23, 2026

**Synopsis**
**Background:** Arrestee brought § 1983 action asserting Fourth Amendment excessive force claim against police officer, for arrest for not leaving as participant in sit-in protest at Statehouse before Statehouse was scheduled to close. The United States District Court for the District of Vermont, Geoffrey W. Crawford, J., 2022 WL 17080324, granted summary judgment to officer based on qualified immunity. Arrestee appealed. The United States Court of Appeals for the Second Circuit, Sack, Circuit Judge, 135 F.4th 19, vacated and remanded. Officer petitioned for writ of certiorari.

**Holdings:** Upon granting certiorari, the Supreme Court held that:

assuming that controlling Circuit precedent could clearly establish the law for qualified-immunity purposes, precedent involving arrests of protesters did not clearly establish that officer violated Fourth Amendment by using routine rear wristlock, after repeated warnings, to bring arrestee to her feet;

precedent's statement that officers who had engaged in wide range of aggressive conduct might have used excessive force did not put the officer on notice that his specific conduct violated Fourth Amendment; and

putative principle, that gratuitous use of pain compliance technique on a protester who was passively resisting arrest violated Fourth Amendment, lacked specificity.

Certiorari granted; judgment of Court of Appeals reversed.

Justice Sotomayor filed a dissenting opinion, in which Justices Kagan and Jackson joined.

**Procedural Posture(s):** Petition for Writ of Certiorari; On Appeal; Motion for Summary Judgment.

**Opinion**

PER CURIAM.

***569** ****928** On the Governor's inauguration day in Vermont, protesters staged a sit-in at the state capitol. When the capitol closed for the day, police officers told them that they would be arrested for trespassing. They refused to leave. As officers removed the protesters one by one, Sergeant Jacob Zorn asked Shela Linton to stand up and ****929** warned her that he would eventually have to use force to remove her. She refused to stand. Zorn took Linton's arm, put it behind her back, placed pressure on her wrist, and lifted her to her feet. ***570** Linton sued Zorn for using excessive force, claiming that the arrest left her with arm injuries and psychological disorders. The Second Circuit held that Zorn was not entitled to qualified immunity. We reverse.

I

On January 8, 2015, Vermont hosted the inauguration for Governor Peter Shumlin in the capitol.[1] About 200 protesters attended, and some of them staged a sit-in to demand universal healthcare. Shela Linton joined them. She planned to refuse to leave and anticipated being forcibly removed. "That's the point of the sit-in part of the protest," she later explained. Deposition of S. Linton in No. 5:18–cv–5 (D Vt., June 3, 2022), ECF Doc. 74–4, p. 127.

When the capitol closed to the public for the night, 29 protesters remained in the legislative chamber, sitting on the floor with their arms linked. At that point, police officers explained that they would arrest the protesters for trespass if they did not leave. The officers dealt with them one at a time; some stood up and were escorted out of the chamber without force, but others refused to stand and had to be lifted to their feet or dragged out.

After removing more than a dozen protesters, the officers turned to Linton. Sergeant Jacob Zorn crouched down to speak with her, but she remained seated with her arms interlocked with those of her fellow protesters. As Linton passively resisted, Zorn unlinked her arm from another protester's, put it behind her back in a rear wristlock, and twisted her arm.[2] Linton exclaimed " ' ow, ow, ow,' " while Zorn repeatedly ***571** implored her to " 'please stand up.' " App. to Pet. for Cert. 47–48. After Linton responded, " 'I will not stand up,' " Zorn told her that he would ask " 'one more time' " and then would use more pain compliance. *Id.,* at 48. Linton refused, so Zorn placed pressure on her wrist and lifted her up by her underarm. Linton yelled as she stood up. Once on her feet, Linton continued to jerk her arms and fell back to the floor. Zorn asked her to stand up again, and when she did not, three officers picked her up by her arms and legs and carried her outside. Linton alleged resulting physical and psychological injuries including post-traumatic stress disorder.

Linton sued Zorn under Rev. Stat. § 1979, 42 U.S.C. § 1983, claiming that Zorn violated her Fourth Amendment right against excessive use of force. The District Court granted summary judgment for Zorn after concluding that he was entitled to qualified immunity. The District Court reasoned that it was not clearly established at the time of the encounter that, in these circumstances, lifting Linton while putting pressure on her wrist violated the Fourth Amendment.

The Second Circuit reversed. It held that its decision in ****930** *Amnesty America v. West Hartford,* 361 F.3d 113 (2004), clearly established that the "gratuitous" use of a rear wristlock on a protester passively resisting arrest constitutes excessive force. 135 F.4th 19, 35 (2025). It remanded for a jury trial against Zorn. Judge Cabranes dissented. "The case before us is not an exceptional case," Judge Cabranes reasoned, but "a routine arrest and removal." *Id.,* at 41.

II

Government officials enjoy qualified immunity from suit under § 1983 unless their conduct violates clearly established law. *Rivas-Villegas v. Cortesluna,* 595 U.S. 1, 5, 142 S.Ct. 4, 211 L.Ed.2d 164 (2021) (*per* ***572** *curiam*). "A right is clearly established when it is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.' " *Ibid.* A right is not clearly established if existing precedent does not place the constitutional question " 'beyond debate.' " *Ibid.*

To find that a right is clearly established, courts generally "need to identify a case where an officer acting under similar circumstances ... was held to have violated" the Constitution. *Escondido v. Emmons,* 586 U.S. 38, 43, 139 S.Ct. 500, 202 L.Ed.2d 455 (2019) (*per curiam*) (internal quotation marks omitted). The relevant precedent must define the right with a "high degree of specificity," so that "every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply." *District of Columbia v. Wesby,* 583 U.S. 48, 63, 138 S.Ct. 577, 199 L.Ed.2d 453 (2018) (internal quotation marks omitted). Principles stated generally, such as that "an officer may not use unreasonable and excessive force," do not suffice. *Kisela v. Hughes,* 584 U.S. 100, 105, 138 S.Ct. 1148, 200 L.Ed.2d 449 (2018) (*per curiam*). In short, officers receive qualified immunity unless they could have "read" the relevant precedent beforehand and "know[ n]" that it proscribed their specific conduct. *City and County of San Francisco v. Sheehan,* 575 U.S. 600, 616, 135 S.Ct. 1765, 191 L.Ed.2d 856 (2015).

The Second Circuit contravened these principles. *Amnesty America* did not clearly establish that Zorn's specific conduct violated the Fourth Amendment.[3] Whether any particular use of force violates the Fourth Amendment depends on "the facts and circumstances of each particular case," *Graham v. Connor,* 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), including whether the officer gave "warnings" before using force, *Barnes v. Felix,* 605 U.S. 73, 80, 145 S.Ct. 1353, 221 L.Ed.2d 751 (2025). In *Amnesty America,* the court considered a wide range of allegations of excessive force. The officers rammed a protester's head into a wall, dragged another protester across the ground, and ***573** used rear wristlocks on two more protesters to lift them up before throwing one of them to the ground. 361 F.3d at 123. Nothing indicated that the officers gave the protesters any warning that they would use such force.

*Amnesty America* did not hold that any of those actions violated the Fourth Amendment, let alone all of them. Instead, it remanded for a jury trial because, while a "reasonable jury *could* ... find that the officers gratuitously inflicted pain," it was also "entirely possible that a reasonable jury would find ... that the police officers' use of force was objectively reasonable given the circumstances." *Id.*, at 124 (emphasis **931 added). Relevant here, *Amnesty America* even relied on a decision approving the practice of warning protesters and then using wristlocks to move them. *Ibid.* (citing *Forrester v. San Diego*, 25 F.3d 804, 807–808 (CA9 1994)).

Reasonable officials would not "interpret [*Amnesty America*] to establish" that using a routine wristlock to move a resistant protester after warning her, without more, violates the Constitution. *Wesby*, 583 U.S., at 63, 138 S.Ct. 577; see *Sheehan*, 575 U.S., at 615–616, 135 S.Ct. 1765. Zorn repeatedly warned Linton that he would have to use more force if she did not stand up, and when she did not do so, he used a wristlock to bring Linton to her feet. See App. to Pet. for Cert. 47–49. *Amnesty America* never "held" that such conduct alone "violated" the Fourth Amendment. *Emmons*, 586 U.S., at 43, 139 S.Ct. 500 (internal quotation marks omitted). If anything, it implied the opposite. See *Amnesty America*, 361 F.3d at 124 (citing *Forrester*, 25 F.3d at 807–808). And its statement that officers who had engaged in a wide range of aggressive conduct may have used excessive force did not "put [Zorn] on notice that his specific conduct was unlawful." *Rivas-Villegas*, 595 U.S., at 6, 142 S.Ct. 4.

The Second Circuit concluded otherwise by reading *Amnesty America* to establish the general principle "that the gratuitous use of pain compliance techniques —such as a rear-wristlock—on *574 a protestor who is passively resisting arrest constitutes excessive force." 135 F.4th at 35 (case below). But that principle, even assuming *Amnesty America* established it, lacks the "high degree of specificity" needed to make it "clear" to officers which actions violate the law. *Wesby*, 583 U.S., at 63, 138 S.Ct. 577 (internal quotation marks omitted). It does not "obviously resolve" whether using a rear wristlock to move a noncompliant protester after repeated warnings violates the Fourth Amendment, *id.*, at 64, 138 S.Ct. 577, as it fails to specify which circumstances make the use of force "gratuitous."

Because the Second Circuit failed to identify a case where an officer taking similar actions in similar circumstances "was held to have violated" the Constitution, *Emmons*, 586 U.S., at 43, 139 S.Ct. 500 (internal quotation marks omitted), Zorn was entitled to qualified immunity. We grant his petition for writ of certiorari and reverse the judgment of the Second Circuit.

*It is so ordered.*

Justice SOTOMAYOR, with whom Justice KAGAN and Justice JACKSON join, dissenting.
Sergeant Jacob Zorn used a " 'pain compliance technique' " called a rear wristlock on Shela Linton, a nonviolent protestor who was peacefully demonstrating at a sit-in in the Vermont capitol. 135 F.4th 19, 24–25 CA2 (2025). The Second Circuit held that Zorn was not entitled to qualified immunity on Linton's Fourth Amendment excessive force claim, at least at the summary judgment stage, because prior Circuit precedent had clearly established that using a rear wristlock against a nonviolent protestor would violate the protestor's constitutional rights. That decision was not erroneous, and certainly not so clearly erroneous as to warrant the "extraordinary remedy of a summary reversal." *Major League Baseball Players Assn. v. Garvey*, 532 U.S. 504, 512–513, 121 S.Ct. 1724, 149 L.Ed.2d 740 (2001) (Stevens, J., dissenting). I respectfully dissent.

***575** I

Given that this case is at the summary judgment stage, the Court must "view the **932 evidence ... in the light most favorable to" Linton, the nonmovant, "with respect to the central facts of this case." *Tolan v. Cotton*, 572 U.S. 650, 657, 134 S.Ct. 1861, 188 L.Ed.2d 895 (2014) (*per curiam*). Before Sergeant Zorn's interaction with Linton, officers had arrested 15 or 16 demonstrators: The "officers tapp[ed] some of the demonstrators' shoulders or sp[oke] briefly with them before the officers placed them under arrest." App. to Pet. for Cert. 44 (App.). "Some of the arrestees

voluntarily stood up after officers approached them," while the "[o]fficers lifted the demonstrators who did not stand up voluntarily and escorted, dragged, or carried them out of the chamber." *Ibid.* "Consistent with the concept of a nonviolent sit-in protest, ... none of [the demonstrators] attacked the officers or used any form of violence." *Id.*, at 45. One officer, Trooper Richardson, described the "level of safety threat in the environment [as] '[v]ery low.' " *Ibid.* (alteration in original).

When Zorn and Richardson first approached Linton, they "did not issue any 'clear request or command,' " and the "video evidence appears to indicate that" one of them said only, " 'ma'am?' " *Id.*, at 46. About five seconds later, Zorn and Richardson unlinked Linton's arms from the other demonstrators' arms. Without any warning—indeed, without saying another word to Linton—Zorn placed Linton's left arm into a rear wristlock by twisting her arm and shoulder, "snapp[ing]" her wrist, and " 'forc[ing] it down and to the rear.' " *Id.*, at 47; Plaintiff's Supp. Affidavit in No. 5:18–cv–5 (D Vt.), ECF Doc. 74–3, p. 2. Linton immediately exclaimed, " 'ow, ow, ow!' " App. 47. Only then did Zorn instruct Linton to " 'please stand up.' " *Id.*, at 48.

Linton did not stand up, at which point Zorn further twisted Linton's arm. "Linton's face contorted in pain as she stated, 'my arm!' or 'don't twist my arm!' " *Ibid.* Zorn asked Linton to stand up several more times. Linton refused ***576** and replied: " 'You're hurting me.' " *Ibid.* Zorn then warned Linton: " 'I'm going to ask you one more time ... and then I will use more pain compliance.' " *Ibid.* Linton repeated that Zorn was " 'hurting' " her and did not move to stand up. *Id.*, at 49. Zorn then applied pressure to Linton's wrist and lifted her upward, causing Linton to "contor[t] her face in pain and ... scream very loudly." *Ibid.* Zorn whispered to her that "she should have called her legislator." *Ibid.*

After being hauled to her feet, Linton collapsed back onto the floor "due to pain and feeling weak." *Id.*, at 50. Zorn, Richardson, and a third officer "lifted" her "by her arms and legs and carried her out of the House chamber" without further use of a rear wristlock or any other pain-compliance technique. *Id.*, at 51. As a result of this event, Linton "suffered permanent damage to her left wrist and shoulder" and has been "diagnosed with post-traumatic stress disorder, depression, and anxiety." 135 F.4th at 25.

II

Officers are not entitled to qualified immunity if "(1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.' " *District of Columbia v. Wesby*, 583 U.S. 48, 62–63, 138 S.Ct. 577, 199 L.Ed.2d 453 (2018). The Second Circuit correctly held that summary judgment must be denied because a jury could find that Zorn violated Linton's clearly established Fourth Amendment rights.

A

Starting with the first prong of the qualified immunity analysis, Linton contends that Zorn violated her Fourth Amendment ****933** rights by using excessive force during her arrest. Determining whether a given use of force is excessive requires a "careful balancing of ' "the nature and quality of the intrusion on the individual's Fourth Amendment interests" ' against the countervailing governmental interests at ***577** stake." *Graham v. Connor*, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). The inquiry depends on the " 'totality of the circumstances,' " "including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, ... whether [s]he is actively resisting arrest or attempting to evade arrest by flight," *ibid.*, the "relationship between the need for the use of force and the amount of force used[, and] the extent of [her] injury," *Kingsley v. Hendrickson*, 576 U.S. 389, 397, 135 S.Ct. 2466, 192 L.Ed.2d 416 (2015).

Here, the Second Circuit rightly concluded that a reasonable jury could find that Zorn's use of force was excessive in violation of the Fourth Amendment. See 135 F.4th at 36. First, the crime of trespass for which Linton was arrested is not " 'particularly severe.' " *Ibid.* Second, it is undisputed that the threat to safety posed by Linton was relatively low. Trooper Richardson described the level of safety risk as " '[v]ery low.' " *Ibid.* The protestors also "passed through security (and therefore must have

been considered to be unarmed), did not significantly outnumber police," and were "not accused of being volatile or violent." *Ibid.* Third, it is also undisputed that Linton "suffered permanent loss of motion in her left wrist and shoulder as a result of the incident." *Ibid.* Fourth, there is a material dispute of fact as to whether Linton was actively resisting arrest, and a jury reasonably could conclude that Linton was only passively resisting and that her failure to comply was because she was "in too much pain to do so." *Id.*, at 37. Finally, a jury also reasonably could conclude that the use of pain compliance was not "reasonably related to any need to use force." *Id.*, at 38. The officers purportedly "did not use pain compliance techniques in the arrests of ... fellow protestors," and Linton contends that "the Vermont State Police use-of-force policy does not suggest ... us[ing] pain compliance techniques in response to passive resistance." *Ibid.* Further, Zorn's own expert stated that "the general police practice in response to passive resistance is 'low level physical contact ... ***578** with little or no pain.' " *Ibid.* Taken together, a jury could reasonably conclude that Zorn used excessive force in violation of Linton's Fourth Amendment rights.

B

The second prong of the qualified immunity analysis asks whether the "unlawfulness of [the official's] conduct was 'clearly established at the time,' " *Wesby*, 583 U.S., at 63, 138 S.Ct. 577, which requires assessing whether the "contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right," *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). "[E]arlier cases involving 'fundamentally similar' facts can provide especially strong support for a conclusion that the law is clearly established," *Hope v. Pelzer*, 536 U.S. 730, 741, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002), but there need not be a " ' "case directly on point," ' " *White v. Pauly*, 580 U.S. 73, 79, 137 S.Ct. 548, 196 L.Ed.2d 463 (2017) (*per curiam*).

In addition to the long-established principle that officers may use only the "amount of force that is necessary in a particular situation," *Graham*, 490 U.S., at 397, 109 S.Ct. 1865, the Second Circuit's prior case, *Amnesty America v. West Hartford*, 361 F.3d 113 (CA2 2004), "clearly ****934** establish[ed] that the gratuitous use of pain compliance techniques—such as a rear-wristlock—on a protestor who is passively resisting arrest constitutes excessive force." 135 F.4th at 35. In that case, officers used multiple forms of force to arrest anti-abortion protestors who had chained themselves together in front of a women's center. *Amnesty America*, 361 F.3d at 118. The plaintiffs alleged that the officers had used excessive force to remove them, including by using a rear wristlock and other pain compliance techniques. *Ibid.* Two plaintiffs in that case were treated much like Linton was: Officers "lift[ed] and pull[ed]" them off the floor "by pressing their wrists back against their forearms in a way that caused lasting damage." *Id.*, at 123. The Circuit then held that, under past cases, "allegations involving comparable amounts of ***579** force used during the arrest of a nonviolent suspect are sufficient to allow a reasonable factfinder to conclude that the force used was excessive." *Id.*, at 123–124.

*Amnesty America*'s specific discussion of rear wristlocks thus clearly established that using a rear wristlock against a nonviolent, passively resisting protestor could constitute excessive force. It therefore put Zorn on notice, to a "high 'degree of specificity,' " *Wesby*, 583 U.S., at 63, 138 S.Ct. 577, that using the same technique against a passively resisting protestor like Linton would expose him to liability for violating Linton's Fourth Amendment rights.

C

The Court's attempts to distinguish *Amnesty America* are mistaken. It first claims that *Amnesty America* differs from this case because the officers there did not give "any warning" to the protestors, while Zorn "repeatedly warned Linton" here. *Ante*, at 930 - 931. That distinction misrepresents both cases. *Amnesty America*, in fact, did involve warnings: It observed that the "police purportedly employed" the pain-compliance techniques "only after they were unsuccessful in verbally convincing protestors to move." 361 F.3d at 119. By comparison, in this case, construing the evidence in favor of Linton (as is required), Zorn "did not issue any 'clear request or command' " before applying a rear wristlock and

began asking her to stand only after he had initiated the wristlock. App. 46; see ECF Doc. 74–3, p. 2 (Linton "was not given warning before [Zorn] initiated the use of pain compliance"). *Amnesty America* thus involved " 'an officer acting under similar circumstances,' " Escondido v. Emmons, 586 U.S. 38, 43, 139 S.Ct. 500, 202 L.Ed.2d 455 (2019) (*per curiam*), and put Zorn on notice that his actions would violate established law.

It is true that, after initiating the wristlock, Zorn warned Linton that he would use " 'more pain compliance' " if she did not stand up, App. 48, whereas the *Amnesty America* opinion does not specify whether similar warnings were given ***580** after the initiation of the wristlocks. If that is the difference on which the majority relies, the majority is essentially requiring Linton to find a factually identical case, a requirement that this Court has repeatedly rejected. See, *e.g.*, Anderson, 483 U.S., at 640, 107 S.Ct. 3034 ("This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful"); *Hope*, 536 U.S., at 741, 122 S.Ct. 2508 (explaining that " 'fundamentally similar' " cases can be helpful but are not necessary).

The majority also suggests that *Amnesty America* considered a "wide range" of conduct, implying that it did not specifically address rear wristlocks like the one at issue here. *Ante*, at 930 - 931. That, too, is inconsistent with the actual opinion, which recognized that each plaintiff had "standing ****935** to assert only those constitutional deprivations that they themselves [were] alleged to have suffered" and specifically identified the use of a rear wristlock against some passively resisting protestors as "sufficient to allow a reasonable factfinder to conclude that the force used was excessive." 361 F.3d at 123–124, and n. 6.

The Court next reasons that *Amnesty America* did not clearly establish any law because it stated that while a "reasonable jury could ... find that the officers" used excessive force, it was also "entirely possible that a reasonable jury would find ... that the police officers' use of force was objectively reasonable given the circumstances and the plaintiffs' resistance techniques." *Id.*, at 124; see *ante*, at 929 - 930. These statements in *Amnesty America*, however, reflect that the Second Circuit was reviewing a district court's grant of summary judgment in favor of the defendants where there was factual uncertainty. In reversing the grant of summary judgment, the Second Circuit held that if the plaintiffs' allegations were true, they would be "sufficient to allow a reasonable factfinder to conclude that the force used was excessive," but it found that there were material disputes on "issues of fact" that could not be resolved at summary judgment. ***581** 361 F.3d at 123–124. Thus, when *Amnesty America* stated that a reasonable jury could rule for the officers, it was merely acknowledging the reality that the jury might well resolve those material factual disputes in favor of the defendants and find that the officers' use of force, under the circumstances that truly occurred, was not excessive. *Id.*, at 124. That possibility, however, does not change the fact that the Second Circuit held the use of a wristlock could be excessive if events had transpired the way plaintiffs alleged they had in that case. See 135 F.4th at 33. Indeed, the Second Circuit has long held that "a vacatur of a grant of summary judgment and a remand in light of the existence of genuine issues of material fact" may clearly establish a constitutional violation, *id.*, at 34, and the dissent below agreed, *id.*, at 40 (Cabranes, J., concurring in part and dissenting in part).

At bottom, the majority's analysis rests on the assumption that the law can be clearly established only by factually identical " ' "case[s] directly on point," ' " despite the Court's rejection of such a standard. *White*, 580 U.S. at 79, 137 S.Ct. 548. Instead, it is "enough that governing law places 'the constitutionality of the officer's conduct beyond debate.' " *Kisela v. Hughes*, 584 U.S. 100, 120, 138 S.Ct. 1148, 200 L.Ed.2d 449 (2018) (SOTOMAYOR, J., dissenting) (quoting *Wesby*, 583 U.S., at 63, 138 S.Ct. 577). Here, taking the facts in the light most favorable to Linton, it is "beyond debate" that Zorn's use of pain compliance against the passively resisting Linton was excessive. Accordingly, Zorn was not entitled to summary judgment based on qualified immunity.

* * *

For the foregoing reasons, the Second Circuit did not err in holding that Zorn is not entitled to qualified immunity at this stage. At the very least, the decision below was not so wrong as to warrant the "extraordinary remedy of a summary reversal."

*Garvey*, 532 U.S., at 512–513, 121 S.Ct. 1724 (Stevens, J., dissenting). Relying on disputed facts, the Court today simply ***582** disagrees with how the Second Circuit applied a correctly stated legal standard (the requirement that law be established to " 'a high degree of specificity' " in the qualified immunity analysis) to this particular set of facts. 135 F.4th at 32 (quoting *Wesby*, 583 U.S., at 63, 138 S.Ct. 577). That is a routine, and nowhere near extraordinary, dispute that did not require the Court's intervention.

****936** In the past, I have noted the "troubling asymmetry" in this Court's "unflinching willingness 'to summarily reverse courts for wrongly denying officers the protection of qualified immunity' but 'rarely interven[ing] where courts wrongly afford officers the benefit of qualified immunity.' " *Kisela*, 584 U.S., at 121, 138 S.Ct. 1148 (SOTOMAYOR, J., dissenting). This case unfortunately represents a resurgence and perpetuation of this "one-sided approach to qualified immunity" that "transforms the doctrine into an absolute shield for law enforcement officers, gutting the deterrent effect of the Fourth Amendment." *Ibid.* The majority today gives officers license to inflict gratuitous pain on a nonviolent protestor even where there is no threat to officer safety or any other reason to do so. That is plainly inconsistent with the Fourth Amendment's fundamental guarantee that officers may only use "the amount of force that is necessary" under the circumstances. *Graham*, 490 U.S., at 396, 109 S.Ct. 1865. Therefore, I respectfully dissent.

**All Citations**

607 U.S. 568, 146 S.Ct. 926, 224 L.Ed.2d 400, 31 Fla. L. Weekly Fed. S 588

Footnotes

1 Because this case comes here on Zorn's motion for summary judgment, we view the facts in the light most favorable to the nonmoving party, Linton. *City and County of San Francisco v. Sheehan*, 575 U.S. 600, 603, 135 S.Ct. 1765, 191 L.Ed.2d 856 (2015).

2 A rear wristlock is a technique that officers use to gain control over a resistant person by gripping his wrist, placing it behind his back, and bending it backward. See U.S. Dept. of Justice, Use of Force by Police: Overview of National and Local Data 49 (Oct. 1999) (summarizing data showing that "[w]hen the suspects used slight resistance, most incidents involved officer use of verbal commands, handcuffing, or wrist/arm locks").

3 We assume without deciding that "controlling Circuit precedent" can clearly establish law for qualified-immunity purposes. *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5, 142 S.Ct. 4, 211 L.Ed.2d 164 (2021) (*per curiam*).

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

181 F.4th 1135
United States Court of Appeals, Eleventh Circuit.

Leroy PERNELL, Sharon Wright Austin, Shelley Park, Jennifer Sandoval, et al., Plaintiffs-Appellees,
v.
FLORIDA BOARD OF GOVERNORS OF the STATE UNIVERSITY, et al., Defendants, Brian Lamb, Eric Silagy, Timothy Cerio, Richard Corcoran, Aubrey Edge, et al., Defendants-Appellants.
Adriana Novoa, Samuel Rechek, First Amendment Forum At University of South Florida, Plaintiffs-Appellees,
v.
Manny Diaz, Jr., Timothy M. Cerio, Richard Corcoran, Aubrey Edge, Patricia Frost, et al., Defendants-Appellants.

No. 22-13992, No. 22-13994
|
Filed: 07/07/2026

**Synopsis**
**Background:** State university professors, students, and student group brought § 1983 action against various State officials and university administrators alleging that Florida's Individual Freedom Act (IFA), which barred Florida's educators from promoting or endorsing disfavored ideas when instructing students, violated their First Amendment rights because it suppressed politically disfavored viewpoints, and that the Act was unconstitutionally vague under the Due Process Clause of the Fourteenth Amendment because it defined the banned concepts with abstract language. The United States District Court for the Northern District of Florida, Nos. 4:22-cv-00304-MW-MAF, 4:22-cv-00324-MW-MAF, Mark E. Walker, C.J., 641 F.Supp.3d 1218, granted in part and denied in part plaintiffs' motion for preliminary injunction. Defendants appealed.

**Holdings:** The Court of Appeals, Grant, Circuit Judge, held that:

*Garcetti*'s analysis of free speech claims made by government employees subjected to after-the-fact discipline did not apply to plaintiffs' free-speech challenge;

government did not maintain control over professors' speech in university classrooms, which weighed against such speech being government speech;

factors of whether speech traditionally communicated government messages and whether public would view speech as endorsed by government weighed against speech by professors in university classrooms being government speech;

context of the speech at issue weighed against Act being constitutional under the Free Speech Clause;

State's interest as an employer in preventing invidious racial discrimination in public education did not support Act's constitutionality under the Free Speech Clause;

strong predilection for academic freedom weighed against constitutionality of Act under the Free Speech Clause; and

uncertainties about coverage of Act weighed against Act's constitutionality under the Free Speech Clause.

Affirmed.

Lagoa, Circuit Judge, filed dissenting opinion.

**Procedural Posture(s):** On Appeal; Motion for Preliminary Injunction.

**West Codenotes**

**Validity Called into Doubt**
Fla. Stat. Ann. § 1000.05(4)

USCA11 Case: 25-11929 Document: 47 Date Filed: 09/14/2026 Page: 11 of 42

Appeal from the United States District Court for the Northern District of Florida, D.C., Docket Nos. 4:22-cv-00304-MW-MAF, 4:22-cv-00324-MW-MAF

**Attorneys and Law Firms**

Tiffani Burgess, Alexsis Johnson, NAACP Legal Defense Fund, New York, NY, Morenike Fajana, New York State Office of Attorney General, Division of Appeals & Opinions, Albany, NY, Crystal Andrea Pardue, Leah Watson, Sarah Hinger, Emerson Sykes, American Civil Liberties Union Foundation, New York, NY, Santino Coleman, Charles McLaurin, NAACP Legal Defense & Educational Fund, Inc., Washington, DC, Jason Allen Leckerman, Ballard Spahr, LLP, Salt Lake City, UT, Caroline Andrews McNamara, Daniel Boaz Tilley, ACLU Foundation of Florida, Inc., Miami, FL, Isabella Salomao Nascimento, Ballard Spahr LLP, Minneapolis, MN, Karli Lubin Talmo, Ballard Spahr, LLP, Philadelphia, PA, Charles David Tobin, Ballard Spahr, LLP, Washington, DC, for Plaintiffs-Appellees in No. 22-13992.

Charles J. Cooper, John David Ohlendorf, John Ramer, Megan M. Wold, Cooper & Kirk, PLLC, Washington, DC, for Defendants-Appellants in No. 22-13992, No. 22-13994.

Eugene Volokh, Professor of Law, Stanford University, Hoover Institution, Stanford, CA, for Amicus Curiae Academic Freedom Alliance No. 22-13992.

Herbert Wachtell, Wachtell Lipton Rosen & Katz, New York, NY, for Amicus Curiae The New Press No. 22-13992.

Peter E. Seley, Gibson Dunn & Crutcher, LLP, Washington, DC, Mark J. Cherry, Apratim Vidyarthi, Gibson Dunn & Crutcher, LLP, New York, NY, Rafaela Uribe, LatinoJustice PRLDEF, New York, NY, for Amicus Curiae LatinoJustice PRLDEF No. 22-13992.

Richard Siwica, Egan Lev Liindstrom & Siwica, PA, Orlando, FL, for Amicu Curiae American Association of University Professors.

Craig Goodmark, Goodmark Law Firm, LLC, Atlanta, GA, for Amici Curiae National Education Association, United Faculty of Florida, Stand for Freedom, National Black Law Students Association.

Marc J. Randazza, Randazza Legal Group, PLLC, Las Vegas, NV, Jay Marshall Wolman, Randazza Legal Group PLLC, Hartford, CT, for Amicu Curiae First Amendment Lawyers Association.

Justin Cox, Law Office of Justin Cox, Hood River, OR, for Amicu Curiae Policing and Criminal Justice Organizations and Scholars.

Justin Cox, Law Office of Justin Cox, Hood River, OR, James Andrew Goldston, Natasha Arnpriester, Genevieve Quinn, Open Society Justice Initiative, New York, NY, for Amici Curiae Law Enforcement Action Partnership, Fair and Just Prosecution, National Coalition Building Institute, Strategies for Justice, BWMP LLC., The Black Police Experience, Kami Chavis, Barry Friedman, Tracie Keesee, Maureen Quinn McGough, Nicola Smith-Kea.

Laurie Webb Daniel, Matthew David Friedlander, Skyler McDonald, Webb Daniel Friedlander, LLP, Atlanta, GA, for Amici Curiae Professor Amna Khalid, Professor Jeffrey Snyder.

Abel S. Delgado, Southern Poverty Law Center, Miami, FL, for Amici Curiae Learning for Justice, Florida Freedom to Read Project.

Greg Harold Greubel, Adam Steinbaugh, Foundation for Individual Rights and Expression, Philadelphia, PA, J.T. Morris, Foundation for Individual Rights and Expression, Washington, DC, Gary Scott Edinger, Gary S. Edinger, PA, Gainesville, FL, for Plaintiffs-Appellees in 22-13994.

Jay Remington Schweikert, The Cato Institute, Washington, DC, for Amicus Curiae Cato Institute.

Before Grant, Lagoa, and Wilson, Circuit Judges.

**Opinion**

Grant, Circuit Judge:

***1144** "Congress shall make no law ... abridging the freedom of speech." U.S. Const. amend I. The First Amendment, incorporated against the States in 1868, is this country's written commitment to the idea that freedom of speech is essential to freedom of thought, and that both are essential to maintaining our liberty. The Supreme Court has long been clear

USCA11 Case: 25-11929 Document: 47 Date Filed: 09/14/2026 Page: 12 of 42

that teaching and scholarship are due some measure of protection under the Amendment. But how much? And in what contexts? That Court has not had to say, but this one is now put to the test. The State of Florida legislated a broad set of speech restrictions banning certain viewpoints relating to race, color, sex, and national origin in various settings. The provision at issue here bars Florida's educators from promoting or endorsing those disfavored ideas when instructing students. Its prohibition applies not only in primary and secondary education, where states traditionally exercise a great deal of control, but also in public colleges and universities, where the state government's role has been far more limited.

When several groups of professors challenged Florida's new restrictions, the State cast about for an existing case or doctrine that could support its speech ban in the university setting. Finding none, it tried to marry public-employee speech cases with government speech doctrine, resulting in a new rule: if the government pays a professor's salary, it has total control over her classroom speech.

That is not a blessed union. Florida's salary-for-speech rule is a breathtaking assertion of power to ban unpopular ideas from public discourse in the very places the State's own statutes recognize as centers of inquiry—classrooms where students are trusted to puzzle through ideas that are good and bad, easy and hard, ideally getting ever closer to the truth. This new rule also runs headlong into the Supreme Court's repeated, if imprecise, endorsements of academic freedom. If the First Amendment offers any boundary of protection at all for public university classrooms, this statute crosses it.

Nor does this Court's leading academic speech precedent, *Bishop v. Aronov*, demand the outcome Florida seeks. ***1145** 926 F.2d 1066 (11th Cir. 1991). In fact, it counsels the opposite. The restriction in that case was imposed by one university, against one professor, relating to speech about one thing—personal religious views that got in the way of the course's well-understood parameters.

That precedent makes clear that universities and even other government entities have crucial authority to shape curricular content, discipline teachers, and take other steps to guide and govern postsecondary education. But the speech ban Florida's political leaders seek to impose here is different in both nature and degree from these ordinary concerns. The rule Florida developed for this case does not withstand scrutiny.

The ideas Florida targets may well be noxious. Or maybe not. Either way, in this context the First Amendment trusts students to figure it out for themselves. We affirm the district court's preliminary injunction.

## I.

The Individual Freedom Act amends the Florida Education Equality Act, implementing new speech restrictions on a range of actors. Fla. Stat. § 1000.05(4)(a). The provision at issue here disallows any "training or instruction that espouses, promotes, advances, inculcates, or compels" students at Florida's public colleges and universities to believe any of eight concepts relating to topics like race and sex:

> 1. Members of one race, color, national origin, or sex are morally superior to members of another race, color, national origin, or sex.
>
> 2. A person, by virtue of his or her race, color, national origin, or sex, is inherently racist, sexist, or oppressive, whether consciously or unconsciously.
>
> 3. A person's moral character or status as either privileged or oppressed is necessarily determined by his or her race, color, national origin, or sex.
>
> 4. Members of one race, color, national origin, or sex cannot and should not attempt to treat others without respect to race, color, national origin, or sex.
>
> 5. A person, by virtue of his or her race, color, national origin, or sex, bears responsibility for, or should be discriminated against or receive adverse treatment because of, actions committed in the past by other members of the same race, color, national origin, or sex.
>
> 6. A person, by virtue of his or her race, color, national origin, or sex, should be discriminated

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

against or receive adverse treatment to achieve diversity, equity, or inclusion.

7. A person, by virtue of his or her race, color, sex, or national origin, bears personal responsibility for and must feel guilt, anguish, or other forms of psychological distress because of actions, in which the person played no part, committed in the past by other members of the same race, color, national origin, or sex.

8. Such virtues as merit, excellence, hard work, fairness, neutrality, objectivity, and racial colorblindness are racist or sexist, or were created by members of a particular race, color, national origin, or sex to oppress members of another race, color, national origin, or sex.

*Id.*[1] Though "promot[ing]" any of these concepts is barred, criticizing them is not. *Id.* Beyond that, the Act allows instructors to introduce the ideas in a neutral fashion, permitting discussion "as part of a larger ***1146** course"—so long as "instruction is given in an objective manner without endorsement of the concepts." *Id.* § 1000.05(4)(b). And the law does not say how far past the classroom its restrictions extend—off-campus speeches and other settings may be in play. *See* § 1000.05(4)(a). *Contra* Dissenting Op. at ——.

The penalties for endorsing these disfavored viewpoints are steep—for both individuals and universities. As directed by the Act, Florida's Board of Governors adopted a comprehensive enforcement regime, requiring public colleges and universities to implement the Act's proscriptions and provide a way to report violations. *See* Fla. Bd. of Govs., Reg. No. 10.005, Prohibition of Discrimination in University Training or Instruction (2022). Under those regulations, if the Board of Governors decides that a university "willfully and knowingly" failed to correct a violation of the Act's speech ban, the university will not receive "performance funding for the next fiscal year." *Id.* § (4)(d). That kind of loss would be financially devastating. The University of South Florida, for example, stood to lose just over $73 million during the 2021–2022 academic year—about fifteen percent of its total state appropriations.

Individual consequences can be severe too. Students (as well as unnamed other observers) can turn in professors whenever they perceive a violation. *Id.* § (2)(a). Those reports trigger investigative protocols for universities, who are then required to investigate any "credible" complaints. *Id.* § (3)(b). If a university finds any instruction or training that is "inconsistent with" the Act, it must self-report that violation to the Board of Governors. *Id.* § (3)(c). The university must separately "mandat[e]" that professors modify their lectures "to be consistent with" the Act. *Id.* And if a professor refuses? Potential termination. But even compliance offers no safe haven—according to the regulations, a university can impose unspecified "disciplinary measures" for violative content, even after the coursework is corrected.[2] *Id.*

Two groups of plaintiffs sued various state officials and university administrators in separate lawsuits.[3] In *Pernell v. Florida Board of Governors*, the plaintiffs are five current professors and one student, all in public universities across the state. In *Novoa v. Diaz*, the challengers are one professor, one student, and one student group at the University of South Florida.[4] Both sets of plaintiffs allege that the Act violates their First Amendment rights because it suppresses politically disfavored viewpoints, and that the Act is unconstitutionally vague under the Due Process Clause of the Fourteenth Amendment because it defines the banned concepts with abstract language.[5] Both sets of ***1147** plaintiffs moved for preliminary injunctive relief.

The district court did not consolidate the two cases, but it addressed both motions in a single order. In *Pernell*, the court enjoined the members of the Florida Board of Governors of the State University System—all in their official capacities—from enforcing § 1000.05(4)(a)–(b) of the Florida Statutes and Regulation 10.005(2)–(3) and (4)(d). And in *Novoa*, the court enjoined the same Board of Governors members from enforcing the Act and Regulation as applied to concepts 1, 2, 3, 5, and 7. It also enjoined the members of the University of South Florida Board of Trustees, in their official capacities, from enforcing the laws as applied to those concepts. In the end, though not every plaintiff had standing to challenge every concept or sue every defendant, at least one plaintiff had standing to challenge each concept.[6] The defendants appealed, and this Court consolidated the two cases.

USCA11 Case: 25-11929 Document: 47 Date Filed: 09/14/2026 Page: 14 of 42

## II.

We review the district court's order granting a preliminary injunction for abuse of discretion. *Otto v. City of Boca Raton*, 981 F.3d 854, 860 (11th Cir. 2020). To succeed, the moving party must show four things: "(1) it has a substantial likelihood of success on the merits; (2) it will suffer irreparable injury unless an injunction issues; (3) this threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) the injunction would not be adverse to the public interest." *Honeyfund.com Inc. v. Governor*, 94 F.4th 1272, 1277 (11th Cir. 2024) (quotation omitted).

## III.

This Court has already concluded that another provision of Florida's Act—the one prohibiting mandatory workplace meetings endorsing these same ideas about race, sex, and nationality—enforced unconstitutional viewpoint discrimination. *See Honeyfund*, 94 F.4th at 1277. The language here is identical, but the academic context puts us at an unprecedented First Amendment intersection: viewpoint discrimination meets public-employee speech, meets government speech, meets academic freedom.

***1148** Viewpoint-based restrictions on speech are widely disfavored in almost any context—"the greatest First Amendment sin." *Id.* "When the government seeks not just to restrict speech based on its subject matter, but also seeks to dictate what particular opinion or perspective individuals may express on that subject, the violation of the First Amendment is all the more blatant." *Chiles v. Salazar*, — U.S. ——, 146 S. Ct. 1010, 1021, 224 L.Ed.2d 446 (2026) (quotation omitted). At the same time, when the government acts as an employer it has discretion to restrict employee speech in ways that it could not for private parties. *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). That authority, though, is designed to allow the government to effectively manage its workplaces, not drive out speech it disfavors. *See Garcetti v. Ceballos*, 547 U.S. 410, 418–23, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006). Of course, if the government itself is the speaker, the rules change yet again. Exempt from First Amendment scrutiny, the government may choose what to say and what not to say. *Shurtleff v. City of Boston*, 596 U.S. 243, 251–52, 142 S.Ct. 1583, 212 L.Ed.2d 621 (2022). And on top of all that hovers our Nation's tradition of academic freedom—celebrated with vigor, but constitutionally defined with only the haziest of lines. *See, e.g.*, *Epperson v. Arkansas*, 393 U.S. 97, 104–05, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968).

A decades-old precedent from this Circuit does not give all the answers, but it does mark a path. In *Bishop v. Aronov*, we considered whether the University of Alabama could bar a professor from interjecting personal religious beliefs into his physiology classes. 926 F.2d at 1067–68. Recognizing the tension between the Supreme Court's homages to academic freedom and its precedents on employee speech, this Court sought a constitutional balance between the two. As *Bishop* explains, the Supreme Court's pronouncements on academic freedom "cannot be extrapolated to deny schools command of their own courses." *Id.* at 1075. Indeed, the opinion rejects the idea of academic freedom as an "independent First Amendment right." *Id.* But that does not mean the Constitution has nothing to say. To the contrary, *Bishop* emphasized that "[o]ur Nation is deeply committed to safeguarding academic freedom, which is of transcendent value to all of us" and "a special concern of the First Amendment." *Id.* (quoting *Keyishian v. Bd. of Regents of Univ. of State of New York*, 385 U.S. 589, 603, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967)).

Then, as now, none of the Supreme Court's precedents provided a controlling answer. *Id.* at 1072–74. So the *Bishop* Court started with *Pickering v. Board of Education*, the first case in the Supreme Court's public-employee-speech trio, "because of the balancing it suggests." *Id.* at 1072; *see Pickering*, 391 U.S. at 568, 88 S.Ct. 1731. The result was a three-part inquiry. We *first* considered the context of the professor's speech; *second*, the university's rights, both as a public employer and as an arbiter of curricular offerings; and *third*, "the strong predilection for academic freedom as an adjunct of the free speech rights of the First Amendment." *Bishop*, 926 F.2d at 1074–75.

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

USCA11 Case: 25-11929 Document: 47 Date Filed: 09/14/2026 Page: 15 of 42

This Court thus has already set out a way to evaluate the competing constitutional interests in the context of postsecondary education. But before we apply those factors here, one more consideration demands our attention: whether *Garcetti v. Ceballos* shifted the foundation of the analysis. That case, decided fifteen years after *Bishop*, defines employee speech in a more expansive way than its predecessors, including *Pickering*. *See Garcetti*, 547 U.S. at 422–24, 126 S.Ct. 1951. But *Garcetti* too ***1149** fails to offer a clear answer. Recognizing the "additional constitutional interests" implicated by classroom expression, *Garcetti* explicitly declined to say whether its expansion of the employee speech category would apply to teaching and scholarship. *Id.* at 425, 126 S.Ct. 1951.

Here, we have no way to avoid that question. So we first consider whether *Garcetti* extends, full-force, to professors teaching in classrooms, thereby qualifying their lectures as "employee speech" subject to control and discipline well beyond what the First Amendment would otherwise allow. It does not, at least here and for at least two reasons.

To start, though the employee speech cases provide a useful framework for balancing interests, their primary rationale—managing government workplaces—does not apply here. Florida's speech restrictions are designed to ban disfavored speech on a broad scale before it happens, not respond to internal workplace issues on an individual level. A second objection is more structural. Blessing an extension of *Garcetti* here would leave no room—none at all—for the traditional value of academic freedom. True, the Supreme Court has not been precise about the boundaries of that freedom or its relationship to the First Amendment. But expanding *Garcetti* to cover every word of every college lecture would imperil academic freedom to a degree that is incompatible with the Supreme Court's precedents.

For its part, Florida seeks to evade any First Amendment limitations at all by rigging together several speech doctrines to create a new rule that would quietly remove all free speech protections from the classroom. Because the government pays the professors' salaries, Florida says, their speech is the State's speech. Emphatically no. The Florida defendants cannot "put together half a donkey and half a camel, and then ride to victory on the synthetic hybrid." David F. Cavers, *The Choice-of-Law Process* 39 (1965) (quotation omitted). When we read the cases Florida cites—rather than the quotations it pulls from them—the doctrinal connections quickly unravel.

Taking *Bishop* as our guide, then, we conclude that the Act violates the First Amendment as applied to these plaintiffs. Viewpoint-based restrictions designed to compel or ban a set of beliefs are dangerous in any setting, and they are especially pernicious in the classroom context. That goes double for broadly worded yet imprecise regulations like these, which are sure to leave both professors and their students guessing about what kind of speech might violate the rules. And instead of asserting traditionally recognized concerns of effective workplace management, or even legitimate pedagogical values, Florida weakly suggests that the Act is meant to penalize discrimination. No—that suggestion is belied by the Act's own text. Here, as in the companion workplace provision, "speech is not regulated incidentally as a means of restricting discriminatory conduct—restricting speech is the point of the law." *Honeyfund*, 94 F.4th at 1283.

More credibly, the State explains that it also seeks to protect its "most cherished ideals." But that justification fails, too. Though the government has plenty of ways to promote its own viewpoint, puppeteering every university professor in the state is not one of them. Forcing an official government line—in a college classroom of all places—is exactly the "pall of orthodoxy" that the First Amendment will not tolerate. *Keyishian*, 385 U.S. at 603, 87 S.Ct. 675.

That is not to say that universities, and even sometimes state governments, cannot exercise ordinary employee management, ***1150** make ordinary curriculum decisions (like which majors or courses to offer), or otherwise ensure competent academic instruction. But there is nothing ordinary about the authority Florida seeks here. The level of control that Florida demands—total—would be inconsistent not only with our Nation's traditional constitutional protections for academic freedom, but also with the doctrines Florida cobbles together to support its suppression of disfavored viewpoints.

### A.

We first examine how *Garcetti* changed the employee speech landscape, expanding the government's ability to control civil servants' work-related communications on an individual basis.

#### 1.

The Supreme Court has long emphasized that the "interplay between free speech rights and government employment" requires "a delicate balancing of the competing interests surrounding the speech and its consequences." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 527–28, 142 S.Ct. 2407, 213 L.Ed.2d 755 (2022) (quotation omitted). But respecting the government's prerogatives as an employer while also protecting employees' rights to speak as citizens has not been easy. Over time, this balancing act blossomed into a multi-step framework used to analyze free speech claims made by government employees who are subjected to after-the-fact discipline.

One early case was *Pickering v. Board of Education*, in which a high school teacher was dismissed after he penned an article in the local paper criticizing the School Board's allocation of funds between academics and athletics. 391 U.S. at 566, 88 S.Ct. 1731. After the teacher objected to his firing on First Amendment grounds, the Supreme Court worked to balance the interests of both government and speaker, while also keeping in mind the "public interest in having free and unhindered debate on matters of public importance—the core value of the Free Speech Clause of the First Amendment." *Id.* at 573, 88 S.Ct. 1731.

Public employees, the Court reasoned, do not forfeit their First Amendment rights simply because they work for the government. *Id.* at 568, 88 S.Ct. 1731. At the same time, the Court recognized that a state's interests in regulating speech as an employer "differ significantly" from its interests in regulating the speech of private citizens. *Id.* Governments, like all other employers, need to run efficient and productive offices. To account for this tension, courts must balance the interests of the employee, "as a citizen, in commenting upon matters of public concern," against the interests of the state, "as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.* One interest not considered? The government's bare desire to avoid public criticism. *See id.* at 570–71, 88 S.Ct. 1731. Ultimately, the school in *Pickering* could not penalize the teacher's speech because that expression had neither "impeded the teacher's proper performance of his daily duties in the classroom" nor "interfered with the regular operation of the schools generally." *Id.* at 572–73, 88 S.Ct. 1731.

The Court further refined this analysis in *Connick v. Myers*, a First Amendment challenge brought by an assistant district attorney after she was fired for soliciting her coworkers' opinions on internal management issues. 461 U.S. 138, 140–42, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). In considering the employee's constitutional claim, the Court emphasized that *Pickering*'s balancing test applies only ***1151** when the employee is speaking on a matter of public concern. *Id.* at 146, 103 S.Ct. 1684. Otherwise, government officials "enjoy wide latitude in managing their offices." *Id.* For Myers, that distinction was bad news. Tolerating her speech would have resulted in "disruption of the office and the destruction of working relationships." *Id.* at 152, 103 S.Ct. 1684. After all, allowing free-range employee comments on any topic, internal or external, could breed both chaos and hard feelings. Together, *Pickering* and *Connick* stood for a two-part standard protecting employee speech: (1) "as a threshold matter, the speech must be fairly characterized as constituting speech on a matter of public concern"; and (2) the employee's "First Amendment interests in commenting on matters of public concern must outweigh the government's interests" as the employer. *Maggio v. Sipple*, 211 F.3d 1346, 1351 (11th Cir. 2000) (quotation omitted).

That test held for more than twenty years, until *Garcetti v. Ceballos*, 547 U.S. 410, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006). There, an assistant district attorney authored internal memoranda attacking a search warrant affidavit's validity and advocating that the follow-on prosecution be dismissed. *Id.* at 413–14, 126 S.Ct. 1951. The difficulty was that while these topics were matters of public concern, they were also matters of concern within the office—and even their internal communication created serious

workplace challenges. The Supreme Court solved that problem by declaring that on-the-job communications, even on matters of public concern, were not protected by the First Amendment. *Id.* at 421, 423, 126 S.Ct. 1951. So "when public employees make statements pursuant to their official duties"—as opposed to when they speak as citizens on matters of more general public concern—"the Constitution does not insulate their communications from employer discipline." *Id.* at 421, 126 S.Ct. 1951. Because Garcetti had spoken as an employee "pursuant to his duties," his speech was unprotected. *Id.*

**2.**

The *Garcetti* Court itself recognized that "expression related to academic scholarship or classroom instruction" may implicate "additional constitutional interests that are not fully accounted for by this Court's customary employee-speech jurisprudence." *Garcetti*, 547 U.S. at 425, 126 S.Ct. 1951. But rather than opining on that fraught question, the Court reserved it: "We need not, and for that reason do not, decide whether the analysis we conduct today would apply in the same manner to a case involving speech related to scholarship or teaching." *Id.* Here, we do not have the luxury of avoiding that question.

We answer in the negative. To start, the rationale underlying the *Pickering–Connick–Garcetti* trio of cases does not apply with equal force to curricular speech by university professors. The chief concerns motivating those decisions were about workplace management, not content restriction for its own sake. Just like other employers, public agencies "need a significant degree of control over their employees' words and actions"—every workplace grievance need not take on a constitutional dimension. *Id.* at 418, 420, 126 S.Ct. 1951.

So when an employee's speech would "disrupt the office, undermine [the manager's] authority, and destroy close working relationships"—in short, when it would impede "the administration of a government office"—the government can generally take the same actions that a private employer might. *Connick*, 461 U.S. at 154, 103 S.Ct. 1684; *see also id.* at 151–52, 103 S.Ct. 1684. Otherwise, government ***1152** offices would face "displacement of managerial discretion by judicial supervision," with "little chance for the efficient provision of public services." *Garcetti*, 547 U.S. at 418, 423, 126 S.Ct. 1951. But when an employee's speech does not hinder the "proper performance of his daily duties" or "interfere[ ] with the regular operation of the [workplace] generally," the government's legitimate interest in limiting that expression is no greater than its interest in limiting similar expression from a private citizen—which means it cannot do so. *Pickering*, 391 U.S. at 572–73, 88 S.Ct. 1731.

These kinds of managerial concerns are not at play here. Florida has not asserted that its law plays any role in allowing proper performance of professors' daily duties, avoiding classroom disruptions, or the like. Instead, the law is a "per se ban on speech the state disagrees with." *Honeyfund*, 94 F.4th at 1283. An interest in banning disfavored viewpoints is not in line with the workplace management concerns that give the government extra leeway in the employee speech cases.

Nor are the university professors here similarly situated to the employees in the *Pickering–Connick–Garcetti* trio. They are not civil servants; their jobs do not involve administering government programs. Public universities of course perform important civic functions—chief among them training and educating the next generation of leaders—but these are different in kind than the ordinary business of public administration. These distinctions carry weight, and the Supreme Court has recognized that not all state actors are treated equally when it comes to on-the-job expression. The speech of elected officials, for example, receives greater protection than that of traditional civil servants. *See Wood v. Georgia*, 370 U.S. 375, 394–95 & n.21, 82 S.Ct. 1364, 8 L.Ed.2d 569 (1962) (sheriff); *Bond v. Floyd*, 385 U.S. 116, 135–36, 87 S.Ct. 339, 17 L.Ed.2d 235 (1966) (legislator). In First Amendment cases, the context always matters, and university professors are not in the same box as civil servants.

What's more, this case involves a broad legislative speech ban enacted by political authorities—the Florida legislature and the Governor—who are not the professors' employers and who exercise no direct

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

USCA11 Case: 25-11929 Document: 47 Date Filed: 09/14/2026 Page: 18 of 42

supervision or control over their employment. *See, e.g.*, Fla. Stat. § 1001.741(1)–(2) (university president has final say on employment decisions); Fla. Const. art. IX § 7(d) (Board of Governors is responsible for management and operation of the university system). The "*Pickering* test is inapplicable" when "the State is not acting in a traditional employer role," and seeking to enforce a legislative speech ban is not remotely equivalent to a boss supervising her employee. *Harris v. Quinn*, 573 U.S. 616, 652, 134 S.Ct. 2618, 189 L.Ed.2d 620 (2014). Indeed, it is even a far cry from a state board's exercise of control over K–12 curriculum. *See, e.g.*, Fla. Stat. § 1001.03(1) (granting the State Board of Education power over public K–12 curricular standards).

One other feature of the public-employee speech cases dissuades us from extending their reasoning here. All three centered on disciplining a single employee who had already spoken—"a *post hoc* analysis of one employee's speech and its impact on that employee's public responsibilities." *United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 467, 115 S.Ct. 1003, 130 L.Ed.2d 964 (1995). Here, the government's attempt to control employee speech is at the other end of the spectrum. The Act is a wide-ranging, ex ante restriction on the speech of every public university professor in the state. Because the Act "chills potential speech before it happens," ***1153** the State's "burden is greater with respect to this statutory restriction on expression than with respect to an isolated disciplinary action." *Id.* at 468, 115 S.Ct. 1003.

**3.**

Those contrasts would likely be enough to counsel against extending *Garcetti*. But one other consideration looms large: if *Garcetti* applies to all aspects of scholarship and teaching, academic freedom is a nullity. And that cannot be—though the Supreme Court has been stingy about the details of academic freedom, it has been generous in its declarations that scholarship and teaching are part of the First Amendment package.

Time and again, the Supreme Court has made clear that "teachers do not 'shed their constitutional rights to freedom of speech or expression at the schoolhouse gate.' " *Kennedy*, 597 U.S. at 531, 142 S.Ct. 2407 (quoting *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969)). "The essentiality of freedom in the community of American universities is almost self-evident.... To impose any strait jacket upon the intellectual leaders in our colleges and universities would imperil the future of our Nation." *Sweezy v. New Hampshire*, 354 U.S. 234, 250, 77 S.Ct. 1203, 1 L.Ed.2d 1311 (1957). This Court has said so, too: "The protections of the First Amendment have been given special meaning when teachers have been involved." *Pred v. Bd. of Pub. Instruction*, 415 F.2d 851, 855 (5th Cir. 1969).[7] Because academic freedom "is of transcendent value to all of us and not merely to the teachers concerned," the First Amendment "does not tolerate laws that cast a pall of orthodoxy over the classroom." *Keyishian*, 385 U.S. at 603, 87 S.Ct. 675.

We could go on—as noted, the Supreme Court has been unsparing in its praise for academic freedom and in tying that value to the First Amendment.[8] The trouble, of course, is that apart from these declarations about its importance, the Supreme Court's discussions of the nature of academic freedom are murky at best: "Lacking definition or guiding principle, the doctrine floats in the law, picking up decisions as a hull does barnacles." J. Peter Byrne, *Academic Freedom: A "Special Concern of the First Amendment,"* 99 Yale L.J. 251, 253 (1989). But the fact remains that these decisions are unequivocal in their recognition that the First Amendment protects at least some core aspects of teaching and scholarship, even in public universities. Extending *Garcetti*'s rationale to allow a state to ban every professor at every public university from promoting a set of viewpoints while teaching would swiftly transform academic freedom from a constitutional value into a constitutional nullity. And it would soon lead to orthodoxy displacing inquiry in our classrooms.

* * *

***1154** Several features of the Supreme Court's public-employee speech precedents motivate our decision not to extend *Garcetti*: the mismatch between the workplace-management rationales behind those decisions and the motivations at play here, the kinds of employees *Garcetti* and its predecessors applied to,

the nature of the speech restrictions at issue, and the traditional importance of academic freedom.[9] To be sure, *Garcetti* may still apply to a professor's speech in another context, including when that speech impedes the proper administration of the school. But if there is anything *Garcetti* cannot cover, it is broad legislative bans on disfavored speech—not if academic freedom has any constitutional weight at all.

**B.**

To be fair, even the Florida defendants do not push for a straightforward application of *Garcetti*. Instead, they hitch employee speech cases to government speech cases, resulting in a new rule altogether: because these professors were hired by and are paid by the government, everything they say in their classrooms is really the government speaking. That assertion is no less remarkable than it sounds. But Florida's rule is not one that emerges neatly—or at all—from any one case. Instead, it requires connecting doctrines together in a way that *almost* makes sense when bouncing from quote to quote.

The first stop is a few lines from *Rosenberger v. Rector & Visitors of University of Virginia*, which Florida characterizes as a government speech case. It is not. *Rosenberger* instead explained that a university must be viewpoint neutral in sponsoring student groups. In so holding, the Supreme Court noted that the University need not be viewpoint neutral in its own speech, "which is controlled by different principles." 515 U.S. 819, 833–34, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995). Of course—universities have control over their own curriculums. How would it be otherwise? They need not offer, for instance, every class a student would like to take. But that does not resolve, or really even address, the issues in this case. For one, *Rosenberger* is about a university's decision, not a state legislature's mandate. That's true, in fact, of all the cases Florida cites in support of curricular control —it is the university's view of the curriculum that is privileged, not the legislature's. Same goes for the dissent, which repeatedly overlooks that the precedents it cites—all of them—reserve space for universities to discipline their employees, not for state political bodies to discipline public dialogue.[10] *See* Dissenting Op. at ——— – ———, ——— – ———.

***1155** Another fundamental problem with Florida's argument is that *Rosenberger* never so much as suggests that in-class speech by a professor is per se government speech. While *Rosenberger* explains that a university speaks through "the content of the education it provides," reading those words in isolation, as Florida invites us to do, distorts their meaning. 515 U.S. at 833, 115 S.Ct. 2510. *Rosenberger* was a case *restricting* the government's ability to impose speech limitations on student groups, with the Supreme Court concluding that a university's selective denial of funding to religious groups was unconstitutional viewpoint-based discrimination. *Id.* at 836–37, 115 S.Ct. 2510. By Florida's logic, *Rosenberger* would have gone the other way—because the University was funding the groups, it could control their speech.

The same thing goes for the cherry-picked quotations from *Board of Regents of University of Wisconsin System v. Southworth*, in which the Supreme Court upheld a university's mandatory student activity fee. 529 U.S. 217, 221, 120 S.Ct. 1346, 146 L.Ed.2d 193 (2000). Here, too, the challenge was from students, who did not want to financially support, even indirectly, student groups they disagreed with. And in approving the university's viewpoint-neutral policy, the Court again suggested that different "principles applicable to government speech would have to be considered" if the speech at issue were "by an instructor or a professor in the academic context." *Id.* at 235, 120 S.Ct. 1346. What it did *not* say is that an individual professor's speech is invariably government speech. The *Southworth* Court thus was carving out, rather than deciding, the question of academic speech. It was also reserving academic freedom for universities. Those moves sound familiar.

After reciting these acontextual quotations, the defendants' briefing shifts to government speech cases, arguing that because Florida "appropriates public funds" to support public education at the State's universities, it is "entitled to say what it wishes" at those universities.[11] That is a sweeping assertion, and one that is unsupported by the cited government speech precedents. Those cases are about public monuments, license plates, and the like—not anything close to academic teaching. The thrust of their holdings is that when ***1156** the government

USCA11 Case: 25-11929 Document: 47 Date Filed: 09/14/2026 Page: 20 of 42

speaks it can choose its message. There is no need, as the Supreme Court put it, for a local government that supports recycling to include a counterargument from the local trash company. *See* *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 207, 135 S.Ct. 2239, 192 L.Ed.2d 274 (2015). The classic government speech cases Florida leans on are also about the government itself expressing certain ideas—not banning employees from endorsing others. Even so, the State asserts that "if the speech of private individuals proposing license plate slogans is government speech, then surely the classroom speech of state-employed educators at state universities is too." But why? Florida does not say.

Not only is Florida's government speech argument wrong, it also amounts to double-dealing, because the State later asserts that the actual government speech doctrine is "wholly inapplicable here." Rather than asking us to conduct the analysis dictated by case law, the Florida defendants would have us conclude —by ipse dixit apparently—that *all* speech, by any professor at a public university, is government speech, completely unprotected by the First Amendment. But the Supreme Court has never endorsed anything like that idea, and we decline to take Florida's word for it. In fact, we are rightfully wary of this very sleight of hand: the government speech doctrine may not be used "as a subterfuge for favoring certain private speakers over others based on viewpoint." *Pleasant Grove City v. Summum*, 555 U.S. 460, 473, 129 S.Ct. 1125, 172 L.Ed.2d 853 (2009). And in service of that same concern, we "exercise great caution before extending our government-speech precedents." *Matal v. Tam*, 582 U.S. 218, 235, 137 S.Ct. 1744, 198 L.Ed.2d 366 (2017).

A variety of factors are at play when considering whether the government is speaking, reflecting the Supreme Court's guidance that the inquiry is a "holistic" one, neither "mechanical" nor a "rote application of rigid factors," but "driven by a case's context." *Shurtleff*, 596 U.S. at 252, 142 S.Ct. 1583. Several considerations may be relevant, including "whether the government maintains control over the speech," "whether the type of speech has traditionally communicated government messages," and "whether the public would reasonably believe that the government has endorsed the speech." *McGriff v. City of Miami Beach*, 84 F.4th 1330, 1334 (11th Cir. 2023); *see also* *Shurtleff*, 596 U.S. at 252, 142 S.Ct. 1583.

We first consider whether the government maintains control over the speech here. The State has traditionally exercised relatively little control over postsecondary education, especially as compared to public primary or secondary education. Florida imposes few curricular requirements by statute. And those that it does impose involve basic general education requirements—things like how many core classes students must take to graduate and what standards a communications course must meet. (Such a course "must afford students the ability to communicate effectively.") *See* Fla. Stat. § 1007.25(3). And the "purpose and mission" of Florida's postsecondary educational system, as defined by state law, is to "enable[ ] all students to participate in the search for knowledge and individual development," to "discover and disseminate knowledge," to "foster[ ] diversity of educational opportunity," and to "develop in students heightened intellectual, cultural, and humane sensitivities." Fla. Stat. § 1004.01. These broad ambitions are inconsistent with unrestricted control over ***1157** the messages conveyed by university professors.

The relative independence of Florida's universities diverges from the State's near plenary authority over primary and secondary education, where "state academic standards establish the core content of the curricula to be taught in the state." Fla. Stat. § 1003.41(1). In exercising this broad authority, the State Board of Education has adopted a comprehensive list of educational standards—nearing 7,300 in number and spanning every subject and every grade. *See* *Browse and Search Standards*, CPALMS, https://www.cpalms.org/Public/search/Standard [https://perma.cc/92R9-FR7Y]; *see also* *Learning Systems Institute*, Florida State University, https://lsi.fsu.edu/projects/current/cpalms [https://perma.cc/PC2Z-LLBK]. To meet these standards, moreover, public school teachers must "us[e] the books and materials required," "follow[ ] the prescribed courses of study," and only "employ[ ] approved methods of instruction." Fla. Stat. § 1003.42(2). The state government, in short, has traditionally controlled the curriculum in primary and

USCA11 Case: 25-11929 Document: 47 Date Filed: 09/14/2026 Page: 21 of 42

secondary schools, but offers only minimal statutory guidance in the postsecondary education context.

The State's relative detachment from college lectures is even more revealing when compared to the level of state control we see in the government speech context —nearly total. A few examples illustrate the point. In one case about the use of a stadium loudspeaker during a state championship game, this Court explained that the announcer's remarks were "entirely scripted," with "[e]very word" written by a state employee. *Cambridge Christian Sch., Inc. v. Fla. High Sch. Athletic Ass'n*, 115 F.4th 1266, 1293–94 (11th Cir. 2024). And in another involving a USDA-sponsored pro-beef campaign, the Supreme Court noted that the government exercised "final approval authority over every word used." *Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550, 561, 125 S.Ct. 2055, 161 L.Ed.2d 896 (2005). Florida does not—and could not—exercise that kind of control over every postsecondary class lecture. Indeed, Florida does not argue that it *has* controlled every word that university professors say, only that it *can*. And common sense also has a role to play here. Does anyone really think that every professor in every class at every public university is putting forward the official line of the State's political branches? So while the government speech doctrine "does not require omnipotence," Florida has not come close to exhibiting the degree of control necessary to classify professors' lectures as government speech. *Leake v. Drinkard*, 14 F.4th 1242, 1250 (11th Cir. 2021).

The second and third factors—whether the speech has traditionally communicated government messages and whether the public would view the speech as endorsed by the government—are closely related here. Certainly at some level the public perceives a seal of approval from the State for the curricular decisions of its universities. And courts have recognized that the universities themselves at least have control over "the parameters of focus and general subject matter of curriculum." *Bishop*, 926 F.2d at 1073 (quotation omitted). But the text of this law does not seek to develop the curriculum of a university, of a major, or even of a class. Instead, it seeks to bar disfavored speech on one set of topics at every university and in any class. And it does so in a way that contradicts Florida's longstanding (and presumably still valid) statutes governing its universities.

Florida law, for instance, requires state universities to continually assess "the intellectual freedom and viewpoint diversity" ***1158** and "the extent to which competing ideas and perspectives are presented" at the school. Fla. Stat. § 1001.706(13)(b). And the Board of Governors is forbidden from limiting students' "access to, or observation of, ideas and opinions that they may find uncomfortable, unwelcome, disagreeable, or offensive," if that speech is protected by the First Amendment. *Id.* § 1001.706(13)(a)(2), (c). These principles are consistent with the Supreme Court's recognition that the "classroom is peculiarly the 'marketplace of ideas.' " *Keyishian*, 385 U.S. at 603, 87 S.Ct. 675. And they are *inconsistent* with the idea that university professors communicate government messages as mouthpieces of the state. These statutes (together with common sense) make clear that the public—and even the State—both recognize that university professors speak independently and without government endorsement of every idea they communicate.

So neither the defendants' cherry-picked quotations, nor a true government speech analysis (which the defendants disclaim), supports their far-reaching conclusion. And the combination of the two fares no better—zero plus zero is still zero. The defendants' mashed-up theory of government speech results in an astonishing assertion: if the government pays your salary, it can dictate every word you say as part of your job. Even in the academic context. And Florida leans into this assertion rather than minimizing it, agreeing at oral argument that a state legislature could constitutionally ban any negative classroom statements about a particular gubernatorial administration. We give the State credit for not feigning limits that its theory lacks, but the chimeric government speech doctrine it conjures cannot withstand constitutional scrutiny.

### C.

With both *Garcetti* and Florida's salary-for-speech approach to academic freedom off the table, we are still left with a difficult question: can the Individual

USCA11 Case: 25-11929 Document: 47 Date Filed: 09/14/2026 Page: 22 of 42

Freedom Act's speech restrictions be constitutionally applied to these professors? After all, though it offers little direct control, Florida (like other states) is fundamentally in charge of its public universities, appointing most members of the Board of Governors, providing considerable funding, and establishing certain core curricular standards. "Federal judges should not be ersatz deans or educators." *Bishop*, 926 F.2d at 1075. And because "States historically have been sovereign" in the field of education, the "traditional role in the formulation and execution of educational policy" belongs to them—not us. *United States v. Lopez*, 514 U.S. 549, 564, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995); *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 208 n.30, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982). That leaves federal courts "reluctan[t] to trench on the prerogatives of state and local educational institutions." *Regents of Univ. of Michigan v. Ewing*, 474 U.S. 214, 226, 106 S.Ct. 507, 88 L.Ed.2d 523 (1985); *see also Virgil v. Sch. Bd.*, 862 F.2d 1517, 1520 (11th Cir. 1989). But these precedents, like their counterparts reserving space in the First Amendment catalogue for academic freedom, fail to provide a direct answer to the question we consider today.

We thus return to *Bishop*, which asked as we do here, "to what degree a school may control classroom instruction before touching the First Amendment rights of a teacher." *Bishop*, 926 F.2d at 1073. As we explained earlier, that case arose when the University of Alabama barred one of its professors from using class time to describe his religious views. *Id.* at 1068–70. Some of his comments concerned his belief in "the creative force behind human physiology." ***1159** *Id.* at 1068. Others were made to share his faith, be open about his biases, and offer suggestions for students on how to deal with academic stress. *Id.* But the students sought something else—an uninterrupted course on exercise physiology. After enough complaints, the University directed Bishop to stop, forbidding him from "presenting his religious viewpoint during instructional time, even to the extent that it represent[ed] his professional opinion about his subject matter." *Id.* at 1069, 1077. We ultimately rejected the professor's free speech challenge to that restriction. *Id.* at 1076–77.

Here, Florida suggests that a direct line connects the constitutionality of the University's response to Bishop with the constitutionality of the Florida political branches' prophylactic speech ban on all public college and university professors. Not so. *Bishop* itself instructs that there is "no substitute for a case-by-case inquiry into whether the legitimate interests of the authorities are demonstrably sufficient to circumscribe a teacher's speech." *Id.* at 1074 (quotation omitted). We are thus surprised by the dissenting opinion's insistence that *Bishop* has already decided this very different case (and presumably every other case about academic freedom) in favor of state control. *See* Dissenting Op. at —— ("In short, *Bishop* held that professors have no First Amendment right to overrule their employer's judgment concerning the content of classroom instruction.").

As directed by this Court's precedent, we take as our starting point *Pickering*'s baseline balancing test for assessing when governmental interests outweigh a government employee's First Amendment rights. *See Pickering*, 391 U.S. at 568, 88 S.Ct. 1731; *Bishop*, 926 F.2d at 1072. And again following *Bishop*'s lead, we recognize "the 'basic educational mission' " of the university system, which authorizes "the use of 'reasonable restrictions' over in-class speech that [the State] could not censor outside the classroom." *Bishop*, 926 F.2d at 1074 (quoting *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 266–67, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988)). Along those same lines, we recognize *Kuhlmeier*'s holding (endorsed in *Bishop*) that "educators do not offend the First Amendment by exercising editorial control over the style and content of student or professor speech in school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns." *Id.* (alteration adopted) (quoting *Kuhlmeier*, 484 U.S. at 273, 108 S.Ct. 562).

These factors cash out to the recognition that here, as in other First Amendment cases, we are called to balance the professors' interests against the State's. But the government's interests in this equation are rather circumscribed: editorial control is taken for granted, but restrictions must be reasonable and related to legitimate pedagogical concerns. In conducting this analysis, we consider *Bishop*'s three general factors:

USCA11 Case: 25-11929 Document: 47 Date Filed: 09/14/2026 Page: 23 of 42

the context of the speech; the state's "position as a public employer"; and the "strong predilection for academic freedom as an adjunct of the free speech rights of the First Amendment." *Id.* at 1074–75.

*First*, context. Here the context is the same as in *Bishop*: "the university classroom during specific in-class time." *Id.* at 1074. *Bishop* also noted that the "University's interest is most obvious when student complaints suggest apparent coercion—even when not intended by the professor." *Id.* The word coercion, to be sure, has echoes of Establishment Clause precedents (particularly around the time of *Bishop*), but we think that ***1160** concern is relevant here, too.[12] Florida's restrictions are, as the State admits, an attempt to force uniformity of thought on students by curtailing the free exchange of ideas in universities—the very environments traditionally regarded as laboratories for expression and truth seeking. *See Healy v. James*, 408 U.S. 169, 180–81, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972); *Rosenberger*, 515 U.S. at 835–36, 115 S.Ct. 2510. Compelling certain beliefs by suppressing "individual thought and expression" is "especially" dangerous in the classroom context, "where the State acts against a background and tradition of thought and experiment that is at the center of our intellectual and philosophic tradition." *Rosenberger*, 515 U.S. at 835, 115 S.Ct. 2510. Unlike in *Bishop*, where the University was furthering an anti-coercion goal, Florida here asserts the opposite interest—coercing university faculty (and by extension the students) into avoiding a certain set of ideas. Whether Florida is right or wrong about how dangerous these viewpoints are is irrelevant, at least to our inquiry as a court. "No matter how controversial the ideas, allowing the government to set the terms of the debate is poison, not antidote." *Honeyfund*, 94 F.4th at 1283; *see also Sweezy*, 354 U.S. at 251, 77 S.Ct. 1203; *id.* at 261–63, 77 S.Ct. 1203 (Frankfurter, J., concurring).

*Second*, we consider the State's interests as an employer. "Courts agree that the school's administration may at least establish the parameters of focus and general subject matter of curriculum." *Bishop*, 926 F.2d at 1073 (quotation and ellipses omitted). No doubt. And "[t]angential to the authority over its curriculum, there lies some authority over the conduct of teachers in and out of the classroom that significantly bears on the curriculum or that gives the appearance of endorsement by the university." *Id.* at 1074. This recognition, we think, significantly mitigates the risk that enforcing the First Amendment in the academic context would leave universities or other government authorities powerless to set overall curricular decisions or exclude speech that veers outside of well-understood parameters—personal tangents irrelevant to the subject matter, conspiracy theories, and the like.

Our own early cases support this same point. In one, we found no constitutional error when a university fired a professor whose speech "seriously impair[ed] ... his effectiveness as an instructor." *Ferguson v. Thomas*, 430 F.2d 852, 859 (5th Cir. 1970). In another, we rejected a First Amendment challenge to a university's decision to deny tenure when the professor gave students two course credits for effectively taking only one course; awarded most students high grades for little work; made "untrue and misleading public statements"; and demonstrated a lack of "professionalism and maturity." *Megill v. Bd. of Regents*, 541 F.2d 1073, 1082–83, 1085 (5th Cir. 1976). And in *Bishop*, we again found no First Amendment violation when the university determined that a professor's tangential speech impeded his ability to properly teach physiology. *Bishop*, 926 F.2d at 1076–77. These cases show that even when reserving space for academic freedom, university administrators (and perhaps other government officials too) have a legitimate interest in ensuring that a professor's in-class speech is both "germane" to the curriculum and "professionally competent." *See* Keith E. Whittington, ***1161** *Professorial Speech, the First Amendment, and Legislative Restrictions on Classroom Discussions*, 58 Wake Forest L. Rev. 463, 501–07 (2023); *see also* Matthew W. Finkin & Robert C. Post, *For the Common Good* 87–100 (2009); Henry Reichman, *Understanding Academic Freedom* 66–69 (2021).

Florida's justifications are not in line with those rationales. Rather than asserting an interest in promoting classroom efficiency or appropriately educating students, Florida says its "sovereign judgment" is that the forbidden viewpoints are "contrary to the State's most cherished ideals." But advancing cherished state ideals is a far cry from ordinary workplace management concerns, much less

USCA11 Case: 25-11929 Document: 47 Date Filed: 09/14/2026 Page: 24 of 42

a legitimate pedagogical interest. What's more, even if many of these ideas are dead wrong, they are not at all irrelevant, at least in certain coursework. Florida itself seems to recognize this fact by allowing discussion of the viewpoints, even while barring their endorsement.

The State does assert one other justification for its law—an "interest in preventing invidious racial discrimination in public education." But as we have already held when considering the companion provision limiting private employers' speech, the Act does no such thing. Discrimination "generally means to treat differently," and "the Act does not regulate differential treatment"—it restricts speech that State political authorities find objectionable. *Honeyfund*, 94 F.4th at 1281 (quotation omitted). Preventing professors from positively discussing a viewpoint is not the same as regulating discrimination, which the State can certainly do. A professor who espouses a particular idea does not stand in the same shoes as one who ridicules a student, threatens a student, or targets a student. The Act does not limit (and does not purport to limit) *actual* discrimination of any kind. It instead assumes that mere exposure to what the State views as the wrong viewpoint is itself a serious harm. But a difference of opinion is not discrimination.[13]

Under the First Amendment, "Florida has no compelling interest in creating a per se rule that some speech, regardless of its context or the effect it has on the listener, is offensive and discriminatory. It is firmly settled that under our Constitution the public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers." *Id.* (quotation omitted).

Even outside the academic context, higher standards are necessary to vindicate broad, prophylactic restrictions on the speech of a large number of employees than to justify case-by-case punishment of an errant employee. *See* *Nat'l Treasury Emps. Union*, 513 U.S. at 466–68, 115 S.Ct. 1003. Here, the law simply suppresses certain viewpoints that Florida disfavors.

At a minimum, then, the State's interests as an employer do not line up with the priorities that we have recognized in *Bishop* and other early cases in the educational context. Nor, as discussed earlier, are they similar to those that the Supreme Court approved in the *Pickering* line of cases. And at their maximum, the State's interests run headlong into bedrock First ***1162** Amendment principles. The Supreme Court said it best: "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion." *West Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943).

*Third*, we consider what we called in *Bishop* the "strong predilection for academic freedom."[14] *Bishop*, 926 F.2d at 1075. As we noted there (and here), scholarly freedom is "abundant[ly]" celebrated in First Amendment caselaw, and the "vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools." *Id.* (quoting *Keyishian*, 385 U.S. at 603, 87 S.Ct. 675). Indeed, our "Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth out of a multitude of tongues, rather than through any kind of authoritative selection." *Id.* (alteration adopted) (quoting *Keyishian*, 385 U.S. at 603, 87 S.Ct. 675).

Again, *Bishop* proves the point. True, that court also noted that "pronouncements about academic freedom" in other contexts "cannot be extrapolated to deny schools command of their own courses." *Id.* To that end, we nod our heads along with *Bishop* as it recognizes that "academic freedom thrives not only on the independent and uninhibited exchange of ideas among teachers and students, but also, and somewhat inconsistently, on autonomous decisionmaking by the academy itself." *Id.* (alteration adopted and quotation omitted). Florida's Act, in contrast, removes any decisionmaking by the academy about the topics it bars. And the State's rationale is not limited—it would allow the legislature to block any speech on any topic for any reason.

Even in other contexts where the government has greater latitude to impose constraints on speech, it still "may not aim at the suppression of dangerous ideas." *Nat'l Endowment for Arts v. Finley*, 524 U.S. 569, 587, 118 S.Ct. 2168, 141 L.Ed.2d 500 (1998) (alteration adopted and quotation omitted).

USCA11 Case: 25-11929 Document: 47 Date Filed: 09/14/2026 Page: 25 of 42

In the university context, then, where the dangers of censorship are heightened, a state prohibiting disfavored messages inspires even more skepticism. The broader the restriction, and the more people whose speech it limits, the more scrutiny it must receive. *See* Nat'l Treasury Emps. Union, 513 U.S. at 466–68, 115 S.Ct. 1003. Case-by-case restrictions on a single problematic professor's teaching are the bread and butter of First Amendment cases affirming the curricular authority of universities. But Florida tries to stretch those precedents to fit an entirely new context: not a university disciplining one professor for discrete misconduct, but a state government barring all professors from sharing politically disfavored ideas.

**D.**

We acknowledge that the *Bishop* factors can sometimes point in different directions. ***1163** In *Bishop* itself they did—the professor's control over his own in-class speech was set against his university's decisions about the overall content of that class. But here, we think they point the same way—toward free speech.

The distinctions between this case and *Bishop* are fundamental. For starters, these statutory speech restrictions are not the considered academic judgment of a university, and these disagreements are not between a university and its professor. That is not to say that states cannot play an important or even decisive role, but it is far less likely that the more workaday employment and curricular concerns that can survive First Amendment review will capture the imagination of legislative majorities. What's more, the restriction in *Bishop* was directed to one professor, about one class, and involved one type of objection to his teaching. *See* *Bishop*, 926 F.2d at 1068–70. The Individual Freedom Act, in contrast, applies to all state professors, in every class, and targets eight broad and disfavored topics. *See* Fla. Stat. § 1000.05(4). It is a naked prohibition on disfavored speech, not a limited restraint on one professor's religious views. And its tiered enforcement scheme applies not only to professors, but also to universities, hitting both with dramatic financial consequences for noncompliance.

Normally, "[d]iscrimination against speech because of its message is presumed to be unconstitutional." *Rosenberger*, 515 U.S. at 828, 115 S.Ct. 2510. And we have previously "emphasized that the dangers of viewpoint discrimination are *heightened* in the university setting." *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1127 n.6 (11th Cir. 2022) (quotation omitted). As Florida itself recognizes, at least in other statutes, universities are where new ideas germinate, where solutions take shape, and where orthodoxy falls. Or, they should be—sometimes groupthink or even more sinister patterns take hold. But make no mistake, "standardization of ideas either by legislatures, courts, or dominant political or community groups" is not the answer. *Terminiello v. Chicago*, 337 U.S. 1, 4–5, 69 S.Ct. 894, 93 L.Ed. 1131 (1949). Instead, "for the State in the person of school officials to justify prohibition of a particular expression of opinion, it must be able to show that its action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint." *Tinker*, 393 U.S. at 509, 89 S.Ct. 733. Florida has made no such showing.

This Act's effect on academic freedom is compounded by its lack of clear definitions. The uncertainties about the Act's coverage are yet another difference between the restrictions placed on Bishop and those sought here. "Broad prophylactic rules in the area of free expression are suspect. Precision of regulation must be the touchstone in an area so closely touching our most precious freedoms." *NAACP v. Button*, 371 U.S. 415, 438, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963) (citations omitted). The Act's language is full of imprecision, which leaves us with some idea of the viewpoints that Florida targets, but little information about the boundaries of those concepts or what it would take to "endorse" them. For example, when a professor assigns a reading for class that promotes one of the prohibited concepts, is that professor subjecting the student to "instruction that espouses, promotes, advances, inculcates, or compels such student ... to believe" in the concept? What about when a professor hosts a guest speaker who presents only one side of the debate?[15] Or how about a ***1164** professor who teaches about one of the forbidden concepts using the Socratic method? Would those discussions be "objective"? The parties disagree on every front.[16] And that is to say nothing of the lack of clear language

USCA11 Case: 25-11929 Document: 47 Date Filed: 09/14/2026 Page: 26 of 42

in the individual concepts' definitions. Just to name one, what does "morally superior" encompass, and against whose perspective is it measured?

Florida, unlike the defendants in *Bishop*, has not offered us a narrow reading of the speech restrictions it seeks to impose. Instead, it offers the broadest possible rule: because the government pays these professors' salaries, it can restrict their speech however it wishes. Moderation is said to be found in the fact that professors will have the opportunity to clean up their courses after shortcomings are identified. What a remarkable suggestion—that we should bless an unclear, viewpoint-based speech ban simply because the government says it will refrain from penalizing the speaker until after it gives a warning. That is a dark kind of mercy.

In the end, the State's interests are insufficient to support the Act's restrictions. Whatever the boundaries of the government's control over in-class, curricular speech, this set of restrictions exceeds them. "If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989) (collecting cases). Try as it might, the State of Florida may not "prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion." *Barnette*, 319 U.S. at 642, 63 S.Ct. 1178. The "First Amendment rests instead on a simple truth: The people lose whenever the government transforms prevailing opinion into enforced conformity." *Chiles*, 146 S. Ct. at 1029 (alteration adopted and quotation omitted). The Act violates the First Amendment's guarantee of freedom of speech.[17]

* * *

A few words about the dissent. Our decision today does not authorize "viewpoint discrimination under exceptions created, interpreted, and enforced by the judiciary." Dissenting Op. at ——. To the contrary, it simply reserves space for the same kinds of curricular and disciplinary decisions that universities have always made. Nor do we make any judgment about the value of the ideas Florida seeks to ban—it is not our place to do so. "As in every case, our single duty is to determine the issues presented in accord with the Constitution and the law." *Coolidge v. New Hampshire*, 403 U.S. 443, 445, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); *see also* *Biden v. Nebraska*, 600 U.S. 477, 506–07, 143 S.Ct. 2355, 216 L.Ed.2d 1063 (2023). For its part, the dissent does not so much as attempt to reconcile its view with the Supreme Court's repeated invocations of academic freedom. Perhaps it finds them inconvenient, ***1165** or even incorrect (though it offers no analysis of why that would be so). But the only way to uphold this law is to disregard those precedents, and as lower court judges we do not have that option.

The dissent also attempts to clothe itself in originalism without offering any originalist inquiry. For one, it makes a show of the lack of pre-twentieth-century discussion of "academic freedom," but that is easy enough to explain—if one considers the matter. *See* Dissenting Op. at —— – ——. To start, the First Amendment was not incorporated against the States until 1868, and the federal government was not in the business of chartering universities, so there was no reason to consider its specific impact on state universities until much later.

Jurisprudential factors were at play, too. The First Amendment had "no general bite in 1900 because of the American judiciary's extremely cramped view of the amendment's scope." William W. Van Alstyne, *Academic Freedom and the First Amendment in the Supreme Court of the United States: An Unhurried Historical Review*, 53 Law. & Contemp. Probs. 79, 82 (1990). That was not, the reader will note, an originalist era. On top of that, the Supreme Court's view of public employment at the time left no room at all for freedom of speech—a government employer had total control over an employee's speech, both in and out of the workplace. *Id.* at 83–84. Then-Judge Holmes offered the most memorable (if troubling) description of this view: "The petitioner may have a constitutional right to talk politics, but he has no constitutional right to be a policeman.... The servant cannot complain, as he takes the employment on the terms which are offered him." *McAuliffe v. Mayor of New Bedford*, 155 Mass. 216, 29 N.E. 517, 517–18 (1892). Though the dissent endorses this long-retired view of public employee speech, its place in the law is thankfully gone.

USCA11 Case: 25-11929 Document: 47 Date Filed: 09/14/2026 Page: 27 of 42

Even considering all this, it is clear that the concept of academic freedom, if not the term, was well recognized early in our Nation's history. One of the very scholars the dissent cites explains that "[p]ractical autonomy from government control has characterized American colleges and universities ... at least since disestablishment of the state churches at the beginning of the nineteenth century." J. Peter Byrne, *Academic Freedom: A "Special Concern of the First Amendment,"* 99 Yale L.J. 251, 321 (1989). Indeed, early sources reflect a respect for keeping politics out of teaching and scholarship. When the New Hampshire legislature tried to take over Dartmouth College, Daniel Webster persuaded the Supreme Court to side with the College. In what turned out to be the most famous oral argument in this Nation's history, Webster stressed that it would be "a dangerous, a most dangerous, experiment, to hold these institutions subject to the rise and fall of popular parties, and the fluctuations of political opinions." *See Trs. of Dartmouth Coll. v. Woodward*, 17 U.S. 518, 599, 4 Wheat. 518, 4 L.Ed. 629 (1819). So too for freedom of inquiry in the university setting. Around the same time, when planning for the University of Virginia, Thomas Jefferson wrote, "this institution will be based on the illimitable freedom of the human mind. For here we are not afraid to follow truth wherever it may lead, nor to tolerate any error so long as reason is left free to combat it." Letter from Thomas Jefferson to William Roscoe (Dec. 27, 1820), *in* 16 *The Papers of Thomas Jefferson: Retirement Series* 499 (J. Jefferson Looney et al. eds., 2019).

We share the dissent's view that the federal courts do not police curriculum. But we do police the First Amendment. And if the history of that Amendment tells ***1166** us anything, it is that the government cannot forbid what it perceives as heresy. As between allowing a state to tamp down discussion of disfavored viewpoints on the one hand, and allowing free debate about those topics on the other, which do we think is more consistent with the founding generation's commitment to the freedom of speech? The question answers itself.

## IV.

"Because the plaintiffs have shown a likelihood of success on the merits, the remaining requirements necessarily follow." *Honeyfund*, 94 F.4th at 1283. The Act is "an unconstitutional direct penalization of protected speech," so "continued enforcement, for even minimal periods of time, constitutes a per se irreparable injury." *Otto*, 981 F.3d at 870 (quotation omitted). And because neither the State nor the public has a legitimate interest in the enforcement of an unconstitutional law, the third and fourth requirements are met. *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006). The plaintiffs have therefore satisfied all four requirements for a preliminary injunction.

* * *

Florida seeks to strip public university professors—and by extension their students—of the ability to fully engage with ideas that are, for better or for worse, very popular in some academic circles. The State asks us to consider its rules a means of targeting discrimination. But hearing an idea you disagree with is not discrimination; it is an opportunity to come up with a better idea, or maybe even change your mind.

This is not the first time that the State has tried to lead us down the garden path about the purpose and effect of a law banning speech. We have once before rejected its reframing of the Individual Freedom Act's proscriptions, and we do so again here. *See Honeyfund*, 94 F.4th at 1283. Section 1000.05(4) cannot be constitutionally applied to these plaintiffs. The Act strikes at the core of the First Amendment's commitment to open dialogue, transforming the classroom into a place where a "deadening dogma takes the place of free inquiry." *Adler v. Bd. of Educ.*, 342 U.S. 485, 510, 72 S.Ct. 380, 96 L.Ed. 517 (1952) (Douglas, J., dissenting), *overruled by Keyishian*, 385 U.S. 589, 87 S.Ct. 675.

The proper role of universities in our society has long been a topic of fierce debate. Universities and professors do not always get it right. Neither does the government. But as we said not long ago, "[i]ntellectual and cultural tumult do not last forever, and our Constitution is unique in its commitment to letting the people, rather than the government, find the

USCA11 Case: 25-11929 Document: 47 Date Filed: 09/14/2026 Page: 28 of 42

right equilibrium." *Honeyfund*, 94 F.4th at 1283. We **AFFIRM** the district court's preliminary injunction.

Lagoa, Circuit Judge, Dissenting:

Our task here is not to decide what the State *should* do, but what it *may* do.

The professor-plaintiffs are state employees, and the speech at issue here occurs during their state-sponsored instruction in a course taken for credit by students enrolled in the State's public universities. According to the majority, a state can restrict a professor's speech so long as the restriction is "reasonable and related to legitimate pedagogical concerns." Maj. Op. at ——. The majority also tells us that the State may legitimately prohibit a professor from discussing "irrelevant" material, "professionally [in]competent" material, "conspiracy theories, and the like." *Id.* at ——. The majority reassures that these are "well-understood parameters." *Id.* But in practice, these "parameters" ***1167** install a judge-made test that is unworkable and whose "policy-driven approach to the Constitution," *McKee v. Cosby*, 586 U.S. 1172, 1173, 139 S.Ct. 675, 203 L.Ed.2d 247 (2019) (Thomas, J., concurring in the denial of certiorari), reduces the First Amendment to a reflection of judicial preference, regardless of the State's interests in its classroom instruction.

The State's authority in this context is not the nullity the majority suggests. We have repeatedly decided cases of this kind, and from those decisions emerges a consistent principle: the State's authority is at its zenith in its public classrooms, including the classrooms in its public universities. *See Bishop v. Aronov*, 926 F.2d 1066 (11th Cir. 1991); *Ferguson v. Thomas*, 430 F.2d 852, 859 (5th Cir. 1970);[1] *Megill v. Bd. of Regents of State of Fla.*, 541 F.2d 1073, 1081–82 (5th Cir. 1976); *Pred v. Bd. of Pub. Instruction of Dade Cnty., Fla.*, 415 F.2d 851, 859 (5th Cir. 1969); *Duke v. N. Texas State Univ.*, 469 F.2d 829, 835–40 (5th Cir. 1972). And "a prior panel's holding is binding on all subsequent panels unless and until it is overruled or undermined to the point of abrogation by the Supreme Court or by this court sitting *en banc*." *United States v. Archer*, 531 F.3d 1347, 1352 (11th Cir. 2008).

A public university's classroom "is not an open forum." *Bishop*, 926 F.2d at 1071. During instructional periods, "the University's classrooms are reserved for other intended purposes," namely "the teaching of a particular university course for credit." *Id.* (internal quotation marks omitted). Our precedent is clear that states retain authority to restrict a professor's "viewpoint" in a public classroom, even if the professor's viewpoint "represents his professional opinion." *Id.* at 1076–77.

To be clear, the First Amendment protects all viewpoints in the public square, whether they are conventional or controversial. But it does not compel all viewpoints to be worthy of state-sponsored endorsement. Indeed, in a case involving a private religious university, the Supreme Court held that the government has a "compelling" and "overriding interest in eradicating racial discrimination in education." *Bob Jones Univ. v. United States*, 461 U.S. 574, 604, 103 S.Ct. 2017, 76 L.Ed.2d 157 (1983). Florida asserts the same interest here. And if the government has a compelling interest in eradicating racial discrimination in a private university, how much greater is Florida's interest in eradicating what it deems to be racial discrimination in its own classrooms? We need not agree or disagree with Florida that the viewpoints at issue here constitute racial discrimination; we need only acknowledge that the State is allowed to decide what is endorsed by its professors in its own classrooms.

Because Plaintiffs have not shown a likelihood of success on the merits that the Individual Freedom Act ("IFA"), Fla. Stat. § 1000.05(4)(a), is unconstitutional, I respectfully dissent.

## I.

The IFA makes it an act of discrimination "on the basis of race, color, national origin, or sex" to subject any student or employee to "training" or "instruction" that "espouses, promotes, advances, inculcates, or compels" belief in any of eight concepts. Fla. Stat. § 1000.05(4)(a). Those concepts are:

USCA11 Case: 25-11929 Document: 47 Date Filed: 09/14/2026 Page: 29 of 42

***1168** 1. Members of one race, color, national origin, or sex are morally superior to members of another race, color, national origin, or sex.

2. A person, by virtue of his or her race, color, national origin, or sex, is inherently racist, sexist, or oppressive, whether consciously or unconsciously.

3. A person's moral character or status as either privileged or oppressed is necessarily determined by his or her race, color, national origin, or sex.

4. Members of one race, color, national origin, or sex cannot and should not attempt to treat others without respect to race, color, national origin, or sex.

5. A person, by virtue of his or her race, color, national origin, or sex, bears responsibility for, or should be discriminated against or receive adverse treatment because of, actions committed in the past by other members of the same race, color, national origin, or sex.

6. A person, by virtue of his or her race, color, national origin, or sex, should be discriminated against or receive adverse treatment to achieve diversity, equity, or inclusion.

7. A person, by virtue of his or her race, color, sex, or national origin, bears personal responsibility for and must feel guilt, anguish, or other forms of psychological distress because of actions, in which the person played no part, committed in the past by other members of the same race, color, national origin, or sex.

8. Such virtues as merit, excellence, hard work, fairness, neutrality, objectivity, and racial colorblindness are racist or sexist, or were created by members of a particular race, color, national origin, or sex to oppress members of another race, color, national origin, or sex.

*Id.* § (4)(a)(1)–(8).

The IFA expressly permits a professor to assign texts containing such concepts to his students, discuss their contents in the classroom, and even dissect their underlying ideologies. *See id.* § (4)(b) (providing an exception for "discussion of the concepts listed," provided that "such training or instruction is given in an *objective manner without endorsement*" of those concepts) (emphases added). Put simply, the statute distinguishes between the discussion and debate of discriminatory ideologies, which is permissible, and their endorsement or promotion by the professor, which is not.

Plaintiffs—two students, several professors, and a student organization at six of Florida's public universities—contend that these nondiscrimination provisions violate the First Amendment.[2]

Before turning to the merits, I clarify the nature of Plaintiffs' challenges. The ***1169** majority assumes that "[t]he plaintiffs bring *as-applied* challenges to the Act." Maj. Op. at —— n.6 (emphasis added). That view is understandable; this doctrine is not always a model of clarity. The Supreme Court has recognized that "the distinction between facial and as-applied challenges is not so well defined," *see Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 331, 130 S.Ct. 876, 175 L.Ed.2d 753 (2010), and that some claims "obviously ha[ve] characteristics of both." *John Doe No. 1 v. Reed*, 561 U.S. 186, 194, 130 S.Ct. 2811, 177 L.Ed.2d 493 (2010). This case is a good example.

Here, "[t]he claim is 'as applied' in the sense that it does not seek to strike the [IFA] in all its applications, but only to the extent it covers [public university professors]. The claim is 'facial' in that it is not limited to plaintiffs' *particular case*, but challenges application of the law more broadly to *all* [public university professors]." *Reed*, 561 U.S. at 194, 130 S.Ct. 2811 (emphases added). In other words, the claim, and the injunction entered below, "reach beyond the particular circumstances of these plaintiffs," *id.*, barring the Board of Governors "from enforcing the IFA and Regulation 10.005 against any state university." *Pernell v. Florida Bd. of Governors of State Univ. Sys.*, 641 F. Supp. 3d 1218, 1288 (N.D. Fla. 2022). As *Reed* explains, when a claim reaches that far, it "must therefore satisfy our standards for a facial challenge to the extent of that reach." 561 U.S. at 194, 130 S.Ct. 2811.

The district court understood as much. It "agree[d] that Plaintiffs bring facial challenges in both their First

Amendment viewpoint discrimination and Fourteenth Amendment vagueness claims[,]" and issued "facial relief" accordingly. *Pernell*, 641 F. Supp. 3d at 1287–88. In short, "[Plaintiffs] chose to litigate these cases as facial challenges, and that decision comes at a cost." *Moody v. NetChoice, LLC*, 603 U.S. 707, 723, 144 S.Ct. 2383, 219 L.Ed.2d 1075 (2024).

For facial challenges, Plaintiffs must show that the IFA "prohibits a substantial amount of protected speech relative to its plainly legitimate sweep." *Id.* (quoting *United States v. Hansen*, 599 U.S. 762, 770, 143 S.Ct. 1932, 216 L.Ed.2d 692 (2023)). Admittedly, because the majority considers the IFA to be impermissibly "viewpoint discriminatory" under the First Amendment, it is unclear whether this analysis is required in the context of public university professors. *See Iancu v. Brunetti*, 588 U.S. 388, 398–99, 139 S.Ct. 2294, 204 L.Ed.2d 714 (2019). Even so, *Moody*'s threshold directive is clear: "*Before a court can do anything else* with these facial challenges, it must address that set of issues—in short, must 'determine what [the law] covers.' " 603 U.S. at 725, 144 S.Ct. 2383 (quoting *Hansen*, 599 U.S. at 770, 143 S.Ct. 1932) (emphasis added). That is no less true "in the First Amendment context[.]" *Id.* at 744, 144 S.Ct. 2383.

The majority does not undertake that threshold task. Instead, it asserts that the IFA provides "little information about the boundaries of those concepts or what it would take to 'endorse' them" and then poses a series of unanswered hypotheticals. *See* Maj. Op. at —— & n.16. But it does so without first identifying the statute's scope, an error the Supreme Court has already admonished this Court for doing once before. *Moody*, 603 U.S. at 726, 144 S.Ct. 2383 ("Neither the Eleventh Circuit nor the Fifth Circuit performed the facial analysis in the way just described."). Regardless of whether the facial analysis described in *Moody* is strictly required to establish viewpoint discrimination, "[a] court cannot invalidate the challenged laws if it has to speculate about their applications." ***1170** *Id.* at 790, 144 S.Ct. 2383 (Alito, J., concurring in the judgment). We should be careful not to repeat that mistake here.[3]

All in all, the district court granted Plaintiffs a sweeping preliminary injunction against the State, an "extraordinary" remedy that is "never awarded as of right." *Starbucks Corp. v. McKinney*, 602 U.S. 339, 345, 144 S.Ct. 1570, 219 L.Ed.2d 99 (2024) (internal quotation marks omitted). The majority labors to affirm that result. But the law in this Circuit is neither novel nor uncertain. It simply points the other way.

## II.

The First Amendment provides, in relevant part, "Congress shall make no law ... abridging the freedom of speech, or of the press." U.S. Const. amend. I. And there is no serious dispute that, before the twentieth century, no one believed that the First Amendment enshrined a professorial right to freedom of speech in the classroom.

Indeed, "[t]here were no American legal precedents for academic freedom prior to its acceptance by the Supreme Court into the pantheon of First Amendment rights in 1957. Neither the common law nor any federal or state statute granted the university professor any more security than that granted in her contract of employment." J. Peter Byrne, *Academic Freedom: A "Special Concern of the First Amendment,"* 99 Yale L.J. 251, 256 (1989); Walter P. Metzger, *Profession and Constitution: Two Definitions of Academic Freedom in America*, 66 Tex. L. Rev. 1265, 1285 (1988) ("Before the middle of [the twentieth] century, no American court had ruled that any provision of the federal constitution protected academic freedom."); Robert C. Post, *Academic Freedom and Legal Scholarship*, 64 J. Legal Educ. 530, 530, 533 (2015) ("Academic freedom did not always exist in the United States. It emerged during the first few decades of the twentieth century. Its birth was a result of a transformation of the mission of higher education in America."); William W. Van Alstyne, *Academic Freedom and the First Amendment in the Supreme Court of the United States: An Unhurried Historical Review*, 53-Sum. L. & Contemp. Probs. 79, 82 (1990) ("At the turn of the twentieth century, the first amendment was virtually in a state of pre-history so far as academic freedom was concerned.").

Before the Civil War, "the concept of academic freedom was literally inconceivable." ***1171** Byrne, *supra*, at 269. The objective of university education

USCA11 Case: 25-11929 Document: 47 Date Filed: 09/14/2026 Page: 31 of 42

was to train students to have the character and "mental discipline" to one day become lawyers, doctors, or members of the clergy. *Id.* And for better or worse, "no one" understood the role of a professor to include "producing scholarship" or "criticizing prevailing dogma." *Id.* Instead, "[f]aculty performed essentially fixed if learned operations within a traditional curriculum under the sanction of established truth." *Id.*

Academic freedom was first argued for—as a policy ideal, not as a constitutional right—at the turn of the twentieth century. This development was triggered by Americans who studied at German universities—where professors enjoyed *Lehrfreiheit* ("teaching freedom") and students enjoyed *Lernfreiheit* ("learning freedom"). Metzger, *supra*, at 1269–70. As American students returned home, they brought the concept of academic freedom with them. *Id.* In 1915, the American Association of University Professors ("AAUP") released a report containing the first "authoritative definition of academic freedom" that endorsed the concept of *Lehrfreiheit*, though it was "couched in American terms." *Id.* at 1267–85; Byrne, *supra*, at 276–78; *Urofsky v. Gilmore*, 216 F.3d 401, 410 (4th Cir. 2000) (citing Metzger, *supra*, at 1267–85). But "[s]ignificantly, the AAUP conceived academic freedom as a professional norm, not a legal one: The AAUP justified academic freedom on the basis of its social utility as a means of advancing the search for truth, rather than its status as a manifestation of First Amendment rights." *Urofsky*, 216 F.3d at 411 (citing Richard Hofstadter & Walter P. Metzger, *The Development of Academic Freedom in the United States* 398–400 (1955); Byrne, *supra*, at 277–78); *see also* Byrne, *supra*, at 256 ("[A]cademic freedom was a matter of professional ideology and custom."). And as a 1937 comment in the Yale Law Journal recognized, "[a]cademic freedom is not ... a constitutional privilege, or even a legal term defined by a history of judicial usage and separately listed in the digests and *Words and Phrases*." Comment, *Academic Freedom and the Law*, 46 Yale L.J. 670, 671 (1937).

Twenty years later, a plurality of the Supreme Court alluded—for the first time—to the "essentiality of freedom in the community of American universities." *Sweezy v. State of N.H. by Wyman*, 354 U.S. 234, 250, 77 S.Ct. 1203, 1 L.Ed.2d 1311 (1957) (plurality opinion). Later cases, such as *Keyishian v. Bd. of Regents*, 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967), also acclaim academic freedom. But these cases were the first of their kind. *See* Byrne, *supra*, at 256. A 1961 article frankly admits:

> It must be added, however, that while these statements are eloquent and incisive defenses of academic freedom, they were all made in the past ten years, and a search of the 363 volumes of the United States Supreme Court Reports will not yield much more on this subject, if anything at all. While there has been no dearth of litigation in the state appellate courts on subjects involving teachers and education, a reading of hundreds of cases has yielded very few opinions which pay any attention to the subject of academic freedom, and, much less, show any genuine appreciation of either its meaning or importance.

David Fellman, *Academic Freedom in American Law*, 1961 Wis. L. Rev. 3, 17 (1961).

To this day, "the Supreme Court has never set aside a state regulation on the basis that it infringed a First Amendment right to academic freedom." *Urofsky*, 216 F.3d at 412. And in *Bishop*, we discussed the "strong predilection" in favor of "academic freedom as an adjunct of the free ***1172** speech rights of the First Amendment," but held that "academic freedom" is nonetheless not "an independent First Amendment right." 926 F.2d at 1075. We noted the "abundant cases which acclaim academic freedom," and identified *Keyishian*, 385 U.S. 589, 87 S.Ct. 675, as "the most applicable" to the context of a public university's classroom. *Id.* But we understood *Keyishian* as dealing "with that brand of regulation most offensive to a free society: loyalty oaths." *Id.* We clarified that *Keyishian*'s "pronouncements about academic freedom in that context" "cannot be extrapolated to deny" public universities "command of their own courses." *Id.*

Even so, the majority's opinion offers no account of how the First Amendment's text was originally understood. *See Greater Birmingham Ministries v. Sec'y of State for Alabama*, 105 F.4th 1324, 1332 (11th Cir. 2024) (affirming the "fundamental canon" that words in a legal provision take their "ordinary meaning at the time" of their enactment) (quoting

USCA11 Case: 25-11929 Document: 47 Date Filed: 09/14/2026 Page: 32 of 42

*New Prime Inc. v. Oliveira*, 586 U.S. 105, 113, 139 S.Ct. 532, 202 L.Ed.2d 536 (2019)); *McKee*, 586 U.S. at 1173, 139 S.Ct. 675 (Thomas, J., concurring in the denial of certiorari) ("We should not continue to reflexively apply this policy-driven approach to the Constitution. Instead, we should carefully examine the original meaning of the First and Fourteenth Amendments."). For that matter, the majority offers only a partial account of how the First Amendment has been understood—relative to the college classroom—for most of American history.

**III.**

Finding little support in historical understandings of the First Amendment in this context, the majority turns to precedent and concludes that we confront "an unprecedented First Amendment intersection." Maj. Op. at ——— - ———. But we do not.

To provide some background, we usually analyze a public employee's First Amendment claims under the *Pickering-Garcetti* framework. For most public employees, the framework proceeds in two steps. *See Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 527–28, 142 S.Ct. 2407, 213 L.Ed.2d 755 (2022). At the first step, we analyze whether a public employee speaks "pursuant to their official duties." *Garcetti v. Ceballos*, 547 U.S. 410, 421, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006). If so, the First Amendment "does not insulate their communications." *Id.* But if a public employee instead speaks in their capacity as a citizen, we proceed to the *Pickering* balancing test at step two. *See Kennedy*, 597 U.S. at 527–28, 142 S.Ct. 2407 (citing *Pickering v. Board of Ed. of Township High School Dist. 205, Will Cty.*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968)). At the second step, we analyze the employee's claim by balancing the "interests" of the employee "as a citizen, in commenting upon matters of public concern" against "the interest of the State, as an employer." *Pickering*, 391 U.S. at 568, 88 S.Ct. 1731.

In *Garcetti*, however, the Supreme Court reserved the question of whether the *Garcetti* test applies to the "scholarship or teaching" of professors at public universities. 547 U.S. at 425, 126 S.Ct. 1951.[4] And five other circuits have declined to apply *Garcetti* to a professor's classroom ***1173** speech. *See Kilborn v. Amiridis*, 131 F.4th 550, 557–58 (7th Cir. 2025); *Heim v. Daniel*, 81 F.4th 212, 224–28 (2d Cir. 2023); *Adams v. Trs. of the Univ. of North Carolina-Wilmington*, 640 F.3d 550, 562–64 (4th Cir. 2011); *Meriwether v. Hartop*, 992 F.3d 492, 504–06 (6th Cir. 2021); *Demers v. Austin*, 746 F.3d 402, 406 (9th Cir. 2014).

We need not resolve that question here because, regardless of *Garcetti*'s application, Florida still prevails under the *Pickering* test at step two.[5] *See Kennedy*, 597 U.S. at 527–28, 142 S.Ct. 2407; *see also Heim*, 81 F.4th at 228–34 (turning to *Pickering* after holding that *Garcetti* is inapplicable); *Adams*, 640 F.3d at 564–65 (same); *Meriwether*, 992 F.3d at 507–12 (same); *Demers*, 746 F.3d at 412 (same). And here, our own binding precedent leaves no room for the majority's result. *See Bishop*, 926 F.2d at 1074–77; *Ferguson*, 430 F.2d at 859; *Megill*, 541 F.2d at 1081–82; *Pred*, 415 F.2d at 859; *see also Duke*, 469 F.2d at 835–40.

The IFA concerns classroom instruction, allowing professors to discuss discriminatory concepts but not endorse or compel them. *See* Fla. Stat. §§ 1000.05(2), (4). And our precedent has already struck this balance in the classroom, finding that the state's interest as an employer outweighs a professor's interest in teaching his personal views.

*Ferguson* is illustrative. There, we recognized that although a state institution normally has "no right to control" a professor's speech, it does "have a right to terminate his employment as a classroom instructor at the point where the exercise of his constitutional privileges clearly over-balanced his usefulness as an instructor." 430 F.2d at 859; *see id.* at 860 (Thornberry, J., dissenting) ("The majority recognizes that the *State of Texas* could terminate Dr. Ferguson's employment...") (emphasis added).

In *Megill*, we likewise held that the Florida Board of Regents "in no way infringed" on a professor's First Amendment rights when it denied him tenure in part because he failed to teach a philosophy course in accordance with the University of Florida's course catalog. 541 F.2d at 1082. We noted that "[i]t is essential that an academic board review a teacher's

USCA11 Case: 25-11929 Document: 47 Date Filed: 09/14/2026 Page: 33 of 42

classroom activities in determining whether to grant or deny tenure." *Id.*

And in *Pred*, we distinguished between a professor's speech in the classroom and outside the classroom:

> [T]he two activities for which this claimed discrimination was meted out are quite different. One, relating to the effort to organize teachers for effective action is quite removed from the classroom-school-house variety. The other, involving possible propaganda or agitation within the classroom and the course of instruction, comes much closer to collision with the need for discipline, both within the classroom and within the ***1174** school as a whole. This may well limit the extent or kind of expression of ideas under the First Amendment's umbrella.

415 F.2d at 859.

In *Duke*, we reaffirmed *Ferguson*'s holding that a public university has "a right to terminate ... a classroom instructor at the point where the exercise of his constitutional privileges clearly over-balanced his usefulness as an instructor." 469 F.2d at 838 (quoting *Ferguson*, 430 F.2d at 859). And although *Duke* did not involve a restriction on classroom speech, it is relevant because we credited the University's argument that the plaintiff's speech "demonstrated a lack of academic responsibility," which suggested that she was unfit to serve as an instructor. *Id.* at 838–40.

And then there is *Bishop*, which ought to end the matter. In *Bishop*, we held that it is the "public employer"—not the professor—who determines what may and may not be taught in the classroom. 926 F.2d at 1074–77. *Bishop* concerned an exercise physiology professor at the University of Alabama who, from 1984 through the 1987 spring semester, "occasionally referred to his religious beliefs during instructional time." 926 F.2d at 1068. The professor told students that he was a Christian and sometimes explained in class why human physiology contained evidence supporting intelligent design. *Id.* He also occasionally interjected his religious views when advising students "on coping with academic stresses." *Id.*

In April 1987, he organized an optional after-class lecture explaining why the complexity of human physiology suggests that humans are "created by God" and are "not the by-product of evolution." *Id.* at 1068–69. After that lecture, his supervisor sent him a memorandum directing him to stop "interject[ing] [his] religious beliefs ... during instructional time periods" and to stop hosting "optional classes where a 'Christian Perspective' of an academic topic is delivered." *Id.* at 1069. When the University refused to rescind the memorandum, the professor sued and obtained an injunction in district court. *Id.* at 1069–70.

On appeal, we reversed. Applying the *Pickering* balancing test, we held that the University "as an employer and educator can direct Dr. Bishop to refrain from expression of religious viewpoints in the classroom and like settings." *Id.* at 1072, 1076–77. We balanced three interests. First, we looked to "the context: the university classroom during specific in-class time and the visage of the classroom as part of a university course in an after-class meeting." *Id.* at 1074. Second, we considered the "University's position as a public employer" and its "authority to reasonably control the content of its curriculum, particularly that content imparted during class time." *Id.* Finally, we considered "the strong predilection for academic freedom as an adjunct of the free speech rights of the First Amendment." *Id.* at 1075. But this final consideration was not dispositive. *Id.* We acknowledged "the invaluable role academic freedom plays in our public schools," yet held that the professor's "interest in academic freedom and free speech do not displace the University's interest inside the classroom." *Id.* at 1075–76.

We repeatedly emphasized that the University restricted the professor's speech only in the "classroom"—"wherever he purports to conduct a class for the University." *Id.* at 1075–76 ("[T]he University seeks only to prevent Dr. Bishop from making assertions about his religious beliefs vis-a-vis the subject matter of his courses."). We concluded that "Dr. Bishop and the University disagree about a matter of content in the courses he teaches. The University must have the final say in ***1175** such a dispute." *Id.* at 1076. And "[t]hough Dr. Bishop's sincerity cannot be doubted, his educational judgment can be questioned and redirected by the University when he is acting under its auspices as a course instructor." *Id.* at 1076–77.[6]

USCA11 Case: 25-11929 Document: 47 Date Filed: 09/14/2026 Page: 34 of 42

Like *Bishop*, this case involves restrictions on a professor's speech in the classroom. *See* Fla. Stat. §§ 1000.05(2), (4). And *Bishop* already held that, concerning classroom instruction, the State's interests outweigh those of the individual professor. 926 F.2d at 1076–77. The majority recognizes *Bishop*'s applicability and analyzes the factors that we considered there. Maj. Op. at —— – ——. But its attempt to distinguish *Bishop* fails.

First, the majority acknowledges that "[h]ere the context is the same as in *Bishop*: 'the university classroom during specific in-class time.' " Maj. Op. at —— (quoting *Bishop*, 926 F.2d at 1074). In *Bishop*, we noted that the University of Alabama legitimately feared that the professor's speech would have a "coercive effect" on his students: that students would feel compelled to show interest in the professor's religious views to obtain a good grade. 926 F.2d at 1069, 1074. The majority says this case is "[u]nlike" *Bishop* because there "the University was furthering an anti-coercion goal." Maj. Op. at ——. Here, Florida supposedly "asserts the opposite interest—coercing [its] university faculty" to avoid "a certain set of ideas." *Id.*

Respectfully, that distinction does not hold up. *Bishop* addressed coercion directed at *students*; we expressed no concern about any coercion suffered by a professor. *See* 926 F.2d at 1074. In other words, the professor in *Bishop*, like the professor-plaintiffs here, was—in the majority's words—"coerc[ed]" to "avoid[ ] a certain set of ideas." Maj. Op. at ——. That is why Bishop brought the suit. *See Bishop*, 926 F.2d at 1068–70. The majority's attempt to cast Florida's interest as somehow "opposite" of the interests in *Bishop* simply does not follow.

Second, regarding the State's interest as an employer, the majority claims that *Bishop* is different because the professor's religious speech was irrelevant to his physiology course. Maj. Op. at —— – ——. The majority says that, unlike this case, the professor's speech in *Bishop* was professionally incompetent. *Id.* at ——. The trouble with the majority's distinctions is that they overlook what *Bishop* actually held.

On the question of relevance, *Bishop* assumed that the professor's religious views informed his professional viewpoint about exercise physiology. 926 F.2d at 1076–77 & n.7. We held that the University could prevent him "from presenting his religious viewpoint during instructional time, *even to the extent that it represents his professional opinion* about his subject matter." *Id.* at 1077 (emphasis added). We likewise recognized that the professor expressed "opinions *about his work* that happen[ed] to have a religious source." *Id.* at 1076 (emphasis added). Yet the University could still conclude—consistent with the First Amendment—that the professor's "opinions should not be represented in the courses he teaches at the University." *Id.* The crux of *Bishop* is not, as the majority suggests, that religion is irrelevant to science, but that the State, as a public employer, may decide what is taught in its classrooms. *Id.* at 1076–77 & n.7.

***1176** On the question of professional competence, we expressly refused to "gauge" whether the professor's views were "well-founded." *Id.* at 1076 n.7. Our decision thus had nothing to do with "professional[ ] competen[ce]." Maj. Op. at —— (quotation omitted). In any event, a carveout for so-called "professionally incompetent" speech would permit, what the majority elsewhere condemns, "naked prohibition[s] on disfavored" viewpoints. Maj. Op. at ——. Whether labeled "incompetent" or "unreasonable," the result is the same: the State may determine which viewpoints its employees may *endorse* during classroom instruction and which they may not. *See Bishop*, 926 F.2d at 1076–77.

Third, *Bishop* considered the First Amendment's "strong predilection for academic freedom as an adjunct of the free speech rights." 926 F.2d at 1075. The majority cites this interest, Maj. Op. at —— – ——, and I agree that it weighs in favor of professorial speech. But the majority fails to meaningfully consider that *Bishop* held that a professor's "interest in academic freedom and free speech" does not ultimately "displace the University's interest inside the classroom." 926 F.2d at 1076. We noted that the state could not restrict a professor's speech "when he acts as an independent educator or researcher," but the state could restrict a professor's speech when he acts "as a course instructor." *Id.* at 1076–77; *see id.* at 1075 ("[W]e do not find support to conclude that academic freedom is an independent First Amendment right.").

USCA11 Case: 25-11929 Document: 47 Date Filed: 09/14/2026 Page: 35 of 42

In short, *Bishop* held that professors have no First Amendment right to overrule their employer's judgment concerning the content of classroom instruction. And the majority overlooks that *Bishop* already balanced these interests and resolved that balance in favor of the State's authority within the classroom.[7]

In my view, the only legitimate difference here is that *Bishop* involved restrictions on one professor's speech while this case involves a statute of general application enacted by the Florida legislature. But that difference should not change the outcome of this case.

To start, *Bishop* did not treat "reasonable[ness]" as a license to rebalance interests in every new case. What made the restrictions "reasonable" was a single, concrete ***1177** fact: "they appl[ied] only to [ ] classroom speech." *Bishop*, 926 F.2d at 1075–76. That limitation carried the entire analysis. And when the IFA is read—as *Bishop* requires—"narrowly because [its restrictions] implicate First Amendment freedoms," *id.* at 1075, its reach is likewise confined to classroom instruction. *See* Fla. Stat. § 1000.05(4)(a) (limiting its restrictions to "training" and "instruction" of "such student or employee"). Moreover, the Act expressly permits "discussion of the concepts listed," provided that any "training or instruction is given in an objective manner without endorsement of the concepts." Fla. Stat. § 1000.05(4)(b). It does not "ban" or reject any idea. *Contra* Maj. Op. at ——, ——, ——, ——. The IFA bars Florida instructors from coercing students into believing they must embrace a prescribed viewpoint (possibly to receive good grades or preferential treatment in class, for instance). The same balance *Bishop* struck therefore resolves this case.

The majority nevertheless invokes *United States v. National Treasury Employees Union* ("*NTEU*"), 513 U.S. 454, 115 S.Ct. 1003, 130 L.Ed.2d 964 (1995), for the proposition that "higher standards are necessary to vindicate broad, prophylactic restrictions on speech of a large number of employees ...." Maj. Op. at —— (citing *NTEU*, 513 U.S. at 466–68, 115 S.Ct. 1003). But the majority stops there, overlooking that *NTEU* itself confronted a statutory speech restriction and still turned to *Pickering*. *NTEU*, 513 U.S. at 468–70, 115 S.Ct. 1003. Although the Court opined that laws with a "widespread impact" on public employee speech raise more serious concerns than "any single supervisory decision," *id.* at 468, 115 S.Ct. 1003, it accounted for this concern by altering the *Pickering* test, not abandoning it. The Court held that "[t]he Government must show that the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by that expression's 'necessary impact on the actual operation' of the Government." *Id.* (quoting *Pickering*, 391 U.S. at 571, 88 S.Ct. 1731).

The majority never explains why *NTEU*'s standard materially alters *Bishop*'s rule in this context. It is undisputed that, unlike *Bishop*, the IFA applies to the classroom instruction of all professors at public universities in Florida. *See* Fla. Stat. § 1000.05(2), (4). But why does that make a difference? *NTEU* involved speech that was unrelated to a public employee's duties at work. *See* 513 U.S. at 466, 115 S.Ct. 1003 (noting that the plaintiffs' "expressive activities" fell "within the protected category of citizen comment on matters of public concern" and "involved content largely unrelated to their government employment"). This case, by contrast, concerns speech by Florida's professors while they are performing their instructional duties. *See Wood v. Florida Dep't of Educ.*, 142 F.4th 1286, 1293 (11th Cir. 2025) ("[W]hen [a teacher] addressed her students in the classroom, she was very much on the clock, discharging the very obligation the state had hired her to discharge."); *see also Bishop*, 926 F.2d at 1076 n.7. And *Bishop* expressly held that when an individual professor and his employer disagree "about a matter of content in the courses he teaches," the employer "must have the final say in such a dispute." 926 F.2d at 1076. There is little reason to think that balance changes when applied on a broader scale.

And the State's interests here are substantial in any event. The IFA prohibits instruction that people should be judged by their skin color, that people "should not attempt to treat" other races equally, and that other races "should be discriminated ***1178** against." Fla. Stat. §§ 1000.05(4)(a)(1), (4), (6). In *Bob Jones*, which involved a private university, the Supreme Court held that "the Government has a fundamental, overriding interest in eradicating racial discrimination in education—discrimination that prevailed, with

official approval, for the first 165 years of this Nation's history." 461 U.S. at 604, 103 S.Ct. 2017; *see also* *Arce v. Douglas*, 793 F.3d 968, 986 (9th Cir. 2015) (holding that Arizona had a "legitimate pedagogical interest in reducing racism" in public school coursework and curriculum). Surely, the State's interest here is even greater than what was recognized in *Bob Jones*, because this case involves only state-sponsored universities.

Although the majority does not meaningfully address *Bob Jones*, the majority tells us that "hearing an idea you disagree with is not discrimination." Maj. Op. at ——. No one disagrees with that generality, but it glosses over the classroom reality, where a professor's endorsement of a particular viewpoint carries weight that can distort genuine academic exchange. As *Bishop* explained, a professor's words do not operate in a vacuum; they carry a "coercive effect" because the professor maintains authority over the students' grades. 926 F.2d at 1074.

Consider a professor who says that Hamas's October 7th attack on Israel was "exhilarating"[8] and something to be celebrated and encouraged. If the professor made that statement as part of classroom instruction, would a Jewish student feel at liberty to wear his kippah or voice contrary views in the classroom, in a graded paper, or on an exam? Doubtful. The majority's assurance that "a professor who espouses a particular idea does not stand in the same shoes as one who ridicules a student, threatens a student, or targets a student," Maj. Op. at ——, does little to account for that reality. Florida acts well within its authority to curb professorial endorsements of that kind within its own classrooms.[9]

Indeed, the Supreme Court has said, even if in dicta, that "when the State" makes choices regarding "the content of the education it provides," the First Amendment permits the State to decide "what is or is not expressed." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 833, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995). The majority claims that this reading misleadingly quotes *Rosenberger* "in isolation," and that "*Rosenberger* was really a case restricting the government's ability to impose speech limitations on student groups." Maj. Op. at —— – ——. Not so.

True, *Rosenberger* involved student rather than professor speech. 515 U.S. at 822–26, 115 S.Ct. 2510. But as *Rosenberger* itself says, the right of a state-sponsored university to decide what it will teach is ***1179** "controlled by different principles." *Id.* at 833–34, 115 S.Ct. 2510; *see also* *Widmar v. Vincent*, 454 U.S. 263, 276, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981) ("Nor do we question the right of [a state] University ... 'to determine for itself on academic grounds who may teach, what may be taught, how it shall be taught, and who may be admitted to study.' ") (quoting *Sweezy*, 354 U.S. at 263, 77 S.Ct. 1203 (Frankfurter, J., concurring in result)).

Furthermore, if I am misreading *Rosenberger*, then so did the Third Circuit in an opinion authored by then-Judge Alito. *See* *Edwards v. California Univ. of Pennsylvania*, 156 F.3d 488, 491–92 (3d Cir. 1998) (Alito, J.). In *Edwards*, the Third Circuit rejected the First Amendment claim of a professor who was directed not to discuss religion in his classroom. *Id.* at 489–92. Writing for the court, then-Judge Alito quoted the same passage of *Rosenberger*—concluding that the University could restrict the professor's classroom speech because his speech "concerned the 'content of the education [that the University] provides.' " *See id.* at 491–92 (quoting *Rosenberger*, 515 U.S. at 833, 115 S.Ct. 2510).

In short, we do not face "an unprecedented First Amendment intersection." Maj. Op. at —— – ——. And discerning the correct result is not so difficult. Our controlling precedents and the original meaning of the First Amendment point in the same direction. The majority veers away from both to adopt a position that does not even remedy the problem it perceives. *See infra* at —— – ——.

"Though we are mindful of the invaluable role academic freedom plays in our public schools, *particularly at the post-secondary level*, we do not find support to conclude that academic freedom is an independent First Amendment right." *Bishop*, 926 F.2d at 1075 (emphasis added); *see also* *Edwards*, 156 F.3d at 491 (Alito, J.) ("[W]e conclude that a public university professor does not have a First Amendment right to decide what will be taught in the classroom.").

USCA11 Case: 25-11929 Document: 47 Date Filed: 09/14/2026 Page: 37 of 42

This panel is not free to rewrite precedent simply because we dislike where it leads. That decision must be made "by the Supreme Court or by this court sitting *en banc*." *Archer*, 531 F.3d at 1352.

* * *

Much of the majority's criticism of this dissent reduces to a supposed distinction between "a *state*'s authority to control curriculum" and "a *university*'s authority to control the curriculum." *See* Maj. Op. at —— - —— & n.10, —— n.14.

But Florida law leaves the majority's university–State distinction with nowhere to stand. *Contra id.* at —— n.10, —— - —— n.14. Florida's Constitution provides that "[t]here shall be a single state university system," that "[a] board of trustees shall administer each public university," and that "a board of governors shall govern the state university system." Fla. Const. art. IX, § 7(b). Florida lists each of the universities associated with the professor-plaintiffs as a "[s]tate university." Fla. Stat. § 1000.21(9). And Florida declares that the "boards of trustees [of state universities] are a part of the executive branch of state government." Fla. Stat. § 1001.71(3); *see id.* § 1001.705(1)(c) (defining "[university] Board of Governors" as "public officer[s]"); *id.* § 1001.705(1)(d) (defining "[s]tate university" and "state universities" as "agencies of the state which belong to and are part of the executive branch of state government"). Indeed, in the Eleventh Amendment context, Florida's grip on its public education system is so tight that its Boards of Trustees function as "arm[s] of the state." ***1180** *Univ. of S. Fla. Bd. of Trustees v. CoMentis, Inc.*, 861 F.3d 1234, 1238 (11th Cir. 2017) (citation omitted).

Not to be overlooked, the suit underlying *Bishop* was brought "against the Board of Trustees of the University." 926 F.2d at 1070. In that case, our reference to the "University" meant "the University of Alabama *through its Board of Trustees*." *Id.* at 1067 (emphasis added). The same was true in its relevant predecessors. *See Pred*, 415 F.2d at 853 n.3 ("Board of Public Instruction of Dade County, Florida"); *Megill*, 541 F.2d at 1076 ("State Board of Regents"); *Duke*, 469 F.2d at 837 (same). So the majority's claim that *Bishop* speaks only to "a university's authority" and not to "a state's authority," *see* Maj. Op. at —— - —— & n.10, —— n.14, has limited force—particularly in Florida, where a university's Board of Trustees is itself an instrumentality of the State. *See* Fla. Const. art. IX, § 7(b).

As to *Edwards*, *see* Maj. Op. at —— - —— n.10, then-Judge Alito explained that "[o]ur conclusion that the First Amendment does not place restrictions on a public university's ability to control its curriculum is consistent with the Supreme Court's jurisprudence *concerning the state's ability* to say what it wishes *when it is the speaker*." *Edwards*, 156 F.3d at 491 (Alito, J.) (emphases added). The same principle appears in our own decisions. *See Megill*, 541 F.2d at 1086 ("When his statements and actions fell short of those that the Board [of Regents] could rightfully expect of its tenured *professors*, *the state's strong interest* in a quality university system and effective teacher contribution to the educational process prevailed.") (emphases added); *Duke*, 469 F.2d at 837 (categorizing, in the Fourteenth Amendment context, "universities" as "creatures of *the state*") (emphasis added); *Pred*, 415 F.2d at 856 ("What is at stake is the vindication of constitutional rights—the right not to be punished *by the State* or to suffer retaliation at its hand because a public employee persists in the exercise of First Amendment rights.") (emphasis added).[10]

Taken together, these authorities make clear that Florida's public universities speak and act subject to the State's control and administration. *Cf. Waugh v. Bd. of Trs. of Univ. of Miss.*, 237 U.S. 589, 596, 35 S.Ct. 720, 59 L.Ed. 1131 (1915) ("It is to be remembered that the University was established by the state, and is under the control of the state..."). Indeed, the IFA functions as the State's directive to its own employees, setting the standards that govern classroom instruction when, as Florida puts it, they teach "the State's curriculum, in the State's classrooms, on the State's time, in return for a State paycheck." And as this Court recognized in *Bishop*, the public employer has authority "to reasonably control the content of its curriculum, particularly that content imparted during class time." *Bishop*, 926 F.2d at 1074.

## IV.

USCA11 Case: 25-11929 Document: 47 Date Filed: 09/14/2026 Page: 38 of 42

The majority's rule, meant to avoid what it believes is the State's improper viewpoint discrimination, nonetheless endorses its own form of viewpoint discrimination. Of course, some amount of viewpoint discrimination is necessary to ensure the effective ***1181** operation of any academic institution. The majority acknowledges as much, retaining vague carveouts—like "reasonable[ness]"—to distinguish between prohibitions that are and are not permissible under the First Amendment. Maj. Op. at ——. The majority emphasizes that the boundary lines are "well-understood." *Id.* at —— – ——. It assures that "conspiracy theories" and "the like" will not be tolerated. *Id.* at ——. But these exceptions do not eliminate viewpoint discrimination. Put differently, the majority recognizes that *someone* must set the limits of what can be taught at public universities. And through its carveouts, the majority shifts that decision-making authority from the people to federal judges. The test now is: Does the presiding judge believe that the professor's viewpoint is within the range of permissible views?

As *Bishop* recognized, we are in "no position to gauge" the legitimacy of viewpoints in fields we know little about. 926 F.2d at 1076 n.7. The majority's rule still allows "naked prohibition[s] on disfavored speech," Maj. Op. at ——, but authorizes that viewpoint discrimination under exceptions created, interpreted, and enforced by the judiciary.[11] Because neither our precedents nor the original meaning of the First Amendment compels that conclusion, I respectfully dissent.

**All Citations**

181 F.4th 1135, 31 Fla. L. Weekly Fed. C 1411

Footnotes

1 The Act's terms apply to all public schools, starting with kindergarten and going through graduate school, but the plaintiffs challenge only its application to postsecondary schools.

2 The State seeks to assuage our concerns by assuring us that no professor will be disciplined unless she refuses to correct her lecture. But that is not what the regulation says. Instead, it says that universities may discipline professors "where appropriate." The regulation goes on to escalate the consequences to termination for those who fail to "comply with the mandate." Fla. Bd. of Govs., Reg. No. 10.005(3)(c), Prohibition of Discrimination in University Training or Instruction (2022).

3 For ease of reference, we generally refer to the defendants collectively as "Florida."

4 No party challenges the district court's conclusion that the students' First Amendment rights rise and fall with those of the professors.

5 The *Pernell* plaintiffs also brought an equal protection claim and the *Novoa* plaintiffs also sued under the Campus Free Expression Act. The plaintiffs did not seek preliminary injunctive relief for those claims, however, so we do not address them here.

6 We agree with the district court's well-reasoned conclusion that at least one individual plaintiff has standing to challenge each enumerated concept. *See Pernell v. Fla. Bd. of Governors of State Univ. Sys.*, 641 F. Supp. 3d 1218, 1245–68 (N.D. Fla. 2022). The plaintiffs bring as-applied challenges to the Act, seeking to vindicate their own First Amendment rights—not the rights of others, say, K–12 teachers. *See DA Mortg., Inc. v. City of Miami Beach*, 486 F.3d 1254, 1262 (11th Cir. 2007). Because we conclude that the Act is unconstitutional as applied to any public postsecondary-school professor, it is unconstitutional as applied to the plaintiff professors. But nothing in this opinion should be construed as applying outside the limited context of postsecondary education.

Even so, the dissenting opinion attempts to raise unbriefed questions about facial and as-applied challenges. *See* Dissenting Op. at —— – ——. We are not quite sure why, because this opinion draws the very boundary that the Supreme Court said was missing in *Moody*; we consider whether the law is constitutional as it applies to one group of people (college professors) in one context (college instruction). *See Moody v. NetChoice,*

LLC, 603 U.S. 707, 724, 144 S.Ct. 2383, 219 L.Ed.2d 1075 (2024) ("What activities, by what actors, do the laws prohibit or otherwise regulate?"). To the extent that one could also say that the opinion carries out a facial analysis for college professors, we have no objection because they have straightforwardly satisfied "our standards for a facial challenge to the extent of that reach." *See Doe v. Reed*, 561 U.S. 186, 194, 130 S.Ct. 2811, 177 L.Ed.2d 493 (2010).

7 Decisions by the former Fifth Circuit handed down before October 1, 1981, are binding on this Court. *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

8 *See, e.g., Sweezy*, 354 U.S. at 250, 77 S.Ct. 1203; *Barenblatt v. United States*, 360 U.S. 109, 112, 79 S.Ct. 1081, 3 L.Ed.2d 1115 (1959); *Shelton v. Tucker*, 364 U.S. 479, 487, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960); *Keyishian*, 385 U.S. at 603, 87 S.Ct. 675; *Whitehill v. Elkins*, 389 U.S. 54, 59–60, 88 S.Ct. 184, 19 L.Ed.2d 228 (1967); *Epperson*, 393 U.S. at 104, 89 S.Ct. 266; *Tinker*, 393 U.S. at 511–12, 89 S.Ct. 733; *Healy v. James*, 408 U.S. 169, 180–81, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972); *Regents of Univ. of Michigan v. Ewing*, 474 U.S. 214, 226, 106 S.Ct. 507, 88 L.Ed.2d 523 (1985); *Univ. of Pennsylvania v. EEOC*, 493 U.S. 182, 198 n.6, 110 S.Ct. 577, 107 L.Ed.2d 571 (1990).

9 We are not alone in this conclusion. *See e.g., Reges v. Cauce*, 175 F.4th 1014, 1030–33 (9th Cir. 2026); *Kilborn v. Amiridis*, 131 F.4th 550, 557–58 (7th Cir. 2025); *Heim v. Daniel*, 81 F.4th 212, 224–28 (2d Cir. 2023); *Meriwether v. Hartop*, 992 F.3d 492, 504–06 (6th Cir. 2021); *Adams v. Trs. of Univ. of North Carolina-Wilmington*, 640 F.3d 550, 562–64 (4th Cir. 2011).

10 The dissent looks to a Third Circuit opinion by then-Judge Alito for support, but will not find it there. *See* Dissenting Op. at ––––––––. Why? Because that case, unlike this one, was about an ordinary disciplinary decision against one professor by one university. And that opinion does not make the same mistake as the dissent—mixing up the state and the university, treating one as the equivalent of the other. *See Edwards v. California Univ. of Pennsylvania*, 156 F.3d 488 (3d Cir. 1998). Justice Alito noted, for example, that "the First Amendment does not place restrictions on a public *university's* ability to control its curriculum." *Id.* at 491 (emphasis added). Agreed. He also explained that "the *University* was acting as speaker and was entitled to make content-based choices in restricting [the individual professor's] syllabus." *Id.* at 492 (emphasis added). Yes—universities can make just that sort of decision. He went on to say that "the *University* can make content-based decisions when shaping its curriculum." *Id.* (emphasis added). Again, yes—we are three for three. And in summing up his conclusions, he rejected the idea that an individual professor has "a constitutional right to choose curriculum materials in contravention of the *University's* dictates"—but not before noting that "academic freedom thrives not only on the independent and uninhibited exchange of ideas among teachers and students, but also, and somewhat inconsistently, on autonomous decisionmaking *by the academy itself*." *Id.* (alteration adopted, emphasis added, and quotation omitted). We agree with both the reasoning and the result of Justice Alito's opinion, and reject the dissent's suggestion that it undermines anything about this one. And, like *Edwards*, all of the other cases cited by the dissent deal with a university exercising ordinary supervision over its professors and instructors on an individual basis; none come close to endorsing total legislative control over academic speech. Dissenting Op. at ––––––––; *see Ferguson v. Thomas*, 430 F.2d 852, 853–55 (5th Cir. 1970); *Duke v. N. Texas State Univ.*, 469 F.2d 829, 831–33 (5th Cir. 1972); *Megill v. Bd. of Regents*, 541 F.2d 1073, 1080–85 (5th Cir. 1976); *Pred*, 415 F.2d at 853–54.

11 *See Pleasant Grove City v. Summum*, 555 U.S. 460, 464, 129 S.Ct. 1125, 172 L.Ed.2d 853 (2009) (city's placement of a privately funded monument in a public park was government speech); *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 219–20, 135 S.Ct. 2239, 192 L.Ed.2d 274 (2015) (state's specialty license plate designs were government speech).

12 *Bishop* rejected the Free Exercise claim and Establishment Clause claim brought by the professor. *Bishop*, 926 F.2d at 1077–78.

13 We are sincerely confused by the dissent's insistence that *Bob Jones University v. United States* has any bearing on this case. 461 U.S. 574, 103 S.Ct. 2017, 76 L.Ed.2d 157 (1983); *see* Dissenting Op. at ––––––––, ––––––––. *Bob Jones* upheld an Internal Revenue Service ruling revoking the tax-exempt status

USCA11 Case: 25-11929 Document: 47 Date Filed: 09/14/2026 Page: 40 of 42

of private universities that refused to admit applicants who were part of an interracial marriage or spoke in support of interracial marriage. 461 U.S. at 577–82, 103 S.Ct. 2017. That case was not about free speech, and this case is not about racial discrimination.

14 The dissent transforms *Bishop's* fact-intensive conclusion (that one university's curricular authority to require one professor to avoid religious coercion outweighed that professor's asserted interest in academic freedom) into a far grander one: that *Bishop* has already done the work for us, weighing state control against academic freedom, and "resolv[ing] that balance in favor of the State's authority within the classroom." *See* Dissenting Op. at —— & n.7. No. As we have already explained, *Bishop* itself directs a context-specific inquiry, and does not remotely offer a blanket rule ranking academic freedom below any state interest. *See* 926 F.2d at 1074–75. And again, *Bishop* offers no holding about a *state*'s authority to control curriculum; it protects a *university*'s authority to control curriculum. *See id.* at 1078.

15 The defendants tell us that a professor would not violate the Act by hosting a guest speaker who promotes one of the eight concepts unless that professor endorses the guest's speech. This exacerbates rather than solves the problem, layering imprecision on imprecision.

16 Under Florida's theory of the case, the State's authority over professors' scholarship would likewise be unlimited—after all, research is part of what they are hired and paid to do. *Bishop* rejected precisely this argument. *See* 926 F.2d at 1076–77 (government may not regulate what professor does as a "researcher").

17 Because we conclude that the Act's speech restrictions directly violate the First Amendment, we need not address the plaintiffs' separate vagueness and overbreadth arguments.

1 In *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981), we adopted as binding precedent all decisions of the former Fifth Circuit rendered prior to October 1, 1981. *Id.* at 1209.

2 As outlined by the district court, Plaintiff Professor LeRoy Pernell intends to teach his students that "racism is embedded in the criminal justice system." *Pernell v. Florida Bd. of Governors of State Univ. Sys.*, 641 F. Supp. 3d 1218, 1246 (N.D. Fla. 2022). Plaintiff Dana Thompson Dorsey "typically assigns her own articles that discuss white privilege and critique the concept of colorblindness." *Id.* Plaintiff Sharon Austin "endorses critical race theory and assigns reading materials that advocate for affirmative action." *Id.* at 1246–47. Plaintiff Shelley Park "teaches that merit, objectivity, and colorblindness function to solidify systems of oppression as foundational truths rather than academic theories." *Id.* at 1247. Plaintiff Jennifer Sandoval's seminar "includes sections on 'whiteness' and race discrimination in academia." *Id.* Plaintiff Russell Almond asserts that "the IFA impacts his ability to instruct on institutionalized racism." *Id.* Plaintiff Adriana Novoa alleges that several of her course materials treat "the existence of racial privilege as a given." *Id.* at 1259.

3 *Iancu* explained that, once a statute is "interpreted fairly" and found unconstitutionally viewpoint discriminatory on its face, a court need not save it by sorting applications. 588 U.S. at 394–99, 139 S.Ct. 2294. But that rule presupposes a facial finding of unconstitutionality that is not present here. If it were, the majority would have no reason to pose those hypotheticals at all. Indeed, even accepting the majority's reading of *Bishop*, the majority describes that inquiry as "fact-intensive," Maj. Op. at —— n.14, while affirming categorical relief. Its proposed "irrelevant"-instruction carveout shows why that matters. *Id.* at —— – ——. An electrical-engineering professor has no apparent reason in his ordinary classroom instruction to endorse race-based discrimination because of "past [acts] by other members of the same race." Fla. Stat. § 1000.05(4)(a)(5). Yet he is swept into the injunction all the same. Because the IFA's speech restrictions do not violate the First Amendment, the majority likewise "errs in upholding the scope of the District Court's injunction." *HM Fla.-ORL, LLC v. Governor of Fla.*, 137 F.4th 1207, 1266 (11th Cir. 2025) (Tjoflat, J., dissenting), *reh'g en banc granted, opinion vacated sub nom. HM Fla.-ORL, LLC v. Sec'y of Fla. Dep't of Bus. & Pro. Regul.*, 160 F.4th 1282 (11th Cir. Dec. 1, 2025). As Judge Tjoflat cautioned, facial challenges "strain the limits of the federal courts' constitutional authority to decide only actual 'Cases' and 'Controversies.' " *Id.* (quoting U.S. Const. art. III, § 2).

4 The district court's reading of *Garcetti* reflects its view that the Supreme Court closed the door on applying the government speech doctrine to public university professors. *See Pernell*, 641 F. Supp. 3d at 1240 ("Refusing to take 'no' for an answer, Defendants assert this Court must apply *Garcetti*'s reasoning to the professor speech at issue here, notwithstanding the *Supreme Court's explicit refusal to do so*.") (emphasis added). But that characterization is mistaken. Rather than "refusing" to extend its reasoning to professors' speech, the Supreme Court simply declined to address an issue not before it. *See* Garcetti, 547 U.S. at 425, 126 S.Ct. 1951 ("*We need not, and for that reason do not, decide* whether the analysis we conduct today would apply in the same manner to a case involving speech related to scholarship or teaching.") (emphasis added). At best, the application of *Garcetti* to state university professors is an open question.

5 In light of *Pickering* and cases like *Bishop*, this case does not require us to decide whether *Garcetti* should be extended to university professors. The majority tells us that *Garcetti* does not apply in this context, but because resolution of that question is not required for the majority to reach its holding, I would leave it for a case that actually requires its answer.

6 *Bishop* clarified twice that its decision had nothing to do with the Establishment Clause. 926 F.2d at 1077 ("In any event, we do not reach the establishment questions raised by Dr. Bishop's conduct. The University can restrict speech that falls short of an establishment violation, and we have already disposed of the University's restrictions of Dr. Bishop under the free speech clause."); *id.* at 1078 (same).

7 The majority is "surprised" by the view that *Bishop* has already balanced the relevant interests in this case. Maj. Op. at ——. But that is not a reason to disregard what *Bishop* actually did. *Bishop* balanced three interests: (1) "the university classroom during specific in-class time," (2) "the University's position as a public employer which may reasonably restrict the speech rights of *employees* more readily than [sic] those of other persons," and (3) "the strong predilection for academic freedom as an adjunct of the free speech rights of the First Amendment." 926 F.2d at 1074–75 (emphasis added). And we concluded that "the University's interests in the classroom conduct of its professors are sufficient, *in the balance we have suggested*, to warrant the reasonable restrictions it has imposed on Dr. Bishop." *Id.* at 1076 (emphasis added). Those are the same interests here. The IFA concerns "training" and "instruction," § 1000.05(4)(a)—terms the Florida Board of Governors has limited to structured university activities, teaching directed at students or "within a course." *See 10.005 Prohibition of Discrimination in University Training or Instruction*, Bd. of Governors, State Univ. Sys. of Fla. (Aug. 26, 2022). The plaintiff-professors are employed by the State. Academic freedom again enters the analysis, though constrained by *Bishop*'s express recognition that it is not "an independent First Amendment right." 926 F.2d at 1075. It does not "transform" *Bishop*, *contra* Maj. Op. at —— – —— n.14, to take the principles and interests we considered there, observe they are the same here, and apply its holding accordingly. That is simply following precedent. If the majority disagrees, the proper course is to take this case en banc and overrule *Bishop*, not to reinterpret it beyond recognition.

8 Jackson Walker, *Cornell professor who called Hamas terrorist attacks 'exhilarating' returns to teaching*, WJAC (Sept. 16, 2024), at https://perma.cc/E45G-LMFK.

9 The majority states that it is "sincerely confused" by my reference to *Bob Jones*. Maj. Op. at —— n. 13. It need not be. The majority dismisses *Bob Jones* on the ground that it is not a "free speech" case. *Id.* But that characterization misses the point. *Bob Jones* identified a compelling governmental interest in eradicating racial discrimination—an interest that Florida expressly invokes here. 461 U.S. at 604, 103 S.Ct. 2017. And because the IFA addresses "discrimination on the basis of race, color, national origin, or sex," the majority's claim that this case "is not about racial discrimination" is unavailing. *See* Maj. Op. at —— n. 13. To the extent the majority believes that, despite *Bishop*, additional balancing of interests is required, Florida's assertion of "the government's interest in preventing invidious racial discrimination in public education" is relevant for the reasons stated here, in *Bob Jones*, and *Arce*.

10 The Supreme Court has distinguished between a state's "attempts to direct the content of speech at private universities," where "[o]bvious First Amendment problems would arise," and a state's "attempts to direct the content of speech at public educational institutions," where "complicated First Amendment issues are

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

presented because government *is simultaneously both speaker and regulator.*" *Univ. of Pennsylvania v. E.E.O.C.*, 493 U.S. 182, 198 n.6, 110 S.Ct. 577, 107 L.Ed.2d 571 (1990) (citing *Meese v. Keene*, 481 U.S. 465, 484, n.18, 107 S.Ct. 1862, 95 L.Ed.2d 415 (1987)) (emphasis added).

11 Despite its assurance that it declines to "make any judgment about the value of the[se] ideas," the majority does exactly that. Maj. Op. at ——. By its own account, it believes "universities *or other government authorities*" may "*exclude speech* that veers outside of well-understood parameters." *Id.* at —— – —— (emphases added). But what does "veer outside of well-understood parameters" mean and why must it be this majority who decides? Those questions go unanswered. Rather, the majority simultaneously labels certain categories of speech as properly excludable while insisting that "it is not our place" to judge the value of contested viewpoints. *Id.* at ——. At bottom, the majority acknowledges that some speech may permissibly be excluded in Florida's classrooms, but it removes that decision from the elected representatives of the State of Florida and vests it instead in the judiciary. I maintain that, in this context, this "is not our place."

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.